Jonathan S. Caplan
**KRAMER LEVIN NAFTALIS**
  **& FRANKEL LLP**
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100
jcaplan@kramerlevin.com

Attorneys for Plaintiff
*WinView IP Holdings, LLC*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF NEW JERSEY

| | |
|---|---|
| WINVIEW IP Holdings, LLC, a Delaware corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>FANDUEL, INC., a Delaware corporation, FANDUEL GROUP, INC., a Delaware corporation, FANDUEL GROUP PARENT LLC, a Delaware corporation, FLUTTER ENTERTAINMENT PLC, an Ireland Public Limited Company, and BETFAIR INTERACTIVE US LLC, a Delaware corporation,<br><br>　　　　　Defendants. | Civil Action No. 25-CV-1146<br><br>**COMPLAINT**<br><br>**FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

## LOCAL CIVIL RULE 10.1 STATEMENT

The address of Plaintiff WinView IP Holdings, LLC ("WinView") is 7804-C Fairview Road, Suite 207 Charlotte, North Carolina 28226.

The address of Defendant FanDuel, Inc. ("FanDuel Inc.") is 1 Racetrack Dr., East Rutherford, New Jersey 07073.

The address of Defendants FanDuel Group, Inc. ("FanDuel Group") and FanDuel Group Parent LLC ("FanDuel Group Parent") is 300 Park Avenue South, New York, NY 10010.

The address of Flutter Entertainment PLC ("Flutter") is 300 Park Avenue South, New York, NY 10010.

The address of Defendant Betfair Interactive US LLC ("Betfair") is 6701 Center Drive West, Los Angeles, California 90045.

Hereinafter, FanDuel FD, FanDuel Group, FanDuel Group Parent, Flutter, and Betfair will be collectively referred to as "Defendants" or "FanDuel."

1

WinView, by and through its undersigned counsel, complains against FanDuel and alleges as follows:

1.     WinView is seeking to protect its valuable intellectual property from FanDuel's ongoing willful infringement.    WinView developed and patented novel technology that transformed various aspects of online and mobile gaming, including daily fantasy games, live sports betting, and online casino games, also known as iGaming.  On multiple occasions, WinView contacted FanDuel to notify it about WinView's patented technology and unique sports skill-based platform, discuss potential partnerships, and attempt to engage FanDuel in a partnership or investment which would exploit WinView's patents and its paid-entry sports betting games of skill.  FanDuel chose to willfully infringe WinView's patents rather than partner with WinView, necessitating this action.

## NATURE OF THIS ACTION

2.     This is an action for patent infringement arising under 28 U.S.C. § 1331 and the United States Patent Act, 35 U.S.C. § 100 *et seq*.  WinView seeks damages and other relief from Defendants for FanDuel's willful infringement of WinView's asserted patents by its gaming offerings and related mobile applications.

## THE PARTIES

3.     Plaintiff WinView is a limited liability company duly organized and existing under the laws of the State of Delaware.  WinView is located at 7804-C Fairview Road, Suite 207 Charlotte, North Carolina 28226.   WinView is a wholly-owned subsidiary of WinView Technology Inc., a corporation organized and existing under the laws of Delaware, headquartered at 7804-C Fairview Road, Suite 207 Charlotte, North Carolina 28226.  WinView Technology, Inc.

offers proprietary application platform features including ultra-low latency streaming.  Ex. 10 at 3-4 (https://winviewtechnology.com/about/).

4.      WinView's patent portfolio includes leading technological innovations in mobile gaming and interactive television, covering various aspects of immersive live sports betting and viewing.  WinView's technologies enable the creation of an online and mobile environment that enhances the sports viewing and gaming experience, making it more engaging and more exciting for customers, while eliminating unfair competitive advantages.  Its technologies enable technical advances which increase FanDuel's customer base and wagering opportunities and enable compliance with state and federal gaming and Daily Fantasy rules and regulations.  Using WinView's patented technology, sports fans across the country can watch sports on television, enter contests, and compete against other fans as the action unfolds, winning cash and other prizes utilizing any Internet-connected device.

5.      WinView's extensive portfolio of United States patents includes U.S. Patent Nos. 11,185,770, 11,235,237, 11,338,189, 11,451,883, 11,678,020, 11,736,771, 11,918,880, 11,951,402, and 12,005,349 (collectively, the "Asserted Patents").  WinView is the owner by assignment of all right, title, and interest in the Asserted Patents.

6.      FanDuel is a digital sports entertainment and gaming company.  FanDuel describes itself as a company with a mission to "make sports more exciting."  FanDuel provides users with daily fantasy sports, online sports betting, and casino-style gambling offerings.  FanDuel is also involved in the design, development, and licensing of sports betting and casino gaming software for online and retail sportsbook and casino gaming products.  FanDuel markets, advertises, sells, and offers to sell infringing products, services, and mobile applications through its root website domain fanduel.com, which includes the subdomains fanduel.com, casino.fanduel.com, and

sportsbook.fanduel.com.   For example, FanDuel offers the FanDuel Sportsbook online at sportsbook.fanduel.com and a FanDuel Sportsbook application for mobile devices.   FanDuel further offers Daily Fantasy Sports online at fanduel.com and a FanDuel Daily Fantasy Sports application for mobile devices.

7.      FanDuel operates through a number of related corporate entities, including FanDuel, Inc., FanDuel Group, FanDuel Group Parent, and Betfair, which are also alter egos of one another, such that FanDuel operates as a consolidated and joint enterprise, and the acts of one Defendant are attributable to the others for purposes of the matters alleged herein.

8.      FanDuel operates with respect to some of the accused offerings under the name "FanDuel" in relevant states.   For example, FanDuel operates sportsbook and casino mobile applications under FanDuel's name.   These include "FanDuel Sportsbook", "The Duel", and "FanDuel Casino."   FanDuel operates under the name "FanDuel Sportsbook" and has registered tradenames, applied and registered for operational license, and is doing business as FanDuel in various states it is allowed to operate.   *See e.g.*, Ex. 11 (FanDuel Sportsbook Website including the marking "© Betfair Interactive US LLC, 2025"); Ex. 12 (Colorado Secretary of State website); Ex. 13 (FanDuel's Notice of Intent Regarding License for Sports Wagering for The Massachusetts Gaming Commission)   (https://massgaming.com/wp-content/uploads/FanDuel-A-Notice-of-Intent-MA.pdf); Ex. 14 (Indiana Gaming Commission's Order approving a settlement agreement listing "Betfair Interactive US, LLC d/b/a FanDuel Sportsbook.") (https://www.in.gov/igc/files/2020-60-Order.pdf); Ex. 15 (Betfair Interactive US, LLC's Application for Massachusetts Sports Wagering Operator License ("Massachusetts Application")).

9.      Defendant FanDuel, Inc. is a corporation duly organized and existing under the laws of the State of Delaware having executive offices at 300 Park Avenue South, New York, NY

10010 and regular and established places of business at 1 Racetrack Drive, East Rutherford, New Jersey 07073 and 1900 Pacific Avenue, Atlantic City, New Jersey 08401. FanDuel, Inc. is a wholly-owned, indirect subsidiary of FanDuel Group. FanDuel, Inc. is the licensing and operating company for FanDuel's daily fantasy sports in each state where it operates except for Pennsylvania, where FanDuel operates daily fantasy sports under FanDuel PA LLC.

10.     Defendant FanDuel Group is a corporation duly organized and existing under the laws of the State of Delaware having executive offices at 300 Park Avenue South, New York, NY 10010 and regular and established places of business at 1 Racetrack Drive, East Rutherford, New Jersey 07073 and 1900 Pacific Avenue, Atlantic City, New Jersey 08401. FanDuel Group is a wholly-owned, direct subsidiary of FanDuel Group Parent. FanDuel Group in its current form was created when Paddy Power Betfair, an Irish gambling company, acquired the predecessor FanDuel and merged FanDuel with its US business, Betfair US. Ex. 16 (Merger Report) (https://paulickreport.com/nl-list/paddy-power-betfair-fanduel-complete-merger-tvg-now-part-of-fanduel-group). FanDuel Group exercises complete domination over FanDuel, Inc. and Betfair, such that FanDuel, Inc. and Betfair lack any separate corporate existence and function as mere instrumentalities of FanDuel Group.

11.     Defendant FanDuel Group Parent is a corporation duly organized and existing under the laws of the State of Delaware, having executive offices at 300 Park Avenue South, New York, NY 10010 and regular and established places of business at 1 Racetrack Drive, East Rutherford, New Jersey 07073 and 1900 Pacific Avenue, Atlantic City, New Jersey 08401. Flutter owns 95.5% of FanDuel Group Parent. Ex. 17 (Flutter 20-F Form) at 81.

12.     Defendant Flutter is a Public Limited Company incorporated under the laws of Ireland, having its operational headquarters at 300 Park Avenue South, New York, NY 10010 and

its registered office at Belfield Office Park, Beech Hill Road, Clonskeagh, Dublin 4, Ireland, D04 V972.

13.     Defendant Betfair is a corporation duly organized and existing under the laws of the State of Delaware, with a principal place of business located at 6701 Center Drive West, Los Angeles, California 90045.  BetFair operates within the state of New Jersey at 525 Washington Boulevard, Jersey City, NJ 07310.   The registered agent of Betfair Interactive US LLC is Corporation Service Company.  The agent office address is 1900 W Littleton Blvd, Littleton, CO 80120.  Betfair Interactive is a wholly-owned, direct subsidiary of FanDuel Group.

14.     Betfair operates and does business under the name "FanDuel."  *See* Ex. 18 (Petition Continue to Conduct Internet Gaming and Sports Wagering in New Jersey) (https://nj.gov/oag/ge/docs/Rulings/2024/sep1_15/C15PTServices.pdf) (listing Golden Nugget and Betfair parties to the PRN 0932401 agreement for casino service industry licensure).  Betfair operates sports and other betting games for FanDuel, through electronic, interactive, and technological means (including the Internet).   Betfair is FanDuel's licensing and operating company for sports betting and Internet gaming in states where FanDuel offers those services.  In accordance with the laws of the State of New Jersey (including, for example, New Jersey Sports Wagering Law, P.L. 2018 at Chapter 33), Betfair maintains both a physical business presence at the casinos with which it operates in the State of New Jersey (e.g., Bally's Atlantic City and Meadowlands Racetrack), and physical equipment in the form of Internet servers, for providing the infringing services to residents of the State of New Jersey.

15.     FanDuel makes, uses, makes available, promotes, sells, offers to sell, and generates substantial revenues from products and services throughout the United States, including the

Internet domains registered and existing at www.sportsbook.fanduel.com and its related state-specific sites, casino.fanduel.com. and mobile applications for Android, iOS, and iPadOS.

## JURISDICTION AND VENUE

16.    This action for patent infringement arises under the patent laws of the United States, 35 U.S.C. § 101 *et seq.*  This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1338.

17.    This Court has personal jurisdiction over FanDuel because Defendants have availed themselves of the legal protections of the State of New Jersey by, among other things, maintaining a physical presence and regular places of business in New Jersey, conducting business in the State of New Jersey, and engaging in continuous and systematic infringing activities in the District of New Jersey. *See* Ex. 19 (FanDuel Careers Jersey City) (https://fanduel.careers/offices/jersey-city); Ex. 20 (FanDuel Careers Offices) (https://fanduel.careers/offices).  In addition, Flutter's public securities filings specify that FanDuel operates its Sportsbook and iGaming products in online casino product offerings in New Jersey.  *See* Ex. 21 (Flutter 10-K) at 13.

18.    This Court also has personal jurisdiction over Defendants because Defendants make, use, offer for sale, and sell products and services in the District of New Jersey and have committed and continue to commit acts of infringement in the District of New Jersey.  *See e.g.* Ex. 22 (FanDuel in New Jersey support website indicating that "[w]hile located in New Jersey, you can play with FanDuel in the following ways: Sportsbook, Casino, Fantasy, [and] FanDuel Faceoff") (https://support.fanduel.com/s/article/FanDuel-in-New-Jersey);  Ex.  23  (FanDuel Sportsbook NY Website) (https://www.fanduel.com/sportsbook-ny); Ex. 24 at 2 (FanDuel casino website indicating that FanDuel iGaming is available in New Jersey: "PLAY CASINO GAMES ANYWHERE IN PA, MI, NJ OR WV RIGHT FROM YOUR PHONE ON THE FANDUEL

CASINO APP!") (https://www.fanduel.com/casino-search-rf1000).  Further, Defendants derive substantial revenue from their acts of infringement in the District of New Jersey and derive substantial revenue from interstate and international commerce associated with the infringing products.

19.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 35 U.S.C. § 1400(b) at least because FanDuel has committed acts of infringement within this judicial district giving rise to this action and has regular and established places of business in this judicial district, including retail sportsbook locations at 1 Racetrack Drive, East Rutherford, New Jersey 07073 and 1900 Pacific Avenue, Atlantic City, New Jersey 08401.

20.    Defendants are properly joined under 35 U.S.C. § 299(a) because, as set forth in greater detail herein, Plaintiff's right to relief is asserted herein against Defendants jointly, severally, and in the alternative with respect to or arising out of the same transactions, occurrences, and series of transactions and occurrences relating to the making, using, selling, and offering to sell into the United States the same accused products and services, and questions of fact common to all defendants will arise in the action.  Defendants, through their own acts and each through the acts of each other acting as its representative, alter ego, or agent, of each other, commonly and jointly make, use, sell, and offer for sale the same infringing products and services discussed herein.

### WINVIEW'S INNOVATIONS RESULTED IN THE ASSERTED PATENTS

21.    Over a period of more than thirty years and through a series of technologically related startup ventures, Mr. David B. Lockton, the inventor of the Asserted Patents, conceptualized and developed a series of successful pioneering technologies, consumer products, services, and companies.  These ventures culminated in Mr. Lockton's latest venture—WinView.

WinView's vision was to revolutionize the paid-entry skill game and sports betting industry by introducing new technologies to enable TV viewers to interact in real time with sports programming and deal with the challenges presented by remote, live, and real-time gaming. By leveraging mobile technology, WinView's innovations enable users to engage with games of skill and chance in dynamic and interactive ways, solving long-standing challenges in sports and entertainment technology.

22.     The success of WinView's vision is illustrated by the decision of the United States Patent and Trademark Office ("USPTO") to award it with a robust patent portfolio with over 90 patents, covering its novel technologies for distributed, mobile, and on-line gaming.

23.     On November 30, 2021, the USPTO duly and legally issued United States Patent No. 11,185,770 (the "'770 Patent") entitled "Methodology for Equalizing Systemic Latencies in Television Reception in Connection with Games of Skill Played in Connection with Live Television Programming" to inventors David B. Lockton, Mark K. Berner, Mark J. Micheli, and David Lowe. WinView is the owner by assignment of the entire right, title, and interest in and to the '770 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof. A true and correct copy of the '770 Patent is attached to this Complaint as Exhibit 1.

24.     On February 1, 2022, the USPTO duly and legally issued United States Patent No. 11,235,237 (the "'237 Patent") entitled "Methodology for Equalizing Systemic Latencies in Television Reception in Connection with Games of Skill Played in Connection with Live Television Programming" to inventor David B. Lockton, Mark K. Berner, Mark J. Micheli, and David Lowe. WinView is the owner by assignment of the entire right, title, and interest in and to the '237 Patent, including the right to seek damages and any remedies for past, current, and future

infringement thereof.  A true and correct copy of the '237 Patent is attached to this Complaint as Exhibit 2.

25.    On May 24, 2022, the USPTO duly and legally issued United States Patent No. 11,338,189 (the "'189 Patent") entitled "Method of and System for Conducting Multiple Contests of Skill with a Single Performance" to inventor David B. Lockton.  WinView is the owner by assignment of the entire right, title, and interest in and to the '189 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '189 Patent is attached to this Complaint as Exhibit 3.

26.    On September 20, 2022, the USPTO duly and legally issued United States Patent No. 11,451,883 (the "'883 Patent") entitled "Method of and System for Managing Client Resources and Assets for Activities on Computing Devices" to inventors David B. Lockton, Tim Huske, Mark J. Micheli, Mark K. Berner, and Matt Ford.  WinView is the owner by assignment of the entire right, title, and interest in and to the '883 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '883 Patent is attached to this Complaint as Exhibit 4.

27.    On June 13, 2023, the USPTO duly and legally issued United States Patent No. 11,678,020 (the "'020 Patent") entitled "Methodology for Equalizing Systemic Latencies in Television Reception in Connection with Games of Skill Played in Connection with Live Television Programming" to inventors David B. Lockton, Mark K. Berner, Mark J. Micheli, and David Lowe.  WinView is the owner by assignment of the entire right, title, and interest in and to the '020 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '020 Patent is attached to this Complaint as Exhibit 5.

28.     On August 22, 2023, the USPTO duly and legally issued United States Patent No. 11,736,771 (the "'771 Patent") entitled "Methodology for Equalizing Systemic Latencies in Television Reception in Connection with Games of Skill Played in Connection with Live Television Programming" to inventors David B. Lockton, Mark K. Berner, Mark J. Micheli, and David Lowe.  WinView is the owner by assignment of the entire right, title, and interest in and to the '771 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '771 Patent is attached to this Complaint as Exhibit 6.

29.     On March 5, 2024, the USPTO duly and legally issued United States Patent No. 11,918,880 (the "'880 Patent") entitled "Method of and System for Conducting Multiple Contests of Skill with a Single Performance" to inventor David B. Lockton.  WinView is the owner by assignment of the entire right, title, and interest in and to the '880 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '880 Patent is attached to this Complaint as Exhibit 7.

30.     On April 9, 2024, the USPTO duly and legally issued United States Patent No. 11,951,402 (the "'402 Patent") entitled "Method of and System for Conducting Multiple Contests of Skill with a Single Performance" to inventors David B. Lockton, Mark K. Berner, and Mark J. Micheli.  WinView is the owner by assignment of the entire right, title, and interest in and to the '402 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '402 Patent is attached to this Complaint as Exhibit 8.

31.     On June 11, 2024, the USPTO duly and legally issued United States Patent No. 12,005,349 (the "'349 Patent") entitled "Synchronized Gaming and Programming" to inventor

David B. Lockton.  WinView is the owner by assignment of the entire right, title, and interest in and to the '349 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '349 Patent is attached to this Complaint as Exhibit 9.

32.    All of the Asserted Patents are patent eligible, valid and enforceable.  The Asserted Patents disclose and specifically claim non-abstract, inventive concepts representing significant improvements over conventional systems.   Specifically, the Asserted Patents introduce transformative advancements in distributed gaming and mobile technology, including real-time bookmaking, geographic integration, specific solutions to manage simultaneous contest participation, and mechanisms to ensure fairness and compliance with state laws.   These innovations enable dynamic user engagement, optimize system efficiency, and address complex regulatory requirements.

33.    WinView's inventions solved problems in the art because live television-related interactive gaming systems created memory management inefficiencies in user input processes, an inability to ensure compliance with geographic restrictions and provide entertaining experiences while complying with state gaming and skill-game laws, and an inability to prevent unfair advantages arising from television signal propagation delays.  Then-available technologies could not manage assets on mobile devices efficiently, hindering user engagement, fairness, and scalability in gaming environments.

34.    The Asserted Patents cover distinct combinations of inventive concepts, which were not conventional at the time of the inventions, including the following concepts.

35.    **Efficient Management of Assets on a Mobile Device:** The efficient technological management of assets on a mobile device optimizes performance by ensuring that only the

necessary assets for specific events are downloaded to users' devices.  Previously, users would experience slow loading times and memory shortages when large amounts of unnecessary data were transferred to their devices, which would also slow down the operating speed of the application.  This approach solves that problem by determining which assets are already resident on the device and only delivering missing assets in real-time before the event.  This reduces data congestion and memory usage, ensuring that users receive the necessary components in a timely manner without overloading their device's resources.  For example, during a live sporting event, the graphics, statistics, and multimedia related to that specific game would be sent to the device, minimizing wait times and optimizing the user experience.

36.     **Providing the Game During an Event Based on Geographic Location:**  The Asserted Patents use location-based filtering to provide game options based on users' geographic locations in order to create a personalized gaming experience.  Integrating real-time location data with live event information ensures that users are only presented with games and events that are legally available in their area.  This enhances the user experience with mobile applications by providing only relevant content and ensures gaming companies can limit operation to the states in which they are licensed by ensuring compliance with state and federal regulations.  For instance, a user attending a live sporting event might be prompted by the sports betting provider to join a geographically enabled contest directly related to that event, providing a dynamic, location-specific gaming experience that would not be possible without real-time geographic integration.

37.     **Efficient Application Memory Management Through Limiting Event Information Based on Geographic Location:** The ability to receive and provide event information from gaming servers whose assets exceeds the memory size of a mobile phone provided in real time based on the user's geographic location represents a significant advancement

in mobile computer technology. Prior to this innovation, companies offering legalized mobile and online betting would have to provision their applications with all the information required to interact with hundreds of games offering hundreds of constantly changing betting markets for all potential users in a single application. This made it impossible to deliver the real-time information required by a unique bettor, significantly slowing down the applications' performance. In addition, in most cases this approach would exceed a mobile phone's memory capacity. By integrating real-time location data to filter event information, this invention ensures that users' native applications running on smart phones are only served information for the events legally available in their jurisdiction, reducing memory requirements and enabling necessary speed requirements, while ensuring compliance with applicable state laws. This feature allows for a seamless, immediate, and location-aware user experience, ensuring that the content provided is both fair and legally compliant.

38. **User Input for Group and Event Selections:** The inventions' user-input mechanism for group and event selections represents an efficiency increase in personalized interactive gaming. Previously, users in Daily Fantasy faced a low probability of winning skill-based open tournaments and Daily Fantasy faced the impossibility of allowing less skilled players the enjoyment of a reasonable chance of winning cash, by conducting potentially millions of simultaneous contests at once, each scored separately and simultaneously. The inventions' approach allows users to effortlessly select multiple groups and events at once, with inputs tailored to their personal preferences and experience level. This approach enables contest providers to operate a massive real-time computing system at very low cost, in effect making it possible to operate Daily Fantasy Sports based on common live events.

39. **Receiving Group Selections by a Device/Server Where Each Group Simultaneously Participates in a Separate Competition**: The simultaneous nature of participation ensures that personalized user selections are registered and managed efficiently, leveraging device/server-side processing for better contest management. This approach allows users to compete with their selection in multiple contests simultaneously with the same performance and with the same investment of time. The offering of many different types of contests simultaneously obviates the problem of single open contests of skill consistently won by a handful of extremely skilled professional competitors. The user experience can further be enhanced by simultaneously scoring user performance.

40. **Receiving/Triggering a Lockout Signal:** Receiving or triggering a lockout signal ensures the integrity of all gaming based on real-time sporting events by preventing last-minute changes to user inputs that could provide some users with significant competitive advantages, undermining the fairness of competition. In live betting systems, after an event is underway, latency between an event's occurrence and its broadcast to users could allow some players, such as those attending an event live or observing the event through a television source with lower signal propagation latencies, to gain an unfair advantage by observing the unfolding action earlier. A lockout signal effectively freezes user inputs as soon as the event's relevant actions begin. On the other hand, sports betting companies wish to delay locking out a potential bet unnecessarily early in order to increase their revenues by accepting more wagers. Different sports and game occurrences present a wide variety of the optimal timing of a lockout signal. By adjusting the execution of a lockout signal for the anticipated time until resolution, taking into account the measured difference between the earliest arriving TV signal and a later arriving one, and utilizing a person physically present at a live event to mark the latest time a lockout must be executed by

marking the lockout event in real time, this innovation further optimizes the length of the betting window for the book maker.  At the same time the method minimizing the impact of latency and ensures an even playing field for all participants.  Confidence that no users will have an unfair advantage is critical to providing a fair and attractive remote-gaming experience and in many cases compliance with various laws.

41.    **Determining a Plurality of Competitive Groups Based on Eligibility:** Determining a plurality of competitive groups based on user eligibility represents an advancement in ensuring fairness across multiple contests, allowing competitors to avoid having to compete against much more skilled competition.  This process analyzes a range of real-time data—such as users' skill level, geographic location, and eligibility to participate in specific types of contents in order to ensure that users are presented or placed into appropriate competitive groups.  By matching users to contests based on these criteria, the system levels the playing field and enhances user engagement by personalizing their gaming experiences.

42.    **Equalizing Latencies in Presenting In-Game Data During a Live Event:** The ability to equalize effects of latency issues in synchronization of the game data presented, with a live event, increases the enjoyment and fairness of games for users.  In sports betting, for example, fair competition necessitates that a fast-paced game, based on the unfolding television action, has a level playing field for all participants regardless of how they receive their game feed.  Live sports betting, which relies on participation by watching an event on a television, has potential latency issues since, for example, television signal reception is not uniform and there are delays between individuals attending a game and varied amounts of delay for those watching the game live on television.  The online broadcast of content depicting what is happening in the sporting event with the synchronized game data constituting, for example, updated odds and propositions, allows

games of chance that rely on participation by watching an event and related data displayed simultaneously. Equalizing delays prevents those attending in person or with access to a lower-latency feed from having a competitive advantage.

43. By disclosing and claiming these and other specific inventive concepts, the Asserted Patents go far beyond just a simple combination of generic components to perform conventional activities. As explained above, the claimed inventions provide technological solutions to address the shortcomings in technology at the time and improve the functionality and capabilities of computers for managing distributed gaming. These inventive concepts provide tangible solutions that address unique challenges in distributed gaming systems, ensuring fairness, compliance, and efficiency.

44. These inventive concepts were not known in the art, let alone conventional, at the time of the inventions because no existing systems provided mechanisms to dynamically filter event participation based on location, prevent latency-based advantages with real-time lockout signals, or optimize mobile asset management in distributed gaming. These features represent groundbreaking advancements that were unavailable in prior art, demonstrating the inventive concepts of the patented claims.

45. In addition, the claims of the Asserted Patents are rooted in computer technology as they are specifically directed toward solving challenges in distributed gaming and mobile device technology, such as contest management, event compliance, and system efficiency. By leveraging specific implementations, real-time geographic data, server-side processing, and dynamic user input mechanisms, the inventions address domain-specific problems inherent to on-line gaming systems and mobile devices.

46.    The significance of WinView's patents is illustrated by the fact that they have been cited by subsequently filed patents as relevant art over 253 times.  Together, the features of the Asserted Patents provide transformative solutions to long-standing challenges in distributed and interactive gaming.

47.    WinView has not licensed any of the Asserted Patents to any third party.  WinView has not offered for sale, sold, or licensed any products that embody any claim of the '189, '020 or '349 Patents.  In addition, all claims in the '770 and '237 Patents are limited to method claims. With respect to the '883, 880, and 402 Patents, WinView is only asserting method claims in this action and, therefore, has removed any requirement for marking as to the '883, '880, and '402 Patents.  Moreover, FanDuel has had actual notice and knowledge of the Asserted Patents, as set forth below.  Thus, WinView's recovery of pre-suit damages for FanDuel's infringement of the Asserted Patents is not limited by 35 U.S.C. § 287(a) as to any Asserted Patent.

**FANDUEL'S INFRINGING PRODUCTS**

48.    FanDuel's infringing product offerings to consumers include online sports betting through FanDuel Sportsbook & Casino ("FD Sportsbook"), online horse racing through FanDuel Racing ("FD Racing"), online traditional salary-based fantasy sports through FanDuel Fantasy Sports ("FD Fantasy"), and online casino gaming through the FanDuel Casino ("FD Casino") (collectively, the Accused Products").  Ex. 25 (FanDuel website: "SPORTSBOOK: Bet on all your favorite sports," "CASINO: Play all your favorite table games and slots," "FANTASY: Draft a winning team every week") (https://www.fanduel.com/).  FanDuel makes, uses, sells, and offers for sale the Accused Products, which practice the claims of the Asserted Patents.

49.    Prior to the formation of FanDuel Group in 2018 by the merger between FanDuel's predecessor entity and Paddy Power Betfair's US, FanDuel's primary products were FD Fantasy

and FD Racing. Following the merger, FanDuel began offering its FD Sportsbook products. States including New Jersey have allowed sportsbook offerings, which now account for a rapidly growing proportion of FanDuel's users and revenue growth. *See, e.g.*, Ex. 26 (FanDuel's NJ Sportsbook Opening Report) (https://www.espn.com/sports-betting/story/_/id/24077347/fanduel-open-sportsbook-meadowlands-racetrack-new-jersey); Ex. 27 (FanDuel Group 2018 Results) ("With proven consumer demand and tremendous market opportunity, our first year since the merger of FanDuel and Betfair US has been an incredible success.") (https://press.fanduel.com/press-releases/fanduel-group-2018-results-highlight-strategic-strength-media-advisory). After the merger, FanDuel also launched its FD Casino offerings.

50.    FanDuel has a large presence in the United States. While FanDuel launched its first mobile sportsbook in New Jersey, FanDuel has expanded its geographic footprint and currently offers its mobile and retail sportsbooks in twenty-six states, including Arizona, Colorado, Connecticut, Washington DC, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, Vermont, West Virginia, Wyoming, Mississippi (retail only), Nevada (retail only), and Washington (retail only). *See, e.g.,* Ex. 28 (FanDuel Sports Betting US Map) (https://www.fanduel.com/legal-sports-betting-us-map). FD Fantasy is available in most states. *See* Ex. 21 (Flutter 10-K) at 14. FD Casino is available in Connecticut, New Jersey, Pennsylvania, Michigan and West Virginia. *See id.* at 13.

51.    Under some states' sports betting and iGaming laws, online sports betting and iGaming licenses are tethered to a finite number of specifically defined businesses that are deemed eligible for a gaming license, such as land-based casinos, tribes, professional sports franchises and arenas and horse racing tracks, each of which is entitled to a "skin" or multiple "skins" under that

state's law.  *See* Ex. 21 (Flutter 10-K) at 13.  A "skin" permits that license holder to partner with an online operator like FanDuel to offer online sports betting or iGaming services under that entity's license Defendants currently rely on skins tethered to land-based casinos, tribes, professional sports franchises and arenas and horse racing tracks in order to access a number of markets through a skin.  *See id.*  In other markets, FanDuel may obtain a license to offer online sports betting and iGaming through a direct license offered by the state, which in some cases may be subject to a competitive application process for a limited number of licenses.  *See id.* at 13.

52.    FanDuel has a strategic partnership with Boyd Gaming.  This partnership provides FanDuel with access to online sports betting and iGaming markets in certain states through the use of the first skin granted by a state to a land-based gaming entity with an existing license.  *See* Ex. 21 (Flutter 10-K) at 32.

53.    While FanDuel has physical locations via its partnerships, most of its customers use the Accused Products via its online platforms.  *See* Ex. 21 (Flutter 10-K) at 136.  FanDuel offers the Accused Products on Apple iOS and iPadOS via Apple's App Store and on Android via Google's Play Store.  FanDuel also provides download links for the Accused Products' apps on its website.  *See* Ex. 11 at 12 (https://sportsbook.fanduel.com/).

**FANDUEL GROUP SITES**

FanDuel Fantasy

FanDuel Racing

FanDuel Casino

TVG

FanDuel Research

FanDuel TV

FanDuel Faceoff

**FANDUEL APPS**

Fantasy (iOS)

Fantasy (Android)

Sportsbook (iOS)

Sportsbook (Android)

Ex. 11 at 12 (links for FanDuel Apps download and installation through the Apple App Store and Google Play Store, available on the FanDuel Sportsbook website) (https://sportsbook.fanduel.com/).

21





Screenshot of FD Fantasy app in Apple's App Store.

Screenshot of FD Sportsbook app in Apple's App Store.



Screenshot of FD Casino app in Apple's App Store.

54. In addition to its mobile app offerings, FanDuel offers the Accused Products via traditional and mobile websites. Ex. 21 (Flutter 10-K) at 43 ("Our online product offerings are delivered as free applications through third-party platforms and are also accessible via mobile and traditional websites.").



Ex. 11 (FanDuel's Sportsbook website) (https://sportsbook.fanduel.com/).



Ex. 29 (FanDuel Casino Website) (https://casino.fanduel.com/).



Ex. 30 (FanDuel Racing website) (https://racing.fanduel.com/).

55.    FanDuel also operates FanDuel retail sportsbook locations in states that authorize retail sports wagering in licensed brick-and-mortar facilities.  Ex. 21 (Flutter 10-K) at 24.



Photograph of a FanDuel kiosk at a brick-and-mortar establishment.

56.    FanDuel operates servers within each state from which it offers the Accused Products, as it is generally required to by state laws and regulations. *See, e.g.*, N.Y. PML § 1367-A(h)-(i) ("The server or other equipment which is used by a mobile sports wagering licensee to accept mobile sports wagering shall be physically located in the licensed gaming facility"); N.J.S.A §§ 5:12A-11(a); 5:20-2(c) ("all equipment used by the holder of the permit, including computers and servers, to conduct fantasy sports activities shall be physically located within the boundaries of" a restricted area on the premises of the casino hotel or in another facility owned or leased by the casino licensee . . . that is secure, inaccessible to the public N.J.S.A § 5:12-95.22; 68 IAC 27-6-2 ("A sports wagering operator must locate a server in the state of Indiana."). FanDuel's servers communicate with customers' devices operating the Accused Products, such as mobile phone, tablets, and laptops.

57.    In order to ensure compliance with applicable state laws and provide users with correct permissions information, the Accused Products use GeoComply to monitor the location of the devices using the Accused Products.



WHERE CAN I DOWNLOAD THE FANDUEL GEOCOMPLY PLUGIN?

If you're using the **FanDuel apps or on mobile web**, start here for more location troubleshooting tips.

When using the FanDuel Sportsbook website **on your desktop**, you'll need to download the GeoComply plugin for us to locate you. Find your operating system and state here:

Windows plugins
Apple Mac plugins

Ex. 31 (https://support.fanduel.com/s/article/Where-Can-I-Download-the-GeoComply-Plugin).

58.    GeoComply provides geolocation solutions to FanDuel. *See, e.g.*, Ex. 15 (Massachusetts Application) at 85 ("FanDuel utilizes the GeoComply geolocation security

system.");  *see   also*   Ex.   33   (GeoComply   Overview)   at   4,   9,   12 (https://www.geocomply.com/app/uploads/2017/09/GeoComply-Overview-2017-3.pdf).

59.    GeoComply is available on mobile phones, tablets, and laptop computers and "occurs seamlessly in the background during the customer's session, without any intrusion to the overall   user   flow/experience."        Ex.   33   (GeoComply   Overview)   at   12 (https://www.geocomply.com/app/uploads/2017/09/GeoComply-Overview-2017-3.pdf).



*Id.* at 9.





*Id.* at 12.

60.    FanDuel uses GPS, Cellular, and Wi-Fi location services to determine the location of a device.  For example, FanDuel notes in its FAQs that "[o]ur location systems require Wi-Fi, GPS, or GSM signals to locate [a user]."  Ex. 34 (FanDuel Location Troubleshooting Tips) at 2 (https://support.fanduel.com/s/article/Location-Troubleshooting-Tips#state).

61.    FanDuel ensures compliance with local laws regarding online sport betting, daily fantasy, and casinos because these types of games are not allowed in every state.  If customers' devices are not in a permitted jurisdiction, FanDuel prevents those customers from placing bets on the FanDuel apps and website and informs the customers that they appear to be located in a state where betting on FanDuel is not available.  In order to ensure compliance with different state laws

28

and provide users with correct permission information, the Accused Products' applications and website are configured to monitor the locations of the devices being used to access the services. *See e.g.*, Ex. 35 (FanDuel House Rules Hub) ("Each state, commonwealth, or province have specific regulations on sports betting, horse racing, daily fantasy, and casino games.") (https://support.fanduel.com/s/article/FanDuel-House-Rules-Hub); *see also* Ex. 36 (Bracket Betting State Guidelines) (https://www.fanduel.com/collegerules); Ex. 37 (FanDuel Sportsbook Privacy Policy) at 5 ("Our Services use precise location-based services in order to locate you so we may verify your location . . ., share your location with our vendors as part of the location-based services we offer, and for purposes of legal and regulatory compliance.") (https://www.fanduel.com/fanduel-sportsbook-privacy-policy).

### A.    FanDuel Sportsbook & Casino

62.    In May 2018, the U.S. Supreme Court struck down as unconstitutional the Professional and Amateur Sports Protection Act of 1992. This decision lifted federal restrictions on sports betting and allowed states to determine for themselves the legality of sports betting. Since this decision, thirty-five states have legalized some form of online sports betting and sports betting is on the rise.

63.    Since FanDuel launched FD Sportsbook in 2018, states including New Jersey that have approved mobile Sportsbook offerings have accounted for a rapidly growing proportion of FanDuel's users, which has contributed to FanDuel's revenue growth.

64.    FanDuel launched its first mobile sportsbook in the United States in New Jersey. FanDuel has expanded its geographic footprint and currently offers its mobile and retail sportsbooks in Arizona, Colorado, Connecticut, Washington DC, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, Vermont, West Virginia, Wyoming,

Mississippi (retail only), Nevada (retail only), and Washington (retail only).  *See, e.g.,* Ex. 28 (FanDuel Sports Betting US Map) (https://www.fanduel.com/legal-sports-betting-us-map).

65.    FD Sportsbook's website and mobile applications only allow customers to place bets if they are in certain states.  *See, e.g.*, Ex. 15 (Massachusetts Application) at 85 ("FanDuel utilizes the GeoComply geolocation security system . . . . FanDuel will only accept wagers on its mobile sports wagering platform from users who are successfully geolocated within the Commonwealth of Massachusetts."); *id* at 87 ("GeoComply is licensed by the relevant gaming regulator in all jurisdictions in which FanDuel operates a mobile sports wagering platform.  The integration between GeoComply's software and FanDuel's mobile sports wagering platform is tested and verified by an independent testing laboratory before FanDuel launches its mobile sports wagering platform in a given state."); *see, also.,* Ex. 28 (FanDuel Sports Betting US Map) (https://www.fanduel.com/legal-sports-betting-us-map).; Ex. 37 (FanDuel Sportsbook Privacy Policy) at 5 ("Our Services use precise location-based services in order to locate you so we may verify your location . . ., deliver you relevant content and ads based on your location, share your location with our vendors as part of the location-based services we offer, and for purposes of legal and regulatory compliance.") (https://www.fanduel.com/fanduel-sportsbook-privacy-policy).

66.    Customers    can    access    FD    Sportsbook    online    at https://sportsbook.fanduel.com/sports and with the FD Sportsbook application for mobile devices, which is available for download and installation through the Apple App Store and Google Play Store in certain states.

67.    Sports betting is an increasingly popular way to engage consumers in their sports viewing experience and increase their entertainment.  Sports betting involves a user placing a bet by wagering money at some fixed odds.  The matter on which the user bets is often referred to as

a "proposition" or "prop". If the user wins, FanDuel pays out the bet. FanDuel generates revenue from the difference between the payouts and the settled handle for bets that FanDuel has taken.

68.    The propositions that FanDuel offers are based on particular sporting events that occur during the year. For example, NFL football, NBA basketball, and MLB baseball games occur during the calendars for their respective seasons.

---

### Legal Sports Betting Online with FanDuel Sportsbook

Welcome to FanDuel Sportsbook, where you can find the best sports betting odds for all of your favorite sports and events. **Whether you're looking to place a bet on NFL, NBA, NHL, MLB, college sports, or any other competition, use America and Canada's number one legal online sportsbook!** We offer the largest selection of betting options, including moneylines, point spreads, over/unders, prop bets, futures bets, parlays, and more. We also offer live betting, allowing you to place bets while a game in progress. Mobile betting is available for legalized online sports betting with the FanDuel Sportsbook and Casino betting app, available on Apple and Android. Check around for odds that interest you and good luck with your bets!

#### Why is FanDuel the Best Online Sportsbook?

**Safe and Secure Sports Betting**: We are the #1 regulated online sports betting platform in the United States
**Best Sportsbook Promos, Bonuses, and Odds Boosts**: Get in on the sports betting action with our customer promotions, such as No Sweat First Bets and Odds Boosts on select sports events.
**Faster Payouts**: You will receive your winnings in as little as 24 hours
**Mobile App and User Interface**: FanDuel Sportsbook has an intuitive and user-friendly interface that makes it easy for users to navigate and place bets. Our mobile app is highly rated and available for both iOS and Android devices, making it convenient for sports bettors to place bets on-the-go.
**Live Betting**: FanDuel Sportsbook offers live in-play betting options, allowing users to place bets during games and events. Customers can also follow along in the app with real-time updates on scores, game statistics, and odds, ensuring that bettors have the most up-to-date information available to make informed decisions.
**More Ways to Win**: Bet our Same Game Parlays, moneylines, teasers, futures bets, partial game odds, prop bets, and more ways to legally place bets!

---

Ex. 11 at 11 (FanDuel Sportsbook website) (https://sportsbook.fanduel.com/).

69.    FD Sportsbook offers betting propositions that include traditional bets based on end-of-game outcomes, such as who will win a particular game or whether a team will win by more than a certain number of points. FD Sportsbook also offers "Live" betting propositions that are made during games and as the action unfolds. Live betting is a significant feature of the FD Sportsbook, designed to increase user engagement and enhance the sports betting experience.

70.    FD Sportsbook allows users to make wagers while the live sporting event is being played. Ex. 15 (Massachusetts Application) at 13 ("FanDuel has a market leading live streaming offering that allows customers to watch and wager on their favorite events.").

71.     FD Sportsbook offers "the ability to wager in-play with odds changing as the action unfolds . . .  Users may wager on a wide range of markets while events are in-play, including game lines, player props, quarters and half betting.  The platform's in-play offering is further enhanced by providing users the ability to track the action for each game (game trackers) as well as live scoreboards and play-by-plays."  Ex. 15 (Massachusetts Application) at 37.

72.     FD Sportsbook "includes integrations with third party content providers (e.g., SportsRadar, IMG and Perform) to offer users the ability to live stream video of games on the mobile sports wagering platform.  This includes select NHL games, select MLB games, tennis, soccer and table tennis."  Ex. 15 (Massachusetts Application) at 38.

73.     FD Sportsbook's "bet tracking flow is divided into several parts, including a flow that feeds into 'My Bets,' where users can see their open bets.  Another important aspect of the bet tracking flow is feeding wagers into the cash out system.  On the 'My Bets' page, users can view the live score, cash out offer and even the individual match statistics on the player prop they have placed."  Ex. 15 (Massachusetts Application) at 38.

74.     The FD Sportsbook displays a "Live Now" prompt indicating sporting events that are underway.  When the "Live Now" prompt is selected, the FD Sportsbook provides the details regarding the "Live" sporting events along with betting propositions for the event.

75.     FD Sportsbook offers in-game betting propositions for various live sporting events, such as tennis.  For example, FanDuel offers "Point-by-Point" propositions during tennis matches. In these propositions, FanDuel provides odds on which player will win the next point (or the next game).  Customers select a particular outcome and enter an amount of the wager on the selected outcome.  Customers in jurisdictions where such betting is permitted will be able to place bets on the propositions.

76.    As the action unfolds relating to a particular betting proposition, the FD Sportsbook website and app provide customers with updated odds for betting propositions.  FD Sportsbook also presents the odds and betting propositions synchronized to virtual representations of the sporting event, such as a depiction of a tennis court that depicts the game action.

77.    FD Sportsbook prevents customers from betting on propositions when they are no longer permitted to do so.  For example, FanDuel sends lockout signals to prevent customers from placing untimely wagers, and may vary the timing of the lockout signal based on the sport involved, the nature of the proposition, and the customers' latency in viewing the underlying game—otherwise users could easily cheat by betting after they know the result.  When customers are no longer permitted to wager on a particular outcome, the displayed choices for the particular wager are closed (or removed from the interface), and the user is prevented from submitting the locked-out selection.  FanDuel's appropriate timing of these lockout signals levels the playing field and increases user engagement, while preventing participants from obtaining information that could give them a material advantage in their betting on the proposition.

**B.    FanDuel Racing**

78.    FanDuel markets, advertises, sells, and offers to sell FD Racing, including through fanduel.com, racing.fanduel.com, Apple's App Store, and Google's Play Store.  Below is a screenshot of the FD Racing app on Apple's App Store:



Screenshot of FD Racing app on Apple's App Store.

79.     In addition to FD Fantasy and FD Sportsbook, FanDuel expanded into the online horse racing market with FD Racing.  While FD Racing offers betting on horse races and the FanDuel Sportsbook and Casino offers betting on other sporting events, for purposes of infringement, the relevant functionality in FD Racing, FD Sportsbook, and FD Casino is the same.

80.     FD Racing is an iGaming service that is available for use in Arizona, Illinois, Iowa, Maryland, Massachusetts, Minnesota, New Mexico, New York, Washington, Oregon, California, Colorado, Wyoming, Idaho, Montana, North Dakota, South Dakota, Arkansas, Louisiana, Indiana, Michigan, Ohio, Kentucky, West Virginia, Virginia, Pennsylvania, Delaware, New Hampshire,

Connecticut, Rhode Island and Florida.  *See* Ex. 38 (Where is FD Racing Legal webpage) (https://support.fanduel.com/s/article/State-Specific-Rule).  Below is a screenshot showing that FD Racing will block customers from placing bets on horse races if they are not located within a jurisdiction where the service is legal:



Screenshot of FD Racing App requiring the user's precise location.

81.    FD Racing allows users to bet on horseracing and live stream the races.  FD Racing covers a wide variety of horse racing events, including, but not limited to, the Kentucky Derby, Preakness Stakes, and Belmont Stakes.  Below is a screenshot of an example of races available to a user for betting:



Screenshot of races available for betting on FD Racing app.

82.    FD Racing allows customers to place various types of wagers including win, place, show, any combination of these three wagers, exacta, trifecta, superfecta, daily double, pick-3, and pick-5.  Below is a screenshot of an example of the bets available for a race on FD Racing:



Screenshot of bets available on FD Racing app.

83.    Below is a screenshot of the FD Racing website:



Ex. 30 (screenshot of FD Racing website) (https://racing.fanduel.com/).

### C.    FanDuel Fantasy Sports

84.    FD Fantasy is a platform offering fantasy sports contests and fantasy sports tournaments which enables players to use their skill and knowledge of relevant professional sports information and the fantasy sports rules to compete against one another for prizes announced in advance of the event.  *See* Ex. 21 (Flutter 10-K) at 132.

85.    FanDuel offers FD Fantasy online at https://www.fanduel.com/contests and on applications for mobile devices, which can be downloaded and installed through the Apple App Store and Google Play Store.  FanDuel provides download links for the FD Fantasy apps on its website.  Ex. 11 (https://sportsbook.fanduel.com/).



Ex. 11 at 12 (links for FanDuel Apps download and installation through the Apple App Store and Google Play Store, available on the FanDuel Sportsbook website) (https://sportsbook.fanduel.com/).



Screenshot of FD Fantasy app on the Apple App Store.

86. FD Fantasy is currently available in all states except Arizona, Hawaii, Idaho, Louisiana, Montana, Nevada, and Washington. FD Fantasy "offers paid-entry contests in 44 states and the District of Columbia (and free-to-play contests in all 50 U.S. states and the District of Columbia) based on the state laws governing fantasy sports in those individual jurisdictions." Ex. 21 (Flutter 10-K) at 14.

87. FanDuel offers various types of daily fantasy sports contests that authorize users to choose a contest with an entry fee, pick their team, and try to win by scoring the most points. FD Fantasy includes contests based on the real-life statistics generated in a wide variety of sports, such as NBA basketball, MLB baseball, and NHL Hockey. FD Fantasy also allows users to create their own contests where they specify the entry fee and other contest parameters and FanDuel then offers the contest to other customers. In this and other ways, users are then matched in contests to compete against one another for the entry-fee dollar amounts according to each contest's payout rules (or against one another in head-to-head contests).

88. FanDuel monitors multiple games and game events on which play is based. FD Fantasy generates statistics on various game events, determines outcomes for each contest, and then pays out awards to the winners based on each contest's payout rules. *See, e.g.*, Ex. 40 (https://www.fanduel.com/how-it-works).

89. To increase user participation and corresponding fantasy revenue, FanDuel recommends contests for users to join and provides functionality for users to enter their lineups quickly in multiple contests. For example, FanDuel recommends contests and instructs users to "enter one lineup into multiple contests — or, enter one lineup into the same contest multiple

times."  Ex. 32 at 1 (What's New: Advanced Entry) (https://www.fanduel.com/advanced-entry).

FanDuel also allows user to easily enter an already created lineup into additional contests.



Screenshot of the Sportsbook & Casino App showing lineups.

### D.    FanDuel Casino

90.    FanDuel's iGaming offerings, including FD Casino, are available in Connecticut,

Michigan, New Jersey, Pennsylvania, and West Virginia.  *See* Ex. 21 (Flutter 10-K) at 13.  FD

Casino allows customers to bet on a range of games of chance, including casino games such as

blackjack, roulette, and slot machines as well as bingo and machine-gaming terminals. *See id.* at 5. FanDuel also offers player vs. player games, such as poker and rummy. *See id.*

91.     FanDuel generates revenue through the gross bets placed less payouts on winning bets, which is also referred to as "hold." Individual online games are designed and function in such a manner that FanDuel expects to realize a net win from the aggregation of all the individual gaming transactions with a player over the relationship based on statistical probabilities. *See* Ex. 21 (Flutter 10-K) at 130.

92.     FanDuel offers online poker as a peer-to-peer game via several platforms. Players can compete in ring games, where they bet cash equivalents on each hand and each hand has a winner and is paid out. Players can also compete in tournaments where they pay an entry fee and play with tournament chips, with prize money distributed to the last remaining competitors. FanDuel collects a portion of the players' wagers, known as the rake, up to a capped amount in ring games and a tournament entry fee for tournaments. *See* Ex. 21 (Flutter 10-K) at 131.

**E.     FanDuel's Marketing and Customer Support**

93.     FanDuel encourages it customers to use the Accused Products in the United States by providing new and existing customer promotions and incentives. *See e.g.*, Ex. 41 (https://sportsbook.fanduel.com/promotions). FanDuel utilizes a variety of marketing channels, including paid external advertising through traditional and digital media, new player and event driven promotions, paid affiliate programs, social media advertisements, sponsored content, in-casino advertisements, billboards, and its websites,. *See* Ex. 21 (Flutter 10-K) at 8.

 

Photos of FD Sportsbook billboards.

94.     FanDuel also relies on successful cross-promotion across its product offerings and has consequently developed ways to minimize friction between their offerings in order to encourage customers to move from one product to another.  For example, FD Sportsbook features an embedded iGaming offering in states where iGaming is permissible so that players can play a subset of casino games without leaving the FD Sportsbook app.

95.     The photographs below illustrate FanDuel advertising and offering promotions for its FanDuel Casino offering inside of their retail FD Sportsbook location.  Specifically, FanDuel offers customers $1,000 back for their losses and 350 bonus spins for its Cash Eruption game.



96.     In addition to traditional marketing channels, FanDuel uses media, sports, and entertainment partnerships to promote customer usage of the Accused Products.  *See* Ex. 21 (Flutter 10-K) at 8.  FanDuel enters into exclusive relationships with athletes and celebrities in order to promote the Accused Products. *See id.*  FanDuel is also (i) an official sports betting partner, official sportsbook, official one-day fantasy partner, official one-day fantasy game, official marketing partner, and authorized gaming operator of the NBA; (ii) an official sponsor/partner, official sportsbook sponsor/partner, official sports betting sponsor/partner and official free to play sponsor/partner of the NFL; (iii) an official sports betting sponsor/partner of MLB; (iv) an official sports betting/wagering partner, official daily fantasy game, official daily fantasy hockey game, official daily fantasy partner, official fantasy partner, and official partner of the NHL; (v) an official sportsbook, official daily fantasy partner, official marketing partner, official partner, and authorized gaming operator of the WNBA; (vi) an official betting operator of the PGA Tour; (vii) an authorized gaming operator of the WTA; (viii) an authorized gaming operator of NASCAR; and (ix) an authorized gaming operator of MLS.  FanDuel also has partnerships with 19 professional teams across these and other leagues.  The nature of these partnerships varies; however, each of these relationships helps FanDuel acquire and retain customers more efficiently by, for example, allowing FanDuel to open a retail sportsbook location in their arena, prominently displaying FanDuel's brand on signs throughout their arena, advertising its products across their television, digital media, and radio outlets and giving FanDuel access to their customer relationship databases for marketing purposes.  *See* Ex. 21 (Flutter 10-K) at 8.

97.     FanDuel offers a compelling set of promotional offers to engage and retain customers:

|  | Bet $X Get $Y | No Sweat First Bet | Refer a Friend | VIP Deposit Match |
|---|---|---|---|---|
| Eligibility | All new users EXCEPT for pre-live users | Users placing their first real money bet with FD Sportsbook | A referred user must be new to FD Sportsbook, but a referring user can be any user | DFS and other local VIP users invited by FanDuel |
| Description | All users who have not received a pre-live registration bonus will have the opportunity to bet a small amount $X to win a much larger amount $Y (e.g., $5 and $150), even if the bet they place loses | If a user's first real money bet with FD Sportsbook settles as a loss, the user will receive their stake back in free bets up to $X in value | Users can invite their friends to register with FD Sportsbook through an exclusive referral link. Once a referred user creates an account, deposits, and places a real money bet of $10 or more, both users unlock $X worth of free bets | VIP users identified by FanDuel will receive the opportunity to make a deposit into their FD Sportsbook account that will be 100% matched by FanDuel |

Ex. 15 (Massachusetts Application) at 70 ("FanDuel also fosters customer loyalty through extensive use of early life and in-life generosity programs designed to incentivize customers to return to the platform.").



*Id.* at 12 (showing examples of promotions offered to customers).

98.     The following are examples of marketing and advertising materials that FanDuel used to promote its launches in Kansas and Ohio.





  

  

Ex. 15 (Massachusetts Application) at 77-78.



**F.      FanDuel's Use of AWS Services**

99.      In addition to its own servers, FanDuel uses cloud-hosted services to support the operation of the Accused Products and to increase its customers' usage of the Accused Products and, thereby, increase FanDuel's revenues.  Ex. 42 (FanDuel describing its technology approach

for large scale events that see lots of traffic like the Super Bowl: "To maintain compliance, we utilise a combination of in-state hybrid cloud solutions and traditional AWS cloud offerings, resulting in a unique production environment for each state in which FanDuel operates.") (https://medium.com/fanduel-life/how-does-fanduel-technology-win-the-super-bowl-5febde9be002).    Specifically, FanDuel uses AWS as its strategic cloud provider.    Ex. 43 (https://press.aboutamazon.com/2023/9/fanduel-selects-aws-as-its-strategic-cloud-provider).

FanDuel uses AWS' Lambda function as a service.  Ex. 44 at 2 ("For our product our tech stack is Java for the core functionality . . . . Infrastructure wise we host our tech stack on AWS using services such as EC2, EKS, AWS Lambda, and AWS RDS managing it all with Terraform.") (https://medium.com/fanduel-life/whats-it-like-being-an-engineer-at-fanduel-4505e7ca283c).

Reviewing the network traffic of an Accused Product illustrates FanDuel's use of AWS' S3 (object storage system) and CloudFront (content delivery network) services which implement with Lambda. *See, e.g.*, Ex. 39 (FanDuel's technology profile illustrating it uses AWS services such as CloudFront S3) (https://builtwith.com/fanduel.com).



Screenshot of FanDuel's network traffic with X-Amz-Cf-Id in the response header; *see also* Ex. 77 (listing X-Amz-Cf-Id as an AWS response header) (https://docs.aws.amazon.com/AmazonCloudFront/latest/DeveloperGuide/RequestAndResponse BehaviorCustomOrigin.html).

100.    As shown in the screenshot below, FanDuel's engineering blogs also confirm its use of AWS.



Ex. 42 at 4-5 (https://medium.com/fanduel-life/how-does-fanduel-technology-win-the-super-bowl-5febde9be002).

101.    AWS' Customer Agreement provides that customers, including FanDuel, are responsible for and control their use of AWS' servers:

- "[FanDuel is] responsible for [its] Content. [FanDuel] will ensure that [its] Content and [its] and End Users' use of [its] Content or the Services will not violate any of the Policies or any applicable law."

- "[FanDuel is] responsible for properly configuring and using the Services and otherwise taking appropriate action to secure, protect and backup your accounts and [its] Content in

a manner that will provide appropriate security and protection, which might include use of encryption to protect [its] Content from unauthorized access and routinely archiving [its] Content."

- "[FanDuel] will be deemed to have taken any action that [it] permit, assist or facilitate any person or entity to take related to this Agreement, [its] Content or use of the Services. [FanDuel is] responsible for End Users' use of [its] Content and the Services, and for their compliance with [its] obligations under this Agreement."

- "[Amazon] do[es] not provide any support or services to End Users unless [FanDuel and Amazon] have a separate agreement with [FanDuel] or an End User obligating [Amazon] to provide such support or services."

Ex. 45 at 1-2 (AWS Customer Agreement) (https://aws.amazon.com/agreement/).

102.    Additionally, AWS' data privacy terms specify that "[FanDuel] maintain[s] full control of [its] content that [it] uploads to the AWS services . . . , and [is] responsib[le] for configuring access to AWS services and resources. . . . [FanDuel] configure[s] access control permissions for any of the services [it] develop[s] or deploy[s] in an AWS environment. [AWS] do not access or use [FanDuel'] content for any purpose without [its] agreement.  Ex. 46 at 1 (Data Privacy FAQs) (https://aws.amazon.com/compliance/data-privacy-faq/).

## **FANDUEL'S INFRINGEMENT OF WINVIEW'S PATENTS**

103.    FanDuel has infringed and continue to infringe one or more claims of each of the Asserted Patents by engaging in acts that constitute infringement under 35 U.S.C. § 271, including but not necessarily limited to making, using, selling, and offering for sale, within this District and elsewhere in the United States, without authority or license, FanDuel products and services falling within the scope of one or more claims of the Asserted Patents.

104.    In addition to directly infringing the Asserted Patents pursuant to 35 U.S.C. § 271(a), literally and under the doctrine of equivalents, FanDuel indirectly infringes all the Asserted Patents under 35 U.S.C. §§ 271(b) and (c), literally or under the doctrine of equivalents.

105.    In addition to directly infringing the Asserted Patents pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, FanDuel indirectly infringes the Asserted Patents under 35 U.S.C. §§ 271(b) and (c), literally or under the doctrine of equivalents.

106.    As discussed above, FanDuel induces infringement of the Asserted Patents by instructing, directing and requiring others, including its customers, purchasers, users, and developers, to meet claim elements of the Asserted Patents, literally or under the doctrine of equivalents.

107.    FanDuel contributorily infringes the Asserted Patents by making and supplying products that are components in an infringing system with components from manufacturers, customers, purchasers, users, and developers that together meet all claim elements in the Asserted Patents, literally or under the doctrine of equivalents.

**FANDUEL'S KNOWLEDGE OF WINVIEW'S ASSERTED PATENTS**

108.    As set forth below, FanDuel had pre-suit knowledge of the Asserted Patents and that its Accused Products infringe the Asserted Patents.  At the very least, FanDuel is aware of the Asserted Patents and of its Accused Products' infringement of the Asserted Patents from its receipt of this Complaint.

109.    WinView Inc. widely disclosed the Asserted Patents giving notice of the Asserted Patents to FanDuel and other participants in the online gaming industry.  At least as early as December 2015, WinView Inc., the previous holder of the Asserted Patents, identified its patents on the intellectual property page of its website.  Ex. 47 (Archive.org web capture)

(https://web.archive.org/web/20151207111054/http://www.winviewgames.com/about/intellectual -property/).  WinView Inc. regularly updated this website, disclosing the Asserted Patents as they issued.

110.    WinView Inc. issued publicly available statements and press releases, including on its website, disclosing its patents and stating that, among other things, its "portfolio of [] foundational patents covers the synchronization of the second-screen with TV broadcasts and commercials and the optimum methods of monetizing sports-based games of skill, among other types of programming content."  Ex. 78 at 4.

111.    FanDuel was well aware of WinView Inc. and of its technology and patents, long before WinView filed this case.  FanDuel was familiar with, and had direct knowledge of, WinView Inc. as early as 2017.  In early 2017, David Lockton, WinView's Founder, President, and CEO, contacted Nigel Eccles through a consultant to arrange a discussion on the synergism between WinView Inc. and its patent portfolio and pioneering paid entry skill game experience, at the time FanDuel's CEO and Co-founder.  Following up, he introduced Mr. Eccles to Tom Rogers, the Executive Chairman of WinView Inc.  This introduction progressed to an email exchange between Mr. Eccles and Mr. Rogers, where Mr. Eccles acknowledged there were "[l]ots of similar interests here" and invited Mr. Rogers to coffee to meet.

112.    Mr. Eccles left FanDuel in November of 2017 and Mr. Lockton contacted FanDuel's new CEO, Matt King, also through a consultant.  Mr. King met with Mr. Rogers in late January 2019 under an NDA.  FanDuel again investigated WinView Inc. and its business, including its patents.  To assist FanDuel with its due diligence, in early 2019, WinView Inc. disclosed to FanDuel detailed information regarding WinView Inc. and its patented technology. WinView Inc. provided FanDuel with an intellectual property "Status Report."  WinView Inc.'s

Status Report specifically identified the respective parent patent applications for the asserted '883, '237, '189 and '770 Patents.  WinView Inc.'s Status Report further identified respective family members of the asserted '020, '771, '349, '130, '402, and '880 Patents.  WinView Inc. further provided FanDuel with selected examples of WinView Inc.'s patents that identified respective family members of the asserted '770, '020, '771, '237 and '883 Patents.  Additionally, WinView Inc. provided FanDuel with a presentation that identified WinView Inc.'s intellectual property vertical.

113.    Despite WinView Inc.'s offers to partner and collaborate with FanDuel or for FanDuel to invest in WinView Inc., FanDuel declined.  Instead, FanDuel elected to continue its infringement of the Asserted Patents without permission.

114.    Because of FanDuel's infringement and unwillingness to participate in discussions regarding WinView's intellectual property, WinView, Inc. filed suit against FanDuel on July 19, 2021, asserting patent infringement of the '243 and '543 Patents.  *See WinView Inc. v. FanDuel, Inc.*, No. 3:21-cv-13807 (D.N.J.), Dkt. No. 1.  On July 28, 2021, WinView Inc. filed an amended complaint, adding claims under U.S. Patent No. 9,993,730 (the "'730 Patent") and U.S. Patent No. 10,806,988 (the '988 Patent).  *Id.*, Dkt. No. 8.  These complaints alleged in detail how the FD Sportsbook and Daily Fantasy Sports websites and mobile applications practice the patents that are family members of the Asserted Patents, as specified above.

115.    From all of the above, FanDuel had knowledge of the Asserted Patents prior to the filing of this action and, is further aware of infringement of WinView's Asserted Patents from its receipt this Complaint.

## COUNT I
### (Direct Infringement of U.S. Patent No. 11,185,770)

116. WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

117. In violation of 35 U.S.C. § 271(a), FanDuel directly infringed and continues to infringe the '770 Patent, including without limitation exemplary Claim 20, by making, using, importing, selling, and offering for sale in the United States FD Sportsbook, FD Casino, and FD Racing (the "'770 Accused Products").

118. As set forth above in the Section entitled The Parties, Defendants FanDuel Inc., FanDuel Group, FanDuel Group Parent, Flutter, and Betfair operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others. Thus, Defendants directly infringe by operating as a joint enterprise.

119. FanDuel's acts of making, using, importing, selling, and offering for sale the infringing '770 Accused Products have been without the permission, consent, authorization, or license of WinView. Indeed, FanDuel declined WinView's request that FanDuel partner with WinView.

120. FanDuel's infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents

121. FanDuel owns and controls the operation of the '770 Accused Products and generates substantial financial revenues therefrom. FanDuel puts into service these products and directs and controls their operations as the licensed operator of these systems. To the extent portions of the '770 Accused Products are hosted on AWS servers, as discussed above, FanDuel controls the operation of the servers, puts them into use, and obtains the benefits of their use by

using its software hosted on the AWS servers to operate the '770 Accused Products in order to generate revenue.

122.    To the extent FanDuel's customers, purchasers, customers, developers, vendors, and manufacturers direct and control the devices and methods in the claims, FanDuel obtains benefits from its control of the system as a whole.

123.    FanDuel also has directly infringed and continues to directly infringe the '770 Patent by having its employees test and use the '770 Accused Products in the United States, performing the claimed methods.  In order to maintain legal compliance, FanDuel is required to periodically monitor and ensure that the '770 Accused Products are performing as designed and intended.  FanDuel further directly infringes by marketing and distributing the '770 Accused Products, which constitutes infringing offers to sell and sales.

124.    By way of example of FanDuel's infringement of the '770 Patent, the '770 Accused Products meet all of the limitations of exemplary Claim 20 of the '770 Patent, which recites:

> 20. A method of implementing a game of skill or chance or other entertainment comprising:
>
> determining a geographic location of each device of a set of devices;
>
> providing a content stream to each device based on the geographic location;
>
> providing the game of skill or chance or other entertainment with the content stream, wherein the game of skill or chance or other entertainment involves customers making selections related to events that occur within the content stream;
>
> preventing entry of a selection in the game of skill or chance or other entertainment after a result is known by sending a lockout signal, utilizing a person attending the events related to the streaming content, to prevent the customers from submitting a response to the game of skill or chance or other entertainment; and
>
> delivering the content stream and synchronized game data to each device of the set of devices.

125.    The '770 Accused Products infringe the '770 Patent, including exemplary Claim 20, in violation of 35 U.S.C. § 271(a)-(c).  For example, they perform the recited method of implementing a game, as discussed below.

126.    FanDuel allows customers to bet on sports matches and casino game livestreams. *See* Ex. 25 ("SPORTSBOOK: Bet on all your favorite sports," "CASINO: Play all your favorite table games and slots," "FANTASY: Draft a winning team every week") product offerings, as well as retail sportsbook, media and other consumer product offerings.") (https://www.fanduel.com/); *see also* Ex. 21 (Flutter 10-K) at 13.  These product offerings are available on Apple iOS and iPadOS via the Apple Store, Android via the Google Play store, and traditional and mobile websites.  *See* Ex. 25 (listing the available mobile apps in the footer) (https://www.fanduel.com/). The mobile apps offer the same product offerings as FanDuel's website.  The '770 Accused Products involve games of chance.  *See* Ex. 21 (Flutter 10-K) at 130 ("peer-to-business . . . products include a range of games of chance such as  . . . online casino").

127.    FD Sportsbook may be accessed online at sportsbook.fanduel.com and casino.fanduel.com respectively and by using the FD Sportsbook Apps on mobile devices such as a smartphone, tablet, or computer.

128.    FanDuel determines the geographic location of customers' devices and provides content streams to each device based on its geographic location.  For example, FD Sportsbook determines the competitive groups users are eligible to compete in based on the geographic location of their devices.  FanDuel is required by law to determine its customers' physical locations, as customers must be located in a state that allows the type of wager they seek to place. FanDuel uses GPS, Bluetooth, and Wi-Fi location services to determine the location of customer

devices.  *See, e.g.,* Ex. 34 (https://support.fanduel.com/s/article/Location-Troubleshooting-Tips#state).



*Id.* at 2.

129.    FD Sportsbook provides content streams to each customer device based on its geographic location.  There are two types of live stream features available in FD Sportsbook—"Live Stream" and "Game Tracker."  FanDuel also uses geographic information to determine whether users can watch the live streams of games.  If a user is within a state that allows sports betting, the user may stream the game.  For example, below is screenshot of FD Sportsbook Application (in the example, on an Apple device) showing the live-stream features of the FD Sportsbook mobile application.



Screenshot of the live stream feature in the FD Sportsbook app.

130.    For users in locations where wagers may not be placed on the event, FanDuel does not allow streaming of the game.  For example, the screenshots below of FD Sportsbook app on an Apple device illustrate location-based streaming access restrictions.

 

Screenshots of the FD Sportsbook App restricting a stream based on location).

131.    FD Casino provides content streams and live video streams to customers' devices based on their geographic location.   If a customer is within a state that allows iGaming, the customer will have access to the live streams of the game.



Screenshot of the FD Casino app showing a live stream of a baccarat game.

132.    For customers in jurisdictions that do not allow iGaming, the FD Casino app will prevent access to the streams for prohibited games.  For example, below is a screenshot of the FD Casino app on an Apple device showing that a user is blocked from accessing a stream for a casino game because of a geographic restriction.



Screenshot of the FD Casino app blocking access to the stream for a casino game due to the device's geographic location.

133.    The '770 Accused Products provide to customers games where the customers make selections related to events that occur within the streaming content.  FanDuel provides betting options on the Sportsbook app that reflect the online broadcast of content and offers live betting propositions.  Customers can make wagers while a live sporting event is being played and

streamed.  FanDuel updates the odds and propositions as the action unfolds and in accordance with what happens in the live sporting event.  FanDuel also removes betting propositions that have been resolved and adds new betting propositions as the sporting event progresses.  For example, the screenshot below shows the FD Sportsbook mobile application providing moneyline bets where users can bet on the winner of the game.  Here, Gael Monfils is the favorite with a $100 payout for a $180 bet and Botic Van De Zandschulp is the underdog with a $140 payout for a $100 bet.



Screenshot of live stream operation of FD Sportsbook App.

134.    FanDuel provides gameplay in its Casino app that reflects real-world dealers' tables, allowing customers to experience remotely the live in-casino experience.  For example,

customers playing blackjack make selections related to events that occur within the blackjack stream, such as the decisions to double, hit, stand, and split.



Screenshot of the live stream feature in the FD Casino app.

135.    FD Sportsbook prevents customers from entering untimely selections by sending a lockout signal.  *See* Ex. 48 at 2 ("If FanDuel Sportsbook accepts a bet on a market for which the outcome has already been determined, then that bet shall be deemed void (and no winnings shall be payable in respect of it) regardless of the bet being a win, lose or push.") (https://www.fanduel.com/fanduel-sportsbook-house-rules-nj).

136.    FanDuel relies in part on data scouts physically present at games in order to determine the real time occurrence of events which would provide an unfair advantage to a physically present customer.  FanDuel receives its real-time data from Sportsradar.  Ex. 49 ("FanDuel Group and Sportradar, the global provider of sports data and content, announced an extension of their current partnership, giving FanDuel access to the use of official NFL league data.  FanDuel now has access to all major U.S. sports data from Sportradar.") (https://press.fanduel.com/press-releases/fanduel-group-adds-official-nfl-data-with-extension-to-sportradar-partnership).  Sportsradar uses data scouts (or data journalists) that are physically

present at games to send event data to its servers.  *See* Sportradar's Live Scouting Data Journalists in Action (Sportsradar data scout explaining that while watching the game at the venue he "use[s] specialty software to record every event that happens. . . . As soon as [he] see[s] it happen [he] press[es] the button [on the software]. [He] enter[s] it into the system and it goes live.") (https://www.youtube.com/watch?v=5WGY-Vu9ZZg); *see also* Ex. 50 (Baseball API Documentation) ("Data is collected via Sportradar on-venue scouts and in-house operators.") (https://perma.cc/NUC7-WEKX);    Ex.    51    (Basketball    API    Documentation)    (same) (https://perma.cc/8MZQ-TLG8);    Ex.    52    (Football    API    Documentation)    (same) (https://perma.cc/2DD5-SQDE);    Ex.    53    (Hockey    API    Documentation)    (same) (https://perma.cc/3ZJS-43NQ);    Ex.    54    (Soccer    API    Documentation)    (same) (https://perma.cc/AV94-HVKM).  FanDuel uses this data as a basis to either adjust or directly trigger the lockout signals.

137.    FD Sportsbook customers can place bets before or during the game.  Upon triggering a lockout signal, a bet becomes unavailable.  At such time, the odds offering will be converted into a greyed-out lock symbol and player will not be able to add this selection to the bet slip.



Screenshot of FD Sportsbook App showing a customer is locked out from placing a bet.

138.    If the locked-out bet is already in the cart, the user will receive a notification that the bet is closed.  The screenshots below illustrate a cart before and after FanDuel sends a lockout signal.

 

Screenshots of FD Sportsbook app.

139.    Similarly, with respect to FD Casino, after customers' devices receive a lockout signal, the customers are prevented from placing a bet when outside of the allotted period.  This signal is based upon the action of a live dealer.

140.    FanDuel delivers the content stream and synchronized game data to each device of the set of devices, such as the customer devices running the '770 Accused Products in order to participate in a game of live-streamed Blackjack.  FanDuel uses its servers and AWS Cloud servers to provide synchronized game data through the '770 Accused Products, as discussed above.

141.    In addition, FanDuel presents the online broadcast of content and synchronized game data.  Customers accessing the same page of the FD Sportsbook website or same portion of the mobile application are presented with the same content, including available sports, betting

propositions, game scores, and statistics. FanDuel updates the odds and betting propositions in accordance with how the live sporting event is being played out in the online broadcast of content. FanDuel presents the online broadcast of content depicting what is happening in the sporting event with the synchronized game data constituting, for example, updated odds and propositions in the Sportsbook application.

142.    Thus, FanDuel's '770 Accused Products satisfy all elements of exemplary Claim 20 of the '770 Patent.

143.    U.S. Patent Application No. 16/909,661 was issued as the '770 Patent on November 30, 2021. For the reasons discussed above in the Section entitled FanDuel's Knowledge of the Asserted Patents, FanDuel became aware of the '770 Patent and aware that its activities concerning the '770 Accused Products infringed the '770 Patent no later than upon its issuance on November 30, 2021. At the very least, FanDuel became aware of its infringement of the '770 Patent from its receipt of this Complaint.

144.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, WinView is entitled to injunctive relief, damages, and attorney's fees and costs.

145.    In light of FanDuel's knowledge of WinView and the '770 Patent, FanDuel has deliberately infringed and continues to deliberately infringe in a wanton, malicious, and egregious manner, with reckless disregard for WinView's patent rights. FanDuel's infringing actions have been and continue to be consciously wrongful.

146.    The Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to WinView pursuant to 35 U.S.C. § 285.

147.    WinView has suffered and continues to suffer irreparable harm as a direct and proximate result of FanDuel's infringement for which there is no adequate remedy at law.  Unless FanDuel is enjoined, WinView will continue to suffer such irreparable injury.

## COUNT II
### (Indirect Infringement of U.S. Patent No. 11,185,770)

148.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

149.    As set forth above, FanDuel has had knowledge of its infringement of WinView's '770 Patent since at least as early as November 30, 2021 and has further knowledge of the '770 Accused Products' infringement of the '770 Patent from the filing of this Complaint.

150.    As set forth above, the '770 Accused Products directly infringe the '770 Patent. FanDuel has induced and continues to induce its customers' direct infringement of one or more claims of the '770 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '770 Patent by using the '770 Accused Products.

151.    FanDuel knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '770 Accused Products, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games.  As discussed above, when the '770 Accused Products are used to gamble, they necessarily infringe the '770 Patent.  Therefore, FanDuel's encouragement of its customers to use the '770 Accused Products to gamble necessarily encourages its customers to directly infringe the '770 Patent.

152. As an example of FanDuel's active encouragement of its customers' direct infringement, FanDuel makes its FD Sportsbook and FD Casino products conveniently accessible by offering the services on its website and mobile applications for Android, iOS, and iPadOS.





Screenshot of FD Sportsbook app as available for iOS from the Apple App Store.

Screenshot of FD Casino app as available for iOS from the Apple App Store.





Screenshot of FD Sportsbook app as available for Android devices from the Google Play Store.

Screenshot of FD Casino app as available for Android devices from the Google Play Store.



Screenshot of FD Sportsbook App for iPadOS as available from the Apple App Store.



Screenshot of FD Casino App for iPadOS as available from the Apple App Store.

153.　FanDuel further encourages customers to actively engage with its support platform, which addresses FAQs and provides comprehensive resources through its instruction guides designed to assist customers. FanDuel offers detailed guides on how to play various games, including the '770 Accused Products, and understand the underlying concepts. For example, FanDuel provides customers with sections like *Sports Betting 101*, *Sports Betting Terms and How to Bet*, *Casino 101*, *How to Play Blackjack*. Ex. 55 (How to Bet Strategy Guide and Tips) (https://www.fanduel.com/sports-betting-strategy); Ex. 56 (Sports Betting Terms and How to Bet) (https://support.fanduel.com/s/article/Sports-Betting-Terms); Ex. 57 (Casino 101 | How to Play Casino Games) (https://www.fanduel.com/casino-101); Ex. 58 (How to Play Blackjack | Learn the Rules of Blackjack) (https://www.fanduel.com/casino-101/blackjack). As explained above, following these instructions to gamble will necessarily result in customers infringing the '770 Patent.

154.    Additionally, FanDuel offers practical instructions on its website for navigating its platform, such as *House Rules Hub*, *Deposit with FanDuel* and *Withdrawal from FanDuel*. FanDuel provides instructions on how to use the actual Accused Product platforms.   Ex. 35 (https://support.fanduel.com/s/article/FanDuel-House-Rules-Hub); Ex. 59 (Deposit with FanDuel) (https://support.fanduel.com/s/article/Depositing-with-FanDuel);   Ex.   60   (Withdrawing   with FanDuel) (https://support.fanduel.com/s/article/Withdrawing-with-FanDuel).



How    To    Use    FD    Sportsbook    -    Sports    Betting    101 (https://www.youtube.com/watch?v=TYSKuZL7xDM).

155.    FanDuel's marketing aims to recruit new customers, retain current customers, and grow   customer   value   via   different   marketing   strategies   and   offerings.    Ex.   61 (https://www.flutter.com/media/5afjvzl1/flutter-factsheet-jan-2024.pdf);    Ex.    62 (https://www.flutter.com/media/305i1v3v/flutter-investor-day-final-website.pdf).    These

investments and personalized promotions are intended to increase consumer awareness and drive engagement.

156.    All the elements of the claims of the '770 Patent are used by FanDuel and its customers, purchasers, customers, developers, vendors, and manufacturers, or a combination thereof.  As set forth above, FanDuel has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with FanDuel, one or more claims of the '770 Patent.

157.    FanDuel also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '770 Patent pursuant to 35 U.S.C. § 271(c). As discussed above, FanDuel has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '770 Accused Products within the United States, without authority from WinView, it is providing the '770 Accused Products which are materials and apparatuses for practicing the claimed inventions of one or more claims of the '770 Patent.  The '770 Accused Products are software programs that are material components of the systems infringing one or more claims of the'770 Patent.  The '770 Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing uses.  As discussed above, when the '770 Accused Products are used to gamble, which is their only substantial intended function, they infringe the '770 Patent.

158.    FanDuel's indirect infringement of the '770 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

159.    FanDuel's indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

160.    FanDuel's indirect infringement of the '770 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

161.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's indirect infringement.

### COUNT III
### (Direct Infringement of U.S. Patent No. 11,235,237)

162.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

163.    In violation of 35 U.S.C. § 271(a), FanDuel directly infringed and continues to infringe the '237 Patent, including without limitation exemplary Claim 1, by making, using, importing, selling, and offering for sale in the United States FD Sportsbook and FD Racing (the "'237 Accused Products").

164.    As set forth above in the Section entitled The Parties, Defendants FanDuel Inc., FanDuel Group, FanDuel Group Parent, Flutter, and Betfair operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

165.    FanDuel's acts of making, using, importing, selling, and offering for sale the infringing '237 Accused Products have been without the permission, consent, authorization, or license of WinView.  Indeed, FanDuel declined WinView's request that FanDuel partner with WinView.

166.    FanDuel's infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents

167.    FanDuel owns and controls the operation of the '237 Accused Products and generates substantial financial revenues therefrom.  FanDuel puts into service these products and directs and controls their operations as the licensed operator of these systems.  To the extent portions of the '237 Accused Products are hosted on AWS servers, as discussed above, FanDuel controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '237 Accused Products in order to generate revenue.

168.    To the extent FanDuel's customers, purchasers, customers, developers, vendors, and manufacturers direct and control the devices and methods in the claims, FanDuel obtains benefits from its control of the system as a whole.

169.    FanDuel also has directly infringed and continues to directly infringe the '237 Patent by having its employees test and use the '237 Accused Products in the United States.  In order to maintain legal compliance, FanDuel is required to periodically monitor and ensure that the '237 Accused Products are performing as designed and intended.  FanDuel further directly infringes by marketing and distributing the '237 Accused Products, which constitutes infringing offers to sell and sales.

170.    By way of example of FanDuel's infringement of the '237 Patent, the '237 Accused Products meet all of the limitations of exemplary Claim 1 of the '237 Patent, which recites:

> 1. A method of equalizing effects of latency issues in synchronization of display of data files on an Internet coupled device with a live event, wherein a game of skill or chance or entertainment is run in conjunction with the live event and wherein the game of skill or chance or entertainment comprises data files, the method comprising:
>
> a. storing the data files on a server which relate to the live event;
>
> b. determining one or more game elements in the live event; and
>
> c. transmitting the files from the server to each of a plurality of Internet coupled devices corresponding to the one or more game elements; and

d. sending a lockout signal to prevent customers from submitting a response to the game of skill or chance or other entertainment after a result of the game element has been revealed within the live event, wherein determining a time of the lockout signal includes utilizing a person observing a television feed located remotely from the live event.

171.    The '237 Accused Product infringes the '237 Patent, including exemplary Claim 1, in violation of 35 U.S.C. § 271(a)-(c).  For example, they perform the recited method of equalizing effects of latency, as discussed below.

172.    The '237 Accused Products are entertainment services that enables customers to conduct sports betting in real-time.  Ex. 21 (Flutter 10-K) at 87, 132 ("Sportsbook involves the player placing a bet (wager) on various types of sporting events at fixed odds determined by the Group. . . . The platform supports 'in play' betting (betting that takes place after an event has started and up to its conclusion)").  Sports betting is characterized as a game of chance.  *Id.* at 31 ("The sports betting and iGaming industries are characterized by an element of chance").  A user places bets in FD Sportsbook based on televised sports events (e.g., the Super Bowl, a televised event) or in FD Racing based on televised horse races.



Screenshot of the FD Sportsbook home page.



Ex. 63 (2025 Super Bowl LIX Sunday - Ways To Watch | NFL.com) ([https://www.nfl.com/super-bowl/ways-to-watch/](https://www.nfl.com/super-bowl/ways-to-watch/)).

173.    FanDuel minimizes the differences in latency effects on its customers' devices when using the FD Sportsbook app.  FanDuel does this by modulating the amount of delay, if any, imposed of a device that is subject to low latency.  *See, e.g.*, Ex. 48 at 2 ("For the purposes of in-play betting, customers should be aware that transmissions described as "live" by some broadcasters may actually be delayed or pre-recorded.  The extent of any delay may vary depending on the set-up through which they are receiving pictures or data.  Please also be aware that, for operational reasons, bet requests made in-play may take slightly longer to process.") ([https://www.fanduel.com/fanduel-sportsbook-house-rules-nj](https://www.fanduel.com/fanduel-sportsbook-house-rules-nj)).

174.    FanDuel operates servers within each jurisdiction in which it offers the '237 Accused Products, as states generally require that FanDuel's servers be located within their boundaries in order to operate.  *See, e.g.*, N.Y. PML § 1367-A(h)-(i) ("The server or other equipment which is used by a mobile sports wagering licensee to accept mobile sports wagering shall be physically located in the licensed gaming facility"); N.J.S.A §§ 5:12A-11(a); 5:20-2(c) ("all equipment used by the holder of the permit, including computers and servers, to conduct

fantasy sports activities shall be physically located within the boundaries of" "a restricted area on the premises of the casino hotel or in another facility owned or leased by the casino licensee . . . that is secure, inaccessible to the public" N.J.S.A § 5:12-95.22; 68 IAC 27-6-2 ("A sports wagering operator must locate a server in the state of Indiana."). These servers communicate with customers' devices, which allow customers to operate the ''237 Accused Products on their devices.

175.    In addition to its own servers, FanDuel uses cloud-hosted services to support the operation of the '237 Accused Products. Specifically, FanDuel uses AWS as its strategic cloud provider. Ex. 43 (https://press.aboutamazon.com/2023/9/fanduel-selects-aws-as-its-strategic-cloud-provider). FanDuel uses AWS' Lambda function as a service. Ex. 44 at 2 ("For our product our tech stack is Java for the core functionality . . . . Infrastructure wise we host our tech stack on AWS using services such as EC2, EKS, AWS Lambda, and AWS RDS managing it all with Terraform.") (https://medium.com/fanduel-life/whats-it-like-being-an-engineer-at-fanduel-4505e7ca283c). Reviewing the network traffic of an Accused Product illustrates FanDuel's use of AWS' S3 (object storage system) and CloudFront (content delivery network) services which implement with Lambda. *See, e.g.*, Ex. 39 (FanDuel's technology profile illustrating it uses AWS services such as CloudFront S3) (https://builtwith.com/fanduel.com).



Screenshot of FanDuel's network traffic with X-Amz-Cf-Id in the response header; *see also* Ex. 77 (listing X-Amz-Cf-Id as an AWS response header) (https://docs.aws.amazon.com/AmazonCloudFront/latest/DeveloperGuide/RequestAndResponse BehaviorCustomOrigin.html).

176.     As shown in the screenshot below, FanDuel's engineering blogs also confirm its use of AWS.



Ex. 42 at 4-5 (https://medium.com/fanduel-life/how-does-fanduel-technology-win-the-super-bowl-5febde9be002).

177.    FanDuel has direction and control over AWS' servers via its services.  As discussed above, the AWS' Customer Agreement states that FanDuel is responsible for its content, proper configuration and use of AWS services, and its end customers' compliance with FanDuel agreement with AWS, acknowledging that AWS does not provide support and services to FanDuel's customers.  Ex. 45 (AWS Customer Agreement) (https://aws.amazon.com/agreement/).

178.    Additionally, AWS' data privacy terms specify that "[FanDuel] maintain[s] full control of [its] content that [it] uploads to the AWS services . . . , and [is] responsib[le] for

configuring access to AWS services and resources. . . . [FanDuel] configure[s] access control permissions for any of the services [it] develop[s] or deploy[s] in an AWS environment.  [AWS] do not access or use [FanDuel's] content for any purpose without [its] agreement."  Ex. 46 at 1 (Data Privacy FAQs) (https://aws.amazon.com/compliance/data-privacy-faq/).

179.    On these servers, FanDuel stores various data files related to the game that a customer is betting on, including historical game data, user bets, and bet results.  For example, the screenshot below shows that a user's bets are sent to and retrieved from FanDuel's servers.

 

Screenshot of FD Sportsbook App showing bet being submitted by a user and being sent to FanDuel's servers.

Screenshot of FD Sportsbook App showing a user pulling current bets for a game from FanDuel's servers.

180.    Customers can also retrieve their active bet data from a device different from the device they used to place the bet, which demonstrates that the bet data are saved to FanDuel's server and not just stored locally on the customers' devices.



Screenshot of the FD Sportsbook website showing ability to retrieve bet data.

181.    FanDuel determines the status of the games for which it is accepting wagers (game elements).  FanDuel uses its own algorithm in combination with third-party, real-time data to determine odds for live events that are sent to customers.  Companies like Sportradar and BetGenius provide real-time data to FanDuel.  Ex. 49 ("FanDuel Group and Sportradar, the global provider of sports data and content, announced an extension of their current partnership, giving FanDuel access to the use of official NFL league data.  FanDuel now has access to all major U.S. sports data from Sportradar.")  (https://press.fanduel.com/press-releases/fanduel-group-adds-official-nfl-data-with-extension-to-sportradar-partnership).  Sportradar uses data scouts (or data journalists) that are physically present at games to send event data to FanDuel's servers.  *See* Sportradar's Live Scouting Data Journalists in Action (Sportradar data scout explaining that while watching the game at the venue he "use[s] specialty software to record every event that happens.

. . . As soon as [he] see[s] it happen [he] press[es] the button [on the software].  [He] enter[s] it into the system and it goes live.") (https://www.youtube.com/watch?v=5WGY-Vu9ZZg); *see also* Ex. 50 (Baseball API Documentation) ("Data is collected via Sportradar on-venue scouts and in-house operators.") (https://perma.cc/NUC7-WEKX); Ex. 51 (Basketball API Documentation) (same)  (https://perma.cc/8MZQ-TLG8);  Ex.  52  (Football  API  Documentation)  (same)  (https://perma.cc/2DD5-SQDE);    Ex.    53    (Hockey    API    Documentation)    (same)  (https://perma.cc/3ZJS-43NQ);    Ex.    54    (Soccer    API    Documentation)    (same)  (https://perma.cc/AV94-HVKM).

182.    FanDuel's servers transmit data files to customers' devices corresponding to the game element data that FanDuel collects.  FanDuel sends these game data updates to its customers so the '237 Accused Products can provide up-to-date data as close to real-time as possible.  For example, as shown below, FanDuel send game statistics and betting odds updates to customers.





Screenshots of FD Sportsbook network traffic showing the request and response for the live game statistic data feed of a game.

183.    As shown in the diagram below, the data which can include the updated odds for propositions and in-game betting options and the statistics for the game is sent to a plurality of devices.



Photo of two devices running FD Sportsbook that are part of the same cohort before receiving updates.



Photo of two devices running FD Sportsbook that are part of the same cohort receiving updates.

184.    FanDuel sends lockout signals to prevent customers from entering selections in the games after a result has happened at the underlying sporting event.  To do so, FanDuel relies on a bookmaker or producer observing a low-latency television feed located remotely from the event in order to determine when to trigger the lockout signal.

185.    FanDuel receives its real-time data from Sportsradar.  Ex. 49 ("FanDuel Group and Sportradar, the global provider of sports data and content, announced an extension of their current partnership, giving FanDuel access to the use of official NFL league data.  FanDuel now has access to all major U.S. sports data from Sportradar.") (https://press.fanduel.com/press-releases/fanduel-group-adds-official-nfl-data-with-extension-to-sportradar-partnership).    Sportsradar uses data scouts (or data journalists) that are physically present at games to send event data to its servers. *See* Sportradar's Live Scouting Data Journalists in Action (Sportsradar data scout explaining that while watching the game at the venue he "use[s] specialty software to record every event that happens. . . . As soon as [he] see[s] it happen [he] press[es] the button [on the software]. [He] enter[s] it into the system and it goes live.") (https://www.youtube.com/watch?v=5WGY-Vu9ZZg); *see also* Ex. 50 (Baseball API Documentation) ("Data is collected via Sportradar on-venue scouts and in-house operators.") (https://perma.cc/NUC7-WEKX); Ex. 51 (Basketball API Documentation) (same) (https://perma.cc/8MZQ-TLG8); Ex. 52 (Football API Documentation) (same)  (https://perma.cc/2DD5-SQDE);  Ex.  53  (Hockey  API  Documentation)  (same) (https://perma.cc/3ZJS-43NQ);    Ex.    54    (Soccer    API    Documentation)    (same) (https://perma.cc/AV94-HVKM).  FanDuel uses this data as a basis to either adjust or directly trigger the lockout signals.

186.    FD Sportsbook customers can place bets before or during the game.  Upon triggering a lockout signal, a bet becomes unavailable, the odds offering will turn converted to a

greyed-out lock symbol and player will not be able to add this selection to the bet slip, and the user will receive a notification that the bet is closed.

187.    FD Sportsbook's betting procedure works as a "shopping cart."  Customers can place bets before or during the game.  If a bet becomes unavailable, customers will receive a lockout signal: the odds offering will convert from an active betting into a greyed-out lock symbol, meaning that customers can no longer add this selection to their bet slip.



Screenshot of FD Sportsbook App showing a customer is locked out from placing a bet.

188.    If the locked-out bet is already in the cart, the user will receive a notification that the bet is closed.  The screenshots below illustrate a cart before and after FanDuel sends a lockout signal.





Screenshot of a FD Sportsbook app.          Screenshot of the FD Sportsbook app.

189.    Thus, FanDuel's '237 Accused Product satisfies all elements of exemplary Claim 1 of the '237 Patent.

190.    U.S. Patent Application No. 16/909,661 was issued as the '237 Patent on November 30, 2021.  For the reasons discussed above in the Section entitled FanDuel's Knowledge of the Asserted Patents, FanDuel became aware of the '237 Patent and aware that its activities concerning the '237 Accused Product infringed the '237 Patent no later than upon its issuance on February 1, 2022.  At the very least, FanDuel became aware of its infringement of the '237 Patent from its receipt of this Complaint.

191.    Pursuant to 35 U.S.C. §§ 283, 284, and 285, WinView is entitled to injunctive relief, damages, and attorney's fees and costs.

192.    In light of FanDuel's knowledge of WinView and the '237 Patent, FanDuel has deliberately infringed and continues to deliberately infringe in a wanton, malicious, and egregious manner, with reckless disregard for WinView's patent rights.  FanDuel's infringing actions have been and continue to be consciously wrongful.

193.    The Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to WinView pursuant to 35 U.S.C. § 285.

194.    WinView has suffered and continues to suffer irreparable harm as a direct and proximate result of FanDuel's infringement for which there is no adequate remedy at law.  Unless FanDuel is enjoined, WinView will continue to suffer such irreparable injury.

## COUNT IV
### (Indirect Infringement of U.S. Patent No. 11,235,237)

195.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the preceding paragraphs, as set forth above.

196.    As set forth above, FanDuel has had knowledge of its infringement of WinView's '237 Patent since at least as early as February 1, 2024 and has further knowledge of the '237 Accused Products' infringement of the '237 Patent from the filing of this Complaint.

197.    As set forth above, the '237 Accused Product directly infringes the '237 Patent. FanDuel has induced and continues to induce its customers' direct infringement of one or more claims of the '237 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and

guiding its customers to directly infringe one or more claims of the '237 Patent by using the '237 Accused Product.

198.    FanDuel knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '237 Accused Product, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games.  As discussed above, when the '237 Accused Product is used to gamble, it necessarily infringes the '237 Patent.  Therefore, FanDuel's encouragement of its customers to use the '237 Accused Product to gamble necessarily encourages its customers to directly infringe the '237 Patent.

199.    As discussed in more detail above with respect to the '770 Patent, FanDuel encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '237 Accused Product, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '237 Accused Product in an infringing manner.

200.    All the elements of the claims of the '237 Patent are used by FanDuel and its customers, purchasers, customers, developers, vendors, and manufacturers, or a combination thereof.  As set forth above, FanDuel has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with FanDuel, one or more claims of the '237 Patent.

201.    FanDuel also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '237 Patent pursuant to 35 U.S.C. § 271(c). As discussed above, FanDuel has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '237 Accused Product within the United States, without authority

from WinView, it is providing the '237 Accused Product which is a material components of the systems infringing one or more claims of the '237 Patent. The '237 Accused Product is not a staple article or commodity of commerce suitable for substantial non-infringing uses. As discussed above, when the '237 Accused Product is used to gamble, which is its only substantial intended function, it infringes the '237 Patent.

202.    FanDuel's indirect infringement of the '237 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

203.    FanDuel's indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

204.    FanDuel's indirect infringement of the '237 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

205.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's indirect infringement.

## COUNT V
### (Direct Infringement of U.S. Patent No. 11,338,189)

206.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

207.    In violation of 35 U.S.C. § 271(a), FanDuel directly infringed and continues to directly infringe the '189 Patent, including without limitation exemplary Claim 24, by making, using, importing, selling, and offering for sale in the United States FD Fantasy and FanDuel Pick6: Fantasy Game (the "'189 Accused Products").

208.    As set forth above in the Section entitled The Parties, Defendants FanDuel Inc., FanDuel Group, FanDuel Group Parent, Flutter, and Betfair operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

209.    FanDuel's acts of making, using, importing, selling, and offering for sale the infringing '189 Accused Products have been without the permission, consent, authorization, or license of WinView.  Indeed, FanDuel declined WinView's request that FanDuel partner with WinView.

210.    FanDuel's infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents.

211.    FanDuel owns and controls the operation of its '189 Accused Products and generates substantial financial revenues therefrom.  FanDuel puts into service these products and directs and controls their operations as the licensed operator of these systems.  To the extent portions of the '189 Accused Products are hosted on AWS servers, as discussed above, FanDuel controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '189 Accused Products in order to generate revenue.

212.    To the extent FanDuel's customers, purchasers, customers, developers, vendors, and manufacturers direct and control the devices and methods in the claims, FanDuel obtains benefits from its control of the system as a whole.

213.    FanDuel also has directly infringed and continues to directly infringe the '189 Patent by having its employees test and use the '189 Accused Products in the United States.  In order to maintain legal compliance, FanDuel is required to periodically monitor and ensure that

the '189 Accused Products are performing as designed and intended. FanDuel further directly infringes by marketing and distributing the '189 Accused Products, which constitutes infringing offers to sell and sales.

214.    By way of example of FanDuel's infringement of the '189 Patent, the '189 Accused Products meet all of the limitations of exemplary Claim 24 of the '189 Patent, which recites:

24. A method programmed in a memory of a device comprising:

a. generating a list of multiple contests of skill or chance to join;

b. presenting the list of multiple contests of skill or chance to join, wherein the multiple contests of skill or chance correspond to one or more events;

c. receiving user input including event selections related to the one or more events and to which of the multiple contests of skill or chance the selections are to be applied, wherein the event selections are separately applied to each of the selected multiple contests of skill or chance, wherein the event selections enable simultaneously and in real time participating in the selected multiple contests of skill or chance;

d. storing results and standings based on the event selections, wherein the standings are based on the results, wherein the standings are separated for each of the multiple contests of skill or chance; and

e. transmitting the standings to the device, wherein the multiple contests of skill or chance are selected from single entry contests and multiple entry contests.

215.    The '189 Accused Products infringe the '189 Patent, including exemplary Claim 24, in violation of 35 U.S.C. § 271(a)-(c). For example, they comprise a software method programmed in the memory of computer devices, as discussed below.

216.    The FD Fantasy app is software that is stored in the memory of customers' electronic devices, such as smartphones and tablets. Below are screenshots of FD Fantasy app, on the Apple App Store and Google Play Store.





Screenshot of the FD Fantasy app on Apple App Store.

Screenshot of the FD Fantasy app on Apple App Store.

217.    Alternatively, FD Fantasy can be accessed via its website on customers' smartphones, tablets, and computers.  Below is a screenshot of FD Fantasy.



Screenshot of FD Fantasy website.

218.    The '189 Accused Products generate lists of contests that customers are allowed to join.  FanDuel provides applications that are configured for receiving information related to one

or more events, including information based on the geographic location of the device.  FanDuel

uses GPS, Bluetooth, and Wi-Fi location services to determine the location of a device, and present

contests    that    a    user    is    legally    able    to    join.    *See,    e.g.*,    Ex.    34

([https://support.fanduel.com/s/article/Location-Troubleshooting-Tips#state](https://support.fanduel.com/s/article/Location-Troubleshooting-Tips#state)).

## Wi-Fi requirements

Fully connect to Wi-Fi, and make sure that it is set up on your device via the connection settings. Our location systems require **Wi-Fi, GPS, or GSM signals** to locate you.

***Ethernet (wireline connection) will not pass the location check, you must be connected using a Wi-Fi connection.***

If using an **Android device**, you will need to change the settings on the device to 'High Accuracy Mode', within your location settings on your device. It may also help to manually disconnect and reconnect your Wi-Fi router.

A stronger network connection will help with location accuracy.

*Id.* at 2.

219.    FanDuel provides customers with state-specific bets to ensure that customers are

physically located where FD Fantasy is legal.  The '189 Accused Products identify the current

geographic location of the customers' mobile device or computer.  The FD Fantasy website and

mobile application will allow customers to participate in contests for prizes only in jurisdictions

where FD Fantasy is permitted.  *See, e.g.*, Ex. 64 at 2 ("See where your state stands. . . .  The map

below shows where we currently offer paid contests.") ([https://www.fanduel.com/legal](https://www.fanduel.com/legal)); Ex. 35

("Each state, commonwealth, or province have specific regulations on sports betting, horse racing,

daily fantasy, and casino games.") ([https://support.fanduel.com/s/article/FanDuel-House-Rules-Hub](https://support.fanduel.com/s/article/FanDuel-House-Rules-Hub)).

220.    In addition to location-based offerings, FD Fantasy provides contests where eligibility is based on customers' time on the platform, skill, or participation level.  For example, FD Fantasy offers "Beginner Contests" which are available to players who have participated in fewer than 50 contests and have not earned an experience badge, allowing new customers to compete against other beginners and avoid more skilled "sharks" who might otherwise dominate contests.  Ex. 65 (What's New: Beginner Contests) ("Beginner contests are exclusively for less experienced players on FanDuel.  To be clear, no one who's played more than 50 contests on FanDuel has access to Beginner contests.   These are for newer FanDuel players only.") (https://www.fanduel.com/beginner-contests).  Similarly, FanDuel offers "Casual Contests" which are intended for players who played over 50 contests but have not yet earned an experience badge, offering a space where intermediate players can continue to improve without facing highly skilled veterans.    Ex. 66 (What's New: Experienced Player Indicator | FanDuel) (https://www.fanduel.com/experienced).



Screenshot of exemplary Beginner Contest from FanDuel's website.

221.    Based on these determinations, the '189 Accused Products present a list of contests that customers are eligible to join, which correspond to real-world events, such as NBA basketball games.

222.    After displaying the list of contests, the '189 Accused Products receive customer input related to the available contests, allowing the customers to make the same selections across multiple selected contests that can take place simultaneously.  FanDuel allows customers to choose a league, team, lineup, and place bets.  For example, FD Fantasy allows customers to create one or more lineups and enter the lineups into multiple contests.  Each line up can be entered into a different competition.  Below are screenshots of the FD Fantasy app (in the example, on an Apple device) showing that FD Fantasy allows a user to compete in distinct contests for each line up.  In the screenshot below, the customer entered two different line ups into three different contest, one of which both line ups were entered into.  These contests will occur simultaneously and begin at "7pm ET."



Screenshot from the FD Fantasy app.





Screenshot of FD Fantasy app showing a user can create a lineup to enter into contests.

Screenshot of FD Fantasy app showing a user can enter the lineup into other contests.

223.    FanDuel stores results from the events separated by the different contests, and then transmits those standings and results to customers' devices and computers to be displayed. FD Fantasy gives customers access to Live Scoring, which provides real-time standings for all contests a user is participating in. The below screenshot on the left illustrates the score of each contest the user enters. The below screenshot on the right shows a customer's ranking with respect to the other participants for a specific contest.

 

Screenshots of the live 'Scores' tab where the live standings are shown.

224.    Thus, FanDuel's '189 Accused Products satisfy all elements of exemplary Claim 24 of the '189 Patent.

225.    FanDuel's direct infringement of the '189 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty

226.    The USPTO issued U.S. Patent Application No. 17/024,330 as the '189 Patent on May 24, 2022.  For the reasons discussed above in the Section entitled FanDuel's Knowledge of the Asserted Patents, FanDuel became aware of the '189 Patent and aware that its activities concerning the '189 Accused Products infringed the '189 Patent no later than upon its issuance on May 24, 2022.  At the very least, FanDuel became aware of its infringement of the '189 Patent from its receipt of this Complaint.

227.    FanDuel's pre-suit infringement and ongoing infringement since the filing of this action are willful, blatant, and in egregious disregard for WinView's patent rights in the '189 Patent.

228.    FanDuel's infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

229.    As discussed above, FanDuel acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '189 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.  WinView is further entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's direct infringement of the '189 Patent.

## COUNT VI
### (Indirect Infringement of U.S. Patent No. 11,338,189)

230.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the preceding paragraphs, as set forth above.

231.    As set forth above, FanDuel has had knowledge of its infringement of WinView's '189 Patent since at least as early as May 24, 2024 and has further knowledge of the '189 Accused Products' infringement of the '189 Patent from the filing of this Complaint.

232.    As set forth above, the '189 Accused Products directly infringe the '189 Patent. FanDuel has induced and continues to induce its customers' direct infringement of one or more claims of the '189 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and

guiding its customers to directly infringe one or more claims of the '189 Patent by using the '189 Accused Products.

233.    FanDuel knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '189 Accused Products, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games.  As discussed above, when the '189 Accused Products are used to gamble, they necessarily infringe the '189 Patent.  Therefore, FanDuel's encouragement of its customers to use the '189 Accused Products to gamble necessarily encourages its customers to directly infringe the '189 Patent.

234.    As discussed in more detail above with respect to the '770 Patent, FanDuel encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '189 Accused Product, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '189 Accused Product in an infringing manner.

235.    As an example of FanDuel's active encouragement of direct infringement, FanDuel makes its FD Fantasy product conveniently accessible by offering the service on its website and mobile applications for Android, iOS, and iPadOS.



Screenshot of FD Fantasy app on Apple App Store on iOS.



Screenshot of FD Fantasy app on the Google Play Store.



Screenshot of FD Fantasy app on the Apple App Store on iPadOS.

236.    FanDuel further encourages customers to actively engage with its support platform which addresses FAQs and provides comprehensive resources through its instruction guides designed to assist customers.  FanDuel offers detailed guides on how to play various games and understand the underlying concepts.  For example, it includes sections like *How to Play*.  Ex. 67 (FanDuel: FD Fantasy)  (https://www.fanduel.com/daily-fantasy-sports).   Customers  are  also provided with clear explanations of how FanDuel's contests work, including *FanDuel Spring Training Camp*.  Ex. 68 (Training Guides) (https://www.fanduel.com/training-guides); Ex. 69 (MLB Training Guide 2021 | FanDuel) (https://www.fanduel.com/mlb-guide?t=tguides).



Screenshot of the FanDuel Fantasy App.

237.    Additionally, FanDuel provides instructions on how to use the actual Accused Product platforms, *What is Auto-Draft and How do I Use It* and *Can I create My Own Fantasy Contest*.    Ex.    70    (What    is    Auto-Draft    and    how    do    I    do    it?)

(https://support.fanduel.com/s/article/What-is-Auto-Draft-and-How-Do-I-Do-It?categories=%5B%22Product.Fantasy%22%5D); Ex. 71 (Can I create my own fantasy contest?) (https://support.fanduel.com/s/article/Can-I-create-my-own-contest).

238.    As discussed above, FanDuel also actively markets its Accused Products through several channels, including social media advertisements, sponsored content, in-casino advertisements, billboards, FanDuel's websites, and traditional media.

239.    FanDuel's marketing aims to recruit new customers, retain current customers, and grow customer value via different marketing strategies and offerings. Ex. 61 (https://www.flutter.com/media/5afjvzl1/flutter-factsheet-jan-2024.pdf); Ex. 62 (https://www.flutter.com/media/305i1v3v/flutter-investor-day-final-website.pdf). These investments and personalized promotions are intended to increase consumer awareness and drive engagement.

240.    All the elements of the claims of the '189 Patent are used by FanDuel and its customers, purchasers, customers, developers, vendors, and manufacturers, or a combination thereof.  As set forth above, FanDuel has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with FanDuel, one or more claims of the '189 Patent.

241.    FanDuel also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '189 Patent pursuant to 35 U.S.C. § 271(c). As discussed above, FanDuel has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '189 Accused Products within the United States, without authority from WinView, it is providing the '189 Accused Products which are material components of the systems infringing one or more claims of the '189 Patent.  The '189 Accused

Products are not staple articles or commodities of commerce suitable for substantial non-infringing uses.  As discussed above, when the '189 Accused Products are used to gamble, which is their only substantial intended function, they infringe the '189 Patent.

242.    FanDuel's indirect infringement of the '189 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

243.    FanDuel's indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

244.    FanDuel's indirect infringement of the '189 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

245.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's indirect infringement.

<u>COUNT VII</u>
**(Direct Infringement of U.S. Patent No. 11,451,883)**

246.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

247.    In violation of 35 U.S.C. § 271(a), FanDuel directly infringed and continues to directly infringe the '883 Patent, including without limitation exemplary Claim 20, by making, using, importing, selling, and offering for sale in the United States FD Sportsbook, FD Racing, FD Casino, and FD Fantasy offerings (the "'883 Accused Products").

248.    While the '883 Patent includes both method claims and non-method claims, WinView is only asserting the method claims of the '883 Patent and is not asserting any non-

method claims of the '883 Patent.  The marking requirement of 35 U.S.C. § 287(a), therefore, does not apply to WinView's request for pre-suit damages for the '883 Patent because WinView is only asserting method claims from the '883 Patent.

249.    As set forth above in the Section entitled The Parties, Defendants FanDuel Inc., FanDuel Group, FanDuel Group Parent, Flutter, and Betfair operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

250.    FanDuel's acts of making, using, importing, selling, and offering for sale the infringing '883 Accused Products have been without the permission, consent, authorization, or license of WinView.  Indeed, FanDuel declined WinView's request that FanDuel partner with WinView.

251.    FanDuel's infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents

252.    FanDuel owns and controls the operation of the '883 Accused Products and generates substantial financial revenues therefrom.  FanDuel puts into service these products and directs and controls their operations as the licensed operator of these systems.  To the extent portions of the '883 Accused Products are hosted on AWS servers, as discussed above, FanDuel controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '883 Accused Products in order to generate revenue.

253.    To the extent FanDuel's customers, purchasers, customers, developers, vendors, and manufacturers direct and control the devices and methods in the claims, FanDuel obtains benefits from its control of the system as a whole.

254.    FanDuel also has directly infringed and continues to directly infringe the '883 Patent by having its employees test and use the '883 Accused Products in the United States. In order to maintain legal compliance, FanDuel is required to periodically monitor and ensure that the '883 Accused Products are performing as designed and intended. FanDuel further directly infringes by marketing and distributing the '883 Accused Products, which constitutes infringing offers to sell and sales.

255.    By way of example of FanDuel's infringement of the '883 Patent, the '883 Accused Products meet all of the limitations of exemplary Claim 20 of the '883 Patent, which recites:

20. A method of implementing a consumer service with a server comprising:

transmitting a set of service related information to an application;

receiving a selection related to the consumer service;

transmitting a set of selection information related to the selection from the server to a mobile Internet-connected computing device;

receiving additional information based on a user's execution of the application on the mobile Internet-connected computing device;

transmitting a list of assets necessary for executing the application, wherein the assets necessary for executing the application directly affect the operation of the application; and

transmitting only a second set of assets within the list of assets that are not already resident on the mobile Internet-connected computing device.

256.    The '883 Accused Products infringe the '883 Patent, including exemplary Claim 20, in violation of 35 U.S.C. § 271(a)-(c). For example, they perform the recited method of implementing a consumer service via a server, as discussed below.

257.    FanDuel performs the method implemented on a server device that interacts with an app or webpage which is downloaded to a device in order to implement the '883 Accused Products.  These product offerings are provided by FanDuel from servers.

258.    FanDuel operates servers within each jurisdiction in which it offers the '883 Accused Products, as states generally require that FanDuel's servers be located within their boundaries in order to operate.  *See, e.g.*, N.Y. PML § 1367-A(h)-(i).  These servers communicate with customers' devices, which allow customers to operate the '883 Accused Products on their devices.

259.    In addition to its own servers, FanDuel uses cloud-hosted services to support the operation of the '883 Accused Products.  Specifically, FanDuel uses AWS as its strategic cloud provider.    Ex.  43    (https://press.aboutamazon.com/2023/9/fanduel-selects-aws-as-its-strategic-cloud-provider).  FanDuel uses AWS' Lambda function as a service.  Ex. 44 at 2 ("For our product our tech stack is Java for the core functionality . . . . Infrastructure wise we host our tech stack on AWS using services such as EC2, EKS, AWS Lambda, and AWS RDS managing it all with Terraform.")        (https://medium.com/fanduel-life/whats-it-like-being-an-engineer-at-fanduel-4505e7ca283c).  Reviewing the network traffic of an Accused Product illustrates FanDuel's use of AWS' S3 (object storage system) and CloudFront (content delivery network) services which implement with Lambda.  *See, e.g.*, Ex. 39 (FanDuel's technology profile illustrating it uses AWS services such as CloudFront S3) (https://builtwith.com/fanduel.com).



Screenshot of FanDuel's network traffic with X-Amz-Cf-Id in the response header; *see also* Ex. 77 (listing X-Amz-Cf-Id as an AWS response header) (https://docs.aws.amazon.com/AmazonCloudFront/latest/DeveloperGuide/RequestAndResponse BehaviorCustomOrigin.html).

260.    As shown in the screenshot below, FanDuel's engineering blogs also confirm its use of AWS.



Ex. 42 at 4-5 (https://medium.com/fanduel-life/how-does-fanduel-technology-win-the-super-bowl-5febde9be002).

261.    FanDuel has direction and control over AWS' servers via its services.  As discussed above, the AWS' Customer Agreement states that FanDuel is responsible for its content, proper configuration and use of AWS services, and its end customers' compliance with FanDuel agreement with AWS, acknowledging that AWS does not provide support and services to FanDuel's customers.  Ex. 45 (AWS Customer Agreement) (https://aws.amazon.com/agreement/).

262.    Additionally, AWS' data privacy terms specify that "[FanDuel] maintain[s] full control of [its] content that [it] uploads to the AWS services . . . , and [is] responsib[le] for

configuring access to AWS services and resources. . . . [FanDuel] configure[s] access control permissions for any of the services [it] develop[s] or deploy[s] in an AWS environment. [AWS] do not access or use [FanDuel's] content for any purpose without [its] agreement." Ex. 46 at 1 (Data Privacy FAQs) (https://aws.amazon.com/compliance/data-privacy-faq/).

263.    In order to operate the '883 Accused Products, FanDuel transmits a set of service related information to the '883 Accused Products on customers' devices. For example, when customers open the FD Sportsbook apps and are authenticated, they are presented with the home screen. Customers are then provided with a variety of information about the services available to them through the '883 Accused Products, such as promotions, a list of current games, and quick links to, for example, FanDuel's different sports offerings (e.g., NBA, NCAAB, and NHL) and other product offerings, such as FD Casino and FD Racing.



Screenshot of the FD Sportsbook app showing service related information sent to customer's device.

264.    FanDuel customers then make selections based on the consumer service information provided to them by the '883 Accused Products.  For example, in the screenshot above, a user can select "Live now" to view all of the live betting available at a moment in time.  In response to the selection of "Live now" betting, customers receive and are presented with a list of options, including the following tennis games: Stefanos Tsitspas vs Harold Mayot, Jiang / Wu vs Gadecki / Nicholls, and Daria Snigur vs Caroline Dolehide.  These options are shown in the screenshot below.



Screenshot of FD Sportsbook App showing a list of available games.

265.    Throughout the duration of the game, FanDuel continuously communicates with customers' devices that are running the '883 Accused Products in order to provide information such as real-time game statistics and betting information during a live gaming event.  In order to do so, FanDuel sends lists of assets to a user's device which can be compared to the existing list of assets on the device or subsequent lists that are generated on the device.  Ex. 55 (How to Bet Strategy Guide and Tips) (https://www.fanduel.com/sports-betting-strategy).



**LIVE BETS OR IN-GAME BETS**

If you're late to a game, you can still get in on the action. Live bets are any bets placed on a live game after it has already started. FanDuel offers odds throughout the game that continuously update as the game progresses.

FYI: Odds are subject to change at any time and often change frequently in real time. Toggle on the "Always accept odds movement", located on the betslip, to submit bets without confirming changes to odds for quick bet placement. Toggle off to confirm odds changes before bet placement.

*Id.* at 5.

266.    The continuous communication of new assets not previously received by the customer's device is shown by looking at the network traffic for an in-game bet.  The screenshot below shows that the '883 Accused Products operating on customers' devices subscribe to data streams after connecting to a live bet, indicating that FanDuel's servers are transmitting the new data assets not already located on the customer's device.  Monitoring the network connection also confirms this.  For example, in the screenshot below, the transmittal of the list of in-game betting options is transmitted in the entry beginning 'in-play?timezone=America%2FNew_York'The entries that begin '{"event":"Event", "data":' are examples of a list of assets, with the green arrow indicating a message transmitted from a customer's device and received by FanDuel's servers and the red arrow indicating a message that FanDuel's servers transmit to the customer's device.



Screenshot of the FD Sportsbook website's network traffic.

267. The following is a partial list of assets transmitted by FanDuel for a basketball game:

Screenshot of the FD Sportsbook website's network traffic.



Screenshot of the FD Sportsbook website's network traffic.

268.    This list of assets can be compared with a subsequent list.  The example below shows screenshots from FD Sportsbook relating to an MLB game between the Chicago Cubs and the Texas Rangers.  These screenshots show that FanDuel is providing updates with game statistics, such as score, batting information, inning information, and betting information.

  

Screenshot of the FD Sportsbook app.    Screenshot of the FD Sportsbook app with new pitch result and odds data.

269.    Comparing the two screenshots above, FanDuel updated the odds for the "Game Line" and "To Hit A Home Run" bets in response to a "ball" for the batter. FanDuel also updated the game statistics to reflect the ball.





Screenshot of the FD Sportsbook app.

Screenshot of the FD Sportsbook app showing the receipt of new assets.

270.    In the course of providing these updates, FanDuel transmits updates assets that are not already resident on the customer's device.  The first list of assets can contain pre-game betting odds and the second list of assets can contain updated betting odds based on in-game events.  As another example, a first list of assets can contain previously-updated betting odds and a second list of assets can contain the odds that have changed based on in-game events.

271.    For example, with respect to the MLB game described above, the score, previously updated "Game Line" odds, and "To Hit A Home Run" odds are included in a first list of assets. After the ball, the game stats and odds will be outdated, so FanDuel sends a second list of assets that contains at least the updated game statistics and odd.  The above screen captures show the

addition of a new asset received from FanDuel and the removal of former assets that are no longer needed.

272.    Thus, FanDuel's '883 Accused Products satisfy all elements of exemplary Claim 20 of the '883 Patent.

273.    FanDuel's direct infringement of the '883 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

274.    The USPTO issued U.S. Patent Application No. 16/893,180 as the '883 Patent on September 20, 2022.  For the reasons discussed above in the Section entitled FanDuel's Knowledge of the Asserted Patents, FanDuel became aware of the '883 Patent and aware that its activities concerning the '883 Accused Products infringed the '883 Patent no later than upon its issuance on September 20, 2022.  At the very least, FanDuel became aware of its infringement of the '883 Patent from its receipt of this Complaint.

275.    FanDuel's pre-suit infringement and ongoing infringement since the filing of this action are willful, blatant, and in egregious disregard for WinView's patent rights in the '883 Patent.

276.    FanDuel's infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

277.    As discussed above, FanDuel acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '883 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.  WinView is further entitled to injunctive relief, damages and any other relief in

accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's direct infringement of the '883 Patent.

## COUNT VIII
### (Indirect Infringement of U.S. Patent No. 11,451,883)

278.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

279.    As set forth above, FanDuel has had knowledge of its infringement of WinView's '883 Patent since at least as early as September 20, 2022 and has further knowledge of the '883 Accused Products' infringement of the '883 Patent from the filing of this Complaint.

280.    As set forth above, the '883 Accused Products directly infringe the '883 Patent. FanDuel has induced and continues to induce its customers' direct infringement of one or more claims of the '883 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '883 Patent by using the '883 Accused Products.

281.    FanDuel knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '883 Accused Products, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games.  As discussed above, when the '883 Accused Products are used to gamble, they necessarily infringe the '883 Patent.  Therefore, FanDuel's encouragement of its customers to use the '883 Accused Products to gamble necessarily encourages its customers to directly infringe the '883 Patent.

282.    As discussed in more detail above with respect to the '770 Patent, FanDuel encourages and induces its customers to infringe by providing new and existing customer

123

promotions and incentives, instructions, guidance regarding the use of the '883 Accused Products, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '883 Accused Products in an infringing manner.

283.    All the elements of the claims of the '883 Patent are used by FanDuel and its customers, purchasers, customers, developers, vendors, and manufacturers, or a combination thereof.  As set forth above, FanDuel has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with FanDuel, one or more claims of the '883 Patent.

284.    FanDuel also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '883 Patent pursuant to 35 U.S.C. § 271(c). As discussed above, FanDuel has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '883 Accused Products within the United States, without authority from WinView, it is providing the '883 Accused Products which are materials and apparatuses for practicing the claimed inventions of one or more claims of the '883 Patent.  The '883 Accused Products are material components of the systems infringing one or more claims of the '883 Patent.  The '883 Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing uses.  As discussed above, when the '883 Accused Products are used to gamble, which is their only substantial intended function, they infringe the '883 Patent.

285.    FanDuel's indirect infringement of the '883 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

286.    FanDuel's indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

287. FanDuel's indirect infringement of the '883 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

288. WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's indirect infringement.

## COUNT IX
### (Direct Infringement of U.S. Patent No. 11,678,020)

289. WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

290. In violation of 35 U.S.C. § 271(a), FanDuel directly infringed and continues to directly infringe the '020 Patent, including without limitation exemplary Claim 1, by making, using, importing, selling, and offering for sale in the United States FD Sportsbook, FD Casino, and FD Racing (the "'020 Accused Products").

291. As set forth above in the Section entitled The Parties, Defendants FanDuel Inc., FanDuel Group, FanDuel Group Parent, Flutter, and Betfair operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others. Thus, Defendants directly infringe by operating as a joint enterprise.

292. FanDuel's acts of making, using, importing, selling, and offering for sale the infringing '020 Accused Products have been without the permission, consent, authorization, or license of WinView. Indeed, FanDuel declined WinView's request that FanDuel partner with WinView.

293. FanDuel's infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents.

294.    FanDuel owns and controls the operation of the '020 Accused Products and generates substantial financial revenues therefrom.  FanDuel puts into service these products and directs and controls their operations as the licensed operator of these systems.  To the extent portions of the '020 Accused Products are hosted on AWS servers, as discussed above, FanDuel controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '020 Accused Products in order to generate revenue.

295.    To the extent FanDuel's customers, purchasers, customers, developers, vendors, and manufacturers direct and control the devices and methods in the claims, FanDuel obtains benefits from its control of the system as a whole.

296.    FanDuel also has directly infringed and continues to directly infringe the '020 Patent by having its employees test and use the '020 Accused Products in the United States.  In order to maintain legal compliance, FanDuel is required to periodically monitor and ensure that the '020 Accused Products are performing as designed and intended.  FanDuel further directly infringes by marketing and distributing the '020 Accused Products, which constitutes infringing offers to sell and sales.

297.    By way of example of FanDuel's infringement of the '020 Patent, the '020 Accused Products meet all of the limitations of exemplary Claim 1 of the '020 Patent, which recites:

1. A method of providing a game of skill or chance or other entertainment including content related to an event, the method comprising:

a. determining a location of a mobile device;

b. providing the game of skill or chance or other entertainment during the event, based on the location of the mobile device;

c. receiving input related to the game of skill or chance or other entertainment during the event; and

126

d. triggering a lockout signal to prevent customers from submitting a response to the game of skill or chance or other entertainment, including utilizing a person in physical attendance at the event to determine when to trigger the lockout signal.

298.    The '020 Accused Products infringe the '020 Patent, including exemplary Claim 1, in violation of 35 U.S.C. § 271(a)-(c).  For example, they perform the recited method of providing a game including content related to live events, as discussed below.

299.    FanDuel allows customers to bet on sports matches, play paid-entry daily fantasy leagues, and wager on casino game livestreams.  The '020 Accused Products involves games of chance.  FanDuel allows customers to bet on sports matches and casino game livestreams.

300.    FanDuel provides the FD Sportsbook websites and the associated mobile applications.  The FD Sportsbook offerings may be accessed online at sportsbook.fanduel.com and casino.fanduel.com respectively and by using the FD Sportsbook Apps on mobile devices such as a smartphone, tablet, or computer.

301.    FanDuel determines the geographic location of customers' devices and provides content streams to each device based on the geographic location of the device.  For example, FD Sportsbook determines the competitive group a user is eligible to compete in based on the geographic location of the device.  FanDuel is required by law to determine its customers' physical locations, as customers must be located in a state that allows the type of wager they seek to place. FanDuel uses GPS, Bluetooth, and Wi-Fi location services to determine the location of customer devices.  *See, e.g.,* Ex. 34  (https://support.fanduel.com/s/article/Location-Troubleshooting-Tips#state).

## Wi-Fi requirements

Fully connect to Wi-Fi, and make sure that it is set up on your device via the connection settings. Our location systems require **Wi-Fi, GPS, or GSM signals** to locate you.

*Ethernet (wireline connection) will not pass the location check, you must be connected using a Wi-Fi connection.*

If using an **Android device**, you will need to change the settings on the device to 'High Accuracy Mode', within your location settings on your device. It may also help to manually disconnect and reconnect your Wi-Fi router.

A stronger network connection will help with location accuracy.

*Id.* at 2.

302.    FanDuel offers online sports betting in Arizona, Colorado, Connecticut, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Vermont, Virginia, Washington D.C., West Virginia and Wyoming.



Ex. 28 (FanDuel Sports Betting US Map) (https://www.fanduel.com/legal-sports-betting-us-map).  Similarly, FanDuel iGaming offering is available in Connecticut, Delaware, Michigan, New Jersey, Pennsylvania, Rhode Island and West Virginia.  *See* Ex. 72 (Where can I play FD Casino?) (https://support.fanduel.com/s/article/Can-I-play-on-Fanduel-Casino-from-anywhere-in-the-US).



Ex. 73 (States Where Online Casinos are Legal 2025 | FanDuel)

(https://www.fanduel.com/casino/states-where-online-casinos-are-legal).

303.    FanDuel offers preliminary location-based requirements for the '020 Accused

Products: physical presence in certain jurisdictions and requisite age per jurisdiction.  Ex. 28

(FanDuel Sports Betting US Map) (https://www.fanduel.com/legal-sports-betting-us-map); Ex. 72

(Where can I play FD Casino?) (listing jurisdictions where online gambling is allowed)

(https://support.fanduel.com/s/article/Can-I-play-on-Fanduel-Casino-from-anywhere-in-the-US);

Ex. 74 (How old do I have to be to bet or play on FanDuel?) (listing required ages to use FD

Sportsbook  by  jurisdiction)  (https://support.fanduel.com/s/article/How-old-do-I-have-to-be-to-

bet-or-play-on-FanDuel); Ex. 75 (Parental Controls) (listing ages required to use FD Casino by jurisdiction) (https://account.ct.casino.fanduel.com/responsible-play/parental-controls).

304.    FanDuel provides customers with state-specific bets.  FanDuel complies with state laws regarding online sports betting.  Ex. 35 ("Each state, commonwealth, or province have specific regulations on sports betting, horse racing, daily fantasy, and casino games.") (https://support.fanduel.com/s/article/FanDuel-House-Rules-Hub); *see also* Ex. 36 (Bracket Betting State Guidelines) (https://www.fanduel.com/collegerules).  Comparing two states— Louisiana and Connecticut, Louisiana does not have any restrictions on sports betting, while Connecticut has restrictions on "in-state collegiate teams."  Therefore, during a game where UConn (home) is playing LSU, an individual physically located in Connecticut would not be able to bet on a UConn game, whereas an individual physically located in Louisiana could.

305.    Additionally, there are also other types of bet restrictions. Compare, for example, Louisiana and Arizona using the same UConn game. As noted above, there are no restrictions on individuals physically located in Louisiana. However, Arizona restricts prop betting on all collegiate events.  A prop (or proposition) bet is a type of side wager on parts of a game or event that may have nothing to do with the final outcome. Examples of popular prop bets range from picking the first player to record a basket in a game to the length of the national anthem at the Super Bowl.  So, while an individual physically located in Arizona may be able to bet on the actual game, they are not able to bet on what player will make the first basket in the UConn v. LSU game.

306.    FanDuel provides a summary of the state guidelines on its side.



Ex. 76 (FanDuel CFB Rules) (https://www.fanduel.com/collegesports-rules).

307.    FD Casino provides access to its casino games based on their geographic location. If a customer is within a state that allows iGaming, the customer will have access to the live streams of the game.



Screenshot of the FD Casino app showing a live stream of a baccarat game.

308.    For customers in jurisdictions that do not allow iGaming, the FD Casino app will prevent access to the streams for prohibited games.  For example, below is a screenshot of the FD Casino app on an Apple device showing that a user is blocked from accessing a stream for a casino game because of a geographic restriction.



Screenshot of the FD Casino app blocking access to the stream for a casino game due to the device's geographic location).

309. As discussed above, the list of available events and game information offered to customers changes based on the customers' locations. FanDuel then receives input from the customers' devices related to the selected game of skill or chance or other entertainment during

the event.  The input for the game of skill or change includes, for example, the submission of a bet.

 

Screenshots of the FD Sportsbook app showing data input by the customer for a selected game that is allowed in the customer's location.

310.    FanDuel prevents customers from entering untimely selections by sending a lockout signal, utilizing a person in physical attendance at the event to determine when to trigger the lockout signal.  FanDuel's lockout signal is derived in part from data scouts physically present at games.  FanDuel receives real-time data from Sportradar.  Ex. 49 ("FanDuel Group and Sportradar, the global provider of sports data and content, announced an extension of their current partnership, giving FanDuel access to the use of official NFL league data.  FanDuel now has access to all major U.S. sports data from Sportradar.") (https://press.fanduel.com/press-releases/fanduel-group-adds-official-nfl-data-with-extension-to-sportradar-partnership).    Sportradar uses data scouts (or data journalists) that are physically present at games to send event data to its servers.

*See* Sportradar's Live Scouting Data Journalists in Action (Sportradar data scout explaining that while watching the game at the venue he "use[s] specialty software to record every event that happens. . . . As soon as [he] see[s] it happen [he] press[es] the button [on the software]. [He] enter[s] it into the system and it goes live.") (https://www.youtube.com/watch?v=5WGY-Vu9ZZg); *see also* Ex. 50 (Baseball API Documentation) ("Data is collected via Sportradar on-venue scouts and in-house operators.") (https://perma.cc/NUC7-WEKX); Ex. 51 (Basketball API Documentation) (same) (https://perma.cc/8MZQ-TLG8); Ex. 52 (Football API Documentation) (same) (https://perma.cc/2DD5-SQDE); Ex. 53 (Hockey API Documentation) (same) (https://perma.cc/3ZJS-43NQ); Ex. 54 (Soccer API Documentation) (same) (https://perma.cc/AV94-HVKM). FanDuel uses this data as a basis to trigger or optimize the timing of the lockout signals.

311. FD Sportsbook customers can place bets before or during the game. Upon triggering a lockout signal, a bet becomes unavailable, the odds offering will turn converted to a greyed-out lock symbol and player will not be able to add this selection to the bet slip.



Screenshot of FD Sportsbook App showing a customer is locked out from placing a bet.

312.    If the locked-out bet is already in the cart, the user will receive a notification that the bet is closed.  The screenshots below illustrate a cart before and after FanDuel sends a lockout signal.

 

Screenshot of a FD Sportsbook app.

313.    Similarly, with respect to FD Casino, after customers' devices receive a lockout signal, the customers are prevented from placing a bet when outside of the allotted period.  Thus, FanDuel's '020 Accused Products satisfy all elements of exemplary Claim 1 of the '020 Patent.

314.    FanDuel's direct infringement of the '020 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

315.    The USPTO issued U.S. Patent Application No. 17/531,596 as the '020 Patent on June 13, 2023.  For the reasons discussed above in the Section entitled FanDuel's Knowledge of the Asserted Patents, FanDuel became aware of the '020 Patent and aware that its activities concerning the '020 Accused Products infringed the '020 Patent no later than upon its issuance. At the very least, FanDuel became aware of its infringement of the '020 Patent from its receipt of this Complaint.  FanDuel's pre-suit infringement and ongoing infringement since the filing of this

action are willful, blatant, and in egregious disregard for WinView's patent rights in the '020 Patent.

316.    FanDuel's infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

317.    As discussed above, FanDuel acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '020 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.  WinView is further entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's direct infringement of the '020 Patent.

## COUNT X
### (Indirect Infringement of U.S. Patent No. 11,678,020)

318.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

319.    As set forth above, FanDuel has had knowledge of its infringement of WinView's '020 Patent since at least as early as June 13, 2023 and has further knowledge of the '020 Accused Products' infringement of the '020 Patent from the filing of this Complaint.

320.    As set forth above, the '020 Accused Products directly infringe the '020 Patent. FanDuel has induced and continues to induce its customers' direct infringement of one or more claims of the '020 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '020 Patent by using the '020 Accused Products.

321.    FanDuel knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '020 Accused Products, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games.  As discussed above, when the '020 Accused Products are used to gamble, they necessarily infringe the '020 Patent.  Therefore, FanDuel's encouragement of its customers to use the '020 Accused Products to gamble necessarily encourages its customers to directly infringe the '020 Patent.

322.    As discussed in more detail above with respect to the '770 Patent, FanDuel encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '020 Accused Products, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '020 Accused Products in an infringing manner.

323.    All the elements of the claims of the '020 Patent are used by FanDuel and its customers, purchasers, customers, developers, vendors, and manufacturers, or a combination thereof.  As set forth above, FanDuel has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with FanDuel, one or more claims of the '020 Patent.

324.    FanDuel also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '020 Patent pursuant to 35 U.S.C. § 271(c).  As discussed above, FanDuel has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '020 Accused Products within the United States, without authority from WinView, it is providing the '020 Accused Products which are materials and apparatuses for practicing the claimed inventions of one or more claims of the '020 Patent.  The

'020 Accused Products are material components of the systems infringing one or more claims of the '020 Patent. The '020 Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing uses. As discussed above, when the '020 Accused Products are used to gamble, which is their only substantial intended function, they infringe the '020 Patent.

325.    FanDuel's indirect infringement of the '020 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

326.    FanDuel's indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

327.    FanDuel's indirect infringement of the '020 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

328.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's indirect infringement.

## COUNT XI
### (Direct Infringement of U.S. Patent No. 11,736,771)

329.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

330.    In violation of 35 U.S.C. § 271(a), FanDuel directly infringed and continues to directly infringe the '771 Patent, including without limitation exemplary Claim 1, by making, using, importing, selling, and offering for sale in the United States FD Sportsbook, FD Casino, and FD Racing (the "'771 Accused Products").

331.    As set forth above in the Section entitled The Parties, Defendants FanDuel Inc., FanDuel Group, FanDuel Group Parent, Flutter, and Betfair operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

332.    FanDuel's acts of making, using, importing, selling, and offering for sale the infringing '771 Accused Products have been without the permission, consent, authorization, or license of WinView.  Indeed, FanDuel declined WinView's request that FanDuel partner with WinView.

333.    FanDuel's infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents

334.    FanDuel own and control the operation of the '771 Accused Products and generates substantial financial revenues therefrom.  FanDuel puts into service this product and directs and controls its operation as the licensed operator of this system.  To the extent portions of the '771 Accused Products are hosted on AWS servers, as discussed above, FanDuel controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '771 Accused Products in order to generate revenue.

335.    To the extent FanDuel's customers, purchasers, customers, developers, vendors, and manufacturers direct and control the devices and methods in the claims, FanDuel obtains benefits from its control of the system as a whole.

336.    FanDuel also has directly infringed and continues to directly infringe the '771 Patent by having its employees test and use the '771 Accused Products in the United States.  In order to maintain legal compliance, FanDuel is required to periodically monitor and ensure that the '771 Accused Products are performing as designed and intended.  FanDuel further directly

infringes by marketing and distributing the '771 Accused Products, which constitutes infringing offers to sell and sales.

337.    By way of example of FanDuel's infringement of the '771 Patent, the '771 Accused Products meet all of the limitations of exemplary Claim 1 of the '771 Patent, which recites:

> 1. A server comprising:
>
> a. a memory for storing an application for conducting one or more real-time games of skill or chance or other entertainment in connection with a sports event, the application configured for:
>
>> i. communicating with a plurality of devices grouped into a plurality of cohorts, wherein each cohort constitutes participants in one of the real-time games of skill or chance or other entertainment; and
>>
>> ii. storing one or more files related to the one or more real-time games of skill or chance or other entertainment;
>>
>> iii. simultaneously transmitting the one or more files to each of the devices within a cohort;
>>
>> iv. sending one or more lockout signals at one or more appropriate times based on an amount of delay to prevent customers from submitting one or more responses to the one or more real time games of skill or chance or other entertainment, wherein the at least one of the one or more lockout signals is based on information from an observer of the sports event; and
>
> b. a processor for processing the application.

338.    The '771 Accused Products infringe the '771 Patent, including exemplary Claim 1, in violation of 35 U.S.C. § 271(a)-(c), as discussed below.  For example, they are the software that is placed on servers to conduct real-time games in connection with sports events.

339.    FanDuel operates servers within each jurisdiction in which it offers the '771 Accused Products, as states generally require that FanDuel's servers be located within their boundaries in order to operate.  *See, e.g.*, N.Y. PML § 1367-A(h)-(i) ("The server or other equipment which is used by a mobile sports wagering licensee to accept mobile sports wagering

shall be physically located in the licensed gaming facility"); N.J.S.A §§ 5:12A-11(a); 5:20-2(c) ("all equipment used by the holder of the permit, including computers and servers, to conduct fantasy sports activities shall be physically located within the boundaries of" "a restricted area on the premises of the casino hotel or in another facility owned or leased by the casino licensee . . . that is secure, inaccessible to the public"); N.J.S.A § 5:12-95.22; 68 IAC 27-6-2 ("A sports wagering operator must locate a server in the state of Indiana."). These servers communicate with customers' devices, which allow customers to operate the '771 Accused Products on the devices (e.g., mobile phone, tablets, and laptops).

340.    In addition to its own servers, FanDuel uses cloud-hosted services to support the operation of the '771 Accused Products. Specifically, FanDuel uses AWS as its strategic cloud provider. Ex. 43 (https://press.aboutamazon.com/2023/9/fanduel-selects-aws-as-its-strategic-cloud-provider). FanDuel uses AWS' Lambda function as a service. Ex. 44 at 2 ("For our product our tech stack is Java for the core functionality . . . . Infrastructure wise we host our tech stack on AWS using services such as EC2, EKS, AWS Lambda, and AWS RDS managing it all with Terraform.")       (https://medium.com/fanduel-life/whats-it-like-being-an-engineer-at-fanduel-4505e7ca283c). Reviewing the network traffic of an Accused Product illustrates FanDuel's use of AWS' S3 (object storage system) and CloudFront (content delivery network) services which implement with Lambda. *See, e.g.*, Ex. 39 (FanDuel's technology profile illustrating it uses AWS services such as CloudFront S3) (https://builtwith.com/fanduel.com).



Screenshot of FanDuel's network traffic with X-Amz-Cf-Id in the response header; *see also* Ex. 77 (listing X-Amz-Cf-Id as an AWS response header) (https://docs.aws.amazon.com/AmazonCloudFront/latest/DeveloperGuide/RequestAndResponse BehaviorCustomOrigin.html).

341.    FanDuel has direction and control over AWS' servers via its services. As discussed above, the AWS' Customer Agreement provides that FanDuel is responsible for its content, proper configuration and use of AWS services, its end customers compliance with FanDuel agreement with AWS, acknowledging that AWS does not provide support and services to the end customers. Ex. 45 (AWS Customer Agreement) (https://aws.amazon.com/agreement/).

342.    Additionally, AWS' data privacy terms specify that "[FanDuel] maintain[s] full control of [its] content that [it] uploads to the AWS services . . . , and [is] responsib[le] for configuring access to AWS services and resources. . . . [FanDuel] configure[s] access control permissions for any of the services [it] develop[s] or deploy[s] in an AWS environment. [AWS]

145

do not access or use [FanDuel's] content for any purpose without [its] agreement." Ex. 46 at 1
(Data Privacy FAQs) (https://aws.amazon.com/compliance/data-privacy-faq/).

343.    FanDuel's servers have memory that stores the software used to operate the '771
Accused Product.  FanDuel then uses the software to allows customers to bet on sports matches
and casino game livestreams.  *See* Ex. 25 ("SPORTSBOOK: Bet on all your favorite sports,"
"CASINO: Play all your favorite table games and slots," "FANTASY: Draft a winning team every
week") product offerings, as well as retail sportsbook, media and other consumer product
offerings.") (https://www.fanduel.com/); *see also* Ex. 21 (Flutter 10-K) at 13.

344.    FD Sportsbook is an entertainment service that enables customers to conduct sports
betting in real-time.  Ex. 21 (Flutter 10-K) at 87, 132 ("Sportsbook involves the player placing a
bet (wager) on various types of sporting events at fixed odds determined by the Group. . . . The
platform supports 'in play' betting (betting that takes place after an event has started and up to its
conclusion)").  Sports betting is characterized as a game of chance.  *Id.* at 31 ("The sports betting
and iGaming industries are characterized by an element of chance").  A user places bets in FD
Sportsbook based on televised sports events (e.g., the Super Bowl, a televised event) or in FD
Racing based on televised horse races.



Screenshot of the FD Sportsbook home page.

146



Ex. 63 (2025 Super Bowl LIX Sunday - Ways To Watch | NFL.com) (https://www.nfl.com/super-bowl/ways-to-watch/).

345.    Each live event for which in-game betting is made available is a real-time game of chance and a separate cohort. Each cohort is identified by an "eventId." For example, the eventId for the Orlando Magic @ Golden State Warriors game listed below is 33994850.



Screenshot of the FD Sportsbook website.

346.    Reviewing the network traffic for the game confirms the eventId.  Players betting on this game are part of the same cohort as they are subscribers to the live data stream for this game.



Screenshot of the FD Sportsbook website.

Screenshot of the FD Sportsbook website.

347.    Further, each participant in the cohort communicates independently with FanDuel's servers.  The photo below illustrates that a customer's device used the GET method to request data from FanDuel's servers.



Screenshot of the FD Sportsbook website.

348.    The screenshot below illustrates three basketball-related game cohorts available for a user to join: (1) the Illinois v. Iowa State game cohort, (2) the NC State v. Marquette game cohort, and (3) the Gonzaga v. Purdue game cohort.



Screenshot of the FD Sportsbook.  When a player is engaged in live betting for a game, the player has joined the cohort for that game.  For example, the screenshot below shows that the user has joined the Illinois v. Iowa State game cohort.



Screenshot of the FD Sportsbook app.

349.    FanDuel can store various files related to the game that are the subject of the cohort, including historical game data, user bets, and bet results.  For example, the screenshot below confirms that users' bets are sent to and retrieved from FanDuel's servers.





Screenshot of FD Sportsbook App showing bet being submitted by a user to FanDuel's servers.

Screenshot of FD Sportsbook App showing a user pulling current bets for a game from FanDuel's servers.

350.    A user can also retrieve the active bets from a device different from the device used to place the bet, confirming the bets are saved to FanDuel's server and not just locally stored on the device.



Screenshot of the FD Sportsbook website showing access to stored bet data.

351.    FanDuel's servers send simultaneous real-time updates of games players have displayed on their devices.  These updates are simultaneously transmitted in order to provide each user with the most up-to-date data as close to real-time as possible.   An example of the simultaneous transmission in the response received from the GET method for the live data.



Screenshot of the FD Sportsbook website.



Screenshot of the FD Sportsbook website.

352.    This can also be confirmed by viewing two devices that are actively participating in the same live betting game.



Photo of two devices running FD Sportsbook that are part of the same cohort before receiving updates.



Photo of two devices running FD Sportsbook that are part of the same cohort receiving updates.

353.    FanDuel sends lockout signals to its customers' apps and computers in order to prevent untimely entry of wagers.  FanDuel may modulate the amount of delay, if any, based on the TV reception latency of a user's device or other game specific factors.  For example, in the screenshot below, the specific in-game bet for marketId 737.111036335 has a betDelay of 3.



Screenshot of the FD Sportsbook website.

354.    FanDuel's lockouts are determined at least in part by utilizing a person in physical attendance at the event (as well as based on input from a producer or bookmaker offsite observing a low-latency television feed).   As discussed above, FanDuel receives its real-time data from Sportsradar, which provides on-site data reporting.  FanDuel uses this data as a basis to either adjust or directly trigger the lockout signals.

355.    FD Sportsbook customers can place bets before or during the game.   Upon triggering a lockout signal, a bet becomes unavailable, the odds offering will turn converted to a greyed-out lock symbol and player will not be able to add this selection to the bet slip, and the user will receive a notification that the bet is closed.



Screenshot of FD Sportsbook App showing a customer is locked out from placing a bet.

356.    If the locked-out bet is already in the cart, the user will receive a notification that the bet is closed.  The screenshots below illustrate a cart before and after FanDuel sends a lockout signal.



Screenshots of the FD Sportsbook app.

357.    FanDuel's servers have processors to run the software that powers their software providing the '771 Accused Product.

358.    Thus, FanDuel's '771 Accused Products satisfy all elements of exemplary Claim 53 of the '771 Patent.

359.    FanDuel's direct infringement of the '771 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

360.    The USPTO issued U.S. Patent Application No. 17/387,055 as the '771 Patent on August 22, 2023.  For the reasons discussed above in the Section entitled FanDuel's Knowledge of the Asserted Patents, FanDuel became aware of the '771 Patent and aware that its activities concerning the '771 Accused Product infringed the '771 Patent no later than upon its issuance on August 22, 2023.  At the very least, FanDuel became aware of its infringement of the '771 Patent from its receipt of this Complaint.  FanDuel's pre-suit infringement and ongoing infringement since the filing of this action are willful, blatant, and in egregious disregard for WinView's patent rights in the '771 Patent.

361.    FanDuel's infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

362.    As discussed above, FanDuel acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '771 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.  WinView is further entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's direct infringement of the '771 Patent.

## COUNT XII
### (Indirect Infringement of U.S. Patent No. 11,736,771)

363.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the preceding paragraphs, as set forth above.

364.    As set forth above, FanDuel has had knowledge of WinView's patents and of its infringement of the '771 Patent since at least as early as August 22, 2023 and has further

knowledge of the '771 Accused Products' infringement of the '771 Patent from the filing of this Complaint.

365.    As set forth above, the '771 Accused Products directly infringe the '771 Patent. FanDuel has induced and continues to induce its customers' direct infringement of one or more claims of the '771 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '771 Patent by using the '771 Accused Products.

366.    FanDuel knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '771 Accused Product, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games.  As discussed above, when the '771 Accused Product is used to gamble, it necessarily infringes the '771 Patent.  Therefore, FanDuel's encouragement of its customers to use the '771 Accused Product to gamble necessarily encourages its customers to directly infringe the '771 Patent.

367.    As discussed in more detail above with respect to the '770 Patent, FanDuel encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '771 Accused Product, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '771 Accused Product in an infringing manner.

368.    All the elements of the claims of the '771 Patent are used by FanDuel and its customers, purchasers, customers, developers, vendors, and manufacturers, or a combination thereof.  As set forth above, FanDuel has known or has been willfully blind to the fact that it is

inducing others to infringe by practicing, either themselves or in conjunction with FanDuel, one or more claims of the '771 Patent.

369.    FanDuel also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '771 Patent pursuant to 35 U.S.C. § 271(c). As discussed above, FanDuel has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '771 Accused Product within the United States, without authority from WinView, it is providing the '771 Accused Product which is a material component of the systems infringing one or more claims of the '771 Patent. The '771 Accused Product is not a staple article or commodity of commerce suitable for substantial non-infringing uses. As discussed above, when the '771 Accused Product is used to gamble, which is its only substantial intended function, it infringes the '771 Patent.

370.    FanDuel's indirect infringement of the '771 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

371.    FanDuel's indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

372.    FanDuel's indirect infringement of the '771 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

373.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's indirect infringement.

## COUNT XIII
**(Direct Infringement of U.S. Patent No. 11,918,880)**

374.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

375.    In violation of 35 U.S.C. § 271(a), FanDuel directly infringed and continues to directly infringe the '880 Patent, including without limitation at least exemplary Claim 1, by making, using, importing, selling, and offering for sale in the United States FD Fantasy (the "'880 Accused Product").

376.    While the '880 Patent includes both method claims and non-method claims, WinView is only asserting the method claims of the '880 Patent and is not asserting any non-method claims of the '880 Patent.  The marking requirement of 35 U.S.C. § 287(a), therefore, does not apply to WinView's request for pre-suit damages for the '880 Patent because WinView is only asserting method claims from the '880 Patent.

377.    As set forth above in the Section entitled The Parties, Defendants FanDuel Inc., FanDuel Group, FanDuel Group Parent, Flutter, and Betfair operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

378.    FanDuel's acts of making, using, importing, selling, and offering for sale the infringing '880 Accused Product have been without the permission, consent, authorization, or license of WinView.  Indeed, FanDuel declined WinView's request that that FanDuel partner with WinView.

379.    FanDuel's infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents.

161

380.   FanDuel own and control the operation of the '880 Accused Product and generates substantial financial revenues therefrom.

381.   FanDuel puts into service these products and directs and controls their operations as the licensed operator of these systems.  To the extent portions of the '880 Accused Product is hosted on AWS servers, as discussed above, FanDuel controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '880 Accused Product in order to generate revenue.

382.   To the extent FanDuel's customers, purchasers, customers, developers, vendors, and manufacturers direct and control the devices and methods in the claims, FanDuel obtains benefits from its control of the system as a whole.

383.   FanDuel also has directly infringed and continues to directly infringe the '880 Patent by having its employees test and use the '880 Accused Product in the United States.  In order to maintain legal compliance, FanDuel is required to periodically monitor and ensure that the '880 Accused Product is performing as designed and intended.  FanDuel further directly infringes by marketing and distributing the '880 Accused Product, which constitutes infringing offers to sell and sales.

384.   By way of example of FanDuel's infringement of the '880 Patent, the '880 Accused Product meet all of the limitations of exemplary Claim 1 of the '880 Patent, which recites:

1. A method programmed in a server device, the method comprising:

a. determining a user's physical location and the user's eligibility to participate in a set of competitive participant groups based on the user's physical location;

b. providing to a user device from the server device the set of competitive participant groups to join;

c. receiving user input including a selection of a plurality of competitive participant groups to join, wherein the plurality of competitive participant groups correspond to one or more events;

d. receiving additional user input including a set of event selections related to the one or more events, wherein the set of event selections comprises predictions available before the one or more events of occurrences happening during the one or more events and enables simultaneously participating with the plurality of competitive participant groups; and

e. triggering a lockout signal at the server device to prevent further additional user input.

385.    The '880 Accused Product infringes the '880 Patent, including exemplary Claim 1, in violation of 35 U.S.C. § 271(a)-(c).  For example, they are the software that performs the claimed method for implementing competitive groups for events, as discussed below.

386.    The '880 Accused Product is provided by FanDuel from servers.  As discussed above, FanDuel uses cloud-hosted services to support the operation of the '880 Accused Product. Specifically,    FanDuel    uses    AWS    as    its    strategic    cloud    provider.    Ex.    43 (https://press.aboutamazon.com/2023/9/fanduel-selects-aws-as-its-strategic-cloud-provider). FanDuel's use of AWS and it supporting operation for FD Fantasy is at the direction and control of FanDuel.

387.    The '880 Accused Product determines the physical location of its customers and if they are eligible to play various games offered by the '880 Accused Product based on their location.  FanDuel servers are configured to request and receive information geographic location. FanDuel provides a customer with contests a customer can join related, based on information based on the geographic location of the device.  FanDuel uses GPS, Bluetooth, and Wi-Fi location services to determine the location of a device, and present contests that a user is legally able to join.  *See, e.g.*, Ex.  34  (https://support.fanduel.com/s/article/Location-Troubleshooting-Tips#state).

> ## Wi-Fi requirements
>
> Fully connect to Wi-Fi, and make sure that it is set up on your device via the connection settings. Our location systems require **Wi-Fi, GPS, or GSM signals** to locate you.
>
> *\*Ethernet (wireline connection) will not pass the location check, you must be connected using a Wi-Fi connection.*
>
> If using an **Android device**, you will need to change the settings on the device to 'High Accuracy Mode', within your location settings on your device. It may also help to manually disconnect and reconnect your Wi-Fi router.
>
> A stronger network connection will help with location accuracy.

*Id.* at 2.

388.    FanDuel provides customers with state-specific bets to ensure that customers are physically located where FD Fantasy is legal.  The '880 Accused Products identify the current geographic location of the customers' mobile device or computer.  The FD Fantasy website and mobile application will allow customers to participate in contests for prizes only in jurisdictions where FD Fantasy is permitted.  *See, e.g.*, Ex. 64 at 2 ("See where your state stands. . . .  The map below shows where we currently offer paid contests.") (https://www.fanduel.com/legal); Ex. 35 ("Each state, commonwealth, or province have specific regulations on sports betting, horse racing, daily fantasy, and casino games.") (https://support.fanduel.com/s/article/FanDuel-House-Rules-Hub).

389.    As discussed above, in addition to location-based offerings, FD Fantasy provides contests where eligibility is based on customers' time on the platform, skill, or participation level.  For example, FD Fantasy offers "Beginner Contests" which are available to players who have participated in fewer than 50 contests and have not earned an experience badge, allowing new customers to compete against other beginners and avoid more skilled "sharks" who might

otherwise dominate contests.  Ex. 65 (What's New: Beginner Contests) ("Beginner contests are exclusively for less experienced players on FanDuel.  To be clear, no one who's played more than 50 contests on FanDuel has access to Beginner contests.  These are for newer FanDuel players only.") (<u>https://www.fanduel.com/beginner-contests</u>).



Screenshot of exemplary Beginner Contest from FanDuel's website.

390.    The '880 Accused Product provides customers with a list of the games (competitive participant groups) they are permitted to join related to a sports event prior to the beginning of the event.  The customers' entry into such a contest is a user selection.  The screenshot below shows some the contests the customer is eligible to play in.



Screenshot showing some of the beginner contests available to the user.

391.    FD Fantasy is configured for receiving user input including a group selection of the plurality of competitive groups available to join, wherein each group of the plurality of competitive groups participates in a separate competition.  FanDuel allows customers to choose a league, team, lineup, and place bets.  For example, FD Fantasy allows customers to create one or more lineups and enter the lineups into multiple contests.





Screenshot of FD Fantasy app showing the lineup requirements.

Screenshot of FD Fantasy app showing a customer selected their lineup.

392.    Each lineup can be entered into a different and multiple competitions.  The below screenshot on the left shows that the FD Fantasy app allows a single line up to be entered into multiple contests.  The below screenshot on the right illustrates the FD Fantasy app allows a second line up can be entered into multiple contests.





Screenshot of FD Fantasy app showing a user can enter the same contest with a different lineup.

Screenshot of FD Fantasy app showing a user can enter a different contest with a different lineup.

393.    FD Fantasy uses lockout signals to prevent customers from entering late entries (additional user input).  Contests with late swap have multiple lockout signals.



Screenshot of FD Fantasy app displaying a pop-up notifying a customer they cannot enter a contest.

394.    Thus, FanDuel's '880 Accused Product satisfies all elements of exemplary Claim 1 of the '880 Patent.

395.    FanDuel's direct infringement of the '880 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

396.    The USPTO issued U.S. Patent Application No. 17/688,412 as the '880 Patent on March 5, 2024.  For the reasons discussed above in the Section entitled FanDuel's Knowledge of the Asserted Patents, FanDuel became aware of the '880 Patent and aware that its activities concerning the '880 Accused Product infringed the '880 Patent no later than upon its issuance on March 5, 2024.  At the very least, FanDuel became aware of its infringement of the '880 Patent from its receipt of this Complaint.

397.    FanDuel's pre-suit infringement and ongoing infringement since the filing of this action are willful, blatant, and in egregious disregard for WinView's patent rights in the '880 Patent.

398.    FanDuel's infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

399.    As discussed above, FanDuel acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '880 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.  WinView is further entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's direct infringement of the '880 Patent.

<u>**COUNT XIV**</u>
**(Indirect Infringement of U.S. Patent No. 11,918,880)**

400.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the preceding paragraphs, as set forth above.

401.    As set forth above, FanDuel has had knowledge of its infringement of WinView's '880 Patent since at least as early as March 5, 2024 and has further knowledge of the '880 Accused Product' infringement of the '880 Patent from the filing of this Complaint.

402.    As set forth above, FanDuel's customers directly infringe the '880 Patent when they use the '880 Accused Product.  FanDuel has induced and continues to induce its customers' and end customers' direct infringement of one or more claims of the '880 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting,

assisting, encouraging, instructing, directing, requiring, and guiding its customers and end customers to directly infringe one or more claims of the '880 Patent.

403.    For example, FanDuel knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the Accused Products.

404.    FanDuel engages in such encouragement by providing new and existing customer promotions and incentives, instructions, guidance regarding the use and troubleshooting, how to and strategy guides, videos, and tutorials, which direct and indirectly facility the use of the Accused Products.

405.    As discussed in more detail above with respect to the '770 Patent, FanDuel encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '880 Accused Product, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '880 Accused Product in an infringing manner.

406.    All the elements of the claims are used by either FanDuel, their customers, purchasers, customers, developers, vendors, and manufacturers, or some combination thereof. FanDuel has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with FanDuel, one or more claims of the '880 Patent.

407.    FanDuel has also contributorily infringed and continues to contributorily infringe one or more claims of the '880 Patent pursuant to of 35 U.S.C. § 271(c), and with knowledge or willful blindness by selling and offering to sell within the United States the '880 Accused Product, without authority, which constitute materials and apparatuses for practicing the claimed invention

of one or more claims of the '880 Patent, such materials and apparatuses constituting material components of the inventions of the '880 Patent and not staple articles or commodities of commerce suitable for substantial non-infringing uses.  For example, WinView is informed and believes, and on that basis alleges, that FanDuel has knowledge that the FD Fantasy and Pick6 websites and mobile applications constitute material parts of the inventions of the '880 Patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are used in an infringing manner.  In particular, FanDuel know that their products are particularly suited to be used in an infringing manner.

408.    To the extent FanDuel's customers, purchasers, customers, developers, vendors, and manufacturers direct and control the devices and methods in the claims, FanDuel obtains benefits from its control of the system as a whole.

409.    FanDuel's indirect infringement of the '880 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

410.    FanDuel's indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

411.    FanDuel's indirect infringement of the '880 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.

412.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's indirect infringement.

## COUNT XV
### (Direct Infringement of U.S. Patent No. 11,951,402)

413.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

414.    In violation of 35 U.S.C. § 271(a), FanDuel directly infringed and continues to directly infringe the '402 Patent, including without limitation exemplary Claim 1, by making, using, importing, selling, and offering for sale in the United States FD Fantasy and FanDuel Pick6: Fantasy Game (the "'402 Accused Products").

415.    While the '402 Patent includes both method claims and non-method claims, WinView is only asserting the method claims of the '402 Patent and is not asserting any non-method claims of the '402 Patent.  The marking requirement of 35 U.S.C. § 287(a), therefore, does not apply to WinView's request for pre-suit damages for the '402 Patent because WinView is only asserting method claims from the '402 Patent.

416.    As set forth above in the Section entitled The Parties, Defendants FanDuel Inc., FanDuel Group, FanDuel Group Parent, Flutter, and Betfair operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

417.    FanDuel's acts of making, using, importing, selling, and offering for sale the infringing '402 Accused Products have been without the permission, consent, authorization, or license of WinView.  Indeed, FanDuel declined WinView's request that FanDuel partner with WinView.

418.    FanDuel's infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents.

419.    FanDuel owns and controls the operation of its '402 Accused Products and generates substantial financial revenues therefrom.  FanDuel puts into service these products and directs and controls their operations as the licensed operator of these systems.  To the extent portions of the '402 Accused Products are hosted on AWS servers, as discussed above, FanDuel controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '402 Accused Products in order to generate revenue.

420.    To the extent FanDuel's customers, purchasers, customers, developers, vendors, and manufacturers direct and control the devices and methods in the claims, FanDuel obtains benefits from its control of the system as a whole.

421.    FanDuel also has directly infringed and continues to directly infringe the '402 Patent by having its employees test and use the '402 Accused Products in the United States.  In order to maintain legal compliance, FanDuel is required to periodically monitor and ensure that the '402 Accused Products are performing as designed and intended.  FanDuel further directly infringes by marketing and distributing the '402 Accused Products, which constitutes infringing offers to sell and sales.

422.    By way of example of FanDuel's infringement of the '402 Patent, the '402 Accused Products meet all of the limitations of exemplary Claim 1 of the '402 Patent, which recites:

> 1. A method, programmed in a memory of a device, of participating in a plurality of competitive groups, each comprising a plurality of competitors and corresponding to one or more events, the method comprising:
>
> > determining, with the device, a physical location of a user and eligibility of the user to participate in the plurality of competitive groups based on the physical location of the user;
>
> > receiving, with the device, one or more event selections by the user related to the one or more events prior to the beginning of a first event of the one or more events,

wherein the one or more event selections enable the user to participate in the plurality of competitive groups; and

triggering, on the device, a lockout signal preventing further additional user input.

423.    The '402 Accused Products infringe the '402 Patent, including exemplary Claim 1, in violation of 35 U.S.C. § 271(a)-(c).  For example, they are the software programmed in the memory of computer devices to operate competitive groups corresponding to live events, as discussed below.

424.    The FD Fantasy app determines the physical location of the customers and if they are eligible to play various games offered by the '402 Accused Product based on their location. Customers receive from FanDuel contests they can join related based on information based on the geographic location of the device.  FanDuel uses GPS, Bluetooth, and Wi-Fi location services to determine the location of a device, and present contests that a user is legally able to join.  *See, e.g.*, Ex. 34 (https://support.fanduel.com/s/article/Location-Troubleshooting-Tips#state).

## Wi-Fi requirements

Fully connect to Wi-Fi, and make sure that it is set up on your device via the connection settings. Our location systems require **Wi-Fi, GPS, or GSM signals** to locate you.

***Ethernet (wireline connection) will not pass the location check, you must be connected using a Wi-Fi connection.***

If using an **Android device**, you will need to change the settings on the device to 'High Accuracy Mode', within your location settings on your device. It may also help to manually disconnect and reconnect your Wi-Fi router.

A stronger network connection will help with location accuracy.

*Id.* at 2.

425.    As discussed above, FanDuel provides customers with state-specific bets to ensure that customers are physically located where FD Fantasy is legal.

426.    In addition to location-based offerings, FD Fantasy provides contests where eligibility is based on customers' time on the platform, skill, or participation level.  For example, FD Fantasy offers "Beginner Contests" which are available to players who have participated in fewer than 50 contests and have not earned an experience badge, allowing new customers to compete against other beginners and avoid more skilled "sharks" who might otherwise dominate contests.  Ex. 65 (What's New: Beginner Contests) ("Beginner contests are exclusively for less experienced players on FanDuel.  To be clear, no one who's played more than 50 contests on FanDuel has access to Beginner contests.   These are for newer FanDuel players only.") (https://www.fanduel.com/beginner-contests).



Screenshot of exemplary Beginner Contest from FanDuel's website.

427.    The '402 Accused Product provides customers with a list of the games (competitive participant groups) they are permitted to join related to a sports event prior to the beginning of the event.  The customers' entry into such a contest is a user selection.  The screenshot below shows some of the contests the customer is eligible to play in.



Screenshot showing some of the beginner contests available to the user.

428.    FD Fantasy is configured for receiving user input including a group selection of the plurality of competitive groups available to join, wherein each group of the plurality of competitive groups participates in a separate competition.  FanDuel allows customers to choose a league, team, lineup and place bets.  For example, FD Fantasy allows customers to create one or more lineups and enter the lineups into multiple contests.




Screenshot of FD Fantasy app showing the lineup requirements.

Screenshot of FD Fantasy app showing a customer's selected lineup.

429.    Each lineup can be entered into a different and multiple competitions.  The below screenshot on the left illustrates that the FD Fantasy app allows a single lineup to be entered into multiple contests.  The below screenshot on the right illustrates the FD Fantasy app allows a second lineup can be entered into multiple contests.







Screenshot of FD Fantasy app showing a user can enter the same contest with a different lineup.

Screenshot of FD Fantasy app showing a user can enter a different contest with a different lineup.

430.    FD Fantasy uses lockout signals to prevent customers from entering late entries (additional user input).  Contests with late swap have multiple lockout signals.



Screenshot of FD Fantasy app displaying a pop-up notifying a customer they cannot enter a contest.

431.    Thus, FanDuel's '402 Accused Products satisfy all elements of exemplary Claim 1 of the '402 Patent.

432.    FanDuel's direct infringement of the '402 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

433.    The USPTO issued U.S. Patent Application No. 17/716,311 as the '402 Patent on April 9, 2024.  For the reasons discussed above in the Section entitled FanDuel's Knowledge of the Asserted Patents, FanDuel became aware of the '402 Patent and aware that its activities concerning the '402 Accused Products infringed the '402 Patent no later than upon its issuance on April 9, 2024.  At the very least, FanDuel became aware of its infringement of the '402 Patent from its receipt of this Complaint.  FanDuel's pre-suit infringement and ongoing infringement

since the filing of this action are willful, blatant, and in egregious disregard for WinView's patent rights in the '402 Patent.

434.    FanDuel's infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

435.    As discussed above, FanDuel acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '402 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.  WinView is further entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's direct infringement of the '402 Patent.

**COUNT XVI**
**(Indirect Infringement of U.S. Patent No. 11,951,402)**

436.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the preceding paragraphs, as set forth above.

437.    As set forth above, FanDuel has had knowledge of its infringement of WinView's '402 Patent since at least as early as April 9, 2024 and has further knowledge of the '402 Accused Products' infringement of the '402 Patent from the filing of this Complaint.

438.    As set forth above, FanDuel's customers directly infringe the '402 Patent when they use the '402 Accused Products.  FanDuel has induced and continues to induce its customers' and end customers' direct infringement of one or more claims of the '402 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring, and guiding its customers and end customers to directly infringe one or more claims of the '402 Patent.

439.    For example, FanDuel knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the Accused Products.

440.    FanDuel engages in such encouragement by providing new and existing customer promotions and incentives, instructions, guidance regarding the use and troubleshooting, how to and strategy guides, videos, and tutorials, which direct and indirectly facility the use of the Accused Products.

441.    As discussed in more detail above with respect to the '770 Patent, FanDuel encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '402 Accused Product, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '402 Accused Product in an infringing manner.

442.    As discussed above, FanDuel also actively markets its Accused Products through several channels, including social media advertisements, sponsored content, in-casino advertisements, billboards, FanDuel's websites, and traditional media.

443.    All the elements of the claims are used by either FanDuel, their customers, purchasers, customers, developers, vendors, and manufacturers, or some combination thereof. FanDuel has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with FanDuel, one or more claims of the '402 Patent.

444.    FanDuel has also contributorily infringed and continues to contributorily infringe one or more claims of the '402 Patent pursuant to of 35 U.S.C. § 271(c), and with knowledge or willful blindness by selling and offering to sell within the United States the '402 Accused Products,

without authority, which constitute materials and apparatuses for practicing the claimed invention of one or more claims of the '402 Patent, such materials and apparatuses constituting material components of the inventions of the '402 Patent and not staple articles or commodities of commerce suitable for substantial non-infringing uses. For example, WinView is informed and believes, and on that basis alleges, that FanDuel has knowledge that the FD Fantasy website and mobile applications constitute material parts of the inventions of the '402 Patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are used in an infringing manner. In particular, FanDuel know that the '402 Accused Products are software programs that are only used with customers' computer devices in order to wager through FD Fantasy which always infringes, as discussed above.

445.    To the extent FanDuel's customers, purchasers, customers, developers, vendors, and manufacturers direct and control the devices and methods in the claims, FanDuel obtains benefits from its control of the system as a whole.

446.    FanDuel's indirect infringement of the '402 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

447.    FanDuel's indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

448.    FanDuel's indirect infringement of the '402 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.

449.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's indirect infringement.

## COUNT XVII
### (Direct Infringement of U.S. Patent No. 12,005,349)

450.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

451.    In violation of 35 U.S.C. § 271(a), FanDuel directly infringed and continues to directly infringe the '349 Patent, including without limitation exemplary Claim 1, by making, using, importing, selling, and offering for sale in the United States FD Sportsbook, FD Casino, and FD Racing (the "'349 Accused Products").

452.    As set forth above in the Section entitled The Parties, Defendants FanDuel Inc., FanDuel Group, FanDuel Group Parent, Flutter, and Betfair operate as a single, consolidated joint enterprise, and the acts of one Defendant are attributable to the others.  Thus, Defendants directly infringe by operating as a joint enterprise.

453.    FanDuel's acts of making, using, importing, selling, and offering for sale the infringing '349 Accused Products have been without the permission, consent, authorization, or license of WinView.  Indeed, FanDuel declined WinView's request that FanDuel partner with WinView.

454.    FanDuel's infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents.

455.    FanDuel owns and controls the operation of the '349 Accused Products and generates substantial financial revenues therefrom.  FanDuel puts into service these products and directs and controls their operations as the licensed operator of these systems.  To the extent portions of the '349 Accused Products are hosted on AWS servers, as discussed above, FanDuel

controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '349 Accused Products in order to generate revenue.

456.    To the extent FanDuel's customers, purchasers, customers, developers, vendors, and manufacturers direct and control the devices and methods in the claims, FanDuel obtains benefits from its control of the system as a whole.

457.    FanDuel also has directly infringed and continues to directly infringe the '349 Patent by having its employees test and use the '349 Accused Products in the United States.  In order to maintain legal compliance, FanDuel is required to periodically monitor and ensure that the '349 Accused Products are performing as designed and intended.  FanDuel further directly infringes by marketing and distributing the '349 Accused Products, which constitutes infringing offers to sell and sales.

458.    By way of example of FanDuel's infringement of the '349 Patent, the '349 Accused Products meet all of the limitations of exemplary Claim 1 of the '349 Patent, which recites:

1. A method of playing a game, comprising:

a. streaming video data and game data;

b. operating a program to display the video data and the game data, wherein the video data and the game data are synchronized when displayed; and

c. preventing customers from submitting a response to the game data based on the video data and a lockout signal.

459.    The '349 Accused Products infringe the '349 Patent, including exemplary Claim 1, in violation of 35 U.S.C. § 271(a)-(c).  For example, they are the software programmed to perform the claimed method for implementing a game, as discussed below.

460.    As discussed above, FanDuel allows customers to bet on sports matches and casino game livestreams.  *See* Ex. 25 ("SPORTSBOOK: Bet on all your favorite sports," "CASINO: Play all your favorite table games and slots," "FANTASY: Draft a winning team every week") product offerings, as well as retail sportsbook, media and other consumer product offerings.") (https://www.fanduel.com/).

461.    FD Sportsbook may be accessed online at sportsbook.fanduel.com and casino.fanduel.com respectively and by using the FD Sportsbook Apps on mobile devices such as a smartphone, tablet, or computer.

462.    FD Sportsbook provides content streams to each customer's device operating the '349 Accused Products.  There are two types of live stream features available in FD Sportsbook— "Live Stream" and "Game Tracker."  FanDuel also uses geographic information to determine whether users can watch the live streams of games.  If a user is within a state that allows sports betting, the user may stream the game.  For example, below is screenshot of FD Sportsbook Application (in the example, on an Apple device) showing the live-stream features of the FD Sportsbook mobile application.




Screenshot of the video data live stream feature in the FD Sportsbook app.

Screenshot of the game data "game tracker" feature in the FD Sportsbook app.

463.    For users in locations where wagers may not be placed on the event, FanDuel does not allow streaming of the game. For example, the screenshots below of FD Sportsbook app on an Apple device illustrate location-based streaming access restrictions.

187





Screenshot of the FD Sportsbook App restricting a stream based on location.

Screenshot of the FD Sportsbook App restricting a stream based on location.

464.    FD Casino provides video data and game data streams to customers' devices based on their geographic location. If a customer is within a state that allows iGaming, the customer will have access to the live streams of the game.



Screenshot of the FD Casino app showing a live stream of a baccarat game.

465.    For customers in jurisdictions that do not allow iGaming, the FD Casino app will prevent access to the streams for prohibited games. For example, below is a screenshot of the FD Casino app on an Apple device showing that a user is blocked from accessing a stream for a casino game because of a geographic restriction.

189



Screenshot of the FD Casino app blocking access to the stream for a casino game due to the device's geographic location.

466.    As shown above, FanDuel operates cellular-based programs to allow the '349 Accused Products to display the streamed video and game data for sporting and casino games. Customers then make selections related to events that occur within the streaming content. FanDuel provides betting options on the Sportsbook app that reflect the online broadcast of the sporting

190

events and offers live betting propositions, including a prop bet that can be made while a sporting

event is underway.  Thus, FD Sportsbook allows customers to make wagers while the live sporting

event is being played and streamed.  FanDuel updates the odds and propositions as the action

unfolds and in accordance with what happens in the live sporting event.  FanDuel also removes

betting propositions that have been resolved and adds new betting propositions as the sporting

event progresses.  For example, the screenshot below shows the FD Sportsbook mobile application

providing moneyline bets where users can bet on the winner of the game.  Here, Gael Monfils is

the favorite with a $100 payout for a $180 bet and Botic Van De Zandschulp is the underdog with

a $140 payout for a $100 bet.



Screenshot of live stream operation of FD Sportsbook app.

467.    FanDuel provides gameplay in its Casino app that reflects real-world dealers'
tables, allowing customers to experience remotely the live in-casino experience.  For example,
customers playing blackjack make selections related to events that occur within the blackjack
stream, such as the decisions to double, hit, stand, and split.



 Screenshot of the live stream feature in the FD Casino app.

468.    FanDuel uses its servers and AWS Cloud servers to provide synchronized game
data through their applications, as discussed above.  This content delivery can occur via cellular
connection as illustrated in the screenshots below where the network connection is an LTE
network.

 

Screenshot of the live video stream feature in the FD Sportsbook app operating over a cellular connection.

Screenshot of FD Casino app showing a game of roulette operating over a cellular connection.

469.    In addition, FanDuel presents the online broadcast of content and synchronized game data.  Customers accessing the same page of the FD Sportsbook website or same portion of the mobile application are presented with the same content, including available sports, betting propositions, game scores, and statistics.  FanDuel updates the odds and betting propositions in accordance with how the live sporting event is being played out in the online broadcast of content. FanDuel presents the online broadcast of content depicting what is happening in the sporting event with the synchronized game data constituting, for example, updated odds and propositions in the Sportsbook application.

193

470.    FD Sportsbook prevents customers from entering untimely selections by sending a lockout signal.  *See* Ex. 48 at 2 ("If FanDuel Sportsbook accepts a bet on a market for which the outcome has already been determined, then that bet shall be deemed void (and no winnings shall be payable in respect of it) regardless of the bet being a win, lose or push.") (https://www.fanduel.com/fanduel-sportsbook-house-rules-nj).

471.    FanDuel relies in part on data scouts physically present at games in order to determine the real time occurrence of events which would provide an unfair advantage to a physically present customer.  FanDuel receives its real-time data from Sportsradar.  Ex. 49 ("FanDuel Group and Sportradar, the global provider of sports data and content, announced an extension of their current partnership, giving FanDuel access to the use of official NFL league data.   FanDuel now has access to all major U.S. sports data from Sportradar.") (https://press.fanduel.com/press-releases/fanduel-group-adds-official-nfl-data-with-extension-to-sportradar-partnership).  Sportradar uses data scouts (or data journalists) that are physically present at games to send event data to its servers.  *See* Sportradar's Live Scouting Data Journalists in Action (Sportradar data scout explaining that while watching the game at the venue he "use[s] specialty software to record every event that happens. . . . As soon as [he] see[s] it happen [he] press[es] the button [on the software]. [He] enter[s] it into the system and it goes live.") (https://www.youtube.com/watch?v=5WGY-Vu9ZZg); *see also* Ex. 50 (Baseball API Documentation) ("Data is collected via Sportradar on-venue scouts and in-house operators.") (https://perma.cc/NUC7-WEKX);    Ex.    51    (Basketball    API    Documentation)    (same) (https://perma.cc/8MZQ-TLG8);    Ex.    52    (Football    API    Documentation)    (same) (https://perma.cc/2DD5-SQDE);    Ex.    53    (Hockey    API    Documentation)    (same) (https://perma.cc/3ZJS-43NQ);    Ex.    54    (Soccer    API    Documentation)    (same)

(https://perma.cc/AV94-HVKM).  FanDuel uses this data as a basis to either adjust or directly trigger the lockout signals.

472.    FD Sportsbook betting works as a "shopping cart."  Players can place bets before or during the game.  Upon triggering a lockout signal, a bet becomes unavailable, the odds offering will turn converted to a greyed-out lock symbol and the player will not be able to add this selection to the bet slip, and the user will receive a notification that the bet is closed.



Screenshot of FD Sportsbook App showing a customer is locked out from placing a bet.

473.    Below are screenshots of FanDuel's Sportsbook App, showing a cart before and after a bet is closed.





Screenshot of FD Sportsbook App showing a cart before a bet is closed.

Screenshot of FD Sportsbook App showing a cart after a bet is closed.

474.    Similarly, with respect to FD Casino, customers are prevented from placing a bet after the lockout signal is sent.

475.    Thus, FanDuel's '349 Accused Products satisfy all elements of exemplary Claim 1 of the '349 Patent.

476.    FanDuel's direct infringement of the '349 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

477.    The USPTO issued U.S. Patent Application No. 17/488,674 as the '349 Patent on June 11, 2024.  For the reasons discussed above in the Section entitled FanDuel's Knowledge of the Asserted Patents, FanDuel became aware of the '349 Patent and aware that its activities concerning the '349 Accused Products infringed the '349 Patent no later than upon its issuance on

June 11, 2024. At the very least, FanDuel became aware of its infringement of the '349 Patent from its receipt of this Complaint.

478.    FanDuel's pre-suit infringement and ongoing infringement since the filing of this action are willful, blatant, and in egregious disregard for WinView's patent rights in the '349 Patent.

479.    FanDuel's infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

480.    As discussed above, FanDuel acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '349 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285. WinView is further entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's direct infringement of the '349 Patent.

<u>**COUNT XVIII**</u>
**(Indirect Infringement of U.S. Patent No. 12,005,349)**

481.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the preceding paragraphs, as set forth above.

482.    As set forth above, FanDuel has had knowledge of its infringement of WinView's '349 Patent since at least as early as June 11, 2024 and has further knowledge of the '349 Accused Products' infringement of the '349 Patent from the filing of this Complaint.

483.    As set forth above, the '349 Accused Products directly infringe the '349 Patent. FanDuel has induced and continues to induce its customers' direct infringement of one or more claims of the '349 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively,

and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '349 Patent by using the '349 Accused Products.

484.    FanDuel knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '349 Accused Products, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games.  As discussed above, when the '349 Accused Products are used to gamble, they necessarily infringe the '349 Patent.  Therefore, FanDuel's encouragement of its customers to use the '349 Accused Products to gamble necessarily encourages its customers to directly infringe the '349 Patent.

485.    As discussed in more detail above with respect to the '770 Patent, FanDuel encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '349 Accused Products, troubleshooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '349 Accused Products in an infringing manner.

486.    All the elements of the claims of the '349 Patent are used by FanDuel and its customers, purchasers, customers, developers, vendors, and manufacturers, or a combination thereof.  As set forth above, FanDuel has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with FanDuel, one or more claims of the '349 Patent.

487.    FanDuel also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '349 Patent pursuant to 35 U.S.C. § 271(c).  As discussed above, FanDuel has done so with knowledge or willful blindness that by selling,

offering to sell, and operating the '349 Accused Products within the United States, without authority from WinView, it is providing the '349 Accused Products which are material components of the systems infringing one or more claims of the '349 Patent. The '349 Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing uses. As discussed above, when the '349 Accused Products are used to gamble, which is their only substantial intended function, they infringe the '349 Patent.

488.    FanDuel's indirect infringement of the '349 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

489.    FanDuel's indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

490.    FanDuel's indirect infringement of the '349 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

491.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's indirect infringement.

## PRAYER FOR RELIEF

WHEREFORE, WinView prays for judgment and relief against FanDuel as follows:

A.    an entry of judgment holding that FanDuel has willfully infringed and is willfully infringing, has induced infringement of and is inducing infringement of, and has contributed to and is contributing to infringement of each of the Asserted Patents;

B.    a preliminary and permanent injunction against FanDuel and its officers, employees, agents, servants, attorneys, instrumentalities, and/or those in privity with them, from infringing, inducing infringement, and contributing to infringement of the Asserted Patents and for all further and proper injunctive relief pursuant to 35 U.S.C. § 283;

C.    an award to WinView of such damages as it shall prove at trial against FanDuel that is adequate to fully compensate WinView for FanDuel's infringement of each of the Asserted Patents that will account for infringement up to trial based on the relevant information and financial data produced, where said damages will be no less than a reasonable royalty;

D.    an award to WinView of increased damages under 35 U.S.C. § 284 based on, *inter alia*, FanDuel's willful infringement;

E.    a finding that this case is exceptional and an award to WinView of its costs and reasonable attorneys' fees, as provided by 35 U.S.C. § 285;

F.    an award of prejudgment interest, post-judgment interest, and costs under 35 U.S.C. § 284;

G.    an accounting of all infringing sales and revenues from the first date of infringement; and

H.    such other and further relief, including equitable relief, as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), WinView hereby demands a trial by jury on all issues triable to a jury.

Respectfully submitted,

Dated: February 10, 2025      By: _s/ Jonathan S. Caplan_

Paul J. Andre (*pro hac vice* to be filed
Lisa Kobialka (*pro hac vice* to be filed)
James Hannah (*pro hac vice* to be filed)
Jennifer L. Gilbert (*pro hac vice* to be filed)
Carlos J. Tirado (*pro hac vice* to be filed)
**KRAMER LEVIN NAFTALIS**
**& FRANKEL LLP**
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
(650) 752-1700
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com
jgilbert@kramerlevin.com
ctirado@kramerlevin.com

Jonathan S. Caplan
Aaron Frankel (*pro hac vice* to be filed)
**KRAMER LEVIN NAFTALIS**
**& FRANKEL LLP**
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100
jcaplan@kramerlevin.com
afrankel@kramerlevin.com

*Attorneys for Plaintiff*
*WinView IP Holdings, LLC*

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiff, by its undersigned counsel, hereby certifies pursuant to Local Civil Rule 11.2 that the matters in controversy are not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding, with the exception:

*WinView Inc. v. FanDuel Inc.*, Civil Action No. 21-13807 (ZNQ) (DEA) , which involves the same parties but not the same asserted patents;

*WinView Inc. v. DraftKings Inc.*, Civil Action No. 21-13405 (ZNQ) (DEA), which involves WinView but not the same asserted patents; and

*WinView Inc. v. DraftKings Inc.*, filed concurrently with this Complaint, which involves the same Asserted Patents.

Respectfully submitted,

Dated: February 10, 2025

By: *s/ Jonathan S. Caplan*

Paul J. Andre (*pro hac vice* to be filed
Lisa Kobialka (*pro hac vice* to be filed)
James Hannah (*pro hac vice* to be filed)
Jennifer L. Gilbert (*pro hac vice* to be filed)
Carlos J. Tirado (*pro hac vice* to be filed)
**KRAMER LEVIN NAFTALIS**
 **& FRANKEL LLP**
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
(650) 752-1700
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com
jgilbert@kramerlevin.com
ctirado@kramerlevin.com

Jonathan S. Caplan
Aaron Frankel (*pro hac vice* to be filed)
**KRAMER LEVIN NAFTALIS**
 **& FRANKEL LLP**
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

jcaplan@kramerlevin.com
afrankel@kramerlevin.com

*Attorneys for Plaintiff*
*WinView IP Holdings, LLC*