# Exhibit 15

CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE

# APPLICATION FOR CATEGORY 1, 2, & 3 SPORTS WAGERING OPERATOR LICENSE



**APPLICANT NAME:** Betfair Interactive US LLC

CONFIDENTIAL, NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: _____ Betfair Interactive US LLC _____

# **INSTRUCTIONS**

When using this application please use the tab on the side to attach all sections requiring submissions. Each attachment should be named for its corresponding section (see (c) under Electronic Application for greater detail). Please make sure to fill out all sections where prompted. If a field does not apply please place N/A. The application must be filled out in its entirety to be accepted by the Massachusetts Gaming Commission.

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: <u>Betfair Interactive US LLC</u>

# **General Information**

This *Application For Category 1, 2, & 3 Sports Wagering Operator License* form (the form itself "Application Form", and along with all attachments "application") was designed by the Massachusetts Gaming Commission ("Commission") as a vehicle for each applicant to demonstrate that it has thought broadly and creatively about creating a sports wagering operation in Massachusetts that will provide a significant and lasting benefit to the Commonwealth of Massachusetts and will deliver an overall experience that both offers an exceptional sports wagering experience and includes significant responsible gaming and consumer protection measures.

The application must be completed in accordance with these instructions. In accordance, any discrepancies may be taken into consideration by the Commission when evaluating the application.

To the extent that an applicant is a newly formed entity or to date has been a largely non-operational entity, any information required to be provided relative to past performance or general practice shall, at a minimum, be provided in relation to the primary controlling and/or operating entity of the proposed sports wagering operator and/or its significant business units.

If an applicant is unable to comply with or respond to any part of the application, it may apply for a waiver or variance from the Commission in accordance with ==205 CMR 102.03(4)== {update reg info when available} in advance of the filing deadline.

All communications, including general questions and application inquiries, should be directed to the Executive Director or Commission staff.

### **How to submit a general question and/or application inquiry:**
1. Please go to: https://massgaming.com/about/sports-wagering-in-massachusetts/applications-for-sports-wagering-licenses/
2. Select "Inquiry Regarding Sports Wagering Application" from the Reason for Submitting Form drop down menu
3. Complete all of the required fields
4. Click "Submit."

A Commission representative will respond to each inquiry in a timely manner. ***At no time during the application process should any applicant, agent of the applicant, qualifier, or another associated individual contact or attempt to contact a Commissioner directly.***

This Application Form does not constitute an offer of any nature or kind to any applicant or its agents. The Commission is under no obligation to issue a license to any of the applicants. By submitting an Application, the applicant is deemed to agree to all of the terms of this process.

To the extent that anything contained in this application is inconsistent with any other guidance or policy-related document issued by the Commission in the past, this application shall control. To the extent that anything contained in this application is inconsistent with any provision of 205 CMR or G.L. c.23N, the governing law shall control.

Terms used in the application shall be given their most logical, plain meaning in the context of the application. The Commission reserves the right to amend or clarify this application at any time prior to the deadline for the submission of applications.

For each Application, all of the Commission's costs and expenses of the administrative proceedings pursuant shall be borne by the applicant. All such costs and expenses shall be assessed to the applicant and collected by the Commission.

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: <u>Betfair Interactive US LLC</u>

The Commission will utilize its website, [www.massgaming.com](http://www.massgaming.com), to provide notices of hearings, a notice of amendment or clarification of the Application Form, general updates, and general information relative to the application process.

Please be advised that any portion of this Application Form and any associated requests for information or documents may be changed at any time.

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: <u>Betfair Interactive US LLC</u>

## **Non-Refundable Processing Fee**

Pursuant to G.L. c. 23N, § 7(a), an applicant for an operator license shall pay to the commission a nonrefundable processing fee of $200,000 for the costs associated with the processing of the application and investigation of the applicant; provided, however, if the costs of the investigation exceed the initial application fee, the applicant shall pay the additional amount to the commission not more than 30 days after notification of insufficient fees or the application shall be rejected.

Applicants may pay the $200,000.00 processing fee via wire transfer, certified check, or cashier's check. Wiring information may be obtained by contacting:

**Douglas O'Donnell**
**Revenue Manager**
**(617) 979-8425**

Checks must be made out to the Massachusetts Gaming Commission and mailed to:

**Massachusetts Gaming Commission**
**c/o Revenue Division**
**101 Federal Street, 12th Floor**
**Boston, MA 02110**

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: <u>Betfair Interactive US LLC</u>

## **Completing the Application**

    The application is divided into seven primary sections, each section containing questions relating to that section. The applicant should answer each question fully. While a cross-reference to other sections within the application may be included as part of an answer to a particular question, a cross-reference may not serve as the entire answer to any particular question. Please make sure to include the name of the applicant in the provided space at the top of the page for each question.  If the answering of any question requires an attachment, please see below.

**Format:** Answers to questions should be formatted in the "Times New Roman" font, with a font size of 12.

**Attachments**: Where an applicant may wish to attach a document in response or to supplement its written response, or another exhibit of any nature, it may attach such documents and/or exhibits as set forth in the instructions for "Electronic Application Format." All attachments must be named and listed for the corresponding question. If the same attachment is responsive to multiple questions within the application, a copy of the attachment should be attached to each question, not just cross-referenced.

    Every question must be answered completely. If a question or portion thereof is not applicable, enter "N/A" into the appropriate space on the application.

    Applicants for Category 1 Sports Wagering Licenses and Category 2 Sports Wagering Licenses may refer the Bureau and Commission to prior application forms submitted to the Commission by the Applicant or previous information otherwise obtained by the Bureau or Commission regarding the Applicant.

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: __Betfair Interactive US LLC__

# **Submission of Materials**

The Application must be submitted by the application deadline. The deadline for **all applications (Category 1, 2 & 3) is Monday, November 21, 2022, at 2 p.m.** The Commission shall have no obligation to accept or review an application submitted after the established deadline.

### **How to Submit an MGC Sports Wagering Operator License Application**

Entities interested in applying for a Sports Wagering Operators License must request a link to the MGC Secure File Transfer Site prior to submitting their application form and any additional documents. This link will allow for the secure and confidential upload and storage of all application materials.

#### *How to Request a Link to the MGC Secure File Transfer Site:*
*Please Note: All link requests must be received no later than one week before the application deadline (November 14, 2022).*

1. Please go to: https://massgaming.com/about/sports-wagering-in-massachusetts/applications-for-sports-wagering-licenses/
2. Select "Request Secure Link to Submit Completed Sports Wagering Application" from the Reason for Submitting Form drop down menu
3. Complete all of the required fields
4. Click "Submit."

A Commission representative will provide the requested link and additional instructions on uploading the application materials securely via email. The information will be sent in two emails, with the link being in the first email and the password sent separately in the second email, for security purposes.

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: <u>Betfair Interactive US LLC</u>

# **Electronic Application Format**

When the electronic version of the application materials is submitted via the MGC Secure File Transfer Site and uploaded to the Commission's server, the applicant must abide by the following:

(a) The applicant must submit this original completed Application Form that has not been printed, signed, and scanned, but with all answers electronically filled in, all attachments identified, and all necessary boxes checked. This version is being required so that it may be searched electronically by the Commission during the evaluation process. This document must be in PDF format.

(b) The applicant must also submit this completed Application Form with all answers electronically filled in, all attachments identified, all necessary boxes checked, and all required signatures affixed. This version is identical to the document described in (a) above, but it should also be printed, signed, and scanned. This scanned document must be in PDF format.

(c) The applicant must submit each attachment as its own electronic file. No electronic file should contain more than one document. Each attachment should be in PDF format unless otherwise required. The file names of all of the attachments must be named strictly in accordance with the following rules:
  ➢ The first portion of the filename must contain the section number and subsection of the question followed by a hyphen, then and the attachment number for that particular question with a leading zero for numbers under 10 (e.g. "B1-b-##").
  ➢ The file name should then contain the descriptive name of the attachment, in at most 20 characters.
  ➢ The name of the attachment must not contain the name of the applicant.
  ➢ The final portion of the filename should be the extension, such as ".pdf" or ".xls".
  ➢ The file name should correspond to the list of attachments on the Application Form.
  ➢ If the Applicant believes the attachment to be confidential, in whole or in part (i.e.- exempt from disclosure under the Public Records Law), then the filename must have the word "CONFIDENTIAL" in all capital letters placed directly before the file extension.  Failure to include this label may result in the public release of the document.

Although a PDF version of each attachment is required, in certain cases providing an alternative file format may be helpful to the Commission in reaching its decision. For example, where the applicant is required to submit tables of calculations, such as a revenue projection, it should be submitted in spreadsheet format so that the Commission may numerically analyze this information. The applicant may also, although not required, provide other documents such as videos, interactive documents, or physical models. These types of documents do not readily lend themselves to conversion into PDF format. For these documents, the applicant should provide both the document in original format, and a PDF file describing the existence of such a document within the applicant's application materials. The file name of the alternate format, if it is in fact a computer-readable file, and the filename of the PDF format of the attachment should be identical, excluding the file extension.

No electronically submitted document to the Commission may be password protected. The individual documents should not be encrypted separately.

Any attachments containing a table of calculations, such as a revenue projection, should be included in the electronic submission in a spreadsheet format, preferably Microsoft Excel ".xls" files.

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant:  <u>Betfair Interactive US LLC</u>

The following is an example of select files of a properly organized application:

```
B2-a-01 Additional Sports Wagering Licensure Information.pdf

B2-a-02 Additional Sports Wagering Jurisdiction Information.pdf

C2-a-01 Revenue Projections CONFIDENTIAL.pdf

C2-b-01 Revenue Projections CONFIDENTIAL.xls

Application.pdf

Signed Application.pdf
```

CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: __Betfair Interactive US LLC__

## **Public Records**

Pursuant to G.L. c. 23N, §6(i), "[a]pplications for operator licenses shall be public records . . . ." Applicants should be mindful of this prior to submission of an Application. However, the law also provides "that trade secrets, competitively-sensitive or other proprietary information provided in the course of an application for an operator license under [chapter 23N], the disclosure of which would place the applicant at a competitive disadvantage, may be withheld from disclosure under [the Massachusetts public records law]."

To help inform applicants of the Commission's intentions, a guide has been attached at the end of the Application advising which answers and attachments submitted with this form will be considered to presumptively meet the exception to the public records law and withheld from public disclosure. There is also space for an applicant to request exempt treatment of a specific document identified in the Application. FAILURE TO FOLLOW THE INSTRUCTIONS PROVIDED IN THE GUIDE MAY RESULT IN PUBLIC RELEASE OF THE DOCUMENTS.

Please note, though the Commission will use its best efforts to protect any information it deems subject to an exemption, final appeals are adjudicated by the Secretary of the Commonwealth in accordance with G.L. c.66, §10.

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: <u>Betfair Interactive US LLC</u>

## **Checklist**

Complete this checklist prior to submitting any materials to the Commission.



☑ The applicant has answered all of the questions in this Application Form that it was required to respond to

☑ Any question requiring an attachment has the attachment noted on the Application Form

☑ The applicant properly named all the files

☑ The applicant has properly organized all of the attachments

☑ No files have been password protected

☑ The applicant has signed all required pages of this application

☑ The applicant has paid the $200,000.00 non-refundable processing fee

☑ The applicant will update the Commission if there are any changes to the information presented in the Application or any of the attachments.

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: __Betfair Interactive US LLC__

## SECTION A: GENERAL INFORMATION

**A.1**  **APPLICANT NAME**

Betfair Interactive US LLC
**Name**

**A.2**  **CATEGORY OF LICENSE APPLYING FOR** *(check one)*

☐ **Category 1** (In-Person Wagering at a Gaming Establishment)
☐ **Category 2** (In-Person Wagering at a Live Horse Racing or Simulcasting Facility)
☒ **Category 3** (Mobile Sports Wagering)

**A.3**  **IF APPLYING FOR CATEGORY 3 (MOBILE SPORTS WAGERING) LICENSE, IS THIS APPLICATION TETHERED TO A CATEGORY 1 OR CATEGORY 2 APPLICATION** *(check one)*

☒ **No** (*Independent Application*)
☐ **Yes, Tethered to Category 1 or Category 2 Applicant** *(applicant name)*:
_____

**A.4**  **STATE/COUNTRY IN WHICH THE BUSINESS ENTITY IS INCORPORATED, ORGANIZED, FORMED, OR REGISTERED**

Delaware                                    United States
**State/Province**                          **Country**

**A.5**  **IDENTIFY THE APPLICANT'S TYPE OF BUSINESS** *(check one)*

☒ **Limited Liability Company**   ☐ **Partnership**          ☐ **Other** *(please describe)*:
☐ **C-Corporation**               ☐ **Limited Partnership**    _____
☐ **S-Corporation**               ☐ **Trust**
☐ **Sole Proprietorship**

**A.7**  **FEDERAL TAX ID NUMBER**

██████ _____
**Federal Tax ID Number**

**A.6**  **APPLICANT LOCATION INFORMATION**

6701 Center Drive West, Suite 1000
**Number and Street Address**

Los Angeles, CA 90045                       310-242-9400
**City, State, & Zip Code**                 **Phone Number**

cory.fox@fanduel.com                        www.fanduel.com
**Email Address**                           **Website**

**A.7**  **APPLICANT PRINCIPAL PLACE OF BUSINESS INFORMATION**

6701 Center Drive West, Suite 1000
**Number and Street Address**

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: **Betfair Interactive US LLC**

Los Angeles, CA 90045        310-242-9400

**City, State, & Zip Code**        **Phone Number**

cory.fox@fanduel.com

**Email Address**

**A.7**    **PRIMARY CONTACT FOR THIS APPLICATION**

Cory Fox        VP, Government Affairs & Product Counsel

**Name**        **Title**

cory.fox@fanduel.com        ███████████

**Email Address**        **Phone Number**

## SECTION B: SPORTS WAGERING EXPERIENCE & EXPERTISE

**B.1**    **APPLICANT'S ABILITY TO OFFER SPORTS WAGERING IN THE COMMONWEALTH**

Provide a thorough description of the applicant's ability to offer sports wagering in the Commonwealth. This should include the following:
**a.** Background in sports wagering
**b.** Experience and licensure in other jurisdictions with sports wagering
**c.** Plans to offer the platform in coordination with other applicants or person
**d.** Intention to limit participation in any allowable sports events

**B.2**    **SPORTS WAGERING EXPERIENCE - DESCRIPTION OF SPORTS WAGERING OPERATION**
*(Category 1 & 2 Applicants Only)*

Provide a thorough description of the sports wagering operation proposed for the Commonwealth. This should include the following:
**a.** Description of the customer experience, including options, promotions, and offers
**b.** Overview of wagering activity
**c.** Estimated volume of wagering activity *(annually)*
**d.** Estimated market share within each jurisdiction

**B.3**    **SPORTS WAGERING EXPERIENCE - DESCRIPTION OF SPORTS WAGERING PLATFORM**
*(Category 3 Applicants Only)*

Provide a thorough description of the sports wagering platform to be operated in the Commonwealth. This should include the following:
**a.** Description of the customer experience, including options, promotions, and offers
**b.** Overview of wagering activity
**c.** Estimated volume of wagering activity *(annually)*
**d.** Jurisdictions where the platform is currently licensed and operating
**e.** Current integration in use with other wagering operators
**f.** The number of user accounts maintained
**g.** Estimated market share within each jurisdiction

**B.4**    **SPORTS WAGERING EXPERTISE – TECHNICAL FEATURES & OPERATION OF PLATFORM**
*(Category 3 Applicants Only)*

Provide a thorough description of the applicant's expertise in sports wagering and how it would be applicable in the Commonwealth. This should include the following:

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: **Betfair Interactive US LLC**

   **a.** Overview of technical standards, features, and operation of the platform
   **b.** List of all current certifications or approvals from certified independent test labs and jurisdictions
   **c.** Plan for continuous support, maintenance, and change management of the platform
   **d.** Outline the features of the platform designed to support the customers
   **e.** Sample wagering menu the Applicant intends to offer, *pending approval from the Commission*
   **f.** Description of Applicant's proposed ability to commence mobile sports wagering on the platform
   **g.** How the Applicant intends to prevent wagering by prohibited persons, including underage persons, problem gamblers, employees, etc.
   **h.** Outline any technology to be used or features offered that the applicant believes sets their platform apart from those of (potential) other applicants

## SECTION C: ECONOMIC IMPACT ON THE COMMONWEALTH

### C.1   EMPLOYMENT OPPORTUNITIES WITHIN THE COMMONWEALTH

Provide a thorough description of the employment opportunities that will be offered if the applicant is approved for licensure by the Commission. This should include the following:
   **a.** The number of current full-time and part-time employees within the Commonwealth
   **b.** The number of current work locations within the Commonwealth
   **c.** The number of proposed full-time and part-time positions that will be created within the Commonwealth
   **d.** The title, job description, salary, and benefits information for each of the proposed positions
   **e.** The training that will be required and made available for all proposed positions
   **f.** The number of proposed work locations that will be created within the Commonwealth
   **g.** Description of plans for workforce development opportunities for Applicant's staff within the Commonwealth
   **h.** Outline the strategy for focusing on job opportunities and training in areas and demographics with high unemployment and/or underemployment

### C.2   PROJECTED REVENUE

Provide studies and projections for gross sports wagering revenue for each of the first five years of wagering operations on a best, average, and worst, case basis. The studies and information provided should include:
   **a.** Projected figures for sports wagering revenue and methodology used to arrive at these projections
   **b.** Projected figures for any non-sports wagering revenue and methodology used to arrive at these projections
   **c.** Projected figures for all tax revenue to the Commonwealth and methodology used to arrive at these projections
   **d.** Profitability of sports wagering operation (in-person & mobile) in other jurisdictions where the applicant is licensed
   **e.** History of operating performance versus revenue projections for the last five years for other jurisdictions where the platform is licensed – *includes documentation outlining the applicant's record of success or failure in meeting the performance objectives*
   **f.** Description of methods to ensure that revenues are maximized within the Commonwealth
   **g.** Description of plans to compete with other nearby jurisdictions and to market to Massachusetts patrons

### C.3   CONSTRUCTION – GAMING ESTABLISHMENTS *(for Category 1 Applicants Only)*

Provide a thorough description of the location of the proposed sports wagering operation. This should include the following:
   **a.** A detailed timeline of construction
   **b.** Proposed location within the gaming establishment, including plans for the construction of a new section within the gaming floor and/or any potential additions to the facility
   **c.** Approximate square footage of the sports wagering area
   **d.** Secure location for storing funds issued by a cage, to be used in the operation, including all security measures and procedures

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: __Betfair Interactive US LLC__

**e.** Proposed security and surveillance of the sports wagering area and operation and how the applicant intends to prevent wagering by prohibited persons, including underage persons, problem gamblers, employees, etc.

**f.** Reasonable measures the applicant will take to ensure the safety and security of all employees and patrons of any sports wagering related events

**g.** Accessibility of patrons to the proposed sports wagering area, including all means of entry and exit, including handicapped access, and the volume of traffic that can be sustained

**h.** Number and location(s) of ticket window(s)

**i.** Number and location(s) of wagering kiosk(s)

**j.** Location and display format for all wagers, available to the public

**k.** Location of posting of house rules

**l.** *If applicable* – description regarding any proposal of providing food, beverages, and other concessions to patrons

## C.4    CONSTRUCTION – LIVE HORSE RACING/SIMULCASTING FACILITY *(Category 2 Applicants Only)*

Provide a thorough description of the location of the proposed sports wagering operation. This should include the following:

**a.** Location of proposed sports wagering operation *(address)*

**b.** A detailed timeline of construction

**c.** Proposed location of sports wagering area within the facility, including plans for the construction of a new section and/or any potential additions to the facility

**d.** Approximate square footage of the sports wagering area

**e.** Secure location for storing funds issued by a cage, to be used in the operation, including all security measures and procedures

**f.** Proposed security and surveillance of the sports wagering area and operation and how the applicant intends to prevent wagering by prohibited persons, including underage persons, problem gamblers, employees, etc.

**g.** Reasonable measures the applicant will take to ensure the safety and security of all employees and patrons of any sports wagering-related events

**h.** Accessibility of patrons to the proposed sports wagering area, including all means of entry and exit, including handicapped access, and the volume of traffic that can be sustained

**i.** Number and location(s) of ticket window(s)

**j.** Number and location(s) of wagering kiosk(s)

**k.** Location and display format for all wagers, available to the public

**l.** Location of posting of house rules

**m.** *If applicable* – description regarding any proposal of providing food, beverages, and other concessions to patrons

*Capital Investment*

In accordance with G.L. c.23N, §3, Category 2 licensees shall make a capital investment of not less than $7,500,000.00 within 3 years after receiving a sports wagering license, which the applicant must agree to expend.

Please provide a thorough description, including the following:

**n.** How the applicant proposes to realize the required capital investment

**o.** The financial commitments and guarantees the applicant is prepared to provide the Commission

**p.** How the applicant will ensure that the project is completed, the license conditions are fulfilled, and sufficient working capital is available to allow operation in the promised fashion

**q.** Any mitigation measures the applicant will take to reduce any impact on the local community

## C.5    COMMUNITY ENGAGEMENT

Provide a thorough description of how the Applicant will contribute to economic & business development, tourism & community relations, and the promotion of charitable causes in the Commonwealth. Including:

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: __Betfair Interactive US LLC__

   a. Creating partnerships for any community, economic development, and tourism opportunities with local or regional entities including but not limited to the Massachusetts Office of Business Development, Chambers of Commerce, Regional Tourism Councils, and the Massachusetts Marketing Partnership

   b. Plans, measures, and steps the applicant intends to take to avoid any negative impact on the revenues currently generated by the Massachusetts State Lottery, including cross-marketing strategies and increasing ticket sales

   c. Promoting local businesses, including restaurants, hotels, and retail outlets

   d. Cross-marketing with live entertainment venues and/or attractions

   e. Supporting any community enhancements being incorporated at the local level

   f. Highlighting unique business and marketing strategies to draw new revenues from new customers

## SECTION D: DIVERSITY, EQUITY, & INCLUSION

### D.1    DIVERSITY, EQUITY, & INCLUSION – WORKFORCE

Provide a thorough description of the applicant's willingness to foster racial, ethnic, and gender diversity, equity, and inclusion, within their workforce, both at the corporate level and the proposed entity within the Commonwealth. The information must include:

   a. Applicant's current diversity, equity, and inclusion team – *please include the name and title of those individuals currently identified as part of the diversity, equity, and inclusion staff/team, as well as a copy of their location on the applicant's organizational chart*

   b. Applicant's workforce diversity, equity, and inclusion policy

   c. Workforce demographics, demonstrating the applicant's current workforce diversity

   d. Efforts to be made to cultivate workforce diversity, equity, and inclusion by identifying, recruiting, and hiring minorities, women, persons with disabilities, and veterans

   e. Memberships and/or intentions for joining any local, regional, state, and/or national organizations committed to the development and promotion of diversity, equity, and inclusion initiatives

### D.2    DIVERSITY, EQUITY, & INCLUSION - SUPPLIER SPEND

Provide a thorough description of the Applicant's overall and specific goals, applicable to the total dollar amount of contracts, for the utilization of:

   a. Minority-owned business enterprises

   b. Women-owned business enterprises

   c. Veteran-owned business enterprises

Please include how each of these enterprise groups will participate as:

- Contractors in the design and/or building of the sports wagering platform
- Vendors in the execution, maintenance, and/or support of the sports wagering platform
- Vendors in the provision of goods and services

### D.3    DIVERSITY, EQUITY, & INCLUSION – CORPORATE STRUCTURE

Provide a thorough description of the Applicant's commitment to diversity, equity, and inclusion initiatives in the Commonwealth. This should include:

   a. The makeup of the Applicant's ownership, leadership, and governance structure, – *including minorities, women, and veterans in positions of leadership throughout the corporate structure*

   a. How the Applicant intends to create joint ventures with corporate partners and/or partnerships with local or regional entities, including but not limited to programs, non-profit organizations, and agencies, dedicated to establishing a welcoming and inclusive experience for all patrons, users, and employees in the Commonwealth

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: __Betfair Interactive US LLC__

## SECTION E: RESPONSIBLE GAMING

### E.1    RESPONSIBLE GAMING POLICIES

Referencing the following documents:
- MGC Responsible Gaming Framework
- Applying Principles of the Massachusetts Responsible Gaming Framework to Sports Wagering Policy & Practice
- GameSense Logic Model
- Responsible Gaming Considerations for Gambling Advertising

Provide a proposed responsible gaming draft that, at a minimum, incorporates policies and tactics for the following key strategies:
**a.** Commitment to corporate social responsibility
**b.** Support positive play
**c.** Promote public health and safety
**d.** Ensure responsible advertising and marketing
**e.** Manage high-risk financial transactions
**f.** Engage the community
**g.** Commitment to improvement and reporting

### E.2    ADVERTISING & PROMOTIONAL PLANS

Provide a thorough description of the Applicant's ability to demonstrate the advertising, marketing, and promotional efforts to be made in the Commonwealth. Information should include:
**a.** Estimated marketing budget in the Commonwealth
**b.** Promotion and player loyalty programs
**c.** Advertising plans – *must include information for any third-party marketing firm applicant plans to partner with for advertising in the Commonwealth*
**d.** Measures to ensure that marketing reaches the target audience and not underage or vulnerable populations
**e.** Player acquisition models – *specify minimum age to participate*
**f.** Plans to incorporate responsible gaming and problem gambling information
**g.** Strategies for converting those customers wagering via unlicensed or illegal means to wagering legally in the Commonwealth
**h.** Examples of marketing, advertising, and promotional materials/activities recently used in other jurisdictions

### E.3    HISTORY OF DEMONSTRATED COMMITMENT

Provide a thorough description of the policies and procedures that the applicant has adopted to:
**a.** Promote responsible gaming within the gaming establishment or mobile application and in the community
**b.** Assist patrons and users that are experiencing gambling-related harm
**c.** Cooperate and support any government or regulatory agencies to promote responsible gaming and/or mitigate gambling-related harm
**d.** List any membership or partnership with an agency or organization whose mission is in whole, or part, dedicated to responsible gaming or problem gambling
**e.** List any awards or recognition the applicant has received, related to efforts to promote responsible gaming, or mitigating gambling-related harms
**f.** List any fines, violations, citations, and/or corrective action required by the applicant in response to insufficient or improper policies, procedures, operations, advertising/marketing, and/or any other business related to sports wagering or other gambling enterprises

## SECTION F: TECHNOLOGY

### F.1    GEOFENCING

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: __Betfair Interactive US LLC__

Provide a thorough description of how the applicant will ensure that authorized users placing online sports wagers on their platform are geographically located in the Commonwealth of Massachusetts. This information must include:

**a.** Which geolocation system(s) will be utilized to reasonably detect the physical location of an authorized user attempting to place a wager on the platform

**b.** How the system will:
  **1.** Accurately detect the physical location of an authorized user attempting to access or place a wager on the platform through accurate location data sources (Wi-Fi, GSM, GPS)
  **2.** Block or deny unauthorized attempts to access the platform, or place a wager, from outside of the Commonwealth
  **3.** Update the IP address and physical location if they change while the user is active on the platform
  **4.** Identify attempts to circumvent the requirement to be physically located in the Commonwealth

**c.** How the applicant will log information received from the system

**d.** How the applicant will report the information received from the system to the Commission

### F.2    KNOW YOUR CUSTOMER

Provide a thorough description of how the Applicant will ensure the verification of information provided by users opening a new account on the platform.
  **1.** Ensure the integrity of the user's account information
  **2.** Ensure the integrity of a user's device if it indicates tampering or suspicious activity
  **3.** Notify the applicant of potential risks or fraudulent activity

### F.3    TECHNOLOGICAL EXPERTISE AND RELIABILITY

Provide a thorough description of how the Applicant will ensure the security, sustainability, and reliability of the following items:

**a.** Wager acceptance

**b.** Systems for monitoring structured wagers, real-time data feed, and any unusual or suspicious wagering activity

**c.** Description, location, and periodic testing of servers

**d.** Security of servers, applications, and communications networks

**e.** Security of patron personal and wagering information

**f.** Integrity monitoring and reporting, including any current affiliations related to integrity monitoring

## SECTION G: SUITABILITY

### G.1    SUITABILITY – CORPORATE INTEGRITY

Applicants must also complete and submit the following documents, before any suitability investigations or background checks will commence:

- Massachusetts Gaming Commission Business Entity Disclosure Form

**a.** Joint Venture Agreements for the implementation of a sports wagering operation:
  **1.** Other Applicants
  **2.** Businesses
  **3.** Contractors
  **4.** Vendors

### G.2    SUITABILITY - INDIVIDUAL QUALIFIER INTEGRITY

Any Key Persons or Employees associated with an applicant must also complete and submit the following documents, before any suitability investigations or background checks will commence:

- Massachusetts Gaming Commission Multi-Jurisdictional Personal History Disclosure Form

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: **Betfair Interactive US LLC**

- [Massachusetts Gaming Commission Supplemental Form](#)

## G.3   FINANCIAL STABILITY & INTEGRITY

Please provide the following documents, for the last five (5) fiscal years and through the date of the application:

**b.** Documentation demonstrating the financing structure and plan for the proposal, including all sources of capital. *Please include current capital commitments, as well as plan and timing for meeting future capital needs*

**c.** A detailed budget of the proposal cost, including any construction, design, legal and professional, consulting, and all other developmental fees. *Also identify all other pre-launch costs, including training, marketing, and initial startup capital*

**d.** An analysis, including best, worst, and average case scenarios, that demonstrates the applicant's plan and capacity for accommodating steep downturns in revenues, and provides examples of those plans and strategies that have been successful in other jurisdictions

**e.** What are the Applicant's annual liquidity, leverage, and profitability ratios, including current ratio, debt-to-equity ratio, and gross/net margin ratios?

**f.** Information pertaining to contracts, loan agreements, and/or commitments that the applicant has breached or defaulted on during the last ten years. *Provide information for any lawsuit, administrative proceeding, or another proceeding that occurred as a result of the breach or default*

**g.** A description of any administrative or judicial proceeding, during the last ten years, in which the applicant or any entity that owns 5%, or greater share, was found to have violated a statute or regulation governing its operation

**h.** Any bankruptcy filings made, or proceedings commenced, for any entities owned or controlled by the applicant and any entity owning a 5% or greater share of the applicant

**i.** Any financing amounts or ownership interests that are anticipated to come from minorities, women, and/or disadvantaged businesses. *If the applicant, or any portion of the applicant, is a public company, it is not necessary to list shareholders*

**j.** Examples and/or narratives that substantiate the applicant's understanding of and experience with Internal Controls.

## G.4   COMPLIANCE

Provide the following information on whether the applicant or its Key Persons has ever:

**a.** Been employed by the Massachusetts Gaming Commission

**b.** Possessed a gaming license (casino, video gaming, charitable games, lottery, pari-mutuel, sports wagering, etc.) issued by any jurisdiction – *if so, please provide a copy of each license*

**c.** Held or holds a direct, indirect, or attributed interest in any business that intends to apply for a license with the Commonwealth

**d.** Withdrawn a gaming license application, in any jurisdiction – *if so, please submit a detailed description of each withdrawal*

**e.** Been denied a gaming-related license or finding of suitability, in any jurisdiction – *if so, submit a detailed statement describing the denial and/or related findings*

**f.** Had a gaming license suspended, in any jurisdiction – *if so, include a detailed statement regarding each suspension*

**g.** Had a gaming license revoked, in any jurisdiction, or has had disciplinary action initiated to revoke a license – *if so, submit a detailed description of each revocation or action initiated*

**h.** Had a gaming license non-renewed or considered for non-renewal, in any jurisdiction – *if so, provide a detailed description of the circumstances*

**i.** Been found unsuitable gaming license non-renewed or considered for non-renewal, in any jurisdiction – *if so, provide a detailed description of the circumstances*

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE

Applicant: <u>Betfair Interactive US LLC</u>

# **<u>SIGNATURE FORMS</u>**

Applicant: Betfair Interactive US LLC

## VERIFICATION AND AUTHENTICATION

The applicant, Betfair Interactive US LLC, hereby authorizes the Commission, the Executive Director of the Commission, the Investigations and Enforcement Bureau, and/or their respective designees to take all necessary and reasonable steps to verify and authenticate any information or materials submitted in conjunction with this application and agrees to fully cooperate in such an inquiry. Further, the applicant is aware that if any of the responses to any question in this application are determined to be false, or if they are misleading, the application may be denied. The applicant acknowledges its continuing duty to provide updated information and/or promptly notify the Commission of any changes to the information or materials, of which it becomes aware or should be aware, that were provided in response to any question in this application.

Amy Howe

Name of Authorized Individual

Signature of Authorized Individual

Manager and CEO

11/16/2022

Position with Applicant

Date

Applicant:  Betfair Interactive US LLC

## **ATTESTATION**

I, Amy Howe , on behalf of Betfair Interactive US LLC hereby swear or affirm under the pains and penalties of perjury that the information contained in this Application form and all materials accompanying said form are true and accurate to the best of my knowledge and understanding; that I have reviewed the information contained in the Application form for accuracy; that I read and understand the questions and responses on the Application form; that any document accompanying this Application that is not an original document is a true copy of the original document; that I have read and understood all applicable provisions of 205 CMR and G.L. c.23N; that the applicant agrees to all terms, conditions, and obligations made applicable to all applicants for a sports wagering operator license; that in the event that the applicant is awarded an operator license it agrees to all obligations, terms, and conditions imposed upon a successful applicant; and that I am authorized to submit this application on behalf of the applicant.

Amy Howe

Name of Authorized Individual

Manager and CEO

Position with Applicant

Signature of Authorized Individual

11/16/2022

Date

Applicant: __Betfair Interactive US LLC__

# **WAIVER OF LIABILITY**

__Betfair Interactive US LLC__ *hereby holds the Commonwealth of Massachusetts and its instrumentalities and agents, including but not limited to the Massachusetts Gaming Commission and its agents, representatives and employees harmless, both individually and collectively, from any and all claims of liability for damages of whatever kind, resulting at any time from any disclosure or publication of information acquired during the application process or the use of any information provided in furtherance of this application.*

Amy Howe
Name of Authorized Individual

Manager and CEO
Position with Applicant

[signature redacted]
Signature of Authorized Individual

11/16/2022
Date



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**B.1 APPLICANT'S ABILITY TO OFFER SPORTS WAGERING IN THE COMMONWEALTH 2**

**B.2 SPORTS WAGERING EXPERIENCE - DESCRIPTION OF SPORTS WAGERING OPERATION (CATEGORY 1 & 2 APPLICANTS ONLY)**................................................................**8**

**B.3 SPORTS WAGERING EXPERIENCE - DESCRIPTION OF SPORTS WAGERING PLATFORM *(CATEGORY 3 APPLICANTS ONLY)*** .........................................................**9**

**B.4 SPORTS WAGERING EXPERTISE – TECHNICAL FEATURES & OPERATION OF PLATFORM *(CATEGORY 3 APPLICANTS ONLY)*** ............................................**24**

**C.1 EMPLOYMENT OPPORTUNITIES WITHIN THE COMMONWEALTH** ..............................**40**

**C.2 PROJECTED REVENUE**...............................................................................................**48**

**C.3 CONSTRUCTION – GAMING ESTABLISHMENTS (FOR CATEGORY 1 APPLICANTS ONLY)** .....................................................................................................**56**

**C.4 CONSTRUCTION – LIVE HORSE RACING/SIMULCASTING FACILITY (CATEGORY 2 APPLICANTS ONLY)**.........................................................................**57**

**C.5 COMMUNITY ENGAGEMENT**....................................................................................**58**

**D.1 DIVERSITY, EQUITY, & INCLUSION – WORKFORCE** .................................................**63**

**D.2 DIVERSITY, EQUITY, & INCLUSION - SUPPLIER SPEND** ...........................................**65**

**D.3 DIVERSITY, EQUITY, & INCLUSION – CORPORATE STRUCTURE** ...............................**67**

**E.1 RESPONSIBLE GAMING POLICIES** ...........................................................................**68**

**E.2 ADVERTISING & PROMOTIONAL PLANS** .................................................................**69**

**E.3 HISTORY OF DEMONSTRATED COMMITMENT**..........................................................**79**

**F.1 GEOFENCING**............................................................................................................**85**

**F.2 KNOW YOUR CUSTOMER**.........................................................................................**90**

**F.3 TECHNOLOGICAL EXPERTISE AND RELIABILITY**....................................................**93**

**G.1 SUITABILITY – CORPORATE INTEGRITY**................................................................**103**

**G.2 SUITABILITY - INDIVIDUAL QUALIFIER INTEGRITY** ..............................................**104**

**G.3 FINANCIAL STABILITY & INTEGRITY**....................................................................**105**

**G.4 COMPLIANCE** .........................................................................................................**114**



**Application for Massachusetts Category 3 Sports Wagering Operator License**

## B.1 APPLICANT'S ABILITY TO OFFER SPORTS WAGERING IN THE COMMONWEALTH

*Provide a thorough description of the applicant's ability to offer sports wagering in the Commonwealth. This should include the following:*

### a. Background in sports wagering

FanDuel has been at the forefront of online sports wagering since the repeal of PASPA in 2018. Today, FanDuel operates an online sportsbook in 17 U.S. jurisdictions, and the province of Ontario. In the U.S. market, FanDuel has established itself as the clear leader in sports betting with 46% market share of online revenue. FanDuel has seen incredible results at the state-level as well, as it holds the #1 market share position in 13 states. These results have led to several industry recognitions such as winning the "Digital Operator of the Year' at the Global Gaming Expo and FanDuel's CEO, Amy Howe, being named "American Executive of the Year."

In addition, FanDuel is part of Flutter Entertainment PLC ("Flutter"). Flutter is the largest real-money gaming operator in the world. While the U.S. market for online sports wagering is only a few years old, Flutter has decades of experience in building a successful sports wagering business across multiple jurisdictions and varying regulatory landscapes, and FanDuel has benefited immensely from Flutter's experience.



*Flutter Global Brands*

CONFIDENTIAL, NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

Flutter is publicly listed on the London Stock Exchange and Euronext Dublin. FanDuel is fortunate to benefit from the experience, financial resources, product knowledge, technological capabilities, and innovation of Flutter. Flutter's decades of experience with similar operations lends immeasurable value to the FanDuel team as the Company looks to expand and scale across the U.S. Many long-tenured employees from other Flutter divisions have moved to the U.S. to support FanDuel directly across several key positions including: Chief Financial Officer, Head of Risk & Trading; VP of Information Technology; Head of VIP; and Sportsbook General Manager. These individuals bring with them experience and many valuable learnings from the global marketplace.



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**b.  Experience and licensure in other jurisdictions with sports wagering**

FanDuel currently operates an online sportsbook in 17 U.S. jurisdictions (including Maryland, where FanDuel is set to launch the week of November 21, 2022). FanDuel is the clear #1 online sportsbook in the U.S. market today with 46% market share of revenue across states in which its operational. In addition, FanDuel's revenue market share is greater than the next three largest operators combined - DraftKings (21%), BetMGM (15%), and Caesars (7%).



*[1]Trailing-Six Months Gross Gaming Revenue, includes all states where FanDuel Sportsbook is live during the period.*

*Source: Eilers & Krejcik's October 2022 - All States Online Sports By Brand Report.*

FanDuel holds the #1 online revenue market share position in 13 out of 15 states included in a recent Eilers analysis. The following chart provides a breakdown of online revenue market share and position by state.

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

| State | Market Share | Position | # of Operators |
|-------|--------------|----------|----------------|
| NY | 54% | 1 | 9 |
| PA | 52% | 1 | 13 |
| CT | 52% | 1 | 3 |
| NJ | 50% | 1 | 23 |
| LA | 49% | 1 | 7 |
| VA | 46% | 1 | 14 |
| IL | 46% | 1 | 7 |
| WV | 43% | 1 | 8 |
| AZ | 43% | 1 | 18 |
| MI | 42% | 1 | 15 |
| IN | 42% | 1 | 12 |
| TN | 36% | 1 | 10 |
| IA | 30% | 1 | 18 |
| CO | 28% | 2 | 26 |
| WY | 11% | 3 | 4 |
| KS | N/A | N/A | N/A |
| **Total** | **46%** | **1** | **49** |

*Source: Eilers & Krejcik's October 2022 - All States Online Sports By Brand Report. Market share numbers are based on trailing-six months. Data is not available for Kansas as state launched in September 2022.*

In addition to FanDuel's nationwide performance, it has an exceptionally strong position in northeast states – New York (54%), Pennsylvania (52%), Connecticut (52%), and New Jersey (50%). FanDuel is confident that its strategy, which has been successful in these states, can be fully deployed in the Commonwealth and bear similar results.

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

### c. Plans to offer the platform in coordination with other applicants or person

Not applicable; Betfair Interactive US LLC has developed and plans to offer its own bespoke account and wallet system as well as its own sports wagering platform.

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

### d.  Intention to limit participation in any allowable sports events

Applicant presently intends to offer in Massachusetts all commonly allowable sports events in other U.S. jurisdictions, subject to any restrictions that may be adopted by the Commission.

CONFIDENTIAL, NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**B.2 SPORTS WAGERING EXPERIENCE - DESCRIPTION OF SPORTS WAGERING OPERATION (Category 1 & 2 Applicants Only)**

Not applicable.

CONFIDENTIAL/ NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**B.3 SPORTS WAGERING EXPERIENCE - DESCRIPTION OF SPORTS WAGERING PLATFORM** *(Category 3 Applicants Only)*

*Provide a thorough description of the sports wagering platform to be operated in the Commonwealth. This narrative should include:*

**a. Description of the customer experience, including options, promotions, and offers**

<u>Customer Experience:</u>

FanDuel consistently has been ranked as a top sportsbook application in the U.S. Market by Eilers and Krejcik Gaming, LLC, a gaming research and consulting firm. In the latest rankings, FanDuel is the #1 ranked application. Rankings are based on 5 key categories; User Experience, Betting Interface, Features, Core, and Aesthetics. FanDuel holds the #1 ranking for User Experience, Betting Interface and Features, and the #2 ranking in the remaining categories.

Here are some quotes from the report:

- *"FanDuel separated itself from DraftKings and PointsBet this quarter, claiming the #1 spot with a sizeable lead. Their Same Game Parlay tool and highly-regarded UX were praised by testers"*
- *"The FanDuel app resonates with users across the board, and their #1 ranking is reflective of a product that modernizes and iterates as the market and user preferences zig and zag".*



**Application for Massachusetts Category 3 Sports Wagering Operator License**



*Source: Eilers & Krejcik's U.S. Sports Betting Apps_ Tested, Scored, And Ranked – 3Q22 Report.*

In addition, FanDuel's mobile application is rated #1 in the category by customers in the Apple App Store and Google Play Store *(as of October 2022)*



**<u>Promotions & Offers:</u>**

FanDuel has invested ███████████ dollars in customer promotions and offers since it launched its first online sportsbook in 2018. This investment is greater than that of any other operator in the market, save DraftKings. FanDuel takes advantage of the ubiquity of its marketing program with the most effective offers that attract and retain customers in the market. FanDuel also believes that simpler is better, and preferred by customers, so FanDuel's offers are straightforward and generous.

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

A sample menu of FanDuel's offers includes:

|  | **Bet \$X Get \$Y** | **No Sweat First Bet** | **Refer a Friend** | **VIP Deposit Match** |
|---|---|---|---|---|
| **Eligibility** | All new users EXCEPT for pre-live users | Users placing their first real money bet with FD Sportsbook | A referred user must be new to FD Sportsbook, but a referring user can be any user | DFS and other local VIP users invited by FanDuel |
| **Description** | All users who have not received a pre-live registration bonus will have the opportunity to bet a small amount \$X to win a much larger amount \$Y (e.g., \$5 and \$150), even if the bet they place loses | If a user's first real money bet with FD Sportsbook settles as a loss, the user will receive their stake back in free bets up to \$X in value | Users can invite their friends to register with FD Sportsbook through an exclusive referral link. Once a referred user creates an account, deposits, and places a real money bet of \$10 or more, both users unlock \$X worth of free bets | VIP users identified by FanDuel will receive the opportunity to make a deposit into their FD Sportsbook account that will be 100% matched by FanDuel |

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

Sample Creative:



In addition to the above promotional offers, FanDuel always is exploring creative ways to enhance the customer experience. One recent example of this is our current offer of "Bet $5 and Get 3 Months of NBA League Pass." FanDuel currently is running this offer in conjunction with the National Basketball Association ("NBA"). Any customer that places a $5 bet on an NBA event will get a free 3-month subscription to NBA League Pass, which allows the customer to watch every out-of-market basketball game not nationally televised.



CONFIDENTIAL – NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

## Live Streaming:

Another great example of FanDuel's #1 user experience is our live streaming offering. FanDuel has a market leading live streaming offering that allows customers to watch and wager on their favorite events. FanDuel continuously is looking to add to its live streaming offering and can integrate seamlessly whenever new content becomes available. FanDuel currently streams select NHL games, Tennis, Soccer and Table Tennis. FanDuel was the first U.S. sportsbook to offer such in-app live streaming of games.





**Application for Massachusetts Category 3 Sports Wagering Operator License**

**b. Overview of wagering activity**

<u>**Wagering Catalogue:**</u>

FanDuel's sports wagering platform is processing and settling significantly more bets than any other platform in the market and offering more markets (i.e., things to bet on) for wagering than any other platform We are proud of our 50,000 unique wagering markets on just the core U.S. sports (NFL, NBA, MLB, NHL). Experience shows us that the more markets offered to our customers, the better the customer experience and the greater the potential to generate revenue.

To further enhance FanDuel's wagering catalogue, this year, FanDuel offered 309 unique pre-live markets and 255 unique in-play markets for selected NBA games. By comparison, based on internal data compiled by FanDuel, DraftKings and BetMGM averaged 92 and 152 pre-live markets, respectively, and 25 and 34 in-play markets, respectively.



*Source: Sample taken during Q2 2021*

Please see attachment **"B3-b-01 Wagering Catalogue"** for an example of FanDuel's sports wagering catalogue. In the attachment, there is an individual tab for each sport FanDuel supports, and within each tab, FanDuel outlines the leagues and markets offered. All markets are subject to regulatory approval.



**Application for Massachusetts Category 3 Sports Wagering Operator License**

## Product Features:

FanDuel seeks to delight our customers and continually enhance their in-app experience through our product. The FanDuel Sportsbook currently offers over 50+ features and several more currently are in development. Here are a few prominent examples:

## Same Game Parlay™:

Beyond the depth of the markets offered by FanDuel, the platform also features game-changing product innovation unavailable to the same extent on any other betting platform. The most prominent example of such innovation is our Same Game Parlay™ feature. Same Game Parlay™ bets allow bettors to select as many individual bets as they wish within a single game (e.g., moneyline, spread, over/under, player props and game props) and combine them into a single bet. The sophistication of our proprietary betting model enables FanDuel to offer these complex bets, which given the correlation in a single event can be extremely difficult to price. FanDuel's main competitors offer single game parlays but do so via 3rd party data partnerships and on a limited basis. Simply put, FanDuel's competitors lack the capability to offer anything remotely resembling the depth of markets on which FanDuel, offers Same Game Parlay™ bets.

This unique offering is a huge advantage that FanDuel holds over the competition and has shown to be incredibly popular when offered in other U.S. states. Approximately 4 out of 5 customers have placed a Same Game Parlay™ bet in 2022. In addition, Same Game Parlay™ bets have higher margins than single game bets, thus increasing the revenue generated for the Commonwealth as more customers place Same Game Parlay™ bets.



## In-Play:

FanDuel's sports wagering platform provides customers a market-leading betting experience for patrons by offering to bet in-play with odds and prices changing as games take place. FanDuel offers in-play wagering on 100% of games in the top U.S. professional leagues (e.g., NBA, NFL, NHL, MLB), and on 80%+ of college games, as well as a wide range of other sports and leagues

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

across the globe, with far more in-play markets offered on these and tertiary sports than any other U.S operator.

Users may bet on a wide range of bet-types while events are in-play, including game lines, player props, quarters and half betting. FanDuel's in-play offerings are further enhanced by providing customers the option to track the action for each game (game trackers) as well as live scoreboards and play-by-plays.

**Player Prop Tracking:**

Proprietary player prop tracking allows customers to follow their bets live as well as providing new wagering opportunities. FanDuel is the only US operator to offer this in real time.



CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**Early Cash Out:**

Early cash out allows customers to close out of their bet before the event has finished. We enable this through our proprietary live betting technology.



CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

## c. Estimated volume of wagering activity *(annually)*

Since launching in the U.S. in 2018, FanDuel has accepted ███████████████████
███████████████████████████████████████████ Based on FanDuel's leading market
share in the U.S., FanDuel's platform is processing and settling exponentially more bets than any
other platform in the market. ██████████████████████████████████████

███████████████████████████████████████████████████████████
██████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

## d. Jurisdictions where the platform is currently licensed and operating

FanDuel currently operates an online sportsbook in 17 U.S. jurisdictions. Please see the below table for a state listing. In addition, FanDuel operates 27 retail sportsbooks across 15 states and the District of Columbia.

| State | Launch Month-Year |
|---|---|
| New Jersey | August-2018 |
| Pennsylvania | July-2019 |
| West Virginia | August-2019 |
| Indiana | October-2019 |
| Colorado | May-2020 |
| Illinois | August-2020 |
| Iowa | September-2020 |
| Tennessee | November-2020 |
| Michigan | January-2021 |
| Virginia | January-2021 |
| Arizona | September-2021 |
| Connecticut | October-2021 |
| New York | January-2022 |
| Louisiana | January-2022 |
| Wyoming | March-2022 |
| Kansas | September-2022 |
| Maryland | November-2022 |

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**e. Current integration in use with other wagering operators**

Not applicable.

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**f. The number of user accounts maintained**

FanDuel currently hosts [REDACTED] unique sports wagering accounts on the FanDuel platform. These accounts are maintained on FanDuel's proprietary player account management system, which houses a patron's account-related information (e.g., login information, responsible gaming settings, saved deposit and withdrawal details, etc.).

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**g. Estimated market share within each jurisdiction**

FanDuel currently operates an online sportsbook in 17 U.S. jurisdictions. FanDuel is the clear #1 online sportsbook in the U.S. market today with 46% market share of revenue across states in which it's operational. In addition, FanDuel's revenue market share is greater than the next three largest operators combined - DraftKings (21%), BetMGM (15%), and Caesars (7%).



[1]*Trailing-Six Months Gross Gaming Revenue, includes all states where FanDuel Sportsbook is live during the period.*
*Source: Eilers & Krejcik's October 2022 - All States Online Sports By Brand Report.*

FanDuel holds the #1 online revenue market share position in 13 out of 15 states. The following chart provides a breakdown of online revenue market share and position by state.

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

| State | Market Share | Position | # of Operators |
|-------|--------------|----------|----------------|
| NY | 54% | 1 | 9 |
| PA | 52% | 1 | 13 |
| CT | 52% | 1 | 3 |
| NJ | 50% | 1 | 23 |
| LA | 49% | 1 | 7 |
| VA | 46% | 1 | 14 |
| IL | 46% | 1 | 7 |
| WV | 43% | 1 | 8 |
| AZ | 43% | 1 | 18 |
| MI | 42% | 1 | 15 |
| IN | 42% | 1 | 12 |
| TN | 36% | 1 | 10 |
| IA | 30% | 1 | 18 |
| CO | 28% | 2 | 26 |
| WY | 11% | 3 | 4 |
| KS | N/A | N/A | N/A |
| **Total** | **46%** | **1** | **49** |

*Source: Eilers & Krejcik's October 2022 - All States Online Sports By Brand Report. Market share numbers are based on trailing-six months. Data is not available for Kansas as state launched in September 2022.*

In addition to FanDuel's nationwide performance, it has an exceptionally strong position in northeast states – New York (54%), Pennsylvania (52%), Connecticut (52%), and New Jersey (50%). FanDuel is confident that its strategy, which has been successful in these states, can be fully deployed in the Commonwealth and bear similar results.

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**B.4 SPORTS WAGERING EXPERTISE – TECHNICAL FEATURES & OPERATION OF PLATFORM** *(Category 3 Applicants Only)*

*Provide a thorough description of the applicant's expertise in sports wagering and how it would be applicable in the Commonwealth. This summary should include:*

**a. Overview of technical standards, features, and operation of the platform**





CONFIDENTIAL, NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**



CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**



CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**b. List of all current certifications or approvals from certified independent test labs and jurisdictions**

FanDuel's PAM and GBP, which together comprise FanDuel's mobile sports wagering platform, have been certified by Gaming Laboratories International (GLI) and approved by the applicable mobile sports wagering regulatory bodies for use in each of the following jurisdictions: Arizona, Colorado, Connecticut, Illinois, Indiana, Iowa, Kansas, Louisiana, Michigan, New York, Pennsylvania, Tennessee, Virginia, West Virginia, and Wyoming.

FanDuel's mobile sports wagering platform has been certified by GLI and is under active consideration for regulatory approval in Maryland and Ohio. FanDuel anticipates that such regulatory approvals will be received on or before January 1, 2023.

Please see attachment **"B4-b-01 GLI Letter"** for a letter from GLI supporting the above.

In addition, the mobile sports wagering platform has been approved for use in the state of New Jersey by the New Jersey Division of Gaming Enforcement, which does not accept independent testing laboratory certifications.

CONFIDENTIAL, NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**c. Plan for continuous support, maintenance, and change management of the platform**

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**d. Outline the features of the platform designed to support the customers**

FanDuel's mobile sports wagering platform has been developed with user experience in mind, and consistently receives high marks for the seamless user experience and intuitive wagering interface of its sports wagering mobile applications in quarterly product testing by Eilers & Krejcik Gaming, LLC.

FanDuel is committed to promoting and providing tools to help users manage their activity on our mobile sports wagering platform. FanDuel users are provided with a suite of responsible gaming tools, including limits that can be set on deposits, wagers, and time spent on the platform. In addition to these user-operated tools, FanDuel provides in-product tools and reminders including self-exclusion resources, timeouts (opportunities for users to take a shorter break), and engagement after certain deposit metrics are hit.

In addition to posting information and tools, FanDuel trains its employees to recognize potential responsible gaming issues and to direct its users to these responsible gaming information and tools. FanDuel has further cemented its status as a pioneer in responsible gaming by becoming the first online operator to partner with the American Gaming Association in its "have a Game Plan" initiative. As part of this initiative, FanDuel became the first U.S. sports betting operator to offer users GamBan, a product that allows users to exclude themselves from accessing any gaming apps or websites, and the first operator to sign up to PlayPause, a national customer database to enable operators to collaborate across platforms to assist at-risk users. FanDuel's robust responsible gaming programs and initiatives are complemented by a highly experienced compliance team and compliance program designed to safeguard the integrity of our product offerings.

To reach users with proactive responsible gaming messaging, FanDuel also promotes responsible gaming with interstitials on all access points for new users, and continues educational and specific engagement with individual users and cohorts of users on a targeted basis. FanDuel also promotes responsible play externally, introducing a dedicated responsible gaming campaign in March 2022. FanDuel will continue with its responsible gaming advertising campaign built by FanDuel's internal creative team. The multi-media campaign titled "The System" will continue to air throughout the year backed by a significant media investment.

FanDuel maintains a robust customer support team and has invested significant resources and undertaken considerable development work towards improving the user support model. FanDuel's customer support staff undergo comprehensive front-line training, and are equipped with the tools and resources to address any and all user concerns. Users have clear and conspicuous methods of engaging with customer support staff through integrated links directly within the mobile sports wagering platform, and integrated chat features allow them to connect with FanDuel staff seamlessly. FanDuel's customer support portal provides tools and resources to address frequently asked questions and to learn more about FanDuel's product offerings. ▮▮▮▮▮▮▮▮▮▮

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**e. Sample wagering menu the Applicant intends to offer, *pending approval from the Commission***

Please see attachment **"B4-e-01 Sports Betting Catalog"** for the wagering menu that FanDuel proposes to offer in Massachusetts, subject to the regulatory approval of the Commission. To the extent the Commission would like to prepare its own sports wagering menu or directive on permissible markets that would be available to all operators, FanDuel would support such efforts and offers its considerable expertise in the space to the Commission. Attachment **"B4-e-01 Sports Betting Catalog"** is capable of being used as the basis for a Commission-directed sports wagering menu.

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**f. Description of Applicant's proposed ability to commence mobile sports wagering on the platform**

FanDuel has successfully launched mobile sports wagering in 16 U.S. jurisdictions (Arizona, Colorado, Connecticut, Illinois, Indiana, Iowa, Kansas, Louisiana, Michigan, New Jersey, New York, Pennsylvania, Tennessee, Virginia, West Virginia and Wyoming). FanDuel also is in the process of launching a mobile sports wagering platform in Maryland (the week of November 21, 2022) and Ohio (expected on January 1, 2023).

*Sportsbook*



**Application for Massachusetts Category 3 Sports Wagering Operator License**

*Fantasy Sports*



*Horse Racing*



CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**g. How the Applicant intends to prevent wagering by prohibited persons, including underage persons, problem gamblers, employees, etc.**

*Underage Persons and Self-Excluded Individuals*



FanDuel verifies that all users are of the legal age of 21 through the check performed above.  FanDuel also verifies that users are not self-excluded or otherwise prohibited from participation in sports betting at the time of account creation.  If there should be a match, the account will be blocked from creation.

FanDuel's Responsible Gaming team will maintain a copy of the Massachusetts self-exclusion list as it does in other states.

*Employees*



CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**



### *OFAC Screening*

FanDuel screens all users against the OFAC lists during the identity verification process and on a periodic basis thereafter. If a user is found to be a true match to the OFAC list during onboarding, an account will not be opened. If a user becomes sanctioned during the life of the account and is identified as such during periodic screening, FanDuel will freeze the account. FanDuel will investigate and report findings to OFAC as per policy.

### *Other Prohibited Persons*

FanDuel's user terms and conditions prohibit athletes, coaches and other team management, team support personnel (e.g. without limitation, team physicians) and team owners from participating in any FanDuel contests in the sport or sports with which they're associated. Team owners, referees, league employees, sports commissioners, and other individuals who through an ownership interest or game-related employment can influence the gameplay are likewise ineligible.



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**h. Outline any technology to be used or features offered that the applicant believes sets their platform apart from those of (potential) other applicants**

*Comprehensive Responsible Gaming Tooling*

FanDuel is committed to promoting and providing tools to help users manage their activity on our mobile sports wagering platform. Users on FanDuel have access to a suite of tools, including limits that can be set on deposits, wagers, and time spent on the platform. In addition to these user-imposed tools, FanDuel provides in-product tools and reminders including self-exclusion resources, timeouts (opportunities for users to take a shorter break), and engagement after certain deposit metrics are hit.

In addition to posting information and tools, FanDuel trains its employees to recognize potential responsible gaming issues and to direct its users to that same information and those same tools. FanDuel has further cemented its status as a pioneer in responsible gaming in becoming the first online operator to partner with the American Gaming Association in its "have a Game Plan" initiative. As part of this initiative, FanDuel has become the first U.S. sports betting operator to offer users GamBan, a product that allows users to exclude themselves from accessing any gaming apps or websites, and the first operator to sign up to PlayPause, a national customer database to enable operators to collaborate across platforms to assist at-risk gamers. FanDuel's robust responsible gaming programs and initiatives are complemented by a highly experienced compliance team and compliance program ensuring the integrity of our product offerings.

The suite of responsible gaming tooling, and the effectiveness of those tools, sets FanDuel apart from other operators in the industry.

*Sports Wagering Features*



*Single A&W Solution*

FanDuel provides users with a single account and wallet solution that can be used across many of FanDuel's other product offerings.

CONFIDENTIAL, NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**



*In-Play Markets*

FanDuel's mobile sports wagering platform provides a market-leading wagering experience for users by offering the ability to wager in-play with odds changing as the action unfolds.

Users may wager on a wide range of markets while events are in-play, including game lines, player props, quarters and half betting. The platform's in-play offering is further enhanced by providing users the ability to track the action for each game (game trackers) as well as live scoreboards and play-by-plays.

*Parlay and Same Game Parlay*

Traditionally, the more selections a wager has, the harder it is to place the wager when prices are moving fast. The mobile sports wagering platform includes bet delay functionality which allows FanDuel to reduce or completely eliminate bet delays for wagers with multiple selections, even when one or more of the events are in-play.

In addition to the breadth of the markets offered by FanDuel through the mobile sports wagering platform, FanDuel's Same Game Parlay ("SGP") offering is a differentiator. SGP is a FanDuel product offering that brings multiple elements of an event to life in one wager. SGP allows the user to select as many individual bets as they wish within a single game (e.g., moneyline, spread, over/under, player props and game props).

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**



FanDuel has continued to innovate on its market leading offering and were first to market with SGP+ (Same Game Parlay Plus). This gives users the ability to combine their SGP bets with other selections, including other SGPs. Not only is this an incredibly engaging feature, but it also helps to boost FanDuel's commercial margins by offering higher odds than a regular SGP bet.

*Cash Out*

The mobile sports wagering platform offers users the ability to cash out of not-yet-determined wagers. Cash out allows FanDuel users the option to get paid for a wager before the result of the event is complete. A user can elect to take partial winnings before the event is complete, should they want to take a profit on a previously placed wager, without the added risk. For example, a user places a $100 bet on the Chiefs to win the Super Bowl at +600 at the start of the season. The Chiefs make the Super Bowl and are now at odds of +100 to win. However, before the game is played, the user can cash out for a profit (e.g., $300) before the event takes place.

The reverse is also true; users may cash out for a loss in the case of their wager moving out in odds from their original value.

*Streaming*

The mobile sports wagering platform includes integrations with third party content providers (e.g., SportsRadar, IMG and Perform) to offer users the ability to live stream video of games on the mobile sports wagering platform. This includes select NHL games, select MLB games, tennis, soccer and table tennis.

*Bet Tracking*

The mobile sports wagering platform's bet tracking flow is divided into several parts, including a flow that feeds into "My Bets," where users can see their open bets. Another important aspect of the bet tracking flow is feeding wagers into the cash out system. On the "My Bets" page, users can view the live score, cash out offer and even the individual match statistics on the player prop they have placed.



**Application for Massachusetts Category 3 Sports Wagering Operator License**

*Security*

*Product Catalog & Pricing*

*Content Filtering*

*User Experience*

FanDuel's mobile application is the highest rated mobile sports wagering application by Eilers & Krejcik Gaming, LLC, garnering high marks for a clear and intuitive user experience, and a breadth of options, bets and features on display.

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**C.1 EMPLOYMENT OPPORTUNITIES WITHIN THE COMMONWEALTH**

*Provide a thorough description of the employment opportunities that will be offered if the applicant is approved for licensure by the Commission. Please include:*

**a. The number of current full-time and part-time employees within the Commonwealth**



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**b. The number of current work locations within the Commonwealth**



CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**c. The number of proposed full-time and part-time positions that will be created within the Commonwealth**



CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**d. The title, job description, salary, and benefits information for each of the proposed positions**



CONFIDENTIAL, NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**e. The training that will be required and made available for all proposed positions**

FanDuel is fully aware that the online sports betting industry is in its infancy stage, and that a lot of new hires join the company from a different industry. FanDuel is committed to making sure all employees have the required training so that they can succeed in their new role. FanDuel has an onboarding program for all new hires. This onboarding program provides specific training about the sports betting industry. See C.1.g for a more detailed description about employee training and development opportunities.

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**f. The number of proposed work locations that will be created within the Commonwealth**

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**g. Description of plans for workforce development opportunities for Applicant's staff within the Commonwealth**

At FanDuel, we are committed to providing our employees with opportunities to develop new skills, grow their expertise, and further their careers.

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**h. Outline the strategy for focusing on job opportunities and training in areas and demographics with high unemployment and/or underemployment**

Diversity, Equity, and Inclusion ("DE&I") is a strategic priority of FanDuel. FanDuel recently hired a Head of DE&I. FanDuel is taking the necessary steps to further solidify and advance its commitment to diversity. FanDuel is steadfast in building a strategy around attracting, hiring, retaining, and developing a diverse population for the betterment of the company and the industry. Some of the immediate steps FanDuel has taken in advancing its diversity recruiting and development efforts include:

- Building a diverse pipeline by attending recruiting events at ***AFROTech*** (Austin, TX) and ***Society of Hispanic Professional Engineers*** (Charlotte, NC). In addition, FanDuel has a partnership with Atlanta University Center and other HBCUs.
- Recruited at ***Women In Sports and Events Multiplier Summit*** (Boston, MA). This summit is dedicated to exposing women in sports to data and analytics.
- Implemented a Women's Leadership Development Program. This is a six-month internal professional development program for emerging women leaders within our company.
- All FanDuel employees are required to take a DE&I learning & training course.

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**C.2 PROJECTED REVENUE**

*Provide studies and projections for gross sports wagering revenue for each of the first five years of wagering operations on a best, average, and worst, case basis. The studies and information provided should include*

**a. Projected figures for sports wagering revenue and methodology used to arrive at these projections**

Please see attachment **"C2-a-01 MA Business Plan"** for detailed projections of Online Sports Wagering.  We have included Average (Base Case), Best and Worst scenarios at varying market shares.



CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**b. Projected figures for any non-sports wagering revenue and methodology used to arrive at these projections**

Please see attachment **"C2-a-01 MA Business Plan"** for detailed projections of Daily Fantasy and Racing.

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**c. Projected figures for all tax revenue to the Commonwealth and methodology used to arrive at these projections**



CONFIDENTIAL, NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**d. Profitability of sports wagering operation (in-person & mobile) in other jurisdictions where the applicant is licensed**

FanDuel currently operates an online sportsbook in 17 U.S. jurisdictions in addition to 27 retail sportsbooks across 15 states and the District of Columbia.



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**e. History of operating performance versus revenue projections for the last five years for other jurisdictions where the platform is licensed** – *includes documentation outlining the applicant's record of success or failure in meeting the performance objectives*



CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**





**Application for Massachusetts Category 3 Sports Wagering Operator License**

**f. Description of methods to ensure that revenues are maximized within the Commonwealth**

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**g. Description of plans to compete with other nearby jurisdictions and to market to Massachusetts patrons**



CONFIDENTIAL, NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**C.3 CONSTRUCTION – GAMING ESTABLISHMENTS**
**(for Category 1 Applicants Only)**

Not applicable.

CONFIDENTIAL – NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**C.4 CONSTRUCTION – LIVE HORSE RACING/SIMULCASTING FACILITY**
**(Category 2 Applicants Only)**

Not applicable.

CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

### C.5 COMMUNITY ENGAGEMENT

*Provide a thorough description of how the Applicant will contribute to economic & business development, tourism & community relations, and the promotion of charitable causes in the Commonwealth. Including:*

**a. Creating partnerships for any community, economic development, and tourism opportunities with local or regional entities including but not limited to the Massachusetts Office of Business Development, Chambers of Commerce, Regional Tourism Councils, and the Massachusetts Marketing Partnership**

As an example of what FanDuel plans to do in Massachusetts, one of FanDuel's flagship events is the FanDuel FanFest, the most recent of which was held at Guaranteed Rate Field in Chicago, IL on September 10, 2022. The event featured live musical performances, appearances by local sports stars, games, food and beverage, and a FanDuel sports bar and lounge:



**EVENT SCHEDULE**

| | |
|---|---|
| 2:00 PM | Doors Open |
| 4:00 PM | Wiz Khalifa |
| 5:00 PM | Superstar Showdown |
| 6:30 PM | Live Sports Betting Panel |
| 7:00 PM | DJ Be Free |
| 8:00 PM | Alesso |



**Enjoy a delicious meal or snack from local food trucks:**

**Harold's Chicken**

**Cynthia's Gumbo Express**

**Robinsons BBQ**

**Tacomotora**

**Damasco Stop**

## LEGENDARY APPEARANCES

CATCH OUR CHICAGO LEGENDS AT THE FANDUEL SPORTS BAR, AND PARTICIPATE IN A LIVE Q&A SESSION:

| | |
|---|---|
| 3:00 - 3:30 PM | Charles Tillman + Nate Robinson |
| 3:30 - 4:00 PM | Chris Chelios + Carla McGhee |
| 6:30 - 7:00 PM | Ozzie Guillen + Brian Urlacher |
| 7:00 - 7:30 PM | Devin Hester |

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**b. Promoting local businesses, including restaurants, hotels, and retail outlets**

As part of FanFest, FanDuel utilizes the services of local businesses, including venues, food and beverage vendors, A/V providers, and temporary staffing and security firms as part of building out the event. Additionally, FanDuel offers a sponsorship program as part of FanFest that provides an opportunity for 5-10 local businesses to raise awareness of their products and services during the event. FanDuel typically also hosts 2-3 events surrounding the launch of online sports betting in a state at local restaurants or sports bars catering to potential VIP customers.

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**c. Cross-marketing with live entertainment venues and/or attractions**



CONFIDENTIAL, NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**d. Supporting any community enhancements being incorporated at the local level**

As part of our Positive Impact Planning, FanDuel will also be investing ▇▇▇▇▇ into local community impact organizations in connection with our launch in various cities.  FanDuel has a track record of such community investments—including contributions to HBCUs in Virginia Maryland—and is actively considering potential recipients in the Commonwealth.  The causes and organizations under consideration include:



CONFIDENTIAL, NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**e. Highlighting unique business and marketing strategies to draw new revenues from new customers**

As part of FanDuel's most recent FanFest, prospective attendees had the ability to purchase a ticket by registering for a FanDuel account and wagering $25 or more during a designated time period.

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**D.1 DIVERSITY, EQUITY, & INCLUSION – WORKFORCE**

*Provide a thorough description of the applicant's willingness to foster racial, ethnic, and gender diversity, equity, and inclusion, within their workforce, both at the corporate level and the proposed entity within the Commonwealth. The information must include:*

*a. Applicant's current diversity, equity, and inclusion team – please include the name and title of those individuals currently identified as part of the diversity, equity, and inclusion staff/team, as well as a copy of their location on the applicant's organizational chart*

*b. Applicant's workforce diversity, equity, and inclusion policy*

*c. Workforce demographics, demonstrating the applicant's current workforce diversity*

*d. Efforts to be made to cultivate workforce diversity, equity, and inclusion by identifying, recruiting, and hiring minorities, women, persons with disabilities, and veterans*

*e. Memberships and/or intentions for joining any local, regional, state, and/or national organizations committed to the development and promotion of diversity, equity, and inclusion initiatives*

DE&I is a strategic priority at FanDuel, and we are committed to creating a workplace where all differences, perspectives, and experiences are valued and appreciated for the betterment of the company and the industry.

The new Head of Diversity, Equity & Inclusion, is Keita Young.  Her office is located in the New York headquarters, and she reports to the Chief People Officer.  Ms. Young's remit is to enhance and improve a strategy around attracting, hiring, and retaining diverse employees, and to get all leaders aligned and committed to a standard set of principles and values that will drive the DE&I strategy forward and create lasting change.

FanDuel's strategy aims to bring about positive change to increase racial, ethnic, and gender diversity representation, particularly at the leadership level throughout FanDuel.  Knowing that addressing representation is not enough, FanDuel recognizes that representation must be underpinned by other aspects of the diversity strategy that focus on equity and inclusion.

FanDuel has made great strides and is continuously striving to do more.  FanDuel's CEO, Amy Howe, is committed to the investment and advancement of ALL colleagues at FanDuel.  Serving as the global champion of gender diversity, in the Positive Impact Plan (international program with 4 global workstreams – gender, multicultural, LGBTQIA+, accessibility) FanDuel has specifically curated programs (the Women's Leadership Development Program; Lean-In Circles; Mentoring Circles, etc.) to meet and overcome challenges women face at all levels of the

CONFIDENTIAL/ NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

organization.  Furthermore, FanDuel has partnered with and/or sponsored many organizations to accelerate our talent attraction and recruiting efforts to build diverse pipelines (i.e., United Negro College Fund (UNCF), Women In Sports and Events (WISE), Code Clan, AFROTech , Society of Hispanic Professional Engineers and several HBCUs, and many others).  It is FanDuel's intention to continue to partner with these organizations while developing relationships with other local, regional, state, and/or national organizations committed to the development and promotion of DE&I.

Lastly, FanDuel's has established 4 employee resource groups (ERGs): TWEE (for female employees), BOLD (for black employees,) SPEAK (for Asian and Pacific American employees) and the Outfield (for LGBTQIA+ employees).  These ERGs serve as critical pillars of FanDuel to support and amplify our diverse communities.  Also, there are 2 developing interest groups focusing on the veterans/military community and Latino community which are on the path to becoming ERGs.

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**D.2 DIVERSITY, EQUITY, & INCLUSION - SUPPLIER SPEND**

*Provide a thorough description of the Applicant's overall and specific goals, applicable to the total dollar amount of contracts, for the utilization of:*

*a. Minority-owned business enterprises*

*b. Women-owned business enterprises*

*c. Veteran-owned business enterprises*

*Please include how each of these enterprise groups will participate as:*

- *Contractors in the design and/or building of the sports wagering platform*
- *Vendors in the execution, maintenance, and/or support of the sports wagering platform*
- *Vendors in the provision of goods and services*

FanDuel is committed to identifying and engaging minority-owned, women-owned, and veteran-owned businesses in support of its external diversity efforts.



CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**



CONFIDENTIAL, NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**D.3 DIVERSITY, EQUITY, & INCLUSION – CORPORATE STRUCTURE**

*Provide a thorough description of the Applicant's commitment to diversity, equity, and inclusion initiatives in the Commonwealth. This should include:*

*a. The makeup of the Applicant's ownership, leadership, and governance structure – including minorities, women, and veterans in positions of leadership throughout the corporate structure*

*b. How the Applicant intends to create joint ventures with corporate partners and/or partnerships with local or regional entities, including but not limited to programs, non-profit organizations, and agencies, dedicated to establishing a welcoming and inclusive experience for all patrons, users, and employees in the Commonwealth*

FanDuel is proud of its progress with respect to diversity, in particular its achievements in gender representation.  Women account for 42% of FanDuel's senior leadership roles.  FanDuel recognizes that it has more to do to improve all diversity representation but is committed to improving in all areas of diversity representation by attracting, hiring, retaining, and promoting diverse talent.

FanDuel anticipates creating more joint ventures with corporate partners and/or partnerships that will benefit all patrons, users and employees in the Commonwealth.  FanDuel recognizes the importance of a welcoming and inclusive environment for the advancement of the company and the industry.  FanDuel, through its charitable giving initiative, has made ███████ investment into community organizations in connection with our launch in various cities and is identifying some potential recipients in Massachusetts.

In addition, please see the information provided in section D.1 and C.5(d).

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

### E.1 RESPONSIBLE GAMING POLICIES

*Provide a proposed responsible gaming plan draft that, at a minimum, incorporates policies and tactics for the following key strategies:*

*a. Commitment to corporate social responsibility*
*b. Support positive play*
*c. Promote public health and safety*
*d. Ensure responsible advertising and marketing*
*e. Manage high-risk financial transactions*
*f. Engage the community*
*g. Commitment to improvement and reporting*

Please see attachment **"E1-a-01 FD Mass RG Plan"** for a comprehensive Responsible Gaming Plan that addresses all of the above.



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**E.2 ADVERTISING & PROMOTIONAL PLANS**

*Provide a thorough description of the Applicant's ability to demonstrate the advertising, marketing, and promotional efforts to be made in the Commonwealth. Information should include:*

**a. Estimated marketing budget in the Commonwealth**

CONFIDENTIAL – NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**b. Promotion and player loyalty programs**

FanDuel offers a compelling set of promotional offers to engage and retain customers:

| | **Bet $X Get $Y** | **No Sweat First Bet** | **Refer a Friend** | **VIP Deposit Match** |
|---|---|---|---|---|
| **Eligibility** | All new users EXCEPT for pre-live users | Users placing their first real money bet with FD Sportsbook | A referred user must be new to FD Sportsbook, but a referring user can be any user | DFS and other local VIP users invited by FanDuel |
| **Description** | All users who have not received a pre-live registration bonus will have the opportunity to bet a small amount $X to win a much larger amount $Y (e.g., $5 and $150), even if the bet they place loses | If a user's first real money bet with FD Sportsbook settles as a loss, the user will receive their stake back in free bets up to $X in value | Users can invite their friends to register with FD Sportsbook through an exclusive referral link. Once a referred user creates an account, deposits, and places a real money bet of $10 or more, both users unlock $X worth of free bets | VIP users identified by FanDuel will receive the opportunity to make a deposit into their FD Sportsbook account that will be 100% matched by FanDuel |

FanDuel also fosters customer loyalty through extensive use of early life and in-life generosity programs designed to incentivize customers to return to the platform.

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**c. Advertising plans – *must include information for any third-party marketing firm applicant plans to partner with for advertising in the Commonwealth***



CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

CONFIDENTIAL / NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**d. Measures to ensure that marketing reaches the target audience and not underage or vulnerable populations**

FanDuel has committed extensive KYC resources to guarantee that it is verifying the identity, location, and age of every user on the platform. FanDuel also takes numerous steps to ensure that its marketing and advertising is reaching its intended 21+ target audience, including:



CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**e. Player acquisition models –** *specify minimum age to participate*



- Pre-Live Registration: In jurisdictions where it has been applicable, FanDuel has allowed users to verify their identity and register an account with FanDuel during the period leading up to launch

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**f. Plans to incorporate responsible gaming and problem gambling information**
**FanDuel is committed to making responsible gaming resources and tools easily accessible to every user, including:**

- Deposit, wager, and time limits, which allow users to set custom limits on how they engage with the site or app
- Timeouts, which prevent a user from accessing the site or app for a designated amount of time
- Self-Exclusion, which users can request to take an indefinite break from FanDuel products
- Reality Checks, which give users regular reminders of how much they've wagered and how much time they've spent on the site or app

Within each jurisdiction in which FanDuel is live, FanDuel publicizes relevant resources and hotlines for users who may be experiencing challenges with problem gaming. FanDuel also recognizes the need to continue to make sure that it is providing the best support possible to users. As such, FanDuel consults with various organizations – such as the National Council for Problem Gambling (NCPG) and the International Centre for Responsible Gaming - that cover a wide array of consumer protection issues, including problem play, to discuss our policies and ways in which they can remain aligned with the ever-evolving needs of our customer.

CONFIDENTIAL-NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**g. Strategies for converting those customers wagering via unlicensed or illegal means to wagering legally in the Commonwealth**

FanDuel believes that the best-in-class customer experience that it offers to its customers will act as the most valuable tool for converting people are currently wagering via unlicensed or illegal means. FanDuel offers customers:

- The #1 ranked sportsbook application in the U.S. market as rated by Eilers & Krejcik, LLC, a gaming research and consulting firm
- An extensive wagering catalog, offering more markets (i.e., things to bet on) for wagering than any other platform, boasting 50,000 unique markets for wagering on just the core U.S. sports (NFL, NBA, MLB, NHL)
- 50+ unique and engaging product features, including Same Game Parlay, Player Prop Tracking, and Early Cash Out, with several more in development
- A diverse set of deposit and withdrawal options, which help ensure customers that their payments will be handled securely and expediently
- FanDuel delivers industry leading customer service directly integrated into our app, providing not only rapid service at the point the customer needs it but also driving a closed loop ecosystem that allows our product, engineering and marketing team to make near real-time adjustments to our products based on customer feedback.

These represent just a sampling of the advantages that FanDuel offers customers relative to unlicensed or offshore sportsbook operators, a value proposition that FanDuel believes will be successful in converting customers to its platform.

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**h. Examples of marketing, advertising, and promotional materials/activities recently used in other jurisdictions**

Please see below some examples of marketing and advertising materials that FanDuel has used to promote its most recent launch in Kansas and an upcoming launch in Ohio:







CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**











**Application for Massachusetts Category 3 Sports Wagering Operator License**

**E.3 HISTORY OF DEMONSTRATED COMMITMENT**

*Provide a thorough description of the policies and procedures that the applicant has adopted to:*

a. **Promote responsible gaming within the gaming establishment or mobile application and in the community**

FanDuel is committed to promoting safe, sustainable play to customer in various ways throughout the customer's experience on FanDuel sites, apps, and other websites. To promote positive play, FanDuel:

- Maintains robust Responsible Gaming pages on all websites and apps that contain information on Responsible Gaming tools, local resource, helpline information, other Responsible Gaming and Problem Gambling Resources
- Promotes RG to customers throughout the customer journey, including through in-app interstitials for new customers promoting safe, sustainable play, targeted messaging to potentially at-risk customers, and other direct promotion of RG tools and resources
- Developed a central resource for Responsible Gaming and Problem Gambling resources outside of the FanDuel platforms ([www.fanduel.com/playwell](www.fanduel.com/playwell))
- In 2022, FanDuel launched a new campaign to promote responsible gaming. The multi-media campaign is titled "The System" and is intended to model that using responsible gaming tools to manage play is the winning system. To date, the advertisement has run more than 10,000 time this year.
- FanDuel created a responsible gaming ambassador team to encourage customers to play within a budget and never chase losses. Currently, Craig Carton (Host of The Carton Show on FS1 and Carton and Roberts on WFAN in New York City) and Amanda Serrano (seven division boxing champion) serve as RG ambassadors and produce content the company shares on social media to share the company's beliefs toward responsible gaming and positive play.
- In September of 2022, FanDuel held its first "Play Well Day", which was an opportunity for all of the company's employees to gather and reaffirm its commitment to responsible gaming. The event featured company and industry leaders discussing how they can work together to further a culture that embraces safer play. Through a series of panels, interviews, an employee contest and other activities, the program sought to educate and inspire employees on the importance of RG and to ensure that everyone understands the role they play in championing responsible play.
- **Play Well** is a core pillar of Flutter's global sustainability strategy, the Positive Impact Plan. Focused on leveraging universal principles to promote responsible

CONFIDENTIAL–NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

> gambling across global markets where Flutter operates, the Group has set a goal for
> 50 percent of online customers globally to be using a safer gambling tool by 2026.

### b. Assist patrons and users that are experiencing gambling-related harm

FanDuel views the safety of our customers as critical to our success, and we are committed to bringing significant resources to bear to research and implement appropriate consumer safeguards.

FanDuel shares the desire to protect at-risk customers and confirm that online gaming products are used safely and responsibly. As described in FanDuel's Responsible Gaming policy and Responsible Gaming Plan, FanDuel is dedicated not only to complying with all applicable legal and regulatory requirements with respect to responsible gaming ("RG"), but also to surpassing those requirements to establish FanDuel as the most trusted operator in the industry. As part of this effort, FanDuel continues to evolve practices used to identify potential indicators of risk and takes action to intervene with customers where appropriate. While we do not diagnose gambling related disorders, FanDuel has processes and procedures for escalation and mitigation of potential risk and for the evaluation and engagement with customers to enable appropriate resources and education about RG and Problem Gambling.

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**c.  Cooperate and support any government or regulatory agencies to promote responsible gaming and/or mitigate gambling-related harm**

FanDuel considers the government and regulatory agencies to be partners with us and other operators and industry partners, including, but not limited to teams, leagues and other players. The company joined a group of other operators to establish and share 12 responsible gaming principles that were shared in September of 2022.

FanDuel also regularly engages with regulators and other government groups to provide regular updates and information sharing about the market, regulatory developments, new initiatives, and our ongoing Responsible Gaming initiatives, plans, and strategy. The company also participates in an internal working group of responsible gaming leads from all of the divisions within Flutter, which allows for continuous learning of best practices tied to responsible gaming across the globe. In addition, lessons are shared from numerous jurisdictions in Europe around enhanced player protection and customer education.

CONFIDENTIAL-NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**d. List any membership or partnership with an agency or organization whose mission is in whole, or part, dedicated to responsible gaming or problem gambling**

FanDuel supports several organizations whose mission is dedicated to responsible gaming and problem gambling, including:

- The national Council on Problem Gambling ("NCPG") as a member and supporter, as well as a participant in NCPG initiatives.
- The Responsible Gaming Council ("RGC") as a member and supporter, as well as a supporter of research on responsible play and problem gambling.
- The International Center for Responsible Gaming ("ICRG") as a partner and support of research.
- Various state RG/PG organizations.
- The American Gaming Association ("AGA") specifically as a member of the Responsibility Committee and the first online operator partner/supporter of the "Have a Game Plan" campaign.
- Mindway AI, a neuroscience and artificial intelligence company with over 10 years of research experience in neuroscience, neuroimaging, and problem gambling that has developed RG risk identification models and other RG tools in the European market.
- FanDuel also works with Gamban, a gambling and gaming blocking software, providing free access to Gamban's software to customer who self-exclude through FanDuel.

CONFIDENTIAL- NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**e. List any awards or recognition the applicant has received, related to efforts to promote responsible gaming or mitigate gambling related harms**

Not applicable.

CONFIDENTIAL-NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**f.  List any fines, violations, citations, and/or corrective action required by the applicant in response to insufficient or improper policies, procedures, operations, advertising/marketing, and/or any other business- related to sports wagering or other gambling enterprises**

See attachment **"E3-f-01 Corrective Action"**.

CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**F.1 GEOFENCING**

*Provide a thorough description of how the applicant will ensure that authorized users placing online sports wagers on their platform are geographically located in the Commonwealth of Massachusetts. This information must include:*

**a. Which geolocation system(s) will be utilized to reasonably detect the physical location of an authorized user attempting to place a wager on the platform**

FanDuel utilizes the GeoComply geolocation security system, which is by far the most widely utilized solution across all regulated gaming markets with a demonstrated history in achieving compliance with Unlawful Internet Gambling Enforcement Act (UIGEA), the Wire Act, and state-specific location requirements since the inception of mobile gaming within the United States. FanDuel will only accept wagers on its mobile sports wagering platform from users who are successfully geolocated within the Commonwealth of Massachusetts.





**Application for Massachusetts Category 3 Sports Wagering Operator License**

**b. How the system will:**

    **1. Accurately detect the physical location of an authorized user attempting to access or place a wager on the platform through accurate location data sources (Wi-Fi, GSM, GPS)**

    **2. Block or deny unauthorized attempts to access the platform, or place a wager, from outside of the Commonwealth**

    **3. Update the IP address and physical location if they change while the user is active on the platform**

    **4. Identify attempts to circumvent the requirement to be physically located in the Commonwealth**

The FanDuel mobile sports wagering platform works with GeoComply for geolocation



CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**



GeoComply is licensed by the relevant gaming regulator in all jurisdictions in which FanDuel operates a mobile sports wagering platform. The integration between GeoComply's software and FanDuel's mobile sports wagering platform is tested and verified by an independent testing laboratory before FanDuel launches its mobile sports wagering platform in a given state.

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**c. How the applicant will log information received from the system**

CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**d. How the applicant will report the information received from the system to the Commission**



CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

## F.2 KNOW YOUR CUSTOMER

*Provide a thorough description of how the Applicant will ensure the verification of information provided by users opening a new account on the platform.*

### 1. Ensuring the integrity of the user's account information

FanDuel has established robust user registration and Know Your Customer ("KYC") procedures for its mobile sports wagering platform, where a user's account details will automatically be checked by third-party service providers, which are integrated KYC providers ("KYC providers"). As part of the FanDuel registration process, a prospective user submits the following personal information:

- Legal Name;
- Date of Birth;
- Residential address;
- Phone number;
- Active email address;
- Social security number, or the last four digits thereof, or an equivalent identification number for noncitizen users, such as a passport or taxpayer identification number; and
- Any other information collected from the user used to verify his or her identity.

Once the user's personal details (name, date of birth, social security number) are received by the KYC providers, the KYC providers validate the data against public and governmental databases.

In instances when a KYC check from a KYC provider returns an error, users may upload identification documents ███████████████████████████████████████ The information requested from users in instances will be universal across the FanDuel platform, except as required by relevant state law or regulations.

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**2. Ensuring the integrity of a user's device if it indicates tampering or suspicious activity**

At the time of account registration on the FanDuel mobile sports wagering platform, the user creates an account using an email address and a password with at least one digit and letter and a minimum of eight characters. When logging in, the user enters their email address and password that they set at time of registration. Once the credentials are verified, the user is logged in and session is created. A user's account will be disabled after three failed log-in attempts and will require multi-factor authentication ("MFA") to recover or reset the account password. The user can change their password while logged in via the "Change Password" page. To reset a forgotten password, the user can click on the "Forgot Password" link on the login page. The user will then be asked to enter their email address. If the address is valid, the user will receive an email with a link taking them to the Password Reset page. The user will be required to provide their date of birth and the last four digits of their social security number that they provided at time of registration before setting a new password.





**Application for Massachusetts Category 3 Sports Wagering Operator License**

**3. Notifying the applicant of potential risks or fraudulent activity**

In addition to the above, FanDuel has robust fraud strategies in place and real-time fraud rules to minimize fraudulent activity. ███████████████████████████████████████████████

███████████████████████████████████████ Upon account creation, the option for users to choose strong Multi-Factor Authentication ("MFA") login protection will be made available. The options are MFA via Short Message Service ("SMS") and MFA via Time-Based One Time Password ("TOTP").

CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**F.3 TECHNOLOGICAL EXPERTISE AND RELIABILITY**

*Provide a thorough description of how the Applicant will ensure the security, sustainability, and reliability of the following items:*

**a.  Wager acceptance**

*System Overview*



CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

*System Functions*

*Global Account and Wallet*

FanDuel provides users with a single account and wallet solution that can be used across many of FanDuel's other product offerings.

CONFIDENTIAL-NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**b.  Systems for monitoring structured wagers, real-time data feed, and any unusual or suspicious wagering activity**

*Anti-Money Laundering*

FanDuel is committed to complying with applicable legal and regulatory requirements with respect to user activity on its platform, including identifying, escalating, preventing, and reporting unusual or suspicious activity. To that end, FanDuel monitors user activity to identify any suspicious activity relating to irregular betting activity, responsible gaming, or suspicious wagering. As a financial institution subject to the Bank Secrecy Act, FanDuel is required to submit suspicious activity reports ("SARs") related to anti-money laundering ("AML"), terrorist financing and sanctions, either directly or through our market access partners (where applicable). FanDuel maintains strict confidentiality with respect to all aspects of SAR filings, as required by law.



CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**



## *Anti-Fraud*



FanDuel's terms and conditions inform users that all withdrawal transactions are subject to review. The Fraud and Payments teams conduct reviews for player withdrawal requests to identify unusual or suspicious activity and escalates to the Federal Regulatory Compliance team, as required.

## *Integrity Monitoring*

The FanDuel Risk and Trading Team has many years of experience in setting and assessing markets and prices, evaluating wagers and risks, identifying potentially suspicious activity, and escalating that activity to the Integrity Team for further evaluation.

CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

FanDuel will share information in a timely manner of unusual betting activity or other suspicious activity regarding sports wagering in this Commonwealth with all sports wagering license holders and sports wagering platforms approved by the Commission in compliance with the Commission's rules.

CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**c.   Description, location, and periodic testing of servers**



CONFIDENTIAL – NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**d.  Security of servers, applications, and communication networks**

FanDuel treats the security of its platforms and the management of user data with the highest level of importance.

*Infrastructure Security*

*Data Security*

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

*Application Security*

CONFIDENTIAL – NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

### e.  Security of patron personal and wagering information

FanDuel follows strict guidelines for any assets containing sensitive or confidential information. That information must be protected from unauthorized disclosure, misuse, and misrepresentation, while at the same time made readily available for only those who require access. FanDuel has an obligation to ensure that private personal user data and company confidential information is managed in accordance with industry best practices and use all commercially reasonable efforts to comport with those policies.

FanDuel maintains comprehensive information security policies addressing user access controls, logging controls, internet access controls, and cybersecurity protection and breach notification controls that all employees are required to adhere to. FanDuel employees also undergo regular cybersecurity training.



CONFIDENTIAL – NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**f.  Integrity monitoring and reporting, including any current affiliations related to integrity monitoring**



On an annual basis, FanDuel will provide the Commission with a report detailing its integrity monitoring services that summarizes unusual betting activity or other suspicious wagering activity notifications issued in the prior year, to the extent required.

CONFIDENTIAL-NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**G.1 SUITABILITY – CORPORATE INTEGRITY**

*Applicants must also complete and submit the following documents, before any suitability investigations or background checks will commence:*

A. *Massachusetts Gaming Commission Business Entity Disclosure Form*
B. *Joint Venture Agreements for the implementation of a sports wagering operation:*
   o *1. Other Applicants*
   o *2. Businesses*
   o *3. Contractors*
   o *4. Vendors*


**A.** Completed Business Entity Disclosure Forms and accompanying attachments for each entity qualifier identified in the Commission's Designation Letter to Betfair Interactive US LLC are being submitted concurrent with this application.

**B.** Not applicable.

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**G.2 SUITABILITY - INDIVIDUAL QUALIFIER INTEGRITY**

*Any Key Persons or Employees associated with an applicant must also complete and submit the following documents, before any suitability investigations or background checks will commence:*

- *Massachusetts Gaming Commission Multi-Jurisdictional Personal History Disclosure Form*
- *Massachusetts Gaming Commission Supplemental Form*

Multi-Jurisdictional Personal History Disclosure Forms, Massachusetts Gaming Commission Supplemental Forms, and accompanying attachments for each individual qualifier identified in the Commission's Designation Letter to Betfair Interactive US LLC are being submitted concurrent with this application.



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**G.3 FINANCIAL STABILITY & INTEGRITY**

*Please provide the following documents, for the last five (5) fiscal years and through the date of the application:*

**b. Documentation demonstrating the financing structure and plan for the proposal, including all sources of capital.** *Please include current capital commitments, as well as plan and timing for meeting future capital needs*

FanDuel is owned by Flutter Entertainment PLC ("Flutter"), the largest online gaming company in the world generating nearly $7 billion in FY '21 revenues.  Flutter is publicly listed on the London Stock Exchange and Euronext Dublin.

Please see attachment **"G3-b-01 Flutter Results FY 2021"** and **"G3-b-02 Flutter Interim Results 2022"** for further information on Flutter.



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**c. A detailed budget of the proposal cost, including any construction, design, legal and professional, consulting, and all other developmental fees.** *Also identify all other pre-launch costs, including training, marketing, and initial startup capital*

In our Average Scenario (Base Case), FanDuel projects ███████████████████ ████████████████████████████████████████████.  Please see attachment **"C2-a-01 MA Business Plan"** for detailed projections.

CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**d. An analysis, including best, worst, and average case scenarios, that demonstrates the applicant's plan and capacity for accommodating steep downturns in revenues, and provides examples of those plans and strategies that have been successful in other jurisdictions**



CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**e. What are the Applicant's annual liquidity, leverage, and profitability ratios, including current ratio, debt-to-equity ratio, and gross/net margin ratios?**

CONFIDENTIAL-NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**f. Information pertaining to contracts, loan agreements, and/or commitments that the applicant has breached or defaulted on during the last ten years.** *Provide information for any lawsuit, administrative proceeding, or another proceeding that occurred as a result of the breach or default*

Not applicable. Betfair Interactive US LLC (d/b/a FanDuel) has not breached or defaulted on any contracts, loan agreements or commitments.

CONFIDENTIAL- NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**g. A description of any administrative or judicial proceeding, during the last ten years, in which the applicant or any entity that owns 5%, or greater share, was found to have violated a statute or regulation governing its operation**

Please see attachment **"E3-f-01 Corrective Action"** for a complete listing.

CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**h. Any bankruptcy filings made, or proceedings commenced, for any entities owned or controlled by the applicant and any entity owning a 5% or greater share of the applicant**

Not applicable. Betfair Interactive US LLC (d/b/a FanDuel) has never had any bankruptcy filings.

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**i. Any financing amounts or ownership interests that are anticipated to come from minorities, women, and/or disadvantaged businesses. *If the applicant, or any portion of the applicant, is a public company, it is not necessary to list shareholders***

Not applicable. FanDuel was acquired by Flutter Entertainment PLC ("Flutter") in 2018. Flutter is the largest online gaming company in the world and is publicly listed on the London Stock Exchange and Euronext Dublin.

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**j. Examples and/or narratives that substantiate the applicant's understanding of and experience with Internal Controls.**

FanDuel employs a variety of financial internal controls to ensure reliability, validity and accuracy of its financial numbers and to minimize risk so that it can conduct its operations in an efficient manner. These internal controls are deployed in 29 states for our sports wagering vertical, 5 states for our casino vertical, 48 states for our daily fantasy sports & faceoff vertical, and 38 states for our horse racing vertical. Please see attachment **"G3-j-01 Example of Internal Controls"** for an example of our internal controls. ████████████████████████████
██████████████████████████

In addition, as a licensed online sports wagering operator in 17 states, FanDuel is required to maintain state-specific sports wagering internal controls that meet the expectations of regulatory bodies in each jurisdiction. These state-specific sports wagering internal controls are specifically related to the operation of a sports wagering platform, as required by sports wagering regulations. FanDuel has a dedicated team that is responsible for the preparation, review, and submission of these controls in all regulated sports wagering jurisdictions.

CONFIDENTIAL; NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**G.4 COMPLIANCE**

*Provide the following information on whether the applicant or its Key Persons has ever:*

**a. Been employed by the Massachusetts Gaming Commission**

Not applicable.

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**b. Possessed a gaming license (casino, video gaming, charitable games, lottery, pari-mutuel, sports wagering, etc.) issued by any jurisdiction – if so, please provide a copy of each license**

Please see attachment **"G4-b-01 Betfair Interactive US LLC Licenses"** for a list of other gaming licenses held by applicant as well as license documents where available. With respect to gaming-related licenses and qualifications held by Applicant's key persons identified in the Commission's Designation Letter, please refer to their respective individual submissions. Please note that other jurisdictions generally do not provide formal license documentation for individual applicants.

CONFIDENTIAL - NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**c. Held or holds a direct, indirect, or attributed interest in any business that intends to apply for a license with the Commonwealth**

Not applicable.

CONFIDENTIAL–NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**d. Withdrawn a gaming license application, in any jurisdiction – if so, please submit a detailed description of each withdrawal**

Not applicable.

CONFIDENTIAL – NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**e. Been denied a gaming-related license or finding of suitability, in any jurisdiction – if so, submit a detailed statement describing the denial and/or related findings**

Not applicable.

CONFIDENTIAL – NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**f. Had a gaming license suspended, in any jurisdiction – if so, include a detailed statement regarding each suspension**

Not applicable.

CONFIDENTIAL-NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**g. Had a gaming license revoked, in any jurisdiction, or has had disciplinary action initiated to revoke a license – if so, submit a detailed description of each revocation or action initiated**

Not applicable.

CONFIDENTIAL–NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**h. Had a gaming license non-renewed or considered for non-renewal, in any jurisdiction – if so, provide a detailed description of the circumstances**

Not applicable.

CONFIDENTIAL: NOT SUBJECT TO PUBLIC DISCLOSURE



**Application for Massachusetts Category 3 Sports Wagering Operator License**

**i. Been found unsuitable gaming license non-renewed or considered for non-renewal, in any jurisdiction – if so, provide a detailed description of the circumstances**

Not applicable.

**Massachusetts Gaming Commission**
**Betfair Interactive US, LLC**
**Application for Sports Wagering Operator License**
**Attachment B3-b-01 Wagering Catalogue**

**Withheld in its Entirety**

**CONFIDENTIAL AND NOT SUBJECT TO DISCLOSURE**
**PURSUANT TO MASSACHUSETTS'S PUBLIC RECORDS LAW**

**Massachusetts Gaming Commission**
**Betfair Interactive US, LLC**
**Application for Sports Wagering Operator License**
**Attachment B4-b-01 GLI Letter**

**Withheld in its Entirety**

**CONFIDENTIAL AND NOT SUBJECT TO DISCLOSURE**
**PURSUANT TO MASSACHUSETTS'S PUBLIC RECORDS LAW**

**Massachusetts Gaming Commission**
**Betfair Interactive US, LLC**
**Application for Sports Wagering Operator License**
**Attachment B4-e-01 Sports Betting Catalog**

**Withheld in its Entirety**

**CONFIDENTIAL AND NOT SUBJECT TO DISCLOSURE**
**PURSUANT TO MASSACHUSETTS'S PUBLIC RECORDS LAW**

**Massachusetts Gaming Commission**
**Betfair Interactive US, LLC**
**Application for Sports Wagering Operator License**
**Attachment C2-a-01 MA Business Plan**

**Withheld in its Entirety**

**CONFIDENTIAL AND NOT SUBJECT TO DISCLOSURE**
**PURSUANT TO MASSACHUSETTS'S PUBLIC RECORDS LAW**

**Massachusetts Gaming Commission**
**Betfair Interactive US, LLC**
**Application for Sports Wagering Operator License**
**Attachment E1-a-01 FD Mass RG Plan**

**Withheld in its Entirety**

**CONFIDENTIAL AND NOT SUBJECT TO DISCLOSURE**
**PURSUANT TO MASSACHUSETTS'S PUBLIC RECORDS LAW**

**Massachusetts Gaming Commission**
**Betfair Interactive US, LLC**
**Application for Sports Wagering Operator License**
**Attachment E3-f-01 Corrective Action**

**Withheld in its Entirety**

**CONFIDENTIAL AND NOT SUBJECT TO DISCLOSURE**
**PURSUANT TO MASSACHUSETTS'S PUBLIC RECORDS LAW**

# Flutter Entertainment Plc Interim Results 2022

12 August 2022



1

# Introduction

*Peter Jackson, Group CEO*

Flutter

# Agenda

- Overview
- Financial Review
- Business Update
- Conclusion



# Overview: H1

- Positive revenue momentum of 9% from recreational player growth +14%
- **US:** continues to accelerate with
  - EBITDA profit in Q2
  - Sports betting market share of 51% in Q2
  - Confidence in 2023 profitability[1]
- **Group ex-US:** revenue of over £2.3bn and EBITDA of £608m in-line with expectations
  - Acquisition of Sisal adds another gold medal with strong H1 performance
- **Full year Group EBITDA** guidance in-line with expectations

---

[1] 2023 profit projection is for the full year 2023 on a Flutter reported basis, including the cost of share based compensation and FOXBet. Projections are also based on current timing expectations of regulatory developments, new state launches in 2022 and 2023 and excludes California.



4

# Overview: continued delivery against strategy





# Overview: US success transforming Group

| **Increasing scale and diversification driving growth….** | **…with further growth and transformation to come** |

**Evolution of geographic mix, H1 2019 – Q2 2022**



UK&I   US   Aus   ROW

82% regulated ➔ 93% regulated

**1** **Revenue mix** will further evolve with US revenue now over one third of Group revenue

**2** **Earnings profile** will transform with swing to positive full year US EBITDA in 2023[1]

**3** **Regulated markets** will increase with additional 3% currently regulating

**4** **Flywheel benefit** drives top-line growth through scale with diversification providing resilience

*[1] 2023 profit projection as set out in the footnote on slide 4.*



# Overview: Flutter Group benefits complementing local scale



| US | UK & Ireland | Australia | International |

**Local scale underpinned by access to key global advantages:**

**People and talent** — **Unparalleled expertise** >20,000 employees[1]; >400 working for FanDuel today from elsewhere in Flutter

**Product** — **Market leading pricing and risk management** capabilities create #1 products e.g. *Same Game Parlay*[TM]

**Technology** — **Scalable, reliable platforms** for growth e.g. global betting platform

**Insight and data** — **Access to global insight** creates opportunity for shared successes

**Optimisation of resources driving growth across our businesses**

[1] Including Sisal employees.



7

# Overview: good H1 progress against Positive Impact Plan



|  **Customers** |  **Colleagues** |  **Communities** |
|---|---|---|
| Helping customers to **Play Well** | Empowering colleagues to **Work Better** | Working with communities to **Do More** |

 **2030 targets**

| We will reach >75% of customers using a safer gambling tool | Our teams will be representative of where we live and work | We will have improved the lives of 10 million people |
|---|---|---|

 **H1 update**

| | | |
|---|---|---|
| • 34.8% tool usage in June 2022 (+2.3ppt vs December 2021)[1] <br> • Adjarabet, Junglee and Tombola now included <br> • Over £33m invested in safer gambling YTD | • Global minimum standard on Parental leave adopted <br> • Global Advocacy Programme launched <br> • Pride Committee established | • Over £1.1m contributed YTD including to Ukraine humanitarian aid <br> • Employee volunteering across divisions: nearly 2,200 hours YTD |



*[1]Play Well tool usage metric has been strengthened to reflect rolling 12 month average of the proportion of Average Monthly Players using a safer gambling tool.*



# Financial Review

## Jonathan Hill, Group CFO

# Financial highlights

|  |  | H1 2022 | H1 2021 | YOY CC |
|---|---|---|---|---|
| **AMPs** | US | 2,188m | 1,470m | +49% |
|  | Group ex-US | 6,528m | 6,155m | +6% |
|  | **Group** | **8,716m** | **7,625m** | **+14%** |
| **Revenue** | US | £1,051m | £652m | +50% |
|  | Group ex-US | £2,337m | £2,400m | -3% |
|  | **Group** | **£3,388m** | **£3,053m** | **+9%** |
| **Adjusted EBITDA** | US | (£132m) | (£87m) | +53% |
|  | Group ex-US | £608m | £684m | -10% |
|  | **Group** | **£476m** | **£597m** | **-19%** |
| **Adjusted cash flow** | Free cash flow | £127m | £358m | |
|  | Cash conversion[1] | 77% | 95% | |
|  | Net debt | £3,004m | £2,682m | |
|  | Net debt / LTM EBITDA | 3.4x | 2.3x | |

- US expansion and Group ex-US recreational customer growth driving revenue performance

- YoY Group profitability in-line with expectations, reflecting:
  - New York launch in Q1
  - Safer gambling initiatives in UK & Ireland
  - Market switch-offs in International

- Free cash flow includes the above, US capex investment and increased corporate tax payments

- Cash conversion lower due to working capital unwind in Q1

- Net debt includes Tombola acquisition

[1] Conversion of adjusted operating profit to pre-tax adjusted free cash flow.



10

# Statutory Group P&L and financial position

| £m | H1 2022 | H1 2021 | YOY |
|---|---|---|---|
| Revenue | 3,388 | 3,053 | +11% |
| Gross profit | 2,036 | 1,931 | +5% |
| **EBITDA** | **434** | **562** | **-23%** |
| Depreciation & amortisation | (145) | (125) | +16% |
| Amortisation of acquisition intangibles | (286) | (276) | +4% |
| Gain on disposal | 2 | - | +100% |
| **Operating profit** | **5** | **162** | **-97%** |
| Net interest expense | (57) | (85) | -33% |
| **(Loss)/profit before tax** | **(51)** | **77** | |
| Tax | (61) | (163) | -63% |
| **Loss after tax** | **(112)** | **(86)** | |

- EBITDA of £434m includes SDIs[1] of £42m, primarily due to restructuring and integration costs

- Loss before tax of £51m includes £286m of SDIs relating to amortisation of acquired intangibles

- Interest lower due to July 2021 refinancing

- Reduction in tax charge reflects one off deferred tax charge of £105m in H1 2021 relating to announced future increase in UK corporation tax rate

[1] Separately Disclosed Items: see slide 42 for further details.



11

# Recreational customer volumes driving revenue growth

**Average Monthly Players ('AMPs'), H1'21 – H1'22**



- **Group** AMPs +14% with revenue +9%
- **US** strong customer acquisition driving AMPs and top-line growth across new and existing states
- **Group ex-US** AMPs +6% with revenue decline of 3% driven by:
  - **Australia** AMP and revenue growth with strong retention from enlarged H2 2021 base
  - **UK&I** addition of Tombola benefitting AMP growth; YOY safer gambling impact of £48m and unwind of heightened Covid engagement leading to revenue 4% lower
  - **International** AMP and revenue declines driven by Russia switch off, regulatory changes and Covid comparatives

[1] International performance incorporates Junglee for revenue only. AMPs do not include Junglee AMPs.



12

# Group ex-US EBITDA in line with expectations

**EBITDA £m, H1'21 – H1'22, constant currency**



- **Ex-US underlying EBITDA** +4% YOY excl:
  - Safer gambling impacts in UK&I
  - Regulatory changes in International
- **UK&I** underlying performance:
  - Reduction from raised Covid activity levels as well as Euros in PY
  - Addition of Tombola in January
  - Benefit from fully open retail estate
- **Australia** driven by strong top-line growth and continued operating leverage
- **International** demonstrating good underlying momentum in "consolidate and invest" markets offsetting Covid unwind in PY



*[1] UK&I safer gambling impact is guided incremental revenue impact of £48m (Q1 £30m, Q2 £18m) with corresponding EBITDA impact of £33m.*
*[2] International regulatory impact Netherlands (£20m), Russia/Ukraine market disruptions (£20m) and incremental German tax costs (£20m).*

13

# US delivering operating efficiency despite early stage

| £m | H1 2022 | H1 2021 | YOY | YOY CC |
|---|---|---|---|---|
| **Total revenue** | **1,051** | **652** | **+61%** | **+50%** |
| Cost of sales | (544) | (293) | +86% | +73% |
| *Cost of sales as a % of net revenue* | *51.8%* | *44.9%* | *+680bps* | *+700bps* |
| **Gross profit** | **507** | **359** | **+41%** | **+31%** |
| Sales & marketing costs | (399) | (292) | +37% | +29% |
| **Contribution** | **108** | **67** | **+60%** | **+38%** |
| Other operating costs | (240) | (154) | +56% | +46% |
| **Adjusted EBITDA** | **(132)** | **(87)** | **+52%** | **+53%** |
| *Adjusted EBITDA margin* | *(12.5%)* | *(13.3%)* | *+70bps* | *-30bps* |

- Revenue +50%
  - Sports +58%, gaming +31%
  - Revenue +71% excluding sports results
- COS % increase due to New York higher tax rates
- Marketing as % of revenue reduced > six percentage points driven by
  - Maturing business as existing states grow as proportion of overall division
  - Disciplined investment
- Other operating cost growth of 46%, less than 71% normalised revenue growth demonstrating operating leverage

**Q2 profit of £16m ($22m); on track to deliver full year profitability in 2023[1]**

*[1] 2023 profit projection as set out in the footnote on slide 4.*



14

# Cash flow

| £m | H1 2022 | H1 2021 |
|---|---|---|
| **Adjusted EBITDA** | **476** | **597** |
| Capex | (156) | (138) |
| Working capital | (41) | 18 |
| Corporation tax | (132) | (92) |
| Lease liabilities paid | (21) | (27) |
| **Adjusted free cash flow** | **127** | **358** |
| Cash flow from separately disclosed items | (39) | (24) |
| **Free cash flow** | **87** | **333** |
| Interest and other borrowing costs | (48) | (75) |
| Acquisitions and disposal | (395) | (34) |
| Other[1] | (3) | (164) |
| **Net (decrease)/increase in cash** | **(360)** | **61** |
| **Net debt at start of year[2]** | **(2,647)** | **(2,814)** |
| Foreign currency exchange translation | (241) | 26 |
| Change in fair value of hedging derivatives | 244 | 45 |
| **Net debt at 30 June** | **(3,004)** | **(2,682)** |

- Adjusted free cash flow lower due to:
  - Lower Adjusted EBITDA
  - Higher capex driven by ongoing US expansion
  - Working capital outflow
  - Increased corporation tax payment due to profit mix

- Interest and other borrowing costs £27m lower following debt refinancing in 2021

- Tombola acquisition cost of £410m net of cash acquired of £15m

- Adjusted pre-tax free cash flow of £258m compares to Adjusted operating profit of £334m, converting at 77%

[1] Other in H1 2021 includes £71m in respect of the Settlement of Kentucky Supersedeas Bonds and £89m relating to the purchase of shares by the Employee Benefit Trust.
[2] Net debt defined as principal amount of borrowings plus associated accrued interest, minus available cash & cash equivalents plus/minus carrying value of debt related derivatives.



15

# Group outlook provides clear path to medium term target

| £'m, leverage ratio[1] | 30 June 2022 | Sisal (Acquired August 2022) | Pro forma for Sisal |
|---|---|---|---|
| Gross debt | 3,785 | 1,620 | 5,405 |
| Cash (excl. customer balances) | (781) | - | (781) |
| Net debt | 3,004 | 1,620 | 4,624 |
| LTM Adjusted EBITDA | 880 | 246 | 1,126 |
| **Leverage ratio** | **3.4x** | | **4.1x** |
| | | | |
| *LTM Group ex-US Adjusted EBITDA* | *1,168* | *246* | *1,414* |
| ***Leverage ratio (ex US losses)*** | ***2.6x*** | | ***3.3x*** |

| Borrowing | Principal | Interest rate | Maturity |
|---|---|---|---|
| **Long term debt structure at 30 June 2022** | | | |
| TLA (GBP) | £1,018m | GBP SONIA +175bps, 0% Floor[2] | 2025 |
| TLB (USD)[3] | $2,916m | USD LIBOR +225bps, 0% Floor | 2026 |
| TLB (EUR) | €507m | EURIBOR +250bps, 0% Floor | 2026 |

- **Leverage at 30 June 2022 of 3.4x** reflects acquisition of Tombola in Q1 for cash

- Pro forma for Sisal 4.1x reducing to 3.3x excluding US losses

- Acquisition completed using underwritten facilities

- Expected weighted average H2 cost of debt 3.4%

- US profitability will have significant impact on leverage profile

- Group remains committed to medium term leverage target of 1-2 times



[1] Gross debt includes the gross value of derivatives. SISAL debt represents €1,913bn drawn under acquisition facility.
[2] Pricing includes a market benchmark credit spread adjustment.
[3] USD TLB is swapped into GBP and EUR at fixed rates.

16

# 2022 guidance[1]

| | |
|---|---|
| **Current trading** | • H2 trading to date in line with expectations |
| **Group Ex-US** | • EBITDA range **£1,290m and £1,390m** including Sisal (completed on 4 August)[2] and Australian POCT (2022: £22m) |
| **US[3]** | • Net revenue range **£2.3bn - £2.5bn ($2.85bn and $3.1bn)**<br>• EBITDA loss range **£225m - £275m ($300m-$360m)** assuming FanDuel online sportsbook launches in Kansas in Q4 2022 |
| **Tax** | • Effective FY22 Group ex-US corporate tax rate **22%-24%** including Sisal |
| **Capex** | • £360m-£390m including Sisal |
| **Interest** | • 3.4% for H2 |



*[1]Assuming normalised net revenue margin for the remainder of the year.*
*[2]Sisal will be consolidated from 1 August 2022 for reporting purposes and all references to guidance including Sisal are on a reported basis.*



Business update

Peter Jackson, Group CEO

# US: FanDuel is clear number one operator in US



| Consistent #1 sportsbook share | NGR where reported >3x nearest competitor |
| --- | --- |

Online sportsbook GGR share for states in which FanDuel is live[1]

Online sportsbook NGR share for states where NGR is available[1]

**Consistent #1 sports betting and iGaming operator overall with combined share of 36% in Q2**



[1] GGR market share of FanDuel and FOXBet in the states in which FanDuel was live based on published gaming regulator reports in those states. Competitor estimates based on third party regulator reporting and Eilers and Krejcik reports. NGR market share includes AZ, PA and MI only.

# US: acquiring customers efficiently and at scale

| Improving DFS conversion … | …faster adoption curves… | …spending less than competitors |
|---|---|---|

**DFS actives cross-sold in weeks post launch**



**FanDuel penetration of adult pop. months post launch**



**FanDuel vs competitor H1 marketing efficiency[1]**



- Continually enhancing launch playbook
- States launched in 2018/2019 now at >60% cross-sell penetration
- NY reached similar levels within 6 months of launch

- Faster adoption curves aided by strategic media partnerships which harness FanDuel brand strength
- Runway for further growth with penetration c. 50% mature markets

- Superior marketing technology drives increasingly personalised approach
- Same amount of H1 marketing spend
- 53% more downloads per $ of spend

**Investment remains disciplined with cumulative CPAs under $300**



[1] Marketing per competitor filings with adjustment to remove share based payments.

20

# US: product delivering excellent return on investment

## Market leading GGR generation...

**Q2 GGR margin in states in which FanDuel was live**



~80% more GGR than competitors for each dollar of handle in Q2

6.0% — Market
10.8% — FanDuel

- Parlay penetration 80% of customers
- Combined with superior pricing capabilities driving higher GGR

## ...producing attractive cohort dynamics

**NGR, Q3 2018 – Q2 2019 acquisition cohorts[1]**



+22% CAGR

Year one — Year three

- Superior product delivering high retention and reduced bonusing leading to YOY cohort growth
- Two year revenue CAGR of 22% for earliest cohorts minimises Covid effect
- Demonstrates strength of FanDuel proposition

## Building embedded value for long term growth



[1] Net gaming revenue of all FanDuel sportsbook and iGaming customers acquired between Q3 2018 and Q2 2019 (excluding revenue generated in NY). Quarter one is the quarter of acquisition with year one revenue = revenue from quarters 2-5, year two revenue = revenue from quarters 6-9 and year three revenue = revenue from quarters 10-13.

21

# US: customer cohorts create virtuous cycle of value creation



**Evolution of sportsbook and iGaming contribution profit, $'m**

**1** LTM 30 June 2021[1]

Existing customers < New customers = Loss

$195m

-$311m

-$116m

**2** YOY swing

New customers turn profitable in 2nd year and combine with existing customers which also grow, to significantly increase profits

$635m

$751m swing

-$116m

**3** LTM 30 June 2022[1]

Existing customers > New customers = Profit

$635m

$63m

-$572m

**4** Future periods

… compounding impact as existing customers become increasingly large proportion of business

**US EBITDA profit full year 2023[2]**

Existing: New customer ratio

25% : 75%

53% : 47%



[1] Charts show contribution for FanDuel North American sportsbook and gaming business for the 12 months to 30 June 2021 and the 12 months to 30 June 2022. Contribution is defined as gross profit less sales and marketing expense. Contribution for existing customers includes an allocation of retention marketing.
[2] 2023 profit projection as set out on slide 4

22

# US: margin expansion as business scales

## Cost base already demonstrating operating leverage...

**FanDuel operating leverage since H1'19**



Revenue growth >2X operating cost growth

- Significant scope for future efficiency with large portion of cost base capable of delivering leverage

## ...with P&L developing like existing businesses

**New Jersey online sportsbook and casino P&L with indicative EBITDA (LTM – year four of operation)**



- LTM indicative EBITDA margin in New Jersey of 17%[1]
- Marketing 30% of revenue due to ongoing investment; expect to reduce as market matures further

## Over one third of states were profitable in Q2 when costs allocated by population



[1] Business not managed to EBITDA on a state by state basis given shared cost base. For the purposes of illustrating state EBITDA, operating costs have been allocated to product verticals on a GGR basis with allocation to online sportsbook/casino business of each state based on the population of that state.

23

# US: clear pathway to profitability in 2023

**Delivered by excellent execution across key areas:**

**1** **Efficient customer acquisition:** through improving DFS cross sell and adoption curves with each new state

**2** **Superior product:** with #1 rated app and best UX, generating best returns

**3** **Operating efficiently** with a disciplined cost base and significant operating leverage

**US EBITDA profit in Q2**

**Positive EBITDA profit for full year 2023[1]**



[1] 2023 profit projection as set out in the footnote on slide 4

24

# Ex-US business well positioned for growth

## Good growth and cash generation over longer term

**Group ex-US AMP, revenue and EBITDA 3 year CAGRs H119-H122**



- Good growth despite regulatory impacts
- H1 2022 EBITDA margin: 26% (mature markets >30%)
- High cash conversion of 84%[1]

## Historic model supporting growth and cash generation



*[1] Reflects conversion of adjusted operating profit to pre-tax adjusted free cash flow in H1 2022.*



25

# Out growing regulatory pressures as markets mature



**Scale operators are best placed to capitalise on regulatory change through superior operating leverage and ability to take market share**



26

# UK&I: reshaped business well placed for growth in H2

## Product improvements delivered across H1



- Nearly one-third of football customers have used BuildABet
- More enhancements to come in H2

- Record retention levels powered by Wonder Wheel
- New Paddy Power branded slots engaging solus gaming players



## Well placed for H2 growth with June gaming performance

UK&I (pro forma including Tombola) gaming AMP growth, YoY %



+9%

H1 2021    H1 2022

- Gaming returned to growth in June
- Product initiatives powering momentum
- Continued recreation player growth across all four brands in H1



27

# UK&I: Building sustainability for post White Paper market

| **Our proactive actions…** | **…reshaped our customer base…** | **… with efficiency initiatives identified** |
|---|---|---|

- Recreational customer compound growth of 13% over last 3 years

- Significant investment in safer gambling initiatives:

  - Roll-out of affordability triple step

  - Expanded operational capabilities with specialist teams

- SG initiatives had annualized revenue impact of £48m in H1

% of UK&I online[1] revenue by customer value tier, tier 1 being lowest level of spend



- Marketing optimisation:

  - More efficient promotional and generosity investment (>£300m in 2021)

  - Increase resource allocation to recreational brands

- Integrate SBG onto proprietary technology stacks

- Remove team structure complexity



[1] Excluding Tombola

28

# Australia: strong customer momentum driving growth

## Continued innovation to core proposition

- Focus on delivering new features to further enhance customer proposition

- Two key product features launched for AFL with Same Game Multi cash out and bet tracker

- Combined uptake has seen 22% engage with the products since launch



## Personalised generosity driving growth...

H1 AMP and revenue growth, £m



- Delivering personalised value to customers

- 80% of structural net win margin increase between 2019 – 2021 returned to customers in generosity

- Retention of customers from H2 when Covid restrictions were in place driving growth despite results headwind



29

# International: Sisal's H1 reinforces strategic rationale



- Secures #1 position in fast-growing Italian, regulated online market
  - Online TAM of £3.6bn by 2024, five-year CAGR of 18%[1]
- Omni-channel offering delivering competitive advantages:
  - Visible brand presence given significant online advertising restrictions
  - Online deposit/withdrawals via retail network
- Addition of 431,000 monthly players to recreational base
- Further diversifies our product and geographical footprint
- Proven management team, with commitment to safer gambling
- Strong H1 performance, aided by Covid-related retail restrictions in prior year
  - Split of revenue: Italy retail 53%, Italy online 36%, International 11%



*[1] Source: MDF Partners*



30

# International: Broad portfolio provides growth opportunities

| | Main markets per category | % of H1 2022 revenue[1] | 2021 est. market size (GGR) | Likely future marketing investment |
|---|---|---|---|---|
| **Consolidate #1 position** Drive profitable growth | | 56% | £15bn | Low - Medium |
| **Invest for leadership** In high potential markets | | 16% | £6bn | High |
| **Optimise returns** Support existing regulated positions | | 14% | £17bn | Medium |
| **Maintain existing position** Minimise cost to serve | Range of geographies | 14% | - | None |

- Investment geographies with addressable market of £6bn:
  - Strong existing position with local hero brands
  - High growth markets with attractive returns profile
  - Significant player acquisition investment
- Increasing regulated mix[1]:
  - 86% revenue from regulated/regulating markets
  - Largest unregulated/not-regulating market 0.3% of Group revenue
- Poker now 19% of International revenue post-Sisal acquisition
- Opportunity for operational efficiency

[1] Includes Sisal revenue for H1 2022



31

# International: Junglee – Performing strongly post acquisition

## Indian rummy market growing rapidly...

## ...Junglee taking share

Indian online real money gaming market, £'m[1]





- Junglee, India's #2 rummy operator, acquired in 2021 (50.1% stake for £48m)

- Indian market:
  - One of fastest growing gaming markets globally
  - Disposable income +45% since 2016
  - Positive regulatory momentum

- Junglee fastest growing rummy brand; leading product and significant player acquisition investment

- Flutter providing Junglee with:
  - Knowledge share e.g. 'Spin 'n Go' product, DFS expertise
  - Marketing capabilities

[1] Source: Redseer Strategy Consultants



# Group ex-US well positioned

| | UK & Ireland | Australia | International | Supporting growth and cash generation |
|---|---|---|---|---|
| 2021 Market position | 🥇 | 🥇 | 🥇 | • Good growth despite regulatory impacts |
| 2021 online market share[1] | 29% | 50% | n/a | • H1 2022 EBITDA margin: 26% (mature markets >30%) |
| H1 AMPs | 3.7m | 1.0m | 1.8m | • High cash conversion of 84%[2] |

**Scale and diversification provide resilient and robust model for growth**



[1] Total NGR online market share in the UK and Ireland based on internal estimates. Total NGR online market share of Sportsbet based on competitor reporting and internal estimates.
[2] Cash conversion reflects conversion of adjusted operating profit to pre-tax adjusted free cash flow in H1 2022.

# Conclusion
## Peter Jackson, Group CEO



34

# Conclusion

- Positive H1 performance
- **US:** continues to accelerate with
    - EBITDA profit in Q2
    - Sports betting market share of 51% in Q2
    - Confidence in 2023 profitability[1]
- **Group ex-US:** well positioned for growth with scale and diversification
    - Acquisition of Sisal adds another gold medal with strong H1 performance
- **Full year Group EBITDA outlook** in-line with expectations



[1] *2023 profit projection is for the full year 2023 on a Flutter reported basis, including the cost of share based compensation and FOXBet. Projections are also based on current timing expectations of regulatory developments, new state launches in 2022 and 2023 and excludes California.*

35

# Appendix



# KPI: Average monthly players

| Average Monthly Players ("AMPs")[1,2] 2022 | Q1 | Q2 | H1 |
|---|---|---|---|
| Group | 8,855 | 8,577 | 8,716 |
| US | 2,359 | 2,016 | 2,188 |
| UK & Ireland | 3,627 | 3,781 | 3,704 |
| Australia | 915 | 1,072 | 993 |
| International | 1,954 | 1,707 | 1,831 |
| **2021** | **Q1** | **Q2** | **H1** |
| Group | 7,672 | 7,578 | 7,625 |
| US | 1,648 | 1,292 | 1,470 |
| UK & Ireland | 3,167 | 3,440 | 3,303 |
| Australia | 831 | 982 | 906 |
| International | 2,027 | 1,863 | 1,945 |
| **YoY %** | **Q1** | **Q2** | **H1** |
| Group | +15% | +13% | +14% |
| US | +43% | +56% | +49% |
| UK & Ireland | +15% | +10% | +12% |
| Australia | +10% | +9% | +10% |
| International | -4% | -8% | -6% |



[1] AMPs do not include Junglee players in 2021 or 2022.

[2] UK&I and US totals are not de-duped i.e. a customer that is active on more than one brand will be counted more than once based on the number of brands they are active within a quarter.

37

# US

| £m | H1 2022 | H1 2021 | YOY | YOY CC |
|---|---|---|---|---|
| *Average monthly players ('000s)* | *2,188* | *1,470* | *+49%* | |
| Sportsbook stakes | 10,911 | 5,072 | +115% | +102% |
| *Sportsbook net revenue margin* | *6.0%* | *6.2%* | *-20bps* | *-20bps* |
| Sports revenue | 770 | 452 | +70% | +58% |
| Gaming revenue | 281 | 200 | +41% | +31% |
| **Total revenue** | **1,051** | **652** | **+61%** | **+50%** |
| Cost of sales | (544) | (293) | +86% | +73% |
| *Cost of sales as a % of net revenue* | *51.8%* | *44.9%* | *+680bps* | *+700bps* |
| **Gross profit** | **507** | **359** | **+41%** | **+31%** |
| Sales & marketing costs | (399) | (292) | +37% | +29% |
| **Contribution** | **108** | **67** | **+60%** | **+38%** |
| Other operating costs | (240) | (154) | +56% | +46% |
| **Adjusted EBITDA** | **(132)** | **(87)** | **+52%** | **+53%** |
| *Adjusted EBITDA margin* | *(12.5%)* | *(13.3%)* | *+70bps* | *-30bps* |
| Depreciation and amortisation | (31) | (22) | +39% | +29% |
| **Adjusted operating profit** | **(162)** | **(108)** | **+50%** | **+48%** |

- Sports revenue +58% reflecting:
  - Sportsbook revenue +91%
  - Strong growth in existing states
  - Five new US states, Ontario in Canada and a full contribution from two launched during Q1 2021
  - Adverse sports results YOY of £104m
- Gaming growth reflects full contribution from three new states (MI, WV and CT)
- COS % increase due to New York higher tax rates
- Marketing as % of revenue reduced by over six percentage points as existing states grow as proportion of overall business
- Good operating leverage when sports results excluded



38

# UK & Ireland

| £m | ONLINE | | | RETAIL | | |
|---|---|---|---|---|---|---|
| | H1 2022 | H1 2021 | YOY | H1 2022 | H1 2021 | YOY |
| *Average monthly players ('000s)* | *3,704* | *3,303* | *+12%* | | | |
| Sportsbook stakes | 4,494 | 5,885 | -24% | 691 | 207 | +234% |
| *Sportsbook net revenue margin* | *10.6%* | *10.6%* | *flat* | *13.2%* | *12.5%* | *+70bps* |
| Sports revenue | 538 | 712 | -24% | 92 | 26 | +253% |
| Gaming revenue | 418 | 382 | +10% | 44 | 16 | +183% |
| **Total revenue** | **956** | **1,094** | **-13%** | **136** | **41** | **+227%** |
| Cost of sales | (304) | (332) | -8% | (31) | (10) | +218% |
| *Cost of sales as a % of net revenue* | *31.8%* | *30.4%* | *+140bps* | *22.8%* | *23.4%* | *-70bps* |
| **Gross profit** | **652** | **762** | **-14%** | **105** | **32** | **+230%** |
| Sales & marketing costs | (194) | (204) | -5% | (3) | (3) | +13% |
| **Contribution** | **458** | **558** | **-18%** | **101** | **29** | **+251%** |
| Other operating costs | (155) | (160) | -3% | (83) | (68) | +23% |
| **Adjusted EBITDA** | **303** | **398** | **-24%** | **18** | **(39)** | |
| *Adjusted EBITDA margin* | *31.6%* | *36.4%* | *-470bps* | *13.5%* | *(93.6%)* | *+10,710bps* |
| Depreciation and amortisation | (44) | (42) | +5% | (19) | (21) | -7% |
| **Adjusted operating profit** | **259** | **356** | **-27%** | **(1)** | **(59)** | |

**Online**

- AMPs +12% with recreational growth
- Revenue -13% reflecting:
  - Addition of Tombola in January 2022
  - Safer gambling impacts
  - Unwind of Covid frequency
  - Benefit of Euros in prior year
- COS % higher due to streaming costs
- Marketing reduced due to Euros investment in the prior year
- Operating cost efficiencies and synergies offsetting  pay inflation and increased safer gambling investment

**Retail**

- Full estate open in H1
- Revenue in UK estate back to 2019 levels, Irish estate lower



# Australia

| £m | H1 2022 | H1 2021 | YOY | YOY CC |
|---|---|---|---|---|
| *Average monthly players ('000s)* | *993* | *906* | *+10%* | |
| Sportsbook stakes | 5,209 | 5,000 | +4% | +4% |
| *Sportsbook net revenue margin* | *11.8%* | *11.7%* | *+10bps* | *+10bps* |
| **Revenue** | **612** | **585** | **+5%** | **+5%** |
| Cost of sales | (290) | (275) | +5% | +5% |
| *Cost of sales as a % of net revenue* | *47.3%* | *47.0%* | *+30bps* | *+30bps* |
| **Gross profit** | **322** | **310** | **+4%** | **+4%** |
| Sales & marketing costs | (54) | (59) | -9% | -10% |
| **Contribution** | **269** | **252** | **+7%** | **+7%** |
| Other operating costs | (50) | (51) | -2% | -3% |
| **Adjusted EBITDA** | **219** | **201** | **+9%** | **+10%** |
| *Adjusted EBITDA margin* | *35.8%* | *34.3%* | *+150bps* | *+180bps* |
| Depreciation and amortisation | (14) | (13) | +4% | +5% |
| **Adjusted operating profit** | **206** | **188** | **+9%** | **+11%** |

- Revenue +5% driven by 10% increase in AMPs
- Customer growth benefitting from strong player retention from H2 2021
- COS % increase due to higher spend on promotional generosity driving effective tax rate up
- Marketing as % of revenue reduced as spend moved to targeted generosity
- Other operating costs broadly flat



# International

| £m | H1 2022 | H1 2021 | YOY | YOY CC |
|---|---|---|---|---|
| *Average monthly players ('000s)* | *1,831* | *1,945* | *-6%* | |
| Sportsbook stakes | 710 | 871 | -18% | -18% |
| *Sportsbook net revenue margin* | *9.0%* | *9.1%* | *-10bps* | *-10bps* |
| Sports revenue | 106 | 118 | -10% | -10% |
| Gaming revenue | 527 | 562 | -6% | -7% |
| **Total revenue** | **633** | **680** | **-7%** | **-8%** |
| Cost of sales | (184) | (199) | -8% | -8% |
| *Cost of sales as a % of net revenue* | *29.1%* | *29.3%* | *-20bps* | *-20bps* |
| **Gross profit** | **449** | **481** | **-7%** | **-7%** |
| Sales & marketing costs | (169) | (171) | -1% | -3% |
| **Contribution** | **280** | **310** | **-10%** | **-10%** |
| Other operating costs | (158) | (131) | +20% | +18% |
| **Adjusted EBITDA** | **122** | **179** | **-32%** | **-31%** |
| *Adjusted EBITDA margin* | *19.3%* | *26.3%* | *-700bps* | *-630bps* |
| Depreciation and amortisation | (33) | (25) | +31% | +22% |
| **Adjusted operating profit** | **89** | **154** | **-42%** | **-40%** |

- AMPs -6% with revenue of £633m reflecting:
  - Strong growth in "consolidate and invest markets"
  - Offset by guided regulatory changes and Covid comparatives
- COS % broadly flat
- Marketing as % of revenue increased, driven by investment in "consolidate and invest" markets
- Other operating costs growth reflecting step up in investment to improve capabilities across product, technology and customer operations
  - Opportunity for operational efficiency



# Separately disclosed items

| £m | H1 2022 | H1 2021 |
|---|---|---|
| Amortisation of acquisition related intangible assets | (286) | (276) |
| Transaction fees and associated costs | (10) | - |
| Restructuring and integration costs | (32) | (22) |
| Greece tax expense | - | (13) |
| **Operating profit impact of separately disclosed items** | **(328)** | **(310)** |
| Financial expense | - | (11) |
| **Profit before tax impact of separately disclosed items** | **(328)** | **(321)** |
| Tax on separately disclosed items | 39 | (72) |
| **Total separately disclosed items** | **(289)** | **(392)** |

- Amortisation of intangibles increase due to acquisition of Tombola

- Transaction fees relate to Tombola and Sisal acquisitions

- Restructuring costs associated with TSG merger

- Deferred tax credit of £39m relates to amortisation of acquired intangibles with prior period reflecting one off charge due to increase in UK corporate tax rate in 2023





www.flutter.com



**Flutter Entertainment plc** Annual Report & Accounts 2021

# The global player



# Flutter

# The scale of the leader, with the mindset of a challenger

We operate some of the world's most **innovative, diverse** and **distinctive** sports betting and gaming brands.














Read more about our brands on **page 4**





Our strategic roadmap

# Leading betting and gaming into the future

Leveraging our scale and technology, we are setting the standard globally for market leading, entertaining and innovative experiences for millions of customers.



**Growing today's businesses**

**Grow** our businesses in core markets

**Invest** to win in the US

**Build** on our network and invest for leadership positions across international markets

Get detailed insights on our strategy on **page 18**



**Creating the future**

Take early positions to realise the potential of future spaces

Read more about our strategy on **page 18**

**Powered by key enablers**



Learn about our Positive Impact Plan on **page 34**

Strategic report



Inside the report



# We are the
# global player



**Strategic report**
1    Our strategic roadmap
3    2021 highlights
4    At a glance
6    Investment case
8    Chair's statement
10   Chief Executive Officer's review
16   Markets
18   Strategy
28   Key performance indicators
32   Business model
34   Key enablers
38   Stakeholder engagement
44   Sustainability
69   Operating and financial review
84   Managing and understanding our principal risks
92   Viability statement

**Corporate governance**
94   Introduction to governance
96   Board of Directors
100  Executive leadership team
102  Chair's introduction
104  Board activities
106  Leadership and purpose
108  Engaging with a broad range of stakeholders
110  Division of responsibilities
112  Composition, succession and evaluation
116  Nomination Committee report
120  Workforce Engagement Committee report
124  Audit Committee report
132  Risk and Sustainability Committee report
136  Directors' remuneration report 2021
155  Directors' report

**Financial statements**
163  Statement of Directors' Responsibilities
164  Independent Auditor's Report
171  Consolidated Income Statement
172  Consolidated Statement of Other
     Comprehensive Income
173  Consolidated Statement of Financial Position
174  Consolidated Statement of Cash Flows
175  Consolidated Statement of Changes in Equity
177  Notes to the Consolidated Financial Statements
243  Company Statement of Financial Position
244  Company Statement of Changes in Equity
246  Notes to the Company Financial Statements
260  Five year financial summary (unaudited)
261  ESG supplementary information
267  Shareholder information

Highlights

# Performance highlights

## Reported revenue (£m)

## +37%

| | | |
|---|---|---|
| 2021 | | 6,036 |
| 2020 | | 4,414 |
| 2019 | | 2,140 |



## Reported EBITDA (£m)

## –6%

| | | |
|---|---|---|
| 2021 | | 723 |
| 2020 | | 772 |
| 2019 | | 408 |



## Reported basic EPS (pence)

## (236.5)p

| | | |
|---|---|---|
| 2021 | | (236.5) |
| 2020 | | 29.3 |
| 2019 | | 180.2 |



## Average monthly players (millions)

## +23%

| | | |
|---|---|---|
| 2021 | | 7.6 |
| 2020 | | 6.2 |
| 2019 | | 5.3 |

## Pro forma revenue (£m)*

## +17%

| | | |
|---|---|---|
| 2021 | | 6,036 |
| 2020 | | 5,264 |
| 2019 | | 4,144 |



## Pro forma adjusted EBITDA (£m)*

## –18%

| | | |
|---|---|---|
| 2021 | | 1,001 |
| 2020 | | 1,231 |
| 2019 | | 1,089 |



## Pro forma adjusted EPS (pence)

## 253.0p

| | | |
|---|---|---|
| 2021 | | 253.0 |
| 2020 | | 496.6 |
| 2019 | | 415.7 |



## Leverage ratio (net debt/pro forma adjusted EBITDA)

## 2.6x

| | | |
|---|---|---|
| 2021 | | 2.6x |
| 2020 | | 2.3x |
| 2019 | | 3.5x |

\* Pro forma numbers presented show the Group's financials with prior acquisitions included for a full 12-month period in each year. This includes the TSG merger in May 2020 and the Adjarabet acquisition in February 2019. Junglee acquired in January 2021 and Singular acquired in September 2021 have been included on a reported basis due to materiality.

Adjusted measures exclude items that are separately disclosed as they are (i) not part of the usual business activity of the Group; (ii) items that are volatile in nature; and (iii) purchase price accounting amortisation of acquired intangibles (non-cash).

To see our company performance please go to **page 28**

At a glance

# Building a
# global brand

Flutter is the parent company for a range of international brands and operations, including FanDuel, Sky Betting & Gaming, Sportsbet, PokerStars, Paddy Power, Tombola, Betfair, FOX Bet, TVG, Junglee Games and Adjarabet.

We are leading betting and gaming into the future by offering some of the most innovative brands in our industry. For us, it's all about bringing entertainment to life for millions of customers in a safe, responsible and sustainable way.

The size and scale of our global activities mean we have been able to invest to make sure our corporate functions support the Group and our refreshed strategy.

Our strategy is based on four key pillars to:

1) Grow our gold medal businesses in core markets;

2) Invest to win in the US;

3) Build on our network and invest for leadership positions across international markets; and

4) Create the future by taking early positions to realise potential of future spaces.

Following our successful merger with The Stars Group ("TSG"), we reorganised the business at the beginning of 2021 into the four divisions set out here. We now report against these divisions and refer to them throughout this report.

**Global footprint***



- UK&I: 35%
- US: 23%
- Australia: 21%
- International: 20%

\* Based on Group net revenue for the year ended 31 December 2021.



**PADDYPOWER.**

**betfair**    **tombola**

## UK&I

Our sports betting and gaming brands are some of the most popular in the UK&I market. Sky Betting & Gaming, Paddy Power and Betfair offer market leading innovation to millions of customers every week.

Although the brands mostly operate online, this division also includes 625 Paddy Power betting shops in the UK & Ireland.

In November 2021, we announced our acquisition of one of the UK's leading bingo operators, Tombola, which completed in January 2022.

Read more on page 16

# £2.1bn
revenue

# 3.2m
average monthly players

Strategic report

## Our offices



 
 

 
 

### US
Our US division consists of FanDuel, FOX Bet, TVG, PokerStars US and Stardust Casino. We offer a diverse set of online and retail sportsbooks, online gaming, poker, advanced deposit wagering on horse racing and TV broadcasting products. FanDuel is the market leading online sportsbook and casino operator in the rapidly expanding US market and is well positioned to continue to take advantage of this opportunity.

Read more on **page 17**

£1.4bn
revenue

1.6m
average monthly players

### Australia
The Sportsbet brand is the market leader in online sports betting across Australia. It's innovative, easy to use products and outstanding personalised value combine to create a leading customer proposition. Sportsbet's strategy is centred on winning in three battleground areas: product, value and marketing.

Read more on **page 16**

£1.3bn
revenue

1.0m
average monthly players

### International
We operate in a number of territories around the world, led by our flagship brand, PokerStars, the world's largest online poker site. The division also includes Betfair International, Adjarabet and Junglee Games.

On 23 December 2021 we announced the acquisition of Italy's leading online gaming operator, Sisal, which we expect to complete in Q2 2022.

Flutter International operates under licence in 21 territories across the globe and has customers in more than 100 countries.

Read more on **page 17**

£1.3bn
revenue

1.9m
average monthly players

Investment case

# Our unique investment thesis

As the world's leading online sports betting and gaming operator, Flutter has an unparalleled portfolio of premium brands in a sector with a long runway of future growth.





## Significant market growth opportunity

The global online betting and gaming market has a significant runway of future growth with a clear pathway for the expansion of additional regulated markets such as additional states in the US and increased online penetration. Even after the acceleration brought about by the Covid-19 pandemic, just 25%, or £75bn, of the £302bn global betting and gaming market was estimated to occur online in 2021, and the compound annual growth of that online market is expected to exceed 10% in the next five years to 2026, driven in part by regulation and further channel migration. In the next two years we expect the regulation of markets such as Brazil, Canada and the Netherlands to increase the International addressable market. New market developments will also expand the size of the opportunity. The US is the largest growth opportunity in the sector today with an estimated addressable market in excess of $20bn by 2025. We are exceptionally well positioned to capitalise with a strong, diverse portfolio of brands in all geographies.

Read more about the market opportunity on **pages 16 and 17**

## Clearly defined corporate and Sustainability strategy

Flutter has a proven track record of setting and delivering on its strategic priorities. Having delivered on the objectives laid out in its previous 2018 corporate strategy, we've set goals for the coming years with a refreshed four pillar strategy for success. As a responsible operator the Group recognises the key role that sustainability plays in enabling this strategy with the launch of its Positive Impact Plan, the Group's new ESG strategy. The introduction of our Group-wide Positive Impact Plan is the next step in Flutter's ongoing commitment to set the sustainability agenda for the industry and make a positive contribution across three key areas: our customers, our colleagues and our communities. Our Positive Impact Plan is rooted in our wider corporate strategy, driven by our enablers and values, and aware of our key risks.

Read more about our corporate and ESG strategy on **pages 18 and 43**

# £302bn
global market

# $20bn+
US market opportunity



Our Positive Impact Plan

Flutter
betfair
POKERSTARS

Morning Line
TVG

## Scale operator with diversified product and geographic portfolio

Because we operate in a lot of markets and offer a broad range of products, we are well balanced when it comes to regulation and external environmental pressures. It allows us to benefit from local tailwinds and reduce the impact of local headwinds. The positive impact of regulation in markets that are opening up, such as the US, helps to reduce the impact of adverse local regulatory costs in more mature markets. As an operator of scale we benefit from the "flywheel" effect which enables organic growth while investing to secure and defend our gold medal positions.

Read more about scale and the flywheel as an enabler of our strategy on **pages 18 and 19**

## Track record of substantial financial return

We have continued our run of robust financial performance with a compound annual growth rate in total shareholder returns of 6.2% for the five years to 31 December 2021.

Read more about our performance on **pages 28 and 31**

**6.20%**

Annual shareholder return over the last five years

**Chair's statement**



# Supporting customers and colleagues

Strong corporate governance supports
our continued strategy execution, business
resilience and contribution to the societies
in which we operate.

# Dear Shareholder

## Introduction

During 2021, the Covid-19 pandemic continued to pose challenges, particularly in the first quarter of the year. We continued to protect the wellbeing of our workforce and customers with measures in place to safeguard our customers' safety, and initiatives to support colleague wellbeing. I have continued to be impressed by the dedication, commitment and resilience shown by our workforce throughout our businesses during these challenging and uncertain times.

## Sustainability

During 2021, our Risk Committee was repurposed as the Risk and Sustainability Committee, strengthening our governance arrangements for oversight of sustainability matters on behalf of the Board, whilst continuing to monitor material risks that impact our business and our reputation.

We have recently launched our Group sustainability strategy, our 'Positive Impact Plan', a comprehensive and challenging strategy which demonstrates that Flutter is setting a clear agenda for positive change. The 'Positive Impact Plan' sets targets to be achieved by Flutter by 2030, under the three pillars of 'Play Well', 'Work Better' and 'Do More'.

'Play Well' extends our commitment in safer gambling by providing customers with a positive, entertaining and safe experience. 'Work Better' aims to build a more diverse and inclusive workforce in our business that is reflective of our communities. 'Do More' allows us to build on our long history of community support by aligning community support with a set of key strategic priorities that allow us to use the expertise and experience within our business to support our communities. 'Do More' will particularly focus on sport, health and wellbeing, and tech for good.

In addition to the core pillars outlined above, the 'Positive Impact Plan' also sets out our strategy for reducing our environmental impact. We have begun to report on how the impacts of climate change could affect our business in line with the Task-Force on Climate Related Disclosure recommendations. Further information on Our Positive Impact Plan is set out on page 45.

## People and culture

As a diverse international Group, we recognise the critical role our workforce plays in our success. In June, the Board approved the establishment of the Workforce Engagement Committee, a Board level committee with responsibility for workforce engagement and oversight of our people and culture across the Group. While it was not possible to physically meet with our colleagues during 2021, we intend to undertake a number of site visits at a number of the Group's international locations during 2022 and beyond. This will provide the Board with an opportunity to meet with colleagues and listen to their views, ideas and matters of concern. Further details on the Workforce Engagement Committee are set out on pages 120 to 123.



'Play Well' extends our commitment in safer gambling by providing customers with a positive, entertaining and safe experience.

## Strategy

During the year, the Group completed the acquisitions of Junglee Games and Singular, and the divestment of the Oddschecker business. The Board also approved the acquisitions of Tombola which completed in January 2022 and Sisal which is expected to complete in early 2022. These transactions align with the Group's strategy of investing to build leadership positions in regulated markets globally.

The Board approved a new integrated corporate strategy in 2021 refreshing the Group's strategic priorities. Further information on our corporate strategy is set out on pages 18 to 27.

## Board change

As part of the Board's ongoing refreshment and succession planning, a number of Board changes took place during the year. Divyesh (Dave) Gadhia and Peter Rigby stood down from the Board following the conclusion of the 2021 AGM. As Executive Chair of The Stars Group, Inc., Dave led the challenging turnaround of the Stars business. He was critical in pursuing the opportunity for the merger with Flutter, while ensuring that his shareholders were appropriately represented and rewarded. He leaves a strong and enduring legacy. Peter has been a stalwart of the Betfair, Paddy Power and legacy Flutter boards during his seven years tenure as Director. He has made significant contributions to Flutter's progress through his Chairing of the Risk Committee and subsequently the Remuneration Committee. We thank Dave and Peter for their substantial contributions to the Flutter Board and legacy Boards.

Nancy Dubuc joined the Flutter Board following the conclusion of the AGM on 29 April 2021. Holly Keller Koeppel joined the Board on 13 May 2021. Atif Rafiq joined the Board on 10 December 2021. We welcome each of Nancy, Holly and Atif as Independent Non-Executive Directors. Their distinct individual expertise is contributing strongly to Board discussions. I am pleased to report that as a result of these Board changes we have exceeded our target of 33% female representation on the Board. We have also achieved our target of at least one member of ethnicity on the Board whilst simultaneously boosting the Board's digital expertise. The Board will continue to review our Board diversity targets during 2022.

Michael Cawley will not be seeking re-election at the 2022 AGM and will step down from the Board at the conclusion of that meeting. Michael joined the Paddy Power plc Board in July 2013 and has spent the last six year's chairing the Audit Committee. Holly Keller Koeppel will replace Michael as Chair of the Audit Committee with effect from the conclusion of the AGM on 28 April 2022.

Zillah Byng-Thorne will seek re-election at the AGM. Zillah will step down from the Board before the 2023 AGM, having served nine years on the Board. Dave Lazzarato will replace Zillah as Chair of the Risk and Sustainability Committee with effect from the conclusion of the AGM on 28 April 2022. Zillah will continue to be a member of the Risk and Sustainability Committee.

I want to thank Michael and Zillah for their exceptional contribution to the Board over their tenure.

As 2022 unfolds with many Covid restrictions being removed, I look forward to the opportunity of meeting with our employees, shareholders and communities in person over the next 12 months.

Thank you for your continued support of Flutter.

**Gary McGann**
Chair
14 March 2022

**Chief Executive Officer's review**

# Positive progress in 2021

We delivered on our key strategic objectives and made meaningful improvements to the sustainable nature of our earnings base.





## Business review [1,2,3,4,5]

2021 was a year of strong progress for Flutter. The Group delivered pro forma revenue growth of 17% driven by an increase in our recreational player base of 23%, with reported revenue increasing 37%. Flutter delivered Adjusted EBITDA of just over £1bn. This represents a reduction of 18% year on year (reported EBITDA reduced 6%). Excellent growth and operating leverage in Australia was more than offset by a combination of factors including (i) increased investment in US customer acquisition as we expanded our footprint to 4 new states, (ii) challenging Covid comparatives, (iii) the impact of regulatory changes in our International markets and safer gambling changes within our UK & Ireland business and (iv) a material swing in sports results, particularly in the UK & Ireland.

We delivered on our key strategic objectives: In the US we continued to lead, with FanDuel remaining the clear market leader in online sportsbook, delivering a 40% share of the market in Q4[6]. The benefits of our superior product offering and scale are driving our US business towards profitability, with FanDuel's sportsbook and gaming business delivering positive contribution in 2021 for the first time. In our core markets of UK and Ireland and Australia, we retained our gold medal positions and in Q4, we bolstered our offering with the announcement of the acquisition of Tombola, the market leading bingo operator. In International, we have stabilised our poker market share, made good progress in key markets of focus and strengthened our international footprint with the acquisition of both Junglee in India and the announced acquisition of Sisal in Italy.

We made meaningful progress in improving the sustainability of our earnings. During 2021 we introduced enhanced safer gambling measures across the Group, continuing to re-shape our UK customer base in particular, with the proportion of revenue from higher value cohorts reduced by more than 50% since 2019. The significant investment we have made in PokerStars over the last two years to better position it for future growth is showing encouraging signs of progress. Our continued focus on investment in regulated markets meant that over 91% of Group revenue was generated in regulated markets during Q4 2021.

## Refreshed four pillar strategy

The scale and geographic footprint of Flutter has been transformed since we set out our original strategy in 2018. We have increased profitability in our core markets (UK, Ireland and Australia), significantly expanded our international footprint with the addition of Adjarabet, PokerStars and Junglee, added podium positions in additional international markets and grown the FanDuel business to become the market leader in the US today.

We are now refreshing our strategy, including establishing more clearly defined sustainability goals. This refreshed strategy is designed to help us defend our number one positions in existing markets and to ensure that we continue to capitalise on future potential opportunities. Our revised four pillars are to:

1. **Grow gold medal positions in core markets** by maintaining focus on growing our recreational customer base, continuing to extend our product and brand leadership positions and leveraging our local scale to drive efficiency

2. **Invest to win in the US** by solidifying FanDuel's leadership position as the #1 sportsbook in the US, improving our iGaming proposition to establish a clear podium position and continuing to exploit the flywheel to maintain leadership

3. **Build on our network and invest for leadership across international markets** by continuing to revitalise the PokerStars business, scaling our casino offering through cross-sell and direct acquisition, building a lead in sports betting through our multi-brand portfolio and buying businesses with podium positions in attractive markets which Flutter can further develop

4. **Take early positions to realise future potential in future spaces** by continuing to nurture an innovative mindset, identifying adjacent opportunities to reinforce and future-proof our business and taking early positions to broaden our customer base. We are already doing this with our PokerStars Virtual Reality immersive digital poker and casino experience, the best iGaming experience available in virtual reality

The key enablers of our strategy are (i) sustainability (ii) speed (iii) customer insight and data (iv) product and technology and (v) scale. While each is crucial to delivering our goals and objectives, we particularly recognise the importance of being a responsible global leader in the sector, placing sustainability at the heart of what we do through the launch of our new sustainability strategy, our Positive Impact Plan.

# Chief Executive Officer's review *continued*



## Flutter's new sustainability strategy, our Positive Impact Plan

Yesterday we launched Flutter's new sustainability strategy, our Positive Impact Plan. Built on Flutter's responsible business foundations, the Positive Impact Plan brings together the significant progress made globally across our three key focus areas; our customers, colleagues and communities, creating a consistent global approach that supports our overall corporate strategy. This ensures that our divisions get greater access to the insight, skills and capabilities of the wider Group while also being empowered to innovate and respond effectively to their local contexts and deliver local initiatives that have the maximum impact.

The Positive Impact Plan focuses on three areas of sustainability for the future, with clear targets set to:

- Help customers **play well**: by 2030 75% of our online customers will use a safer gambling tool (reaching 50% by 2026)[7]
- Empower colleagues to **work better**: by 2030 our teams will be representative of the places in which we live and work
- Work with communities to **do more**: by 2030 we will improve the lives of 10 million people

Further information in relation to our Positive Impact Plan can be found on page 44.



## Our new sustainability strategy will ensure we deliver local initiatives that have the maximum impact.

## Safer gambling progress in 2021 and launch of the Flutter "Play Well" strategy

During 2021 we further enhanced our safer gambling measures across the Group, investing over £45m in advertising, research, people and training. In the UK and Ireland we introduced several new measures such as a £10 staking limit trial across all our online slots games and brands and a ban on credit card deposits in Ireland. We also continued to iterate our "Triple Step" approach to affordability:

- **New customers:** are now subject to tailored monitoring in the initial period post registration, with thresholds dependent on age. SBG introduced mandatory deposit limits in January 2021 for younger customers with this set to be rolled out for all under 25s across our other brands this year.
- **Ongoing monitoring:** we made various enhancements to our proprietary technology, in use for a number of years, to track and monitor customer behaviour. We issued approximately 5.3m automated communications to customers encouraging safer gambling awareness and positive play during 2021. Enhanced financial vulnerability checks were rolled out on a trial basis to a proportion of our customers since Q4 2021. A range of spend checks and limits are also applied across all brands with thresholds based on age.
- **Backstops:** annual thresholds are being put in place across all brands to ensure that customers are protected where our new customer and/or ongoing monitoring controls do not trigger an engagement. These ensure that at a particular level of spend, customer activity is reviewed with support provided where required.

In Australia we launched our "Take a sec before you bet" campaign in July, encouraging customers to put deposit limits in place and we continue to utilise our proprietary technology to monitor customer behaviour and engage with our customers where we believe interaction is warranted. In the US, FanDuel partnered with the American Gaming Association and announced its partnership with Craig Carton in promoting positive play in the growing US market.

## Play Well strategy

Extending our leadership in safer gambling, our new Play Well strategy builds on the progress we have made in recent years within each of our divisions, bringing it together in an overarching set of universal principles and guidelines. With a presence across a multitude of regulatory environments and cultures, we know there is no "one-size-fits-all" solution to promoting safer gambling. Instead there are universal principles we can employ across our divisions, leveraging global scale, capability and expertise to provide players with the tools, information and support they need to Play Well.

In 2022, we are introducing locally tailored Play Well metrics, directly linked to colleague bonuses for each of our divisions. These metrics have been developed on a divisional basis to ensure that each business is focused on the initiatives that will support and promote their local safer gambling strategies, taking into account individual markets and contexts, whilst being consistent with our global Play Well principles.

In addition to division specific targets, we have also set ourselves an ambitious Group goal to have 75% of our online customers using safer gambling tools by 2030, with over 50% doing so within five years. (2021: 34.7%)[7]

## 2021 review

### US

In the US, our business has significantly expanded in scale during 2021, as we leveraged the 'flywheel effect' to accelerate growth. With revenue of $1.9bn, 47% more than our next nearest online competitor, our advantage is compounding, providing us with the additional firepower required to continue to invest heavily in both product and customer acquisition. Since launching our first online sportsbook in the summer of 2018, we have now acquired over 3.9 million sports betting and gaming customers. At our 2021 interim earnings announcement we outlined the key drivers of our success in the US and during the second half we made further enhancements across a number of these areas.

### Product

We continued to innovate on product by expanding the breadth of our proprietary and market leading Same Game Parlay™ ("SGP") product. We now provide players with the ability to (i) combine SGPs on multiple different games into a single bet, (ii) place a SGP in-play on certain sports, and (iii) place a SGP on college football. We have now completed development of in-house pricing for college basketball, increasing the proportion of our handle that is priced in-house to 80%. The combination of better pricing accuracy and a greater proportion of handle coming from higher margin parlay products means that we generated 340 basis points more in gross margin than our competitors during Q4 (Q2: 300 basis points higher).

In gaming we are increasingly focused on improving our overall customer proposition to establish a clear podium position. Following a period of significant focus on sports we have scaled up our gaming team by adding nearly 100 colleagues, including the addition of gaming experts from around the Group. We continued to make incremental product improvements by enhancing how we communicate with and reward casino players, while also making gaming more accessible for sportsbook players.

## The FanDuel brand

The FanDuel brand continues to resonate strongly with sports bettors. We have the leading share of voice in the market, with a focus on ensuring high levels of brand visibility throughout the year, not just during seasonal peaks. We have recently added and/or extended several key partnerships, including the NFL, NBA and with Pat MacAfee, locking in important assets for multiple years. We invested over $1bn in promotions, sales and marketing across our US business in 2021.

These competitive advantages have enabled us to consolidate our combined overall leadership position in the US online market, a market which has grown by over 120% since Q4 2020:

- Our sports-betting share in Q4 was 40%[6]
- Our online gaming share in Q4 was 20%[6]
- Our overall online market share in Q4 was 31%[6]

This leading revenue share is moving FanDuel closer to a position of profitability. In 2021 FanDuel became the first large scale online brand to generate a positive in-year contribution from sports betting and gaming in the US. FanDuel generated contribution of £9m ($14m) in 2021, with the positive contribution from more mature states (such as New Jersey, Pennsylvania, Indiana and Illinois) more than offsetting the material investment in large states newly launched in 2021 (Michigan, Virginia, Arizona and Connecticut).

Encouragingly as we expand into further new states, we are seeing faster adoption rates for online sports betting. This results in bigger initial losses in the early months post a state launch as we acquire more customers. However, when combined with better retention rates and our product mix advantages, we now expect new states to generate positive contribution after 12 to 24 months post launch, in contrast to the 18 to 30 month guidance we provided in 2019. Such guidance excludes a higher tax state such as New York.

Based on our current expectations relating to the timing of new state regulation in 2022 and 2023, we remain confident that our US business will be EBITDA profitable in 2023. The timing of regulatory developments and new state launches can be difficult to predict and any variance to our expectations across these two years could affect the timing of profitability being reached, particularly if an unexpected large state such as California launches in 2023.

Our online sportsbook is currently available in 14 states following successful launches in New York and Louisiana in early 2022. In New York, we have already acquired over 400,000 new sports betting customers since launch.

### UK & Ireland

In 2021 we maintained our leadership position of the UK and Ireland online markets with a 29%[8] market share (2020: 29%), driven by a focus on recreational customer growth. Our total AMPs increased by 25%, resulting in online revenue growth of 3%. The relative lower rate of revenue growth reflected several key factors including challenging Covid comparatives, adverse sports results and a general slowdown in the UK online market, particularly in Q4.

# Chief Executive Officer's review continued

## 2021 review continued

### UK & Ireland continued

Despite a more challenging environment we continued to innovate on product. During the year we leveraged Group technology, pricing and risk management capabilities to launch "Popular Betbuilder" on our Paddy Power sportsbook. On the gaming side we saw good retention driven by the launch of Sky Vegas live, the roll out of PokerStars gaming content across both Paddy Power and Sky Vegas brands (via the Group Gaming Network) and the continued benefit from our daily prize mechanics across all three brands.

An unprecedented run of customer-friendly sports results in 2021 cost the division £232m in revenue year-on-year (before adjusting for recycling), £149m of which was in Q4 alone. In addition, relaxation of Covid-related restrictions led to customers spending a greater proportion of leisure time on other activities. A combination of the factors above resulted in us observing materially lower levels of customer recycling (than we have seen historically) during the fourth quarter.

Safer gambling improvements in 2021, together with the other changes implemented in recent years, have resulted in our player base becoming more recreational. For example, since H2 2019, we have reduced revenue coming from higher value bands by more than 55%. While it is challenging to quantify exactly what the cost of new safer gambling measures have been (because we cannot be definitive on how all player behaviour has changed in response), our best estimate is that the total revenue impact in 2021 alone was in excess of £90m. While we recognise that the improvements we have made, and continue to make, will impact near term growth, they will better position the business longer-term. As we assess the outlook for longer term customer economics, we are also reviewing the cost base of the business to ensure that it is appropriate going forward.

The UK Government's review of the Gambling Act is ongoing and we are hopeful that we will get improved visibility on the future shape of the industry in Q2 in the form of the government's White Paper publication. While this document should provide some clarity on the shape of future changes, we believe that the impacts will ultimately be phased over the coming years. In Ireland, the legislative process to establish a gambling regulatory authority has commenced which we welcome.

### Australia

Sportsbet delivered another excellent performance, clearly displaying the benefits that can be derived from attaining significant local scale. In 2021, Sportsbet had over one million AMPs, an increase of 60% on 2019. This has resulted in a 7 percentage point increase in online market share in this period, to 50% in 2021[8]. 

We continue to win in our key battlegrounds of product, value and marketing. In Q4, we launched 'Bet returns for SGM' which combines the great customer experience of our personalised generosity offering with our market leading Same Game Multi product. This followed our highly successful "Bet with Mates" product which launched in H1.

In H2, over 60% of the Australian population experienced the reintroduction of Covid related restrictions (which had been removed for most of H1). As trading conditions normalise in 2022, we will continue to invest in offering outstanding value for money to retain leisure spend from migrated players. As outlined at our September investor day (here), the medium-term outlook for Sportsbet remains compelling; with growth likely to be driven by the growing financial maturity of our existing player base as well as the continued conversion of non-betting sports fans and retail gamers. Sportsbet continues to provide a template for what can be achieved in other International markets as we look to leverage the Group's scale.

### International

As expected, the easing of Covid restrictions during 2021 resulted in a reduction in revenues in our International division, with the normalisation of customer engagement following elevated levels in 2020. In addition, the pro-active compliance measures we introduced following the TSG merger and the adverse changes to regulation in both Germany and the Netherlands created headwinds for the business. Positively, underlying growth in key markets of focus such as Brazil, Canada and Georgia during 2021 has been encouraging.

At the time of the TSG merger we identified various improvements required to position the business for future success and to correct for historic underinvestment in certain key areas. While much of this investment was foreseen, a number of unexpected headwinds have materially impacted revenues (e.g. adverse FX movements, Dutch regulation, and alignment of PokerStars' standards of compliance with those of Flutter). As such, the last two years has seen a significant reshaping of the International division. We have materially reduced the division's risk profile, albeit at a lower level of profitability. We have developed a clear growth strategy with an emphasis on key geographical markets, supplemented by the acquisition of Junglee and the recently announced acquisition of Sisal.

We significantly increased investment in order to revitalise PokerStars and have rebased the business, delivering:

- A stabilised poker market share via an improved customer proposition and the launch of our new PokerStars reward scheme in October, which resonated well with customers. Stabilising our poker customer base is crucial for cross-sell into casino.
- An improved product mix through investment in direct casino acquisition with the launch of our "Epic Downtime" PokerStars Casino campaign. We continued to broaden our gaming content, leveraging our three Flutter in-house gaming studios. Over 45% of Q4 PokerStars' gaming revenues came from casino products (Q4 2019: 35%).



The scale and geographic footprint of Flutter has been transformed since we set our original strategy in 2018 and so we refreshed our objectives to help us defend and deliver our gold medal positions.

- An improved regulatory profile with 63% of International revenues generated in regulated markets in Q4 2021 compared with 48% in H1 2019. We believe that reducing exposure to higher risk jurisdictions, even if that means delivering lower levels of profitability in the short-term, is the right approach to put the business on a more stable footing for future growth.

While the investment required to rebuild capabilities and brand strength has been extensive, our strategy is showing progress. On an organic basis, stripping out the adverse impacts of regulatory changes, the International division has delivered compound annual double digit revenue growth since 2019. Progress in our key markets has been as follows:

- **Italy:** recently announced acquisition of the Italian omni-channel operator Sisal, owner of Italy's number one online brand, which will propel Flutter into a leadership position in Italy
- **Georgia and Armenia:** market leadership positions in both countries due to Adjarabet's exceptional performance, with EBITDA almost doubling year-on-year
- **Canada:** PokerStars brand strength evident with high brand awareness as the market moves toward regulation
- **Brazil:** Betfair drove triple digit AMP growth following our step up in marketing investment in H1
- **India:** added podium position via Junglee which has performed well, with AMPs in Q4 doubling year-on-year amid a more positive regulatory outlook

As we look to the future, we will focus on building leading positions in focussed markets organically or through acquisition where we find businesses with strategic moats around them. These markets of focus vary in terms of maturity but over the next five years we expect them to have an addressable market size of approximately £26bn. Given Flutter's scale and superior capabilities, we believe the International division is in an excellent position to capitalise on the opportunities across these markets.

## Capital structure and balance sheet update[9]
At 31 December 2021, the Group had gross debt of £3,599m[10] and a net debt position of £2,647m, representing a leverage ratio of 2.6 times. The Group's capital structure has evolved during the period due to:

- A refinancing of Group debt in mid-July, which significantly reduced the effective cost of debt and increased available liquidity
- The sale of Oddschecker Global Media on 31 August for an enterprise value of £135m
- Acquisition of Junglee and Singular

Post period end, the Group completed the acquisition of Tombola based on an enterprise value of £402m (10 January 2022). In December, the Group announced the acquisition of Sisal, Italy's leading online gaming operator for a consideration of £1.6bn. The transaction is expected to complete in Q2 2022 once all necessary regulatory approvals have been received.

These acquisitions will result in an increased leverage ratio in the near term. However, the Group continues to generate significant free cash flow which will help it to de-lever quickly. The Group remains committed to its medium-term leverage target of 1-2 times and the Board will review the Group's dividend policy once leverage returns to these levels.

## Other updates
As previously disclosed, the Group is in a legal arbitration process with FOX Corporation with respect to its option to acquire an 18.6% stake in FanDuel and related issues. Despite this, both sides have continued active discussions to determine whether an agreement can be reached. While those discussions have been productive and have advanced materially, it remains unclear at this time as to whether agreement can be concluded. As a result, the arbitration is proceeding in parallel with a hearing date now set for 20 June 2022. Should the parties not reach agreement in the interim, this hearing will proceed and we expect will result in a binding decision by the arbitrator in Q3 2022. The Group continues to vigorously defend its position.

**Peter Jackson**
Chief Executive Officer
14 March 2022

For footnotes see **pages 78 and 79**



Markets

# Fast growing global opportunity

The global online betting and gaming market has a significant runway of future growth, with more countries and US states expected to regulate in the years ahead. Just 25%, or £75bn, of this £302bn global market in 2021 is currently online (2019: 13%) with compound annual growth of the online channel expected to exceed 10% over the next five years to 2026.

## UK and Ireland

The UK market is the largest regulated market in Europe. Between the UK and Ireland, the total addressable market ("TAM") was estimated to be c. £9.9bn in 2021. While more mature than many other European markets, the UK and Ireland online market has continued to exhibit strong levels of growth, having delivered c. 9% compound annual growth over the last five years. The majority of this growth has been at the recreational/more casual end of the market. Online penetration of the overall market continues to rise, sitting at approximately 86% today. The migration of customers from offline channels to online accelerated during the Covid-19 pandemic as retail venues were temporarily closed.

In the near term, regulatory changes and safer gambling initiatives being introduced by operators will likely lead to slower market growth in 2022/23. However, over the medium term we expect the recreational customer segment to continue to drive further growth in the total online addressable market. As the leading operator in the UK and Ireland, Flutter have implemented several proactive measures over the last three years to ensure our customer base is increasingly recreationally focused, positioning the Group well ahead of any regulatory change. We enjoyed a c. 29% share of the UK online sports and gaming market in 2021 and our recreational brands are well placed to capture future online migration and growth both in the near and longer term.

### UK and Ireland market, GGR (£bn)



## Australia

The Australian sports betting market is fully regulated and was worth an estimated $7.9bn in 2021, with online accounting for 87% of the market. The market has seen a continuous benefit from a customer shift to online, which accelerated over the last two years due to Covid-related restrictions in retail. Pre-2020, the online market had been growing at approximately 14% per annum with future growth rates dependent on (i) the number of migrated retail customers that choose to remain online, and (ii) conversion of avid sports fans who don't currently bet with any bookmaker. Online gaming products such as casino and poker are not currently permitted in Australia.

Sportsbet had an estimated 50% share of the online market during 2021 and enjoyed multi-year market share gains through (i) the structural shift in betting patterns given Sportsbet's strength in both non-racing sports and fixed odds sports betting, (ii) capturing a significant portion of customers who migrated from retail to online, and (iii) leading the market across our three strategic pillars of product, value and marketing. More detail on the Australian market can be found in the Sportsbet investor day presentation, which was held in September 2021 and is available at www.flutter.com/investors.

### Australian sports betting market, GGR ($bn)





## International

The International division operates in over 100 different countries, in both regulated and unregulated markets with select case study markets outlined below combining to provide the division with an addressable market size of c. £26bn. Many of these jurisdictions, such as Latin America and Eastern Europe, have strong underlying growth prospects. These case study markets are expected to have an online compound annual growth rate of 10% over the medium term as countries such as Brazil, Canada and the Netherlands continue to regulate.

The International division has leadership positions in a number of these markets through brands including PokerStars, Adjarabet, Betfair and Junglee. The Group also announced the acquisition of Sisal in December 2021 which will provide the business with a gold medal position in Italy.

We will continue to use our experience in both direct customer acquisition and cross-selling techniques in markets where we enjoy a strong leadership position in one product vertical to expand our existing customer base efficiently. The global scale of the Group together and the local focus achieved through podium positions organically or through acquisition, makes us well placed for long-term future growth.

### International case study markets, GGR (£bn)



| | |
|---|---|
| Italy (retail and lottery) | 13.8 |
| Italy (online) | 3.8 |
| Canada | 4.1 |
| Brazil | 3.4 |
| India | 1.0 |

## US

The US is the single biggest market opportunity for Flutter. FanDuel has continued to see positive legislative momentum, resulting in its online sportsbook now being available in 14 states and online gaming being available in five states. In 2021, these states generated $7.0bn in online GGR, with $3.3bn in sports betting and $3.7bn in gaming.Our brands had a market share of 40% in sports betting and 20% in gaming in Q4 2021.

We expect the TAM for its products in the US to be over $20bn by 2025 from:

- maturing of existing sports betting and gaming states;
- expansion of sports betting to cover over 65% of the US population, currently 34%;
- expansion of online gaming to cover over 16% of the US population, currently 11%; and
- ongoing revenue contributions from retail sportsbooks, online horse wagering, daily fantasy sports and poker.

There is further significant potential for the TAM to exceed $34bn as states continue to grow beyond 2025, particularly if California and Florida regulate our products and FanDuel can expand into Canada.

### US market, GGR ($bn)



**TAM: $20bn+**

Sportsbook
$12.2bn

iGaming
$5.3bn

Retail
$1.4bn

DFS/online racing
$1.1bn

Strategy

# The scale of the leader, with the mindset of a challenger

Our scale and geographic footprint has been transformed since we set our four-pillar strategy in 2018. The first pillar of that strategy focussed on increasing profitability within the our core markets. Through disciplined execution and the acquisition of TSG in 2020, we grew both our market share and profitability in these markets. We did this while also increasing its focus on recreational customers and building a more sustainable business. The second and third pillars were aimed at furthering our international expansion, the foundations for which were laid with the addition of the PokerStars brand in 2020 as well as additional bolt-on acquisitions such as Adjarabet in 2019 and Junglee in 2021. Finally, the fourth pillar of the 2018 strategy was about pursuing the US opportunity rigorously. Since launch, FanDuel has built a winning position in the US market as the undisputed number one US online sports betting provider.

With successful progression and delivery against the 2018 goals, in 2021 we refreshed our strategic priorities to make sure that they reflected our updated thinking. The newly refreshed strategy will deliver and defend gold medal positions in existing businesses as well as ensuring continued cultivation of an innovative mindset to capitalise on future potential opportunities. These new priorities, set out across four pillars below, also recognises the role Flutter plays as a responsible global leader by placing sustainability at the heart of everything we do with the launch of our new ESG strategy, our Positive Impact Plan.

## Powered by key enablers

**Links to principal risks:**

1. Changes to legal, regulatory and licensing landscape
2. Cyber resilience
3. US growth execution and competition
4. International technology transformation
5. Global talent acquisition
6. Existing compliance with legal, regulatory and licensing landscape
7. IT resilience – availability and stability
8. Third parties and key suppliers
9. Play Well
10. Global talent management and retention





## Grow our gold medal positions in core markets

Read more on page 20

**Focusing on growing our recreational customer base efficiently, using local scale to unlock synergistic benefits across our core markets**

**What it means**
- Maintaining a laser focus on growing our recreational customer base
- Continuing to extend our product and brand leadership positions
- Leveraging our local scale to drive efficiency across our core markets

**2021 performance**
- Maintained gold medal positions in UK & Ireland and Australia
- Significant progress made on safer gambling initiatives and "Affordability Triple Step"
- Delivered material synergies during 2021

**Links to principal risks:**




## Invest to win in the US

Read more on page 22

**Building on the gold medal FanDuel has won in the US we will extend our leadership position and continue to win as new states regulate**

**What it means**
- Solidifying FanDuel's leadership position as the #1 sportsbook in the US
- Growing our iGaming proposition and portfolio to establish a clear podium position
- Continuing to exploit the flywheel to maintain leadership and deliver positive EBITDA in 2023

**2021 performance**
- Maintained #1 position through product leadership with 40% Q4 online sportsbook market share
- Achieved significant scale at nearly 50% larger than next competitor
- FanDuel sportsbook and gaming business delivered positive 2021 contribution of $14m

**Links to principal risks:**




## Build on our network and invest for leadership positions across international markets

Read more on page 24

**Buying and building podium positions across our international markets, we will combine global scale with local presence to deliver sustainable growth and maximise the network benefits of our poker and exchange products**

**What it means**
- Continuing to revitalise the PokerStars business
- Scaling casino business through cross-sell and direct acquisition
- Building a lead in sports betting through our multi-brand portfolio
- Buying businesses with podium positions in attractive markets that Flutter can further develop

**2021 performance**
- Stabilised poker market share following investment
- Improved revenue mix with greater proportion coming from casino products
- Increased sustainability of the business with 78% of revenue coming from regulated/regulating markets in Q4

**Links to principal risks:**




## Creating the future

Read more on page 26

**Take early positions to realise the potential of future spaces**

**We will continue to nurture an innovative mindset to identify adjacent opportunities to grow our customer base and position the Group for growth in a continuously evolving entertainment space.**

We are building an innovation engine to further embed the experimental mindset that allows us to explore new spaces and provide more immersive betting and gaming experiences for our customers. Everything we do is enabled by the passion of our people, the strength of our products, the diversity of our brands and our desire to ensure our customers are always supported.

Our global scale enhances our ability to win by making it easier to share technology, capability and innovation between our divisions. As a result, breakout developments and new strategies can quickly be distributed and repurposed for local settings. By taking early positions we not only look to broaden our customer base and create new revenue streams but reinforce and future-proof our core business.

**Links to principal risks:**

Growing today's businesses



# Grow

## our gold medal businesses in core markets

Our core markets remain a crucial pillar of our strategy. We will retain our challenger mindset and continue to invest in our brand and product propositions to extend our leadership position and grow our recreational customer base efficiently, leveraging local scale.





Strategic report

# 4.2m

customers in our core markets

## Building on our winning strategy

1. Our focus on recreational customer growth will continue across our core markets as we remain focused on setting the standard for safer gambling initiatives. With the launch of our Play Well safer gambling strategy, which further strengthens the existing Flutter approach to safer gambling, we will extend our leadership in this important area further in the coming years.

2. Our scale will position the Group well to invest in extending our brand and product leadership to deliver best-in-class experiences to our customers. With previous market leading product innovations such as our Sportsbet "Same Game Multis" and daily prize mechanics like the Sky Vegas "Prize Machine" we will continue to invest to deliver the next product advantage.

3. As we further integrate our brands in the UK and Ireland, we will leverage the local and global scale we enjoy to unlock further synergistic benefits with the sharing of innovation and capabilities.

Read more on page 18

# 29%

2021 UK online market share

# 50%

2021 Australian online market share



21



**Growing today's businesses** continued



# Invest
# to win in the US

Since the repeal of PASPA in 2018, FanDuel has consistently been the #1 brand in the market. As more states open up, we are ready to move quickly to cement our leadership in this important market.







# Extending our leadership position

1. As the US market evolves, we will continue to win as each new state opens up, solidifying our position as the #1 sportsbook. We will leverage the global scale, capabilities and insight of the Flutter Group to be first to market, build positions of scale in all states and have the leading product in the market.

2. We will leverage the Flutter portfolio of assets and expertise to improve our gaming proposition and drive increased personalisation across our iGaming content. Leveraging our global assets, we will deliver a podium position in gaming in the medium term.

3. FanDuel Group is the largest online sports and gaming operator in the US. We will leverage this scale advantage to drive the flywheel and invest further in our market leading products, efficient customer acquisition and the FanDuel brand, to drive further revenue growth and operating leverage. This is expected to result in a positive EBITDA within the US division by 2023, provided there are no significant variances versus out expectations for state regulation.

⊟ Read more on **page 18**



**US revenue ($bn)**

**2 year CAGR: 97%**

| 2019 | 2020 | 2021 |
|------|------|------|
| 0.5  | 0.9  | 1.9  |

# 9

gold medal positions







**Growing today's businesses** continued

# Build

## on our network and invest for leadership positions across international markets

As a global group our strength lies in combining global scale and local knowledge. Using these advantages we will extend our leadership position internationally through building and buying podium positions in regulated markets to maximise the network benefits of our poker and exchange products.





Strategic report

## Building the framework for future growth

1. Following the merger with TSG we have been revitalising the PokerStars business through investment in product, brand and technology. We will continue to deploy resource and capital to generate long-term value.

2. Leveraging Group capabilities in both cross-sell and direct customer acquisition we will build the number one online casino business in the world.

3. Adopting a multi-brand approach we will build a lead in sports globally, leveraging the globally renowned Flutter pricing and risk management technology and global betting platform to create superior sportsbook experiences for customers around the world.

4. We will also continue to focus on acquiring podium positions such as Adjarabet and Junglee in attractive, fast-growing markets where organic growth is slower or more difficult.

Read more on **page 18**

# 19%
**growth in customer base since 2019**

# 56%
**of gaming revenue from casino products**



**Create the future**



# Future
## spaces and new customers

Our scale is global but we think and act like a challenger. This means always exploring ways to broaden our customer base, push the boundaries of what is possible and lay the foundations for future growth.





Strategic report

# Taking early positions and driving innovation

The digital entertainment space is defined by its fast pace of change. We invest significantly in understanding our global customer base, particularly how they engage with other aspects of the wider entertainment ecosystem creating a range of opportunities for us to expand into adjacent spaces and connect with new customer segments.

Using this customer insight we will continue to pursue opportunities in our core and growth markets to optimise our customer experiences and to create innovative new ways of enhancing the betting and gaming experiences our customers already love. For example, our PokerStars virtual reality ("VR") product offers players a free to play ("F2P"), immersive and social gaming experience. Since its launch, it has become one of the top five experiences in the Oculus store in terms of time spent in-game with a 4/5 star average rating and the best iGaming experience available in VR. It was the first F2P app to exceed $3m in revenue in 2020. 2021 growth in daily players and revenues accelerated by more than 4 times, and 2022 is off to a strong start too.

 Read more on **page 18**

# 4x

growth in daily average users of iGaming experience



---

Jul 4 at 12.57 AM

★★★★★

**Just wow**

I can't tell you how happy I am with this game. I'm so happy I have put it on both my vr headsets. The game is great and the community is awesome! The developers care more about the community and the growth of the game than the money. Everyone is so helpful. Love the time I spend playing this game and the people I play with. Thanks and keep up the good work!

---

May 24 at 5.04 AM

★★★★★

**Amazing game**

It's like being at a real table. Amazing graphics and realistic play. You can customise your character and socialize (or not) while you play. Tons of cash tables, Sit & Go's and tournaments. They knocked it outta the park with this game. Others can't compare. Well done.

Key performance indicators

# Measuring our progress

Tracking our key performance indicators (KPIs) helps us make better decisions, set the right goals and measure our progress in achieving our strategic ambitions.

## Financial indicators

### Reported revenue (£m)

+37%



| | |
|---|---|
| 2021 | 6,036 |
| 2020 | 4,414 |

**Definition:**
Net revenue refers to the total amount staked or wagered by customers after deducting amounts paid out to customers, free bets and promotional credits, and VAT.

**Why we measure it:**
This measures our ability to effectively and sustainably build brand equity and grow market share in key markets across our product and geographic portfolio.

**Performance:**
Reported revenue increased 37% reflecting a full 12 months contribution from TSG and continued strong AMP momentum in the US and Australia.

Pro forma revenue increased 17% driven by pro forma AMP growth of 23% from expansion of our recreational base in the UK, Ireland and Australia, along with regulation of additional US states

### Pro forma revenue (£m)

+17%



| | |
|---|---|
| 2021 | 6,036 |
| 2020 | 5,264 |

### Reported EBITDA (£m)

–6%



| | |
|---|---|
| 2021 | 723 |
| 2020 | 772 |

**Definition:**
Reported EBITDA refers to total earnings before interest, tax, depreciation and amortisation generated from our operations. Adjusted EBITDA is EBITDA before deducting Separately Disclosed Items ("SDIs").

**Why we measure it:**
This measures the profitability of our business driven by our investment choices and our ability to effectively manage costs and leverage scale.

**Performance:**
Reported EBITDA decreased 6% with investment led US losses increasing £81m to £243m and once-off costs associated with the Kentucky settlement offsetting strong UK&I and Australia growth.

Pro forma EBITDA decreased 18% with investment led US losses increasing £81m to £243m. International and the UK&I had more challenging comparatives due to prior year Covid and sports results benefits, combined with regulatory headwinds. Australia had another excellent year.

### Pro forma adjusted EBITDA (£m)

–18%



| | |
|---|---|
| 2021 | 1,001 |
| 2020 | 1,231 |



Strategic report

### Adjusted free cash flow (£m)

# £625m



| | |
|---|---|
| 2021 | 625 |
| 2020 | 1,151 |

**Definition:**
Adjusted free cash flow ("FCF") refers to net cash flows from operating activities of the Group after capital expenditure, lease liability payments and working capital movements and before deduction of the cash element of separately disclosed items ("SDIs").

**Why we measure it:**
This measures our ability to generate cash, which we can then use to fund future investment in the business, both organic and acquisitive, and to fund potential dividends to our shareholders.

**Performance:**
The decline in Adjusted FCF reflects lower Adjusted EBITDA in 2021, ii) a more favourable working capital movement in the prior year due to significant growth in the business, and iii) increased Capex primarily to fund expansion into more US states.

### Leverage ratio (net debt/adjusted EBITDA)

# 2.6x



| | |
|---|---|
| 2021 | 2.6 |
| 2020 | 2.3 |

**Definition:**
Leverage ratio is calculated as net debt divided by trailing 12-month pro forma adjusted EBITDA. Net debt comprises the principal outstanding balance of borrowings, accrued interest on those borrowings and derivatives held for hedging debt instruments less cash and cash equivalents.

**Why we measure it:**
The Board has set a medium-term leverage ratio target of 1–2 times which we believe is appropriate for a group operating in our sector.

**Performance:**
The leverage ratio increased to 2.6x as strong Adjusted FCF generation of £625m was offset by non-operating cash flows including the Kentucky settlement and share purchases. Adjusted EBITDA was lower in 2021 which also drove an increase in the ratio.

### Total shareholder return (%)

# (23)%



| | |
|---|---|
| 2021 | (23) |
| 2020 | 67 |

**Definition:**
Total shareholder return ("TSR") refers to the total return accruing to shareholders during the year. This will reflect the total share price return as well as any cash returns, including, for example, ordinary dividends, special dividends and share buy-back programmes.

**Why we measure it:**
This measures the effectiveness with which Flutter achieves long-term value for our shareholders in line with Group strategy. Relative TSR is also used as the sole performance measure for the Executive Directors' Long Term Incentive Plan.

**Performance:**
TSR declined in 2021 following a strong performance in 2020. Gaming stocks were weaker in Q4 following a re-rating of our US peers. This despite FanDuel's continued strong momentum and high market share. Five year TSR is 6.2%.

**Key performance indicators** continued

# Measuring our progress continued

## Non-financial indicators

### Average monthly players (m)
# +23%



| 2021 | 7.6 |
| 2020 | 6.2 |

**Definition:**
Monthly players are the total number of players who have placed and/or wagered a stake and/or contributed to rake or tournament fees during the month. Average Monthly Players ("AMPs") are the average of the monthly players over the reporting period.

**Why we measure it:**
This measures changes in the size of our customer database which is a key driver of long-term growth, particularly in markets which remain in investment mode.

**Performance:**
AMPs increased 23% in 2021 reflecting continued expansion of our recreational customer base in the UK, Ireland and Australia, along with further expansion of our sports and gaming business in the US.

### Colleagues engagement (%)
# 80%



| 2021 | 80.0 |
| 2020 | 81.0 |

**Definition:**
Colleague engagement is measured as a weighted average of the various regular employee engagement survey scores across the Group which include metrics for employee satisfaction and well-being.

**Why we measure it:**
Colleague engagement is a key enabler of our strategy and performance and is at the centre of everything we do.

**Performance:**
Employee engagement remains high at 8.0 in 2021 as we continue to prioritise development of our people. See more in our People section from page 52 and the Colleagues section of our Positive Impact Plan on page 45.

### Technology availability (%)
# 99.30%



| 2021 | 99.30 |
| 2020 | 99.73 |

**Definition:**
Technology availability is the proportion of time during the year when our technology platforms were fully available to our customers.

**Why we measure it:**
This measures the reliability, scalability and flexibility of our technology platforms which are key drivers of our ability to continuously innovate and provide best-in-class products to our millions of customers.

**Performance:**
Technology availability remains very high at 99.3% despite being impacted by outages with third party providers in the current year. We migrated our US sports business to a proprietary platform in 2021.

Strategic report

Play Well global goal (%)

# 34.7%*



| | |
|---|---|
| 2021 | 34.7 |
| 2020 | n/a |

## Definition:
Global Play Well goal measured as the % of active online customers who use a safer gambling (Play Well) tools in the specified reporting period.

## Why we measure it:
We believe there are universal principles we can employ, leveraging our global scale and expertise to provide players with tools, information and support to enable an entertaining, safe experience. The Play Well goal measures our progress on this.

## Performance:
We have set ourselves an ambitious Group target to have 75% of our customers using safer gambling tools by 2030. In 2021 this stood at 34.7%.

\* 2021 measure excludes Junglee, Adjarabet and Tombola. We will continue to evolve our Play Well goal to incorporate acquired business as the strategy evolves.

Flutter's disclosure in accordance with Art. 8 Taxonomy Regulation and Art. 10 (2) of the Art. 8 Delegated Act, "Disclosures Delegated Act" is contained on page 265

**Business model**

# How we generate revenue

| Sports betting | Gaming | Peer to Peer |
|---|---|---|
| Traditional bookmaking where we make a margin from bets placed by customers on the outcome of events | Games of chance such as online casino, bingo and machine gaming terminals. The games involve customers betting "against the house" and we generate a margin | We make a commission from products where customers play/bet against each other. This includes Poker, Betfair Exchange, DFS and TVG pooled wagering |
| Higher volatility | Medium volatility | Lower volatility |



**Free to play**
Customers enter competitions at no cost to win prizes, e.g. Sky Super 6.
Some of these customers play real money products over time.

Gross gaming revenue

Less: **Customer promotions**

**Net revenue**

Less: **Cost of sales**

Gross profit

Less: **Marketing costs**

Contribution

Less: **Other operating costs**

EBITDA

# How we enable value creation



Flutter operates a divisional management and operating structure across its markets. Each division has a talented and empowered management team, which is responsible for maintaining the momentum and growth in its respective markets.

## The value we create

**Taxes**

# £1.6bn[1]

1  Figure includes betting and gaming taxes, VAT, Corporation Tax and other taxes.

**Total shareholder return**

# 6.2%[1]

1  Compounded annual return since 31 December 2016.

**Sport and community contributions**

# £3.7m

**Sports levies**

# £374m

**Powered by key enablers**

# Our Positive Impact Plan



As a responsible operator, putting sustainability at the heart of everything we do and setting the agenda for positive change in our industry is key to our long-term success. Our new Positive Impact Plan introduced in 2021, is the next step in our ongoing commitment to making a positive difference across to our customers, our colleagues and our communities, building on the strong progress our individual brands have made over the years. This plan sets out a blueprint for bringing together our learnings from individual brands and setting out short, medium and long-term targets for positive impact.

Read more on **page 45**



# Working with communities to **do more**

The combination of our global scale and our local experience in the communities in which we operate is key to the success of our ability to drive positive change in the areas in which we live and work. Our Do More strategy is about building on the strong partnerships we have already made around the world and doing more than ever before to better support and engage with our communities.

≡ Read more on our Do More strategy
on **page 56**

# Empowering colleagues to **work better**

Our teams challenge norms, explore ideas, champion our customers and will ultimately set the positive agenda for the industry. At Flutter a key enabler of our strategic priorities is our people and our Work Better strategy is about making sure that we develop policies and create work spaces that empower our people to perform at their best. Our success depends on the colleagues who work in Flutter having a safe space for expression and creativity.

≡ Read more on our Work Better strategy
on **page 52**

# Helping customers **play well**

We have always led the industry when it comes to safer gambling. We were the first operator to introduce proprietary technology in 2015 to monitor customer behaviour and proactively intervene to prevent harm in our Paddy Power and Betfair brands. We have introduced a targeted Play Well strategy which is about (i) using the insights learned from the progress we have already made to define key universal principles for all of our divisions to tailor to their specific market and customer needs, and (ii) leveraging our global scale, capability and expertise to support them.

≡ Read more on our Play Well strategy
on **page 48**

**Powered by key enablers** continued

# Our four key enablers power our business and help us to deliver on our strategy.



## Scale



We have ambitious growth plans and goals for the future and the global and local scale to achieve them.

Our diversified portfolio of brands and products provide the local presence required to create personalised and tailored products for different markets. Combined with access to our global capabilities such as product and technology innovation, customer insights and data and global poker and exchange liquidity position, this dual-scale approach positions us to win in local markets. This scale gets our "flywheel" going which enables organic growth and secures and defends our gold medal positions.



Enhanced customer proposition

Higher revenue growth

Value creation compounds as we continue to invest for growth

Increased scale and flexibility to invest

Greater operating leverage



## Speed



The volatility and pace of our market demands agility. That's why we always think like a challenger, even when we are a leader.

As the number one global operator in the gaming space, we are confident but not complacent. The spaces we operate in are volatile and defined by technological and social change. We aim to be at the forefront of capitalising on opportunities arising from changes in consumer behaviour, developments in technology or emerging adjacencies. We will purposely prioritise speed over efficiency to further our strategy and double down on new opportunities to future-proof our core business and broaden our customer base.

# 34%

of US population now have access to FanDuel sportsbook



# Product and technology



We have a long heritage in providing our customers with innovative products underpinned by reliable, collaborative technology platforms.

Our global workforce of over 4,500 technologists is focussed on building the proprietary technology platforms which underpin our best in class customer propositions. With over 700 pricing and risk management experts around the globe we are continually evolving our proprietary sports betting product advantage and rolling out market leading customer favourites such as Same Game Parlays in the US, Betbuilder in the UK & Ireland and Bet with Mates in Australia. Our three in-house gaming studios are continuously developing cutting edge content for our customers with further titles added in 2021. Similar to our sports betting business, we are always looking at innovative new ways to engage our gaming customers with the launch of new products such as Paddy's Wonder Wheel and Betfair Prize Pinball in the UK & Ireland.



# Customer insights and data



Our global platform and data capabilities empower our local brands to meet players where they are.

We had 18m customers interact with our portfolio of sports betting and gaming brands in 2021. Maintaining a positive relationship with each of our customers is crucial to our success. Our diversified global portfolio provides access to unparalleled insight on customer behaviour and trends which we use to better serve and support our broad player base more effectively. We leverage customer insight to inform decision making throughout all areas of the organisation including implementing best-in-class safer gambling initiatives, product and technology development, how we deploy our marketing and promotional strategies and even how we structure our teams and define our strategic priorities to best serve our customers.

## 4,500
technologists
in our global workforce

## 700
pricing and risk
management experts

## 18m
customers interact
with our sports betting
and gaming brands

Stakeholder engagement

# Engaging with our stakeholders

**The Directors continue to act in a way that promotes the success of the Company for the benefit of shareholders and all of our many stakeholders.**

While the 2018 UK Code makes specific reference to section 172 of the United Kingdom's Companies Act 2006, Flutter is incorporated in Ireland and subject to the requirements of the Companies Act 2014 of Ireland rather than the 2006 UK legislation. Nonetheless, feedback from all engagement activities is regularly considered by the Board as part of its decision-making processes as detailed in this section of the report. Effective stakeholder engagement helps us better understand the impact of our decisions on all our stakeholders as well as their needs and concerns.



**Links to strategy:**

 Maximise profitable growth in core markets

 Maintain and grow US leadership position

 Attain podium positions in international markets

Grow business in rest of world

 **Shareholders and investors**

Strategic report

### How we engaged

- The AGM was held on 29 April 2021. Due to restrictions on travel and gatherings of people in place in Ireland at the time of the meeting, shareholders participated in the meeting virtually and submitted questions to the Chair.
- The Chair held meetings with our largest investors on corporate governance topics, including talent retention and succession planning at both Board and Executive Committee levels and other senior roles, risk management and sustainability. There was a big focus on safer gambling, integration and transformation post-merger with TSG and the performance and growth of Flutter as a whole.
- Regular engagement with our shareholders happens through a comprehensive programme defined by the Investor Relations team. This includes continuous engagement with institutional shareholders and sell-side analysts during the year through meetings, conference calls and video calls.
- All Directors are available to meet with institutional investors on request. The Chair of the Remuneration Committee, together with the Board Chair and the Company Secretary, engaged with investors on remuneration matters.
- The Executive Directors presented and met with our largest shareholders and analysts following release of the full year and half year results as well as quarterly trading updates during the year.
- A virtual investor event in September 2021 on the Sportsbet brand in Australia set out a comprehensive overview of areas of the business for the benefit of shareholders and sell-side analysts.
- The Board received regular analysts' commentary and reports and received presentations from corporate brokers.
- The Company Secretary's office communicated directly with private individual shareholders.

### Outcomes

- Investors welcomed our comprehensive communications programme to keep them updated on our financial position, performance, business perspectives and risk.
- Shareholders and sell-side analysts also welcomed the in-depth analysis of the US and Australian businesses provided as part of the Interim Results issued in August 2021 and the Sportsbet investor day held in September 2021.
- The feedback we got on safer gambling initiatives and commitments and wider ESG matters helped inform the Group's Play Well safer gambling strategy and Positive Impact Plan.
- Our engagement with shareholders provided an understanding of the rationale for a negative vote against the resolution to allot shares at our 2021 AGM.

### Links to strategy

  





We are committed to maintaining constructive dialogue with shareholders and ensuring that we have a deep understanding of their views.

**Stakeholder engagement** continued

## Colleagues



**How we engaged**

- We are passionate about keeping our colleagues informed and engaged about the Company's performance and progress and communicating clearly and transparently. This year we brought together colleagues from across the globe as we ran a number of live streamed events with our Executive team. We also held regular Town Halls across the Group throughout the year, both at a Group and divisional level where colleagues were able to speak directly to Board members and ask questions. Our individual teams also have their own local communications events and activities. As well as updates about strategy, trading and performance, we take time to focus on important topics such as wellbeing, diversity and inclusion.

- We invest in new ways to support two-way communication across the Group including internal social networking sites, email and divisional intranet sites. Choice around the way employees receive key messages is important and also helps to overcome the challenge of a global workforce. We encourage collaboration across the Group and use platforms that foster our community culture to share knowledge and experience.

- We want all colleagues to feel they have a voice and have a regular opportunity to share their opinions, so throughout the year we gather feedback from across the Group through staff surveys covering a range of topics.

- We held four Employee Voice Forums during the year, supported by three designated Non-Executive Directors.

**Outcomes**

- We increased various health and safety measures to protect our colleagues from the continued pandemic, including conducting risk assessments and dedicating significant time and resources to ensure our people were equipped to work from home in the most effective and seamless way possible.

- We introduced wellbeing initiatives to support colleagues working from home including virtual fitness classes, activity challenges and engaging external speakers for motivation and inspiration. We encouraged time away from screens with Zoom-free afternoons and checking in with each other.

- We created a Gift of Shares equivalent to £1,000 for all employees across the Group as a one-off thank you for their continued efforts during the pandemic in 2020. Employees were able to cash in their shares on our vesting date in November 2021 or retain them to become a shareholder in Flutter.

**Links to strategy**



> "
>
> We're committed to growing talent from within the Flutter Group and ensuring that we support our people to be their very best.

Strategic report

##  Customers

### How we engaged
- Customer safety is at the heart of our business and our customer engagement. Through regular communication and advertising, we engage with our customers on various topics, notably safer gambling, where we continually educate our customers about the tools we have in place to keep them protected.
- Our numerous brands engage with our customers on a daily basis. This is through our betting and gaming platforms online, our marketing communications, our retail stores and our customer service channels.
- We always try to understand our customer needs. We engage with our customers through feedback channels, engage in research and obtain insights into our customers' thoughts and experiences.

### Outcomes
- We continue to lead on customer safety across the business. For example, in the UK & Ireland we recently announced measures to enhance the protection of under-25s as part of our risk based "Triple Step" approach to affordability.
- The way we communicate with customers continues to evolve. We always look to keep these communications innovative, engaging and informative irrespective of the service channel. This is done in a way that is unique to the brand that the customer uses.
- Understanding our customer needs helps us develop experiences that are intuitive and easy to use. For our UK brands this has meant improving the betting experience of our customers through product enhancements, such as: a) revamped InPlay and Bet Builder products, b) making our in-house studio content available across all gaming brands.
- We conducted an industry-first advertising campaign in Australia to encourage customers to set deposit limits before they bet.
- We embarked on a more progressive push into real-time support and are moving away from legacy email predominance. We have also cut the long wait times and backlogs that occurred during Covid-19.

### Links to strategy
   

> " We are able to use the strength and reach of our leading brands to make a difference to the causes we support.





**Links to strategy:**

 Maximise profitable growth in core markets

 Maintain and grow US leadership position

Attain podium positions in international markets

Grow business in rest of world

**Stakeholder engagement** continued

## Communities

**How we engaged**
- We engage with communities by supporting a variety of charitable initiatives across our global divisions on an ongoing basis.
- We support projects that use sport and games to make a difference in communities.
- We are able to use the strength and reach of our leading brands to make a difference to the causes we support.
- We had regular dialogue with sporting bodies, where sporting events were held behind closed doors.

**Outcomes**
- We contributed £100m across media rights, levies, marketing and sponsorship to support horse racing in the UK & Ireland.
- We supported various community causes throughout 2021 and continued to offer assistance where needed for Covid-19. This included a £100,000 contribution to our charity partner Americares to help with medical supplies in India and a donation of oxygen tanks and PPE to a local hospital there. We also provided extra support to our many employees based in India.
- We contributed to local communities and global organisations through charitable donations. These included the work by our local charity committees which, through staff volunteers, donated over £200,000 to smaller charities around our office locations.
- Using the monies we received through the business rates relief system for our shops in England during 2020/21, we set up the £4.79m "Clubs in Crisis" fund to support local clubs delivering positive social outcomes. Hundreds of grassroots sports clubs across the UK received grants via our donation to Made by Sport.
- We donated £150,000 to our charity partner Right To Play and in addition once again sponsored its annual Sports Quiz which raised over £500,000.
- We launched a new partnership with the charity Missing People, donating £150,000 and using the power of our brands to raise awareness.
- £750,000 was contributed by FanDuel to United Negro College Fund in partnership with Washington Football Team.
- Through Sportsbet's partnership with the NRL, $265,000 AUD was donated to Men of League Foundation's Mose Masoe Appeal.

**Links to strategy**



## Suppliers

**How we engaged**
- We worked with our suppliers to enhance our risk framework to help us manage suppliers more holistically across the entire lifecycle of their relationship with us.
- We trialled some new tools to help manage the end-to-end supplier lifecycle from onboarding to termination. This includes structured business and quality reviews and managed terminations.

**Outcomes**
- Developed and implemented a set of new global minimum standards to standardise our approach to supplier performance and managing supplier risk exposure across the goods and services we procure.
- The rollout of these new tools strengthens the controls around spend governance in areas such as contract pre-approval and spend authorisation.
- A new toolkit to enhance and standardise business and quality reviews and supplier exits.
- We created risk heatmaps for key suppliers for our business divisions, which will continue into 2022.
- We implemented the new global minimum standards for anti-bribery and corruption across more areas of the business.

**Links to strategy**

 



Links to strategy:

 Maximise profitable growth in core markets

 Maintain and grow US leadership position

 Attain podium positions in international markets

 Grow business in rest of world

Strategic report



## 🏛 Government and regulators

**How we engaged**

- The UK Government launched its Gambling Act Review in December 2020 with the publication of its call for evidence, which we welcomed publicly. During the year, we engaged with a wide range of MPs, peers and other interested stakeholders, to discuss the Review and our own proactive policy initiatives.

- Sportsbet has a leading role in engaging with policymakers and the community sector, including supporting the development of measures to prohibit the use of credit cards in online wagering.

- FanDuel worked effectively with state regulators to secure online gaming licences and gain approval to launch our products sooner or at the same time as our competitors.

- Our International division has been heavily involved in ongoing regulatory developments across multiple markets across the globe in 2021 both directly and through industry associations such as the European Gaming and Betting Association ("EGBA").

**Outcomes**

- In March, we provided the UK Government with extensive evidence within our own submission, while also contributing to the industry submission drafted by the Betting & Gaming Council ("BGC").

- In August, Sportsbet and other members of Responsible Wagering Australia announced plans for a technical solution to deliver the credit card reform and would seek the assistance of banks and payment processing providers to support the initiative.

- In 2021, FanDuel secured licences in Arizona, Connecticut, Louisiana, Michigan, Virginia and New York. In Virginia, FanDuel was the first operator approved to launch, while launching at the same time as with other operators in Connecticut and Virginia.

- In the International division we have seen positive regulatory developments in a number of markets, including Canada and Brazil. Engagement with the Canadian provinces, key politicians and government officials has led to federal legislation being passed in June 2021 which provided the legal basis for all Canadian provinces to regulate single event sports betting.

- We continue to evaluate a number of upcoming licensing opportunities and hopes to enter the Netherlands market with a licence in the course of 2022.

**Links to strategy**

  

❝

Our International division has been heavily involved in ongoing regulatory developments across multiple markets across the globe in 2021.

Sustainability

# Our approach
# to sustainability

" We are committed to contributing positively to our customers, colleagues and communities. Our Positive Impact Plan builds on the strong foundations laid by each of our divisions, using our global scale and placing us at the heart of meaningful change.

**Peter Jackson**
Chief Executive Officer



We're on a mission to lead betting and gaming into the future. Being a responsible leader means making sure we always do the right thing for our customers, colleagues and communities and the environment too. For years, our individual divisions and brands have been doing great work in these areas. We are now embarking on an even more ambitious journey, with big goals made possible by the global scale of Flutter.

This year we are launching Flutter's first sustainability strategy, our Positive Impact Plan. It's the start of an exciting new chapter in the Group's history, built on the passionate and committed work of our teams across all of our divisions. The new strategy brings these achievements together and gives our diverse portfolio of brands better access to the insight, skills and capabilities of the wider Group to support local initiatives and create the biggest impact.

Our Positive Impact Plan aligns us with leading global practices and standards and gives us a launchpad for our Group-wide safer gambling and diversity and inclusion strategies. It's a global approach to sustainability that supports our corporate strategy and employee value proposition while empowering our divisions to innovate and respond effectively to their local contexts.

We know we've got more to do. Our approach will continue to evolve in response to changes in our markets, technological developments and continued collaboration with our stakeholders. But one thing remains clear: Flutter is setting the agenda for positive change.



# Our **Positive Impact** Plan

## Framework and 2030 goals

We've worked hard to ensure we make a positive impact on our customers, colleagues, and the communities in which we operate. Our Positive Impact Plan brings all our hard work together under a set of ambitious goals that challenge us to always do better. With our global scale, we can make a big difference to local progress in these areas, and we will continue to adapt our approach as the needs of our stakeholders evolve.

### Strategic focus

**Customers - Play Well**

To have 75% of our active online customers using one or more of our Play Well tools by 31 December 2030, with over 50% using one or more tools by end 2026.

Read more on **page 48**

### Key ESG pillars

**Colleagues - Work Better**

To create and build teams that represent the locations in which we live and work, through a comprehensive DE&I strategy, by 31 December 2030.

**Communities - Do More**

To improve the lives of 10 million people using the power of sport and play, the skills of our colleagues and the reach of our brands by 31 December 2030.

Read more on **page 52**

### Essential foundations

**Environment – Reduce Our Environmental and Climate Impact**

| Business ethics and integrity | Anti-corruption and AML | Data protection and management | Economic contribution (tax, levies) |

Read more on **page 60**

### Capabilities

**Measurement, reporting and performance management enabled by strengthened data**
Drive continuous improvement of ESG performance

**Governance and organisation**
Ensure clear accountability and effective risk management

**Sustainability** continued

# Our Positive Impact Plan
## Progress and shorter term goals

Our new central Sustainability team is leading our first global sustainability strategy.

| Helping customers play well | Empowering colleagues to work better | Working with communities to do more |
|---|---|---|

**Progress in 2021**

We established a global

### safer gambling

working group and developed our global Play Well strategy to leverage our global scale and support local safer gambling strategies

We invested

### £45 million

in developing and promoting safer gambling across our business operations

**Progress in 2021**

We developed and

### launched

our first global Diversity, Equity & Inclusion strategy

In UK&I and Group functions we introduced a development fund of

### £1,000 per

employee to support continued career development

**Progress in 2021**

We invested over

### £3.7 million

in community projects and schemes

We delivered more than

### 1,600 grants

to support thousands of grassroots clubs, reaching over 250,000 young people, through our partnership with Made by Sport

**Goals**

**2022 divisional goals;**

- UK&I - targeting a 2% reduction in the proportion of revenue from customers who self-exclude
- Sportsbet- increase % of net revenue from customers with deposit limits in place to 15%
- International - increase % customers applying a deposit limit, cooling off period or stake limit to 36.5%
- FanDuel – all employees to complete training in March, all new customers to receive responsible gambling messaging and signposts to tools within 30 days of sign-up

**Goals**

- Measure difference in sentiment across different demographics by the end of 2022
- All divisions to report on pay performance, progression and retention across different demographics by the end of 2023
- Achieve 40% of women in our top leadership roles by the end of 2026

**Goals**

- All employees globally to have the option to do two days' volunteering per year

| Environment: Reducing our environmental impact |
|---|

- Set science-based carbon targets by the end of 2022 to establish our roadmap to net zero emissions
- Develop and roll out a global e-waste policy across our divisions and suppliers that follows the waste hierarchy by the end of 2023
- Move all our energy tariffs to renewable energy tariffs by the end of 2030

Strategic report

# Creating our Positive Impact Plan by defining what matters

Our global portfolio of brands takes us directly into communities and homes all over the world, and we take that responsibility very seriously. We want to always do the right thing for all of our stakeholders. That starts by evaluating which issues matter most to our business and stakeholders, and using that insight to clearly set our priorities.

## Developing our materiality matrix

Working with leading sustainability consultants Accenture, we went through four steps to identify the most important environmental, social and governance ("ESG") issues for Flutter. From this we developed clear, goal-based strategies for addressing them.

The materiality matrix was stress-tested against external sources and reporting standards to ensure its accuracy and relevance, and that it comprehensively reflects every aspect of our business. Our materiality matrix gives us a clear view of the things we need to be aware of as well as the potential opportunities that are open to us. We will regularly revisit this matrix and any changes will be communicated as part of our reporting processes.

We have developed high-level action plans from the 15 material issues, supported by roadmaps. We will report our progress against these action plans in next year's Annual Report.

**1.** We created a comprehensive list of the 31 material issues that impact our global business – using peer analysis, relevant standards (Global Reporting Initiative ("GRI"), Sustainability Accounting Standards Board ("SASB") and the World Economic Forum International Business Council ("IBC")), and market and ESG rating agency metrics.

**2.** Using established reporting frameworks including SASB's primary and additional issue classifications, we produced a materiality heatmap, shortlisting 15 issues.

**3.** Next, we interviewed key stakeholders in our Executive team and divisions to help us prioritise these 15 issues.

**4.** Finally, we combined our interview insights with publicly available information and internal insights to produce our materiality matrix.



### Materiality analysis of top 15 issues

We used our materiality analysis to decide on the key pillars of our strategy (customers, colleagues and community), and identify the essential foundations which include environmental.

**Strategic pillars**
- Customers
- Colleagues
- Communities
- Essential foundations
- Environmental

*Importance to stakeholders*

**Very high**
- Safer gambling
- Business ethics & integrity
- Jobs & skills
- Diversity, equity & inclusion
- Data protection & management

**High**
- Climate change
- Energy use & carbon emissions
- Community investment
- Tax
- Responsible marketing & advertising
- Anti-money laundering

**Medium**
- Water extraction & use
- Waste
- Responsible sourcing
- Ethical technology

*Medium — High — Very high*

*Impact on the business*

Combined Score (Internal Survey Results, Quantitive Analysis and mapping to standards (GRI, SASB, IBC, Arabesque)).

**Sustainability** continued

# Helping customers
# play well

### Extending our leadership on safer gambling with the Play Well strategy

We know every customer is different. We want each one to have the best experience possible every time they play, and have tools and support to look after their financial and mental wellbeing too. They can count on us to always promote safe and enjoyable play, whether in our retail outlets or online.

We are in the entertainment business and creating experiences that create loyalty amongst our customers is what we love. But building sustainable relationships with customers demands more than providing entertainment. We need to always work hard to understand their needs, build trust and provide products that are customer centric. Our work on safer gambling is a huge part of this.

### Introducing Play Well

As a global operator, we work across 100 countries, with a customer base of 18 million. We know there is no "one-size-fits-all" solution to promoting safer gambling. But we believe there are universal principles we can use, leveraging our global scale and expertise to provide players with tools, information and support to enable an entertaining, safe experience.

This is what our Play Well strategy is all about. It's not solely focused on identifying and addressing risky behaviour and unsafe play, although of course this is massively important for us. It also guides us towards a better experience for every person that comes into contact with one of our brands, with the aim of preventing play becoming potentially harmful.

It is based on our industry leading levels of customer insight, and our continuing passion to do the right thing by our customers.

### A Play Well culture

Our brands work in a variety of local contexts, all with their own unique cultural norms, customer preferences and regulatory environments. Implementing Play Well effectively means using our global scale to support local progress and empower our teams to create strategies that meet players where they are. Play Well is a philosophy and a culture which puts our customers at its heart.

Learn more about how we engage with our customers on page 41.



## Play Well principles

### 1
### Lead progress
We're investing in research, innovation and collaboration.

We listen to customers, colleagues, industry experts and critics to develop new ideas. We want to define what a positive play experience looks like and lead the way in providing it.

### 2
### Promote positive play
We promote sustainable entertainment.

We develop platforms and products designed to support a safe and trusted customer experience. We educate, empower and assist players to play positively, delivering a world-class customer experience, wherever you play.

### 3
### Effective interaction
We have better conversations with our customers.

We combine technology and data with a personalised approach to effectively interact where we see signs of potential harm. We help customers pause, reflect and make positive choices.

### 4
### Support and protect
We want to support our customers in every possible way we can.

We recognise some people need targeted support or intervention to stop falling into negative play habits. We support customers through robust internal infrastructures, partnerships and funding new initiatives.

### Our focus for 2022

Over the last 12 months we have developed our Play Well strategy and during 2022 will be introducing a new global internal reporting structure which has been developed by a working group comprised of safer gambling experts from across our global business. This will make us more consistent at measuring and communicating progress on our safer gambling initiatives while recognising the different levels of regulatory maturity across our local markets. It will also enable us to develop increasingly sophisticated goals and metrics, rooted in robust data and insight, to ensure we continually drive progress in this critical area.

We'll use our global insight to support our brands and divisions in further developing and executing tailored local strategies and leading the conversation around safer gambling in their markets.

As we continue to grow our culture of safer gambling across the Group, we will also embed Play Well into our employer value proposition to encourage even more engagement, insights and ideas from every part of our organisation.

### Measuring our progress

We've also established our first global Play Well goal. We want to have 75% of active online customers using one or more of our Play Well tools by end 2030, with over 50% by end 2026.

That's not all, in 2022 we are introducing annual divisional Play Well metrics which will be directly linked to a percentage of variable remuneration for each of our divisions. These metrics have been developed to ensure that each division supports and promotes their local safer gambling strategies, taking into account individual markets and contexts, whilst being consistent with our Play Well principles and supporting our global Play Well goal.

### Australia

Sportsbet's safer gambling metric will be the percentage of net revenue that comes from customers with deposit limits in place, with a target of 15%

### International

Our International division will be measuring the percentage of customers that apply a deposit limit, game and stake limits and cool offs/time outs. We are targeting 36.5% of active customers using these tools in 2022.

### UK&I

Our UK&I brands will continue to use the transactional risk indicator ("TRI") that we introduced in 2021, which measures the proportion of net gambling revenue earned from customers who are at risk. We are targeting a 2% year on year reduction in this revenue for 2022, on a like for like basis.

### US

FanDuel will introduce a new responsible gaming measure for the first time in 2022, focusing on establishing appropriate mechanisms to promote and embed responsible gaming tools. The targets are as follows:

- All FanDuel employees will complete responsible gaming training during March 2022.

- All new FanDuel customers will receive responsible gaming messaging within 30 days of downloading the FanDuel app.

- All existing FanDuel customers between 21 and 25 years old will receive responsible gaming messaging through in-app notifications.

### 2023 and beyond

We will develop the metrics we use and the way we measure and report our progress. This will inform how the divisions, and Group develop our reward and bonus offerings in line with our strategic priorities. Linking our work and commitment to safer gambling to the longer-term commercial sustainability of the Group is a key objective. This will help us develop better products, tools and risk analysis models in order to continue offering our customers industry leading support and protections.

Play Well builds on the substantial work we have done so far in safer gambling, and our strategy will evolve as we identify gaps and respond to changes in regulation and customer preferences. This is a collective journey, powered by our colleagues and in collaboration with our stakeholders.

# Sustainability continued



## The work we are already doing

We have a strong track record of developing industry leading safer gambling initiatives across our key markets.

During 2021 we directly invested over £45m to support and promote safe play across our global operations. We increased our dedicated safer gambling resource across the Group, invested in technology, developed marketing campaigns to raise awareness and educate, and made significant contributions to research, education and treatment across our markets.

All over the Group, Play Well is building on strong foundations and continued innovation across our divisions.

> **"**
>
> ### It's the collective ambition of our members to be top of the class in terms of industry responsibility, and Flutter's membership strengthens our commitment and position.
>
> Maarten Haijer, Secretary General at the EGBA

## 1

## Lead progress
### We are leading progress throughout our industry

As well as the measures we champion across the Flutter Group, we also work with the rest of our industry to create a stronger culture around safer gambling.

We are active members of the Betting and Gaming Council ("BGC") in the UK, the American Gaming Association and Responsible Wagering Australia ("RWA"). In 2021, we cemented our positive relationship with the European Gaming and Betting Association ("EGBA") by formally joining as a board member.

We welcomed the UK Government's decision to launch a review of the UK Gambling Act. During 2021 we provided detailed evidence and input to questions raised by the Government, both directly and in collaboration with the BGC, committing significant resource to support this important consultation process. Flutter also worked closely with the BGC and other operators on other key initiatives, such as developing a more consistent approach to checks on customer spend.

In Ireland, we took the initiative to voluntarily implement a ban on credit cards and whistle to whistle TV advertising.

In Australia, we proactively lobbied for a ban on credit cards and are involved in the development and design of new national consumer protection measures including updated activity statements and a national self-exclusion register.

In addition, we sponsored and attended the renowned 2021 Discovery Conference, run by the Canadian Responsible Gambling Council, which brings global leaders together to share knowledge and best practice to drive positive change on responsible gambling.

## 2

### Promote positive play
### We are promoting positive play with market leading tools, communication and features

Sportsbet extended its leadership position around safer gambling in the Australian market. In 2021, the brand invested $15m in developing and launching its new "Take a Sec" campaign which encourages customers to set deposit limits on their accounts, whether betting with Sportsbet or anyone else. Backed up by academic research from one of Australia's leading universities, the campaign led to an increase of 65% of customers setting their first deposit limit when compared to the six week pre-campaign average and customer interaction with the Sportsbet responsible gambling hub increased by 480%.

In the US, we have a number of initiatives to promote positive play. In March 2021, FanDuel became the first US Sports Operator to sign up to the American Gaming Association's responsible sports betting initiative, Have a Game Plan.® Bet Responsibly. FanDuel has made a multimillion dollar commitment of its media inventory to promote Have a Game Plan.

## 3

### Effective interaction
### We are innovating to effectively interact with our customers

In September 2021, FanDuel announced that acclaimed sports media personality and safer gambling advocate Craig Carton would be its first national responsible gaming ambassador. The host of the popular "Carton & Roberts" show on New York's WFAN 101.9 FM will help FanDuel strengthen its efforts around advocacy, prevention awareness and content development on the topic.

In addition, in the UK, we continued to develop our customer interaction programme and are seeing positive results. The impact of our programmes demonstrates that customers are regulating their play following our interactions with them, as 35% - 40% of these customers deposit less in the subsequent 90-day window following their interaction with our team. In addition, we are seeing positive trends in relation to our TRI, which is calculated by reference to the proportion of revenue from players who have self-excluded during a rolling 12-month period.



I want to use my experience and platform to shine a meaningful spotlight on the issue of problem gambling. FanDuel shared the same goals and was comfortable working transparently with me for the sole purpose of protecting people.

Craig Carton, radio host and national responsible gaming ambassador for FanDuel

## 4

### Support and protect
### We are supporting and protecting our customers

In UK&I, our new policy further strengths the tools and protections available to our younger customers. Based on our risk-based "Triple Step" approach to affordability, an automatic £500 per month net deposit limit for all customers under the age of 25 will be in place across all our UK&I brands by the end of H1 2022. We use real-time data to monitor player activity and behaviours to ensure that everyone has the tools to play well, and that those who may need additional support always have it.

Our policy is part of several important steps the industry has taken to better protect younger players in 2021. Other measures include avoiding the targeting of under 25s in paid for social media channels, using specific age markers on data models, developing bespoke thresholds based on age, and ensuring gambling ads appearing on search engines make it clear that they are for those aged 18 and over.

Enhanced protections for under 25s have also been introduced in Australia. We take care to decrease our marketing and communications for any customers with a heightened risk score.

In the US, FanDuel has an important new partnership with technology company Gamban to make gambling blocking software available free of charge to US customers. The innovative new measures allow self-excluding players to not only block FanDuel sites but all other real money gaming sites including online casinos, poker sites, social gaming and e-sports on up to 15 devices.

**Sustainability** continued

# Empowering colleagues to
# work better

## Promoting a dynamic and inclusive workplace

We work hard to make sure that each of our customers are having fun and are supported. It's the passion of our people that powers our brands to create these amazing experiences. Our teams deliver our strategy by challenging norms, exploring ideas, championing our customers and setting the pace in our industry. We know that when our colleagues feel included and represented at work, they will work better, with better outcomes for our business, our colleagues, and our Positive Impact Plan.

Our success and global scale are built on embracing diversity. Our brands bring together people and insights from all over the world and their hard work and creativity ensures millions of customers have exciting, innovative and safe betting and gaming experiences. Extending our leadership and gold medal market positions depends on our ability to create workplaces that engage and enable our people by always providing a safe space for expression and creativity.. We're rolling out Peakon globally and increasing its frequency, so we have a scalable way of providing colleagues with a safe space to feedback.

Throughout 2021 we have listened and learned from our people and taken important steps to achieve our strategic goals in this area. This means committing to bring long-lasting positive changes in our workplaces.





<div style="text-align: right">Strategic report</div>

### Introducing our DEI strategy

2021/22 saw us launch our global diversity, equity and inclusion ("DEI") strategy. It sets a clear direction and goals for the Group so we can measure our progress in embedding DEI into everything we do. It will help us adapt to local contexts while ensuring that the values of the Group are always met.

The strategy is made up of three distinct phases.

### Phase one: Create

The aim of the first phase is for each brand to understand its internal reality and identify its greatest opportunities and challenges. This began in 2021 and will continue across 2022 as we work towards our overarching goal of embedding DEI into our business.

Globally we've launched two tools to help us determine, measure and drive DEI locally:

#### Include by Peakon
Include gives us a full view of DEI metrics across every brand. It shows our local and global leadership teams how our colleagues are feeling and simplifies the process of getting their feedback.

By the end of 2022, all of our brands will be using Include to measure the impact of our DEI strategies.

#### Global Diversity, Equity and Inclusion Benchmarks ("GDEIB")
Created for us by the Global Inclusion Council, the new GDEIB tool codifies best practice and is an additional tool to help us determine and drive our strategy.



No two people share exactly the same experience in the workplace and the potential barriers they face look different depending on who they are. It's important when we design experiences at work that we don't create them under the assumption that we're all the same.

Greg McCaw, Group Director of Inclusion and Diversity

### Phase two: Embed

In 2022 - 2024, we'll transform our insight into strategies that bring about lasting change across our entire portfolio. Our focus is both behavioural change and structural inclusion, and we have set three primary target areas:

#### Setting the tone
Our training will equip our leaders and colleagues with the skills and knowledge to increase their awareness of DEI issues and translate it into positive action. We'll also work closely with brands to create behavioural nudges and reinforcing mechanisms to embed the training throughout the employee life-cycle.

#### Creating lasting change
To effectively address structural inclusion, we'll use benchmarking to continually examine and optimise our policies and practices to line up better DEI outcomes.

#### Reviewing our talent processes
To address under-representation in the most meaningful and authentic way, we will conduct an end-to-end review of our hiring and training processes and look at new ways and spaces to connect with under-represented groups, such as women, ethnic minorities and members of the LGBTQIA communities.

### Phase three: Measure

We are upgrading our DEI data and insight to measure progress and set standards. To do this we will:

- bring the same level of informed decision making to DEI that we have in every other part of the business;
- develop and communicate clear metrics, goals and outcomes;
- make DEI measurements a normal part of business reviews; and
- share accountability by ensuring all leaders can access the information they need to listen, learn and act.

Our new DEI strategy is the beginning of an exciting journey for the Group. It'll help us build a more diverse, fair, inclusive and effective Flutter, one that is more reflective of the communities we work in and the world around us. It's essential that we continue to hold ourselves accountable and we have set ourselves clear goals to help us realise our ambitions in this space.

# Sustainability continued

### Our 2030 goal

### Create and build teams that reflect the communities in which we live and work

To get there, we've set ourselves several shorter term goals:

- Our ambition is that by the end of 2026, 40% of our top leadership roles will be held by women. How we'll measure our progress in gender diversity and equity will include areas such as pay, recruitment, retention, advancement and representation.

- By the end of 2022 we will have developed clear interventions and actions to ensure we attract, retain and grow talent from under-represented groups, underpinned by our plans to create an inclusive and equitable experience.

- Our equity goal is that by the end of 2023, all our divisions will be measuring and reporting on pay performance, progression and retention across different diversity demographics.

- For inclusion, we will measure the difference in colleague engagement across different diversity demographics by the end of 2022.

These will continue to evolve as we improve our data and measurement capabilities around DEI and throughout 2022, all of our brands will put the necessary steps in place so they can measure the diversity make-up of their brand year on year:

We made significant progress during 2021 in relation to the diversity of our Board; further details can be found on page 119.

### Creating a culture of allyship

We are excited to be working with Huma Qazi, the acclaimed international consultant, speaker and facilitator on diversity and inclusion, HR, strategy, leadership and culture. Huma is the founder of the Privilege Project.

The Privilege Project is reframing the idea of "privilege" and how it is understood, to remove barriers and create a more just world. It is helping us explore the different kinds of privilege that exist, how they manifest and what impacts they have on people with different backgrounds, identities and socio-economic statuses.

Starting on 7 December 2021, our senior leaders began a three-month experience of understanding their privilege. The aim is to provide space to learn, collaborate, have bold and brave conversations, deep dive into topics, and ideate on solutions for the future of work. Ultimately, it will help to ensure our leaders become better allies to drive social change.

### The Luminary Programme

We are aware that the gaming industry is lacking in diversity. We have made movements in our business to address this and further reflect the diversity of the customers we serve. The Luminary programme was sponsored by our CEO Peter Jackson, which shows the commitment of our Executive leadership and Board to champion change, challenge the status quo and always look to advance our strategy and product offering. We are committed to creating more opportunities at senior leadership level for our divisions to embrace diversification of skill, behaviours, background and thought and this programme serves to deliver on all areas of diversification.

Flutter is striving to be challenged as much as challenger and this programme allows the successful individual to diversify their own experiences across the Group.

Luminary is an 18 month rotational program comprising of two nine month rotations, each rotation taking place in a different continent (ideally) but certainly in a different company within Flutter.

There are three clear components of this programme:

- Diversifying skill, thought & background
- A clear strategy for improving our succession planning agenda
- Capability mapping across our organisations towards the skills for the future



## FastFutures

We are proud to be one of the founding investors of FastFutures, a programme built to bridge the gap between education and employment. The free programme helps young people from all backgrounds build the skills they need to thrive in an increasingly digital workplace. Over 80 mentors from across our brands provided the support and encouragement needed to help learners harness new workplace skills.

Since its launch in the summer of 2020, FastFutures has trained 4,500 young people from diverse backgrounds in the transferable digital business skills that employers need today and into the future. Learners consistently report feeling more confident and more employable and most begin to secure more interviews within weeks. Around half have found employment within six months of graduating.

## Enhancing employee skills

Building the skills and strengths of our teams remains a key strategic priority for the Group in 2022/23. It makes our brands more resilient to external disruptions or changes in our markets and boosts our ability to explore new spaces, drive improvements in our products and continue to delight new and returning customers.

We give our colleagues opportunities to try new things, take on new challenges and build a rewarding career with Flutter. Creating tailored development plans for every colleague contributes to higher rates of talent retention. These plans include training through a range of online learning platforms as well as practical development opportunities such as job swings to other roles and part-time sabbaticals. In UK&I and the Group we have also introduced a new £1,000 development fund for each employee to help individuals take the next step in their careers.

Learning and development is also tied to our ongoing DEI goals, and we are helping our teams embed DEI priorities into every part of our organisation.

## Attractive remuneration and rewards

We want to reward the creativity and passion of our people and attract and retain the best talent our industry has to offer. We regularly review market conditions to make sure that the pay and rewards we offer are attractive and fair.

In 2020, we granted our full-time employees the equivalent of £1,000 in Flutter shares, which vested in November 2021, and £600 to all part-time colleagues. This was a significant benefit for our colleagues to acknowledge the hard work and dedication they showed in the face of disruption and uncertainty due to the global pandemic. Our Sportsbet colleagues also received a bonus for achieving the brand's goal of reaching two million customers in the market.

## Making the most of our new office spaces

During 2021, we focused on supporting our employees to deliver a seamless customer experience. Empowering and enabling hybrid working has allowed us to focus on what employees need from an office location in order to do their best work. We've opened innovative and sustainable office spaces in Leeds and Dublin.

Designed to facilitate hybrid working, the £15 million Leeds space brings 1,700 colleagues under one roof in one of the UK's largest technology hubs. Built to the highest environmental standards and achieving a BREEAM Excellent rating on completion, the site includes a range of accessibility and sustainable features, meeting the WELL Building Standard, which aims to make the work environment healthier for colleagues.

The building's features include:

- IT "vending machines" for certain equipment to free up resource and time for IT colleagues;
- £1 million investment in VC and AV equipment to promote inclusive meetings between those working remotely and in the office;
- electric car charging points in the basement; and
- break-out furniture items made from recycled Coca-Cola bottles.

The new Dublin office is also designed to allow people to work in a way that suits them. While most offices of its size would have 1,600 desks we have 1,000. This ensures maximum space for those spending their day there, while agile lounges and the 130 specialised virtual calling spaces mean people have everything they need to work effectively. As well as more space, the office features a natural aspiration mechanism to ensure great air flow throughout the building as well as a free gym and lots of areas for non-work-related activities and classes.

Some of the office's other features are:

- energy efficient design;
- beehives on the roof, creating honey served in the canteen;
- gender neutral toilets;
- workspace events team for in-house events;
- Ireland's first frictionless shop open to everyone in the estate;
- subsidised canteen; and
- free underground car parking.

In 2021 we completely refurbished our Melbourne HQ to prepare for return post-Covid-19 restrictions in 2022, designed to support future hybrid ways of working and attract new talent.

We will continue to create innovative, exciting and supportive places to work in 2022. This includes the opening of the new 68,000sq² Tech Center in Atlanta, Georgia, in Q1 2022.

You can learn more about how we engaged with our colleagues in 2021/22 on page 52

We continued to provide support and assistance to all our colleagues throughout the Covid challenges during 2021. We did not seek or receive any government support during this time, through the Furlough scheme or other means.



**Sustainability** continued

# Working with communities to
# do more

## Maximising the positive impact of our business

Our Positive Impact Plan builds on our long history of community support. Our global scale and local footprint mean we can work with some amazing partners and stakeholders to create better futures for the places where we live, work and play.

Across the Group, we invested £3.7m in community causes in 2021. Excluding the £4.79m rates relief donated in 2020, 2021's figure represents an overall increase of our contribution year on year of £367,000. This included ongoing work with existing partners as well as many exciting new projects. With the launch of the Positive Impact Plan we will be better able to use our global scale as a group to go further than we ever have before. To support this, all colleagues globally can participate in two days' volunteering from 2022.

Our colleagues share a drive to do the right thing, and it is their local experience that makes our investments in communities successful. We will draw on their insight to help us identify opportunities to drive positive change in all our markets.

You can learn more about how we engaged with community stakeholders in 2021/22 on **pages 57 to 59**

### Our priorities for community investment

We have aligned our charitable and community support with a set of key strategic priorities that allow us to use the expertise and experience within our business to support our communities: sport, health and wellbeing, and technology for good.

### Adjarabet Corporate Social Responsibility Award

In 2021, Adjarabet was awarded the Corporate Social Responsibility Award by the Georgian Times, and the Partnership for Sustainable Development Award through the UN Global Compact Network Ukraine in recognition for its continued support of communities and sporting groups across Georgia.

Adjarabet has a strong record of helping and supporting sports within Georgia. It has a particular focus on developing para athletics and is working with Youth Media Union to promote better integration of people with disabilities in society, through sport, creativity and involvement in social projects.

Adjarabet employees shared their innovation and technology skills with local communities (Product Tank Tblisi) and supported 22 beneficiaries of the Femina Foundation to take courses to develop skills in English and office programmes.





Nini Gujabidze, Head of Public Relations Department for Adjarabet.



Here are some of the great things we achieved during 2021/22:

## Sport

### Made by Sport/Cash4Clubs

In 2021, we launched our partnership with Made by Sport to help grassroots clubs recover from the pandemic. By combining this initiative with our existing Cash4Clubs programme, we created a new "Clubs in Crisis" fund. We announced in 2021 our commitment to donate the full £4.79 million of business rates relief we received for our shops in England to the charity, which worked with the Community Foundation network in the UK to deliver the funding. Since launching the fund we've delivered more than 1,600 grants to support thousands of grassroots clubs, reaching over 250,000 young people. These grants are helping the clubs to recover from the pandemic and continue to help young people develop vital communication, employability and life skills to build stronger communities.

One of the clubs we supported is Boots and Beards. With over 100 members this organisation uses hillwalking and other outdoor activities as a way to bring people from different backgrounds together, help them build their leadership skills and generally live a more active lifestyle.

### Right To Play

We continued our long-term partnership with Right To Play through our PokerStars brand. During the last six years, over £2.5m has been donated to the charity, including £196,000 in 2021, through corporate, colleague and customer support.

The charity uses sport and play to help young people stay in education in some of the world's poorest countries and it reaches over two million children a year through its work.

As part of our support we fund its annual flagship Sports Quiz in London. This year's event featured a charity poker event hosted by snooker legend Stephen Hendry and raised £540,000 on the night to help its mission to empower and support vulnerable children around the world.

### Racing Welfare

Betfair continued its long-term relationship with Racing Welfare, which supports people who work in the racing industry. The brand donated £30,000 this year as part of the organisation's Racing Staff Week.

### Britannia Stakes

Alongside other members of the UK Betting and Gaming Council, we donated profits from the Britannia Stakes for the second time. Held on 17 June 2021, the event raised over £1.25m, of which Flutter contributed over £450,000. This funding was split between Prostate Cancer UK, Marie Curie and three armed forces charities.

### Washington University/United College Negro Emergency Student Aid Fund

As part of its ongoing partnership with the Washington Football Team, FanDuel contributed $750,000 to create the FanDuel/Washington Football Team Emergency Student Aid Fund. The fund supports students enrolled in Virginia's five historically black colleges and universities ("HBCUs") and provides grants for those seeking assistance for technology, housing, food security, tuition and other education-related expenses.

## Clubs in Crisis – Boots and Beards

Boots and Beards addresses a number of issues disproportionately affecting the South Asian community and, more broadly, the minority ethnic population living in Glasgow.

This includes poorer levels of social engagement, engagement with the outdoor environment and physical/mental health. The money from Clubs in Crisis will be used to deliver extra outdoor and sporting activities which aim to improve the mental health of young members of the Glasgow BAME community who have been adversely and disproportionately affected by Covid-19.



More on Boots and Beards can be found here:
https://www.theguardian.com/travel/2020/jul/28/boots-and-beards-asian-pakistani-hiking-group-trail-blazing-scotlands-mounatins

# Sustainability continued

## Health and wellbeing

### Save Her Seat
It is often the case that sport, health and wellbeing are tied together in the initiatives we support, and this is definitely the case with the "Save Her Seat" campaign. Launched by our long-term partner Right To Play, it aims to get 50,000 girls back into education, many of whom had to drop out of schooling as a result of the pandemic. PokerStars supported this initiative with an online tournament in November 2021.

### Macmillan
Back in 2020, Sky Betting & Gaming launched its charity partnership with Macmillan Cancer Support – and over the last two years has raised £210,000, with £146,000 being raised in 2021. All the money goes to support people living with cancer.

This money will fund the Macmillan Support Line for over 535 hours, allowing the organisation to handle 11,250 calls from people affected by cancer.

### Million Dollar Lunch-Children's Cancer Foundation
Through Sportsbet's Australian Football League ("AFL") partnership, it sponsored the Million Dollar Lunch to raise money for the Children's Cancer Foundation. Due to Covid-19 and lockdown, the event was held virtually this year through a Million Dollar Lunch Virtual Giving Day. Sportsbet donated $100,000 AUD towards the cause, contributing to the total of $771,320 AUD raised throughout the event. These vital funds support childhood cancer research, clinical trials, clinical care and family support.

### Orange Sky
Sportsbet gives $60,000 AUD a year to help homeless people in Brisbane by providing a mobile laundry service that has been running since 2014.

### Cure4MND/Big Freeze
These two charities fund medical research and provide support for families affected by motor neurone disease. Sportsbet supports these organisations as part of its ongoing sponsorship agreement with the AFL.

### Try July – Men of League Foundation's Mose Masoe Appeal
Through Sportsbet's National Rugby League ("NRL") partnership, in 2021 the Try July campaign was relaunched. We asked NRL players to provide us a post try celebration for which we donate money to charity. Try celebrations have a rich history in the NRL and for each try celebration in the month of July, including State of Origin, Sportsbet donated $5,000 AUD to the Men of League Foundation's Mose Masoe Appeal, which helps former Samoa international player Mose and his family after a tragic end to his rugby league career. In total, Sportsbet raised $265,000 AUD towards the Appeal.

## Technology for good

### Women Who Code
We have developed a new partnership with Women Who Code, an organisation dedicated to inspiring women to excel in technology careers. Our talent acquisition team will be working with them to help us attract more women into technology-based roles across our brands.

### Missing People
Another initiative is raising awareness for the thousands of people who are currently missing across the UK. Through our new partnership called "Together for Missing", we have donated £150,000 and are using the reach of our brands to raise awareness of the issue, including campaign content featuring Peter Crouch and David Ginola. We hosted a media event on 17 November 2021 to promote awareness of the campaign, supported by a 90-second film that we have shared via our social media channels, highlighting the number of people missing.

Another feature of the campaign was the "Missing Deck"-a special deck of cards created with the kings, queens and jacks missing until put under UV light. On the pack is a special QR code that takes users to a dedicated website. Included in the film are real cases of missing people.



https://www.youtube.com/watch?v=qK6BWWs6aYA&t=16s





### Alpha Hub
Through our Alpha Hub programme, we are connecting with the most innovative and exciting start-ups to explore ways we can support them in their journey as well as supporting our own commercial and sustainability goals. The programme started by looking at new approaches to safer gambling but has also given us a chance to mentor and provide feedback to support some really exciting companies in their early stages. We'll expand Alpha Hub in 2022, engaging a new crop of start-ups across a variety of areas, leveraging our depth of expertise and global reach to help them grow.

### Holberton School Australia scholarships
Sportsbet provides scholarships to support women in technology including Career Switcher Scholarships and Indigenous Scholarships offered to Aboriginals or Torres Strait Islanders.

### FastFutures
As a founding investor of FastFutures, we've supported the training of over 4,500 young people from a range of backgrounds since 2020. The programme is designed to provide participants with the skills and knowledge they need to forge an amazing career in increasingly digital workspaces.

In 2021 we gave a £200,000 donation and have committed to a further £100,000 in 2022. Over 80 people from our brands also actively support and mentor participants, helping to share their insight and experience of creating digital experiences that excite, entertain and support huge numbers of customers every year.

## Employees
### Local charity committees
There are currently seven charity committees across our office locations which in total have received over £200,000 to support local causes. Run entirely by staff volunteers the projects supported have been diverse. Here are a few examples.

In **Malta**, the committee has continued its long-term partnership with the charity "Inspire", which provides support to people with various disabilities. This year the committee funded the build of two sensory quiet rooms that help children with autism.

In the **Isle of Man**, the committee continued to support the annual "Relay for Life" in aid of Cancer Research UK. This 24-hour walking challenge attracts hundreds of people every year. This year through our support they raised over £100,000 which brings the Isle of Man total in the last 10 years to over £1m.

In **India**, our colleagues faced a very difficult time due to Covid-19 and as part of the support there, we funded oxygen tanks and wheelchairs for our local hospital.

Colleagues can also apply for Flutter to match donations of up to £500 for their fundraising activities and this year we have provided over £15,000 worth of matched fundraising to support charities that our staff are passionate about.

## Emergency support
Our divisions have a long history of providing support at times of crisis, and we have continued to provide emergency support to our local communities during 2021, responding proactively and collaborating with aid organisations to help to respond to crises.

### Americares
We first partnered with Americares in 2019 following the devastation that Hurricane Dorian left behind. In 2021 we worked with the charity to provide emergency relief in India which saw a huge rise in Covid-19 cases. We contributed £100,000 to provide PPE and other provisions.

### CARE International
We have donated over £2m to CARE International since 2014 to help them provide disaster relief to communities around the world. We have an ongoing relationship with them, regularly consulting on response efforts needed for international emergencies which will continue throughout 2022.

Sustainability continued

# Environment

We are committed to playing our part in tackling global climate-related issues through reducing our environmental impact.

The environment is a significant foundation of our Positive Impact Plan. Climate, carbon, energy, waste and water were included within the shortlist of 15 issues identified through our materiality assessment on page 47 and have been focus areas as we have developed our Positive Impact Plan. In September 2021, we signed up to the UN Race to Zero campaign, confirming our commitment to reach net zero global emissions. In 2022 we will develop science-based targets and set out our roadmap to net zero, which we are confident will be achieved well in advance of 2050.

We are making progress in a number of areas, like continuing with our renewable energy tariffs within our UK retail and data centre operations and optimising energy consumption within our data centres. We have introduced external assurance of greenhouse gas ("GHG") data as part of improved governance around carbon data. We have also enhanced our own internal governance of sustainability issues, including climate, carbon, energy, waste and water, further details of which are included on page 66.

## Climate change (TCFD)

This year we started work to further our understanding of how the impacts of climate change could affect our business, using the Task Force on Climate-related Financial Disclosures ("TCFD") recommendations to frame our update on climate matters with the support of a leading accountancy firm. As outlined by the TCFD recommendations, we have considered the impact of climate-related issues on our business and how they are integrated within the four pillars of governance, strategy, risk management and metrics and targets. This is the first year we have used this framework to support our reporting, and we are committed to ensuring that we continue to improve the maturity of our climate-related disclosures.

In accordance with LR 9.8.6R(8) and LR 9.8.7, we are required to include a statement in this Annual Report and Financial Statements setting out whether the Company has included climate-related financial disclosures consistent with the TCFD Recommendations and Recommended Disclosures ("TCFD Recommendations"). We have included climate-related financial disclosures in this Annual Report and Financial Statements consistent with the TCFD Recommendations, except for the following:

- disclosing the actual and potential impact of climate-related risks and opportunities ("CROs") on our businesses, strategy and financial planning (Recommendations (a), (b) and (c) of the strategy pillar); and
- disclosing the metrics and targets used to assess and manage relevant CROs (Recommendations (a) and (c) of the metrics and targets pillar).

Our climate-related financial disclosures are set out below, with a summary reference table included on page 263. During 2021 we carried out a review of our wider sustainability strategy where climate change was identified as a material issue. In addition, our standard risk management process has identified climate risk as a longer-term emerging risk. A key action arising out of the development of the sustainability strategy and the identification of climate change as an emerging risk is to complete a granular assessment of climate-related risks and to ascertain the materiality of those risks to the business. This is something we are committed to doing in 2022 (strategy pillar Recommendation (a)). As this action has not yet been undertaken, we were unable to disclose against a number of other related TCFD Recommendations. The steps the Company is taking or plans to take in order to be able to make those disclosures in the future, and the timeframe within which the Company expects to be able to make those disclosures, are set out in the section below.

## How our leadership approaches climate change risks and opportunities (governance)

The Board is responsible for the oversight of climate change and responsibilities for various aspects have been delegated to Board Committees. As outlined on page 106, Flutter has five Board Committees including the recently repurposed Risk and Sustainability Committee. This reflects our recognition and prioritisation of sustainability issues, including those related to climate change. Flutter is currently determining next steps to ensure effective collaboration among all Board Committees in order to appropriately manage our climate-related issues. Updated Terms of Reference ("TOR") for the Risk and Sustainability Committee were developed in 2021 and formally ratified in February 2022. The TOR reflects the Risk and Sustainability Committee's primary role in overseeing climate-related issues, as part of its broader responsibilities to provide oversight for sustainability strategy and ongoing risk management. The increasing collaboration of the Risk and Sustainability and Audit Committees will enable increased focus on assurance over sustainability matters, including those which are climate related. To enhance the knowledge of the Board and the Board Committees with regard to climate-related risks and opportunities and their impact on Flutter, we will facilitate climate change awareness training sessions in 2022.

During 2021 the Risk and Sustainability Committee received updates regarding the newly developed Positive Impact Plan which includes consideration of climate change. This strategy is discussed in more detail in the Strategy section on page 45. The Risk and Sustainability Committee received an update in December 2021 on the TCFD framework, an outline of the

relevance of climate-related risks and opportunities to the business and an indication of the work being completed as part of the FY 2021 Annual Report as well as future anticipated actions. This is discussed in further detail on page 61.

The Risk and Sustainability Committee is supported by an Executive Sustainability SteerCo. The Sustainability Reporting and Governance section on pages 66 to 67 and the Risk and Sustainability Committee section on page 132 outline the governance framework and cadence for climate matters within Flutter.

Our divisions will, with support and guidance from the Sustainability Working Group and in accordance with our sustainability governance structure, be responsible for setting local environmental and climate change priorities, managing and delivering environmental and climate change initiatives as well as collecting data and reporting on environmental and climate-related performance. We are reviewing opportunities to further embed environmental and climate-related committee and working group roles, responsibilities and reporting requirements within the divisions of the Group.

## Our plan for making our business and strategy more resilient to climate change (strategy)

Flutter's Board understands the need to consider climate change when formulating strategy and the way we do business. Through our sustainability strategy development, we identified a shortlist of 15 issues as shown on page 47, including one focused on climate change. This assessment followed the general principles of both GRI and our standard risk management framework discussed on pages 84 to 91.

The process was completed independently of the standard biannual risk assessment updates as it was a specific initial review focused on ESG. Following this focused review of ESG, based on the concept of double materiality, there are two angles from which climate change has been considered within Flutter:

1.  **Our impact on our environment:** This focus has led to a number of positive climate change initiatives including a commitment to the UN "Race to Zero". During the course of 2022 we will develop science-based targets and confirm our target date to reach net zero global emissions, which will be well before 2050. This commitment and how we will achieve it is discussed further in the Metrics section below. We are predominantly an online business and so our environmental

impact is relatively low. Our data centres, offices, retail units and business travel are the main sources of our emissions.

Within our real estate portfolio, our data centres are the most energy intensive. We've had success in optimising these data centres and exploring how we can further reduce the energy consumption across the global data centre estate. We're also working to replicate the success of achieving high environmental and energy standards in our flagship offices across our corporate real estate and to apply similar environmental standards across our property portfolio. We plan to address and report on our progress in future reporting periods.

In terms of energy, to meet our 2030 renewable energy ambition, we are looking at how to expand our sourcing of renewable energy beyond our UK retail and data centre operations.

Following our Race to Zero commitment we will be reviewing our sustainability strategy in 2022 in line with our SBTi commitment, identifying actions to be undertaken and ensuring that our strategic objectives are aligned with the transition to a low carbon economy. Any financial impact arising from the identification of the actions required to meet these commitments will be carefully considered and reported on in line with accounting standards.

2.  **The environment's impact on Flutter:** We do this through a top-down and bottom-up exercise in line with our risk management framework (discussed below and in the Risk Management section on pages 84 to 91).

We have identified climate change as a longer-term emerging risk through our top-down risk assessment exercise, with the potential to have an impact on our physical footprint. Specifically, the risk of extreme weather/geophysical disasters due to climate action failure, which represents a threat to human life and major disruption to our business operations and to location-specific sporting events as a result of extreme weather events.

During 2022 we will complete a granular review of our climate change risks and opportunities. As part of this, we will look at the different geographies and business models utilised throughout the Group and will complete this work using a divisional, brand and Group lens as appropriate.



We joined the Race to Zero, committing to set science-based targets to reach net zero emissions.



# Sustainability *continued*



### Our plan for making our business and strategy more resilient to climate change (strategy) *continued*

In 2022 we will use scenario analysis on our material climate-related risks and opportunities to look at the potential impact on our business model and strategy under various risk factors.

Once we've completed our specific work on climate change risks and opportunities, and based on the materiality of those areas, we'll begin integrating climate change within our financial planning and risk management framework and improving the processes for identification, monitoring and escalation.

### Understanding our climate-related risks and opportunities (risk management)

Our Board understands how important it is to include climate change in our broader risk management framework. In February 2022, the risk management framework was adjusted to include climate change as a specific risk to be addressed within the framework. Moreover, our risk taxonomy has been updated to include climate risk.

The standard risk assessment process, including the risk governance structure, is discussed on pages 84 to 91 of this report.

Climate change has been identified as a longer-term (greater than three years) emerging risk through the horizon scanning process discussed in the Risk section of this report on page 85. As a result, it is monitored to follow its evolution over time and to detect any changes in the exposure to risk. Through additional deep dive work we'll do in 2022 on CROs, any resulting change in the proximity or velocity of the climate change risk may result in it being subsumed into relevant active risk registers.

Identified climate-related risks will be used as the basis for the Group's risk appetite statement and to form the Group's risk profile. Scanning for climate change and ESG regulation will be developed into a more formal component of our overall horizon scanning process and we plan to report on this area in more detail in 2022.



We will complete scenario analysis on the most material climate change risks and opportunities identified and will integrate the results into our strategic considerations where relevant.

Given the global nature of our operations, it is important that our divisions are proactive in identifying potential transition and physical risks. As noted in the Strategy section above, we'll complete a more granular bottom-up assessment of climate-related issues in 2022. Supporting this, leadership teams in our divisions and Group will get training on climate-related issues in the coming year to ensure that they have the appropriate knowledge and expertise to identify and manage climate-related risks and opportunities and to communicate them at a Group level as part of the Group's bottom-up risk identification approach.

Following this assessment, we expect that specific climate risks will be embedded in the divisions where the risks are considered to be material. This work will be supported by a wider Group programme aimed at identifying climate-related risks and opportunities and completing scenario analysis.

### Measuring our progress (Metrics and Targets)

During 2022, we'll link our climate mitigation targets to the Science Based Targets initiative ("SBTi"). Specifically, we'll set a science-based emission reduction target across all scopes in line with 1.5°C emission scenarios and the criteria and recommendations of the SBTi. We have started to improve our environmental data systems and processes so that they are able to capture accurate and reliable emissions data. As with previous reporting periods, we adopt a financial control boundary to report on the climate-related impacts on our business.

We're using the GHG Protocol to guide us with our greenhouse gas reporting and calculation methodologies and to assist us in determining a new baseline, which is essential for our SBTi commitment. In 2021 we completed significant work in closing data gaps within our current Scope 1 and 2 emission metrics, in addition to expanding our Scope 3 emission reporting. However, further work is needed to analyse the impact of those gaps on the prior three years' reporting. In 2022, we will continue to refine our reporting processes and improve the quality of our comparative figures.

We report on GHG emissions and use tonnes of carbon dioxide equivalent ("$tCO_2e$") as the metric for reporting GHG emissions, converting into kWh in line with Streamlined Energy and Carbon Reporting ("SECR") requirements. The GHG data highlighted with a "Δ" has been assured by EY to the ISAE 3410 for greenhouse gas ("GHG") key performance indicators ("KPIs") standard.

| | Reporting year | | |
|---|---|---|---|
| | **2021** | 2020 | 2019 |
| Scope 1 ($tCO_2e$) | **854** | 483 | 1,668 |
| Scope 2 ($tCO_2e$) | **10,288** | 10,152 | 11,795 |
| Scope 3 ($tCO_2e$) | **3,853** | 5,883 | 12,351 |
| Total GHG ($tCO_2e$) | **14,995**△ | 16,519 | 25,815 |
| Revenue (£m) | **6,036** | 4,414 | 2,140 |
| $tCO_2e$/£m revenue intensity | **2.48** | 3.74 | 12.06 |

The emission sources which form the overall Scope 1,2 and 3 are included in the ESG Supplementary section on page 261. While the GHG emissions this period reduced slightly from those reported in 2020, we acknowledge that a number of known sources have been excluded due to data issues (see page 262 for further details). We are addressing these data issues in 2022 and will apply these improvements to previous reporting periods.

As a result, and in line with our Restatement Policy, our intention is to restate these emissions in our next Annual Report if a material difference is identified. Furthermore, we have obtained, for the first time, assurance over emissions data, included on this page marked with △. We are committed to extending our assurance programme in future reporting periods as we continue to enhance our data management and reporting.

## Our priorities for the next reporting period

- The main focus is to build homogeneous, comprehensive and granular data gathering processes across all operations and geographies to ensure that we are collecting accurate and comprehensive data.

- Once the improved data gathering and validation process is in place, we will also focus on setting and reporting on relevant targets.

- After the completion of the top-down and bottom-up climate change risk identification process, we'll develop key metrics to measure and manage climate-related risks and opportunities.

- We'll complete scenario analysis on the most material climate change risks and opportunities identified and will integrate the results into our strategic considerations where relevant.

- Depending on the materiality of climate-related issues, we'll consider incorporating related performance metrics as part of a review of wider ESG material issues into remuneration policies in the future.

- We will finalise the forming of an environmental working group who will report into the Sustainability Working Group with a focus of coordinating carbon, energy and environmental initiatives across the group.

## Energy

Our total UK energy consumption for FY 2021 is 24,727,374 kWh (6,096$tCO_2e$ with an intensity of 1.01 $tCO_2e$/£m) which comprises of fuel, natural gas and electricity. We track and monitor energy-optimising initiatives to ensure we continue to focus on energy efficiency alongside switching to low and zero-carbon energy choices. The following examples are initiatives in the short to medium term which will be driving our continued energy and carbon performance:

- switching our energy tariffs to renewable energy; and

- ensuring all new real estate leases are BREEAM, LEED or similar.

## Waste

We support the principles of circular economy and implement these principles where possible in our operations. As a business with large technology operations, e-waste is the largest impact area, with our corporate real estate following.

Our waste data gaps were not reduced to a sufficient level to allow reporting and have been omitted in this years' reporting. We have introduced initiatives with our suppliers to reduce the amount of e-waste produced. Our focus in 2022 will be to understand how to sustainably manage and reduce the e-waste that is produced by our data centres globally.

## Water

We operate in regions where increasing temperatures, through climate change, will impact the availability of potable water. Droughts and wildfires have increased in their severity in some of these regions where we operate.

We have improved our data collection of water usage across our real estate portfolios. However, our water data gaps were not reduced to a sufficient level to allow reporting and have been omitted in this years' reporting. We will continue to research and implement methods to optimise our water usage across our operations in 2022.

**Sustainability** continued

# Building a culture where we operate responsibly, honestly, fairly

## Business integrity

### Group Code of Ethics

Building a culture where we operate responsibly, honestly, fairly and in accordance with the law throughout each of our divisions is essential to us at Flutter. Our Code of Ethics (the "Code") requires all employees across the Group to act with integrity and to treat everyone with whom they come into contact with mutual dignity and respect. It outlines the Group's policies on areas such as anti-bribery and corruption, whistleblowing and modern slavery. We also have in place procedures, management systems and internal controls to prevent and detect bribery and corruption.

### Code of Ethics mandatory training

To ensure this Code is embedded in everything we do, all employees are required to undertake annual, detailed mandatory e-learning training covering a range of areas, including safer gambling, conflicts of interest, betting integrity, anti-bribery and corruption, and information security. All of our employees who interact with customers are also rigorously trained in how to monitor and recognise behaviour that could indicate someone being potentially at risk of gambling-related harm and intervene where appropriate.

### Anti-Money Laundering and sanctions training

At Flutter, we are collectively responsible for ensuring that our products and systems are not used to launder money. We are rigorous in ensuring that we do not do business with persons, entities or jurisdictions that are subject to financial sanctions. As part of that commitment, we avoid pursuing business opportunities that require us to compromise those standards. Our employees and management take these obligations seriously and through training, we have implemented appropriate policies and procedures to help ensure that our products and systems are not used to launder money and constantly remind ourselves of our role in contributing to the integrity of the global financial system.

### Whistleblowing

A whistleblower hotline and a formalised Whistleblowing Policy are in place to encourage employees to raise issues regarding possible improprieties in matters of financial reporting, ethical or policy violations, or other matters on a confidential basis. Targeted communications have also been issued to all employees regarding Flutter's zero-tolerance policy prohibiting retaliation against any employee who makes a report as well as to ensure there is clear visibility of the whistleblowing options which are available to them.

### Anti-bribery and corruption

The Group is committed to conducting its business openly, fairly and honestly in the jurisdictions in which it operates and in accordance with all applicable laws including anti-bribery and anti-corruption laws. As part of this commitment, the Group has a zero-tolerance approach towards bribery, corruption and facilitation payments throughout its global operations.

We have in place policies, procedures, training, management systems and internal controls across Flutter to prevent and detect bribery and corruption, including requiring risk-based due diligence to be carried out on individuals and companies which will perform services for or on behalf of Flutter. These obligations are set out in our Code of Ethics and anti-bribery and corruption policies and procedures which all employees are required to adhere to. This also includes guidance on receiving and offering gifts and hospitality involving any public official.



Strategic report

## Modern Slavery Statement

We understand that modern slavery is a global threat that imposes an intolerable burden on those affected by it. As a global operator, we are committed to preventing slavery and human trafficking in all areas of our business and we expect the same commitment from our employees, contractors, suppliers and business partners.

In 2021, we continued to develop our policies and procedures on modern slavery. We expanded the use of tools to more effectively screen our suppliers for any instances of forced labour and human trafficking. We remain determined to expand and deepen the screening to account for the global nature of our supply chain and will continue to be proactive in monitoring our business for breaches.

Our Modern Slavery Statement can be found in full at: https://www.flutter.com/modern-slavery-statement/.

## Human rights

We are committed to upholding the United Nations' Universal Declaration of Human Rights. We are proud to support human rights through our policies which require employees to behave ethically and to respect the human rights of our employees and other stakeholders in the business.

## Equal opportunities

We are committed to equal opportunities and diversity in our workplace and will not tolerate harassment, discrimination, victimisation or bullying. We recruit, employ and promote employees based on their qualifications and abilities. Our Equal Opportunities Policy states our commitment to a policy of equality of opportunity and treatment in our employment practices. Details of our DEI strategy can be found on page 53.

We do not discriminate on any grounds, including gender, sexual orientation, marital or civil partner status, gender reassignment, race, religion or belief, colour, nationality, ethnic or national origin, disability or age, pregnancy, trade union membership, or part-time or fixed-term status, and take appropriate steps to accommodate the requirements of an individual's religion, culture and domestic responsibilities.



# A culture that does not tolerate harassment, discrimination, victimisation or bullying.

## Health and safety

The Group recognises the importance of health and safety. We are committed to ensuring the wellbeing and safety of our employees and customers in all our corporate offices and retail betting shops, and ensure that our policies and procedures comply with relevant local safety, health and welfare at work legislation, as appropriate.

We have created a Global Health and Safety Framework to ensure we maintain one consistent approach to health and safety management within the worldwide organisation. Key to this is the creation and delivery of a Three-Year Strategic Roadmap, which has resulted in the development of global policies, standards and procedures which will drive compliance within the brands, regions and countries where we operate and ultimately an improved safety culture across our operations.

Utilising our iLearn online training platform and through focused campaigns, we are providing our teams with the tools, understanding and capability to carry out their activities and roles safely and in compliance with both legal and industry standards.

**Sustainability** continued

# Governing our approach to sustainability

The launch of our Positive Impact Plan has led us to revise our governance structures around sustainability to ensure accountability and facilitate Group-wide co-ordination. These changes will allow us to better support our brands as they launch their own local strategies as well as remaining agile and responsive to changes in our markets.

### A focus on Sustainability at board level

On 10 December 2021, the Board's Risk Committee became the Risk and Sustainability Committee, with Terms of Reference revised to enhance the Committee's focus on sustainability. This change will increase Board-level accountability and oversight of the implementation and evaluation of the Positive Impact Plan and any associated risk management. This is in line with corporate governance and TCFD expectations. It will also help the Board Risk and Sustainability Committee collaborate more effectively with the Audit Committee to strengthen its focus on sustainability-related data. In addition, a safer gambling sub-committee of the Board Risk and Sustainability Committee has been established, to provide dedicated oversight to this critical area.

In 2021, we formed an Executive Sustainability Steering Committee, comprising members of the Executive management team and chaired by the Chief Legal Officer and Group Commercial Director. This Committee will contribute to shaping and ensuring the effective execution of the Positive Impact Plan and will assume responsibility for directing and validating the approach of the Group Sustainability function. The Executive Sustainability Steering Committee reports and provides recommendations to the Board Risk and Sustainability Committee and the Executive management team.

In addition, we established a Sustainability Working Group, including senior leaders from relevant functions and each of our operating divisions, to develop and implement our Positive Impact Plan, driving collaboration and alignment around key initiatives. The Sustainability Working Group reports to the Executive Sustainability Steering Committee.

### Our growing sustainability team

In 2021, we continued to build an industry leading team by recruiting additional senior resources and developing a dedicated Sustainability and Regulatory Affairs central function. Under the direction of the Group Director of Sustainability and Regulatory Affairs, supported by a Head of ESG, this team has overall responsibility for the development and governance of the Positive Impact Plan as well as supporting the execution and reporting of Flutter's sustainability activities. It is helping us to leverage our global scale by co-ordinating with other Group functions and divisions in order to effectively implement the Positive Impact Plan.



"

Through the three core pillars of our Positive Impact Plan, supported by our revised governance structures, we will continue to lead positive and meaningful change in our industry.

Pádraig Ó'Ríordáin, Chief Legal Officer and Group Commercial Director

# Sustainability reporting and governance

**Provide oversight**

| Board Risk and Sustainability Committee |

| Safer gambling sub-committee |

**Define and approve strategy and ambitions**

| Executive Sustainability SteerCo |

**Mobilise strategy and projects**

| Sustainability Working Group* |

\* Working group comprises functional leads plus representatives from each division.

**Various workstreams deliver sustainability strategy and projects**

| Play Well, Work Better, Do More, Environmental, Communications and Governance workstreams |



Quarterly reporting–external ratings and internal pulse surveys

**Sustainability** continued

# Independent Assurance Statement

## Scope

We have been engaged by Flutter Entertainment plc ("Flutter") to perform a 'limited assurance engagement,' as defined by International Standards on Assurance Engagements, here after referred to as the engagement, to report on Flutter's selected subject matter information marked with the symbol Δ (the "Subject Matter") in the Flutter Annual Report ("the Report") for the year ended 31 December 2021.

Other than as described in the preceding paragraph, which sets out the scope of our engagement, we did not perform assurance procedures on the remaining information included in the Report, and accordingly, we do not express a conclusion on this information.

## Criteria applied by Flutter

In preparing the Subject Matter, Flutter applied The Greenhouse Gas Protocol Corporate Accounting and Reporting standard as the reporting criteria. Such Criteria was used to guide the measurement and reporting of the Subject Matter.

## Flutter's responsibilities

Flutter's management is responsible for selecting the Criteria, and for presenting the Subject Matter in accordance with that Criteria, in all material respects. This responsibility includes establishing and maintaining internal controls, maintaining adequate records and making estimates that are relevant to the preparation of the subject matter, such that it is free from material misstatement, whether due to fraud or error.

## EY's responsibilities

Our responsibility is to express a conclusion on the presentation of the Subject Matter based on the evidence we have obtained.

We planned and performed our engagement in accordance with the International Standard for Assurance Engagements ISAE 3410 Assurance Engagements on Greenhouse Gas Statements (ISAE 3410), and the terms of reference for this engagement as agreed with Flutter on 26 January 2022. The nature, timing, and extent of the procedures selected depend on our judgment, including an assessment of the risk of material misstatement, whether due to fraud or error.

The Subject Matter has been evaluated against the following criteria:

- Completeness: Whether all material data sources have been included and that boundary definitions have been appropriately interpreted and applied.
- Consistency: Whether the Flutter scope and definitions for the Subject Matter Information have been consistently applied to the data.
- Accuracy: Whether the data has been accurately collated by Flutter management, and whether there is supporting information for the data reported by operations to Flutter management.

We believe that the evidence obtained is sufficient and appropriate to provide a basis for our limited assurance conclusions.

We do not accept or assume any responsibility for any other purpose or to any other person or organisation. Any reliance any such third party may place on the Report is entirely at its own risk.

## Our independence and quality control

We have maintained our independence and confirm that we have met the requirements of the Code of Ethics for Professional Accountants issued by the International Ethics Standards Board for Accountants, and have the required competencies and experience to conduct this assurance engagement.

EY also applies International Standard on Quality Control 1, Quality Control for Firms that Perform Audits and Reviews of Financial Statements, and Other Assurance and Related Services Engagements, and accordingly maintains a comprehensive system of quality control including documented policies and procedures regarding compliance with ethical requirements, professional standards and applicable legal and regulatory requirements.

## Description of procedures performed

Procedures performed in a limited assurance engagement vary in nature and timing from, and are less in extent than, for a reasonable assurance engagement. Consequently, the level of assurance obtained in a limited assurance engagement is substantially lower than the assurance that would have been obtained had a reasonable assurance engagement been performed. Our procedures were designed to obtain a limited level of assurance on which to base our conclusion and do not provide all the evidence that would be required to provide a reasonable level of assurance.

Although we considered the effectiveness of management's internal controls when determining the nature and extent of our procedures, our assurance engagement was not designed to provide assurance on internal controls. Our procedures did not include testing controls or performing procedures relating to checking aggregation or calculation of data within IT systems.

A limited assurance engagement consists of making enquiries, primarily of persons responsible for preparing the Subject Matter and related information, and applying analytical and other appropriate procedures.

Our procedures included:

- Interviewed management to understand the key processes, systems and controls in place for the preparation of the Subject Matter.
- Performed a review of the data management systems, tested reasonableness of conversion factors applied, reviewed alignment with the Criteria and conducted analytical review procedures over the Subject Matter.
- Agreed sample selection to supporting documentation and re-performed calculations.
- Assessed the appropriateness of the Criteria for the Subject Matter.
- Reviewed the Report for the appropriate presentation of the Subject Matter, including the discussion of limitations and assumptions relating to the data presented.

We also performed such other procedures as we considered necessary in the circumstances.

## Conclusion

Based on our procedures and the evidence obtained, we are not aware of any material modifications that should be made to the Subject Matter for the year ended 31 December 2021, in order for it to be in accordance with the Criteria.

**Ernst & Young**
Dublin, Ireland
14 March 2022

**Operating and financial review**





Strategic report

# Recreational customer growth

drove top line momentum. Operating leverage in Australia was partly offset by challenging comparatives, International regulatory changes, UK & Ireland safer gambling measures and customer friendly sports results.

# **Operating and financial review** continued

## Operating and financial review[1–5,9–12]
### Pro forma review
Group

| *Unaudited Adjusted Pro forma* | FY 2021 £m | FY 2020 £m | Change % | CC Change % |
|---|---|---|---|---|
| Average monthly players ('000s) | 7,619 | 6,174 | +23% | |
| Sports revenue | 3,774 | 3,000 | +26% | +27% |
| Gaming revenue | 2,262 | 2,264 | —% | +4% |
| Total revenue | 6,036 | 5,264 | +15% | +17% |
| Cost of sales | (2,262) | (1,782) | +27% | +29% |
| *Cost of sales as a % of net revenue* | *37.5%* | *33.8%* | *+360bps* | *+350bps* |
| Gross profit | 3,774 | 3,483 | +8% | +11% |
| Sales and marketing | (1,508) | (1,130) | +33% | +38% |
| Contribution | 2,266 | 2,353 | -4% | -2% |
| Other operating costs | (1,164) | (1,000) | +16% | +19% |
| Corporate costs | (101) | (121) | -17% | -13% |
| Adjusted EBITDA[1,2] | 1,001 | 1,231 | -19% | -18% |
| *Adjusted EBITDA margin %* | *16.6%* | *23.4%* | *-680bps* | *-700bps* |
| Depreciation and amortisation | (255) | (241) | +6% | +7% |
| Adjusted[1] operating profit | 746 | 990 | -25% | -24% |
| Adjusted[1] basic earnings per share | 252.7p | 496.6p | -49% | |
| Net debt at period end | 2,647 | 2,814 | -6% | |

Note: Flutter's combination with TSG completed on 5 May 2020. The pro forma financials include TSG for a full 12-month period in both 2020 and 2021. Junglee, acquired in January 2021 and Singular acquired in September, have been included on a reported basis due to materiality. A full analysis of the Group's reported performance can be found on page 75. A reconciliation of the Group's pro forma performance to the Group's consolidated income statement is included at Appendix 2 on page 80.

In 2021 pro forma revenue grew 17% to £6.0bn driven by AMP growth of 23% to 7.6m. This player growth was driven by the expansion of our recreational base in the UK and Ireland, and Australia, along with the regulation of sports betting and gaming in further US states.

Sports revenue increased 27% to £3.8bn, with expansion into four additional US states and continued strong momentum in Australia. Sports net revenue margin declined 100 basis points year-on-year due to less favourable sports results in the UK and Ireland. Gaming revenue increased 4%, with growth in the US partly offset by tougher comparatives in our International division as a result of the elevated levels of player engagement during the lockdown period of Q2 2020.

Cost of sales as a percentage of net revenue increased by 350 basis points to 37.5% with a greater proportion of revenue coming from the US where direct costs are higher. Additionally, the increase in regulated revenue also led to higher gaming taxes.

Sales and marketing costs grew by 38%, mainly reflecting a doubling of US investment to support significant new customer acquisition. US expansion is also the key driver of the year-on-year increase in other operating costs. For Group ex-US, other operating costs increased by just 2%. Corporate costs remain tightly controlled, benefiting from the realisation of £19m in merger related synergies.

In total, merger related cost synergies of £113m were delivered in 2021, ahead of the £90m expected in-year due a faster realisation in most divisions. We remain on track to deliver synergies of £170m by 2023.

Adjusted EBITDA was £1.0bn with the US investment-led loss increasing by £81m to £243m. For Group ex-US, adjusted EBITDA was 10% lower as strong top line growth and operating leverage in Australia was more than offset by the various factors referenced above that impacted our International and UK & Ireland divisions.

The Adjusted effective tax rate for the Group was 26.8% (2020: 13.2%) driven by the geographic mix of profits during the year as US losses increased where no deferred tax benefit was recognised, and the proportion of profits in higher tax jurisdictions such as Australia also increased. Excluding the US, the Adjusted effective tax rate was 18.5% (2020: 10.4%).

Adjusted basic EPS reduced from 497p to 253p reflecting the increased tax charge in the current period and a higher share count in 2021. Our acquisition of the additional stake in FanDuel in December 2020 was mainly settled via the issuance of shares directly to Fastball and through an equity raise.

Net debt as at 31 December 2021 of £2,647m was 6% lower than the prior year despite the free cash flow generated by the operating activities of the Group being used to pay expenses such as the settlement of a historic legal case with the Commonwealth of Kentucky and the purchase of shares for FanDuel incentive schemes.

A full analysis of the Group's reported performance can be found at page 75.

## UK & Ireland

| Unaudited Adjusted Pro forma | UK & Ireland Total | | | UK & Ireland Online | | | UK & Ireland Retail | | |
|---|---|---|---|---|---|---|---|---|---|
| | FY 2021 £m | FY 2020 £m | Change % | FY 2021 £m | FY 2020 £m | Change % | FY 2021 £m | FY 2020 £m | Change % |
| Average monthly players ('000s) | 11,376 | 9,400 | +21% | 3,153 | 2,532 | +25% | 904 | 998 | -9% |
| Sportsbook stakes | 11,376 | 9,400 | +21% | 10,473 | 8,401 | +25% | 904 | 998 | -9% |
| Sportsbook net revenue margin | 9.9% | 12.0% | -210bps | 9.7% | 11.7% | -200bps | 12.6% | 14.3% | -170bps |
| Sports revenue | 1,282 | 1,286 | —% | 1,168 | 1,143 | +2% | 114 | 143 | -20% |
| Gaming revenue | 781 | 743 | +5% | 721 | 686 | +5% | 60 | 57 | +5% |
| Total revenue | 2,063 | 2,029 | +2% | 1,889 | 1,829 | +3% | 174 | 200 | -13% |
| Cost of sales | (621) | (577) | +8% | (581) | (534) | +9% | (40) | (44) | -9% |
| Cost of sales as a % of net revenue | 30.1% | 28.5% | +170bps | 30.8% | 29.2% | +160bps | 22.9% | 21.8% | +100bps |
| Gross profit | 1,442 | 1,451 | -1% | 1,308 | 1,295 | +1% | 134 | 156 | -14% |
| Sales and marketing | (391) | (375) | +4% | (384) | (369) | +4% | (6) | (6) | -2% |
| Contribution | 1,051 | 1,077 | -2% | 923 | 927 | —% | 128 | 150 | -15% |
| Other operating costs | (435) | (446) | -2% | (298) | (298) | —% | (138) | (148) | -7% |
| Adjusted EBITDA[1,2] | 616 | 630 | -2% | 626 | 629 | —% | (10) | 2 | -647% |
| Adjusted EBITDA margin | 29.9% | 31.1% | -120bps | 33.1% | 34.4% | -130bps | (5.6%) | 0.9% | -650bps |
| Depreciation and amortisation | (126) | (119) | +6% | (85) | (77) | +11% | (41) | (43) | -4% |
| Adjusted[1] operating profit | 490 | 511 | -4% | 541 | 552 | -2% | (50) | (41) | +23% |

The UK & Ireland division operates Paddy Power, Betfair and Sky Betting & Gaming brands online, as well as retail operations in the UK and Ireland.

### UK & Ireland Online
Performance during 2021 was driven by several factors:

- Good AMP volumes, especially in gaming, albeit with a reduction in customer engagement levels (during Q4 in particular) versus the elevated levels seen in prior Covid affected periods
- A higher volume of sporting events compared with the prior year which contributed to 25% growth in staking
- Net revenue margin 10 basis points below expected margin (2020: 270 basis points favourable) resulted in an adverse 280 basis point sports results impact. This equates to a £232m year-on-year impact in revenue before adjusting for customer recycling (Q4: £149m)
- A lower level of recycling compared with historic trends
- New safer gambling measures which impacted revenue by £93m, £37m of which related to Q4[15]

AMP growth of 25% translated into a revenue increase of just 3% due to the significant swing in sports results year-on-year. Given the complexity of Covid comparatives, a year-on-two-year comparison provides a cleaner view of growth, with compound annual revenue and AMP growth of +12% and +13% respectively since 2019. Adjusting for safer gambling impacts in 2021 and the impact of adverse sports results, the equivalent revenue CAGR would be 15%.

Sports revenue increased by 2%, with staking growth of 25% offset by net revenue margins which were 200 basis points lower year-on-year at 9.7% due to adverse sports results. Increased penetration of higher margin "Betbuilder" products and enhancements to our pricing and risk management capabilities both helped to structurally increase our expected margin, helping to partly mitigate the adverse sports results.

Online gaming revenue grew by 5% during the year reflecting good customer engagement across our brands, with AMPs up 22% despite the year slowing in Q4. AMP growth exceeded revenue growth, demonstrating how the changes to safer gambling measures are reducing average revenue per user ("ARPU"), as well as the increased recreational nature of the customer base.

Cost of sales as a percentage of revenue increased by 160 basis points to 30.8% reflecting increased streaming costs and a higher effective tax rate due to increased promotional spend during the year.

Sales and marketing increased by 4% reflecting increased investment ahead of the European football championships and increased spend on safer gambling campaigns which was partly offset by synergy benefits realised during the year. Sales and marketing as a percentage of revenue increased in H2 although absolute spend was down due to the sports results impact on top line.

Other operating costs were flat year-on-year. We experienced some inflationary pressures in employee pay and made incremental investment in safer gambling capabilities and research, education and training (RET) funding. These were offset by the sale of Oddschecker at the end of August, resulting in a reduction in associated operating costs.

Online EBITDA was flat year-on-year at £626m.

### UK & Ireland Retail
Retail revenue declined by 13% in 2021, reflecting the impact of Covid related shop closures and social distancing restrictions that were in place during the year. Both estates remained shut throughout Q1, with our UK shops re-opening in April and our Irish shops re-opening in May.

Revenue in the second half of the year was approximately 85% of 2019 levels, with a stronger performance in the UK than in Ireland. In the UK we have been pleased with footfall. Revenue performance in H2 was in line with that of 2019, benefiting in particular from a strong gaming performance, with gaming revenues 13% higher than 2019. In Ireland by contrast, revenue in H2 remained at just 67% of 2019 levels, with performance reflecting a higher level of societal caution in relation to Covid.

Other operating costs declined by 7% to £138m, despite the Group continuing to fund all staff costs without accessing offered government supports.

The business incurred a £10m Adjusted EBITDA loss for the year, with EBITDA of £29m in H2.

# Operating and financial review continued

## Operating and financial review [1-5,9-12] continued
### Pro forma review continued
### Australia[4]

| Unaudited Adjusted Pro forma | FY 2021 £m | FY 2020 £m | Change % | CC Change A$ |
|---|---|---|---|---|
| Average monthly players ('000s) | 1,008 | 794 | +27% | |
| Sportsbook stakes | 11,702 | 9,713 | +20% | +20% |
| *Sportsbook net revenue margin* | *11.1%* | *11.1%* | *—bps* | *—bps* |
| Total revenue | 1,294 | 1,075 | +20% | +20% |
| Cost of sales | (636) | (520) | +22% | +22% |
| *Cost of sales as a % of net revenue* | *49.2%* | *48.4%* | *+80bps* | *+80bps* |
| Gross profit | 658 | 555 | +18% | +18% |
| Sales and marketing | (119) | (129) | -8% | -9% |
| Contribution | 539 | 426 | +26% | +26% |
| Other operating costs | (102) | (108) | -5% | -6% |
| Adjusted EBITDA[1,2] | 437 | 318 | +37% | +37% |
| *Adjusted EBITDA margin* | *33.7%* | *29.6%* | *+420bps* | *+420bps* |
| Depreciation and amortisation | (26) | (30) | -16% | -17% |
| Adjusted[1] operating profit | 411 | 288 | +43% | +42% |

*Australia encompassed Sportsbet, which offers online sports betting, in 2021 following the migration to a single brand in September 2020.*

Sportsbet grew Adjusted EBITDA by 37% in 2021 to £437m delivering another excellent performance. Our Australian division's scale has been transformed over the last two years with compound annual Adjusted EBITDA growth of 64% since 2019. This has been driven by:

- Compound growth of 38% in revenue and 27% in customers to over one million AMPs. Our market leading product and value propositions have resonated strongly with both existing players and those that migrated from retail during Covid

- Realisation of over £50m in synergy benefits from the merger with TSG which, when combined with our efficient operating model, reduced operating costs as a % of revenue by 15 percentage points to 17.1% in 2021

In 2021, Sportsbet delivered player growth of 27% which drove a 20% increase in both sportsbook stakes and revenue. Strong retention of the players that migrated online during 2020 and further benefit from Covid related restrictions re-introduced in the second half of 2021 were key contributors to this growth.

Sportsbook net revenue margin was in line with the prior year at 11.1%, with both periods benefitting from circa 60 basis points of favourable sports results above expectations. In 2021, improvements to our structural margin from changes in bet mix were offset by an increase in personalised generosity to attract and retain players.

Sales and marketing declined by 9%, or 280 basis points as a percentage of revenue, benefitting from synergies associated with operating a single brand in Australia from September 2020. In absolute terms, spend has remained near pre-merger levels for the combined brands, reflecting continued significant investment in the Sportsbet brand to maintain its market leading position. Other operating costs declined by 6% due to merger related synergies.

These cost efficiencies continue to deliver excellent operating leverage, with Adjusted EBITDA as a % of revenue increasing 420 basis points to 33.7%.

## International[4]

| Unaudited Adjusted Pro forma | FY 2021 £m | FY 2020 £m | Change % | CC Change % |
|---|---|---|---|---|
| Average monthly players ('000s) | 1,901 | 1,938 | -2% | |
| Sportsbook stakes | 1,592 | 1,368 | +16% | +21% |
| *Sportsbook net revenue margin* | *8.7%* | *8.5%* | *+20bps* | *+20bps* |
| Sports revenue | 220 | 180 | +22% | +26% |
| Gaming revenue | 1,068 | 1,285 | -17% | -13% |
| Total revenue | 1,288 | 1,465 | -12% | -8% |
| Cost of sales | (392) | (365) | +7% | +12% |
| *Cost of sales as a % of net revenue* | *30.4%* | *24.9%* | *+550bps* | *+530bps* |
| Gross profit | 897 | 1,100 | -19% | -14% |
| Sales and marketing | (335) | (279) | +20% | +27% |
| Contribution | 562 | 822 | -32% | -28% |
| Other operating costs | (270) | (248) | +9% | +9% |
| Adjusted EBITDA[1,2] | 292 | 574 | -49% | -46% |
| *Adjusted EBITDA margin* | *22.7%* | *39.2%* | *-1,650bps* | *-1,580bps* |
| Depreciation and amortisation | (52) | (50) | +4% | +6% |
| Adjusted[1] operating profit | 240 | 524 | -54% | -51% |

International includes PokerStars, Adjarabet, Betfair and Junglee brands which offer online poker, casino, sports betting, rummy and daily fantasy products. Excludes PokerStars US business and Betfair UK and Ireland operations.

Our International division delivered revenues of £1.3bn, 8% lower than the prior year (H1 -11%, H2 -4%). AMPs were down 2% year-on-year (Q3: -2%, Q4: flat) with Adjusted EBITDA of £292m. Several key factors contributed to these results:

- Challenging prior year comparatives as a result of the extended Covid related lockdowns; we previously disclosed that the revenue uplift in H1 2020 was estimated to be £205m with a benefit in H1 2021 of approximately £50m
- Compliance changes introduced following the merger with TSG continued to impact year-on-year growth in the first half of the year (guided annualised contribution impact of £65m)
- German and Dutch regulatory changes which we previously indicated would reduce contribution by £85m in 2021 (guided annualised contribution impact of £140m)
- An improved revenue mix with a greater proportion coming from regulated markets and casino products – both have higher associated direct costs
- Increased investment across both Betfair and PokerStars to improve the customer proposition and increase brand awareness
- The addition of Junglee to the division, currently in investment phase, which generated an EBITDA loss of £3m and added 4 percentage points to revenue growth.

Excluding the impact of Covid and the regulatory headwinds referenced above, revenue would have increased by 14%.

Gaming revenue was 13% lower for the year. In H2 it declined by 5% (casino: +15%, poker: -25%) with casino and poker growth being impacted by 10 and 8 percentage points respectively from regulatory changes. Q4 was the first quarter to reflect all previously guided regulatory headwinds, with the division delivering £258m in Q4 gaming revenue.

Underlying casino growth of 25% in H2 was driven by (i) an increased emphasis on direct casino acquisition (e.g. the PokerStars "I'm in" campaign launched in the UK) (ii) further improvements to our proprietary casino content (iii) a strong

performance in our key markets and (iv) the addition of Junglee to the portfolio which added approximately 9 percentage points to casino growth.

The underlying decline of 17% in poker during H2 reflected a reduction in engagement from customers acquired during the lockdown spike of Q2 2020 as well as investment in the PokerStars reward scheme which had an approximate 2 percentage point impact on growth and regulatory impacts outlined above.

Sports revenue of £220m increased by 26% (H1: +62%, H2: flat) benefiting from an increase in sports fixtures year-on-year, particularly in H1 2021. Improvements made to our pricing and risk management capabilities continued to benefit our expected sportsbook margins in H2 which was partially offset by an adverse year-on-year swing in sports results leading to an increase of 20 basis points in net revenue margin.

Cost of sales in H2 increased by 390bps to 31.6% due to (i) the introduction of gaming taxes in Germany from 1 July, (ii) an increased proportion of revenues coming from regulated markets and (iii) a change in product mix, with casino products incurring a higher associated revenue share cost and tax rate.

Sales and marketing increased by 27% during 2021, reflecting the period of underinvestment in H1 2020. The year-on-year increase is attributable to: (i) Betfair spend in LATAM, primarily Brazil (ii) the addition of Junglee, (iii) marketing spend to revitalise the PokerStars brand and (iv) investment in direct casino acquisition. Spend in H2 was flat year-on-year.

Other operating costs increased by 9% in 2021. Similar to sales and marketing, this increase reflected a period of underinvestment in H1 2020. The year-on-year increase primarily related to growth in headcount as we invested to stabilise and improve our capabilities across product, technology and customer operations. In H2 other operating costs (excluding Junglee) were broadly flat versus the first half.

# Operating and financial review continued

**Operating and financial review** [1–5,9–12] continued

**Pro forma review** continued

US[4]

| Unaudited Adjusted Pro forma | FY 2021 £m | FY 2020 £m | Change % | CC Change US$ |
|---|---|---|---|---|
| Average monthly players ('000s) | 1,557 | 910 | +71% | |
| Sportsbook stakes | 11,284 | 4,411 | +156% | +167% |
| *Sportsbook net revenue margin* | *6.3%* | *4.6%* | *+170bps* | *+170bps* |
| Sports revenue | 978 | 458 | +113% | +126% |
| Gaming revenue | 413 | 237 | +74% | +87% |
| Total revenue | 1,391 | 695 | +100% | +113% |
| Cost of sales | (614) | (319) | +92% | +104% |
| *Cost of sales as a % of net revenue* | *44.1%* | *46.0%* | *-190bps* | *-190bps* |
| Gross profit | 778 | 376 | +107% | +121% |
| Sales and marketing | (663) | (348) | +91% | +102% |
| Contribution | 115 | 28 | +310% | +383% |
| Other operating costs | (357) | (198) | +81% | +92% |
| Adjusted EBITDA[1,2] | (243) | (170) | +43% | +50% |
| *Adjusted EBITDA margin* | *(17.5%)* | *(24.4%)* | *+700bps* | *+730bps* |
| Depreciation and amortisation | (47) | (37) | +26% | +35% |
| Adjusted[1] operating profit | (289) | (207) | +40% | +47% |

The US division includes FanDuel, FOX Bet, TVG, PokerStars and Stardust brands, offering regulated real money and free-to-play sports betting, casino, poker, daily fantasy sports and online racing wagering products to customers across various states in the US.

Revenue grew by 113% to £1.4bn ($1.9bn) in 2021, with 94% attributable to FanDuel Group. Strong player acquisition and retention saw player volumes increase by 71% to 1.6m, with just under two million AMPs in Q4.

Sports revenue grew by 126%, with a 266% increase in sportsbook and 11% growth in TVG/daily fantasy sports combined. The substantial year-on-year growth in sportsbook was due to:

- **Player growth:** Sportsbook AMPs were 180% higher in 2021
- **Ongoing growth from more mature states:** Continued strong growth from the four pre-2020 states where revenue more than doubled
- **New states:** A full year benefit from the four states that opened during 2020 and the addition of four new states in 2021 (Michigan, Virginia, Arizona and Connecticut)
- **Structural growth in expected margin:** Sportsbook net revenue margin increased by 170 basis points to 6.3% with 130 basis points from expansion of our expected margin. This structural margin improvement is due to a higher share of stakes coming from our market-leading parlay products. Favourable sports results added 50 basis points to margin year-on-year (or 130 basis points to our expected margin of 5.0% in 2021)

Gaming revenue grew by 87% to £413m ($568m) driven by a 136% increase in AMPs. We launched in three new casino states in 2021 (Michigan, West Virginia and Connecticut), bringing our casino footprint to 5 US states.

Cost of sales as a percentage of net revenue declined 190 basis points due to (i) a reduction in the percentage of gross revenue (which is the tax base in most states) spent on customer promotions (ii) migration of our sports betting business to the Group's proprietary betting platform during 2021 and (iii) a higher proportion of revenue coming from lower tax states.

Sales and marketing doubled year-on-year to £663m as we continued to invest materially to acquire and retain customers although sales and marketing as a percentage of revenue declined by 270 basis points. This is due to continued investment discipline to maximise returns, and the greater maturity of the business. While marketing investment in pre-2021 states continued to increase, it declined as a proportion of revenue. Other operating costs also declined by 270 basis points as a percentage of revenue. This was despite significant expansion of our product and technology headcount as well as ongoing expenses associated with efforts to pass sports betting legislation in additional states.

The US division made an Adjusted EBITDA loss of £243m ($333m).

## Statutory review[11]
### Group

| £m | FY 2021 | FY 2020 | Change % |
|---|---|---|---|
| Sports revenue | 3,774 | 2,725 | +38% |
| Gaming revenue | 2,262 | 1,688 | +34% |
| Total revenue | 6,036 | 4,414 | +37% |
| Cost of sales | (2,310) | (1,542) | +50% |
| *Cost of sales as a % of net revenue* | *38.3%* | *34.9%* | *+340bps* |
| Gross profit | 3,727 | 2,872 | +30% |
| Operating costs | (3,003) | (2,101) | +43% |
| EBITDA | 723 | 772 | -6% |
| *EBITDA margin %* | *12.0%* | *17.5%* | *-550bps* |
| Amortisation of acquisition related intangibles | (543) | (432) | +26% |
| Depreciation and amortisation | (254) | (213) | +19% |
| Impairment | — | (23) | —% |
| Gain on disposal | 12 | — | —% |
| Operating (loss)/profit | (63) | 104 | 160% |
| Net finance expense | (226) | (102) | *+121%* |
| (Loss)/profit before tax | (288) | 1 | |
| Taxation | (124) | (36) | *+245%* |
| Loss after tax | (412) | (35) | |
| Basic earnings/(loss) per share | (236.5p) | 29.3p | |
| Diluted earnings per share | (236.5p) | 28.5p | |
| Net current liabilities | (112) | (521) | |
| Net assets/(liabilities) | 10,288 | 10,996 | |
| Net cash from operating activities | 686 | 998 | *-31%* |

Note: Flutter's combination with TSG completed on 5 May 2020. Reported financials include TSG included for 241 days post completion in 2020 and for the full year 2021. Junglee, acquired in January 2021 and Singular acquired in September, have been included in 2021 from the date of completion. A full analysis of the Group's pro forma performance can be found at pages 70 to 74. A reconciliation of the Group's pro forma performance to the Group's consolidated income statement is included at Appendix 2.

In 2021 reported revenue grew 37% year-on-year when compared to 2020. The primary driver of the strong year-on-year growth in 2021 was the completion of Flutter's acquisition of TSG on 5 May 2020. The prior year comparatives above include the results of TSG from the date of completion with the results for 2021 consolidated for the full year. Further expansion of our market leading US online business to 12 states in 2021 from 8 in 2020, strong growth in Australia and a normalised sporting calendar following widespread cancellations in 2020 also contributed to the year-on-year performance.

Sports revenue increased by 38% to £3.8bn, benefitting from (i) the impact of the acquisition of TSG during the prior year, (ii) Covid related sports fixture cancellations in the prior year, (iii) our US expansion into four additional states and (iv) continued strong momentum in Australia in 2021. Gaming revenue increased 34%, reflecting (i) the addition of the PokerStars and Sky Vegas businesses in May 2020 and (ii) good organic gaming growth in our FanDuel, Adjarabet, Paddy Power and Betfair businesses partly offset by challenging Covid related comparatives.

Cost of sales as a percentage of net revenue increased by 340 basis points to 38.3% with a higher proportion of revenue now coming from the US where direct costs are higher. A changing product/geographical revenue mix in International also contributed to this increase.

Operating costs increased 43% driven by growth in sales and marketing costs and investment in operations, mainly reflecting the impact of the TSG acquisition, the settlement of the historic legal case regarding Kentucky and a doubling of US investment to support significant new customer acquisition.

Reported EBITDA reduced by 6% to £723m driven by the increase in costs outlined above, regulatory changes impacting the UK & Ireland and International divisions as well as further expansion in the US where increased investment losses were incurred when compared with the prior year.

The Group incurred a loss after tax of £412m reflecting (i) an increase in depreciation and amortisation due to the acquisition of

TSG in the prior year (ii) increased financing costs of £226m which also reflect the cost of refinancing part of the Group's debt during 2021 and (iii) an increased tax charge of £124m incorporating a deferred tax charge in respect of the UK's main corporate tax rate change from 19% to 25% applicable from 1 April 2023. See Note 6 of the financial statements for more details.

When combined with the increased US losses, the Group had a basic loss per share of 236.5p in 2021 compared to basic earnings per share of 29.3p in 2020.

Net current liabilities reduced from £521m at 31 December 2020 to £112m at 31 December 2021 mainly due to increased cash balances following the refinancing of borrowings in July 2021 which increased general liquidity overall. As in previous years, the Group operates regularly in a net current liability position due to the Group's operating model whereby it receives payments for nearly all revenues in advance with material cost items paid in arrears.

Net assets reduced in the year from £11.0bn to £10.3bn due to a reported loss after tax of £412m as outlined above, the foreign currency translation impact of goodwill and intangible assets and the purchase of shares by the Employee Benefit Trust to settle US employee incentive schemes.

Net cash from operating activities reduced from £998m to £686m driven by the settlement of the Kentucky proceedings of £234m including associated legal costs. Other factors included a lower working capital increase compared to the prior year partially offset by the growth in the business due to the TSG acquisition.

A full analysis of the Group's pro forma performance (as though TSG was part of the Group for both periods in full) can be found at pages 70 to 74.

# Operating and financial review *continued*

## Operating and financial review [1-5,9-12] continued
### Separately disclosed items

| | FY 2021 £m | FY 2020 £m |
|---|---|---|
| Amortisation of acquisition related intangible assets | (543) | (432) |
| Kentucky settlement and associated legal costs | (163) | — |
| Transaction fees and associated costs | (22) | (33) |
| Restructuring and integration initiatives | (45) | (96) |
| Germany and Greece tax expense | (47) | — |
| Disposal of Oddschecker Global Media | 12 | — |
| Impairment | — | (23) |
| VAT refund | — | 11 |
| **Operating profit impact of separately disclosed items** | **(809)** | **(573)** |
| Financial income | — | 79 |
| Financial expense | (100) | (71) |
| **Profit before tax impact of separately disclosed items** | **(909)** | **(565)** |
| Tax credit on separately disclosed items | 43 | 58 |
| **Total separately disclosed items** | **(866)** | **(507)** |

Separately disclosed items do not relate to business as usual activity of the Group, items that are volatile in nature or non-cash purchase price accounting amortisation and therefore are excluded from Adjusted profits.

Amortisation of acquisition related intangible assets increased to £543m mainly due to the May 2020 combination with TSG, resulting in a full twelve month charge in 2021.

The Kentucky costs relate to the full and final settlement of a historic case taken by the Commonwealth of Kentucky against certain subsidiaries of TSG for $300m, with $100m already provided for, along with associated legal fees (£163m).

Restructuring and integration costs primarily relate to the integration with TSG.

The Greece and German tax expense relates to historic cases in both countries. The German tax assessment related to the Betfair Exchange which operated in Germany until November 2012. The assessment is a multiple of the German revenue generated by the Exchange but the German Federal Tax Court dismissed the Group's appeal in September 2021. The Greek tax authorities case against Paddy Power relates to a period when it was operating under an interim licence between 2012-14. Whilst the Group will continue to appeal these verdicts in both Germany and Greece, once-off expenses of £34m and £13m respectively (including interest and penalties) has been recognised.

Financial expense relates to repayment of the Group's Senior Notes in 2021 and additional fees from other repayment and refinancing activities associated with the Group's debt. The Senior Notes related expense includes settlement of the embedded derivative asset arising from the redemption option on the Senior Notes and the premium payable on repayment.

The tax credit of £43m has arisen primarily on recognition of a deferred tax asset on an internal transfer of intangibles of £68m, acquisition related intangible amortisation of £59m and the tax effect of other separately identifiable items of £20m, offset by a tax rate change on acquisition related intangible assets as result of the increase in the UK's main corporation tax rate from 19% to 25% from 1 April 2023 of £104m as outlined in Note 6 to the financial statements.

## Cash flow and financial position

| Pro forma | FY 2021 £m | FY 2020 £m |
|---|---:|---:|
| Adjusted EBITDA | 1,001 | 1,231 |
| Capex | (308) | (252) |
| Working capital | 119 | 310 |
| Corporation tax | (138) | (93) |
| Lease liabilities paid | (48) | (46) |
| Adjusted free cash flow | 625 | 1,151 |
| Cash flow from separately disclosed items | (61) | (120) |
| Free cash flow | 563 | 1,031 |
| Interest cost | (140) | (177) |
| Other borrowing costs | (57) | (24) |
| Settlement of swaps | (68) | (36) |
| Amounts paid in respect of Kentucky settlement | (234) | — |
| Purchase of shares by the Employee Benefit Trust ("EBT") | (181) | — |
| Acquisitions and disposals | 73 | — |
| Other | (13) | 22 |
| Proceeds from equity raise | — | 1,921 |
| Acquisition of further interest in FanDuel | — | (1,546) |
| Cash transferred in acquisitions/ disposals | 4 | — |
| Net (decrease)/increase in cash | (53) | 1,192 |
| Net debt[9] at start of year | (2,814) | (3,827) |
| Foreign currency exchange translation | (5) | (20) |
| Change in fair value of hedging derivatives | 225 | (159) |
| Net debt[9] as at 31 December | (2,647) | (2,814) |

The Group had Adjusted free cash flow of £625m in 2021, down from £1,151m in the prior year. The movement reflects (i) lower Adjusted EBITDA in 2021, (ii) a more favourable working capital movement in the prior year due to significant growth in the business which partially unwound in 2021, and (iii) increased Capex primarily to fund expansion into more US states.

Capital expenditure of £308m, reflects continued US investment as we expand into more US states. 2021 includes the upfront fee of (£22m) $25m for New York market access. We continue to materially invest in our online products across all regions.

Corporate tax payments were higher than the prior period due to the change in the geographic mix of profits during the year.

Working capital in the current year benefitted from the continued growth of our US business. The large working capital increase in 2020 was due to the enhanced scale of the Group and the timing of some gaming tax and product fee payments. This increase partially unwound in 2021.

Cash flow from SDIs of £61m principally relates to restructuring and integration costs in relation to the combination with TSG.

Interest costs were £37m lower than in 2020 on a pro forma basis due to the (i) repayment of debt following the Group's equity raise in May 2020 and (ii) reduction in the weighted average cost of debt following the May 2020 debt repayment and further refinancing of debt in July 2021.

During the period the Group incurred cash costs of £234m in relation to the settlement with the Commonwealth of Kentucky for a historic legal case with subsidiaries of TSG and includes associated legal fees.

The Employee Benefit Trust purchased £181m in Flutter shares to settle US employee incentive schemes that were put in place at the time of the original FanDuel acquisition to incentivise value creation in FanDuel.

The acquisitions and disposal relate to the acquisition of Junglee Games and Singular along with the disposal of Oddschecker during the period.

As at 31 December 2021, the Group had net debt of £2,647m, excluding customer balances, representing a leverage ratio of 2.6x times[9]. The Group continues to hedge the impact of currency fluctuations on its leverage ratio through cross currency swap agreements. Changes in the fair value of these hedging derivatives are reflected in net debt.

## Current trading/outlook
In the first 7 weeks to 20 February, Group revenue was in line with our expectations. Total Group revenue increased 2% year on year, reflecting strong comparatives in the first 7 weeks of 2021, which benefited from very favourable sports results.

Across H1 2021 the Group also benefited from favourable sports results, with group gross win margin 120 basis points above expected levels. In contrast, H2 margins were in line with expectations. As a result, we expect that Flutter's revenue growth in 2022 will accelerate as the year progresses, assuming expected sports results. This trend will also reflect the phasing of safer gambling measures introduced in 2021.

In Russia and Ukraine, we are continuing to monitor the situation closely. Since completion of our merger with TSG, Flutter has materially reduced its exposure to the Russian online market. In 2021, Russia accounted for £41m in contribution. In addition, Ukraine represented contribution of £19m.

# Operating and financial review continued

## Footnotes

1. "Adjusted" measures exclude items that are separately disclosed as they are: (i) not part of the usual business activity of the Group (ii) items that are volatile in nature and (iii) purchase price accounting amortisation of acquired intangibles (non-cash). Therefore, they have been reported as "separately disclosed items (SDIs)" (see note 6 to the financial statements).

2. EBITDA is defined as profit for the period before depreciation, amortisation, impairment, gain on disposal, financial income, financial expense and taxation and is a non-GAAP measure. This measure is used internally to evaluate performance, to establish strategic goals and to allocate resources. The directors also consider the measure to be commonly reported and widely used by investors as an indicator of operating performance and ability to incur and service debt, and as a valuation metric. It is a non-GAAP financial measure and is not prepared in accordance with IFRS and, as not uniformly defined terms, it may not be comparable with measures used by other companies to the extent they do not follow the same methodology used by the Group. Non-GAAP measures should not be viewed in isolation, nor considered as a substitute for measures reported in accordance with IFRS. All of the adjustments shown have been taken from the financial statements.

3. Flutter's combination with TSG completed on 5 May 2020. Pro forma numbers show the Group's financials with TSG included for a full 12-month period in 2020. Junglee, acquired in January 2021 and Singular acquired in September 2021, have not been included on a pro forma basis. See Appendix 2 for a reconciliation of pro forma results to statutory results.

4. Growth rates in the commentary are in local or constant currency[12] except reported numbers which are in nominal currency.

5. Average Monthly Players represent the average number of players who have placed and/or wagered a stake and/or contributed to rake or tournament fees during the month in the reporting period. AMP numbers do not include Junglee in 2020 or 2021 to allow for better comparability of underlying player growth for International and Group.

6. Online sportsbook market share is the GGR market share of FanDuel and FOX Bet for Q4 2021 in the states in which FanDuel was live based on published gaming regulator reports in those states. During Q4 2021 FanDuel was live in 12 states; Arizona (AZ), Colorado (CO), Connecticut (CT), Illinois (IL), Indiana (IN), Iowa (IA), Michigan (MI), New Jersey (NJ), Pennsylvania (PA), Tennessee (TN), Virginia (VA) and West Virginia (WV). During 2021 FOX Bet was live in 4 states; CO, NJ, MI and PA. Market share does not include Arizona for December as the data has yet to be released. Online gaming market share reflects the combined CT, MI, NJ, PA and WV market share of our gaming brands.

7. Global Play Well goal measured as the % of active online customers who use a safer gambling (Play Well) tool in the specified reporting period. Active players are defined as any players who have placed and/or wagered a stake and/or contributed to rake or tournament fees during the month in the reporting period. A safer gambling tool is any tool that a customer has used (or Flutter has applied to a customer) in the reporting period that helps to promote safer gambling. For the purposes of this 2021 measure Adjarabet and Junglee have been excluded. We will look to align with AMP reporting and work on expanding to include further brands as appropriate as we evolve our Play Well strategy.

## Appendix 1: Divisional Key Performance Indicators FY 2021
### Unaudited pro forma[1]

| £m | UK & Ireland | | | Australia | | |
|---|---|---|---|---|---|---|
| | FY 2021 | FY 2020 | CC[2] % Change | FY 2021 | FY 2020 | CC[2] % Change |
| Average monthly players[3] (000's) | 3,153 | 2,532 | +25% | 1,008 | 794 | +27% |
| Sportsbook stakes | 11,376 | 9,400 | +22% | 11,702 | 9,713 | +20% |
| *Sportsbook net revenue margin* | *9.9%* | *12.0%* | *-210bps* | *11.1%* | *11.1%* | *—bps* |
| Sports revenue | 1,282 | 1,286 | 0% | 1,294 | 1,075 | +20% |
| Gaming revenue | 781 | 743 | +5% | 0 | 0 | 0% |
| Total revenue | 2,063 | 2,029 | +2% | 1,294 | 1,075 | +20% |
| Cost of Sales | (621) | (577) | +8% | (636) | (520) | +22% |
| *Cost of sales as % of net revenue* | *30.1%* | *28.5%* | *+170bps* | *49.2%* | *48.4%* | *+80bps* |
| Gross Profit | 1,442 | 1,451 | 0% | 658 | 555 | +18% |
| Sales & marketing | (391) | (375) | +5% | (119) | (129) | -9% |
| Contribution | 1,051 | 1,077 | -2% | 539 | 426 | +26% |
| Other operating costs | (435) | (446) | -1% | (102) | (108) | -6% |
| Corporate costs | | | | | | |
| Adjusted EBITDA | 616 | 630 | -3% | 437 | 318 | +37% |
| *Adjusted EBITDA margin* | *29.9%* | *31.1%* | *-160bps* | *33.7%* | *29.6%* | *+420bps* |
| Depreciation & amortisation | (126) | (119) | +6% | (26) | (30) | -17% |
| Adjusted operating profit/(loss) | 490 | 511 | -5% | 411 | 288 | +42% |

1. Flutter's combination with TSG completed on 5 May 2020. Pro forma numbers show the Group's financials with TSG included for a full 12-month period in 2020. Junglee, acquired in January 2021 and Singular acquired in September 2021, have not been included on a pro forma basis. See Appendix 2 for a reconciliation of pro forma results to statutory results.

2. Constant currency ("cc") growth is calculated by retranslating the non-sterling denominated component of 2020 at 2021 exchange rates (see Appendix 4). Growth rates in the commentary are in local or constant currency.

3. Average Monthly Players represent the average number of players who have placed and/or wagered a stake and/or contributed to rake or tournament fees during the month in the reporting period. AMP numbers do not include Junglee in 2020 or 2021 to allow for better comparability of underlying player growth for International and Group.

8. Total NGR online market share in the UK and Ireland based on internal estimates. Total NGR online market share of Sportsbet based on competitor reporting and internal estimates.

9. Net debt is the principal amount of borrowings plus associated accrued interest, minus cash & cash equivalents plus/minus carrying value of debt related derivatives. Leverage is calculated using pro forma Adjusted EBITDA for the appropriate 12-month period. The leverage ratio is calculated using pro forma Adjusted EBITDA for the 12-month period to 31 December 2021.

10. Includes the gross value of derivatives.

11. Reported figures represent the IFRS reported statutory numbers. Where amounts have been normalised for SDIs they are labelled as Adjusted.

12. Constant currency ("cc") growth is calculated by retranslating the non-sterling denominated component of 2020 at 2021 exchange rates (see Appendix 4). Growth rates in the commentary are in local or constant currency.

13. Quantified safer gambling impacts are an approximate measure of the revenue estimated to have been lost due to changes in safer gambling measures during 2021. Due to the complexity of disaggregating from volatility in net win margins, Covid related behaviour and the wider market environment this amount does not yet include the effect of the changes on customer behaviour.

| | International | | | US | | | Group | | |
|---|---|---|---|---|---|---|---|---|---|
| | FY 2021 | FY 2020 | CC² % Change | FY 2021 | FY 2020 | CC² % Change | FY 2021 | FY 2020 | CC² % Change |
| | 1,901 | 1,938 | -2% | 1,557 | 910 | +71% | 7,619 | 6,174 | +23% |
| | 1,592 | 1,368 | +21% | 11,284 | 4,411 | +167% | 35,954 | 24,892 | +46% |
| | *8.7%* | *8.5%* | *+20bps* | *6.3%* | *4.6%* | *+170bps* | *9.1%* | *10.1%* | *-100bps* |
| | 220 | 180 | +26% | 978 | 458 | +126% | 3,774 | 3,000 | +27% |
| | 1,068 | 1,285 | -13% | 413 | 237 | +87% | 2,262 | 2,264 | +4% |
| | 1,288 | 1,465 | -8% | 1,391 | 695 | +113% | 6,036 | 5,264 | +17% |
| | (392) | (365) | +12% | (614) | (319) | +104% | (2,262) | (1,782) | +29% |
| | *30.4%* | *24.9%* | *+530bps* | *44.1%* | *46.0%* | *-190bps* | *37.5%* | *33.8%* | *+350bps* |
| | 897 | 1,100 | -14% | 778 | 376 | +121% | 3,774 | 3,483 | +11% |
| | (335) | (279) | +27% | (663) | (348) | +102% | (1,508) | (1,130) | +38% |
| | 562 | 822 | -28% | 115 | 28 | +383% | 2,266 | 2,353 | -2% |
| | (270) | (248) | +9% | (357) | (198) | +92% | (1,164) | (1,000) | +19% |
| | | | | | | | (101) | (121) | -13% |
| | 292 | 574 | -46% | (243) | (170) | +50% | 1,001 | 1,231 | -18% |
| | *22.7%* | *39.2%* | *-1,580bps* | *(17.5%)* | *(24.4%)* | *+730bps* | *16.6%* | *23.4%* | *-700bps* |
| | (52) | (50) | +6% | (47) | (37) | +35% | (255) | (241) | +7% |
| | 240 | 524 | -51% | (289) | (207) | +47% | 746 | 990 | -24% |

# Operating and financial review continued

## Appendix 2: Reconciliation of pro forma results to statutory results

The merger of Flutter and TSG completed on 5 May 2020, with the merger accounted for as an acquisition of TSG by Flutter on that date. The statutory results reflect this accounting treatment. Pro forma results for the Group are prepared as if Flutter and TSG had always been merged and are included in these preliminary results, as they best represent the Group's underlying performance. The difference between the statutory and pro forma results is inclusion of the results of TSG in the period prior to completion as per the table below. Junglee, which was acquired in January 2021 and Singular acquired in September, have been included in reported figures but not on a pro forma basis due to materiality.

| £m | Pro forma adjusted results FY 2021 | FY 2020 | TSG results pre-merger completion* FY 2021 | FY 2020 | Separately disclosed items FY 2021 | FY 2020 | Statutory results FY 2021 | FY 2020 |
|---|---|---|---|---|---|---|---|---|
| Sports revenue | 3,774 | 3,000 | | 275 | | | 3,774 | 2,725 |
| Gaming revenue | 2,262 | 2,264 | | 592 | | 16 | 2,262 | 1,688 |
| Total revenue | 6,036 | 5,264 | — | 866 | — | 16 | 6,036 | 4,414 |
| Cost of sales | (2,262) | (1,782) | | (243) | (47) | (3) | (2,310) | (1,542) |
| Cost of sales as a % of net revenue | 37.5% | 33.8% | | | | | 38.3% | 34.9% |
| Gross profit | 3,774 | 3,483 | — | 624 | (47) | 13 | 3,727 | 2,872 |
| Sales and marketing | (1,508) | (1,130) | | (139) | | | (1,508) | (991) |
| Contribution | 2,266 | 2,353 | — | 484 | (47) | 13 | 2,219 | 1,881 |
| Other operating costs | (1,164) | (1,000) | | (113) | (163) | | (1,328) | (887) |
| Corporate costs | (101) | (121) | | (29) | (67) | (131) | (168) | (222) |
| EBITDA | 1,001 | 1,231 | — | 342 | (278) | (118) | 723 | 772 |
| EBITDA margin | 16.6% | 23.4% | | | | | 12.0% | 17.5% |
| Depreciation and amortisation | (255) | (241) | | (28) | (531) | (455) | (786) | (668) |
| Operating profit | 746 | 990 | — | 314 | (809) | (573) | (63) | 104 |
| Net finance expense | (126) | (177) | | (67) | (100) | 7 | (226) | (102) |
| Profit/(loss) before tax | 620 | 813 | — | 247 | (909) | (565) | (288) | 1 |

The following table reconciles pro forma Adjusted revenue and EBITDA by division to revenue from external customers (before VAT refund for FY 2020) and Adjusted EBITDA as disclosed in the Financial Statements (Note 5).

| £m | Pro forma adjusted results FY 2021 | FY 2020 | TSG results pre-merger completion* FY 2021 | FY 2020 | Statutory results FY 2021 | FY 2020 |
|---|---|---|---|---|---|---|
| Revenue by division | | | | | | |
| UK & Ireland | 2,063 | 2,029 | — | 290 | 2,063 | 1,739 |
| Australia | 1,294 | 1,075 | — | 87 | 1,294 | 989 |
| International | 1,288 | 1,465 | — | 468 | 1,288 | 997 |
| US | 1,391 | 695 | — | 22 | 1,391 | 673 |
| Adjusted EBITDA by division | | | | | | |
| UK & Ireland | 616 | 630 | — | 118 | 616 | 513 |
| Australia | 437 | 318 | — | 11 | 437 | 307 |
| International | 292 | 574 | — | 264 | 292 | 310 |
| US | (243) | (170) | — | (22) | (243) | (148) |
| Corporate costs | (101) | (121) | — | (30) | (101) | (92) |

\* Note the adjustments to reflect the exclusion of TSG results prior to the merger also include any transactions that are now deemed to be intercompany as a result of the merger.

## Appendix 3: Reconciliation of pro forma to statutory earnings per share

The merger of Flutter and TSG completed on 5 May 2020, with the merger accounted for as an acquisition of TSG by Flutter on that date. The statutory results reflect this accounting treatment. Pro forma results for the Group are prepared as if Flutter and TSG had always been merged. The difference between the statutory and pro forma results is the inclusion of the results of TSG in the period prior to completion as per the table below. The calculation of earnings per share also requires an adjustment to the assumed number of shares outstanding in the period as set out in the table below:

| £m | Pro forma adjusted results | | TSG results pre-merger completion[1,2] | | Separately disclosed items[3] | | Statutory results | |
|---|---|---|---|---|---|---|---|---|
| | FY 2021 | FY 2020 | FY 2021 | FY 2020 | FY 2021 | FY 2020 | FY 2021 | FY 2020 |
| Profit for EPS calculation | 444 | 756 | | (234) | (860) | (484) | (416) | 38 |
| Weighted average number of shares ('000s) | 175,780 | 152,163 | | (22,605) | | | 175,780 | 129,558 |
| Adjusted basic EPS (pence) | 253 | 497 | | | | | (237) | 29 |

1. TSG pre-acquisition profit of £234m is comprised of £314m operating profit, £67m interest expense and £13m taxation charge.

2. Assumes the issuance of 65,316,588 Flutter ordinary shares as consideration of the acquisition of The Stars Group on 5 May 2020 occurred on 1 January 2020, and the issuance of 819,230 Flutter ordinary shares as consideration for the acquisition of the remaining 20% of the outstanding share capital of TSG Australia on 13 May 2020 occurred on 1 January 2020.

3. See note 6 of the financial statements.

# Operating and financial review continued

## Appendix 4: Reconciliation of pro forma growth rates to pro forma constant currency growth rates

Constant currency ("cc") growth is calculated by retranslating non-sterling denominated component of FY 2020 at FY 2021 exchange rates as per the table below.

| £m | FY 2021 | FY 2020 | % Change | FY 2020 FX impact | FY 2020 CC | CC % Change |
|---|---|---|---|---|---|---|
| Sports revenue | 3,774 | 3,000 | +26% | (31) | 2,969 | +27% |
| Gaming revenue | 2,262 | 2,264 | 0% | (78) | 2,186 | +4% |
| Total revenue | 6,036 | 5,264 | +15% | (109) | 5,155 | +17% |
| Cost of sales | (2,262) | (1,782) | +27% | 32 | (1,749) | +29% |
| *Cost of sales as a % of net revenue* | *37.5%* | *33.8%* | *+360bps* | | *33.9%* | *+350bps* |
| Gross profit | 3,774 | 3,483 | +8% | (77) | 3,406 | +11% |
| Sales and marketing | (1,508) | (1,130) | +33% | 35 | (1,095) | +38% |
| Contribution | 2,266 | 2,353 | -4% | (42) | 2,311 | -2% |
| Other operating costs | (1,164) | (1,000) | +16% | 21 | (979) | +19% |
| Corporate costs | (101) | (121) | -17% | 5 | (116) | -13% |
| Adjusted EBITDA | 1,001 | 1,231 | -19% | (16) | 1,215 | -18% |
| *Adjusted EBITDA margin* | *16.6%* | *23.4%* | *-680bps* | | *23.6%* | *-700bps* |
| Depreciation and amortisation | (255) | (241) | +6% | 4 | (238) | +7% |
| Adjusted operating profit | 746 | 990 | -25% | (12) | 978 | -24% |
| Revenue by division | | | | | | |
| UK & Ireland | 2,063 | 2,029 | +2% | (6) | 2,022 | +2% |
| Australia | 1,294 | 1,075 | +20% | 5 | 1,081 | +20% |
| International | 1,288 | 1,465 | -12% | (67) | 1,398 | -8% |
| US | 1,391 | 695 | +100% | (41) | 654 | +113% |
| Adjusted EBITDA by division | | | | | | |
| UK & Ireland | 616 | 630 | -2% | 6 | 636 | -3% |
| Australia | 437 | 318 | +37% | 1 | 320 | +37% |
| International | 292 | 574 | -49% | (36) | 537 | -46% |
| US | (243) | (170) | +43% | 8 | (162) | +50% |
| Corporate costs | (101) | (121) | -17% | 5 | (116) | -13% |

Strategic report

## Appendix 5: Reconciliation of pro forma cash flow to reported statutory cash flow

In the operating and financial review the cash flow has been presented on a pro forma net cash basis. The merger of Flutter and TSG completed on 5 May 2020, with the merger accounted for as an acquisition of TSG by Flutter on that date. The statutory cash flow reflects this treatment while the pro forma cash flow is prepared as if Flutter and TSG had always been merged. The difference between the net cash basis and the reported cash flow is the inclusion of borrowings to determine a net cash position.

| £m | Pro forma cash flow | | TSG results pre-merger completion | | Adjustment to include borrowings | | Statutory cash flow | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 | 2021 | 2020 | 2021 | 2020 |
| Adjusted EBITDA[1] | 1,001 | 1,231 | | 342 | | | 1,001 | 889 |
| Capex[2] | (308) | (252) | | (33) | | | (308) | (219) |
| Working capital[3] | 119 | 310 | | (8) | | | 119 | 318 |
| Corporation tax | (138) | (93) | | (3) | | | (138) | (89) |
| Lease liabilities paid | (48) | (46) | | (5) | | | (48) | (41) |
| Adjusted free cash flow | 625 | 1,151 | — | 293 | — | — | 625 | 858 |
| Cash flow from separately disclosed items[4] | (61) | (120) | | | | | (61) | (120) |
| Free cash flow | 563 | 1,031 | — | 293 | — | — | 563 | 738 |
| Interest cost[5] | (140) | (177) | | (64) | | | (140) | (113) |
| Other borrowing costs[5] | (57) | (24) | | | | | (57) | (24) |
| Settlement of swaps | (68) | (36) | | | | | (68) | (36) |
| Amounts paid in respect of Kentucky settlement | (234) | — | | | | | (234) | — |
| Purchase of shares by the EBT | (181) | — | | | | | (181) | — |
| Acquisitions and disposals[6] | 73 | — | | | | | 73 | — |
| Other[7] | (13) | 22 | | 6 | | | (13) | 16 |
| Proceeds from equity raises | — | 1,921 | | | | | — | 1,921 |
| Acquisition of further interest in FanDuel | — | (1,546) | | | | | — | (1,546) |
| Net amounts repaid on borrowings[8] | | | | | 416 | (923) | 416 | (923) |
| Cash acquired in business combinations[6] | 4 | — | | | | 445 | 4 | 445 |
| Net increase/(decrease) in cash | (53) | 1,192 | — | 235 | 416 | (478) | 363 | 479 |
| Net (debt)/cash at start of year[9] | (2,814) | (3,827) | (3,328) | (3,563) | 89 | 372 | 603 | 108 |
| Foreign currency exchange translation | (5) | (20) | | | (10) | 37 | (15) | 17 |
| Change in fair value of hedging derivatives | 225 | (159) | | | (225) | 159 | — | — |
| Net debt as at 31 December[9] | (2,647) | (2,814) | (3,328) | (3,328) | 271 | 89 | 952 | 603 |

1. Adjusted EBITDA includes the following line items in the statutory cash flow: Profit for the period, separately disclosed items, tax expense, financial income, financial expense and depreciation and amortisation.

2. Capex includes purchase of property, plant and equipment, purchase of intangible assets, capitalised internal development expenditure, lease incentive received and payment of contingent deferred consideration.

3. Working capital includes (increase)/decrease in trade and other receivables, increase in trade, other payables and provisions, employee equity-settled share-based payments expense before separately disclosed items, loss / (gain) on disposal of assets and investments and foreign currency exchange loss/(gain).

4. Cash flow from separately disclosed items relates to transaction fees, along with restructuring and integration costs.

5. Interest and other borrowing costs includes interest paid, interest received and fees in respect of borrowing facilities.

6. The combination of acquisition and disposals of (£73m) and cash acquired in business combinations (£4m) reconciles to the statutory cash flow amounts for disposal of assets (£127m) offset by purchase of a business net of cash acquired.

7. Other includes proceeds from the issue of shares on exercise of employee options, dividends paid to non-controlling interest, release of cash from restricted cash, lease interest paid and other.

8. Net amounts repaid on borrowings includes repayment of USD First Lien Term Loan B, full settlement of the Senior Notes and additional debt drawn down on GBP First Lien Term Loan A and USD First Lien Term Loan B.

9. Net debt comprises principal outstanding balance of borrowings, accrued interest on those borrowings, cash and cash equivalents and derivatives held for hedging debt instruments.

**Jonathan Hill**
Chief Financial Officer
14 March 2022

Risks

# Understanding and managing our <span style="color:#2ca5d8">principal risks</span>

Risk-informed decisions lie at the heart of our ability to continue evolving the business and prepare for the future. Robust risk management drives better performance and commercial outcomes, protects our people and our brands, and supports our desire to grow a sustainable and resilient business.

Our risk management teams empower people to make informed decisions that fuel growth and drive commercial success.

We do this by:

- helping people consider what might affect successful outcomes;
- balancing the pros and cons of actions and decisions;
- identifying and avoiding risks early;
- speeding up, not slowing down decision making; and
- partnering, empowering and defending the business.

Through 2021, we have strengthened and built upon our strong foundations of risk management, such as the redesigned risk governance structures put in place in the prior year. We have continued to enhance our risk processes, capabilities and structures in all our divisions through working closely with the divisional Chief Risk Officers and at Group level, with a focus on ensuring our top-down and bottom-up risks are identified, assessed and being proactively monitored and managed. We also developed a three-year strategy for risk, with a clear vision, principles and roadmap to act as our guiding compass across the Group.

### Risk management framework

Our framework, embedded across the divisions and Group, ensures a standardised and aligned approach of identification, management and reporting of risks and sets out a structured and consistent approach to threats and opportunities throughout all of our operations. Our risk management framework is reinforced by integrated processes which harness the collective risk insights and information of the Group. The maturity of our risk structures has enabled us to integrate our bottom-up and top-down risk perspectives, ensuring transparency of threats, opportunities and controls in the context of individually and collectively held strategic objectives.



## 2021 highlights

### Framework maturity
A key priority for 2021 was the top to bottom risk identification, assessment and review of our divisions, brands and functions, with over 1,000 risks identified, assessed and under management across the divisions and the Group.

Enterprise and Divisional Risk Committees covered over 50 key risk and compliance topics and themes, and we continued to invest in risk and compliance resources, with over 100 people in place across our four divisions and the Group.

### Horizon scanning
We established a robust process collating emerging risk perspectives, informed by divisions, relevant corporate subject matter experts and leadership, to provide a Group-wide view.

We define an emerging risk is a potentially significant threat with an uncertain impact restricting our ability to confidently define a strategy and build capabilities to significantly influence the materiality of the risk. Examples include accelerated digitalisation and technological advances, and climate change.

### The Task Force on Climate-related Financial Disclosures ("TCFD")
We recognise that climate change poses a number of physical (e.g. extreme weather events affecting sporting events) and transition-related (e.g. stakeholder perception) risks and opportunities for our business. As part of our commitment to operate ethically and sustainably, we take a risk-based collaborative and strategic approach to climate change. We are aligning internal processes with the recommendations of the TCFD.

More in-depth information on our progress and plans can be found on page 60



### Risk management processes

Given the dynamic nature of risk and the agility of our business, our enhanced framework operates as a business process at all levels of Flutter. Integration with strategy and performance, in addition to ongoing risk management processes, will ensure robust and effective risk management to support in maximising the performance of our brands, our divisions and the Group as a whole.

See page 89



### Enhancing our risk framework for 2022

Looking ahead to 2022, some of the key areas of focus for risk management include the following:

#### Risk strategy
Further embedding and building upon the enhanced risk processes, capabilities and governance structures within the divisions and at Group level to ensure efficient reporting, escalation and communication lines, complemented with clear accountability for risks.

#### Aligned assurance
Alignment of assurance activities across the Group by our three lines, and mapping these processes to provide integrated risk insights and reporting.

#### GRC technology
Integrated governance, risk and compliance ("GRC") technology will automate routine compliance, risk and governance processes and workflows to enable more efficient and effective reporting and collaboration.

**Risks** continued

## Risk governance structure

Our risk governance within the Group enables agile decision making, easy escalation of material matters and transparent reporting. We deploy the Three Lines Model to support the Board in its responsibilities for risk management. Clarity of ownership and responsibility is pervasive throughout the Group, supported by our robust governance structure.

**Board**
The Board has overall responsibility for overseeing the Group's internal control and risk management processes, ensuring appropriate and robust systems of internal control and risk management are in place to identify, manage and mitigate the risks to the overall viability of the Group.

**Other Committees**
Committees include: The Nomination Committee, The Remuneration Committee and the Market Disclosure Committee. Each Committee Chair formally reports to the Board following their meetings and makes any recommendations to the Board in line with their Terms of Reference. Refer to the Governance section on page 106 for further information.

**Risk and Sustainability Committee**
The Risk and Sustainability Committee has responsibility for ensuring our first and second line functions are performing their roles in managing risk across the divisions and the Group. In addition, it is responsible for overseeing the Group sustainability strategy, and monitoring and providing challenge on the principal and emerging risks facing the Group.

**Audit Committee**
The Audit Committee has responsibility for ensuring the integrity of the Group's financial reporting and internal control and risk management systems, as well as reviewing the work of the Internal Audit function and considering the reports presented by the external auditor. On an annual basis, the Audit Committee performs an effectiveness review of the risk framework.

**Executive Committee**
Day-to-day management of the business and operations. Execution of the strategy is delegated to the Chief Executive Officer and the Executive Committee.

**Executive Risk Committee**
Chaired by the Chief Legal Officer and Group Commercial Director, this Committee has the responsibility for identifying, assessing, monitoring and challenging material risks and taking advantage of opportunities for the Group.

**Divisional Risk Committees**
Chaired by the local Chief Risk Officer, or equivalent, the main objectives of these Committees are to ensure proper alignment of risk management with the strategy, performance and sustainability of each division.

**First line**
Executive Management and Operational teams in our divisions with responsibility for:
- risk ownership: know their businesses, know their processes and hence know their risks;
- decision making driven by risk/ reward trade-offs;
- establishing and developing the divisional risk and control environment;
- managing risk events and decisions within appetite; and
- identifying and quantifying risks.

**Second line**
Divisional Advisory and Oversight functions with responsibility for:
- oversight on reporting risk, control quality and emerging risks;
- providing guidance and subject matter expertise to first line in relation to risk management practices; and
- maintaining of divisional policy and internal control framework.

Our Group functions including Group Legal & Commercial, Group Technology, Group Finance and Group People reinforce and complement the divisional second lines, and provide further advisory, assurance and oversight capabilities.

**Third line**
Group Internal Audit team with responsibility for:
- providing independent challenge and assurance that risks are appropriately managed;
- systematic evaluation and monitoring of controls including internal control framework and operational effectiveness of controls; and
- identifying efficiencies and process improvement opportunities.



Strategic report

### 1. Identify risks

Our robust methodology identifies material and emerging risks across the divisions and wider Group.

### 2. Assess and quantify risks

Analyse risks and controls and evaluate the commercial, strategic, regulatory and other impacts, as well as the likelihood of occurrence.

### 3. Develop action plans to manage and mitigate risk

Risk owners assess effectiveness and adequacy of controls. If additional mitigation is required, these are identified and actions plans detailed with responsibilities assigned.

### 4. Monitor and reassess risk post mitigation and report

Management is responsible for monitoring controls and progress of actions to manage principal risks and is supported through the Group's internal audit and assurance programmes which evaluate the design and effectiveness of controls.

### 5. Continuous review

The risk management process is continuous and evolving; principal and emerging risks are reported to both the Board Risk and Sustainability and Audit Committees, and more regularly through the Executive and Divisional Risk Committees.



Risk governance

Risk culture

1. Identify

2. Assess

**Risk Management Framework**

3. Mitigate

4. Monitor and report

5. Continuous review

**Risks** continued

## Identifying our principal risks

The principal risks and uncertainties which are considered to have a material impact on the Group's future performance, sustainability and strategic objectives are set out on the following pages. These were identified through risk assessments across the Group and from each of the divisions at a point in time and will continue to be monitored. Both external and internal risk factors in the current and medium-term time periods have been considered. This process also complements our Group horizon scan.[1]

This is not an exhaustive and extensive analysis of all risks which may affect the Group. Additional risks and uncertainties currently deemed to be less material, or not presently known to management, may also have an effect on the performance and strategic objectives of the Group.

**Key:**

**Impact:** Impact on the business if the risk materialises.

**Likelihood:** Likelihood of occurrence of the risk in the next three years after taking into account mitigation activities by the business.

 High

 Medium

 Low

**Links to strategy:**

 Maximise profitable growth in core market

 Maintain and grow US leadership position

 Attain podium positions in international market

 Grow business in rest of world

| Principal risk/ uncertainty | Why we need to manage this | How we manage and mitigate the risk | Residual impact/ likelihood |
|---|---|---|---|

### Changing legal, regulatory, tax and licensing landscape — Links to strategy: 

| | | | |
|---|---|---|---|
| **Risk category:**<br>• External dynamics<br><br>**Future Trend:**<br>• Stable<br><br>**Risk owner:**<br>• CLO | The complex and constantly changing regulatory environments in which we operate, in terms of multiple jurisdictions, tax regimes and licensing obligations, can make it commercially challenging for the us to operate, or impact our ability to grow at pace. | • We have dedicated internal and external Legal, Regulatory, Compliance and Tax teams covering all regions with responsibility for working with, and advising management on any upcoming regulatory changes, to set appropriate policies, processes and controls to adapt and ensure compliance.<br>• Improved regulatory profile with an increased proportion of revenues coming from regulated markets and a continuous focus on reducing exposure to higher risk jurisdictions.<br>• For material markets, we invest significantly in external counsel advice to conduct ongoing monitoring and to guide and support strategic decision making and planning associated with these markets.<br>• We invest continuously in the flexibility of our in-house technology which is key for entering or remaining in markets, and allowing for adaptability and flexibility of our products as market conditions change.<br>• Flutter and its divisions have dedicated Corporate Affairs teams and hold memberships with associations and industry groups working with regulators and governments to influence and drive proportionate, transparent and reasonable regulation and taxation in all markets. | **Impact:**<br><br><br>**Likelihood:** |

### Cyber resilience — Links to strategy: 

| | | | |
|---|---|---|---|
| **Risk category:**<br>• Cyber and business resilience<br><br>**Future Trend:**<br>• Stable<br><br>**Risk owner:**<br>• CIO | We are dependent on technology to support its products, business activities and customer operations. Cyber maturity and capabilities across our expanding Group vary and may increase the number of potential attack vectors or internal threats, which could lead to financial loss, data breaches, regulatory action and reputational damage. | • We invest significantly in cyber security resources, capabilities and technologies, and work with a variety of external security specialists to ensure security arrangements and systems are appropriate for our evolving threat and continue to follow leading practice.<br>• The Group Chief Information Security Officer works with the Group and divisional information security teams to devise and advance our strategy for cyber security, enhance our control assurance capabilities and governance.<br>• The Flutter cyber security team owns and reports on the Group-wide cyber policy detailing our key cyber topics and control standards, with periodic review and approval, in addition to internal and external annual assessment of security maturity.<br>• Flutter cyber assurance framework established, with risk assessments ongoing to provide assurance that security controls implemented protect against key risk topics. | **Impact:**<br><br><br>**Likelihood:**<br><br> |

1   While not a principal risk, we recognise the area of climate change is evolving quickly. It is currently monitored as an emerging risk. This will be reassessed in 2022 following the completion of a focused bottom-up risk assessment.

Strategic report

| Principal risk/<br>uncertainty | Why we need<br>to manage this | How we manage<br>and mitigate the risk | Residual impact/<br>likelihood |
|---|---|---|---|

**US growth execution and competition**                                              Links to strategy:

| | | | |
|---|---|---|---|
| **Risk category:**<br>• Strategy<br>**Future Trend:**<br>• Stable<br>**Risk owner:**<br>• CEO(s) | The successful execution of the growth strategy for the US business across its brands and partnerships is critical to our long-term ambitions. | • We continue to establish and maintain strong commercial relationships with our market access partners and strategic media partners to secure access to new markets and maintain growth.<br>• We continue to invest in people, product and brands to acquire further market share and to maintain the agility, scalability and leading market positions for our products.<br>• In addition, we also have dedicated external advisers, internal expertise and resources to support with the monitoring and assessment of the US competitive landscape to take appropriate actions.<br>• We continue to develop our in-house technology stack, including the adoption of our proprietary global betting platform for the provision of sports betting, to continuously improve our offering and meet evolving stakeholder needs.<br>• Our dedicated US Legal, Risk and Compliance teams work closely with the business teams to monitor ongoing compliance across multiple jurisdictions to continuously improve our processes and controls to ensure compliance with our federal and state obligations. | **Impact:**<br>🔴<br>**Likelihood:**<br>🟡 |

**International technology transformation**                                          Links to strategy:

| | | | |
|---|---|---|---|
| **Risk category:**<br>• Technology<br>**Future Trend:**<br>• Decreasing<br>**Risk owner:**<br>• CEO(s) | Challenges to transform, expand and scale our capabilities, given variances in legacy entities, which may lead to lower than desired resilience, reliability and product agility. | • Full restructure by CIO and key new leadership roles in International Technology function, recruiting externally and leveraging internal talent from other brands and divisions.<br>• Full review of the International division's technology risk profile with clear plans and structures in place to improve, using a risk-based approach.<br>• Our revised technology strategy has been defined to support significant market growth and expansion.<br>• We continue to invest in resources, software and hardware to address themed strategic initiatives, which address stability, process, people and technology.<br>• Focused support from external advisers, strategic partners and experts to support with technology transformation delivery. | **Impact:**<br>🟡<br>**Likelihood:**<br>🔴 |

**Global talent acquisition**                                                        Links to strategy:

| | | | |
|---|---|---|---|
| **Risk category:**<br>• People<br>**Future Trend:**<br>• Increasing<br>**Risk owner:**<br>• CPO(s) | Acquisition of key talent, senior management and leadership positions across the Group, and their successful retention, to satisfy the needs of our growing organisation is critical to achieving our strategic objectives. | • Our employee value proposition has been amplified for all our brands to to attract the right talent, with the skills, capabilities and experience for Flutter.<br>• Dedicated workstreams led by the Group CPO function to align processes and identify talent acquisition partners to support internal teams to build a pipeline and attract the best talent for the Group going forward.<br>• Flutter launched its vision, purpose and values, in alignment with divisional perspectives, supported by playbooks, talkshops and toolkits. Surveys continue to be conducted to listen and learn from employees and understand colleague engagement levels Group wide.<br>• We conduct extensive market research and benchmarking to ensure that the Group maintains an attractive employee value proposition.<br>• The Group and divisional CPOs address our talent matters in a prioritised manner and build capability to address gaps and facilitate talent mobility. | **Impact:**<br>🟡<br>**Likelihood:**<br>🔴 |

# Risks continued

**Key:**

**Impact:** Impact on the business if the risk materialises.

**Likelihood:** Likelihood of occurrence of the risk in the next three years after taking into account mitigation activities by the business.

🔴 High

🟡 Medium

🟢 Low

Links to strategy:

📊 Maximise profitable growth in core market

📋 Maintain and grow US leadership position

🏅 Attain podium positions in international market

⏩ Grow business in rest of world

| Principal risk/ uncertainty | Why we need to manage this | How we manage and mitigate the risk | Residual impact/ likelihood |
|---|---|---|---|
| **Compliance with existing legal, regulatory and licensing landscape** | | | Links to strategy:   |
| **Risk category:**<br>• Legal<br><br>**Future Trend:**<br>• Stable<br><br>**Risk owner:**<br>• CLO | The interpretation and ongoing compliance with complex and multiple regulatory and legislative requirements applicable to the Group's activities in the markets in which it operates underpins the sustainability and reputation of our business. | • For the jurisdictions in which we hold a licence, dedicated Divisional Compliance teams work closely with the business teams to monitor ongoing compliance and continuously enhance our processes and controls to ensure compliance with regulatory frameworks and licence requirements.<br>• We have a number of Group-led overarching policies and compliance programmes to govern processes across divisions and thereby ensure compliance with applicable laws and regulations.<br>• Detailed policy and procedures across each division ensure local regulatory requirements are documented, monitored and reviewed periodically.<br>• Annual compliance training, including Anti-Bribery and Corruption ("ABC"), Data Protection ("DP") and Anti-Money Laundering ("AML"), is mandatory for all staff, as well as regular, targeted training and awareness sessions.<br>• Divisional and Group management provide periodic legal and regulatory updates through established governance forums at both divisional and Group level Committees. | **Impact:**<br>🟡<br><br>**Likelihood:**<br>🟡 |
| **Global talent management and retention** | | | Links to strategy:   |
| **Risk category:**<br>• People<br><br>**Future Trend:**<br>• Increasing<br><br>**Risk owner:**<br>• CPO(s) | The people who work within Flutter are key to our the success. Insufficient management and retention of key individuals may impact our ability to deliver on our strategic and operational objectives. | • Flutter Workforce Engagement Committee established to ensure the Group has a culture that underpins its vision, values and strategy, and to provide an employee voice to the Board.<br>• The Remuneration Committee and wider reward programmes review the structures in place for our people with the objective to incentivise, motivate and retain talent to support the delivery of the Group's long-term strategy.<br>• We communicate through different platforms to underscore key career development opportunities, highlight employee recognition programmes and bring attention to strategic programmes such as DEI.<br>• Regular engagement surveys take place for all colleagues to ensure we understand the values and behaviours that are important to staff and the brands they support.<br>• The Group and divisional CPO functions continue to drive health and wellbeing initiatives as part of our dynamic Future Ways of Working approach. | **Impact:**<br>🟡<br><br>**Likelihood:**<br>🟡 |

Strategic report

| Principal risk/<br>uncertainty | Why we need<br>to manage this | How we manage<br>and mitigate the risk | Residual impact/<br>likelihood |
|---|---|---|---|

**Third parties and key suppliers**                              Links to strategy: 

**Risk category:**
- Cyber and business resilience

**Future Trend:**
- Stable

**Risk owner:**
- CEO(s)

Across our divisions and Group, we place reliance upon certain critical suppliers of technology, marketing, sports content and media which are fundamental to our business and product offerings. The effective management of critical third party relationships, performance and regulatory expectations is key to our strategic objectives.

- Strategic and critical suppliers are subject to regular business and quality reviews to ensure ongoing relationship and performance management.
- The Group Procurement and Third Party Assurance functions maintain a Risk Heatmap to monitor strategic and critical suppliers and ensure continuity of critical services.
- As part of our procurement processes, we employ dedicated resources supplemented by subject matter expertise within risk, compliance, legal and technology assurance to protect and enhance value, demonstrate our high standards of corporate integrity, and reinforce organisational resilience.
- Where possible, we limit reliance on a single supplier to reduce potential single point of failure.

**Impact:**
🔴

**Likelihood:**
🟢

---

**Safer gambling strategy**                              Links to strategy:

**Risk category:**
- Sustainability

**Future Trend:**
- Stable

**Risk owner:**
- CLO

Safer gambling underpins every element of the our strategy. We want to demonstrate consistency and global alignment with our safer gambling strategy to protect our customers who are at risk of the potential negative effects of gambling and ensure we grow our business sustainably.

- Our safer gambling strategy informs everything from how we identify and interact with at-risk customers through to how we communicate to our broad group of stakeholders and how we encourage safer gambling tool usage.
- We leverage and share policies, processes and practices across the ever expanding Group to enhance the strategic approach to safer gambling and demonstrate our commitment to ESG.
- A leading range of tools are provided on all our brand sites to support customers in managing their spend and play, and we are continually working to improve and enhance our tools and site content to enable us to identify and interact with at-risk customers.
- We work closely with leading external third parties to facilitate internal teams to enhance our understanding, and capabilities in relation to identification of problem gambling through the use of artificial intelligence.
- We invest significantly in improvements for tackling the problem through donations to research, treatment and education initiatives, as well as through driving collaboration across the industry with other operators, charities and regulatory bodies.

**Impact:**
🟡

**Likelihood:**
🟢

---

**Technology resilience – availability and stability**                              Links to strategy:

**Risk category:**
- Technology

**Future Trend:**
- Decreasing

**Risk owner:**
- CIO

We have a critical dependency on our in-house technology, and on certain material third parties, to maintain the stability and availability of our customer-facing products, as well as the ability to recover in a timely manner from severe disruption with minimal impact on our customers and products.

- We invest in our proprietary technology and resources to improve IT resilience, eliminate single points of failure and drive better performance.
- We have established a standard scale to better compare the IT disaster recovery resilience levels in each division and ensure adequate improvement plans are developed and tracked to mitigate any material risks.
- We have dedicated resources to develop, enhance and test our disaster recovery capability for our key products across all our brands of the Group.
- Key global metrics on critical systems and platforms which are regularly monitored and reported on identify any potential emerging issues on our brands or customer-facing technologies.
- We have a defined formal incident management process in place for identifying, escalating and resolving issues and a post-incident process to ensure we continuously improve our proprietary technology stack and incident response processes.

**Impact:**
🟢

**Likelihood:**
🟡

Viability statement

# Managing our business for the longer term

## Longer-term viability

The Board, taking into consideration the Group's principal risks and uncertainties, including emerging risks, assessed the long-term viability of the Group in line with the requirements of the 2018 UK Corporate Governance Code. Its conclusions are outlined below.

### Viability assessment: period

Flutter continues to deem a three-year timeframe appropriate for the assessment of the Group's viability, having had regard to:

- the Board's strategic planning horizon and associated principal risks;
- the possible impact of future regulatory change and the pace of technological change, as well as variations in industry and commercial dynamics; and
- the performance period for the Group's Long Term Incentive Plan.

Overall, a three-year timeframe is deemed to achieve a suitable balance between long and near-term influences.

### Viability assessment: approach

The viability of the Group is assessed against strategic plans and projections, and considers cash flows, committed funding and liquidity positions, forecast future funding requirements and other key financial ratios.

The Directors' assessment and stress testing have been made with reference to the strong cash generation capabilities of the Group, its committed debt facilities, including its £482m committed revolving credit facility which expires in May 2025, the Board's risk appetite and the principal risks and uncertainties and how they are managed, as detailed on pages 84 to 91.

The Directors also assessed the potential financial and operational impacts, in severe but plausible scenarios, of the principal risks and uncertainties and the likely degree of effectiveness of current and available mitigating actions.

## Assessment of prospects

The Directors carried out a robust assessment of our current position and the principal risks facing the Group, including those which would threaten its strategy, business model, future performance, solvency or liquidity.

### Current position
- Investment case, page 6
- Our markets, page 16

### Strategy and business model
- Strategy, page 18
- Business model, page 32

### Principal risks
- Key performance indicators, page 28
- Managing and understanding our principal risks, pages 84 to 91

The Board's consideration of the long-term prospects of the Group is an extension of the strategic planning process. This includes regular budget reviews as part of the internal reporting cycle, financial forecasting and performance reviews, a comprehensive enterprise risk management assessment and scenario planning involving our principal risks and uncertainties. Our business strategy is to deliver sustainable value for our stakeholders by maintaining long-term financial and operational discipline.

### Viability statement
Based on their assessment of prospects and viability, the Directors confirm that they have a reasonable expectation that the Group will continue to operate and meet its liabilities, as they fall due, for the next three years to December 2024.

## Assessment of viability

**Long-term plans** are the three-year forecasts, used to calculate cash position and headroom

**Headroom** is calculated using cash, cash equivalents and other available facilities at year end

**Sensitivity analysis**

Assessment of the level of decline in performance that the Group could withstand, were a grey or black swan event to occur

**Principal risks**

Severe but plausible scenarios modelled to quantify the cash impact of principal risk(s) materialising over the viability assessment period

**Scenario group 1**
**Change in external dynamics**

Impact of variations in market dynamics or regulatory change

A) Changes to legal, regulatory, tax and licensing landscape
B) US growth execution and competition

**Scenario group 2**
**One-off expense**

Impact of a potential large event, fine and/or penalty

A) Cyber resilience
B) Existing compliance with legal, regulatory and licensing landscape
C) IT resilience – availability and stability

**Scenario group 3**
**Combined scenarios**

Quantification of the cash impact of combined scenarios where multiple risks materialise across one or more markets, over the viability assessment period

**Principal risks**

**Viability** results from comparing the cash impact of severe but plausible scenarios on the available headroom, considering additional liquidity options

## Assessment of prospects

**Outlook, strategy and business model**

Outlook of possible long-term scenarios expected in the industry and the Group's current position to face them
Assessment of the principal risks that may influence the Group's long-term prospects
Articulation of the main levers in the Group's strategy and business model ensuring the sustainability of value creation

**Long-term viability statement**

The Directors confirm that they have reasonable expectation that the Group will be able to continue in operation and meet its liabilities as they fall due over the three-year viability assessment period

Governance

# Introduction to governance



The Company is subject to the principles and provisions of the 2018 UK Corporate Governance Code (the "Code"). For the year ended 31 December 2021, the Company fully complied with the provisions set out in the Code as detailed on page 95, except for Provision 38, an explanation for which is provided on page 162. A summary of the system of governance adopted by the Company is set out on pages 94 to 162.

## Introduction to corporate governance

As the business grows and develops internationally, our governance will be increasingly scrutinised. Good corporate governance ensures our business is managed effectively for the benefit of all our stakeholders. Our governance framework provides clear lines of accountability and responsibility. It also supports the appropriate sharing of information, ensures appropriate oversight on strategic matters and facilitates an effective and transparent decision-making process.

Our governance arrangements support our strategy by:

- ensuring accountability and responsibility
- facilitating sharing of an appropriate level of information to inform decisions
- establishing engagement programmes with key stakeholders
- maintaining a sound system of risk oversight and robust internal controls
- providing independent insight and knowledge from Non-Executive Directors
- facilitating monitoring of business performance

The Board has a formal schedule of matters reserved for its approval. These include decisions on the Group's strategy, capital structure, financing, major acquisitions or disposals, the risk appetite and capital expenditure above the delegated authority limits. The matters reserved for the Board are reviewed annually and available on: www.flutter.com/about-us/corporate-governance.

Read a summary of matters reserved for the Board on **page 111**

Read more on our governance framework on **page 106**

### 2021 highlights

**Board meetings in the year**

While Board meetings were held virtually for the majority of 2021 due to local Covid-19 restrictions, physical Board meetings were held in September and October, the first physical meetings held in 18 months. This gave Board members an opportunity to meet in person for the first time since completion of the TSG merger in May 2020. The annual Board strategy offsite was also held in person, during which the Board approved a new corporate strategy.

Read more on our strategy on **pages 18 to 27**

**Board inductions**

Holly Keller Koeppel, Nancy Dubuc and Atif Rafiq joined the Board during 2021 as Independent Non-Executive Directors. Each Non-Executive Director joining the Board received a comprehensive induction on the Flutter business including divisions, brands and operations, our governance framework, strategy, and comprehensive Board Committee inductions.

Read more on Board inductions on **page 113**

# UK Corporate Governance Code

## 1.
### Leadership and Company purpose
The Board is responsible for leading the strategic direction of the business to promote long-term sustainable success.

This includes effective engagement with our stakeholders and colleagues. Our dedicated Board level Committee, the Workforce Engagement Committee, supports the Board's engagement with our colleagues in order to foster a meaningful engagement between Flutter and its workforce.

Our Code of Ethics and associated policies ensure our colleagues can meet our expected values and behaviours.

Read more on **pages 106 to 107**

## 2.
### Division of responsibilities
The roles of the Chair and Chief Executive Officer are clearly defined. The Board operates effectively with an appropriate balance of Independent Non-Executive Directors. No Director dominates the decision-making process.

Read more on **pages 110 to 111**

## 3.
### Board composition, succession and evaluation
Our clear processes when considering appointments to the Board ensure we've an appropriate balance of skills, experience and broad diversity. We undertake an annual evaluation of the Board's performance and have in place appropriate Board succession plans.

Our Nomination Committee supports the Board in overseeing the recruitment and selection of Board and senior management positions, and the annual Board evaluation process, and makes recommendations to the Board on the composition of the Board and its Committees.

Read more on **pages 112 to 115**

## 4.
### Audit, risk and internal controls
Our Audit Committee has oversight of our internal controls which safeguard the integrity of the Financial Statements and maintain effective systems of internal controls.

Our Risk and Sustainability Committee makes sure that our risk and control environment is appropriately managed to protect our reputation, achieve our long-term strategic objectives and addresses ESG including climate, safer gambling, betting integrity and anti-money laundering.

Read more on **pages 124 to 131**

## 5.
### Remuneration
Our Remuneration Committee ensures the Company's remuneration arrangements are designed to support the strategy and promote long-term sustainable success by appropriately incentivising the relevant performance.

Read more on **pages 136 to 154**

# Compliance with the Code

### Our approach to governance
We are committed to the highest standards of corporate governance and regularly review our governance structures and arrangements to be sure that they meet best practice requirements. The Board is responsibility for the leadership, strategic direction, risk appetite and long-term success of the Group. The Board is also responsible for the stewardship of the Group, establishing the Group's purpose, values and strategy and satisfying itself that these are aligned to the culture of the organisation.

The Board assess its approach to corporate governance. As part of its decision-making process, due regard is given to the interests of all of the Group's stakeholders with the goal of achieving long-term sustainable success for the business. The Board, its Committees and management, working together, and using our governance principles, provide a clear and robust framework within which decisions are made.

The primary (premium) listing of Flutter Entertainment plc is on the London Stock Exchange, with the listing on Euronext Dublin characterised as secondary. For this reason, Flutter Entertainment plc is not subject to the same ongoing listing requirements as would apply to an Irish company with a primary listing on Euronext Dublin, including the requirement that certain transactions require the approval of shareholders. For further information, shareholders should consult their financial adviser.

Despite our secondary listing on Euronext Dublin, the Company voluntarily adopts the provisions of the Irish Corporate Governance Annex (the "Irish Annex") in addition to the requirements of the Code.

### Statement of compliance for 2021
This report sets out the operations and activities undertaken by the Board and its Committees in compliance with the Code and the Irish Annex throughout 2021. On behalf of the Board, I am pleased to confirm that we have applied all the Principles, and complied with all the Provisions of the Code, except for Provision 38, an explanation of for which is provided on page 162 of this Annual Report, and fully complied with the Irish Annex for the year ended 31 December 2021. As set out in further detail on page 162, we have committed to complying with Provision 38 by 1 January 2023, in line with accepted practice amongst UK investor bodies.

The UK Code is available from the Financial Reporting Council's website, **www.frc.org.uk**

The Irish Annex is available from Euronext Dublin's website, **www.euronext.com**

**Gary McGann**
Chair
14 March 2022

Governance

Board of Directors

# Leadership, governance
# and engagement

Committee membership key:

 A Audit    N Nomination    Re Remuneration   Ri Risk   W Workforce Engagement   ● Committee Chair

---



**Gary McGann** (IR)
**Chair – Independent on appointment**
(age 71)
**Appointed to this position**
1 July 2015*



**Key strengths and experience**
- Extensive board experience in both the private and public sector
- Significant number of years' experience in senior finance, operations, market-facing and general management roles

Gary was, until September 2020, Chair of Aryzta AG, and previously a Non-Executive Director of Green Reit plc and Non-Executive Director of Smurfit Kappa Group plc having been Group Chief Executive of Smurfit Kappa Group prior to this and having previously held a number of senior roles including President and Group Chief Operations Officer. Prior to this, he was Chief Executive of Gilbeys of Ireland and Aer Lingus Group.

Gary holds BA and MSc Management degrees and is a qualified accountant (FCCA).

**Other current appointments**
None.

* Became a Non-Executive Director: November 2014.

---



**Peter Jackson** (UK)
**Chief Executive Officer**
(age 46)
**Appointed to this position**
8 January 2018*

**Key strengths and experience**
- Extensive experience in leading consumer businesses with international reach within a highly regulated industry
- Technology and digital consumer sector expertise

Prior to becoming Chief Executive Officer, Peter was Chief Executive Officer of Worldpay UK, an operating division of Worldpay Group plc. He was formerly Chief Executive Officer of Travelex Group. He then joined Banco Santander as Head of Global Innovation and a Director of Santander UK Group Holdings plc. Peter's previous experience includes senior positions at Lloyds and Halifax Bank of Scotland, as well as time at McKinsey & Company.

He holds an MEng degree.

**Other current appointments**
Non-Executive Director of Deliveroo plc.

* Non-Executive Director of Betfair Group plc: April 2013 and Paddy Power Betfair plc: February 2016.

---



**Jonathan Hill** (UK/IR)
**Chief Financial Officer**
(age 53)
**Appointed to this position**
22 October 2018

**Key strengths and experience**
- Significant financial and operational experience across various industry sectors and at listed companies
- Strong knowledge in strategic planning and development of large corporate projects

Jonathan was previously the Group Chief Financial Officer at Saga plc. Prior to that, he held various senior roles within TUI Travel plc and Centrica plc and was the Group Finance Director at Bovis Homes Group plc.

He is a qualified Chartered Accountant and spent his early career at Price Waterhouse in London.

**Other current appointments**
None.

---



**Zillah Byng-Thorne** (UK)
**Independent Non-Executive Director**
(age 47)
**Appointed to this position**
2 February 2016*



**Key strengths and experience**
- A number of years' financial and operational experience
- Strong insight into retail trends, consumer behaviour, brands and the digital and technology sector having led a consumer-facing digital business

Zillah was appointed Chief Executive of Future plc in April 2014, having previously served as Chief Financial Officer and Company Secretary. Prior to this, she was Chief Financial Officer of Trader Media Group, Fitness First Group Ltd and Thresher Group.

She is a Chartered Management Accountant and a qualified treasurer and holds an MA in Management Studies and an MSc in Behavioural Change.

**Other current appointments**
Chief Executive of Future plc and Non-Executive Director of THG plc.

* Non-Executive Director of Betfair Group plc: September 2013.

---

## Non-Executive Directors' skills

| Regulation and regulatory environment | FTSE 100 or equivalent board experience | International experience (US, AU, EU) | M&A and capital markets |
|---|---|---|---|
| Finance | Cyber security/technology | Business transformation | Prior Committee Chair |
| Consumer services/retail | Marketing/branding | Risk management | Sustainability |
| CEO/CFO experience | Strategic leadership | Qualified accountant | Gambling/gaming |

Governance

---



### Michael Cawley (IR)
**Independent Non-Executive Director**
(age 67)
**Appointed to this position**
17 July 2013



**Key strengths and experience**
- Significant experience in senior finance, leadership and operational roles
- Extensive regulated industry experience

Michael is Chair of Hostelworld plc, and Non-Executive Director of Kingspan plc. He is also Non-Executive Director of Ryanair plc, having previously held a number of senior positions including Deputy Chief Executive Officer, Chief Operating Officer, Chief Financial Officer and Commercial Director. Prior to that, Michael was Group Finance Director of Gowan Group Limited. He is also Chair of Linked P2P Limited, Meadowbrook Heights Unlimited and Prepaid Power Limited.

He is a qualified Chartered Accountant and holds a Bachelor's degree in Commerce.

**Other current appointments**
Chair of Hostelworld Group plc and Non-Executive Director of Kingspan Group plc and Ryanair Holdings plc.

---



### Nancy Dubuc (US)
**Independent Non-Executive Director**
(age 53)
**Appointed to this position**
29 April 2021



**Key strengths and experience**
- Extensive media, digital and publishing experience
- Significant number of years' experience in senior leadership

Nancy is CEO of VICE Media Group and responsible for the definition, strategic growth and performance of the organisation's five distinct global lines of business - VICE TV, VICE News, Digital Publishing, Global Studios and Virtue, the company's global creative agency. In 2019, she led the acquisition and integration of Refinery29 and expanded VICE News globally. Nancy joined VICE after having been one of its board members. Prior to VICE, Nancy was President & CEO of A+E Networks, where she launched A+E Studios and A&E Indie Films and led their global expansion and digital migration.

Nancy holds a BSc.

**Other current appointments**
CEO of VICE Media Group LLC and Chair of Audit Committee of Warner Music Group

---



### Nancy Cruickshank (UK)
**Independent Non-Executive Director**
(age 51)
**Appointed to this position**
15 May 2019

  

**Key strengths and experience**
- Extensive digital and entrepreneurial expertise
- A wealth of non-executive director experience

Nancy is a serial entrepreneur, digital leader and non-executive director. She presently works as an Operating Partner at Exponent PE as part of a plural non-executive portfolio. Her last start-up, My Showcase, was named by the Sunday Times as one of the 15 fastest-growing startups in the UK in 2016. The business was acquired by Miroma Group in February 2018. w Nancy worked in the digital industry for over 25 years, including launching Condé Nast online in 1996, overseeing Telegraph Media Group's Digital business and developing the fashion and beauty market leader Handbag. com between 2001 and 2006, leading to a successful sale to Hearst Corporation in 2006.

**Other current appointments**
Chair at Go City, Non-Executive Director at In The Style PLC, Oodle Car Finance and Allegro.EU.SA.

---



### Andrew Higginson (UK)
**Senior Independent Director**
(age 64)
**Appointed to this position**
2 October 2019



**Key strengths and experience**
- A wealth of executive and non-executive board-level experience
- Commercial, retail and leadership expertise

Andrew served as Chair of Wm Morrison Supermarkets plc until its merger with Clayton, Dubilier & Rice in October 2021. Prior to this, he was an Executive Director at Tesco plc, having spent 15 years on the main board, first as Finance and Strategy Director, and latterly as Chief Executive of its Retailing Services business. His early career was with Unilever, Guinness, Laura Ashley and the Burton Group. He was previously the Chair of Poundland Group plc and N Brown plc, Senior Independent Director of Sky plc and a Non-Executive Director of the Rugby Football Union.

**Other current appointments**
Chair of Evergreen Garden Care Limited.

# Board of Directors continued

**Committee membership key:**

 A Audit    N Nomination    Re Remuneration   Ri Risk   W Workforce Engagement    Committee Chair



### Holly Keller Koeppel (US)
**Independent Non-Executive Director**
(age 63)
**Appointed to this position**
13 May 2021

 

**Key strengths and experience**
- Broad international experience in consumer goods, commodities and energy
- Extensive experience with operational and financial leadership responsibilities in infrastructure and energy

Up until April 2018, Holly was a Senior Adviser to Corsair Capital LLC, where she had previously served as Managing Partner and Co-Head of Infrastructure from 2015 until her retirement in 2017. From 2010 to 2015, Holly was Partner and Global Co-Head of Citi Infrastructure Investors, a division of Citigroup. Holly served as Executive Vice President and Chief Financial Officer for American Electric Power Corporation from 2006 to 2009. Prior to 2000 Holly held a series of senior operational executive leadership positions in America Electric Power Company, Inc and Consolidated Natural Gas Company. Until May 2021, Holly served as Non-Executive Director of Vesuvius plc. Holly is a member of the Women's Corporate Directors (London Chapter).

Holly holds a BSc and MBA.
**Other current appointments**
Non-Executive Director of British American Tobacco plc, AES Corporation and Arch Resources, Inc.



### Alfred F Hurley, Jr (US)
**Independent Non-Executive Director**
(age 67)
**Appointed to this position**
5 May 2020*



**Key strengths and experience**
- Extensive board experience in both private and public sector
- Strong financial services, corporate governance and risk management experience

Prior to the combination between Flutter and TSG, Alfred was Lead Director and Chair of TSG's Compensation Committee. Before that, he was Vice Chair and Chief Risk Officer of Emigrant Bank and Emigrant Bancorp, and previously the Chief Executive Officer of M. Safra & Co. Alfred spent most of his career at Merrill Lynch where he was an investment banker and held various management positions including Senior Vice President of Merrill Lynch & Co.
**Other current appointments**
Chair of the Nomination and Governance and Compensation Committees of New Mountain Finance Corporation.

\* Non-Executive Director of The Stars Group, Inc: June 2016. Lead Director May 2018 - 2020.



### Richard Flint (UK)
**Non-Executive Director**
(age 49)
**Appointed to this position**
5 May 2020



**Key strengths and experience**
- Significant senior management and operational experience across the global gambling industry
- Extensive non-executive board level experience

Richard formerly served as Executive Chair of Sky Betting & Gaming, until October 2019, having previously held the position of Chief Executive Officer for 10 years. Prior to this, Richard held positions as Channel Director at FT.com and Product Director of the original flutter.com, which merged with Betfair in 2001. Richard worked as a consultant at McKinsey & Company from 1997 to 1999.

Richard has a degree in Engineering, Economics and Management and a Master's in Public Policy.
**Other current appointments**
Chair of the board of online pet food company Butternut Box and Non-Executive Director on the board of Welcome to Yorkshire.



### David Lazzarato (CA)
**Independent Non-Executive Director**
(age 66)
**Appointed to this position**
5 May 2020*

**Key strengths and experience**
- Significant public and private sector board experience
- Extensive experience in senior leadership, financial and operational roles

David served as a board member and Chair of the Audit Committee of TSG prior to its combination with Flutter. Prior to this, he chaired the audit committees of Yellow Pages Limited and LED Roadway Lighting. He also previously served as Senior Vice President of Finance at Bell Canada, Chief Executive Officer of Craig Wireless Systems, Executive Vice President and Chief Financial Officer of Alliance Atlantis Communications Inc., Executive Vice President and Chief Financial Officer of Allstream Inc. (formerly, AT&T Canada Inc.) and Chief Corporate Officer of MTS Allstream Inc.

David holds a Bachelor of Commerce degree, is a Chartered Accountant, and received his ICD.D certification from the Institute of Corporate Directors.
**Other current appointments**
None.

\* Non-Executive Director of The Stars Group Inc: June 2016.



### Mary Turner (CA)
**Independent Non-Executive Director**
(age 68)
**Appointed to this position**
5 May 2020*



**Key strengths and experience**
- Significant experience in financial services, payments, customer service, credit risk management, enterprise risk management, operations, finance and information technology
- A wealth of non-executive board level experience

Mary most recently served as a board member of TSG, where she chaired the corporate governance and nominating committee. Prior to that, she served as the President and Chief Executive Officer and as a board member of Canadian Tire Bank, a subsidiary of Canadian Tire Corporation. Before joining Canadian Tire, Mary was a partner at Deloitte & Touche (now Deloitte LLP). She has previously served on several boards, including Mackenzie Financial Corporation, a subsidiary of IGM Financial Inc.

She holds an honours BSc and is a Chartered Accountant.

**Other current appointments**
None.

\* Non-Executive Director of The Stars Group Inc.: June 2017.



### Edward Traynor
**Company Secretary**
**Appointed to this position**
14 May 2015

**Key strengths and experience**
- Edward is a qualified solicitor and holds a BL in Civil Law (International)

Edward is Group Company Secretary and is responsible for advising the Board on governance matters and managing Flutter's relationship with the Company's registrar. Edward has extensive legal and governance experience, having been General Counsel and Company Secretary for Paddy Power prior to its merger with Betfair in 2015. Prior to this, Edward held the positions of General Counsel and Company Secretary and latterly Head of Legal and Regulatory Affairs for Vodafone Ireland.



### Atif Rafiq (US)
**Independent Non-Executive Director**
(age 48)
**Appointed to this position**
10 December 2021

**Key strengths and experience**
- Significant experience in e-commerce, marketplaces and direct to consumer
- Extensive global business and operations experience for well known public companies

Atif most recently worked for MGM Resorts International, at the President level, and has vast experience in innovation across e-commerce, marketplaces, digital media, digitization of traditional business, direct to consumer business models and autonomous vehicles. From 2017 to 2019 he worked as Chief Digital and Global Chief Information Officer for Volvo Cars and prior to this served as Global Chief Digital Officer and Corporate SVP of McDonald's from 2013 to 2017. Atif has also worked for Amazon, Yahoo! and AOL.

Atif holds a bachelor's degree in Mathematics-Economics and a master's degree in Business Administration.

**Other current appointments**
Non-Executive Director for Clearcover, Inc. and member of the board of directors at KINS Technology.

### Board diversity



- ● Male: 64.3%
- ● Female: 35.7%

≋ Read more on our Board skills and diversity on pages 116-119

Governance

Executive leadership team

# An experienced
# leadership team

**"**

The Executive Committee is responsible for executing Flutter's strategy, fulfilling strategic and sustainability objectives, driving robust financial performance, and ensuring a supportive business culture.



**Peter Jackson**
**Chief Executive Officer – Flutter**
See full biography on **page 96**



**Jonathan Hill**
**Chief Financial Officer–Flutter**
See full biography on **page 96**



**Paul Cutter**
**Chief Information Officer – Flutter**
Role
Paul is responsible for setting the global technology strategy for the Flutter Group. Paul and his team work with each of our brands to share technology, insights and best practices that enable us to benefit from our global scale without sacrificing local innovation and customer responsiveness.



**Barni Evans**
**Chief Executive Officer – Sportsbet**
Role
Barni heads up the team at Sportsbet in Australia. He is responsible for ensuring Sportsbet brings excitement to life for our customers and driving the culture and strategies that help deliver the best product, value and marketing. Prior to becoming CEO in 2018, Barni served in several marketing and commercial functions at Sportsbet and Paddy Power.

Governance



### Conor Grant
**Chief Executive Officer –
Flutter UK & Ireland**
**Role**
Conor took up this position in July 2020
and is responsible for the day-to-day
operations of Sky Betting & Gaming,
Paddy Power, Betfair & Tombola. Conor
started his career working at Paddy Power
in 1998 and in 2010 joined Sky Betting
& Gaming and worked in a variety of
positions including Managing Director
of Gaming before his promotion to Chief
Operating Officer in October 2018.



### Amy Howe
**Chief Executive Officer and
President – FanDuel**
**Role**
Amy is responsible for the day-to-day
operations of the FanDuel business in
North America. Prior to her appointment
as CEO, Amy was President of FanDuel with
responsibility for leading the company's
core commercial functions across its
Sportsbook, Casino, Racing and Daily
Fantasy businesses.



### Pádraig Ó Ríordáin
**Chief Legal Officer and Group
Commercial Director – Flutter**
**Role**
Pádraig is responsible for the Legal and
Commercial strategy of the Group,
at the core of which is the Group's
sustainability strategy, the Positive
Impact Plan, as well as leading the global
strategic direction of the Group in the
areas of risk, safer gambling, regulatory
and compliance.



### Ian Proctor
**Executive Chairman – Flutter UK & Ireland**
**Role**
Following the Flutter acquisition of
The Stars Group in May 2020, Ian took
up his latest position of Executive
Chairman UK & Ireland – Flutter.  Among
Ian's key responsibilities in this role are
leading Flutter's engagement with the
UK Government's on-going Gambling Act
Review, along with Flutter's industry liaison
efforts, primarily through its membership
of the Betting & Gaming Council.



### Dan Taylor
**Chief Executive Officer –
Flutter International**
**Role**
Dan has been with Flutter for 7 years and is
responsible for all our international brands
including Adjarabet, Betfair, Junglee,
PokerStars and FoxBet brands across all
markets and geographies. Prior to this,
Dan was the CEO of PPB with similar
responsibilities for Betfair, Adjarabet and
Paddy Power online and retail businesses.
Prior to these roles he was MD, UK & Ireland
and MD, Retail.

# Chair's introduction to governance



> Good corporate governance and an inclusive culture are the foundations of Flutter's purpose, vision and strategy.

### Commitment to good governance

By setting the tone for our culture, values and behaviour, the Board includes the views of all stakeholders in its decision making. We remain focused on delivery of the long-term sustainable success of the Group.

The Board remains strongly committed to good governance. This report sets out our progress in governance areas including work undertaken this year to support Directors, in particular new Board members, to engage in Board meetings, and enhancing our risk governance framework to support embedding of risk culture throughout the Group.

Following the resignation of Dave Gadhia and Peter Rigby as Non-Executive Directors during 2021, Nancy Dubuc joined the Board as an Independent Non-Executive Director on 29 April 2021, Holly Keller Koeppel joined the Board as an Independent Non-Executive Director on 13 May 2021, and Atif Rafiq joined the Board as an Independent Non-Executive Director on 10 December 2021. The Board regularly reviews its skills and competencies and the composition of all Committees in line with its commitment to regularly refresh Board Committee composition. This ensures adequate skills and experience on each Committee. Michael Cawley will not seek re-election at the 2022 AGM and will step down from the Board at the conclusion of that meeting. Zillah Byng-Thorne, having completed nine years on the Board and legacy boards, will step down from the Board prior to the 2023 AGM. The Board will continue to keep the composition of the Board and its Committees under regular review in light of these Board changes.

Read more on Directors' biographies on pages 96 to 99

Between January 2021 and September 2021, in response to travel restrictions imposed due to the Covid-19 pandemic, the Board continued to conduct its meetings, and those of its Committees, remotely. Despite the challenge this presented, particularly in the context of new Board members, the Board continued to foster a highly effective Board culture. We are satisfied that the integrity of our governance structure has been maintained during this period.

We were also delighted to conduct the September strategy offsite and Board meeting, as well as the October meetings, physically in Dublin. These meetings were the first time the Board were in same room since the completion of the merger with TSG in May 2020 when the enlarged Board combined.

Unfortunately, the December Board and Committee meetings reverted to remote video calls due to increased incidents of Covid-19 globally arising from the Omicron variant and for the safety of our colleagues. We will continue to monitor restrictions and the ongoing Covid-19 pandemic and will endeavour to hold physical meetings when it is safe to do so.

### Sustainability

The Board welcomes the development of a new sustainability strategy for the Group focused on climate, environment, safer gambling, responsible business and strong social priorities. The new strategy builds strong sustainability foundations and capabilities incorporating sustainability performance management processes for ongoing sustainability reporting and ensures alignment with the overall corporate strategy and purpose. Our Positive Impact Plan focuses on three distinct stakeholder groups, customers (Play Well), colleagues (Work Better) and communities (Do More). The Board also welcomed a number of enhancements to the sustainability governance structure. These included evolving the Risk Committee to become the Risk and Sustainability Committee to include a clear sustainability focus and formalised reporting lines and the mandate for the Group sustainability team. These enhancements to the sustainability governance structures support Flutter's commitment to increased accountability to sustainability.

Read more on sustainability on pages 44 to 68

### Monitoring culture

The Code emphasises the importance of culture within organisations and the Board recognises its role in monitoring, assessing and promoting a healthy culture throughout the business. We set the strategy for the Group to live our purpose. In implementing this, we make sure that Flutter is suitably resourced to deliver on its strategic objectives through a culture that drives the right behaviours, and the establishment and review of underpinning policies and codes of conduct which set the expectations of how the Group should operate. It monitors the cultural dynamics of the Group through site visits, social engagement, colleague surveys and the activities of the Workforce Engagement Committee. The scale and diversity of our business continues to allow us to leverage best practice policies and procedures from each of the businesses. The Board had a number of opportunities to consider cultural metrics, particularly in relation to employees, customers and risk throughout the year, allowing it to assess culture within the Group, and to ensure it is aligned with strategy and our purpose.

During 2021, a new culture narrative was launched to unify all Group companies towards a purpose that is compelling, while ensuring our people have a place where they feel they belong and are clear on the things that unite the multiple brands and divisions.

≡ Read more on our culture on pages 120 to 123

### Strategy

The Board approved a new integrated corporate strategy in September 2021 which included refreshed strategic priorities. The new strategy aims to deliver and defend gold medal positions in existing businesses and use innovation to capitalise future potential opportunities. The strategy is underpinned by our key enablers and places sustainability at the heart of our business. This has been further supported by the launch of a new sustainability strategy, Our Positive Impact Plan.

≡ Read more on our strategy on pages 18 to 27

### Stakeholder engagement

The Board has always had regard to wider stakeholders' interests' as well as those of our shareholders. Indeed, our Positive Impact Plan has been designed to take our stakeholders at its core and to develop out our sustainability approach with the key groups of Customers, Colleagues and Communities as its starting point. One important group is our workforce who we couldn't meet during the year in person due to travel restrictions imposed as a result of the Covid-19 pandemic. In June, the Board established the Workforce Engagement Committee, which replaced the Employee Voice Forum for the purpose of employee engagement in accordance with the recommendations of the Code.

≡ Read more in Engaging with our Stakeholders on page 108

≡ Read more in the Workforce Engagement Committee Report on page 120

The Chair holds regular engagement with regulators, and held a meeting with the UK Gambling Commission in December. Committee Chairs also spend time outside of formal meetings conducting more widespread discussions with our stakeholders. Both Andrew Higginson (as Chair of the Remuneration Committee) and I met investors to talk about remuneration matters during the year and details of these are discussed within this report.

I also met with investors to discuss general governance and sustsainability matters.

At our AGM on 29 April 2021, although Resolution 6, authority to allot shares, was passed with the necessary majority, 30.17% of votes received were against the resolution. Resolution 6 was proposed in accordance with routine practice for listed companies, and as mentioned in our Notice of AGM, the authority sought by the Company was in line with the guidance issued by the Investment Association's Share Capital Management Guidelines. Since the AGM, the Board has further consulted with shareholders and understands that certain overseas institutional investors have a policy of not supporting this authority for Directors to issue shares. In line with the requirements of the Code, an AGM update statement was issued on 29 October 2021.

Under Irish law, our Directors need specific authority from shareholders to allot shares. Our senior management and Board rely on having the flexibility to quickly take advantage of strategic opportunities, including potential acquisitions and other capital-intensive opportunities.

## The Board's role in shaping strategy

### The following strategic matters were considered by the Board at the following meetings:

**January**
- Approval of acquisition of Junglee Games

**February**
- Review of Technology Roadmap

**March**
- Approval of 2020 Final Results

**April**
- Launch of diversity, equity and inclusion strategy

**June**
- Approval of Singular acquisition

**July**
- Approval of divestment of Oddschecker business

**August**
- Approval of 2021 Interim Results

**September**
- Approval of integrated corporate strategy

**October**
- Approval of ESG strategy

**November**
- Approval of Tombola acquisition

**December**
- Approval of safer gambling strategy
- Approval of Sisal acquisition

From time to time, opportunities may require the Company to allot and issue new shares. While the Board does not have any current intention to exercise its authority to allot shares, if this authority is not renewed, we would be required to obtain shareholder approval prior to issuing any shares in connection with new strategic opportunities which may arise. We think this would put the Company at a disadvantage compared to our peers in competing for acquisitions and similar strategic opportunities and may limit our ability to pursue transactions that we consider to be in the best interests of our shareholders. As a result, the Board still considers the flexibility afforded by this authority to be in the best interests of the Company and shareholders.

**Gary McGann**
Chair
14 March 2022

Governance

Statement of corporate governance

# Board activities

During 2021, the Board held nine meetings. The key activities considered by the Board at these meetings are set out below:

| Strategic and operational matters | Finance and investor relations |
|---|---|
| • Through the Chief Executive Officer, received updates on operational, business and strategic matters, including safer gambling, competitor analysis, and people.<br><br>• Held strategy sessions on the Group's strategic opportunities and challenges and as a result, the strategy for the Group, as set out on page 18, was approved by the Board.<br><br>• Attended presentations on regional and functional updates and developments received from Executive Committee members and other members of senior management incorporating actions, progress and risks in relation to the strategic priorities.<br><br>• Oversaw the divestment of Oddschecker, and acquisitions of Junglee Games, Singular, Tombola and Sisal and was provided with updates on progress in relation to integration programmes and synergies.<br><br>• Considered changes in regulation and regulatory headwinds across our markets and the impact on our business and options available for mitigation.<br><br>• Received updates on material communications with regulators and other regulatory and legislative bodies. | • Through the Chief Financial Officer, the Board was regularly updated on financial performance.<br><br>• Approved the 2022 budget.<br><br>• Considered the Long Term Plan and capital allocation for 2022-24.<br><br>• Reviewed and approved the results announcements and trading updates, and other relevant market announcements.<br><br>• Received updates on investor views, shareholder relations, analysts' reports and media updates, share register movements and share price performance, and engagement with investors.<br><br>• Reviewed and approved the going concern and viability statements.<br><br>• Reviewed the Group's financing and capital structure, and approved the Dividend Policy, including continued suspension of dividend payments for the financial year 2021 (see Note 13 to the Company Financial Statements on page 256).<br><br>• Considered the annual review of the Group's tax strategy and its publication on our website. |

## Key Board meetings during 2021

**February**
- Business presentation: UK&I divisional update
- Review of Technology Roadmap
- Approval of Dividend Policy, and Preliminary Results announcement
- Approval of 2020 Annual Report and Financial Statements, viability statement and going concern
- Update on investor governance meetings
- Review of internal Board evaluation
- Review of conflicts of interest, independence and recommendations for election/ re-election at 2021 AGM

**July**
- Approval of Board Diversity Policy
- UK Gambling Act Review update
- Approval of capitalisation of merger reserve and reduction in share capital
- Legal, regulatory and compliance update
- Received reports from Board Committees
- Update on strategic projects

**October**
- Business presentation: Sportsbet divisional update
- Q3 forecast 2021, Q3 trading update and investor relations update
- Received external presentation on capital markets
- Legal, regulatory and compliance update
- Review of Executive Director and Executive Committee succession plans

Governance

| Governance, risk and regulatory obligations | People and culture |
|---|---|
| • Reviewed developments in corporate governance, and legal and regulatory updates, and considered enhancements to current practices to meet the Company's obligations.<br>• Undertook a fair, balanced and understandable review of the 2020 Annual Report and Accounts.<br>• Received updates on our internal control and risk management systems through reports from the Audit Committee and Risk and Sustainability Committee Chairs.<br>• Agreed the process and actions from the Board and Committee effectiveness evaluation.<br>• The Group Chair engaged with investors on governance, sustainability matters and feedback on voting in relation to AGM 2021 matters.<br>• The Group Chair and Remuneration Committee Chair engaged with investors on remuneration matters.<br>• Reviewed and approved the matters reserved for the Board and each Committee's Terms of Reference.<br>• Discussed the composition of the Board and its Committees, including continued Board refreshment, succession planning, and approved changes to the composition of the Board and its Committees.<br>• Approved the ESG strategy including climate and safer gambling strategy.<br>• Approved repurposing the Risk Committee to the Risk and Sustainability Committee.<br>• Approved the Group's updated Modern Slavery Statement and other Group-wide policies. | • Received updates on employee proposition, engagement, succession planning, talent management and diversity, particularly at senior management level.<br>• Prioritised the establishment of the Workforce Engagement Committee, a Board level Committee responsible for workforce engagement, with a particular focus on people and culture.<br>• Updated on employee remuneration structure.<br>• Approved a Group diversity, equity and inclusion strategy and monitored progress on its implementation across the Group. |



**December**
- Approval of 2022 Budget
- Approval of Annual Assurance Statements for UK Gambling Commission
- Approval of Compliance Policy and statement
- Approval of matters reserved for the Board and Board Committee Terms of Reference
- Approval of Modern Slavery Statement
- Update on strategic projects

## 2022 future focus

The Board's objective for 2022 is to oversee the implementation of the new corporate strategy, sustainability strategy and safer gambling strategy. The Board will continue to prioritise safer gambling, including responding to the UK Gambling Act Review and the proposed establishment of an Irish gambling regulator, as well as wider ESG matters such as climate and TCFD reporting and other ESG matters relevant to our businesses. We will continue to support the Executive Directors with the execution of our strategy, focus on the attraction and retention of talented staff, succession planning, increase the diversity of the organisation and enhance our governance practices. We are always aware and up-to-date on cyber risks and mitigation and ensure that we understand the interests of all of our stakeholders. The Board will continue to focus on ongoing refreshment of the Board and its Committee to ensure it continues to have an appropriate balance of skills and experience.

The Board looks forward to updating our shareholders on the progress of our objectives at our AGM, which will be held on Thursday 28 April 2022 at 11.00 am at its recently refurbished head office in Belfield Office ParkClonskeagh, Dublin 4, Ireland.

**Statement of corporate governance** continued

# Leadership and purpose

| Board |
| :---: |

| Chief Executive Officer |
| :---: |

| **Executive Committee**<br>Day-to-day management of the business and operations.<br>Execution of the strategy is delegated to the Chief Executive Officer and the Executive Committee. |
| :---: |

## Nomination Committee
Considers the structure, size and composition of the Board and its Committees and advises on succession planning for the Board and the Executive Committee so that the Board retains an appropriate mix of skills, experience, knowledge and diversity.

Read more on **pages 116 to 119**

## Audit Committee
Provides governance and oversight over the integrity of the Group's financial reporting and the Group's internal controls and risk management systems, and monitors the performance of internal and external audit.

Read more on **pages 124 to 131**

## Risk and Sustainability Committee
Reviews the reputational impact of the Group's activities and how these are being managed, safer gambling strategy objectives and performance, sustainability strategy, including climate objectives and performance, cyber security, betting risk and integrity and data protection, and our risk management activities to ensure that these are appropriate and in line with the risk appetite of the Group.

Read more on **pages 132 to 135**

## Remuneration Committee
Reviews all aspects of Executive remuneration, reviewing trends across the industry and setting the Executive Directors' Remuneration Policy, which is designed to incentivise and retain talent to support the delivery of our long-term strategy. It also sets the remuneration of the Chair, the Executive Committee and the Company Secretary and reviews the structure in place for wider workforce remuneration.

Read more on **pages 136 to 154**

## Workforce Engagement Committee
Monitors and facilitates colleague engagement within the Group to create a meaningful dialogue between Flutter and its employees. It also ensures that Flutter maintains appropriate workforce engagement policies, processes and communication channels throughout each division of the Group, encouraging participation in and evaluating feedback received from workforce engagement initiatives, keeps fully informed on issues identified by employees and other stakeholders as having a material impact on the Group's workforce and communicates such issues to the Board.

Read more on **pages 120 to 123**

## Market Disclosure Committee
Responsible for overseeing the disclosure of information by the Company to meet its obligations under the EU Market Abuse Regulation as implemented in the EU and UK, the Central Bank of Ireland's laws and regulations and the Financial Conduct Authority's Listing Rules and Disclosure Guidance and Transparency Rules.

Each Committee Chair formally reports to the Board following their meetings and makes any recommendations to the Board in line with their Terms of Reference. Papers and minutes for all Board Committee meetings are circulated to all Board members other than Directors who may be deemed to have a potential conflict of interest.

## An effective Board

The Board's role is to secure the long-term sustainable success of the Group by ensuring delivery of an appropriate strategy and sustainable profitability. Maintaining the highest standards of governance is essential to this, along with decisions that create sustainable long-term value for the mutual benefit of our shareholders, customers, employees and communities.

Our Board is supported by the collective experience of the Directors and their diverse skills. This helps the Board to reach decisions in a focused and balanced way, supported by independent thought and challenging constructive debate. Trust and mutual respect are the cornerstones of relationships between Directors, with a Board dynamic of open and honest conversations. This ensures decisions are taken for the benefit of Flutter in full consideration of the impact on all stakeholders.

The procedures of the Board are clearly documented in the Articles of Association and the matters requiring approval by the Board are set out in a schedule of matters reserved for the Board. The Board reviewed and approved the matters reserved for the Board in December 2021. These documents are available at www.flutter.com/about-us/corporate-governance.

Read a summary of the matters reserved for the Board on **page 111**

There is a clear division of responsibilities between the roles of the Chair and CEO. To allow these responsibilities to be discharged effectively, the Chair and CEO maintain regular dialogue outside the Boardroom, to ensure adequate engagement and effective flow of information.

The Non-Executive Directors have direct access to senior management at all times. Informal as well as formal contact with the wider business is encouraged in order to develop a deeper understanding of Flutter's operations, and requests by Non-Executive Directors for site visits and further information are welcomed. This broadens the Non-Executive Directors' sources of information and enables them to consider the wider impact of any Board decisions on stakeholders more broadly. The effectiveness of the Board is reviewed at least annually and conducted according to the guidance set out in the Code and the FRC Guidance on Board Effectiveness.

Read more on Board evaluation on **page 115**

Responsibility to all of our stakeholders for the approval and delivery of the Group's strategy and for creating and overseeing the framework to support its delivery resides with the Board. The Board holds at least one dedicated strategy day with the Executive Committee to help review the strategic direction of the Group for the short, medium and long term. Responsibility for the initial development and ultimate implementation of the Group's strategy and overall commercial objectives, following Board approval, resides with the Chief Executive Officer who is supported by the Executive Committee.

Nine Board meetings were held in 2021. At each, standing agenda items included updates by the Chair, the Chief Executive Officer, the Chief Financial Officer and the Company Secretary. Each Committee Chair also gives an update on their respective Committee meetings and copies of each Committee's minutes (to the extent that they contained no items which would be a potential conflict for other Directors) are circulated to the Board. The Chief Legal Officer and Group Commercial Director and regional CEOs are regular attendees. In addition, the Non-Executive Directors met at the start of Board meetings without the presence of Executive Directors.

Board and Committee members are provided with papers in a timely manner in advance of each meeting on a secure electronic portal. Each Director ensures they have reviewed papers in advance of the meeting. Exceptionally, if a Director is unable to attend, comments are provided to the Chair or the relevant Committee Chair beforehand. If any Director has unresolved concerns about the Group or a proposed action, these are recorded in the minutes of the meeting. There were no such occasions in 2021.

## Time commitment

On appointment, Directors are advised of, and required to give, the necessary time commitment to discharge their responsibilities effectively. No precise timings are given as this will vary from year to year depending on activities. The Chair keeps the time each Non-Executive Director has dedicated to the Group under review and his own time commitment is kept under review by himself in conjunction with the Nomination Committee. This is also considered as part of the Board evaluation process. The majority of Directors are experienced board directors of public companies and all have an understanding of the time and intellectual commitment that is necessary to fulfil their commitments to the Group.

Zillah Byng-Thorne has both an executive and a non-executive director position in addition to her being a Non-Executive Director with the Group. The Chair and the Board consider that Zillah provides sufficient time to discharge her responsibilities. Like all our Committee Chairs, Zillah spends an appropriate amount of time outside of meetings preparing and meeting with key internal stakeholders. Zillah has a 100% attendance record for Board and Committee meetings for 2021.

For any Director who has not previously been a director of a public company, time expectations are highlighted on appointment. The Board recognises the Code's guidance and investors' expectations that Directors give sufficient time to discharge their responsibilities. Attendance at Board and Committee meetings is a high priority. As well as the formal scheduled meetings, there is significant other engagement by Directors. This includes private individual meetings with the Chair, the Chief Executive Officer and other Directors, as necessary.

As part of enhancing business knowledge and insight, Non-Executive Directors, in particular Committee Chairs, had meetings with other members of senior management throughout 2021. While site visits are actively encouraged, these were not possible during 2021 due to travel restrictions imposed in response to the Covid-19 pandemic.

In respect of all Directors, the Chair is satisfied that their other duties and time commitments do not conflict with those as Directors of the Group and their involvement and commitment is more than sufficient to meet their Board obligations and responsibilities.

Executive Directors may hold one external non-executive directorship (but not a chairmanship) of a large public listed company (or its equivalent) but must obtain prior consent from the Chair before accepting such a position. Executive Directors may retain the fees from any such directorship. This is considered helpful to broaden and deepen their skills, knowledge and experience. Peter Jackson joined the board of Deliveroo plc as a Non-Executive Director on 1 January 2022. Jonathan Hill does not currently hold any external directorships.

Governance

**Statement of corporate governance** continued

# Engaging with a broad range of stakeholders

### Stakeholder engagement

We work hard to maintain close relationships with its stakeholders, understand their views and the importance of these relationships in delivering our strategy. Our key stakeholders and their differing perspectives are taken into account as part of Board and Committee discussions. Throughout this Annual Report, we have provided information on some of the initiatives and approaches undertaken to ensure that we are staying in touch with our stakeholders during 2021, which remained a turbulent year for many key groups.

### Workforce engagement

The Board considers it a key priority to hear the views of our colleagues and the culture of the organisation through visits to our offices, one-to-one meetings with colleagues, Board presentations and feedback from the Executive Directors. Site visits were not possible during 2021 due to continuing travel restrictions imposed in response to the Covid-19 pandemic. Employees are a key stakeholder and in June, the Board approved the establishment of the Workforce Engagement Committee with responsibility for workforce engagement activities. The Workforce Engagement Committee held three meetings during 2021 and reported on its activities to each Board meeting.

Read more on the Workforce Engagement Committee on page 120

### Shareholder engagement

The Chair makes sure that appropriate channels of communication are established between the Board and shareholders, and all Directors are aware of any issues or concerns of major shareholders raised during that dialogue. The Chair and the Company Secretary hold governance meetings at least annually with major shareholders. Executive Directors attend investor presentations and results presentations, and the Board receives regular feedback from investor relations reports and broker updates throughout the year. The Company Secretary engages with proxy advisers in advance of any shareholders meetings. In addition, throughout the year, the Chair of the Remuneration Committee led a process whereby major shareholders were extensively consulted on proposed Executive Director remuneration. A summary of investor engagement activities is set out below.

## Investor engagement activities

**January**
- Extraordinary General Meeting in connection with the migration from the CREST to Euroclear Bank settlement system
- Governance and remuneration meetings with investors

**February**
- Analysts and investor presentation

**March**
- 2020 Preliminary Results
- Investor roadshow following results presentations

**April**
- Q1 2021 trading update
- Annual General Meeting

**August**
- 2021 Half Year Results
- Virtual investor roadshow following results release

**September**
- Sportsbet investor day

**October**
- Engagement with shareholders on AGM voting

**November**
- Q3 2021 trading update
- Attendance at multiple conferences
- The Chair of the Remuneration Committee engaged with shareholders on remuneration matters

**December**
- The Chair of the Remuneration Committee engaged with shareholders on remuneration matters



Governance

## Annual General Meeting ("AGM")

The 2021 AGM was held on 29 April 2021. Due to the Covid-19 pandemic, we followed public health guidance in Ireland which prohibited public gatherings and non-essential travel. However, webcast facilities were available to shareholders to view proceedings at the meeting and submit questions in advance and during the meeting and shareholders were provided with an opportunity to appoint a proxy electronically or by post in advance of the meeting to cast their votes. In line with the FRC Guidance on Board Effectiveness, the Company issued the Notice of the AGM, together with an explanation of the items of business to be considered at the AGM in a letter from the Chair to shareholders, in excess of 20 working days before the AGM. Voting turnout for the AGM was 47.58% (2020: 38.82%).

All resolutions at the 2021 AGM were passed; however, Resolution 6, authority to allot shares, received 69.83% votes in favour. Resolution 6 was proposed in accordance with routine practice for listed companies, and the authority sought by the Company was in line with the guidance issued by the Investment Association's Share Capital Management Guidelines. Following the AGM, the Board consulted and engaged with relevant shareholders to understand the reasons behind their votes against this resolution. Through this engagement, the Board understands that certain overseas institutional investors have a policy of not supporting this authority for Directors to allot new shares.

Under Irish law, our Directors must have specific authority from shareholders to allot shares. Our senior management and Board rely on having the flexibility to quickly take advantage of strategic opportunities, including potential acquisitions and other capital-intensive opportunities. From time to time, certain of these opportunities may require the Company to allot and issue new shares. While the Board does not have any current intention to exercise its authority to allot shares, if this authority is not renewed, we would be required to obtain shareholder approval prior to issuing any shares in connection with new strategic opportunities which may arise. The Board believes that

this would put the Company at a disadvantage to our peers in competing for acquisitions and similar strategic opportunities and may limit our ability to pursue transactions that we consider to be in the best interests of our shareholders. As a result, the Board still considers the flexibility afforded by this authority to be in the best interests of the Company and shareholders and released an announcement six months after the AGM providing an update on views received from shareholders in accordance with the Code. The Board will continue to engage with shareholders on the authority to allot shares for future AGMs.

The 2022 AGM will be held on Thursday 28 April 2022 at our newly refurbished offices in Belfield Office Park, Clonskeagh, Dublin 4 Ireland. A letter from the Chair and Notice convening the AGM, with separate resolutions proposed for each item of business, will be sent to shareholders and will be made available at: www.flutter.com/investors/shareholder-information/agm.

## Extraordinary General Meetings ("EGMs")

An EGM was held on 19 January 2021 in connection with migration of Flutter ordinary shares from CREST to the Euroclear Bank settlement system. As a result of the withdrawal of the UK from the EU ("Brexit"), Flutter, as an Irish incorporated company, was no longer able to continue settlement of its securities in CREST, the London-based central securities depository. The migration from CREST to Euroclear Bank was essential to ensure electronic settlement of trading of Flutter's shares could continue in order to ensure ongoing compliance with the electronic share settlement requirements for listing on the London Stock Exchange and Euronext Dublin. This meeting was also held under constrained circumstances due to public health restrictions in Ireland as a result of Covid-19 and facilities were made available to shareholders to listen live to the proceedings by teleconference, to submit questions in advance of the meeting and to appoint a proxy electronically or by post in advance of the meeting to cast their votes electronically. All resolutions were passed with an average of 99.98% in favour of the resolutions and voting turnout was 71.34%.

**Statement of corporate governance** continued

# Division of responsibilities

## Defining Board responsibilities

The below role specifications show the clear division of responsibility between Executive and Non-Executive members of the Board, which supports the integrity of the Board's operations.

### Non-Executive Directors
- Bring a strong external perspective, advice and judgement to the Board, acting independently and constructively challenging decisions.
- Scrutinise, measure and review the performance of management and assist in the development of strategy.
- Review Group financial information and ensure the system of internal control and risk management framework are appropriate and effective.
- Review succession plans for the Board, Executive Directors, and key members of senior management.
- Monitor actions to support diversity, equity and inclusion in line with the Group's DEI strategy.
- Set Executive Remuneration Policy.
- Engage with key stakeholders and feed back insights as to their views, including employees in relation to culture.
- Serve on or chair various Committees of the Board.
- Bring varied industry and professional backgrounds, experience, skills and expertise aligned to the needs of the Group's business and long-term strategic objectives.

### Gary McGann, Chair
- Responsible for the leadership and effectiveness of the Board, including overseeing corporate governance matters and ensuring the evaluation of the Board, its Committees and the Directors is undertaken.
- With the Board, ensures that the Group's culture is aligned with its purpose, values and strategy.
- Agrees and manages the Board's agenda, ensuring that Directors receive timely, accurate and clear information on the Group's business, and that they are fully informed of relevant matters, and that there is sufficient time allocated to discuss important matters, and thereby promoting effective and constructive debate and supporting a sound decision-making process.
- Oversees the Board's consideration of the Group's strategy and the major issues facing the Group.
- Ensures adequate time is available for discussion and consideration of the Group's principal risks and their mitigation.
- Ensures there is effective stakeholder engagement and the Board is kept aware of their views, in particular those of shareholders and employees.

### Andrew Higginson, Senior Independent Director
- Available to liaise with shareholders in exceptional circumstances when they have concerns that have not been addressed by the Chair, the Chief Executive Officer or the Chief Financial Officer.

- Leads the annual performance review of the Chair and assists the Chair with the annual Board evaluation.
- Provides advice and support to the Chair and is available to other Directors as necessary.

### Peter Jackson, Chief Executive Officer
- Leads the development of strategy and proactive focus on innovation.
- Overall responsibility for the Group's performance.
- Directs the delivery of the Group's strategy in consultation with and supported by the Board.
- Builds and leads an effective Executive Committee and oversees the Group's business operations and management of its risks.
- Ensures appropriate consideration is given to the Group's responsibilities to all stakeholders, including its shareholders, customers and employees.
- Communicates and provides feedback on the implementation of Board-agreed policies, and their impact on behaviours and culture, ensuring Flutter operates in a way that is consistent with its values.

### Jonathan Hill, Chief Financial Officer
- Deputises for the Chief Executive, if necessary.
- Manages the Group's financial affairs, including the Finance, Tax, Treasury, Investor Relations, and Property and Procurement functions, as well as communication with capital markets.
- Supports the Chief Executive Officer in the implementation and achievement of the Group's strategic objectives.
- Proposes policy and actions to support sound financial management and leading on M&A transactions.

### Edward Traynor, Company Secretary
- Ensures a good flow of timely information within the Board and its Committees and between senior management and the Non-Executive Directors.
- Advises the Board on legal and corporate governance developments and ensures compliance with Board procedures.
- Facilitates new Director induction programmes, and assists with continuous Board education as required.
- With the Chair and the Senior Independent Director, reviews the governance processes, including the Board and Committee evaluation, in terms of being fit for purpose and the consideration of any improvements to be made.
- Provides advice to all Directors and supports the activities of the Board Committees.

## Summary of matters reserved for the Board

- Agreeing the long-term strategic goals and overall business and commercial strategy
- Ensuring our purpose and values are aligned to the Group's culture
- Evaluating and managing of risks impacting our reputation and setting the Group's risk appetite
- Approving of budgets, major capital projects, contracts and corporate actions, including significant mergers, acquisitions and divestments
- Overseeing of financial reporting and internal controls, and approval of financial reports and announcements and market relevant announcements

- Ensuring compliance with statutory and regulatory requirements, including corporate governance and Listing Rule requirements
- Approving appointments to the Board and ensuring sufficient succession plans are in place, including having regard to the Board Diversity Policy
- Determining the remuneration framework for Executives having regard to wider workforce remuneration arrangements
- Overseeing of environmental, social and governance matters including approval of the Group's priorities, plans and targets in respect of ESG and climate and a review of performance in conjunction with the Risk and Sustainability Committee

### 2021 Board meetings attendance

| | Meetings[1] attended/ eligible to attend | % of meetings attended |
|---|---|---|
| Gary McGann | 9/9 | 100% |
| Peter Jackson | 9/9 | 100% |
| Jonathan Hill | 9/9 | 100% |
| Zillah Byng-Thorne | 9/9 | 100% |
| Michael Cawley | 9/9 | 100% |
| Nancy Cruickshank | 9/9 | 100% |
| Nancy Dubuc[2] | 5/5 | 100% |
| Richard Flint | 9/9 | 100% |
| Dave Gadhia[3] | 4/4 | 100% |
| Andrew Higginson | 9/9 | 100% |
| Alfred Hurley | 9/9 | 100% |
| Holly Keller Koeppel[4] | 5/5 | 100% |
| David Lazzarato | 9/9 | 100% |
| Atif Rafiq[5] | 1/1 | 100% |
| Peter Rigby[3, 6] | 3/4 | 75% |
| Mary Turner | 9/9 | 100% |

1. Comprises scheduled and unscheduled meetings.
2. Appointed on 29 April 2021.
3. Resigned with effect from 29 April 2021.
4. Appointed on 13 May 2021.
5. Appointed on 10 December 2021.
6. Peter Rigby was unable to attend one meeting due to a conflict previously notified to the Chair.

In addition to the formal Board meetings held throughout the year, the Chair meets with the Non-Executive Directors without the presence of Executive Directors at the start of each Board meeting. In addition, during the year, the Senior Independent Director held a meeting of Non-Executive Directors without the presence of the Chair to discuss his performance.

Read more on the Workforce Engagement Committee on page 120

### Independence

The Board is committed to ensuring that it continues to comprise a majority of Independent Non-Executive Directors who objectively challenge management. The Nomination Committee has carried out its annual assessment of independence of each of the Non-Executive Directors, taking into account the circumstances set out in the Code, especially whether the Directors are independent in character and judgement and free from relationships or circumstances which are likely to affect, or could appear to affect, the Directors' judgement.

Until October 2018, Richard Flint held the position of Executive Chair of Sky Betting & Gaming. Richard also has in place a consultancy agreement for the provision of consultancy services for Flutter Plc. The fee for these consultancy services is £250,000 per annum. Further details are set out in Note 31 to the Financial Statements.

The Board has determined that for this reason Richard Flint did not meet the independence criteria as set out in the Code for the year ended 31 December 2021. The Board is satisfied that all other Non-Executive Directors remain independent for the purposes of the Code.

Read more on Directors' biographies on page 96 to 99

### Conflicts of interest

Formal procedures are in place for managing conflicts of interest, which include an annual confirmation by all Directors. Directors must give advance notice of any actual or potential conflicts of interest to the Company Secretary and the Board should they arise. In the case of a conflict, the relevant Director would be excluded from discussions on matter related to the conflict and cannot vote in respect of any matters in which they have an interest. These are formally considered on an annual basis by the Board alongside any other appointments held by Directors.

Before accepting any external appointments, Directors must discuss the time commitment and their ability to continue to effectively contribute to the Board with the Chair, who will consider any additional commitments, prior to reporting to all Board members.

Governance

**Statement of corporate governance** continued

# Composition, succession and evaluation

Making sure the Board and its Committees have the necessary skills and experience and are diverse and appropriately balanced remains a priority for Flutter.

## Board composition

We aim to have a Board that is well balanced and has the appropriate skills, knowledge, experience and diversity for the current and future needs of the business. While the tenure of individual Directors is taken into account, we are keen to strike a balance between continuity and succession for the Board as a whole. Longer-serving Directors bring valuable experience, and working in conjunction with newer appointees, the Board believes that it has an appropriate balance, is diverse and continues to operate effectively.

Following many years of service, both Divyesh (Dave) Gadhia and Peter Rigby stepped down from the Board following the conclusion of the 2021 AGM. Dave joined the Board as Deputy Chair following completion of The Stars Group merger in May 2020. Prior to this, Dave was a Non-Executive Director of TSG from May 2010 and Executive Chair of TSG since May 2018.

Peter Rigby joined the Betfair Group plc board in April 2014. During his time with Flutter and its legacy Boards, Peter Chaired the Risk Committee and more recently the Remuneration Committee.

Following the resignation of Dave Gadhia and Peter Rigby as Non-Executive Directors, Nancy Dubuc joined the Board as an Independent Non-Executive Director on 29 April 2021. Holly Keller Koeppel joined the Board as an Independent Non-Executive Director on 13 May 2021, and Atif Rafiq joined the Board as an Independent Non-Executive Director on 10 December 2021.

We believe the current size and composition of the Board, including the number of Non-Executive Directors, to be within a range which is appropriate for the Group given its size and complexity.

Having served nine years on the Board, including Chairing the Audit Committee, Michael Cawley will not seek re-election at the 2022 AGM and will step down from the Board at the conclusion of the AGM on 28 April 2022. Zillah Byng-Thorne will step down from the Board prior to the 2023 AGM.

An effective Board requires the right mix of skills and experience. The Board maintains a matrix of key skills and experience identified by the Board as particularly valuable to the effective oversight of the Company which continues to grow in size, scale and breadth and the execution of our strategy. Board composition is kept under constant review with regard to the skills and experience relevant to the Board as a whole.

The Board also considers tenure and independence, complies with the recommendations of the Hampton-Alexander Review on female representation and the Parker Review on ethnic diversity. A summary of the process followed for the assessment of Director independence is set out on page 111 and an overview of key skills and experience relevant to the Board is set out on pages 96 to 99.

Read more on Directors' biographies on pages 96 to 99

Read more on Board diversity on pages 116 to 119

## Ongoing training and development and advice

The Chair and Company Secretary review the knowledge of each Director, their understanding of the Group, key risks and uncertainties, and the evolving regulatory environment within which the Group operates, to fulfil their roles on the Board and its Committees. All Directors are encouraged to request further information and any support they need to fulfil their role. As part of ongoing development, legal and regulatory updates are provided as necessary to the Board and each Committee by internal and external advisers. Our Directors have a diverse range of experience, and we encourage them to take on continual professional development through attending external seminars in areas such as remuneration, ESG and climate, cyber security and Covid-19 and briefings that will assist them individually, particularly in the case of Committee Chairs. Additional knowledge is also gained through updates and briefings covering relevant areas for the business and the Group.

The aim of ongoing training and development is to continually refresh and expand the Board's knowledge and skills enabling Directors to contribute to discussions on technical and regulatory matters more effectively.

Throughout 2021, the Board received training and development briefings on capital markets, diversity and inclusion, an anti-bribery and corruption, an Audit Committee workshop, a Risk and Sustainability Committee workshop and various cyber security training workshops. Market Abuse, safer gambling and the UK Gambling Act Review, legal and regulatory landscape and product development are amongst the items on the agenda for 2022.

Each Director may get independent professional advice at the Company's expense in the furtherance of their duties as a Director. Each Committee is supported by the Company Secretary and his Deputy. In addition, each Committee may seek independent professional advice as required.

## Governance in action: Director induction and development

When they join the Board, new Directors take part in our induction programme. The primary purpose is to familiarise new Directors with the Group's operations and business, the regulatory environment, our stakeholders, as well as Directors' duties and our governance practices. Non-Executive Directors are encouraged to visit our international offices to gain a first-hand understanding of the culture. While there is an overall induction programme in place, this is tailored to take into account a Director's previous experience, their responsibilities and specific Committee responsibilities. This is then discussed with the Director themselves. Comprehensive induction sessions were delivered to Nancy Dubuc, Holly Keller Koeppel and Atif Rafiq during 2021.



Governance

| **Divisions and brands** | • **UK&I:** Sky Betting & Gaming, Paddy Power, Betfair<br>• **International:** PokerStars, Betfair, Adjarabet, Junglee Games<br>• **Australia:** Sportsbet<br>• **US:** FanDuel, TVG, FOX Bet |
|---|---|
| **Legal, risk and regulatory** | • Overview of Chief Legal Officer and Group Commercial Director function, comprising legal and company secretarial, regulatory (including safer gambling), compliance, reputation and integrity<br>• Divisional risk model<br>• Anti-bribery and corruption<br>• Material litigation and legal matters<br>• Regulatory and licensing<br>• Sustainability<br>• Safer gambling framework |
| **Culture, people and reward** | • Remuneration Policy and reward structures<br>• HR operating model<br>• People strategy<br>• Leadership<br>• Performance and engagement<br>• Diversity and culture<br>• Talent attraction and retention |
| **Governance and internal control framework** | • Corporate governance<br>• Internal controls function<br>• Internal Audit |
| **Technology** | • Technology footprint<br>• Global operating model<br>• Cross-divisional technology projects<br>• Technology transformation programme<br>• Cyber security |
| **Strategy** | • Corporate strategy<br>• Sustainability strategy including safer gambling |

# Statement of corporate governance continued

## Election/re-election of Directors

When recommending the election/annual re-election of individual Directors to shareholders, the skills and experience each Director brings, as well as their time commitment, tenure and independence, are considered by the Nomination Committee. The performance review and evaluation also feed into this process.

Following the review by and recommendation of the Nomination Committee, the Board will recommend the election of Nancy Dubuc, Holly Keller Koeppel and Atif Rafiq and the re-election of all other current Directors to shareholders at our upcoming 2022 AGM other than Michael Cawley who is retiring and will not put himself forward for re-election at the 2022 AGM.

## Effectiveness of the Board

In accordance with the Code and the FRC Guidance on Board Effectiveness, we annually evaluate the performance of the Board and its Committees to assess their effectiveness. Led by the Chair and supported by the Senior Independent Director, the performance evaluation considers the balance of skills, experience and independence of the Board with regard to Board Diversity Policy.

The annual performance evaluation is externally facilitated every three years. The 2019 performance evaluation was externally facilitated by Russell Reynolds Associates. An internal evaluation was undertaken during 2020 and an update on progress of the actions arising from this review is set out below.

## Board and Committee evaluation

As well as the formal performance evaluation process set out below, the Chair kept under review the performance of all Non-Executive Directors, having individual meetings and providing feedback as appropriate.

The performance evaluation to assess the performance of the Board, its Committees and Directors for 2021 was carried out internally and the process is set out on page 115. The internal evaluation considered:

- the composition, performance and cohesion of the Board and its Committees, reflecting the current and future business model, the strategy of the Group, and risk oversight;
- the individual competence of each member of the Board of Directors;
- the roles and responsibilities and evidence of the strengths of the Board and its Committees;
- the Board's approach to leading the development of the culture and values across the Group;
- any areas inhibiting the Board and its Committees from being fully effective; and
- the quality of materials presented and operation of Board meetings.

During a Board meeting held on 22 February 2022, the Chair presented a report on the outcome of the 2021 performance evaluation which summarised the feedback and highlighted key themes for consideration by the Board. This was discussed with the Chair of the Board and Senior Independent Director prior to being presented to the Board.

Actions were agreed with the Board and progress against these will be monitored by the Nomination Committee and the Company Secretary during 2022.

| 2020 evaluation actions | Progress |
|---|---|
| **Reporting:** Review content and depth of reporting to the Board to ensure there is no duplication in information being presented and that sufficient level of information is provided to inform decision making. | Enhancements to functional and divisional reporting have improved the level and depth of reporting provided to the Board, with clear and succinct pre-read and deep dive materials circulated in advance of Board meetings. |
| **Strategy:** The strategy review to include a one-year post-merger review and progress of integration and delivery of synergies. | A number of sessions were held with the Board throughout the year considering post-merger review, progress on integration and synergies, and proposed scoping of the strategic review which took place in advance of the annual Board strategy offsite. |
| **NED only sessions:** Include NED only sessions as standing agenda items at Board meeting to support the Committees on key matters to be addressed during meetings. | NED only sessions are now standing agenda items at the start of the Board meeting, providing Non-Executive Directors an opportunity to discuss matters to be addressed during the meeting without Executive Directors present as well as other relevant matters. |
| **Board dynamics and meetings:** Continue to lead Board dynamics and culture while meetings take place virtually, and ensure sufficient time during meetings for discussion and debate. | Physical meetings took place in September and October; all other meetings were held virtually. It was not possible to incorporate site visits during 2021 due to ongoing travel restrictions. However, a number of site visits have been planned for 2022. Time allocated for Board and Committee meetings was extended to ensure sufficient time for discussion and debate. |
| **Workforce engagement:** Evaluate the continued appropriateness of the Board's mechanism for workforce engagement given the size, scale and diversity of the Group. | The Board established the Workforce Engagement Committee, a Board level Committee with responsibility for workforce engagement under the Code. The Workforce Engagement Committee replaces the designated Non-Executive Directors and Employee Voice Forum. |
| **Succession, diversity and inclusion:** Review succession plans for Executive Directors and the Boards key regional and functional leaders. Consider initiatives for the Board and Group to become more diverse. | The Board reviewed succession plans for Executive Directors and key regional and functional leaders. The Board received updates on diversity and inclusion the new Group DEI strategy, and approved the Board Diversity Policy during the year. |

# Board evaluation cycle process



Governance

## 2021 Board evaluation process | Results and conclusions | Focus areas

| 2021 Board evaluation process | Results and conclusions | Focus areas |
|---|---|---|
| **Questionnaires**<br>The questionnaires issued to each Director focused on: (i) Board dynamics, behaviours and culture; (ii) Board leadership, composition and succession planning; (iii) understanding the business, strategic alignment and risk oversight; and (iv) Board governance. | Overall, it was concluded that the Board functions well with strong engagement, allowing adequate time to discuss areas within its remit. | Continue to monitor succession plans for the Board and Executive Committee. Monitor progress on implementation of the Group's DEI strategy below Board-level. |
| **One-to-one interviews**<br>One-to-one interviews were held with the Senior Independent Director and each Director and the Company Secretary. This enabled further feedback on individual contributions and the collective performance of the Board. | Due to Covid-19 travel restrictions, all meetings, except two during 2021, have taken place virtually. Despite this, there is a strong cohesive relationship between Directors and debate is appropriate. Board members are considered to be making an effective contribution to their roles, bringing relevant knowledge, diversity of perspective, and an ability and willingness to challenge, particularly as new members get acclimatised. | Develop Board travel plans for 2022 to incorporate key site visits. These visits should take account of the purpose of the Workforce Engagement Committee to monitor culture and listen to the views and concerns of the workforce. |
| **Board Committees**<br>Committee Chairs keep under review the performance of their Committees. Individual Committee effectiveness was incorporated into the questionnaire and provided to each Committee Chair. | Each of the Committees was effective with strong engagement, allowing adequate time to discuss areas within its remit. The Workforce Engagement Committee continued to evolve from its recent form as a Board committee. | Continue to monitor the remit of each of Board Committee, in particular, the re-purposed Risk and Sustainability Committee and the recently established Workforce Engagement Committee. |
| **Chief Executive Officer**<br>The Chair provided feedback to the Chief Executive Officer on his performance having discussed with the other Directors. | The CEO had an outstanding year, strategically, operationally and financially. | Lead the implementation of the new corporate strategy, and continue to lead innovation. |
| **Executive Directors**<br>The Chief Executive Officer provided feedback to the Chief Financial Officer on his performance having also discussed with the other Directors. | The Chief Financial Officer also had an outstanding year having delivered strong financial results. | Continue to drive synergies across the Group, develop the Finance team and lead the financial systems integration programme. |
| **Chair**<br>The Senior Independent Director meets with the Non-Executive Directors without the Chair, and also receives feedback from the Executive Directors on the performance of the Chair. | The Chair continues to perform very effectively, both in respect of Board matters and in relation to other aspects of his role as Chair, taking into account the benefit for all stakeholders, including shareholders. The Chair has facilitated a positive and supportive culture of openness in the Boardroom. | Continue to lead Board dynamics and culture as the Board meets in person more frequently. Review plans for Board ongoing training and awareness, to incorporate external presenters and site visits. |

Nomination Committee report

# Evaluating Board composition to ensure our governance is effective



"

The Committee supports the Board in ensuring that effective governance structures are in place and that the Board and its Committees have an appropriate balance of skills and experience.

**Highlights**
- Oversaw changes in composition to the Board
- Monitored the progress of ongoing Board succession plans
- Oversaw the internal Board evaluation process and implementation of action plans
- Considered succession plans for senior management
- Approved the Board Diversity Policy

**Key focus for next year**
- Further progress on broad Board diversity
- Support progress on he new diversity, inclusion and equality strategy introduced across the business and ensure progress is made and continues to be embedded within our culture
- Continue to review and enhance succession planning at both Board and senior management level
- Continued implementation of the recommendations arising from the 2021 internal Board performance evaluations

**Key responsibilities**

The Nomination Committee looks at the structure, size and composition of the Board and its Committees, advising on succession planning for senior executives and making recommendations so that the Board retains the right mix of skills, experience, knowledge and diversity, in line with the current and future needs of the Board.

▰ Read the Nomination Committee Terms of Reference at www.flutter.com/about-us/corporate-governance

▰ Read Directors' biographies on pages 96 to 99

**Inclusion and diversity**

At Flutter, we are building a workforce which is representative of the communities we serve, in all aspects of diversity. Our inclusion and diversity initiatives are set out in the Work Better section on pages 52 and 55. Overall DEI agenda is an element of the WEC going forward.

**2021 meeting attendance**

| Committee members[1] | Date appointed | Attended / eligible to attend |
|---|---|---|
| Gary McGann (Chair)[2] | Jul 2015 | 6/6 |
| Nancy Cruickshank | May 2019 | 5/6 |
| Nancy Dubuc[4] | Jun 2021 | 4/4 |
| Dave Gadhia[5] | May 2020 | 2/2 |
| Andrew Higginson[6] | Feb 2020 | 6/6 |
| Alfred Hurley | May 2020 | 6/6 |
| Holly Keller Koeppel[4] | Jun 2021 | 4/4 |
| Peter Rigby[5] | May 2020 | 2/2 |

1. All members of the Committee are Independent Non-Executive Directors and the Chair of the Board was independent on appointment to that role.
2. Appointed Chair of the Committee with effect from 29 April 2021.
3. Nancy Cruickshank was unable to attend one meeting due to a prior conflict previously notified to the Chair.
4. Appointed Committee member on 15 June 2021.
5. Resigned with effect from 29 April 2021.
6. Resigned as Committee Chair with effect from 29 April 2021.

## Key Committee meetings during 2021

### February
- Review of internal 2020 Board and Committee effectiveness review findings
- Independence and election/re-election of Directors
- Approval of external reporting disclosures
- Review of Board Committee composition

### July
- Approved the updated Board Diversity Policy
- Considered the FRC's report on board effectiveness of FTSE 350 companies
- Reviewed Board succession planning and Committee composition
- Reviewed succession plans for key senior management positions

### December
- Considered the process for the 2021 Board and Committee effectiveness review
- Review of Board succession planning
- Consideration of Board diversity in respect of Hampton-Alexander and Parker Reviews
- Approved governance matters

Governance

## Board Diversity Policy

The Board Diversity Policy sets out our approach to diversity on the Board. We aim to have a Board that is well balanced and has the appropriate skills, knowledge, experience and diversity for the needs of the business. The Board Diversity Policy incorporates the requirements of the Code, together with the recommendations of the Hampton-Alexander Review on gender diversity and the Parker Review on ethnicity for FTSE 100 companies. We think about diversity in the broadest sense including diversity of thought, age, gender, nationality, independence, professional background, social and ethnic backgrounds, business and geographic experience, and cognitive and personal strengths. These differences are considered in determining the optimum composition of the Board and, when possible, should be appropriately balanced.

The Board Diversity Policy is available on our website at www.flutter.com

Senior managers are defined in legislation as including both persons responsible for planning directly or controlling the activities of the Company (or strategically part of the Company), and any other directors of undertakings including in the consolidated accounts. For reporting purposes, as at 31 December 2021, there were 85 Group subsidiary entity board directors, comprising 10 female and 75 male.

\* As at 31 December 2021.

## Objectives of the Board Diversity Policy

The Nomination Committee reviews all measurable objectives for achieving diversity on the Board and recommends them for Board adoption. At any given time, the Board may pursue one or more aspects of its Diversity Policy and measure progress accordingly.

The Board wants to continue to improve diversity on the Board and maintain the recommendation of the Hampton-Alexander Review of 33% female representation on the Board. It is recognised that there may be periods of change on the Board when this number may be smaller while the Board is refreshed. However, it is the Board's longer-term intention to at least maintain this balance.

The Board supports the recommendations set out in the Parker Review on ethnic diversity and is committed to improving its representation of diverse social and ethnic backgrounds. The Board has at least one Director from an ethnic minority on the Board.

**All employees\***



16,813

- Male: 10,784 – 64%
- Female: 6,029 – 36%

**Senior management\***



367

- Male: 290 – 79%
- Female: 77 – 21%

# **Nomination Committee report** continued

**Gender**
(Executive and Non-Executive Directors)



- Male: 64.29% – 9
- Female: 35.71% – 5

**Length of tenure**
(Non-Executive Directors)*



- 0 to 3 years – 6
- 3 to 6 years – 3
- 6 to 9 years – 3

**Balance of independence**



- Independent Non-Executive Directors* – 11
- Non-Independent Non-Executive Directors – 1
- Executive Directors – 2

\* Including Chair, who was independent on appointment.

Read more on independence on page 111

## **Implementation of the Board Diversity Policy during 2021**

All appointments to the Board are based on merit, in the context of the balance and mix of appropriate skills and experience the Board as a whole requires in order to be effective.

Diversity in the board is a key factor for consideration as part of the Board renewal process, and the Nomination Committee takes into account the following criteria when considering Non-Executive Director roles:

- skills, knowledge and experience in areas relevant to the operation of the Board, including professional background, international experience and having regard to Board skills gaps;
- diversity in all respects, including age, nationality, gender, social and ethnic backgrounds, and cognitive and personal strengths; and
- the need for an appropriately sized Board.

During the process of ongoing Board renewal, each or a combination of these criteria can take priority.

As part of the annual performance evaluation of the effectiveness of the Board, its Committees and individual Directors, the Nomination Committee considers the balance of skills, experience, independence and knowledge on the Board and the current and future diversity representation of the Board.

The Nomination Committee and the Company intend to only engage with search firms which are accredited under the Enhanced Voluntary Code of Conduct for Executive Search Firms in Board appointments. When we go out to the market to look for Non-Executive directors, we require longlists of potential candidates to comprise at least 50% female candidates and the inclusion of other candidates from groups that are traditionally under-represented at board level.





## 2021 Board diversity progress

As at 31 December 2021, we achieved our target of having at least one Director from an ethnic minority on the Board. We also achieved our target for female Board representation, with 35.71% of our Directors being female. We continue to work towards further enhancing our gender diversity on the Board. Russell Reynolds Associates, the external search agency used during the recruitment process for the appointments of Nancy Dubuc, Holly Keller Koeppel and Atif Rafiq, is accredited under the Enhanced Voluntary Code of Conduct for Executive Search Firms.

The recruitment processes for the appointment of Nancy Dubuc and Holly Keller Koeppel as Non-Executive Directors considered candidates from a wide pool of experience and both longlists and shortlists of potential candidates were comprised wholly (100%) of female candidates in order to further enhance our female representation on the Board. The recruitment process for the appointment of Atif Rafiq considered candidates with experience in the gaming/gambling industry and, or candidates with digital experience.

## 2022 Board diversity priorities

The Board is committed to having a diverse Board and to ensuring an open and fair recruitment and selection process for all Board appointments. The Board has exceeded its target of 33% female representation and has met its target on ethnic diversity on the Board. The Board intends to maintain or improve its current levels of female and ethnic diversity on the Board for the year ending 31 December 2022.

Recognising the benefits of wider experience, Non-Executive Director candidates from a wide variety of backgrounds have been taken into account when considering Non-Executive Director appointments.

The recruitment and selection process for Non-Executive Directors ensures that longlists of potential candidates comprise at least 50% female candidates.

During 2022, the Nomination Committee and the Board will continue to promote our Board Diversity Policy and its implementation to ensure it continues to implement an inclusive and diverse Board. It will also includes Board exposure to advances in best practice in this area to help reset our diversity ambitions.

Read Directors' biographies on pages 96 to 99

## Succession planning

The Board's succession plan is a continuous process and is reviewed formally once a year and addresses Board size, Committee structure and composition, skills on the Board, tenure, independence, diversity, including gender and ethnicity, Board roles, and succession plans for key Board and Committee positions. In addition to our regular review of Non-Executive Director succession plans, the Committee continued to review the succession plans of key senior leaders to ensure sufficient strength of pipeline of future leaders.

Succession plans include contingency strategies for unexpected departures, medium-term plans for orderly replacement of current Board members and long-term plans linking strategy with the skills needed on the Board in the future.

## Skills and experience

For balanced and effective decision making, it is important the Board has a broad range of skills and experience. The Committee maintains a skills matrix of the Board to identify areas for enhancement and allows for the mapping of the Board's skills as a whole against the evolving needs of the business, and ensures that any future search for Non-Executive Directors is focused. This assists in defining the attributes required as part of the search for new Non-Executive Directors.

Read more on our skills matrix on page 97

## Effectiveness of the Committee

The operation, performance and effectiveness of the Committee is monitored by me throughout the year and was also specifically reviewed as part of the internal Board and Committee evaluation process. I am pleased to confirm that it was considered that the Committee was operating effectively and focusing on the key areas within its remit.

Read more on our Board evaluation on pages 114 and 115

**Gary McGann**
**Nomination Committee Chair**
14 March 2022

**Workforce Engagement Committee report**

# Committed to engaging with our global workforce



> We have established a Board Committee with clearly defined purposes and structure that provides reverse mentoring for Directors to learn from our workforce.

## Highlights

- The Board established the Workforce Engagement Committee to reflect that the workforce are key stakeholders and the employee voice is considered by the Board in its decision-making
- Considered the Financial Reporting Council's report on "Workforce Engagement and the UK Corporate Governance Code: A Review of Company Reporting and Practice" in designing the Terms of Reference for the Committee
- Developed the dual purpose and identified the focus for the Committee
- Learnt how the Group People function provides oversight on workforce issues and concerns and how it provides guidance and overarching principles adopted across each of the Group divisions
- Undertook a comprehensive review of existing workforce engagement mechanisms
- Listened to workforce matters through updates from the International division, the Group functions and the FanDuel Technology function
- Extensive consultation with management on the Group's diversity, equity and inclusion strategy ("DEI strategy") and the implementation of the associated action plans
- Learnt how management and employees were preparing for, and embracing the future ways of working post-Covid-19
- Learnt about emerging global workforce issues, specifically those matters affecting Flutter
- Reviewed information on existing workplace cultures and engaged with management on the launch of a new culture narrative

## Key focus for next year

- Subject to the lifting of Covid-19 travel restrictions, implement a programme of employee engagement in our major locations designed to allow the Committee to understand and monitor culture
- Listen and hear divisional updates on workforce engagement initiatives and matters of concern for the workforce
- Evaluate feedback received from workforce engagement initiatives and monitor the effectiveness of engagement mechanisms, workforce communication and feedback channels
- Continue to engage with management on oversight of implementation of the DEI strategy and monitor the progress of the action plans
- Review workforce policies to ensure they are consistent with Flutter's values and support its long-term sustainable success

## 2021 meeting attendance

| Committee members[1] | Date appointed | Attended / eligible to attend |
|---|---|---|
| Mary Turner (Chair) | Jun 2021 | 3/3 |
| Nancy Cruickshank | Jun 2021 | 3/3 |
| Nancy Dubuc | Jun 2021 | 3/3 |
| Richard Flint | Jun 2021 | 3/3 |

1. All members were appointed on 15 June 2021 and are Non-Executive Directors.



## Our People Insights

# 16,500+
**employees**

# 60+
**nationalities**

# 60+
**languages**

# 23
**countries**

Governance

### Review of workforce engagement mechanisms and rationale for establishment of Committee

The Code introduced a requirement for UK listed company boards to have in place a mechanism for appropriate workforce engagement to ensure that employees are considered by boards as key stakeholders, that board members would be exposed to the concerns and views of the workforce, and that the employee voice is considered by the board in their decision making. Following the introduction of this requirement, in July 2019 the Board appointed three Non-Executive Directors designated for the purposes of workforce engagement. The Board also established an Employee Voice Forum as the Board governance forum for the designated Non-Executive Directors to receive quarterly updates from the workforce.

The Code requires boards to keep engagement mechanisms under review so that they continue to remain effective. Since the Board adopted these workforce engagement mechanisms in July 2019, significant events have taken place across the Group that drove a review of the appropriateness of the existing mechanisms; in particular, the Group completed the merger with TSG in May 2020. As a result of this merger, the composition, demographics and diversity of the Board changed. In addition, the combined Group is significantly larger, with operations in many new jurisdictions, an increase in employees to over 16,500 employees across over 60 different nationalities speaking over 60 languages, and new brands each with their own distinct culture. The Group has also completed a number of acquisitions since May 2020 which has further broadened the demographics, diversity and employee base of the Group. As a result, during 2021 the Board undertook a comprehensive review of the continued appropriateness of its workforce engagement mechanisms. The views and concerns of our workforce are important to be taken into consideration during Board deliberations. The Board felt it appropriate to elevate the importance it places on our people to a dedicated Board level Committee with responsibility for oversight of matters important to our workforce. The Board approved the establishment of the Committee in June 2021 as its formal mechanism for workforce engagement.

The Board believes that a Board level Committee with responsibility for workforce engagement is appropriate given the size and scale of the Group, the differing cultures within each division, and the sub-cultures that exist within our brands.

The aim of the Workforce Engagement Committee is to monitor and facilitate workforce engagement within the Group in order to ensure a meaningful dialogue between Flutter and its employees

exists. Through the establishment of the Workforce Engagement Committee, Flutter aims to enhance the Board's awareness of employee matters in the context of the Board's decision-making process. The Workforce Engagement Committee's duties will include, but are not limited to, ensuring Flutter maintains appropriate workforce engagement policies, processes and communication channels throughout each division of the Group, encouraging participation in and evaluating feedback received from workforce engagement initiatives, and keeping fully informed on issues identified by employees and other stakeholders as having a material impact on the Group's workforce and communicating such issues to the Board.

The establishment of the Workforce Engagement Committee with its clearly defined purposes and governance structure acts like reverse mentoring; Directors are learning from the workforce, and this will enhance the Board's effectiveness and decision making. The Board will continue to monitor the operation and development of the Committee during 2022.

### Membership and operation of the Committee

The Committee met three times since it was established in June 2021. While site visits were not possible due to Covid-19 travel restrictions during 2021, in 2022 meetings will take place while the Board undertakes a number of global site visits. These visits will provide the Committee with an opportunity to meet with members of the workforce at these locations.

In addition to members of the Committee, regular attendees who attend meetings by invitation include the Group Chief Executive Officer, Group Chief Financial Officer, Group Chief People Officer, Group Director of Diversity and Inclusion, divisional CEOs and divisional CPOs. The Company Secretary, or his Deputy, acts as secretary to the Committee and provides support as required.

Read more on Directors' biographies on pages 96 to 99

As Chair of the Committee, I report to the Board on the key outcomes from each meeting and on how the Committee has discharged its duties. The minutes of all Committee meetings are circulated to the Board for information.

### Key responsibilities

The main responsibilities and primary role of the Committee, as set out in its Terms of Reference (available at www.flutter.com) are to assist the Board in fulfilling its oversight of workforce engagement as set out in the Code and ensuring the views and concerns of the workforce are taken into account during Board decision making.

See the Committee's dual purpose on page 122

# Workforce Engagement Committee report continued

## Committee activities during 2021

As a newly established Committee, the Committee initially focused on Committee governance matters, including approval of the Committee's dual purpose, initial focus areas for 2021 and 2022, its Terms of Reference and schedule of matters, as well as the frequency and operation of meetings. The Committee received a number of divisional deep dives, including from the International division, Group functions, and the FanDuel Technology team. The Divisional CEOs and CPOs presented on their divisions' people strategy, employee engagement insights, culture, future ways of working and return to the office post-Covid-19. These updates also included specific focus on the challenges associated with attraction and retention of critical skills, workloads and employee mental health during Covid-19. These divisional deep dives provided the Committee with an insight into the key matters of concern to colleagues in each division, the widely diverse cultures that exist across the Group, and sub-cultures within various brands in each division.

The Committee has engaged extensively with management on the development and progress of the DEI strategy. We are committed to the success of the DEI strategy and our support for this important initiative will continue throughout 2022 and will be underpinned by three core principles:

1.  providing a safe and welcoming space to discuss complex challenges;

2.  providing independent advice and support on strategic delivery; and

3.  helping drive accountability beyond HR and DEI for the delivery of the global strategy by inviting CEOs and senior business leaders to update on progress.

Read more on diversity, equity and inclusion in the Sustainability Report on pages 44 to 68

## Committee's dual purpose

| Purpose | | How to achieve this purpose |
|---------|---|------------------------------|
| **Purpose 1** | To listen to and understand the views, interests and concerns of the workforce, one of our key stakeholders, and to consider these views, interests and concerns during Board discussions and decision making. This will support the Board in making effective decisions and underpin a sustainable and successful business. | Making the Board more accessible to the workforce through a programme of informal engagement mechanisms so they can hear directly from the workforce. Examples include: <br><br>1. meetings with cross-sections of the workforce during Board site visits; <br><br>2. meetings with senior leaders and high-potential individuals; and <br><br>3. focus groups on specific topics attended by the Committee or teams responsible for delivery of specific projects. |
| **Purpose 2** | To provide oversight of management's workforce engagement activities to ensure that the culture, policy, practices and behaviours across the Group are aligned to our purpose, values and strategy. | This will involve oversight of management activities on workforce engagement to ensure that effective mechanisms are currently in place or will be implemented in the future. Examples include: <br><br>1. employee engagement surveys; <br><br>2. reporting on metrics or targets; <br><br>3. review of strategic and culture risks; <br><br>4. DEI policy and progress; <br><br>5. updates on policies, practices or principles; and <br><br>6. workforce initiatives implemented and their progress. |





Effective leadership development is critical to the long-term success of the Group. The Committee received updates on how divisions were supporting personal development and ongoing training opportunities to colleagues. One such update was on the Group's Luminary Programme launched in 2021. This is a unique programme that supports the Group in preparing for future growth. The programme is aimed at creating and developing a diverse leadership capability offering a number of rotations for the programme nominee within the Group supporting Divisional CEOs on various strategic projects.

### Culture in action

A healthy corporate culture is one in which our values, behaviours and people promise are understood by our stakeholders, where compliance, ethics and integrity are embedded, and an operating environment that is inclusive, diverse and engaging. Together, these aspects encourage employees to make positive differences for stakeholders, in which values guide decisions and actions and in which attitudes and behaviours are consistent with high standards of conduct and doing the right thing. Our people promise enable colleagues to work in an agile and flexible way, to never settle by challenging norms, and provides a safe place for everyone to be themselves when the work.

The role of the Board in relation to purpose, vision, strategy, which underpins our long-term goals and stakeholder engagement is key in supporting a healthy culture across the Group, as is reinforcing the agreed cultural tone through:

- the substance of the decisions it takes;
- the way in which those decisions are taken; and
- the visibility, transparency and communication of those decisions.

Flutter operates within a federated model, but with a widely diverse colleague base and multiple cultures across our brands and divisions. The uniqueness of our diverse cultures is a strength to the global nature of the Group yet localised by putting the customer at the heart of each brand. The employee value proposition empowers culture by putting decisions as close to the customer as possible.

During 2021, a review was undertaken of existing cultural indicators and metrics particularly in relation to reporting on employees, customer matters and risk which resulted in the

implementation of a new employee engagement strategy adopted across the majority of our businesses during the year. This engagement platform is an interactive listening tool which enables the Committee to understand the strategies and principles which unify and unite our colleagues. Our new culture narrative launched during 2021 defines Flutter's philosophy and aims to unify the Group of companies towards a purpose that is compelling, while ensuring our people from across the Group have a place where they belong and are clear on the things that unite our multiple brands and divisions. A new interactive listening tool was also launched in 2021 to strengthen the Committee's ability to hear directly from employees.

Our culture pillars are communicated through culture related programmes and initiatives such as targeted communications, mandatory compliance training and employee engagement surveys. The output of these programmes and initiatives are reported back to the Board by executives and the Workforce Engagement Committee.

To understand more fully how culture manifests in employee beliefs and actions, the Committee monitors the development of tools to allow culture to be assessed, in part, on objective evidence. In working towards this, further enhancements have been made within employee engagement surveys. All of the above supports the objective of identifying shortcomings and taking corrective action should it be required. The Board and Workforce Engagement Committee recognise that this will continue to be an evolving area.

### Effectiveness of the Committee

The operation, performance and effectiveness of the Committee is monitored by me throughout the year and was also specifically reviewed as part of the internal evaluation process. All feedback received is used to improve the Committee's effectiveness. I am pleased to confirm that notwithstanding the relatively recent establishment of the Committee, it operates effectively.

Read more on our skills matrix on page 97

Read more on our Board evaluation on pages pages 114 and 115

**Mary Turner**
Workforce Engagement Committee Chair
14 March 2022

**Audit Committee report**

# Monitoring the integrity of our system of internal controls



❝

The Audit Committee provides oversight of the financial reporting and disclosure process, ensuring quality of our audit process and integrity of our system of internal controls.

## Highlights

- Reviewed the significant financial judgements made during the year
- Conducted a review of the 2021 Annual Report and Financial Statements to confirm that it was fair, balanced and capable of being understood by shareholders
- Conducted a review of our external auditors and proposed the reappointment of KPMG for the year ending 31 December 2022
- Approved the Group's 2021 Internal Audit Plan and oversight of the Group Internal Audit function
- Approved the updated Group Treasury Policy
- Oversight of the Internal Controls team, a second line function with responsibility for financial controls
- Commenced preparations for the external audit tender in readiness for 2022

## Key focus for next year

- Continue to provide oversight of integration of financial reporting systems across the Group
- Support the delivery of a comprehensive internal audit programme
- Provide continued monitoring of the closure of management actions
- Monitor changes in regulatory reporting requirements
- Oversee the process for external audit tender

## 2021 meeting attendance

| Committee members[1] | Date appointed | Attended/ eligible to attend |
|---|---|---|
| Michael Cawley (Chair) | Jul 2014 (Member: Jul 2013) | 6/6 |
| Zillah Byng-Thorne | Feb 2016 | 6/6 |
| Nancy Cruickshank[3] | May 2020 | 3/3 |
| Holly Keller Koeppel[4] | Jun 2021 | 3/3 |
| David Lazzarato | May 2020 | 6/6 |
| Mary Turner | May 2020 | 6/6 |

1. All members were Independent Non-Executive Directors.
2. Excludes annual joint Audit and Risk and Sustainability Committees meeting on 9 December 2021. Excludes an Audit Committee workshop held in June 2021.
3. Rotated off Committee on 15 June 2021.
4. Appointed Committee member with effect from 15 June 2021.

## Key responsibilities

The main role of the Committee, as set out in its Terms of Reference (available at www.flutter.com) are to assist the Board in its oversight responsibilities by monitoring the integrity of the Financial Statements of the Group and other financial information before publication, and reviewing significant financial reporting judgements contained in them. In addition, the Committee also reviews:

- the system of internal financial and operational controls on a continuing basis (the Risk and Sustainability Committee reviews the internal control and risk management systems); and

- the accounting and financial reporting processes, along with the roles and effectiveness of both the Group Internal Audit function and the external auditor.

## Membership and operation of the Committee

The Committee met six times in 2021. The annual joint Audit and Risk and Sustainability Committees meeting was held in December. In addition, the Committee held a detailed workshop in June. Meetings are generally scheduled around the financial reporting cycle to allow the Committee to discharge its duties in relation to the Financial Statements.

In addition to members of the Committee, regular attendees who attend meetings by invitation included the Chief Executive Officer, the Chief Financial Officer, the Group Director of Internal Audit and the Group Director of Finance and Treasury. The external auditor, KPMG, also attends Committee meetings and has direct access to the Chair of the Committee. The Company Secretary, or his Deputy, acts as secretary to the Committee and provides support as required.

The Board is satisfied that Zillah Byng-Thorne, Holly Keller Koeppel, David Lazzarato, Mary Turner and I all have "recent and relevant financial experience" as required under the Code. All members of the Committee were Independent Non-Executive Directors during their appointment to the Committee with financial and commercial experience relevant to either the digital and/or consumer industry and the broader commercial environment within which we operate. Therefore, the Committee, the Nomination Committee and the Board are satisfied that the Committee, as a whole, has competence relevant to the sector in which the Group operates.

⧉ Read more on our Directors' biographies on pages 96 to 99

To work effectively, the Committee has unrestricted access to the Group's external auditor, KPMG, and the Internal Audit function, which it meets throughout the year with, and without, management, as appropriate. These meetings ensure there are no restrictions on the scope of their audits and allow discussion of any matter that the internal or external auditor might not wish to raise in the presence of management. The Committee may obtain, at the Group's expense, outside legal or other professional advice needed to perform its duties.

As Chair of the Committee, I report to the Board on the key outcomes from each meeting and on how the Committee has discharged its duties. The minutes of all Committee meetings are circulated to the Board for information.

## Significant activities undertaken during the year

### Significant financial judgements

Our review of the significant financial judgements made during the year and any key financial reporting issues are described on page 127 of this report. In addition to routine consideration of potential fraud in revenue recognition and tax provisions matters, the Committee considered the settlement of the Kentucky litigation.

### Internal audit

We work closely with our Internal Audit function and in particular, the Group Director of Internal Audit. During 2021, we monitored and reviewed the effectiveness of the Group's Internal Audit function. This included consideration of the results of internal audits undertaken and challenges of management's responses to the findings, including updates on actions identified; approving any changes to the Internal Audit Plan for 2021 and approval of the Internal Audit Plan for 2022; and reviewing and approving amendments to the Internal Audit Charter.

### Internal controls over financial reporting

We reviewed the work undertaken by the Group Internal Controls team. It presented its programme for "second line of defence" assurance work over the design adequacy and operational effectiveness of the financial controls designed to mitigate the risks of financial misstatement. We reviewed its plan, which involved the regular review and testing of a tailored suite of internal financial controls.

### Financial and business reporting

During the year, we monitored the integrity of the Financial Statements and the formal announcements relating to the Group's financial performance and considered the report of the external auditor on the Financial Statements and the year-end audit. We assessed the Group's viability in line with the Code requirements and the appropriateness of the going concern basis and maintained oversight of compliance with relevant regulations for financial reporting and the Code.

### Reporting and governance

On behalf of the Board, we undertook a review of whether the Annual Report and Financial Statements, taken as a whole, was fair, balanced and understandable and provides the necessary information to shareholders to assess the Group's position and performance, business model and strategy. Our review of the Annual Report and Financial Statements is described on page 126.

The Committee undertook a review of the Committee's Terms of Reference and schedule of proposed matters in December.

### Risk management and internal control

The Committee assessed the appropriateness of the Group's overall risk management and internal control framework. Throughout the year, the Committee had responsibility to ensure there is a robust process in place to monitor and evaluate the principal risks to which the Group is exposed, including those that would threaten its business model, future performance, solvency or liquidity.

We also reviewed the processes for detecting fraud, misconduct and control weaknesses and considering responses to any such occurrence.

Following these reviews, the Committee concluded that the Company's systems of risk management and internal control were effective and appropriate in the context of the Group.

**Audit Committee report** continued

## Fair, balanced and understandable



At the request of the Board, the Committee considered whether, in its opinion, the 2021 Annual Report and Financial Statements, taken as a whole, is fair, balanced and understandable and whether it provides the information necessary for shareholders to assess the Group's position and performance, business model and strategy.

### How do we define "fair, balanced and understandable"?

In justifying this statement, we considered the robust process in place to create the Annual Report and Financial Statements, including:

- reviewed a draft of the whole Annual Report and Financial Statements at a meeting in advance of giving its final opinion and ahead of final approval by the Board. The Committee was provided with all relevant information, received briefings from management on how specific issues are managed and challenged management as required;

- received confirmation that each Committee had signed off on each of its respective Committee reports and reviewed other sections for which it has responsibility under its Terms of Reference;

- was provided with a confirmation by management that it was not aware of any material misstatements in the Financial Statements made intentionally to achieve a particular presentation; and

- was provided with findings from KPMG that it had found no material audit misstatements that would impact the unqualified audit opinion during the course of its work. The Committee confirms that it is satisfied that KPMG, as the external auditor, has fulfilled its responsibilities with diligence and professional scepticism. After reviewing the presentations and reporting from management and consulting where necessary with KPMG, the Committee is satisfied that the Annual Report and Financial Statements appropriately addresses the critical judgements and key estimates, both in respect of the amounts reported and the disclosures.

### Is the report fair?

- Is the whole story presented and has any sensitive material been omitted that should have been included?
- Is the reporting on the business performance in the narrative reporting consistent with that used for the financial reporting in the Financial Statements?
- Are the key messages in the narrative reflected in the financial reporting?
- Are the KPIs disclosed at an appropriate level based on the financial reporting?

### Is the report balanced?

- Is there a good level of consistency between the narrative reporting in the front and the financial reporting in the back of the report, and does the messaging presented within each remain consistent when one is read independently of the other?
- Is the Annual Report an appropriate document for shareholders?
- Are the statutory and adjusted measures explained clearly with appropriate prominence?
- Are the key judgements referred to in the narrative reporting and the significant issues reported in this Audit Committee Report consistent with the disclosures of key estimation uncertainties and critical judgements set out in the Financial Statements?
- How do the significant issues identified compare with the risks that KPMG plans to include in its report?

### Is the report understandable?

- Is there a clear and understandable framework to the report?
- Are the important messages highlighted appropriately throughout the document?
- Is the layout clear with good linkage throughout in a manner that reflects the whole story?

### Conclusion

Following its review, we believe that the 2021 Annual Report and Financial Statements is representative of the year and presents a fair, balanced and understandable overview, providing the necessary information for shareholders to assess the Group's position, performance, business model and strategy.

Governance

# Key Committee meetings*

### February
- Assessment of external auditor independence and recommendation for reappointment
- Review of internal controls and risk management systems
- Review of internal controls year-end attestation
- Consideration of fair, balanced and understandable
- Assessment of viability statements and going concern basis of preparation
- Recommendation of 2020 Annual Report and Financial Statements and results announcement
- Consideration of external auditor effectiveness review
- Approval of non-audit services
- Meeting with external auditor without management present

### April
- Review of 2021 external audit and scope of work
- Review of internal controls over financial reporting
- Approval of Internal Audit Charter
- Approval of Group tax strategy
- Consideration of audit tender process plan

### July
- Review and recommendation of approval of 2021 Interim Results
- Consideration of going concern basis of preparation
- Review of interim internal controls update
- Review of External Audit Plan update

### October
- Review of tax risks update
- Received treasury client funds update and approval of Treasury Policy
- Review of Q3 trading update
- Review of divisional financial controls over reporting
- Meeting with external auditor without management present
- Meeting with Group Director of Internal Audit without management present

\* Internal audit update and external auditor update were standing agenda items at each Committee meeting.

# Financial reporting and significant financial issues

The committee monitors the integrity of the Financial Statements at half year and at year end, as well as formal announcements relating to the Group's financial performance. We considered whether accounting standards are consistently applied across the Group and whether disclosures in the Financial Statements are appropriate and sufficient. Following discussions with management and KPMG, the Committee has determined that the key risks of misstatement of the Group's Financial Statements are in relation to the following:

| Matter considered | Action |
|---|---|
| **Revenue recognition**<br>The Group has a number of income streams across its online and retail operations with a high prevalence of cash and card payment transactions. Effective operational and fraud-related controls from both an IT systems and financial control perspective help us ensure the accuracy and completeness of these income streams. | We gained comfort over this area through discussion with the CFO and the Group Director of Finance and Treasury in relation to the operation of key financial controls such as cash and revenue reconciliations.<br><br>The Joint Head's of Treasury and Client Funds gave us a presentation on treasury and banking controls in operation, which ensure the accuracy and integrity of funds held in the Group's bank accounts and client funds accounts.<br><br>We also gained an understanding of, and challenged, the work performed by KPMG, including its assessment of the key IT controls in operation in relation to the Group's IT systems.<br><br>As a result of the above, the Committee is satisfied that there are appropriate controls and processes in place across the Group to ensure the completeness and accuracy of reported revenue. |

# Audit Committee report continued

## External auditor

We reviewed and made a recommendation to the Board in relation to the continued appointment of KPMG as the external auditor and, as a Committee, approved KPMG's remuneration and terms of engagement for the 2021 financial year. During the year, the Committee reviewed and approved the External Audit Plan for 2021 presented by KPMG, including consideration of its key areas of risk and the audit approach applied by KPMG, the proposed areas of coverage of KPMG's audit and any changes thereto during the year. The Committee considered KPMG's updates during 2021 in relation to the External Audit Plan, related actions and evaluated the performance of KPMG, including its independence and objectivity and monitored any non-audit services provided by KPMG. The Committee also reviewed the Group's Non-Audit Services Policy (the "Non-Audit Policy") and, in advance, approved any non-audit services and related fees to be provided by KPMG during 2021.

## Internal audit

Internal Audit is an independent assurance function for the Group whose remit is to provide independent and objective assurance that the key risks to the Group are appropriately identified and managed and that key controls are operating as expected. It reports directly into the Committee. The Committee annually approves the Internal Audit Charter.

The Group Director of Internal Audit attends and reports at every Committee meeting and has direct access to all Committee members, and the Committee Chair also met with the Group Director of Internal Audit outside of Committee meetings throughout 2021. The Committee approved the 2021 Internal Audit Plan in December 2020 and this was assessed by the Committee to ensure it provided adequate coverage across the Group and was risk based in its approach.

A number of minor changes were made to this plan which were reviewed and agreed by the Committee.

Progress against the Internal Audit Plan was reported to the Committee throughout 2021 and was considered in detail at the half year and after the year end. We also reviewed the specifics of audit findings and the progress of the business in addressing audit recommendations. Internal Audit regularly reported to the Committee on risk profiles across the divisions, methodology enhancements and the overall risk management frameworks in the business.

After taking all of this into consideration, the Committee and I are satisfied as to the Internal Audit function's performance.

## Risk management

In accordance with the Code, the Board must describe the principal risks to which the business is exposed and the activities undertaken to mitigate against them. The Board must also confirm that it has carried out a robust assessment of the principal risks facing the Group, including those that would threaten the business model, future performance, solvency or liquidity of the business.

We must explain how we assessed the prospects of the Group, over what period we have done so, why this period is considered appropriate and whether the Board has a reasonable expectation that the Group will be able to continue in operation and meet its liabilities as they fall due over the period of their assessment, drawing attention to any qualifications or assumptions as necessary. The Board has reported on these requirements on page 92.

This Committee and the Risk and Sustainability Committee together support the Board in relation to monitoring the adequacy and effectiveness of the risk management systems. During 2021, this Committee reviewed the output of the Internal Audit function as well as the management of financial risks. The Committee also reviewed the reports presented by the external auditor, KPMG, and reports from the recently established Internal Control function. The Risk and Sustainability Committee reviewed the work of the second line functions and ongoing operational risk management. To ensure that there is a full review of the risk management process as a whole, myself and the incoming Audit Chair Holly Keller Koeppel are members of the Risk and Sustainability Committee and the Chair of the Risk and Sustainability Committee, Zillah Byng-Thorne and incoming Chair Dave Lazzarato, are also members of this Committee. We also have an annual joint meeting of the Audit and Risk and Sustainability Committee at which a review of the risk management process, as a whole, is undertaken, for its

appropriateness and effectiveness in identifying the principal risks and reviewing how those risks are being managed and mitigated. The Committees also rely on the work of internal and external audit to ensure that appropriate measures are taken to address risks as they are identified or as their risk profile changes.

As part of the overall risk management framework, management maintains divisional risk registers. This Committee and the Risk and Sustainability Committee, together, at their annual joint meeting, formally consider these and the appropriateness of management's risk appetite.

Read more on understanding and managing our principal risks on **pages 84 to 91**

Read more in the Risk and Sustainability Committee Report on **pages 44 to 68**

## External auditor: KPMG
There are a number of areas which the Committee considers in relation to KPMG as the external auditor – its performance, reappointment and length of service, independence and the provision of non-audit services, objectivity and remuneration.

### Performance
In October, KPMG presented its Audit Plan and strategy to the Committee. It provided detail on the proposed audit approach and methodology and the materiality level intended to be used during the audit and highlighted the areas considered as having a higher risk due to the level of judgement involved and the potential impact of a misstatement on the Group Financial Statements.

The areas of highest risk were considered to be the treatment of the Kentucky litigation which was resolved prior to the year end and revenue recognition. In addition, KPMG highlighted that, as required by auditing standards, management override of controls was also included as a significant audit risk. The Committee reviewed and appropriately challenged the conclusions reached by KPMG before agreeing its proposed Audit Plan's scope and approach.

The Committee provided appropriate challenge to the work performed, assumptions made and conclusions drawn, particularly in relation to the higher-risk areas identified above. The Committee meets privately with KPMG at least once a year without any members of management or the Executive Directors being present.

### Reappointment and length of service
The Committee makes recommendations on the appointment, reappointment and removal of the external auditor to the Board. It also reviews whether the external auditor is, and remains, objective and independent. KPMG Ireland was appointed as the Group's auditor in 2002. The audit was last tendered in 2011 for the year ended 31 December 2011. Post the merger with Betfair, KPMG LLP, the UK member firm of KPMG International, was the Group's auditor for the years ended 31 December 2016 and 2017. The Committee reviewed the performance and effectiveness of KPMG and concluded that it continues to provide an effective audit service and that there are no compelling reasons for change. The Committee is mindful of the requirements of the EU Directive on audit reform. Under the Directive's transitional arrangements, KPMG can continue to act as the Group's external auditor for the period up to 31 December 2023 at which point the Committee will need to recommend the appointment of a different audit firm. The Committee has commenced the audit tender process which it expects to conclude in Q2 2022, with KPMG completing its final audit for the period 31 December 2023.

Accordingly, the Committee recommended the reappointment of KPMG to the Board (which was accepted) for the 2022 financial year. Ryan McCarthy is the current lead audit partner and 2021 was his first year in this role.

Governance

# Audit Committee report continued

## External auditor: KPMG continued

### External audit process

| Bespoke questionnaire prepared covering | Questionnaire completed by | Results of the questionnaire | Assessment |
|---|---|---|---|
| • Audit Plan including risk assessment and timetable<br>• Mindset and culture<br>• Qualifications, expertise, character and resources<br>• Dealing with key accounting and audit judgements, and how these are communicated<br>• Quality and content of deliverables<br>• Response to challenge by the Audit Committee<br>• Relationship with Internal Audit | • Committee Chair<br>• CFO<br>• Group Director of Finance and Treasury<br>• Director of Group Accounting and Reporting<br>• Group Director of Internal Audit<br>• Divisional Finance Leads<br>• Director of Financial Controls<br>• Group Tax Director<br>• General Counsel and Company Secretary<br>• Deputy Company Secretary | • Results of the questionnaire are collated centrally by Group Finance and a summary of the findings was provided for the Committee to consider the overall effectiveness of the function and any action required | • The output from the effectiveness questionnaire was shared with the Committee and KPMG<br>• Following the Committee's review of the output, the Committee confirmed that KPMG is effective as external auditor to the Company and recommended to the Board its reappointment as auditor be proposed to shareholders at the 2022 AGM |

## Auditor rotation timeline

     

**2002**
KPMG Ireland appointed

**2011**
Full competitive tender following which KPMG Ireland was reappointed

**2021**
Commencement of competitive tender

**2022**
Completion of competitive tender and appointment of external auditor with effect from 1 January 2024

**2023**
31 December 2023 KPMG's last external audit

### Independence and the provision of non-audit services

The Committee implements appropriate safeguards when the external auditor also provides non-audit services to the Group. The perceived independence and objectivity of the external auditor may be compromised where it receives fees for non-audit services, so we operated a Non-Audit Policy during 2021. This formalised the process to be followed when considering whether to engage the external auditor for non-audit services. Any engagement of the external auditor for non-audit work must satisfy applicable rules and legislation, including Statutory Instrument SI 312 and the IAASA Ethical Standard for Auditors (Ireland).

KPMG cannot engage in non-audit services that would compromise its independence, would violate any laws or regulations affecting its appointment as the external auditor, or would lead a reasonable third party to regard the objectives of the proposed non-audit service as being inconsistent with the external audit. The Non-Audit Policy specifically calls out services that the external auditor cannot provide to the Group. No approval is given by the Committee for the provision of prohibited services. Beyond this all engagements of KPMG are formally approved by the Committee in advance.

The Group's policy is that the total fees for non-audit services to the Group shall be limited to no more than 70% of the average of the fees paid for the last three consecutive years for audit-related services to KPMG Ireland and overseas offices. During 2021, KPMG Ireland was engaged to perform agreed upon procedures on responding to third parties, the half-year review and other non-audit services. The Audit Committee specifically considered the impact of this on KPMG's independence as auditor and was satisfied that it was appropriate to engage KPMG, having taken into account the potential impact to the auditor's independence and the procedures put in place to reduce them to an acceptable level. During 2021, the Committee monitored the extent to which KPMG was engaged to provide non-audit services and considered and approved the engagement as required under the Non-Audit Policy. An analysis of the non-audit fees provided by KPMG during 2021 is set out in Note 9 to the Consolidated Financial Statements on page 200. For 2021, non-audit fees paid to KPMG amounted to 6% (2020: 48%) of audit-related fees paid to the Irish firm and overseas offices.

The Committee and I are satisfied that the non-audit services provided and fees paid in relation to these don't impair KPMG's independence and objectivity and there are sufficient safeguards in place in respect of this.

### Objectivity and hiring of former employees of the external auditor

To ensure the independence and objectivity of the external auditor, KPMG, any offer of employment to a former employee of the audit firm, within two years of the employee leaving the audit firm, must be pre-approved by the Committee where the offer is made in respect of a senior executive position. Key audit partners will not be offered employment by the Group within two years of undertaking any role on the audit. Other key team members will not be offered employment by the Group within six months of undertaking any role on the audit. Other employees of KPMG who accept employment by the Group must cease any activity on the Group's audit immediately when they tender their resignation to KPMG. In order to ensure objectivity, any partner previously involved in the audit of the Group's Parent Company or its subsidiaries shall not be recruited in the Group Finance function.

We are satisfied with the independence, objectivity and effectiveness of KPMG as the external auditor, and with the external audit process as a whole.

### Effectiveness of the Committee

The operation, performance and effectiveness of the Committee is monitored by me throughout the year and was also specifically reviewed as part of the internal evaluation process. All feedback received is used to improve the Committee's effectiveness. I am pleased to confirm that the Committee continues to operate effectively.

Read more on our skills matrix on **page 97**

Read more on our Board evaluation on **pages 114 and 115**

**Michael Cawley**
Audit Committee Chair
14 March 2022

Governance

---

## External auditor effectiveness review



We considered whether the external auditor had appropriate resources and expertise to conduct the audit, including the competence with which KPMG handled key accounting and audit judgements and the manner in which it communicated the same.



We spoke to the CFO and management about the objectivity of the auditor.

Non-audit services provided by KPMG were reviewed and, as described on page 130, are not considered to have affected the auditor's independence.

The Committee was satisfied that KPMG complied with relevant ethical and professional guidance on the rotation of audit partners.



We looked at the effectiveness and organisation of the planning process for the audit, including progress against the agreed Audit Plan, and communication of any changes to the plan in respect of matters such as emerging risks and post-audit evaluation.

The Committee was satisfied with the quality of reporting from the external auditor and its recommendations.

We also took into account the outcome from an internal management review of its performance.

Risk and Sustainability Committee report

# Overseeing management of material risks **impacting our reputation**



**"** Safer gambling is fundamental to every element of the Group's strategy and brand sustainability.

**Highlights**

- Approval of the re-purposed Risk and Sustainability Committee focused on the management of material risks, sustainability matters including approval of a new Group ESG strategy, review of climate-related disclosure requirements, data protection and approval of Modern Slavery statement

- Oversight of the Group's safer gambling strategy, including approval of a new Group safer gambling strategy, monitoring of regulatory landscape including UK Gambling Act Review and approval of Annual Assurance Statements

- Monitored cyber security threats, oversight of implementation of Group cyber security strategy and policy and held deep dive cyber Security workshops

- Oversight of implementation of risk management framework and risk strategy, including review of Group's divisional risk registers, and monitoring Group risk appetite

- Monitored compliance activities, including anti-money laundering and counter terrorist financing, anti-bribery and corruption policies, whistleblowing arrangements and Code of Ethics

- Reviewed and monitored bookmaking risks and trading limits

- Monitored material litigation and legal matters

- Reviewed and monitored data protection

- Oversight of people and travel risks

**Key focus for 2022**

- Oversee implementation of ESG strategy

- Oversee progression of safer gambling strategy and the outcomes of the review of the UK Gambling Act and establishment of an Irish gambling regulator, and continue to sponsor the promotion of safer gambling standards across the Group and industry

- Monitor and mitigate cyber security threats and data protection risks

- Monitor external regulatory environment and licensing requirements

- Monitor key third party suppliers

- Oversee strategic risks and risk appetite of material risks of the Group

- Ensure crisis management plans are in place and fit for purpose

**2021 meeting attendance**

| Committee members[1] | Date appointed | Attended / eligible to attend |
|---|---|---|
| Zillah Byng-Thorne (Chair) | Jan 2018 | 5/5 |
| Michael Cawley | Feb 2016 | 5/5 |
| Nancy Cruickshank | May 2019 | 5/5 |
| Richard Flint | May 2020 | 5/5 |
| Dave Gadhia[3] | May 2020 | 2/2 |
| Holly Keller Koeppel[4] | Jun 2021 | 3/3 |
| David Lazzarato | May 2020 | 5/5 |
| Peter Rigby[2] | Feb 2016 | 2/2 |

1. All members are Non-Executive Directors.
2. Excludes annual joint Audit and Risk and Sustainability Committee meeting held on 9 December 2021.
3. Resigned from the Board on 29 April 2021.
4. Appointed Committee member on 15 June 2021.

## Key activities undertaken in 2021

### Sustainability

Our new sustainability strategy has been introduced as our Positive Impact Plan. As part of its regular risk assessment, the Committee takes account of the significance of ESG matters to the business of the Group. We stay updated on the Group's objectives and strategy in respect of ESG and progress in the delivery of agreed actions. As detailed in the Strategic Report, our ESG strategy addresses safer gambling, diversity and inclusion, environment and climate, and community engagement and corporate social responsibility initiatives.

 Read more on sustainability on **pages 44 to 68**

### Safer gambling

Safer gambling is fundamental to every element of the Group's strategy and brand sustainability. The Board considers preventing gambling-related harm to be an essential part of behaving responsibly as a business and we continue to enhance wide-ranging policies and tools and support mechanisms to help our customers manage their gambling. We are actively engaging with the UK's Gambling Act Review, proposals to establish a gambling regulator in Ireland, as well as safer gambling initiatives across the Group. Safer gambling continues to be a very high priority area for the Board.

In addition to safer gambling being a standing agenda item as part of the Chief Executive Officer's update at Board meetings, the Committee spends considerable time reviewing the strategic objectives and priorities for the Group and the progress being made in relation to agreed actions and work streams, as well as the monitoring of risks. Related presentations provide the opportunity to receive updates on the progress being made, for example on safer gambling operating controls and the continual improvements being made in relation to interactions with customers. The Committee approved a further enhanced safer gambling strategy in October 2021 and will monitor its implementation during 2022 and beyond.

 Read more on safer gambling on **pages 44 to 51**

### Compliance

The Committee regularly received updates in relation to the Group's ongoing compliance with its regulatory licences and legal obligations and considered the processes in place to manage and mitigate the risks related to relevant operational matters. These included anti-money laundering, anti-bribery, marketing compliance and data protection and privacy.

We also reviewed formal reports from the Group Data Protection Officer and the Global Head of Financial Crime and Sports Integrity. We are kept up-to-date about any important communications with regulators and management of such relationships. Together with the Audit Committee, this Committee was updated on the Group's Code of Ethics and related standards and policies, including those involving whistleblowing and anti-bribery and corruption, and how these are communicated to all employees, including mandatory training.

Our Code of Ethics sets out the standard of conduct and behaviour expected of our employees throughout the organisation. Our policies, procedures, management systems and internal controls are there to prevent bribery and corruption occurring, including policies on whistleblowing and anti-bribery and corruption. The formalised Whistleblowing Policy and procedure help employees to raise issues regarding possible improprieties in matters of financial reporting or other matters on a confidential basis. The Committee monitored its effectiveness and was advised of notifications made. We are satisfied that the whistleblowing process was working appropriately.

 Read more on the Group Code of Ethics on **page 64**

> The repurposed Risk and Sustainability Committee strengthens Flutter's governance arrangements for oversight of sustainability matters, whilst continuing to monitor the material risks that impact our reputation.



Governance

**Risk and Sustainability Committee report** continued

## Governance in action

### Cyber Security Toolkit for Boards

Cyber threats are an important risk of operating digital businesses and the Board recognises this. Therefore, we dedicated time in 2021 to discussing and monitoring cyber risks and security, and the progress in mitigating these risks and preventing any possible attacks or related material adverse incidents, including:

- approval of the Global Cyber Security Policy which sets out the set of cyber security requirements across the Group;
- regular review of access controls;
- review of security standards such as ISO 27001:2013, PCI and NIST held across the Group;
- approach to testing products and services in the same way that hackers would;
- defensive measures, procedures and teams in place to protect from malicious distributed denial of service ("DDOS") attacks;
- processes in place to ensure security is built in to product development;
- tools and processes in place to ensure the Group is protected against insider threat including data leakage; and
- an emphasis on employee awareness, education and testing.

To further strengthen the Board's knowledge and expertise on cyber security, a collective series of workshops were held during the year which provided one-to-one mentoring for members of the Committee focused on identity access management, cyber threat and intelligence and third party security assurance. In addition to these workshops, the Committee received advisory sessions based on the UK National Cyber Security Centre ("NCSC") Cyber Security Toolkit for Boards.

We'll continue to monitor the effectiveness of the cyber security strategy throughout 2022.



### Key Committee meetings during 2021

**February**
- Legal and regulatory including material litigation update
- Safer gambling and update on UK Gambling Act Review
- High value customer update
- Review of external reporting disclosures
- Risk management, emerging risks, risk management framework and feedback from Executive Risk Committee
- Money Laundering Reporting Officer Report
- International markets and compliance update

**July**
- Legal and regulatory update
- Bookmaking risk and trading
- UK Gambling Act Review
- ESG strategy
- People risk update
- Group risk management update
- Review of biannual litigation log
- Data Protection Officer Report

**December**
- Update from Risk and Sustainability Committee workshop
- Legal and regulatory updates
- Risk strategy
- Safer gambling strategy
- Cyber security strategy
- Crisis management framework
- Annual Assurance Statements for the UK Gambling Commission
- Divisional updates

### Risk management framework

During 2021, we monitored key areas of risk, regulatory and legal, risk strategy and Group risk management governance framework as well as how embedded our three lines of defence model is.

Read more on risk management on **page 85**

### Bookmaking risks and trading limits

We reviewed and approved the performance of the Group's policies in respect of bookmaking risks. During 2021, the Committee received presentations from the Chief Trading Officer, as well as presentations from management, on the adequacy and effectiveness of the Group's Bookmaking and Risk Management functions. We also looked at the Group's bookmaking risk and pay-out limits.

## Risk management, including identification of emerging risks

Alongside the Audit Committee we support the Board in monitoring the Group's risk management processes for their appropriateness and effectiveness in identifying the emerging and principal risks facing the Group. As part of the overall risk management framework, management maintains individual divisional risk registers for each division. These detail the significant risks facing the business and the potential likelihood and impact of these risks materialising once the existence of controls and mitigating factors are considered.

The Committee also reviews how our risks are being managed and mitigated and has oversight of key second line functions such as Risk Management, Compliance and Information Security. During 2021, as part of its procedures to identify emerging risks as well as to monitor established risks, we met with, and received, detailed presentations from various key functions to talk about how we manage our main operational risks, including specific updates in relation to the International division, as well as updates on cyber security related risks, commercial risks and strategic risks among others. The Audit Committee has oversight of the third line function.

Read more on the Audit Committee on **pages 124 to 131**

To ensure that there is a full review of the risk management process as a whole, I am a member of the Audit Committee, Michael Cawley (Audit Committee Chair) is a member of this Committee. Holly Keller Koeppel and David Lazzarato are members of both Committees and incoming Chairs of the Audit Committee and Risk and Sustainability Committees respectively. In addition, updates are provided by each Committee Chair at each Board meeting. We also hold at least one joint meeting of the Audit and Risk and Sustainability Committees annually at which we specifically review the risk management process as a whole, for its appropriateness and effectiveness in identifying the emerging and principal risks and how those risks are being managed and mitigated, the Group's risk registers, and the appropriateness of management's risk appetite. This is then reported to the Board for its assessment and approval.

Read more in the Audit Committee Report on **pages 124 to 131**

### Risk tolerance

Given the operating environment and industry in which we operate, we continuously face risks and uncertainties. An overview of the Group's risk profile is set out in Understanding and Managing Our Risks on pages 84 to 91. The Group's risk tolerance is set by the Board as well as the level of risk we will accept to achieve our strategic objectives.

Our overall risk tolerance is low and is contained in our Risk Appetite Statement. This tolerance, alongside our culture, shows colleagues how to respond to risk. Our divisional risk teams, with support from Group Risk, continue to monitor potential risks or breaches of our risk tolerance and report to the Committee.

Read more on strategy on **page 18 to 27**

### Effectiveness of the Committee

This is monitored by me and was also specifically reviewed as part of the internal Board and Committee evaluation process. All feedback received will improve the Committee's effectiveness particularly as the scope and remit of the Committee evolve in a very dynamic market. I am pleased to confirm that the Committee continues to operate effectively.

Read more on our Board evaluation on **page 114 and 115**

**Zillah Byng-Thorne**
Risk and Sustainability Committee Chair
14 March 2022

Governance

Directors' remuneration report 2021

# Remuneration Committee Chair's Statement



### Committee focus in the year
- Extensive discussions on the appropriateness of remuneration for Executive Directors
- Consultation with shareholders on proposed remuneration arrangements for 2022
- Reviewed and approved relevant annual bonus outturn and LTIP vesting levels
- Reviewed and approved LTIP awards across Flutter, below Executive Director level

### Priorities for 2022
- Continue to keep abreast of changes in UK corporate governance and best practice
- Monitor the outcome of the UK Gambling Act review and its impact upon Flutter's remuneration arrangements
- Ensure that remuneration opportunities remain appropriate to attract and retain key talent
- Oversee below-Board reward strategy and structure, ensuring that it remains agile and fit for purpose across all divisions
- Continue ongoing engagement with shareholders
- Consider and set incentive plan targets that are appropriately stretching
- Review the existing Remuneration Policy and any proposed changes to it ahead of the shareholder vote at the 2023 AGM

The Committee's Terms of Reference are reviewed annually and are available at: **www.flutter.com/investors**

## How this Directors' Remuneration Report is structured

As an Irish-incorporated company, Flutter Entertainment plc is not subject to the UK's remuneration reporting requirements; however, our preference is for our remuneration policies, practices and reporting to reflect best practice corporate governance for a FTSE 100 company. Accordingly, since 2015 the Committee has complied with the reporting regulations on a voluntary basis.

- This **Remuneration Committee Chair's Statement** on pages 136 to 139 provides context for the decisions made by the Committee in the year, and the proposed approach to implementing the policy in the upcoming year. It also summarises the remuneration outcomes for Executive Directors. A "Remuneration at a Glance" page is included after this section.
- The **Annual Report on Remuneration**, which runs from pages 141 to 150, details the remuneration arrangements and outcomes in place in the year under review.
- A summary of the **Remuneration Policy**, which was approved by shareholders at the 2020 AGM, is shown on pages 151 to 154.

For clarity, remuneration is reported in pound sterling, in line with the Group's reporting currency. Where relevant, remuneration is converted to pound sterling from euros, to simplify reporting.

## 2021 meeting attendance

| Committee members[1] | Date appointed | Attended / eligible to attend |
|---|---|---|
| Peter Rigby (Chair until 29 April) | Jan 2018 (member: Feb 2016) | 3/3 |
| Andrew Higginson (Chair from 29 April) | Apr 2022 (member: Feb 2020) | 8/8 |
| Nancy Dubuc[2] | June 2021 | 4/4 |
| Alfred Hurley | May 2020 | 8/8 |
| Gary McGann | Jul 2015 | 8/8 |
| Mary Turner[3] | May 2020 | 7/8 |

1. All members are Independent Non-Executive Directors and the Chair of the Board was independent on appointment to that role.
2. Appointed Committee member on 15 June 2021.
3. Mary Turner was unable to attend one meeting due to a prior commitment, which had been notified in advance.

### Other attendees

The Chief Executive Officer, Chief Financial Officer, Chief People Officer, Company Secretary, Global Director of Reward and Benefits, Group Reward and Benefits Director, Head of Executive Compensation and PricewaterhouseCoopers ("PwC"), our remuneration advisers, attended some or all of the meetings by invitation but are not members. Individuals are not present when their own remuneration is discussed.

The Deputy Company Secretary & Head of Governance acts as secretary to the Committee.

Governance

In recent years, Flutter has transformed into a global industry leader in betting and gaming. We are a vastly different organisation than when the current Executive team joined, with a significant shift even since I joined the Board just two years ago. This change is reflected in our growth across many of our key markets and no more so than in the US. We have built scale, both organically and through acquisition, and our growth continues apace.

2021 has seen Flutter continue to evolve. Despite the ongoing global effects of the Covid-19 pandemic, which continue to impact parts of our business as well as the wider environment, we have continued to sharpen our strategy and shape the business to capitalise on the vast opportunities that lie ahead. This is particularly true in the US however we continue to make progress in all our divisions.

The transformation of our business over recent years means that we operate in a very different global marketplace for talent to when we last considered our Executive Director remuneration arrangements. In light of this development and the remuneration challenges it presents, the Committee conducted a detailed review of Executive Director remuneration this year and discussed the findings extensively with shareholders.

### Context for considering change

Last year continued our trend of multiple strong years of performance. In recent years, Flutter has transformed as a Group and under the leadership of our current Executive team, Flutter has:

- completed a strategic combination with The Stars Group Inc.;
- acquired and scaled the FanDuel business to take advantage of the exceptional opportunity in the US market, such that we are the clear market leaders; and
- thoroughly executed on our strategy in core markets, extending market share through both organic growth and key strategic acquisitions including Adjarabet, Junglee, Singular, Tombola and the upcoming acquisition of Sisal.

Our evolution has brought us much closer to the US both operationally and in respect of competition for talent. The US market represents the fastest growing area of our business today, and the most attractive market opportunity in the sector. FanDuel is scaling rapidly, reflecting the pace of regulatory change in the US. By the end of 2022 the Group will be live, online, in 19 states. It is anticipated that the US will become our largest market in revenue terms by 2023, notwithstanding expected growth in other markets.

We need to ensure that we have a strong global leadership team that offers a blend of sector expertise with experience in scaling digital businesses. The recent search for the FanDuel Group CEO highlighted how competitive the market is for proven executives in this space. This gives us a challenge on compensation with current Executive Director remuneration levels now lagging behind the UK market as well as being significantly below the US market. Without significant changes to the current package, we are exposed in our ability to both:

- retain current Executive Directors; and
- recruit future Executives, where we will need access to the highest calibre of talent from the global market, including in particular the US and international digital marketplace.

Whilst the Board and Committee are not concerned about the commitment of the existing Executive team, it is important that we pay the established management team fairly in the context of the current size and complexity of the company and the market in which we operate, as well as having regard of their success in growing the business to date. If and when it becomes necessary to recruit at this level, we will need to have an established pay structure in place that demonstrates we are able to pay competitively against the talent markets from which we wish to recruit, including the US and international digital markets.

In this context we developed proposals to address the issues set out above and incentivise our Executive team to continue to create exceptional levels of value for our shareholders and other stakeholders alike. These comprised two components:

- an uplift to salary levels for the CEO and CFO, to bring their salaries in line with other UK-listed business of similar size and scale; and
- a new long-term incentive focussed on continued strong growth, with higher opportunity levels for outstanding performance.

Our analysis showed that the combination of these changes would position remuneration at the upper quartile compared to other large UK companies and at the lower quartile compared to similar US-listed business, which we judged to be an appropriate outcome.

In the last quarter of 2021, we consulted with shareholders representing around two-thirds of our share capital. They universally recognised the issues we had identified and were supportive of change, and most endorsed the size of the change required. We received helpful input on the details of our proposals which we took into account as we refined them.

# Directors' remuneration report 2021 continued

## Remuneration Committee Chair's Statement continued

However, in the period immediately before finally agreeing these proposals, the external environment changed markedly. Valuations in the global technology sector receded in the early part of the year and, in late February and early March, this was accelerated by significant changes in the geopolitical environment. The Committee judged that, in light of a significant fall in the value of shareholders' investments in Flutter, it was no longer appropriate to proceed with the full package of change we had intended. We therefore decided not to make changes to our long-term incentives for 2022, continuing instead with the structure we have used since 2020. However, we believe it remains appropriate to implement the intended changes to the Executive Directors' salaries to partly bridge the gap to the competitive positioning we identified.

Over the coming year, we will re-evaluate whether the proposed long-term incentive plan we developed this year should form part of a new Remuneration Policy, to be put before shareholders at next year's AGM. Our existing Remuneration Policy was approved by shareholders at the 2020 AGM and is therefore ordinarily due for renewal in 2023. We will consider what is right for the business over the course of 2022 as Flutter develops and the broader macroeconomic environment evolves.

### Changes to total salary

Current total salary levels are positioned towards the lower end of the UK market for companies of a similar size. In order to address this, total salaries will be increased, effective 1 March 2022 as follows:

| | 1 March 2021 | 1 March 2022[1] | % increase |
|---|---|---|---|
| Peter Jackson | £927,000 | £1,170,000 | 26% |
| Jonathan Hill | €694,220 | | |
| | €596,946 | £715,000 | 20% |

1. Both Executive Directors will have UK contracts going forward and, as such, both will have their salaries set in GBP.

Whilst these increases are materially higher than the average increase across the rest of our UK workforce, they are required to achieve the required market positioning. As outlined above, we believe that these increases are necessary to ensure that the Executive Director total packages are representative of Flutter's business context, and are more competitive in both the current UK market and the wider US and international digital markets in which we operate. The process we undertook in reviewing the salaries is also in line with the approach that we take for the wider workforce i.e. if an individual's role and responsibility significantly increases as a result of growth in the size of the business they manage, or the market value of the role shifts significantly, we would review their salary and remuneration levels to ensure that they remained appropriate within this new context. Whilst we considered taking a phased approach to increases, following internal discussions, and discussions with shareholders, we ultimately decided that it would be more appropriate to make the increases in one go. We believe that the Executive Directors are already delivering value now, and therefore aligning their reward to this now is deemed important. Our decision not to implement the new long-term incentive, which would have further enhanced our competitive position, cemented this decision.

### 2021 performance outcomes
#### Business context

As noted on the previous pages, 2021 was another strong financial year for Flutter; we continued our strong momentum across all divisions, whilst progressing with the integration of our businesses and growing our leadership positions in core markets. In the context of another challenging and uncertain year, with lockdowns extending into 2021 to various degrees across our respective markets, we were able to successfully navigate this situation through our diversification.

Each of our divisions played an important part in helping to deliver on our key strategic objectives. We retained gold medal positions in our core markets of UK and Australia, whilst continuing to win in the US, with FanDuel remaining the clear market leader in online sportsbook. We also supplemented our International division with the acquisition of Junglee in India and announced the acquisition of Sisal in Italy, subject to competition clearance.

Importantly, we continued to lead and innovate in respect of our safer gambling and wider ESG agenda. Not only did we establish and develop our overall ESG strategy, as well as our global safer gambling and DEI strategies, we have actively started tracking and measuring our progress in many of these areas across all parts of our business, and developed and committed to plans to significantly enhance reporting during 2022. We included safer gambling targets for two of our divisions in our 2021 annual bonus plan, and are pleased that we are including all of our divisions in our 2022 annual bonus plan. We believe it is our responsibility to lead from the front and, as such, we have disclosed our safer gambling targets on a prospective basis. Full details around the measures and associated targets are set out on page 146. Whilst safer gambling is clearly an area which is extremely important in determining the sustainable future success of our business, we are also actively considering how our remuneration framework will interact with, support and incentivise our wider ESG agenda.

## Annual bonus

The strong performance of our brands resulted in an annual bonus pay-out close to maximum, at 99.9% (2020: 98.4%). The 2021 bonus plan was based on Group EBIT (excluding US) (65%), US Net Revenue (25%) and safer gambling (UK&I and Sportsbet) (10%), with stretching targets set for all three measures. Notwithstanding the extremely challenging targets, each was met in full, other than the UK&I safer gambling measure, which paid out just below maximum in the context of significantly stretching targets.

Given the strong performance of all of our brands and divisions over the course of the year, particularly in the context of ongoing uncertainties in many of the markets in which we operate, the Committee considered the level of annual bonus pay-out to be appropriate. A consistent approach was taken with bonus outcomes for all colleagues throughout the Group. Half of each Executive Director's resulting pay-out will be deferred into the Deferred Share Incentive Plan ("DSIP") for a period of three and four years. Further details are set out on pages 146 to 154.

## 2019 LTIP

75% of the 2019 LTIP (linked to Relative TSR) is due to vest in March 2022 and the remaining 25% (linked to a US Value target) is due to vest in July 2023. The US Value target is linked to the external valuation of our FanDuel business, which would not have been available to us until July 2023 as part of the original FanDuel deal and related put and call options. However, in December 2020, we announced that we had reached early agreement to increase our stake in FanDuel, and the valuation of the business undertaken at this time indicates that the US Value target will be significantly exceeded, resulting in full vesting of this element. We have reflected this likely outcome in this report. Nonetheless, this element will not vest until July 2023, subject to the Committee being satisfied that the value has not decreased below the level required for the measure to pay out at maximum. The relative TSR element of the 2019 LTIP has well exceeded the upper end of the stretching performance range, and so the overall vesting of the plan is expected to be 100% (2018 LTIP: 100%).

Prior to approving this level of vesting, the Committee considered the Group's wider achievements over the three-year performance period to objectively determine that full vesting was warranted. The Committee considered that:

- Flutter's TSR performance over the period was 3.7 times the median of our comparator group (99.6% versus 26.7%).
- The current business is significantly larger, more diverse in scale and scope and, crucially, far more sustainable over the long-term than it was three years ago. Whilst a large extent of this is a result of the successful merger with The Stars Group Inc. in 2020, the acquisitions of Adjarabet, Junglee, Singular and Tombola, and organic growth through exceptional leadership have also contributed.
- These achievements are all in the context of a global pandemic, which the Committee believes was extremely successfully navigated by the current management team.
- Our safer gambling and wider ESG agenda have led the market; these now guide each and every significant business decision we make as a Group.

## Effectiveness of the Committee

The operation, performance and effectiveness of the Committee is monitored throughout the year, and also specifically reviewed as part of the internal evaluation process. All feedback received is used to improve the Committee's effectiveness. I am pleased to confirm that the Committee continues to operate effectively. Read more on our Board evaluation on page 114.

## Looking ahead

I would like to thank my predecessor, Peter Rigby, for his immense contribution to this Committee over the course of the last five years, firstly as a member and latterly as the Chair of the Remuneration Committee. I would also like to welcome Nancy Dubuc, who joined the Committee in June 2021, and I look forward to working with her over the coming years.

I strongly believe that the proposed changes to the Executive Directors' remuneration arrangements will be vital in incentivising the management team to lead the business through the next phase of our growth. We look forward to receiving shareholders' support at the 2022 AGM, and I look forward to meeting you later in 2022 as we prepare for our Remuneration Policy review.

**Andrew Higginson**
Remuneration Committee Chair
14 March 2022

Governance

# Directors' remuneration report 2021 continued

## Remuneration at a glance
### 2021 outturns

**2021 annual bonus outcome**



| | |
|---|---|
| 100% | Group EBIT (ex. US) (65%) |
| 100% | US Value (25%) |
| 98.8% | Safer gambling (10%) |
| 99.9% | Total |

Overall, the bonus outturn for the CEO is 284.6% of salary and for the CFO is 264.7% of salary. Half of this will be deferred under the DSIP, 50% for 3 and 50% for 4 years.

**2019 LTIP**



- US Value (25%)
- TSR (75%)

The 2019 LTIP is estimated to vest in full. The TSR element will vest in March 2022 and the US Value element will vest in July 2023.

### 2021 single total remuneration figures



**Peter Jackson, Chief Executive Officer**

£7k    £2,626k    Total: £8,404k
£923k  £138k    £4,706k    £4k

**Jonathan Hill, Chief Financial Officer**

£14k    £1,572k    Total: £4,792k
£594k  £89k    £2,523k

- Salary
- Benefits
- Pension
- Annual bonus
- Long-term incentive plan
- Other

### Balance of fixed versus variable pay



**Peter Jackson, Chief Executive Officer**

13%    58%    30%

**Jonathan Hill, Chief Financial Officer**

15%    58%    28%

- Fixed Pay
- Variable pay
- Variable pay – share price growth

### Structure of Executive Directors' pay



| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| LTIP | Performance period: 3 years | | | Holding period: 2 years | | |
| Bonus | Performance period: 1 year | Holding period: 50% for 3 years, 50% for 4 years | | | | |
| Benefits & pension | Paid in the year | | | | | |
| Salary | Paid in the year | | | | | |

Denotes payment date

# Annual Report on Remuneration

The Committee believes that the existing Remuneration Policy operated as intended during 2021. This section provides details of remuneration outcomes for the financial year ended 31 December 2021 for Executive Directors and Non-Executive Directors who served during 2021, as well as how the Remuneration Policy will be implemented in 2022.

## The Remuneration Committee's responsibilities

Set out below is a summary of the Committee's key responsibilities:

- setting the Remuneration Policy for the Executive Directors;
- engaging with shareholders in respect of the Remuneration Policy for Executive Directors and its implementation as appropriate;
- reviewing the wider workforce remuneration and related policies, the alignment of incentives and rewards with culture and taking these into account when setting the policy for Executive Director remuneration;
- supporting the Board in determining whether reward-related employee policies and practices are in line with the Group's culture, strategy and values;

- ensuring that the Remuneration Policy and reward decisions incentivise and retain talent, and support the delivery of our long-term strategy;
- considering the appropriateness of the Remuneration Policy when reviewed against the rest of the organisation;
- ensuring that the remuneration framework remains effective in attracting and retaining colleagues in our industry;
- determining the terms of employment for Executive Directors, members of the Executive Committee and the Company Secretary, including remuneration, recruitment and termination arrangements;
- approving the measures and targets for incentive plans for Executive Directors, the Executive Committee and the Company Secretary; and
- assessing the appropriateness of and achievement against performance targets relating to incentive plans.

The Directors' biographies of the current members of the Committee are given on **pages 96 to 99**

## The Remuneration Committee's focus in 2021

| | |
|---|---|
| **Overall remuneration** | • Reviewing and approving total remuneration of the Executive Directors and members of the Executive Committee<br>• Reviewing the Remuneration Policy approved by shareholders in 2020 in the context of the current business and extensively discussing potential changes to it<br>• Discussing the feedback received from shareholders in respect of remuneration arrangements for 2022 |
| **Total salary** | • Reviewing current total salary levels in the context of both the current size and scope of the business, as well as their impact on total pay, and subsequently approving increases for both the Chief Executive Officer and Chief Financial Officer |
| **Annual bonus** | • Determining and approving bonus outcomes in respect of 2020 performance<br>• Reviewing and approving performance measures and targets for 2021 bonus<br>• Reviewing forecasted 2021 bonus outcome<br>• Reviewing and considering the 2022 annual bonus structure and performance measures, including the appropriateness of expanding the safer gambling element of the bonus plan<br>• Reviewing and approving an additional bonus for all Sportsbet colleagues, to recognise and reward the exceptional performance of the division |
| **Long-term incentives** | • Reviewing the TSR performance measures and targets for the 2021 LTIP awards<br>• Approving 2021 incentive plan grants for Executive Directors, the Executive Committee and Company Secretary<br>• Approving overall quantum of awards for 2021 share incentives for all employees<br>• Receiving updates on the performance of the long-term incentive in place across the Group<br>• Approving the vesting of the 2018 LTIP, including the US Value element, which vested later in the year<br>• Reviewing and approving the vesting of the FanDuel Value Creation Plan<br>• Reviewing and approving the structure of other division-specific incentive plans and share award grants, including for Executive Committee members<br>• Approving new long-term incentive arrangements for FanDuel employees |
| **Governance** | • Reviewing and approving the 2020 Directors' Remuneration Report<br>• Reviewing the annual Remuneration Committee calendar<br>• Reviewing and updating the Committee's Terms of Reference<br>• Assessing dilution from share plans against recommended limits, and use of Employee Benefit Trust<br>• Reviewing the Flutter gender pay gap and CEO pay ratio disclosures<br>• Approving the 2021 Sharesave grant, and receiving an update on A Gift of Shares award made to all employees in 2020 |
| **Changes to the Executive Committee** | • Reviewing and approving the leaver arrangements for the outgoing FanDuel CEO<br>• Reviewing and approving the remuneration package and employment terms for the incoming FanDuel CEO |
| **Shareholder consultation** | • Extensive engagement with shareholders on proposed changes to both Executive Director salaries and Remuneration Policy for 2022 |

Governance

# Directors' remuneration report 2021 continued

## Annual Report on Remuneration continued

### External advisers

PwC are the Committee's remuneration advisers. They were appointed by the Committee in 2017 following a competitive tender process. They provide independent commentary and advice, together with updates on legislative requirements and market practice to assist the Committee with its decision-making.

PwC report directly to the Committee, and are a signatory to, and abide by the Code of Conduct for Remuneration Consultants (which can be found at www.remunerationconsultantsgroup.com). The Committee undertakes due diligence periodically to ensure that the remuneration advisers remain independent of the Group and that the advice provided is impartial and objective. The Committee is satisfied that any conflicts are appropriately managed.

The fees paid to PwC in respect of work carried out for the Committee in 2021 totalled £217,000 and were based on an agreed fee for business-as-usual support (with additional work charged on a time and materials basis). PwC advised on TCFD reporting requirements and also provided tax advice to the Group during 2021 .

The Committee also seeks internal advice and support from the Chief People Officer, Global Director of Reward and Benefits, Group Reward and Benefits Director, Head of Executive Compensation, Company Secretary and Deputy Company Secretary and Head of Governance, as appropriate.

### Shareholder voting at shareholder meetings

The following shows the results of the advisory votes on the Annual Statement and Annual Report on Remuneration and the Remuneration Policy at the 2020 and 2021 AGMs:

| | For | Against | Total votes cast | Votes withheld |
|---|---|---|---|---|
| Annual Report on Remuneration (AGM 2021) | 70,293,675 (84.52%) | 12,870,333 (15.48%) | 83,164,008 | 214,537 |
| Remuneration Policy (AGM 2020) | 53,240,152 (94.64%) | 3,012,332 (5.36%) | 56,254,924 | 2,440 |

Details of our engagement with shareholders over the relevant year are provided in each year's Annual Report and Accounts.

Read more on shareholder engagement on page 39

### Single figure of total remuneration for Executive Directors (audited)

The table below sets out the single figures of total remuneration earned by each Executive Director of the Company during the year ended 31 December 2021 and the prior year. Remuneration relates to the period during which each Executive Director was a member of the Board in this capacity. Please refer to notes below the table for full details of how the figures are calculated.

| | Peter Jackson | | Jonathan Hill[1] | |
|---|---|---|---|---|
| | 2021 £'000 | 2020 £'000 | 2021 £'000 | 2020 £'000 |
| Total salary[2] | 923 | 840 | 594 | 569 |
| Benefits[3] | 7 | 10 | 14 | 15 |
| Pension[4] | 138 | 126 | 89 | 85 |
| Fixed pay | 1,068 | 976 | 697 | 669 |
| Annual bonus | 2,626 | 2,355 | 1,572 | 1,483 |
| Long-term incentives[5] | 4,706 | 4,596 | 2,523 | 2,145 |
| Other[6] | 4 | 479 | — | 133 |
| Variable pay | 7,337 | 7,430 | 4,095 | 3,761 |
| Total | 8,404 | 8,406 | 4,792 | 4,430 |

1. Where applicable, values are converted from euros to pound sterling using the 12-month average exchange rate over the relevant financial year (2021: £1 = €1.1630; 2020: £1 = €1.1052).

2. Total salary: represents the total amount earned for the relevant financial year. Peter Jackson's total salary at the start of the year was £900,000. This was increased to £927,000 on 1 March 2021. Jonathan Hill's salary at the start of the year was €674,000. This was increased to €694,220 on 1 March 2021.

3. Benefits comprise private medical insurance, life assurance and income protection.

4. Pension: the pension for both Executive Directors is the value of the cash paid to them in lieu of contributions. Neither of the Executive Directors has a prospective entitlement to a defined benefit pension.

5. The Committee used its discretion to replace the EPS and Revenue elements of both the 2018 and 2019 LTIPs with a Relative TSR measure. As dividends are added at the time of vesting, for the 2019 LTIP they will be included when this figure is updated in next year's report. For the 2018 LTIP, these have been included. For Peter Jackson, £2.5m of the 2019 LTIP (or 53%) is attributable to share price growth, whilst for Jonathan Hill £1.3m of this (or 53%) is attributable to share price growth. For Peter Jackson, £2.2m of the 2018 LTIP is attributable to share price growth, whilst for Jonathan Hill £1.2m of this is attributable to share price growth.

6. Other includes the value of the buyout options for both Peter Jackson and Jonathan Hill which vested during 2020. For 2021, it also includes the value of Peter Jackson's SAYE award on the date of grant.

## 2021 annual bonus (audited)

The maximum annual bonus opportunity for Executive Directors in 2021 was 285% and 265% of salary for the CEO and CFO respectively. Target bonus was two thirds of the relevant maximum. The 2021 annual bonus was based on Group EBIT (excluding US business performance), US-specific measures and a safer gambling measure. The table below shows the outcome for each element relative to the targets set:

| | Weighting | Performance targets[1] | | | Actual performance | Bonus outcome (% of element) | Bonus outcome (% of max) | Bonus outcome | |
| | | Threshold | Target | Maximum | | | | Peter Jackson | Jonathan Hill |
|---|---|---|---|---|---|---|---|---|---|
| Group EBIT (excluding US) | 65% | £852.8m | £916.9m | £962.8m | £1,035.7m | 100% | 65.0% | | |
| Net revenue from all verticals in existing states | 25% | £971.6m | £1,214.5m | £1,457.4m | £1,617.9m | 100% | 25.0% | | |
| Safer gambling: | 10% | | | | | | | | |
| UK&I TRI score[2] | 5% | 1% reduction | 4% reduction | 8% reduction | 7.7% reduction | 97.5% | 4.9% | | |
| Sportsbet reduction of net of revenue at risk[2] | 5% | 10% reduction | 15% reduction | 20% reduction | 33% reduction | 100% | 5.0% | | |
| Total | | | | | | | 99.9% | £2,625,970 | £1,572,340[3] |

1. Awards pay out on a straight-line basis between the points shown.
2. In 2020, we introduced safer gambling bonus targets for our PPB business. In 2021 we were able to extend this to include both our UK&I and Sportsbet divisions. For the UK&I this measure was Transactional Risk Indicator (TRI) score, which measures aggregated margin for customers who apply either a Self-Exclusion (greater than 6 months) or Gamstop divided by the total UK&I margin, over a 12-month period. In Sportsbet we measured the reduction of net revenue from potentially at-risk customers, as defined by the Sportsbet SG predictive model.
3. Converted from euros to pound sterling at the 12 month average exchange rate over the financial year of £1 = €1.1630.

In line with market practice and as with in previous years, the bonus targets have been adjusted for exchange rate movements over the period ensuring that bonus is measured on a constant currency basis.

Prior to approving the annual bonus outcomes, the Committee discussed whether or not the proposed outcome was considered to be fair and reasonable in the context of the Company's overall business performance over the year. Following the discussion, the Committee was satisfied that the outcome was appropriate and fair.

In line with the Remuneration Policy, half of any bonus earned has been deferred into Flutter shares under the DSIP, vesting 50% on the third anniversary of the grant and 50% on the fourth anniversary. A revenue underpin of 2% per annum growth will apply. Malus and clawback provisions apply to the annual bonus and DSIP both prior to vesting and for a period of two years post-vesting.

## 2019 LTIP (audited)

The tables below set out a summary of performance relative to the 2019 LTIP targets, and the outturn for each Executive Director. As disclosed in last year's Report, the Committee decided to replace EPS and Revenue measures with relative TSR over the full performance period, and retain the US Value measure (which was unaffected by the merger). The TSR element of the 2019 LTIP is due to vest in March 2022 and the US Value measure will vest in July 2023. The performance outcome of the US Value measure has been estimated at maximum, based on the valuation reached in December 2020 to increase Flutter's stake in FanDuel. The outcome will be retested in July 2023 when the award vests as originally communicated. Awards are also subject to the relevant leaver treatment, i.e. continued employment except for those reasons set out in the Policy for Payments for Loss of Office section.

| Performance measure | Targets | | Outcome | | |
| | Threshold (25% vesting) | Maximum (100% vesting) | Actual performance | % of maximum achieved | % of award eligible for vesting |
|---|---|---|---|---|---|
| US Value measure (25%) | 30% growth ($1.04bn) | 90% growth ($1.52bn) | 1,400% growth ($11.2bn)[1] | 100%[1] | 100% |
| TSR relative to FTSE 31-130[2] | Growth in line with median (26.7%) | Growth in line with upper quartile (73.5%) | 99.6% | 100% | 100% |
| Total vesting (% of max) | | | | 100% | |

1. Currently expected to be significantly above the maximum 90% growth required, and we have therefore estimated the outcome to be 100%.
2. TSR relative to the FTSE 31-130 (excluding housebuilders, real estate investment trusts and natural resources companies).

| Executive Director | Award type | Date of grant | Number of shares awarded | % of total award vesting | Number of shares vesting[1] | Value at vesting[2] |
|---|---|---|---|---|---|---|
| Peter Jackson | Nil-cost options | 11/03/2019 | 37,983 | 100% | 37,983 | £4,706,212 |
| Jonathan Hill | Nil-cost options | 11/03/2019 | 20,361 | 100% | 20,361 | £2,522,792 |

1. Dividend equivalent shares will be added to reflect any dividends accrued during the vesting period, as appropriate.
2. As the award vests after the publication of this report, the value for reporting purposes is based on the average share price over three months to 31 December 2021 of £123.90. For Peter Jackson, £2.5m of this is attributable to share price growth, whilst for Jonathan Hill £1.3m of this is attributable to share price growth.

Governance

# Directors' remuneration report 2021 continued

## Annual Report on Remuneration continued

### 2018 LTIP update (audited)

In last year's Report, we estimated the value of the 2018 LTIP using the 3-month average share price to 31 December 2020, in line with the prescribed single figure methodology. We have now updated the values using the actual share price at the date of vesting. We have also included dividends, where relevant, which were only calculated at the time of vesting.

| Executive Director | Number of shares | 3-month average share price to 31 December 2020 | Estimated value of LTIP 2018 awards | Dividends | Share price on vesting[1] | Actual value of LTIP 2018 awards |
|---|---|---|---|---|---|---|
| Peter Jackson | 27,261 | £136.18 | £3,712,458 | 1,837 | £157.95 | £4,596,029 |
| Jonathan Hill | 14,181 | | £1,931,197 | 703 | £144.10 | £2,144,784 |

1. Jonathan Hill joined in October 2018 and his award was granted, and therefore also vested, later than Peter Jackson's.

### Incentive plan interests awarded in the year (audited)

On 18 March 2021, awards were granted to the Executive Directors under the LTIP and DSIP. Details of these awards are set out in the following table:

| | Type of interest in shares | Face value (%) | Face value (£)[1] | Number of shares | Vesting at threshold | Vesting date[2] |
|---|---|---|---|---|---|---|
| **Peter Jackson** | | | | | | |
| SAYE | Discounted options | — | £4,493 | 155 | n/a | 1 December 2024 |
| LTIP | Nil-cost options | 180% of total salary | £1,668,561 | 9,969 | 25% | 18 March 2024 |
| DSIP | Nil-cost options | 50% of net bonus | £1,177,316 | 7,034 | n/a | 50%: 18 March 2022 |
| | | | | | | 50%: 18 March 2023 |
| **Jonathan Hill** | | | | | | |
| LTIP | Nil-cost options | 150% of total salary | £893,280[3] | 5,337 | 25% | 18 March 2024 |
| DSIP | Nil-cost options | 50% of net bonus | £703,142[3] | 4,201 | n/a | 50%: 18 March 2022 |
| | | | | | | 50%: 18 March 2023 |

1. Three-day average share price prior to the date of grant, which was £167.38. For SAYE this is the value of the gain on the date of grant.

2. A further two-year holding period applies to the LTIP following the vesting date. Both the LTIP and DSIP are subject to a post-employment holding period of two years.

3. The value of the award was calculated using the three-day average exchange rate prior to the date of grant, which was £1 = €1.1657.

The DSIP is subject to an underpin which requires Revenue growth of at least 2% p.a. over the deferral period.

The LTIP awards will vest subject to the achievement of TSR performance, as per the vesting schedule below:

| | Below threshold (nil vesting)[1] | Threshold (25% vesting)[1] | Maximum (100% vesting)[1] |
|---|---|---|---|
| Relative TSR[2] | Below median growth | Growth in line with median | Growth in line with upper quartile |

1. Awards vest on a straight-line basis between the points shown.

2. TSR relative to the FTSE 100 (excluding housebuilders, real estate investment trusts and natural resources companies) over the period 1 January 2021 to 31 December 2023.

### Single figure of total remuneration for Non-Executive Directors (audited)

The table below sets out the single figures of total remuneration received by each Non-Executive Director who served during the year ended 31 December 2021:

| | | Fees (£'000)[1] | |
|---|---|---|---|
| Non-Executive Director | Board Committee membership | 2021 | 2020 |
| Zillah Byng-Thorne | Audit, Risk (Chair)[2] | 112 | 100 |
| Michael Cawley | Audit (Chair), Risk | 114 | 104 |
| Nancy Cruickshank[3] | Nomination, Risk, Workforce Engagement | 90 | 81 |
| Nancy Dubuc[4] | Remuneration, Nomination, Workforce Engagement | 65 | — |
| Richard Flint[5] | Risk, Workforce Engagement | 340 | 303 |
| Dave Gadhia[6] | Risk, Nomination | 26 | 53 |
| Andrew Higginson[7] | Nomination, Remuneration (Chair[4]) | 134 | 101 |
| Alfred Hurley | Nomination, Remuneration | 90 | 53 |
| Holly Koeppel[8] | Audit, Risk, Nomination | 62 | — |
| David Lazzarato | Audit, Risk | 90 | 53 |
| Gary McGann[9] | Nomination (Chair[2]), Remuneration, Chair of the Board | 477 | 407 |
| Atif Rafiq[10] | Risk | 6 | — |
| Peter Rigby[6] | Remuneration (Chair), Nomination | 33 | 97 |
| Mary Turner[11] | Audit, Remuneration, Workforce Engagement (Chair[5]) | 99 | 53 |

1. Fees for Non-Executive Directors are pro-rated according to their appointment date or date of role change where appropriate. Fees are paid in euros but have been shown here in pounds sterling for consistency.
2. The Risk Committee was repurposed as the Risk and Sustainability Committee on 10 December 2021.
3. Nancy Cruickshank rotated off the Audit Committee and was appointed as a member of the Nomination Committee and Workforce Engagement Committee on 15 June 2021.
4. Nancy Dubuc was appointed to the Board on 29 April 2021, and was appointed as a member of the Nomination Committee, Workforce Engagement Committee and Remuneration Committee on 15 June 2021.
5. Richard Flint has a consultancy agreement with Flutter to provide additional advice and guidance and received additional fees in respect of this. He was appointed as a member of the Workforce Engagement Committee on 15 June 2021.
6. Divyesh (Dave) Gadhia and Peter Rigby stepped down from the Board following the 2021 AGM on 29 April 2021.
7. Andrew Higginson was appointed Chair of Remuneration Committee on 29 April 2021.
8. Holly Koeppel was appointed to the Board on 13 May 2021, and was appointed as a member of the Audit Committee, Risk Committee and Nomination Committee on 15 June 2021.
9. No fees were paid to Board Chair for chairing Nomination Committee.
10. Atif Rafiq was appointed to the Board and as a member of the Risk and Sustainability Committee on 10 December 2021.
11. Mary Turner was appointed Chair of Workforce Engagement Committee on 15 June 2021.

## Implementation of Remuneration Policy for 2022

### Total salary

The Committee has approved the following total salaries for the Executive Directors, effective 1 March 2022. As noted in the Remuneration Committee Chair's Statement, these increases are higher than the average increases awarded to our UK colleagues in order to address significant issues around market competitiveness. Total salaries for Peter Jackson and Jonathan Hill are split between a salary in respect of their employment and payment of Board fees in respect of their roles as Directors.

|  | 1 March 2021 | 1 March 2022 | % increase |
|---|---|---|---|
| Peter Jackson | £927,000 | £1,170,000 | 26% |
| Jonathan Hill [1] | €694,220 | | |
|  | £596,946 | £715,000 | 20% |

1. Converted from euros to pound sterling at the 12-month average exchange rate over the financial year of £1 = €1.1052. Both Executive Directors will have UK contracts going forward and, as such, both will have their salaries set in GBP.

### Pension and benefits

The Executive Directors will receive a cash supplement in lieu of pension contribution of 15% of total salary in 2022. They will also receive benefits in line with the Remuneration Policy. From 1 January 2023 these will reduce to the level applying to the wider workforce in the country in which an Executive Director is based. Currently, both are based in the UK where this is 5% of total salary.

### Annual bonus

The maximum annual bonus opportunity for the CEO and CFO in 2021 will remain at 285% of total salary and 265% of total salary respectively.

As in previous years, the Committee has determined that financial performance targets will not be disclosed on a prospective basis for reasons of commercial sensitivity but will be disclosed retrospectively in next year's Annual Report on Remuneration. However, we believe that, where possible, targets should be disclosed externally to ensure that our shareholders can hold us accountable and, as such, we have disclosed our Safer Gambling metrics prospectively. Details are set out on the next page.

The performance measures for the 2022 bonus are as follows:

|  | Weighting |
|---|---|
| Group EBIT (excluding US) | 60% |
| FanDuel: Net revenue from all verticals in existing states | 30% |
| Safer gambling | 10% |

Half of any bonus earned will be paid in cash, with the remaining half deferred into shares under the DSIP, vesting 50% after three years and 50% after four years from grant, subject to continued employment and a revenue underpin of 2% growth per annum. Awards are eligible to receive dividend equivalents. Malus and clawback provisions apply to the annual bonus and DSIP both prior to vesting and for a period of two years post-vesting.

We will review the Group EBIT (excluding US) targets during the year in the context of the acquisition of Sisal. Given its materiality, the Committee intends to adjust the targets to take account of Sisal, however it will determine the exact approach depending on when the deal closes.

**Directors' remuneration report 2021** continued

# Incentivising Safer Gambling

**At Flutter, we recognise that the future success of our industry is predicated on getting safer gambling right. In 2022, as part of our Positive Impact Plan, we launched our first global safer gambling strategy, Play Well, as detailed on page 46. This strategy enables us to leverage the depth and breadth of our global expertise in safer gambling, to support the continued evolution of our divisional safer gambling strategies which are tailored to customers across our various markets.**

As our divisions operate within different regulatory and societal contexts, with varying levels of maturity with regards to being able to measure safer gambling, we have taken the approach of considering safer gambling on a divisional basis for the purposes of setting bonus targets. This allows us to set targets which are meaningful, linked to divisional strategy, and which can really drive change tailored to helping to keep our customers safe in the context in which those customers operate.

In 2021, we challenged all divisions to determine suitable bonus metrics around safer gambling to include in the 2022 bonus. We are pleased that all divisions were able to set meaningful and robust targets which they defined, refined and tested in 2021, ready to implement in 2022.

The following targets have been included in each of our divisional bonus plans as well as in the Group plan, thereby aligning each employee's bonus outturn with strategic gambling objectives for their division. The goals all support safer gambling tool usage, which is the focus of our overarching global safer gambling goal (see page 46). Each division takes a slightly different approach to measurement, and they all have differing starting points in terms of the level of safer gambling maturity in the markets in which they operate. Notwithstanding, we believe that there is an equivalent level of stretch contained in each division's targets.

## UK&I

**Measure:** Transactional Risk Indicator score, which measures the % of revenue from customers who self-exclude (either directly with a Flutter brand or via GAMSTOP) in the year as a proportion of total revenue for that year (target is a reduction year-on-year on a like-for-like basis).

**Rationale:** Retaining the TRI score, which was used to measure "at risk" revenue generated by the UK&I division's online brands for 2021; targets are shown as a % reduction from 2021 on a like-for-like basis. In addition, we will be measuring revenue identified from new initiatives in 2022

(including from Paddy Power Retail and as a consequence of any sharing of self-exclusion data) for which we do not have comparative data.

**Targets:**

| Threshold | Target | Maximum |
|---|---|---|
| 1% reduction compared to 2021 | 2% reduction compared to 2021 | 4% reduction compared to 2021 |

## Sportsbet

**Measure:** % of net revenue from customers with a deposit limit.

**Rationale:** This is considered a more proactive measure than the one used in 2021; it measures affirmative action on safer gambling taken by the team rather than being reactive.

**Targets:**

| Threshold | Target | Maximum |
|---|---|---|
| 13.5% | 15% | 16.5% |

## International

**Measure:** % of customers applying a deposit limit, cooling-off period or stake limit.

**Rationale:** Like the Sportsbet measure, this is considered to be proactive rather than reactive, measuring preventative actions taken on safer gambling.

**Targets:**

| Threshold | Target | Maximum |
|---|---|---|
| 33.5% | 36.5% | 39.5% |

## FanDuel

Safer gambling has been introduced for the first time into the FanDuel bonus plan. As the US is our most nascent market, we are working hard to build out our safer gambling tools and capabilities. For 2022 we have decided to measure safer gambling based on a basket of measures:

| Measure | Threshold | Target | Maximum |
|---|---|---|---|
| Employee training completion (20%) | 95% | 98% | 100% |
| New customer first impressions (40%) | 31 Dec 2022 | 8 Sept 2022 (NFL kick off) | 1 July 2022 |
| RG impressions for all customers aged 21-25 (40%) | 31 Dec 2022 | 8 Sept 2022 (NFL kick off) | 1 July 2022 |

The two customer impressions measures have been designed to reach customers (either new customers or those aged between 21-25) with Safer Gaming messaging through in-app messaging and interstitials.

# Annual Report on Remuneration continued

## LTIP

The 2022 LTIP award grant levels are in line with the Remuneration Policy, as set out below:

| | Face value at date of award (£) | Face value at date of award (% of total salary) |
|---|---|---|
| Peter Jackson | 2,106,000 | 180% of salary |
| Jonathan Hill | 1,072,500 | 150% of salary |

The awards will vest based on Relative TSR performance. The proposed targets are the same as for 2021, and are set out in the table below:

| | Below threshold (nil vesting) | Threshold (25% vesting)[1] | Maximum (100% vesting)[1] |
|---|---|---|---|
| Relative TSR[2] | Below median growth | Growth in line with median | Growth in line with upper quartile |

1. Awards vest on a straight-line basis between the points shown.

2. TSR relative to the FTSE 100 (excluding housebuilders, real estate investment trusts and natural resources companies).

## Save As You Earn ("SAYE")

Executive Directors are eligible to participate in the plan with the same terms as all other UK employees if an invitation to enter a savings contract is offered during the year.

## Chair and Non-Executive Director fees

During the year, we reviewed both Non-Executive Director and Chair fees, the latter of which had not been increased since it was originally set at the time of the merger between Paddy Power and Betfair in 2016. The previous and current fees, which took effect from 1 June 2021, are set out in the table below:

| | 1 January 2021 | 1 June 2021 |
|---|---|---|
| **Base fee** | | |
| Chair | €450,000 | €630,000 |
| Base Non-Executive Director fee | €90,000 | €115,000 |
| | | |
| Additional fees | | |
| Senior Independent Director | €15,000 | €30,000 |
| Audit Committee Chair | €25,000 | €30,000 |
| Remuneration Committee Chair | €25,000 | €30,000 |
| Risk and Sustainability Committee Chair | €20,000 | €30,000 |
| Nomination Committee Chair[1] | €20,000 | €20,000 |
| Workforce Engagement Committee Chair[2] | — | €20,000 |

1. If the Board Chair holds the position of Nomination Committee Chair, no additional fee will be paid for the Nomination Committee role.

2. The Workforce Engagement Committee was established during the year. The fees for the role of the Chair of this Committee will be reviewed in 12 months, taking into account the evolution of the Committee's remit and responsibilities.

## Percentage change in Directors' remuneration compared with other employees

The table below shows the percentage change in the Chief Executive Officer's remuneration from the prior year compared with the average percentage change in remuneration for all other employees. To provide a relevant comparison, the analysis includes only salaried corporate office UK and Ireland employees and is based on a consistent set of employees. The Committee considers this to be the most appropriate comparator group.

| | Percentage change in 2021 compared with 2020 | | | Percentage change in 2020 compared with 2019 | | |
|---|---|---|---|---|---|---|
| | Base salary/fee | Taxable benefits | Annual bonus | Base salary/fee | Taxable benefits | Annual bonus |
| Peter Jackson | 3.0% | -32.8% | 11.5% | 21.6% | 39.4% | 141.9% |
| Jonathan Hill | 3.0% | -8.6% | 6.0% | 21.6% | -78.3% | 131.9% |
| Zillah Byng-Thorne | 19% | — | — | -3% | — | — |
| Michael Cawley | 15% | — | — | 0% | — | — |
| Nancy Cruickshank | 16% | — | — | 59% | — | — |
| Richard Flint | 77% | — | — | — | — | — |
| Divyesh (Dave) Gadhia[1] | -50% | — | — | — | — | — |
| Andrew Higginson | 39% | — | — | 397% | — | — |
| Alfred Hurley | 77% | — | — | — | — | — |
| Holly Koeppel | — | — | — | — | — | — |
| David Lazzarato | 77% | — | — | — | — | — |
| Gary McGann | 23% | — | — | 0% | — | — |
| Peter Rigby[1] | -65% | — | — | 18% | — | — |
| Atif Rafiq | — | — | — | — | — | — |
| Mary Turner | 96% | — | — | — | — | — |
| Corporate office UK&I employees | 12.7% | -0.6% | 7.9% | 10.8% | 20.2% | 56.3% |

1. Both Non-Executive Directors stepped down from the Board in April 2021.

Governance

# Directors' remuneration report 2021 continued

## Annual Report on Remuneration continued

### Relative importance of spend on pay

The table below shows the percentage change in total employee pay expenditure and shareholder distributions (i.e. dividends and return of capital) from the financial year ended 31 December 2020 to the financial year ended 31 December 2021.

|  | 2021 (£m) | 2020 (£m) | % change |
|---|---|---|---|
| Dividends | — | — | — |
| Share buybacks | — | — | — |
| Total shareholder distributions | — | — | — |
| Employee remuneration | £1,049.1 | £856.6 | 22% |

### CEO pay ratio disclosure

The CEO pay ratios for our UK employees in respect of 2021 and previous years are as follows:

| Financial year | Calculation method | CEO pay £'000 | 25th percentile pay ratio | Median pay ratio | 75th percentile pay ratio |
|---|---|---|---|---|---|
| 2021 | A | 8,404 | 346:1 | 214:1 | 122:1 |
| 2020 | A | 7,522 | 340:1 | 198:1 | 114:1 |
| 2019 | A | 2,099 | 107:1 | 89:1 | 54:1 |
| 2018 | A | 1,664 | 113:1 | 92:1 | 54:1 |

The total pay and benefits of each employee at the 25th, 50th and 75th percentile is as follows:

|  | 25th percentile pay ratio | Median pay ratio | 75th percentile pay ratio |
|---|---|---|---|
| Total pay and benefits | £24,281 | £39,327 | £69,146 |
| Salary | £20,376 | £31,080 | £52,333 |

The pay and benefits of employees were calculated in line with the single total figure of remuneration methodology. We have used calculation method A (which is the most comprehensive). As such, we have used actual pay and benefits from 1 January to 31 December 2021 for any employee who was employed as at 1 October 2021. Joiners, leavers and part-time employees' earnings have been annualised on a full-time equivalent ("FTE") basis, excluding any payments of a one-off nature, with FTE calculations based on 40 hours per week. Those on unpaid leave for more than 30 days have been excluded from the analysis. For annual bonus payments, bonuses calculated for the 2021 year and to be paid in 2022 have been used. Benefits included in the calculation are employer pension/or cash in lieu received and the benefit in kind/P11D value of any taxable benefits.

The ratio is broadly consistent with last year. There was a strong level of bonus payout across all UK&I employees, however as the CEO has a higher bonus opportunity than others, this has had a greater impact on his number and has therefore led to a small increase in the pay ratio. Both salary and total pay and benefits for the wider employee workforce have increased since last year: median salary levels are 7% higher than the levels disclosed in last year's report, and the median total pay and benefits are 4% higher, which is consistent with pay and progression policies for UK employees.

## Directors' shareholdings (audited)

We believe it is important that Executive Directors build up a significant holding in Flutter Entertainment plc shares, in order to align their interests with those of our shareholders. As part of our approved Remuneration Policy, the holdings that the CEO and CFO are required to build and maintain are 300% of salary and 200% of salary respectively. Shareholding requirements may be met through both beneficially owned shares and vested but unexercised options net of notional tax. Those subject to continued employment or performance assessment are not included.

Post-employment holding periods apply on LTIP awards (from 2020 onwards) DSIP awards (from 2021 onwards). As such, Executive Directors are required to hold the higher of their actual shareholding at the time of departure and the applicable shareholding requirement for two years post-departure.

The table below shows the shareholding of each Director against their respective shareholding requirement (where relevant) as at 31 December 2021. Since this time, Nancy Cruickshank, Andrew Higginson and Gary McGann each bought Flutter shares (1,255, 3,343, and 2,200 respectively). Peter Jackson exercised his SAYE share options. In addition, both Peter Jackson and Jonathan Hill's DSIP 2020 nil-cost options vested, and both were granted nil-cost options in respect of their 2022 DSIP and LTIP awards.

| | Beneficially owned[1] | Share options subject to performance | Share options vested but unexercised | Share options subject to continued employment only | Share options exercised in the year | Shareholding requirement (% of salary) | Current shareholding (% of salary)[2] | Requirement met? |
|---|---|---|---|---|---|---|---|---|
| Peter Jackson[3] | 7,561 | 62,615 | 29,427 | 9,145 | 15,238 | 300% | 275% | No |
| Jonathan Hill | 1,728 | 34,003 | 18,206 | 5,729 | — | 200% | 206% | Yes |
| Zillah Byng-Thorne | 1,287 | — | — | — | — | — | — | — |
| Michael Cawley | 3,660 | — | — | — | — | — | — | — |
| Nancy Cruickshank | — | — | — | — | — | — | — | — |
| Nancy Dubuc | — | — | — | — | — | — | — | — |
| Richard Flint | 24,134 | — | — | — | — | — | — | — |
| Holly Koeppel | — | — | — | — | — | — | — | — |
| Andrew Higginson | — | — | — | — | — | — | — | — |
| Alfred Hurley | 2,960 | — | 14,358 | — | — | — | — | — |
| David Lazzarato | 2,708 | — | 8,291 | — | — | — | — | — |
| Gary McGann | 3,314 | — | — | — | — | — | — | — |
| Atif Rafiq | — | — | — | — | — | — | — | — |
| Mary Turner | 4,296 | — | 7,096 | — | — | — | — | — |

1. Includes shares held by the individual and those held by persons closely associated with them.

2. Based on beneficially owned shares and vested but unexercised options net of notional tax, a share price of £117.60 and salaries as at 31 December 2021.

3. Peter Jackson exercised 15,238 options during the year, realising a gain of £2.17m.

Governance

# Directors' remuneration report 2021 continued

## Annual Report on Remuneration continued

### Pay for performance

The graph below shows the TSR performance (share price plus dividends paid) of Flutter Entertainment plc[1] compared with the performance of the FTSE 100 Index over the 10-year period to 31 December 2021, assuming a nominal £100 investment in Paddy Power plc[1] and the FTSE 100 Index at the start of the timeframe. This index has been selected because the Company believes that the FTSE 100 provides a relevant and appropriate broad market comparator index for the combined entity and includes companies of a similar size.



1. Paddy Power plc changed its name to Paddy Power Betfair plc on completion of the merger of Paddy Power plc and Betfair Group plc on 2 February 2016. In 2019, Paddy Power Betfair plc was renamed Flutter Entertainment plc.

### Change in Chief Executive Officer's single total figure of remuneration

|  | 2012 Patrick Kennedy | 2013 Patrick Kennedy | 2014 Patrick Kennedy | 2015 Andy McCue | 2016 Andy McCue | 2016 Breon Corcoran | 2017 Breon Corcoran | 2018 Breon Corcoran | 2018 Peter Jackson | 2019 Peter Jackson | 2020 Peter Jackson | 2021 Peter Jackson |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CEO single figure of remuneration[1] (£'000) | 6,534 | 6,752 | 6,450 | 2,701 | 2,109 | 1,557 | 3,233 | 295 | 1,664 | 2,099 | 8,406 | 8,404 |
| Annual bonus outcome (% of maximum) | 62% | 55% | 67% | 77% | 0%[5] | 67% | 60% | 0%[6] | 49% | 73% | 98% | 99% |
| LTIP vesting[2] (% of maximum) | 100% | 95%[3] | 83%[4] | 100% | 100% | 100% | 100% | 64% | n/a[7] | n/a[7] | 100% | 100% |

1. Remuneration is converted from euros to pounds sterling as appropriate, using the 12-month average exchange rate over the financial year. Patrick Kennedy and Andy McCue were paid in euros. Breon Corcoran was paid in pound sterling, as is Peter Jackson.

2. Before retesting – note, there is no provision for retesting in respect of LTIP awards made from 2013 onwards.

3. Retesting was applied to the unvested portion of the 2011 LTIP based on performance to 31 December 2014, and as a result an additional 4.9% of the award vested in March 2015.

4. Retesting was applied to the unvested portion of the 2012 LTIP based on performance to 31 December 2015, and as a result an additional 4.0% of the award vested in March 2016.

5. Andy McCue was not eligible for a bonus in 2016 in line with his payment for loss of office.

6. Breon Corcoran was not eligible for a bonus in 2018 in line with his payment for loss of office.

7. Peter Jackson has no LTIP vestings in these years.

## Remuneration Policy

The Remuneration Policy was approved by shareholders at the 2020 AGM. For ease of reference, the Remuneration Policy table and our remuneration policy for the wider workforce sections have been reproduced in the summary below. The full Remuneration Policy can be found in the 2019 Directors' Remuneration Report.

### Remuneration Policy table

The table below sets out our Remuneration Policy for Executive Directors. It has been represented in full and unchanged from 2020:

| Element | Purpose and link to strategy | Operation and performance measures | Maximum opportunity |
|---|---|---|---|
| Salary | To attract and retain high-calibre talent in the labour market in which the Executive Director is employed. | Generally reviewed annually but may be reviewed at other times of the year in exceptional circumstances. Salaries (inclusive of any Director fees) are set with reference to individual skills, experience, responsibilities, Company performance and performance in role. Independent benchmarking is conducted on a periodic basis against companies of a similar size and complexity, and those operating in the same or similar sectors, although this information is used only as part of a broader review. | Increases (as a percentage of salary) will generally be in line with salary inflation and consistent with those offered to the wider workforce. Higher increases may be appropriate in certain circumstances including, but not limited to: • where an individual changes role; • where there is a material change in the responsibilities or scope of the role; • where an individual is appointed on a below market salary with the expectation that this salary will increase with experience and performance; • where there is a need for retention; • where salaries, in the opinion of the Committee, have fallen materially below the relevant market rates; and • where the size of the Group increases in a material way. The Committee will review salaries if the proposed combination with The Stars Group completes. This may lead to increases awarded at rates higher than the wider workforce level, given that it would represent a significant change in the scale and complexity of the business and therefore the roles of the Executive Directors. |
| Benefits | To provide market competitive, cost effective benefits. | Employment-related benefits may include (but are not limited to) private medical insurance, life assurance, income protection, relocation, travel and accommodation assistance related to fulfilment of duties, tax equalisation and/or other related expenses as required. Where expenses are necessary for the ordinary conduct of business, the Company may meet the cost of tax on benefits. | The value of benefits may vary from year-to-year in line with variances in third-party supplier costs which are outside of the Company's control, business requirements and other changes made to wider workforce benefits. |
| Pension | To provide retirement benefits that are appropriately competitive within the relevant labour market. | Paid as a defined contribution and/or cash supplement. | Contribution of up to 15% of salary (or an equivalent cash payment in lieu) for current Executive Directors. These will reduce to the UK and Ireland wider workforce level from the start of 2023. For any new Executive Directors appointed during the term of this Policy, contributions will be set in line with the wider workforce level upon recruitment. |

Governance

# Directors' remuneration report 2021 continued

## Remuneration Policy continued

| Element | Purpose and link to strategy | Operation and performance measures | Maximum opportunity |
|---|---|---|---|
| **Annual bonus and DSIP** | To incentivise and reward the successful delivery of annual performance targets. The DSIP also provides a link to long-term value creation. | The Committee reviews the annual bonus prior to the start of each financial year to ensure that the opportunity, performance measures, targets and weightings are appropriate and in line with the business strategy at the time. | Threshold performance will result in an annual bonus pay-out of 25% of the maximum opportunity. |
| | | Performance is determined by the Committee on an annual basis by reference to Group financial or strategic measures, or personal objectives, although the financial element will always account for at least 50% of the bonus in any year. The DSIP will be subject to a financial underpin; for 2020 this will be a revenue underpin but a different measure may be used in future years. | For target performance, the annual bonus earned is two-thirds of the maximum opportunity. |
| | | Half of any annual bonus is paid in cash, with the remaining half deferred into shares under the DSIP. Any deferred element is released 50% after three years and 50% after four years from the date of grant. | Maximum annual opportunity of 285% of total salary for the CEO and 265% of salary for other Executive Directors. |
| | | Malus and clawback provisions apply to the annual bonus and DSIP both prior to vesting and for a period of two years post-vesting. Dividends (or equivalent) accrue and are paid on DSIP awards that vest. | |
| **LTIP** | To attract, retain and incentivise Executive Directors to deliver the Group's long-term strategy while providing strong alignment with shareholder interests. | Annual grant of shares or nil-cost options, vesting after a minimum of three years, subject to the achievement of performance conditions. | The normal maximum opportunity is 180% of salary for the CEO and 150% of salary for other Executive Directors. Threshold performance will result in no more than 25% vesting. |
| | | The Committee reviews the performance measures, targets and weightings prior to the start of each cycle to ensure that they are appropriate. The measures and respective weightings may vary year-on-year to reflect strategic priorities, but at least 75% will always be based on financial measures (which can include TSR). | |
| | | Following vesting, awards are subject to a holding period of up to two years, such that the overall timeframe of the LTIP will be no less than five years. Directors may sell sufficient shares to satisfy the tax liability on exercise but must retain the net number of shares until the end of this two-year period. | |
| | | Malus and clawback provisions apply to the LTIP, which allow the Company to reduce or claw back awards during the holding period. Dividends (or equivalent) accrue and are paid on LTIP awards that vest. | |

| Element | Purpose and link to strategy | Operation and performance measures | Maximum opportunity |
|---|---|---|---|
| **SAYE** | To facilitate share ownership and provide further alignment with shareholders. | The Company operates Save As You Earn share plans for all employees (in the UK this is an HMRC-approved and in Ireland this is an Irish Revenue-approved plan); the Executive Directors may participate in the plan on the same basis as other employees.<br><br>Participants are invited to save up to the monthly limit over a three-year period and use these savings to buy shares in the Company at up to the maximum discount allowable in the relevant jurisdiction. | Maximum opportunity is in line with HMRC and Irish Revenue limits (currently £500 and €500 per month for UK and Irish employees respectively).<br><br>Maximum opportunity for employees in other countries is the equivalent of €500 per month. |
| **Shareholding guidelines** | To create alignment between the interests of Executive Directors and shareholders. | Executive Directors must build up and maintain a holding of shares in the Company equivalent to a minimum of 300% of salary for the CEO and 200% of salary for other Executive Directors. Executive Directors must retain half of post-tax vested awards until the guidelines are met. Shareholding guidelines may be met through both beneficially owned shares and vested but unexercised options on a notional net of tax basis. Executives are required to hold the lower of their respective shareholding guideline and the actual shareholding immediately prior to departure for two years post-departure. | n/a |

## Our remuneration policy for the wider workforce

Below Board level, employees receive a remuneration package that is reflective of their role and responsibilities, set by reference to internal relativities and external market data where applicable. Employees at the Executive level will typically have a greater emphasis on performance-related and long-term pay compared with those below this level. Details are given in the table below:

| Element | Approach |
|---|---|
| **Salary** | Our approach to salary reviews is consistent across the Group, with consideration given to the level of responsibility, experience, individual performance and salary levels in comparable companies. Remuneration surveys are referenced, where appropriate, to establish market rates.<br><br>Although increases may vary, Executive Director increases are aligned with the typical increases awarded across the Group under normal circumstances. |
| **Pension and benefits** | Benefits and pension arrangements are tailored to local market conditions for all of our employees across the Group. |
| **Annual bonus** | The majority of our employees are eligible to participate in an annual bonus plan, though award sizes vary by level. Performance measures are tailored to be suitable to the nature and responsibility of the role, and the geographic location, though the structure remains broadly consistent across the Group. |
| **Share plans** | Executive Directors are eligible to participate in the LTIP. Employees at Executive Committee and senior management level are also eligible to participate in share plans, which vest based on continued employment and, in some cases, are also subject to performance conditions. The timing of the vesting is dependent on geographic location.<br><br>The majority of our workforce is also eligible to participate in the employee SAYE plan; the basis of participation varies depending on geographic location. |
| **Shareholding guidelines** | Shareholding guidelines are in place for Executive Directors and Executive Committee members. |

Governance

# Directors' remuneration report 2021 continued

## Considerations of the UK Corporate Governance Code principles

During the 2020 Remuneration Review, our Remuneration Policy was designed taking into account the following principles of the UK Corporate Governance Code.

| | | |
|---|---|---|
| **Clarity** | Remuneration arrangements should be transparent and promote effective engagement with shareholders and the workforce. | We removed the complexity of setting long-term targets, in favour of using TSR to measure performance under the LTIP.<br><br>This requires no adjustments and is clear and easy to understand. Overall, the deferred bonus structure is clear and transparent. |
| **Simplicity** | Remuneration structures should avoid complexity and their rationale and operation should be easy to understand. | The removal of multiple complex long-term measures assists with simplicity.<br><br>We believe that the current structure can be easily understood and articulated. |
| **Risk** | Remuneration arrangements should ensure reputational and other risks from excessive rewards, and behavioural risks that can arise from target-based incentive plans, are identified and mitigated. | The Committee was very conscious of this area in designing the 2020 Remuneration Policy, and took steps to mitigate potential risks. Full details of the approach to this can be found in the 2019 DRR. |
| **Predictability** | The range of possible values of rewards to individual directors and any other limits or discretions should be identified and explained at the time of approving the Policy. | The LTIP is performance-based, and the value delivered under both the LTIP and DSIP is influenced by share price performance. |
| **Proportionality** | The link between individual awards, the delivery of strategy and the long-term performance of the company should be clear. Outcomes should not reward poor performance. | The Policy enables meaningful and appropriate targets to be set with a significant proportion of remuneration linked to long-term shareholder value. We believe that incentive plan outcomes will reflect the successful execution of our strategy. |
| **Alignment to culture** | Incentive schemes should drive behaviours consistent with company purpose, values and strategy. | The measures used in our incentive structure are aligned with our business strategy and values. For example, the inclusion of an RG measure demonstrates our commitment to the RG agenda, which is a core part of Flutter's values. |

# Directors' report

The Directors' Report for the year ended 31 December 2021 should be read in conjunction with the other sections of this Annual Report and Financial Statements. The following sections of this Annual Report and Financial Statements are incorporated into this Directors' Report by reference for the purposes of sections 325 and 1373 of the Companies Act 2014, Regulation 21 of the European Communities (Takeover Bids Directive (2004/25/EC)) Regulations 2006 (SI 255/2006), the Transparency (Directive 2004/109/EC) Regulations 2007 (SI 277/2007), the European Union (Disclosure of Non-Financial and Diversity Information by Certain Large Undertakings and Groups) Regulations 2017 (SI 360/2017) and the Disclosure and Transparency Rules of the UK Financial Conduct Authority as applicable:

| Statutory, regulatory and other information | |
| --- | --- |
| Matter | Location |
| The Strategic Report, which includes a review of the development and performance of the Group, the external environment, key strategic aims, the business model and certain financial and non-financial disclosure requirements arising from EU and Irish legislation | Pages 1 to 93 |
| The non-financial information statement | Page 161 of this Directors' Report |
| Information on employees | Pages 52 and 55 |
| The Corporate Governance Report | Pages 94 to 162 |
| Information on the Company's diversity initiatives and Board Diversity Policy | Pages 52 and 55 an 116 to 119 |
| The Directors' Remuneration Report, which includes information on the annual bonus, the LTIP, share options, Directors' service contracts and Directors' remuneration | Pages 136 to 154 |
| Details of the Audit Committee | Pages 124 to 131 |
| Details of share capital and reserves | Note 24 to the Consolidated Financial Statements on pages 223 to 225 |
| Details of earnings per share | Note 11 to the Consolidated Financial Statements on page 202 |
| Details of derivative financial instruments | Note 23 to the Consolidated Financial Statements on pages 219 to 223 |
| The Treasury Policy and objectives of the Group | Note 27 to the Consolidated Financial Statements on pages 231 to 232 |

## Principal activities

The Group is a global sports betting and gaming operator, whose headquarters are in Dublin, Ireland, employing over 16,500 people worldwide. During 2021, the Group operated across the following four divisions:

- UK&I: The division operates the Paddy Power, Betfair and Sky Betting & Gaming brands online, as well as retail operations in the UK and Ireland.
- Australia: Consists of Sportsbet, the market leading brand in the fast-growing Australian online betting market.
- International: Includes the PokerStars, Adjarabet, Betfair and Junglee brands which collectively offer online poker, casino, and sports betting, rummy and daily fantasy products.
- US: The US division includes FanDuel, FOX Bet, TVG, PokerStars US and Betfair Stardust Casino brands, offering regulated real money and free-to-play sports betting, casino, poker, daily fantasy sports and online racing wagering products to customers across various states in the US.

## 2022 outlook

The 2022 outlook set out in the Operating and Financial Review on pages 69 to 83 is deemed to be incorporated in this part of the Directors' Report.

# Directors' report continued

## Research and development

The Group performs research and development activities to ensure that it continues to be a recognised innovator in the betting and gaming industry. These activities support the introduction of new products, the creation of new betting markets, improved online customer experience and the development of better processes and systems. Continued research and development contributes to the Group's future growth and profitability. Further details of our research and development activities are set out in the Strategic Report on pages 1 to 93.

## Results

The Group's EBITDA for 2021 of £723m reflects a decrease of 6% on the 2020 EBITDA of £772m. Overall Group operating loss for 2021 amounted to £63m. Further information is set out in the Consolidated Financial Statements on pages 171 to 242. Basic loss per share amounted to £2.37 compared with basic earnings per share of £0.29 in the previous year. The financial results for 2021 are set out in the Consolidated Income Statement on page 171. Total equity attributable to the Company's equity holders at 31 December 2021 amounted to £10,250.9m (2020: £10,965.1m).

## Business review and key performance indicators

The Strategic Report on pages 1 to 93, which includes the Chair's Statement and the Chief Executive Officer's Review, contains a review of the performance and developments of the Group during the year, including the analysis of the key performance indicators.

## Principal risks and uncertainties

Pursuant to section 327(1)(b) of the Companies Act 2014, Regulation 5(4)(c)(ii) of the Transparency (Directive 2004/109/EC) Regulations 2007 and Rule 9 of the Central Bank (Investment Market Conduct) Rules 2019, the principal risks and uncertainties facing the Group are set out on pages 84 to 91 and are deemed to be incorporated in this part of the Directors' Report.

## Annual General Meeting ("AGM") 2022

The Notice convening the AGM to be held on 28 April 2022 will be sent to shareholders together with this Annual Report and Financial Statements. The Notice contains full details of the resolutions that will be put to shareholders at the AGM. It is also available on our corporate website: www.flutter.com/investors/shareholder-information/agm.

## Changes to the Board of Directors

Dave Gadhia and Peter Rigby retired as Non-Executive Directors of the Company effective from the conclusion of the AGM on 29 April 2021 and Nancy Dubuc was appointed as a Non-Executive Director at the same date. Holly Keller Koeppel and Atif Rafiq also joined the Board as Non-Executive Directors effective from 13 May 2021 and 10 December 2021 respectively.

Michael Cawley will step down as a Non-Executive Director of the Company effective from the conclusion of the AGM on 28 April 2022 and Zillah Byng-Thorne will step down as a Non-Executive Director before the 2023 AGM.

In accordance with the provisions of the 2018 UK Corporate Governance Code (the "Code"), all Directors eligible for re-election should retire at each AGM and offer themselves for election or re-election (as appropriate). Accordingly, all Directors, except Michael Cawley, who will not be seeking re-election as outlined above, will retire and seek election or re-election at the AGM to be held on 28 April 2022. The Board believes that all Directors offering themselves for election or re-election continue to be effective and demonstrate commitment to the role. The names and biographies of our current Directors can be found on pages 96 to 99.

## Directors' and officers' liability insurance

Throughout 2021, the Group had in place Directors' and officers' liability insurance, which covered all Directors and officers.

## Directors' and Company Secretary's shareholdings

The Company has in place share ownership guidelines for Executive Directors to ensure that their interests are aligned with those of shareholders. For detailed information, see the Directors' Remuneration Report on pages 136 to 154.

As at 2 March 2022 (being the latest practicable date before publication of this Annual Report and Financial Statements), the current Directors and the Company Secretary held the same number of beneficial interests in shares as at 31 December 2021 as set out in the table below. These shareholdings include all beneficial interests and those held by persons closely associated with them. This does not include their share awards under the Company's share schemes. The interests of the Executive Directors in the Company's share schemes as at 31 December 2021 are set out on page 149. The Company Secretary has no interest in the share schemes that requires disclosure.

| | Number of ordinary shares of €0.09 each | |
|---|---|---|
| | 31 December 2021 (or date of resignation, if earlier) | 31 December 2020 (or date of appointment to the Company if later) |
| Zillah Byng-Thorne | 1,287 | 1,287 |
| Michael Cawley | 3,660 | 3,660 |
| Nancy Cruickshank | — | — |
| Nancy Dubuc[1] | — | — |
| Divyesh (Dave) Gadhia[2] | 50,546 | 50,546 |
| Richard Flint | 24,134 | 24,134 |
| Andrew Higginson | — | — |
| Alfred Hurley | 2,960 | 2,960 |
| Jonathan Hill | 1,728 | 1,728 |
| Peter Jackson | 7,561 | 7,561 |
| Holly Keller Koeppel[3] | — | — |
| David Lazzarato | 2,708 | 2,708 |
| Gary McGann | 3,314 | 3,314 |
| Atif Rafiq[4] | — | — |
| Peter Rigby[2] | 128 | 128 |
| Mary Turner | 4,269 | 4,269 |

1. Appointed with effect from 29 April 2021.
2. Resigned with effect from 29 April 2021.
3. Appointed with effect from 13 May 2021.
4. Appointed with effect from 10 December 2021.

None of the Directors nor the Company Secretary had an interest in the shares of any subsidiary undertaking of the Company or in any significant contracts of the Group.

## Remuneration report

The remuneration report required to be included in this Directors' Report pursuant to section 325(f) of the Companies Act 2014 is contained on pages 136 to 154 of this Annual Report and Financial Statements, which is incorporated into this Directors' Report.

## Shares

### Substantial shareholdings

As at 31 December 2021 and 2 March 2022 (being the latest practicable date before publication of this Annual Report and Financial Statements), the Company had been notified of the following details of interests of over 3% in the Company's ordinary share capital (excluding treasury shares):

| Substantial shareholdings | Notified holding 31 December 2021 | Notified holding 2 March 2022 | Notified % holding 2 March 2022 |
|---|---|---|---|
| The Capital Group Companies, Inc.[1] | 26,030,020 | 26,030,020 | 14.87% |
| Caledonia (Private) Investments Pty Limited | 17,959,749 | 17,959,749 | 10.26% |
| BlackRock Inc. | 10,004,428 | 10,004,428 | 6.45% |
| Parvus Asset Management Europe Limited | 5,422,128 | 5,422,128 | 3.09% |
| Massachusetts Financial Services Company | 5,301,085 | Below disclosure threshold | |

1.  As notified by The Capital Group Companies, Inc. ("CGC"), CGC is the parent company of Capital Research and Management Company ("CRMC") and Capital Bank & Trust Company ("CB&T"). Neither CGC nor any of its affiliates owns shares of Flutter Entertainment plc for its own account. Rather, CGC has advised Flutter that the shares reported on the notification provided by CGC to the Company are owned by accounts under the discretionary investment management of one or more of the investment management companies described above.

### Corporate governance

For the purposes of section 1373 of the Companies Act 2014 and Rule 7.2 of the Disclosure and Transparency Rules of the UK Financial Conduct Authority, the Corporate Governance Report on pages 94 to 162 is deemed to be incorporated into this Directors' Report and forms part of the corporate governance statement required by section 1373 of the Companies Act 2017 and Rule 7.2 of the Disclosure and Transparency Rules of the UK Financial Conduct Authority.

### Share capital, rights and obligations

As at 31 December 2021, the Company's total issued share capital was €15,806,548.62, comprising 175,628,318 ordinary shares each with a nominal value of €0.09, all of which are of the same class and carry the same rights and obligations. As at 31 December 2021, no ordinary shares were held as treasury shares either directly by the Company or through Group companies or nominees.

Accordingly, as at 2 March 2022 (being the latest practicable date before publication of this Annual Report and Financial Statements), the Company's total issued share capital was €15,811,296.21, comprising 175,681,069 ordinary shares.

### Rights attaching to ordinary shares

Ordinary shares carry the right to dividends declared by the Company from its profits available for distribution and to the return of capital on the winding up of the Company. Ordinary shares carry the right to attend and speak at general meetings of the Company and each share has the right to one vote. With regard to the Company's ordinary shares:

(i)   there are no restrictions on their transfer;

(ii)  no person holds shares carrying special rights with regard to the control of the Company;

(iii) there are no shares to which a Company share scheme relates carrying rights with regard to the control of the Company;

(iv)  there are no restrictions on the voting rights attaching to the Company's shares; and

(v)   there are no agreements between shareholders that are known to the Company that may result in restrictions on the transfer of securities or on voting rights.

### Lock-up agreement with certain shareholders

The purchase agreement entered into between the Company and Fastball Holdings LLC ("Fastball") on 3 December 2020 (the "Purchase Agreement") in relation to the acquisition of Fastball's entire 37.2% minority interest in FanDuel Group Parent LLC (the "FanDuel Acquisition") contains certain lock-up provisions which restricted Fastball's ability to distribute or transfer the 11,747,205 ordinary shares in the Company which Fastball received as partial consideration for the FanDuel Acquisition (the "Consideration Shares") during the financial year ended 31 December 2021. Under the terms of the Purchase Agreement, subject to limited exceptions, Fastball was restricted from distributing or transferring the Consideration Shares during 2021, save that:

(a)   from and after 31 March 2021, Fastball was permitted to distribute or sell up to 20% of the Consideration Shares;

(b)   from and after 1 July 2021, Fastball was permitted to distribute or sell up to 50% of the Consideration Shares (inclusive of any shares distributed or sold prior to 1 July 2021); and

(c)   from and after 31 December 2021, Fastball was permitted to distribute or sell up to 100% of the Consideration Shares.

### Controlling shareholders

As far as known to the Directors, the Company is not directly or indirectly owned or controlled by another company or any government. Further information on the Company's share capital is set out in Note 24 to the Consolidated Financial Statements on pages 223 to 225.

Governance

# Directors' report continued

## Authority to allot new shares

At the Company's AGM on 29 April 2021, shareholders authorised the Directors, by way of ordinary resolution, to allot new equity securities:

(a) up to a maximum aggregate value of €5,255,413.83 (representing 58,393,487 ordinary shares), being approximately 33.33% of the issued share capital of the Company (excluding treasury shares); and

(b) up to a maximum aggregate value of €10,510,827.66 (representing 116,786,974 ordinary shares), being approximately 66.66% of the issued share capital of the Company (excluding treasury shares), provided the allotment is made in connection with a rights issue or other pre-emptive issue in favour of holders of equity securities and less any amounts allotted pursuant to paragraph (a) above.

The authority conferred at the 2021 AGM will expire at the close of the Company's AGM in 2022 or the close of business on 28 July 2022 (whichever is earlier).

At the 2022 AGM, shareholders will be requested to renew this authority. Save for the allotment of shares in respect of the Group's employee share schemes, the Directors have no current intention to exercise this authority.

## Disapplication of pre-emption rights

At the Company's AGM on 29 April 2021, shareholders authorised the Directors, by way of special resolution, to allot new equity securities:

(a) up to a maximum aggregate value of €788,312.07 (representing 8,759,023 ordinary shares), being approximately 5% of the issued share capital of the Company (excluding treasury shares); and

(b) up to an additional maximum aggregate value of €788,312.07 (representing 8,759,023 ordinary shares), being approximately 5% of the issued share capital of the Company (excluding treasury shares), provided the proceeds of any such allotment are to be used only for the purposes of financing (or refinancing) a transaction which the Directors determine to be an acquisition or other capital investment of a kind contemplated by the Statement of Principles on Disapplying Pre-emption Rights.

In each case, for cash without first being required to offer them to existing shareholders of the Company.

The authorities conferred at the 2021 AGM will expire at the close of the Company's AGM in 2022 or the close of business on 28 July 2022 (whichever is earlier).

At the 2022 AGM, shareholders will be requested to renew this authority. Save for the allotment of shares in respect of the Group's employee share schemes, the Directors have no current intention to exercise this authority.

## Purchase of own shares

At the Company's AGM on 29 April 2021, shareholders authorised the Company and/or any of its subsidiaries, by way of special resolution, to make market purchases of a maximum of 17,518,046 of the Company's ordinary shares (being 10% of the issued share capital of the Company (excluding treasury shares)) at certain minimum and maximum prices specified in the resolution.

The authority conferred at the 2021 AGM will expire at the close of the Company's AGM in 2022 or the close of business on 28 July 2022 (whichever is earlier).

At the 2022 AGM, shareholders will be requested to renew this authority. The Board of Directors will only exercise the power to purchase shares in the future at price levels at which it considers purchases to be in the best interests of the shareholders generally after taking account of the Group's overall financial position. The Directors have no current intention to exercise this authority.

## Capitalisation of merger reserve and capital reduction

At the Company's AGM on 29 April 2021, shareholders approved, by way of ordinary resolution, the capitalisation of up to the entire amount standing to the credit of the Company's merger reserve account as at 31 December 2020 for the purpose of applying such sum in paying up in full one or more unissued shares in the capital of the Company to be allotted as fully paid bonus shares (the "Capitalisation") and authorised the Board of Directors to determine, on behalf of the Company, the amount of the Capitalisation and the number of shares to be issued, to determine whether or not to proceed with the Capitalisation and to implement any such Capitalisation in accordance with the provisions of Article 126 of the Company's Constitution as it saw fit.

In addition, at the 2021 AGM, shareholders approved, by way of special resolution, subject to the confirmation of the Irish High Court, the reduction of the Company's company capital by up to the entire amount of the undenominated capital standing to the credit of the Company's share premium account as at 31 December 2020, together with any undenominated capital arising to the credit of the Company's share premium account as a result of implementation of Capitalisation, with the reserve arising to be treated as profits available for distribution within the meaning of section 117 of the Companies Act 2014.

On 9 September 2021, the Board of Directors approved the capitalisation of €7,982,942,509.88, being the entirety of the amounts standing to the credit of Flutter's merger reserve account at 31 December 2020 in connection with the allotment and issue of a single bonus share, resulting in the creation of undenominated capital standing to the credit of the Company's share premium account of €7,982,942,509.80, and resolved to make an application to the Irish High Court to seek confirmation of the reduction of the Company's company capital in an amount of €10,000,000,000 (or such lesser amount as the High Court may determine) standing to the credit of Flutter's share premium account following completion of the Capitalisation (the "Capital Reduction").

On 3 November 2021, the Irish High Court confirmed the Capital Reduction and ordered that the sum of €10,000,000,000 be transferred from the Company's share premium account to its distributable reserves account. Following completion of the Capital Reduction, the bonus share issued in connection with the Capitalisation was surrendered to the Company for nil consideration and cancelled.

## Cancellation of treasury shares

On 1 January 2021, the Company's total issued share capital was 177,033,508 shares, comprising: (a) 175,067,908 ordinary shares in issue each with a nominal value of €0.09; and (b) 1,965,600 ordinary shares held as treasury shares either directly by the Company or through Group companies or nominees.

Ordinary shares held as treasury shares represented 1.1% of the Company's total issued share capital (including treasury shares) as at 1 January 2021. Ordinary shares held in treasury do not have any voting rights.

On 28 July 2021, the Board of Directors resolved to cancel all ordinary shares held as treasury shares in accordance with sections 106 and 109(6)(a) of the Companies Act 2014. Prior to cancellation, those ordinary shares held as treasury shares through Group companies or nominees were surrendered to the Company for nil consideration. The cancellation of the ordinary shares held as treasury shares was effective on 25 August 2021. As at 31 December 2021, no ordinary shares were held as treasury shares by the Company or through Group companies or nominees.

### Shareholders' meetings

The Company operates under the Companies Act 2014 of Ireland. Under the Companies Act 2014, the Company is required to hold a general meeting of shareholders each calendar year as its Annual General Meeting ("AGM"). Any other general meeting of shareholders held in that year is classified as an Extraordinary General Meeting ("EGM"). Not more than 15 months may elapse between the date of one AGM and the next. EGMs are convened when considered appropriate by the Board and may also be convened at the request of members holding not less than 5% of the issued share capital of the Company which carries voting rights. A shareholder or a group of shareholders holding at least 3% of the issued share capital of the Company which carries voting rights has the right to put an item on the agenda of an AGM, provided the shareholder exercises that right within the prescribed time period, or to table a draft resolution for an item on the agenda of a general meeting.

No business may be transacted at any general meeting unless a quorum is present at the time when the meeting proceeds to business. Under Flutter's Constitution, two persons entitled to vote upon the business to be transacted, present in person or by proxy or as a duly authorised representative of a corporate member, constitute a quorum. Only those shareholders registered on the Company's register of members at the prescribed record date, being a date specified by the Board in relation to the relevant general meeting, are entitled to attend and vote at a general meeting.

Notice of an AGM, the Form of Proxy and the Annual Report are sent to shareholders at least 20 working days before the AGM in line with the recommendations of the Code. The notice period for an EGM to consider any special resolution is 21 clear days. Subject to the approval of shareholders at the immediately preceding AGM, the Directors may also convene an EGM to consider any ordinary resolution on 14 clear days' notice. As a matter of policy, 14 clear days' notice will only be utilised to convene an EGM where the Directors believe that it is merited by the business of the meeting and the circumstances surrounding such business.

While the Company's Constitution provides that resolutions may be voted on by a show of hands or on a poll, Flutter's practice is that all resolutions are voted on a poll. After each resolution has been dealt with, details are given of the level of proxy votes cast on each resolution and the numbers for, against and withheld. On a poll, the votes of shareholders present and voting at the meeting are added to the proxy votes received in advance of the

meeting and the total number of votes for, against and withheld for each resolution are announced following the conclusion of the meeting. Ordinary resolutions may be passed by a simple majority of votes cast in favour, while special resolutions require a 75% majority of votes cast in favour. Any shareholder who is entitled to attend, speak and vote at a general meeting is entitled to appoint one or more proxies to attend, speak and vote on his or her behalf. A proxy need not be a member of the Company.

The business of the Company is managed by the Directors who may do all such acts and things and exercise all the powers of the Company save for those powers required to be exercised by the Company in general meeting. Matters reserved to shareholders in general meetings include the election of Directors, the declaration of final dividends on the recommendation of the Directors, the fixing of the remuneration of the external auditor, amendments to the Constitution, measures to increase or reduce the ordinary share capital and the authority to issue shares.

### Own shares held

During 2021, the Paddy Power Betfair plc Employee Benefit Trust ("EBT") transferred 1,372,056 (2020: 3,077) ordinary shares to employees under the Company's share schemes. At 31 December 2021, the EBT held 33,158 (2020: 67,320) ordinary shares in the Company, representing 0.019% (2020: 0.038%) of the total issued share capital of the Company as at that date. 1,337,894 shares were purchased into the EBT during the year ended 31 December 2021 (2020: 0). Further information is set out in Note 26 to the Consolidated Financial Statements on pages 225 to 229.

### Outstanding options

980,835 (2020: 767,889) awards or grants over shares were made during 2021 that would be dilutive of the Company's issued share capital. We settle outstanding awards or grants under the Company's share schemes with shares purchased in the market and through issuing new shares. The Board continues to review this as appropriate. As at 31 December 2021, there were 2,090,603 (2020: 1,842,762) options outstanding.

### Dividends

The Board's capital management policy for the Group remains to target a leverage ratio of 1.0x to 2.0x over the medium term. The Board will continue to monitor the impact of Covid-19, and the Group's anticipated deleveraging and balance sheet position, and will decide when it is an appropriate time to reinstate a dividend.

As a result, the Board did not recommend an interim dividend for 2021 (2020: £nil) or a final dividend for the year ended 31 December 2021 (2020: £nil).

### Employees

Information on employee matters is contained on pages 52 to 55 and is deemed to be incorporated in this Directors' Report. Details of the Group's policy on the granting of options and awards under its employee share schemes and other long-term incentive schemes is contained in the Remuneration Report and on pages 136 to 154 and is deemed to be incorporated in this Directors' Report.

# Directors' report continued

## Events after the reporting date

Details of events after the reporting period are set out in Note 33 on page 242 of the Consolidated Financial Statements.

## Other

### Political donations

No political donations were made by the Company during 2021 that require disclosure in accordance with the Electoral Acts 1997 to 2002 and the Electoral (Amendment) Political Funding Act 2012.

### Audit Committee

The Company has established an Audit Committee, the details of which are set out on pages 124 to 131.

### Articles of Association

The Company's Articles of Association may only be amended by way of a special resolution approved by the shareholders. They were last amended, effective as of 19 January 2021, by way of a special resolution passed at the EGM held on that date.

### Significant agreements – change of control provisions

Other than as detailed below, there are no significant agreements which contain provisions entitling other parties to exercise termination or other rights in the event of a change in control of the Company. The rules of certain Company share schemes include provisions which apply in the event of a takeover or reconstruction.

The Company is party to two credit agreements as follows:

- a Term Loan A and Revolving Facility Agreement originally dated 11 March 2020 between, among others, the Company and Lloyds Bank plc as agent and security agent as amended and/or restated from time to time including by way of an amendment agreement dated 10 December 2021 (the "TLA Agreement"); and
- a Term Loan B agreement originally dated 10 July 2018 between, among others, The Stars Group Inc. and Deutsche Bank AG New York Branch acting as administrative agent and collateral agent as amended and/or restated from time to time including by way of amendment agreements dated 15 June 2020 and 21 July 2021 (the "TLB Agreement").

Both the TLA Agreement and the TLB Agreement contain provisions entitling other parties to exercise certain rights to, among other things, demand prepayment of the relevant outstanding amounts in the event of a "Change of Control" (as set out and as defined in the TLA Agreement) and a "Change in Control" (as set out and as defined in the TLB Agreement).

### Contractual arrangements

The Group has contractual arrangements with numerous third parties in support of its business activities. In that context, disclosure in this Annual Report and Financial Statements of information about any of those third parties is not considered necessary for an understanding of the development, performance or position of the Group's businesses.

### Related party transactions

Internal controls are in place to ensure that any related party transactions involving Directors or their connected persons are carried out on an arm's length basis and are disclosed in the Consolidated Financial Statements. Transactions with Directors and parties related to them have been disclosed in Note 31 to the Consolidated Financial Statements on pages 239 to 240.

## Funding and liquidity risk

Liquidity risk is the risk that the Group will not be able to meet its financial obligations as they fall due. The Group's approach to managing liquidity is to ensure, as far as possible, that it will always have sufficient liquidity from available cash and borrowing facilities to meet its liabilities when due, under both normal and stressed conditions, without incurring unacceptable losses or risking damage to the Group's reputation. With regard to available cash, the Group's Treasury Policy sets conservative credit rating and tenor-based limits for exposures to financial counterparties. The Group performs regular cash flow projections to ensure that it has sufficient headroom available from cash and borrowing facilities to meet expected obligations over the forecasted period.

The Group has entered into a Term Loan A and Revolving Credit Facility Agreement (the "TLA Agreement") comprising a term loan and Revolving Credit Facility totalling £1.4bn, with a maturity date of 5 May 2025. In November 2021, an additional lender was added to the TLA Agreement, bringing the total facility to £1.5bn, and the Group completed a drawdown of £68m under the existing terms. The Term Loan A amounts to £1,018m and the entire principal is due at maturity. The TLA Agreement also provides a multi-currency Revolving Credit Facility in an aggregate amount of £482m.

The Group holds a USD term loan with an outstanding principal balance of $2.9bn (the "USD First Lien Term Loan B") and a EUR first lien term loan with an outstanding principal balance of €507m (the "EUR First Lien Term Loan B"), each with a maturity date of 25 July 2026. The USD First Lien Term Loan requires scheduled quarterly principal payments in amounts equal to 0.25% of the initial aggregate principal amount of the USD First Lien Term Loan B of US$2,938m, with the balance due at maturity. There is no amortisation on the EUR First Lien Term Loan B and the principal is due at maturity.

At 31 December 2020, total borrowings were £3.6bn. During the 12 months ended 31 December 2021, the Group complied with all covenants related to its borrowings under all facilities. Further details are set out in Note 22 of the Consolidated Financial Statements on pages 217 to 219.

## Viability statement

The viability statement, as set out on pages 92 to 93, is deemed to be incorporated in this section of the Directors' Report.

## Going concern, responsibilities and disclosure

The Group reported EBITDA of £723.3m and a loss after tax of £411.9m for the year ended 31 December 2021. This includes £797.7m of non-cash depreciation and amortisation charged against profit in the year. The net cash generated from operating activities during the year ended 31 December 2021 was £685.5m. The balance sheet at 31 December 2021 reported a net current liability position of £112.3m. During 2021, the Group's various lenders consented to waive any Default or Event of Default that may have arisen by virtue of the Kentucky judgement, including any enforcement steps or actions taken by the Commonwealth of Kentucky prior to settlement. During the 12 months ended 31 December 2021, the Group is in compliance with all covenants related to its lending arrangements.

The Directors have considered the available financial resources which include, at 31 December 2021, £951.7m of cash and cash equivalents and a £482.0m Revolving Credit Facility with undrawn capacity of £467.0m. Whilst there are certain loan repayments due within the next 12 months of £22.1m, the Group's lending

facilities primarily fall due in 2026 as set out in more detail in Note 22. As a consequence, the Directors believe that the Group is well placed to manage its business risks successfully. See 'Managing and understanding our principal risks' in this report for more detail.

The Group's forecasts to the year ending 31 December 2022 and beyond indicate that it will continue to have significant financial resources, continue to settle its debts as they fall due and operate well within its banking covenants as outlined in Note 22 for at least a period of 12 months from the date of these consolidated financial statements. 12 months from the date of these consolidated financial statements was selected as the going concern period as it represents the period in which the Group has prepared detailed forecasts for the majority of the period and it also reduces the degree of judgement and estimation uncertainty involved in both the forecasts and the downside scenarios.

When preparing the forecasts, the Group has included the cash outflows associated with the post balance sheet acquisition as detailed in Note 33. Various downside scenarios over and above those already included in the base case model on the potential impact of further reductions to cash flows due to changes in the legal, regulatory and licencing landscape and the Group's cyber and IT resilience have been considered in respect of these forecasts. The impact of these items involves significant judgement and estimation uncertainty.

In the event that it were necessary to draw down additional debt funding, the Directors have a reasonable expectation that this could be achieved within the confines of its existing debt facilities and financial covenant requirements.

Having given regard to the above, the Directors have a reasonable expectation that the Group has adequate resources to continue in operational existence for a period of at least 12 months from the date of approval of these consolidated financial statements, and therefore they continue to adopt the going concern basis in its consolidated financial statements.

### Risk management and internal control
The Directors confirm that, in addition to the monitoring carried out by the Risk and Sustainability and Audit Committees under their respective terms of reference, they have reviewed the effectiveness of the Group's risk management and internal control systems as at the date of approval of the Financial Statements. This review had regard to all material controls, including financial, operational and compliance controls that could affect the Group's business. Further details are set out on pages 124 to 135.

### Compliance policy statement
It is the policy of the Directors of the Company to comply with its relevant obligations (as defined in the Companies Act 2014). As required by section 225(2) of the Companies Act 2014, the Directors acknowledge that they are responsible for the Company's compliance with its relevant obligations. The Directors have drawn up a compliance policy statement (as defined in section 225(3)(a) of the Companies Act 2014) and arrangements and structures are in place that are, in the Directors' opinion, designed to secure material compliance with the Company's relevant obligations. The Directors confirm that these arrangements and structures were reviewed during the financial year. In discharging their responsibilities under section 225, the Directors relied on the advice both of persons employed by the Company and of persons retained by the

Company under contracts for services, who they believe have the requisite knowledge and experience to advise the Company on compliance with its relevant obligations.

### Non-financial reporting
In compliance with the non-financial reporting requirements set out in the Companies Act 2014, the European Union (Disclosure of Non-Financial and Diversity Information by Certain Large Undertakings and Groups) Regulations 2017 (SI 360/2017) and the EU Taxonomy Regulation (Regulation (EU) 2020/852), the table below sets out certain non-financial information to provide investors and other stakeholders with an understanding of the Group's development, performance, position and impact of its activity and where this information has been provided in this Annual Report and Financial Statements:

| Non-financial reporting | | | |
|---|---|---|---|
| Reporting requirement | Relevant policies and additional information | Location of information[1] | Page |
| Environmental and climate matters | Sustainability and environment | Sustainability | 60 to 63 |
| Social and employee matters | Code of Ethics; Global Health and Safety DEI Strategy Framework | Safer Gambling Sustainability Business Integrity | 44 to 63 and 64 to 65 |
| Human rights | Code of Ethics; Modern Slavery Statement[2] | Business Integrity | 64 to 65 |
| Anti-bribery and corruption | Code of Ethics; Anti-Bribery and Corruption Policy | Business Integrity | 64 to 65 |
| Business model | — | Business Model | 32 to 33 |
| Non-financial KPIs | — | Measuring Our Progress | 28 to 31 |
| Principal risks | — | Understanding and Managing Our Principal Risks | 84 to 91 |
| Environmentally sustainable activities (Regulation (EU) 2020/852) | — | Sustainability ESG supplementary information | 60 to 63 and 261 to 266 |

1  The referenced sections are deemed to be incorporated within this Directors' Report.
2  Available on Flutter's website, www.flutter.com.

Governance

# Directors' report continued

## Task Force on Climate-related Financial Disclosures ("TCFD")

In accordance with LR 9.8.6R (8) and LR 9.8.7, the Company is required to include a statement in this Annual Report and Financial Statements setting out whether the Company has included climate-related financial disclosures consistently with the recommendations of the Task Force on climate related Financial Disclosures ("TCFD"). We have disclosed consistent with the TCFD recommendations except for disclosing a listing of climate related risks and opportunities ("CROs"), embedding those CROs into our strategy and financial planning and conducting scenario analysis (strategy pillar), identifying CROs, managing those risks and integrating them into the organisation's overall risk management (risk management pillar) and identifying and monitoring metrics and targets aligned to those CROs (metrics and targets pillar).

Further information is set out in the Sustainability section of the Strategic Report on pages 261 to 266.

## Greenhouse gas emissions

Disclosures relating to the Group's greenhouse gas emissions are contained in the Sustainability section of the Strategic Report on pages 63 and 261 to 266.

## Provision 38 of the UK Corporate Governance Code

At the time of the introduction of provision 38 of the UK Corporate Governance Code, the Company had already signed a contract with the CEO and CFO that entitled them to an annual pension contribution equivalent to 15% of their annual total salary. This is higher than the pension contribution levels of the wider workforce which, in the UK, are currently 5% of annual salary. As a result, the Company has been non-compliant with provision 38 since its introduction. Despite the contractual obligations, the Remuneration Committee has agreed with the CEO and CFO that, from 1 January 2023, their pension contribution entitlements will reduce to the wider workforce level. The Committee has engaged with shareholders on this matter and explained the reasons why the Company has not been able to comply with provision 38 to date and assured shareholders that the Company will be fully compliant with provision 38 by 1 January 2023.

## Auditor

KPMG, Chartered Accountants, was appointed statutory auditor on 18 May 2018 and has been reappointed annually since that date, and pursuant to section 383(2) of the Companies Act 2014 will continue in office. Prior to 18 May 2018, KPMG LLP, the UK member firm of KPMG International, was the auditor to Flutter Entertainment plc, having served as auditor for the two financial years ended 31 December 2017. KPMG in Ireland previously served as auditor to Paddy Power plc (subsequently renamed to Flutter Entertainment plc) for 14 uninterrupted financial years.

In accordance with section 381(1)(b) of the Companies Act 2014, a resolution authorising the Directors to fix the remuneration of the auditor will be proposed at the 2022 AGM.

## Disclosure of information to the external auditor

Each of the Directors who held office at the date of approval of this Directors' Report confirms that:

(i)  so far as they are aware, there is no relevant audit information of which the external auditor is unaware; and

(ii) they have taken all steps that they ought to have taken as a Director to make themselves aware of any relevant audit information and to establish that the external auditor is aware of that information.

## Books of account

The measures which the Directors have taken to ensure that adequate accounting records are kept with the requirements of sections 281 to 285 of the Companies Act 2014 are:

(i)  the appointment of suitably qualified personnel;

(ii) the adoption of suitable policies for recording transactions, assets and liabilities; and

(iii) the appropriate use of computers and documentary systems.

The Group and Company accounting records are kept at the Company's headquarters at Belfield Office Park, Beech Hill Road, Clonskeagh, Dublin 4, Ireland.

## Listing Rule 9.8.4C

In its Q3 2021 trading update, the Company published the following guidance in respect of the financial year ending 31 December 2021.

## Outlook:

- Group ex-US: Unfavourable sports results in the first 24 days of October have impacted EBITDA by around £60m. Combined with the expected £10m EBITDA impact from the Netherlands, we are revising our adjusted EBITDA expectations for 2021 to £1.24bn-£1.28bn (previous guidance: £1.27bn-£1.37bn).

- US: Net revenue guidance remains unchanged at £1.285bn-£1.425bn ($1.8bn-$2.0bn) with an adjusted EBITDA loss now expected to be £250m-£275m (previous guidance: £225m-£275m). This revised EBITDA range includes a £15m impact from adverse sports results in October.

The above statements represented a profit forecast for the purpose of LR 9.2.18 and replaced the Company's previous guidance as outlined in the statement. For the purposes of compliance with LR 9.8.4R (2), the Company confirms that 2021 adjusted EBITDA for the Group, excluding the US, was £1.24bn, within the range previously indicated. US net revenue was $1.9bn, within the range previously indicated, whilst the 2021 adjusted EBITDA loss in the US was £243m, exceeding the top end of the guidance previously issued by 3%.

For the purposes of compliance with LR 9.8.4R (4) details of any long-term incentive schemes are included in the Directors' Remuneration Report on pages 136 to 154 and included by reference within this Directors' Report.

For the purposes of compliance with LR 9.8.4R (12) and (13) – Waivers of Dividend Disclosure – the Trustee of the Employee Benefit Trust has elected to waive dividends in respect of certain holdings of Flutter shares, details of which are set out on page 225 of the Financial Statements and are included by reference within the Directors' Report.

The remaining LR 9.8.4R sections are not applicable.

On behalf of the Board of Directors

**Peter Jackson**
Chief Executive Officer
14 March 2022

**Jonathan Hill**
Chief Financial Officer
14 March 2022

Flutter Entertainment plc, registered in Ireland

Company number 16956

# Statement of Directors' Responsibilities
In respect of the Annual Report and the Consolidated Financial Statements

The Directors are responsible for preparing the Annual Report and the Group and parent Company financial statements (the "Annual Report and Accounts") in accordance with applicable law and regulations.

Company law requires the Directors to prepare Group and parent Company financial statements for each financial year. Under that law, the Directors are required to prepare the Group financial statements in accordance with International Financial Reporting Standards ("IFRS") as adopted by the European Union ("EU") and applicable law including Article 4 of the IAS Regulation. The Directors have elected to prepare the parent Company financial statements in accordance with FRS 101 Reduced Disclosure Framework as applied in accordance with the provisions of the Companies Act 2014.

Under company law, the Directors must not approve the financial statements unless they are satisfied that they give a true and fair view of the assets, liabilities and financial position of the Group and parent Company and the Group's profit or loss for that year. In preparing each of the Group and parent Company financial statements, the Directors are required to:

- select suitable accounting policies and apply them consistently;

- make judgements and estimates that are reasonable and prudent;

- state whether applicable Accounting Standards have been followed, subject to any material departures disclosed and explained in the financial statements;

- assess the Group and Parent Company's ability to continue as a going concern, disclosing, as applicable, matters related to going concern; and

- use the going concern basis of accounting unless they either intend to liquidate the Group or Parent Company or to cease operations, or have no realistic alternative but to do so.

The Directors are also required by the Transparency (Directive 2004/109/EC) Regulations 2007 and the Transparency Rules of the Central Bank of Ireland to include a management report containing a fair review of the business and a description of the principal risks and uncertainties facing the Group.

The Directors are responsible for keeping adequate accounting records which disclose with reasonable accuracy at any time the assets, liabilities, financial position and profit or loss of the Company and which enable them to ensure that the financial statements comply with the provision of the Companies Act 2014. The Directors are also responsible for taking all reasonable steps to ensure such records are kept by its subsidiaries which enable them to ensure that the financial statements of the Group comply with the provisions of the Companies Act 2014 including Article 4 of the IAS Regulation. They are responsible for such internal controls as they determine are necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error, and have general responsible for safeguarding the assets of the Group, and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities. The directors are also responsible for preparing a Directors' Report that complies with the requirements of the Companies Act 2014.

The Directors are responsible for the maintenance and integrity of the corporate and financial information included on the Group and Parent Company website (www.flutter.com).  Legislation in the Republic of Ireland concerning the preparation and dissemination of financial statements may differ from legislation in other jurisdictions.

## Responsibility statement of the Directors in respect of the Annual Report
Each of the Directors, whose names and functions are listed on pages 96 to 99 of this annual report, confirm that, to the best of each person's knowledge and belief:

- the Group Financial Statements, prepared in accordance with IFRS as adopted by the European Union and the Parent Company Financial Statements prepared in accordance with FRS 101 Reduced Disclosure Framework give a true and fair view of the assets, liabilities and financial position of the Group and Parent Company at 31 December 2021 and of the profit or loss of the Group for the year then ended;

- the Directors' Report includes a fair review of the development and performance of the business and the position of the Group and Company, together with a description of the principal risks and uncertainties that they face; and

- the Annual Report and financial statements, taken as a whole, provides the information necessary to assess the Group's position and performance, business model and strategy, is fair, balanced and understandable, and provides the information necessary for shareholders to assess the Group's position and performance, business model and strategy.

On behalf of the Board

**Peter Jackson**
Chief Executive Officer
14 March 2022

**Jonathan Hill**
Chief Financial Officer

Financial statements

# Independent Auditor's Report
to the members of Flutter Entertainment plc

## Report on the audit of the financial statements

### Opinion

We have audited the financial statements of Flutter Entertainment plc ('the Company') and its consolidated undertakings ('the Group') for the year ended 31 December 2021 set out on pages 171 to 259 contained within the reporting package 635400EG4YIJLJMZJJ782-2021-12-31-en.zip, which comprise the Consolidated Income Statement, the Consolidated Statement of Other Comprehensive Income, the Consolidated Statement of Financial Position, the Consolidated Statement of Cash Flows, the Consolidated Statement of Changes in Equity, the Company Statement of Financial Position, the Company Statement of Changes in Equity and related notes, including the summary of significant accounting policies set out in note 3. The financial reporting framework that has been applied in the preparation of the Group financial statements is Irish Law including the Commission Delegated Regulation 2019/815 regarding the single electronic reporting format (ESEF) and International Financial Reporting Standards (IFRS) as adopted by the European Union and, as regards the Company financial statements, Irish Law and FRS 101 Reduced Disclosure Framework issued in the United Kingdom by the Financial Reporting Council.

In our opinion:

- the financial statements give a true and fair view of the assets, liabilities and financial position of the Group and Company as at 31 December 2021 and of the Group's loss for the year then ended;
- the Group financial statements have been properly prepared in accordance with IFRS as adopted by the European Union;
- the Company financial statements have been properly prepared in accordance with FRS 101 Reduced Disclosure Framework issued by the UK's Financial Reporting Council; and
- the Group and Company financial statements have been properly prepared in accordance with the requirements of the Companies Act 2014 and, as regards the Group financial statements, Article 4 of the IAS Regulation.

### Basis for opinion

We conducted our audit in accordance with International Standards on Auditing (Ireland) (ISAs (Ireland)) and applicable law. Our responsibilities under those standards are further described in the Auditor's Responsibilities section of our report. We believe that the audit evidence we have obtained is a sufficient and appropriate basis for our opinion. Our audit opinion is consistent with our report to the audit committee.

We were reappointed as auditor to the Company by the Directors on 18 May 2018. The period of total uninterrupted engagement is the four financial years ended 31 December 2021. Prior to 18 May 2018, KPMG LLP, the UK member firm of KPMG International, was the auditor to the Company having served as auditor for the two financial years ended 31 December 2017. KPMG Ireland previously served as auditor to Paddy Power plc (subsequently renamed to Flutter Entertainment plc) for 14 uninterrupted financial years. We have fulfilled our ethical responsibilities under, and we remained independent of the Group in accordance with, ethical requirements applicable in Ireland, including the Ethical Standard issued by the Irish Auditing and Accounting Supervisory Authority (IAASA) as applied to public interest entities. No non-audit services prohibited by that standard were provided.

### Conclusions relating to going concern

In auditing the financial statements, we have concluded that the director's use of the going concern basis of accounting in the preparation of the financial statements is appropriate. Our evaluation of the director's assessment of the Group and Company's ability to continue to adopt the going concern basis of accounting included considering the inherent risks to the Group and Company's business model and analysing how those risks might affect the Group and Company's financial resources or ability to continue operations over the going concern period.

The sensitivity we considered most likely to adversely affect the Group and Company over this period is changes to regulatory environments in key markets which could result in a reduction in recurring income levels or an exit from certain markets. We considered various downside scenarios over the level of available financial resources indicated by the Group's financial forecasts. A key judgement in the downside scenarios is that there is a reasonable expectation that additional debt financing within the confines of the Group's existing debt facility agreements and financial covenant requirements could be raised, if required. No breach of covenants is indicated by the various downside scenarios. As such we assessed this risk to the assessment of the Group's and Company's ability to continue to adopt the going concern basis of accounting as being remote. There were no other risks identified that we considered were likely to have a material adverse effect on the Group's and Company's available financial resources over this period.

We further note that both the Group and Company are in a net current liability position. As part of our assessment, we have considered the financial resources available to the Group and Company, and in particular the availability of the undrawn portion (£467m) of the revolving credit facility for the Group, and the fact that the Company's position arises largely from intra-group balances.

Based on the work we have performed, we have not identified any material uncertainties relating to events or conditions that, individually or collectively, may cast significant doubt on the Group or the Company's ability to continue as a going concern for a period of at least twelve months from the date when the financial statements are authorised for issue.

In relation to the Group and the Company's reporting on how they have applied the UK Corporate Governance Code and the Irish Corporate Governance Annex, we have nothing material to add or draw attention to in relation to the directors' statement in the financial statements about whether the directors considered it appropriate to adopt the going concern basis of accounting.

Our responsibilities and the responsibilities of the directors with respect to going concern are described in the relevant sections of this report.

## Key audit matters: our assessment of risks of material misstatement

Key audit matters are those matters that, in our professional judgment, were of most significance in the audit of the financial statements and include the most significant assessed risks of material misstatement (whether or not due to fraud) identified by us, including those which had the greatest effect on: the overall audit strategy; the allocation of resources in the audit; and directing the efforts of the engagement team. These matters were addressed in the context of our audit of the financial statements as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters.

Settlement of Kentucky litigation is a new Key Audit Matter in the current year due to the significant level of management and auditor attention focused on this matter during the year.

We continue to perform procedures over acquisition accounting. However, the acquisitions were less significant this year compared to the transformative combination with The Stars Group in 2020, and so we have not assessed this as one of the most significant risks in our current year audit and, therefore, it is not separately identified in our report this year.

We also continue to perform procedures over tax provisioning. However, following developments in the Greek and German cases during the year, the accounting judgements are less significant, and so we have not assessed this as one of the most significant risks in our current year audit and, therefore, it is not separately identified in our report this year.

In arriving at our audit opinion above, the key audit matters, in decreasing order of audit significance, were as follows:

### Online revenue recognition (Group key audit matter)
Refer to page 180 (accounting policy) and pages 193 to 196 (financial disclosures).

| The key audit matter | How the matter was addressed in our audit |
|---|---|
| The Group has a number of income streams across its online operations.<br><br>These revenue streams are calculated and recorded on highly complex IT systems, which process a high volume of low value transactions across a large variety of different sporting events and games wagered on. The accuracy and completeness of the Group's revenue recognition are highly dependent on the Group IT systems; particularly there is a significant risk that systems do not interface correctly from the customer-facing systems through to the financial information systems.<br><br>The key audit matter is applicable for each of the following online revenue streams: sportsbook, poker, gaming and exchange. | Our procedures in relation to the IT systems included, but were not limited to, the following:<br><br>• We obtained and documented our understanding of key online revenue processes and specifically how transactions from each online revenue stream were initiated, processed and recorded from transaction initiation through to recording in the Financial Statements.<br><br>• We evaluated the design and implementation of key controls, both automated and manual, in these processes. We also identified the key IT environments supporting these processes.<br><br>• We tested key controls relevant to supporting our audit approach to online revenue. These included logical access controls, including user access management; user access recertification; appropriateness of privileged users from the perspective of user access management, change management and job scheduling; and user authentication.<br><br>• As part of our evaluation of IT change management procedures we tested controls over authorisation and testing of changes and developments to the systems and controls over job processing and scheduling (automated IT processing for interfaces and batch processing).<br><br>• We tested the operating effectiveness of controls over customer account set-up, cash deposits and withdrawals from customer accounts.<br><br>• We tested the operating effectiveness of controls over the capturing of initial bets, their allocation between different products and their processing through the system to recognition as revenue or in the appropriate customer account. |

Financial statements

# Independent Auditor's Report continued
to the members of Flutter Entertainment plc

## Key audit matters: our assessment of risks of material misstatement continued

| The key audit matter | How the matter was addressed in our audit |
|---|---|
| | In addition to our procedures over the IT systems, other procedures we performed which provided relevant evidence included, but were not limited to, the following:<br><br>• We tested key interfaces between transaction recording systems and the General Ledger.<br><br>• We traced a selection of sportsbook stakes, commission on exchange and poker and gaming transactions placed on live-betting environments from the customer-facing systems to the data warehouses and then from the data warehouses to the financial information systems to assess whether that information is passed appropriately from one system to another.<br><br>• We tested a selection of sportsbook bets to verify the pay-out was correctly calculated based on the stake placed and odds offered on the individual bet.<br><br>• We obtained a selection of external confirmation and/or third-party statements of the client funds held in the client trust and reconciled the bank balance confirmation/third-party statement to the customers' betting accounts.<br><br>• We assessed the appropriateness of cash transferred from the client trust accounts to corporate cash by reconciling the total revenue amounts reported by key IT systems to the amounts transferred from the client funds to corporate cash. We tested a sample of these transfers by agreeing the amounts to the relevant bank information.<br><br>• We recalculated commission for a sample of customers and validated, for one customer, across the year that commission rates were charged as described in the terms and conditions for exchange transactions.<br><br>• We recalculated premium charges for a sample of customers during the year, confirming such charges were applied as described in the terms and conditions for exchange transactions.<br><br>• We performed substantive procedures over online revenue streams, which included reconciling cash receipts to revenue and tested the inclusion of revenue in the appropriate period.<br><br>• We tested a selection of bets placed around year end for events which had occurred, ensuring the revenue was appropriately recorded in the correct period. We also tested a selection of open bets at year end ensuring the event had not yet occurred and ensured the bet was correctly recorded as an open bet at year end.<br><br>Our testing identified no significant weaknesses in the design of IT general controls relating to interface of information from customer-facing systems to financial reporting systems.<br><br>Through our additional testing we identified no errors in the recording of revenue transactions for the online businesses. |

## Settlement of Kentucky litigation (Group key audit matter)

Refer to page 191 to 192 (accounting policy) and page 197 (financial disclosures).

| The key audit matter | How the matter was addressed in our audit |
|---|---|
| The Group's results for the year include a charge of US$200m (£145.2m) arising from the final settlement with the Commonwealth of Kentucky in relation to an historic legal case in The Stars Group.<br><br>Based on management's view and the opinion of the Group's legal counsel and advisers as to the likely pay-out outcomes at the time, the Group had recognised a provision of US$100m (£73.3m) in the 2020 financial statements to cover the outcome of this litigation.<br><br>The full and final settlement of the litigation for US$300m (£216.2m) was announced on 22 September 2021.<br><br>Due to the resolution of the dispute prior to year end, we have not identified a significant risk of material misstatement in relation to this assessment and the accounting does not involve judgement. However, we consider this a key audit matter due to the significance of the judgement issued by the Commonwealth of Kentucky in 2020, the significance of the settlement amount and the significant level of management and auditor attention focused on this matter during the year. | Our procedures included, but were not limited to, the following:<br><br>• We obtained an understanding of the litigation and appeals process and the subsequent mediation process which resulted in the settlement through discussions with Group's internal and external legal counsel.<br><br>• We obtained and documented our understanding of the Group's process for responding to the Commonwealth of Kentucky in relation to the claim and assessing the likely impact.<br><br>• We considered the adequacy of the opening $100m provision as at 30 June 2021 during our half year review procedures.<br><br>• We obtained the settlement agreement and vouched evidence of the full payment.<br><br>• We assessed the accounting and disclosure for this transaction in the year and are satisfied that it is appropriately reflected in the financial statements. |

## Carrying value of the investments in subsidiary companies (Company only key audit matter) – £16,682m (2020: £16,610m)

Refer to page 251 (accounting policy) and page 254 (financial disclosures).

| The key audit matter | How the matter was addressed in our audit |
|---|---|
| The Company balance sheet includes a £16.7bn financial asset relating to its investment in subsidiary companies.<br><br>During the year, an internal reorganisation in the Group lead to a reallocation of net assets between the Company's investments. Management conducted an impairment assessment at year end and determined that one of the Company's subsidiary's no longer supported its carrying value on the Company's balance sheet. The value of this investment was impaired to its recoverable value.<br><br>The assessment of the recoverability of the remaining investments does not involve significant judgements due to the significant value of the underlying businesses. However, we consider this a key audit matter due to the significance of the investments based on their magnitude to the Company. | Our procedures included, but were not limited to, the following:<br><br>• We obtained and documented our understanding of the process around management's assessment of the recoverability of the carrying value of investments in subsidiary companies.<br><br>• We vouched a sample of the movements in the carrying value of investments in subsidiaries during the year.<br><br>• We evaluated management's impairment assessment over the carrying value of the investments in subsidiaries.<br><br>• We assessed the adequacy of disclosures in the Company's Financial Statements. Based on evidence obtained, we found that management's judgements were appropriate in assessing the carrying value of individual investments and supported by the market capitalisation at year end. |

Financial statements

# Independent Auditor's Report continued
to the members of Flutter Entertainment plc

## Our application of materiality and an overview of the scope of our audit

Materiality for the Group Financial Statements as a whole was set at £45m (2020: £30m), determined with reference to a benchmark of Group revenues, of which it represents 0.75% (2020: 0.74%). The significant increase in materiality primarily arose due to the full year impact of consolidation of The Stars Group which was acquired on 5 May 2020, along with the growth in revenues across the Group in the year, primarily in the US division. We have used Group revenues as the benchmark to set our materiality for the current year which is consistent with the prior year. For 2021 and the prior year there has been a significant amount of volatility in the Group's profit before tax result due to losses in the Group's US segment arising from ongoing investment in the business, the amortisation charge on intangibles recognised through acquisitions and other transaction-related expenditure. As a result we believe Group revenues to be the most representative benchmark for the financial performance of the Group for 2021.

Materiality for the Company Financial Statements as a whole was set at £33.75m (2020: £22.5m), determined with reference to a benchmark of total assets and chosen to be lower than materiality for the Group Financial Statements as a whole. It represents 0.2% of total assets (2020: 0.1%).

We agreed to report to the Audit Committee any corrected or uncorrected identified misstatements exceeding £2.25m (2020: £1.5m), in addition to other identified misstatements that warranted reporting on qualitative grounds.

In planning the audit, we applied materiality to determine that, of the Group's six reporting components, we would subject five to full scope audits for Group purposes, this is consistent with the approach in 2020. The components subject to full scope audits accounted for 96% of Group revenues (2020: 97%), 99% of Group total assets (2020: 99%) and 96% of Group profit before taxation (2020: 99%). The remaining 4% of total Group revenues and 4% of Group profit before tax are represented by one component. For this residual component, we performed analysis at an aggregated Group level and reconfirmed our assessment that there were no significant risks of material misstatement within this component.

We applied materiality to assist us determine what risks were significant risks and the Group team instructed component auditors as to the significant areas to be covered by them, including the relevant risks detailed above and the information to be reported back.

The Group team approved the materiality of each component, which ranged from £15m to £20m, having regard to the mix of size and risk profile of the Group across the components. The work on four of the five in-scope components was performed by component auditors in the UK, Isle of Man, Australia and the US and the remaining component and the audit of the Company, was performed by the Group team.

The Group team held videoconference meetings with the components to assess the audit risk and strategy. Further videoconference meetings were held throughout the audit and at the conclusion of their fieldwork to discuss the findings reported to the Group team. The Group team also attended the videoconference closing meetings for all components. The Group team also carried out a detailed review of the component audit workpapers, and we applied materiality to determine the scope and extent of that review.

## Other information

The directors are responsible for the preparation of the other information presented in the Annual Report together with the financial statements. The other information comprises the information included in the Strategic Report, the Corporate Governance section, the Directors' Report and the Non-Financial Statement.

The financial statements and our auditor's report thereon do not comprise part of the other information. Our opinion on the financial statements does not cover the other information and, accordingly, we do not express an audit opinion or, except as explicitly stated below, any form of assurance conclusion thereon.

Our responsibility is to read the other information and, in doing so, consider whether, based on our financial statements audit work, the information therein is materially misstated or inconsistent with the financial statements or our audit knowledge. Based solely on that work we have not identified material misstatements in the other information.

Based solely on our work on the other information undertaken during the course of the audit, we report that, in those parts of the directors' report specified for our consideration:

- we have not identified material misstatements in the directors' report;
- in our opinion, the information given in the directors' report is consistent with the financial statements; and
- in our opinion, the directors' report has been prepared in accordance with the Companies Act 2014.

## Disclosures of principal risks and longer-term viability

Based on the knowledge we acquired during our financial statements audit, we have nothing material to add or draw attention to in relation to:

- the Understanding and Managing our Principal Risks disclosures describing these risks and explaining how they are being managed and mitigated;
- the directors' confirmation within the Directors' Report on pages 160 and 161 that they have carried out a robust assessment of the principal risks facing the Group, including those that would threaten its business model, future performance, solvency and liquidity; and
- the directors' explanation in the Directors' Report of how they have assessed the prospects of the Group, over what period they have done so and why they considered that period to be appropriate, and their statement as to whether they have a reasonable expectation that the Group will be able to continue in operation and meet its liabilities as they fall due over the period of their assessment, including any related disclosures drawing attention to any necessary qualifications or assumptions.

## Other corporate governance disclosures

We are required to address the following items and report to you in the following circumstances:

- Fair, balanced and understandable: if we have identified material inconsistencies between the knowledge we acquired during our financial statements audit and the directors' statement that they consider that the Annual Report and financial statements taken as a whole is fair, balanced and understandable and provides the information necessary for shareholders to assess the Group's position and performance, business model and strategy.

- Report of the Audit Committee: if the section of the Annual Report describing the work of the Audit Committee does not appropriately address matters communicated by us to the Audit Committee.

- Statement of compliance with UK Corporate Governance Code: if the directors' statement does not properly disclose a departure from provisions of the UK Corporate Governance Code specified by the Listing Rules of Euronext Dublin and the UK Listing Authority for our review.

- If the directors' statement relating to Going Concern required under the Listing Rules of Euronext Dublin and the UK Listing Authority set out on pages 160 to 161 is materially inconsistent with our audit knowledge.

We have nothing to report in these respects.

In addition as required by the Companies Act 2014, we report, in relation to information given in the Corporate Governance Statement on pages 94 to 162, that:

- based on the work undertaken for our audit, in our opinion, the description of the main features of internal control and risk management systems in relation to the financial reporting process is consistent with the financial statements and has been prepared in accordance with the Act;

- based on our knowledge and understanding of the Company and its environment obtained in the course of our audit, we have not identified any material misstatements in that information; and

- the Corporate Governance Statement contains the information required by the European Union (Disclosure of Non-Financial and Diversity Information by certain large undertakings and groups) Regulations 2017.

We also report that, based on work undertaken for our audit, the information required by the Act is contained in the Corporate Governance Statement.

## Directors' Remuneration Report

In addition to our audit of the Financial Statements, the Directors have engaged us to audit the information in the Directors' Remuneration Report that is described as having been audited, which the Directors have voluntarily decided to prepare as if the Company were required to comply with the requirements of Schedule 8 to The Large and Medium-sized Companies and Groups (Accounts and Reports) Regulations 2008 (SI 2008 No. 410) made under the UK Companies Act 2006. In our opinion the part of the Directors' Remuneration Report which we were engaged to audit has been properly prepared in accordance with Schedule 8 to The Large and Medium-sized Companies and Groups (Accounts and Reports) Regulations 2008 made under the UK Companies Act 2006, as if those requirements were to apply to the Company.

## Our opinions on other matters prescribed by the Companies Act 2014 are unmodified

We have obtained all the information and explanations which we consider necessary for the purpose of our audit.

In our opinion, the accounting records of the Company were sufficient to permit the financial statements to be readily and properly audited and the financial statements are in agreement with the accounting records.

## We have nothing to report on other matters on which we are required to report by exception

The Companies Act 2014 requires us to report to you if, in our opinion:

- the disclosures of directors' remuneration and transactions required by Sections 305 to 312 of the Act are not made;

- the Company has not provided the information required by Section 1110N in relation to its remuneration report for the financial year 31 December 2020; or

- the Company has not provided the information required by section 5(2) to (7) of the European Union (Disclosure of Non-Financial and Diversity Information by certain large undertakings and groups) Regulations 2017 for the year ended 31 December 2020 as required by the European Union (Disclosure of Non-Financial and Diversity Information by certain large undertakings and groups) (amendment) Regulations 2018.

We have nothing to report in this regard.

The Listing Rules of Euronext Dublin and the UK Listing Authority require us to review:

- the Directors' Statement, set out on pages 160 to 161, in relation to going concern and longer-term viability;

- the part of the Corporate Governance Statement on page 95 relating to the Company's compliance with the provisions of the UK Corporate Governance Code and the Irish Corporate Governance Annex specified for our review; and

- certain elements of disclosures in the report to shareholders by the Board of Directors' remuneration committee.

We have nothing to report in this regard.

# Independent Auditor's Report continued
to the members of Flutter Entertainment plc

## Respective responsibilities and restrictions on use

### Directors' responsibilities

As explained more fully in their statement set out on page 163, the directors are responsible for: the preparation of the financial statements including being satisfied that they give a true and fair view; such internal control as they determine is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error; assessing the Group and Company's ability to continue as a going concern, disclosing, as applicable, matters related to going concern; and using the going concern basis of accounting unless they either intend to liquidate the Group or the Company or to cease operations, or have no realistic alternative but to do so.

### Auditor's responsibilities

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue our opinion in an auditor's report. Reasonable assurance is a high level of assurance, but does not guarantee that an audit conducted in accordance with ISAs (Ireland) will always detect a material misstatement when it exists. Misstatements can arise from fraud, other irregularities or error and are considered material if, individually or in aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of the financial statements. The risk of not detecting a material misstatement resulting from fraud or other irregularities is higher than for one resulting from error, as they may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control and may involve any area of law and regulation and not just those directly affecting the financial statements.

A fuller description of our responsibilities is provided on IAASA's website at http://www.iaasa.ie/Publications/Auditing-standards/International-Standards-on-Auditing-for-use-in-Ire/Description-of-the-auditor-s-responsibilities-for.

### The purpose of our audit work and to whom we owe our responsibilities

Our report is made solely to the Company's members, as a body, in accordance with Section 391 of the Companies Act 2014. Our audit work has been undertaken so that we might state to the Company's members those matters we are required to state to them in an auditor's report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the Company and the Company's members, as a body, for our audit work, for our report, or for the opinions we have formed.

### Ryan McCarthy

for and on behalf of KPMG
Chartered Accountants, Statutory Audit Firm
1 Stokes Place
St. Stephen's Green
Dublin 2
14 March 2022

# Consolidated Income Statement

For the year ended 31 December 2021

| | Note | 2021 £m | 2020 £m |
|---|---|---|---|
| *Continuing operations* | | | |
| Revenue | 5 | 6,036.2 | 4,413.9 |
| Cost of sales | | (2,309.5) | (1,541.7) |
| Gross profit | | 3,726.7 | 2,872.2 |
| Operating costs excluding depreciation, amortisation, impairment and gain on disposal | | (3,003.4) | (2,100.6) |
| EBITDA[1] | | 723.3 | 771.6 |
| Amortisation of acquisition-related intangible assets | | (543.3) | (432.3) |
| Depreciation and amortisation of other assets | | (254.4) | (213.2) |
| Impairment | | — | (22.6) |
| Gain on disposal | | 11.9 | — |
| Operating (loss)/profit | | (62.5) | 103.5 |
| Financial income | 8 | 3.2 | 79.9 |
| Financial expense | 8 | (229.1) | (182.3) |
| (Loss)/profit before tax | | (288.4) | 1.1 |
| Tax expense | 10 | (123.5) | (35.8) |
| (Loss)/profit for the year | | (411.9) | (34.7) |
| | | | |
| Attributable to: | | | |
| Equity holders of the Company | | (415.8) | 37.9 |
| Non-controlling interest | | 3.9 | (72.6) |
| | | (411.9) | (34.7) |
| | | | |
| Earnings per share | | | |
| Basic | 11 | (£2.365) | £0.293 |
| Diluted | 11 | (£2.365) | £0.285 |

1.  EBITDA is defined as profit for the period before depreciation, amortisation, impairment, gain on disposal, financial income, financial expense and tax expense/credit. It is considered by the Directors to be a key measure of the Group's financial performance.

Notes 1 to 33 on pages 177 to 242 form an integral part of these consolidated financial statements.

Financial statements

# Consolidated Statement of Other Comprehensive Income

For the year ended 31 December 2021

| | 2021<br>£m | 2020<br>£m |
|---|---:|---:|
| Loss for the year | (411.9) | (34.7) |
| **Other comprehensive (loss)/income:** | | |
| *Items that are or may be reclassified subsequently to profit or loss:* | | |
| Effective portion of changes in fair value of cash flow hedges | 61.4 | (280.4) |
| Fair value of cash flow hedges transferred to the income statement | (28.4) | 267.8 |
| Foreign exchange gain/(loss) on net investment hedges, net of tax[1] | 68.2 | 19.6 |
| Foreign exchange (loss)/gain on translation of the net assets of foreign currency denominated entities | (309.6) | 41.9 |
| Debt instruments at FVOCI | (1.3) | (0.4) |
| Other comprehensive (loss)/income | (209.7) | 48.5 |
| Total comprehensive (loss)/income for the year | (621.6) | 13.8 |
| | | |
| **Attributable to:** | | |
| Equity holders of the Company | (627.9) | 93.8 |
| Non-controlling interest | 6.3 | (80.0) |
| Total comprehensive (loss)/income for the year | (621.6) | 13.8 |

1. Foreign exchange gain on net investment hedges is presented including an income tax charge of £17.2m (2020: £5.1m) which relates to the tax effect on foreign exchange activities with respect to the Group's hedging activities. A corresponding tax credit of £16.7m (2020: £5.1m) in relation to the same is recognised in the Consolidated Income Statement such that there is a £0.5m net impact on the Consolidated Statement of Financial Position, reflecting excess FX gain in OCI not offset by current year or prior year losses.

Notes 1 to 33 on pages 177 to 242 form an integral part of these consolidated financial statements.

## Consolidated Statement of Financial Position

As at 31 December 2021

| | Note | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|---|
| **Assets** | | | |
| Property, plant and equipment | 12 | 451.4 | 361.9 |
| Intangible assets | 13 | 4,875.6 | 5,527.8 |
| Goodwill | 14 | 9,346.8 | 9,516.7 |
| Deferred tax assets | 18 | 8.2 | 7.4 |
| Non-current tax receivable | | 21.5 | 15.3 |
| Investments | 16 | 5.5 | 3.0 |
| Derivative financial assets | 23 | 68.0 | 16.9 |
| Financial assets – restricted cash | 17 | 7.4 | 6.9 |
| Other receivables | 16 | 29.3 | 75.2 |
| **Total non-current assets** | | **14,813.7** | **15,531.1** |
| Trade and other receivables | 16 | 203.9 | 139.5 |
| Financial assets – restricted cash | 17 | 677.6 | 587.9 |
| Cash and cash equivalents | 17 | 951.7 | 603.4 |
| Current investments at FVOCI – customer deposits | 17 | 83.0 | 82.8 |
| Current tax receivable | | 45.6 | 47.5 |
| **Total current assets** | | **1,961.8** | **1,461.1** |
| **Total assets** | | **16,775.5** | **16,992.2** |
| **Equity** | | | |
| Issued share capital and share premium | | 477.6 | 2,481.7 |
| Merger reserve | 24 | — | 7,982.9 |
| Treasury shares | 24 | — | (40.7) |
| Shares held by Employee Benefit Trust | 24 | (4.0) | (5.8) |
| Cash flow hedge reserve | 24 | 22.7 | (10.3) |
| Other reserves | | (61.7) | 152.3 |
| Retained earnings | | 9,816.3 | 405.0 |
| **Total equity attributable to equity holders of the Parent** | | **10,250.9** | **10,965.1** |
| Non-controlling interest | | 37.5 | 30.8 |
| **Total equity** | | **10,288.4** | **10,995.9** |
| **Liabilities** | | | |
| Trade and other payables | 19 | 1,096.4 | 1,033.0 |
| Customer balances | | 721.0 | 643.4 |
| Derivative financial liabilities | 23 | 74.0 | 150.9 |
| Provisions | 20 | 71.3 | 14.3 |
| Current tax payable | | 42.3 | 41.0 |
| Lease liability | 21 | 47.0 | 48.3 |
| Borrowings | 22 | 22.1 | 50.8 |
| **Total current liabilities** | | **2,074.1** | **1,981.7** |
| Trade and other payables | 19 | 19.8 | 14.6 |
| Derivative financial liabilities | 23 | 55.1 | 102.3 |
| Provisions | 20 | 47.8 | 145.0 |
| Deferred tax liabilities | 18 | 498.0 | 500.9 |
| Non-current tax payable | | 25.2 | 18.0 |
| Lease liability | 21 | 217.4 | 145.7 |
| Borrowings | 22 | 3,549.7 | 3,088.1 |
| **Total non-current liabilities** | | **4,413.0** | **4,014.6** |
| **Total liabilities** | | **6,487.1** | **5,996.3** |
| **Total equity and liabilities** | | **16,775.5** | **16,992.2** |

Notes 1 to 33 on pages 177 to 242 form an integral part of these consolidated financial statements.

On behalf of the Board

**Peter Jackson**
Chief Executive Officer
14 March 2022

**Jonathan Hill**
Chief Financial Officer

Financial statements

# Consolidated Statement of Cash Flows

For the year ended 31 December 2021

|  | Note | 2021 £m | 2020 £m |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Loss for the year | | (411.9) | (34.7) |
| Tax expense | | 123.5 | 35.8 |
| Financial income | | (3.2) | (79.9) |
| Financial expense | | 229.1 | 182.3 |
| Amortisation of acquisition related intangible assets | | 543.3 | 432.3 |
| Depreciation and amortisation of other assets | | 254.4 | 213.2 |
| Impairment | | — | 22.6 |
| Gain on disposal | | (11.9) | (0.2) |
| Separately disclosed items included within EBITDA | | 277.7 | 117.6 |
| Employee equity-settled share-based payments expense | | 79.1 | 52.1 |
| Foreign currency exchange loss/(gain) | | 15.7 | (31.6) |
| **Cash from operations before changes in working capital** | | **1,095.8** | **909.5** |
| (Increase)/decrease in trade and other receivables | | (40.5) | 18.1 |
| Increase in trade, other payables and provisions | | 64.0 | 280.1 |
| **Cash generated from operating activities** | | **1,119.3** | **1,207.7** |
| Taxes paid | | (138.5) | (89.4) |
| **Cash generated from operations, net of taxes paid** | | **980.8** | **1,118.3** |
| Transaction fees, restructuring and integration costs paid | 6 | (61.2) | (119.9) |
| Amounts paid in respect of Kentucky litigation | 20 | (234.1) | — |
| **Net cash from operating activities** | | **685.5** | **998.4** |
| **Cash flows from investing activities** | | | |
| Purchase of property, plant and equipment | | (89.3) | (59.3) |
| Purchase of intangible assets | | (62.4) | (53.2) |
| Capitalised internal development expenditure | | (142.3) | (99.6) |
| Purchase of businesses net of cash acquired | 15 | (50.7) | 445.2 |
| Payment of contingent deferred consideration | 15 | (21.6) | (7.2) |
| Proceeds from disposal of assets | | — | 12.5 |
| Net proceeds from disposal of subsidiary | 15 | 127.1 | — |
| Interest received | | 1.5 | 1.3 |
| Change in restricted cash | | (0.4) | (4.8) |
| Other | | (0.8) | — |
| **Net cash (used in)/from investing activities** | | **(238.9)** | **234.9** |
| **Cash flows from financing activities** | | | |
| Proceeds from the issuance of new shares in respect of equity placement (net of issuance costs) | 24 | — | 1,920.8 |
| Proceeds from the issue of shares on exercise of employee options | 24 | 13.2 | 34.3 |
| Acquisition of further interest in subsidiary | | — | (1,546.0) |
| Dividend paid to non-controlling interest | | (16.7) | (15.2) |
| Payment of lease liabilities | 21 | (47.9) | (45.7) |
| Payment of lease interest | 21 | (8.4) | (5.7) |
| Lease incentive received | | 7.3 | — |
| Proceeds from borrowings | 22 | 1,167.7 | 950.0 |
| Net amounts drawn down previous GBP Revolving Credit Facility | | — | (117.2) |
| Repayment of borrowings | 22 | (751.2) | (1,756.0) |
| Interest paid | | (141.9) | (114.1) |
| Settlement of derivatives | | (67.9) | (35.6) |
| Financing fees paid in respect of borrowing facilities | | (56.7) | (24.4) |
| Ordinary shares of the Company acquired by the Employee Benefit Trust | 24 | (180.7) | — |
| **Net cash used in financing activities** | | **(83.2)** | **(754.8)** |
| **Net increase in cash and cash equivalents** | | **363.4** | **478.5** |
| **Cash and cash equivalents at start of year** | | **603.4** | **108.1** |
| Foreign currency exchange (loss)/gain on cash and cash equivalents | | (15.1) | 16.8 |
| **Cash and cash equivalents at end of year** | 17 | **951.7** | **603.4** |

Notes 1 to 33 on pages 177 to 242 form an integral part of these consolidated financial statements.

# Consolidated Statement of Changes in Equity
For the year ended 31 December 2021

| | Number of ordinary shares in issue millions # | Issued share capital and share premium £m | Merger reserve £m | Treasury shares £m | Shares held by Employee Benefit Trust £m | Cash flow hedge reserve £m | Fair value reserve[1] £m | Foreign exchange translation reserve[1] £m | Other reserves[1] £m | Share-based payment reserve[1] £m | Retained earnings £m | Total equity attributable to shareholders of the Company £m | Non-controlling interest £m | Total equity £m |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at 1 January 2021 | 177.0 | 2,481.7 | 7,982.9 | (40.7) | (5.8) | (10.3) | (0.4) | 49.6 | 2.3 | 100.8 | 405.0 | 10,965.1 | 30.8 | 10,995.9 |
| Total comprehensive income/(loss) for the year | | | | | | | | | | | | | | |
| Loss for the year | — | — | — | — | — | — | — | — | — | — | (415.8) | (415.8) | 3.9 | (411.9) |
| Foreign exchange translation including net investment hedges | — | — | — | — | — | — | — | (226.6) | — | — | — | (226.6) | 2.4 | (224.2) |
| Effective portion of changes in fair value of cash flow hedges | — | — | — | — | — | 61.4 | — | — | — | — | — | 61.4 | — | 61.4 |
| Fair value of cash flow hedges transferred to the income statement | — | — | — | — | — | (28.4) | — | — | — | — | — | (28.4) | — | (28.4) |
| Financial assets at FVOCI | — | — | — | — | — | — | (1.3) | — | — | — | — | (1.3) | — | (1.3) |
| Tax on foreign exchange hedging | — | — | — | — | — | — | — | (17.2) | — | — | — | (17.2) | — | (17.2) |
| Total comprehensive income/(loss) for the year | — | — | — | — | — | 33.0 | (1.3) | (243.8) | — | — | (415.8) | (627.9) | 6.3 | (621.6) |
| Transactions with owners of the Company, recognised directly in equity | | | | | | | | | | | | | | |
| Shares issued on exercise of employee share options (Note 24) | 0.6 | 13.2 | — | — | — | — | — | — | — | — | — | 13.2 | — | 13.2 |
| Cancellation of Treasury shares | (2.0) | (0.2) | — | 40.7 | — | — | — | — | 0.2 | — | (40.7) | — | — | — |
| Merger reserve capitalisation (Note 24) | — | 7,982.9 | (7,982.9) | — | — | — | — | — | — | — | — | — | — | — |
| Reduction of capital (Note 24) | — | (10,000.0) | — | — | — | — | — | — | — | — | 10,000.0 | — | — | — |
| Business combinations (Note 15) | — | — | — | — | — | — | — | — | — | — | — | — | 17.1 | 17.1 |
| Ordinary shares of the Company acquired by the Employee Benefit Trust (Note 24) | — | — | — | — | (180.7) | — | — | — | — | — | — | (180.7) | — | (180.7) |
| Equity-settled transactions—expense recorded in the income statement | — | — | — | — | — | — | — | — | — | 80.5 | — | 80.5 | — | 80.5 |
| Equity-settled transactions – vesting | — | — | — | — | 182.5 | — | — | — | — | (182.5) | — | — | — | — |
| Tax on share-based payments | — | — | — | — | — | — | — | — | — | 0.7 | — | 0.7 | — | 0.7 |
| Exercise of share options | — | — | — | — | — | — | — | — | — | (49.6) | 49.6 | — | — | — |
| Dividend paid to non-controlling interest (Note 24) | — | — | — | — | — | — | — | — | — | — | — | — | (16.7) | (16.7) |
| Total contributions by and distributions to owners of the Company | (1.4) | (2,004.1) | (7,982.9) | 40.7 | 1.8 | — | — | — | 0.2 | 30.9 | 9,827.1 | (86.3) | 0.4 | (85.9) |
| Balance at 31 December 2021 | 175.6 | 477.6 | — | — | (4.0) | 22.7 | (1.7) | (194.2) | 2.5 | 131.7 | 9,816.3 | 10,250.9 | 37.5 | 10,288.4 |

1. Included in other reserves in the Statement of Financial Position.

Notes 1 to 33 on pages 177 to 242 form an integral part of these consolidated financial statements.

Financial statements

# Consolidated Statement of Changes in Equity
For the year ended 31 December 2020

| | Number of ordinary shares in issue millions # | Issued share capital and share premium £m | Merger reserve £m | Treasury shares £m | Shares held by Employee Benefit Trust £m | Cash flow hedge reserve £m | Fair value reserve £m | Foreign exchange translation reserve £m | Other reserves £m | Share-based payment reserve £m | Retained earnings £m | Total equity attributable to shareholders of the Company £m | Non-controlling interest £m | Total equity £m |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at 1 January 2020 | 80.3 | 428.3 | — | (40.7) | (6.1) | 2.3 | — | (21.5) | 2.3 | 80.6 | 3,539.5 | 3,984.7 | 204.9 | 4,189.6 |
| **Total comprehensive income/(loss) for the year** | | | | | | | | | | | | | | |
| Loss for the year | — | — | — | — | — | — | — | — | — | — | 37.9 | 37.9 | (72.6) | (34.7) |
| Foreign exchange translation including net investment hedges | — | — | — | — | — | — | — | 74.0 | — | — | — | 74.0 | (7.4) | 66.6 |
| Tax on foreign exchange hedging | — | — | — | — | — | — | — | (5.1) | — | — | — | (5.1) | — | (5.1) |
| Effective portion of changes in fair value of cash flow hedges | — | — | — | — | — | (280.4) | — | — | — | — | — | (280.4) | — | (280.4) |
| Fair value of cash flow hedges transferred to the income statement | — | — | — | — | — | 267.8 | — | — | — | — | — | 267.8 | — | 267.8 |
| Financial assets at FVOCI | — | — | — | — | — | — | (0.4) | — | — | — | — | (0.4) | — | (0.4) |
| Total comprehensive income/(loss) for the year | — | — | — | — | — | (12.6) | (0.4) | 68.9 | — | — | 37.9 | 93.8 | (80.0) | 13.8 |
| **Transactions with owners of the Company, recognised directly in equity** | | | | | | | | | | | | | | |
| Shares issued on equity placement (net of issuance costs) (Note 24) | 16.1 | 1,933.2 | — | — | — | — | — | — | — | — | (12.4) | 1,920.8 | — | 1,920.8 |
| Shares issued on exercise of employee share options (Note 24) | 1.5 | 34.3 | — | — | — | — | — | — | — | — | — | 34.3 | — | 34.3 |
| Shares issued as consideration for the acquisition of TSG (Note 15) | 65.3 | 5.1 | 6,189.5 | — | — | — | — | — | — | — | — | 6,194.6 | — | 6,194.6 |
| Issue of replacement options (Note 15) | — | — | — | — | — | — | — | — | — | 58.0 | — | 58.0 | — | 58.0 |
| Shares issued as consideration for acquisition of TSG Australia (Note 15) | 0.8 | 79.7 | — | — | — | — | — | — | — | — | — | 79.7 | — | 79.7 |
| Present value of FanDuel put liability with Fastball up to termination of option | — | — | — | — | — | — | — | — | (846.0) | — | — | (846.0) | — | (846.0) |
| Unwind of put option on termination of option | — | — | — | — | — | — | — | — | 846.0 | — | — | 846.0 | — | 846.0 |
| Acquisition of non-controlling interest in FanDuel Group (Note 15) | 11.7 | 1.0 | 1,793.4 | — | — | — | — | — | 2.2 | — | (3,263.7) | (1,467.1) | (78.9) | (1,546.0) |
| Deal fees on acquisition of FanDuel | — | — | — | — | — | — | — | — | — | — | (9.3) | (9.3) | — | (9.3) |
| Equity-settled transactions – expense recorded in income statement | — | — | — | — | — | — | — | — | — | 70.2 | — | 70.2 | — | 70.2 |
| Equity-settled transactions – vesting | — | — | — | — | 0.3 | — | — | — | — | (0.3) | — | — | — | — |
| Tax on share-based payments | — | — | — | — | — | — | — | — | — | — | 5.4 | 5.4 | — | 5.4 |
| Exercise of share awards | — | — | — | — | — | — | — | — | — | (107.7) | 107.7 | — | — | — |
| Dividend paid to non-controlling interest | — | — | — | — | — | — | — | — | — | — | — | — | (15.2) | (15.2) |
| Dividends to shareholders | 1.3 | 0.1 | — | — | — | — | — | — | — | — | (0.1) | — | — | — |
| Total contributions by and distributions to owners of the Company | 96.7 | 2,053.4 | 7,982.9 | — | 0.3 | — | — | — | 2.2 | 20.2 | (3,172.4) | 6,886.6 | (94.1) | 6,792.5 |
| Balance at 31 December 2020 | 177.0 | 2,481.7 | 7,982.9 | (40.7) | (5.8) | (10.3) | (0.4) | 49.6 | 2.3 | 100.8 | 405.0 | 10,965.1 | 30.8 | 10,995.9 |

Notes 1 to 33 on pages 177 to 242 form an integral part of these consolidated financial statements.

## Notes to the Consolidated Financial Statements

### 1. General information

Flutter Entertainment plc (the "Company") and its subsidiaries (together referred to as the "Group") is a global sports betting and gaming group, whose headquarters are in Dublin, Ireland. As a result of internal restructuring and integration initiatives in 2021, the Group transitioned from the five segment operating model reported in 2020 into a four segment operating model. In 2021, the Group's four reportable segments are (i) UK and Ireland ("UK&I"), which includes Sky Betting & Gaming and Paddy Power (both online and retail) and Betfair's operations in the UK and Ireland (ii) Australia, comprising Sportsbet, the market leader in the fast-growing Australian online betting market; (iii) International, which includes online poker, gaming, betting, rummy and daily fantasy sport product offerings under the PokerStars, Betfair International, Adjarabet and Junglee games brands; and (iv) US, which includes sports betting, daily fantasy sports, poker and gaming services under the FanDuel, TVG, FOX Bet, Stardust and PokerStars brands.

On 5 May 2020, the Company completed an all-share Combination with TSG (the "Combination") through an acquisition of all of the issued and outstanding share capital of TSG by the Company. The results of TSG prior to completion of the Combination are not included in these consolidated financial statements. See Note 15 for further information on the Combination.

The Company is a public limited company incorporated and domiciled in the Republic of Ireland and has its primary listing on the London Stock Exchange under the symbol FLTR and a secondary listing on the Irish Stock Exchange under the symbol FLTR.IR. The address of its registered office is set out on page 268 of this Annual Report.

The consolidated financial statements of the Group for the year ended 31 December 2021 comprise the financial statements of the Company and its subsidiary undertakings and were approved for issue by the Board of Directors on 14 March 2022.

### 2. Recent accounting pronouncements
#### Adoption of new accounting standards
The IASB issued the following standards, policies, interpretations and amendments which were effective for the Group for the first time in the year ended 31 December 2021:

- Amendments to IFRS 9, IAS 39, IFRS 7 and IFRS 16: Interest Rate Benchmark Reform Phase 2; and
- Amendment to IFRS 16: Covid-19 Related Rent Concessions.

The adoption of the new standards and interpretations did not have a significant impact on the Group's consolidated financial statements.

#### Adopted IFRS not yet applied
The following IFRSs have been issued but have not been applied in these financial statements. Their adoption is not expected to have a material effect on the Group's consolidated financial statements, other than IBOR reform which is disclosed in more detail below:

- Amendments to IAS 37: Onerous contracts – Cost of Fulfilling a Contract (Effective date 1 January 2022);
- Amendments to IAS 16: Property, Plant and Equipment: Proceeds before Intended Use (effective 1 January 2022);
- Amendments to IFRS 1, IFRS 9 and IAS 41: Annual Improvements to IFRS Standards 2018–2020 (effective 1 January 2022);
- Amendments to IFRS 3: Reference to the Conceptual Framework (effective 1 January 2022);
- Amendments to IAS 1: Classification of Liabilities as Current or Non-current (effective 1 January 2023);
- IFRS 17 Insurance Contracts and amendments to Insurance Contracts (effective date 1 January 2023);
- IAS 1 and IFRS Practice Statement 2: Disclosure of Accounting Policies; (effective date 1 January 2023);
- Amendments to IAS 8: Definition of Accounting Estimates (effective date 1 January 2023);
- Amendments to IAS 12: Deferred Tax related to Assets and Liabilities arising from a Single Transaction (effective date 1 January 2023); and
- Amendments to IFRS 10 and IAS 28: Sale or Contribution of Assets between an Investor and its Associate or Joint Venture (effective date to be confirmed).

#### IBOR reform
The Company has considered the impact of interest rate benchmark reform ("IBOR reform") on its loan accounting and hedge accounting. The Company has adopted the Interest Rate Benchmark Reform – Phase 2 Amendments to IFRS 9, IAS 39 and IFRS 7 issued in August 2020 ("Phase 2 relief"). Adopting these amendments provides temporary relief from applying specific loan accounting and hedge accounting requirements for hedging relationships directly affected by IBOR reform.

For loan accounting, the reliefs have the effect that the Company can update its effective interest rate for the change to the new risk-free rate without recognising an immediate gain or loss. For hedge accounting, the reliefs have the effect that IBOR reform should not generally cause hedge accounting to cease and updates to hedge documentation relating to IBOR reform will not result in a de-designation event for existing hedge relationships. However, any hedge ineffectiveness should continue to be recorded in the income statement. Qualifying for the reliefs is contingent on the Company's transition, i.e. the new risk-free rate plus credit adjustment spread, being economically equivalent to the previous LIBOR basis.

On 5 March 2021, the UK's Financial Conduct Authority ("FCA") formally announced the cessation of all GBP London Interbank Offered Rate ("LIBOR") benchmark settings currently published by ICE Benchmark Administration ("IBA") immediately after 31 December 2021. In response, the Company has entered into agreements with its lenders to amend the benchmark rate referenced in the Term Loan A agreement from GBP LIBOR to GBP SONIA for any interest periods commencing on or after 1 January 2022.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 2. Recent accounting pronouncements continued

The Group's USD First Lien Term Loan B, and certain of its cross-currency interest rate swaps are indexed to USD-LIBOR, and its EUR First Lien Term Loan B is indexed to EURIBOR. See Notes 22 and 23 for details of the borrowings and hedging derivatives notional amounts. The Group is monitoring and evaluating the related risks, which include interest payments on its borrowings, and amounts received on certain of its cross-currency interest rate swaps. These risks arise in connection with transitioning contracts to an alternative rate, including any resulting value transfer that may occur. Additional risk exists as the method of transitioning to an alternative reference rate may be challenging and requires agreement with the respective counterparty about how to make the transition.

The table below indicates the nominal amount and carrying amount of financial instruments that will be affected by IBOR reform which are yet to transition to alternative benchmark rates. The Company has adopted the Interest Rate Benchmark Reform – Amendments to IFRS 9, IAS 39 and IFRS 7 issued in September 2019 ("Phase 1 relief") in relation to its derivatives in hedge relationships. Adopting these amendments provides temporary relief from applying specific hedge accounting requirements to hedging relationships directly affected by IBOR reform.

| Current benchmark rate | Non-derivative financial liability nominal amount | Derivative instruments nominal amount |
|---|---|---|
| USD Libor | $2,931m | $2,931m |
| EURIBOR | €507m | — |

The reliefs have the effect that IBOR reform should not generally cause hedge accounting to terminate. However, any hedge ineffectiveness should continue to be recorded in the income statement. Furthermore, the amendments set out triggers for when the reliefs will end, which include the uncertainty arising from interest rate benchmark reform no longer being present.

As illustrated above, the Company has a significant exposure to changes in the USD IBOR benchmark. At 31 December 2021 the Company has a term loan of USD $2,931m and cross-currency interest rate swaps with a notional amount of USD $2,931m, which are indexed to USD LIBOR. The cross-currency interest rate swaps are designated in a cash flow hedge relationship hedging the USD LIBOR term loan. In assessing whether the hedges are expected to be highly effective on a forward-looking basis, the Company has assumed that the USD LIBOR interest rate on which the cash flows of its interest rate swaps and its hedged floating rate loans are based are not altered by IBOR reform.

The Company anticipates that USD LIBOR will transition to SOFR and has considered an IBOR transition plan. The transition project will include changes to systems, processes, risk and valuation models, as well as managing related tax and accounting implications. The Company currently anticipates that the areas of greatest change will be amendments to the contractual terms of its LIBOR referenced floating-rate swaps and updating its hedge designation. None of the Group's cross currency interest rate swaps have interest rate reset dates which occur after 30 June 2023, the date on which USD LIBOR is expected to be discontinued. The Group expects the EURIBOR will continue to exist as a benchmark rate for the foreseeable future.

The Group will continue to apply the amendments to IFRS 9/IAS 39 until the uncertainty arising from the interest rate benchmark reforms with respect to the timing and the amount of the underlying cash flows that the Group is exposed to ends. The Group has assumed that this uncertainty will not end until the Group's contracts that reference IBORs are amended to specify the date on which the interest rate benchmark will be replaced, the cash flows of the alternative benchmark rate and the relevant spread adjustment.

## 3. Basis of preparation and summary of significant accounting policies

The consolidated financial statements are prepared on the historical cost basis except for derivative financial instruments (which include betting transactions), equity securities, certain financial assets which have been designated as FVTPL, FVOCI, contingent deferred consideration and share-based payments, all of which are stated at fair value (grant date fair value in the case of share-based payments). The consolidated financial statements are presented in pounds sterling and are rounded to the nearest 0.1 million.

Further to IAS Regulation (EC1606/2002, 'Accounting standards adopted for use in the EU'), EU law requires that the annual consolidated financial statements of the Group be prepared in accordance with International Financial Reporting Standards ("IFRS") adopted by the European Union ("EU"). These consolidated financial statements have been prepared on the basis of IFRS adopted by the EU and effective for accounting periods ending on or after 1 January 2021.

The accounting policies applied in the preparation of these consolidated financial statements have been applied consistently during the year and prior year, except as noted above and in Note 2 'Recent accounting pronouncements'.

### Going concern

The Group reported EBITDA of £723.3m and a loss after tax of £411.9m for the year ended 31 December 2021. This includes £797.7m of non-cash depreciation and amortisation charged against profit in the year. The net cash generated from operating activities during the year ended 31 December 2021 was £685.5m. The balance sheet at 31 December 2021 reported a net current liability position of £112.3m. During 2021, the Group's various lenders consented to waive any Default or Event of Default that may have arisen by virtue of the Kentucky judgement, including any enforcement steps or actions taken by the Commonwealth of Kentucky prior to settlement. During the 12 months ended 31 December 2021, the Group is in compliance with all covenants related to its lending arrangements.

The Directors have considered the available financial resources which include, at 31 December 2021, £951.7m of cash and cash equivalents and a £482.0m Revolving Credit Facility with undrawn capacity of £467.0m. Whilst there are certain loan repayments due within the next 12 months of £22.1m, the Group's lending facilities primarily fall due in 2026 as set out in more detail in Note 22.

### 3. Basis of preparation and summary of significant accounting policies continued

As a consequence, the Directors believe that the Group is well placed to manage its business risks successfully. See 'Managing and understanding our principal risks' in this report for more detail.

The Group's forecasts to the year ending 31 December 2022 and beyond indicate that it will continue to have significant financial resources, continue to settle its debts as they fall due and operate well within its banking covenants as outlined in Note 22 for at least a period of 12 months from the date of these consolidated financial statements. 12 months from the date of these consolidated financial statements was selected as the going concern period as it represents the period in which the Group has prepared detailed forecasts for the majority of the period and it also reduces the degree of judgement and estimation uncertainty involved in both the forecasts and the downside scenarios.

When preparing the forecasts, the Group has included the cash outflows associated with the post balance sheet acquisition as detailed in Note 33. Various downside scenarios over and above those already included in the base case model on the potential impact of further reductions to cash flows due to changes in the legal, regulatory and licencing landscape and the Group's cyber and IT resilience have been considered in respect of these forecasts. The impact of these items involves significant judgement and estimation uncertainty.

In the event that it were necessary to draw down additional debt funding, the Directors have a reasonable expectation that this could be achieved within the confines of its existing debt facilities and financial covenant requirements.

Having given regard to the above, the Directors have a reasonable expectation that the Group has adequate resources to continue in operational existence for a period of at least 12 months from the date of approval of these consolidated financial statements, and therefore they continue to adopt the going concern basis in its consolidated financial statements.

#### Basis of consolidation

A subsidiary is an entity controlled by the Group. The Group controls an entity when it is exposed to, or has rights to, variable returns from its involvement with the entity and has the ability to affect those returns through its power over the entity. The Group's consolidated financial statements include the accounts of the Company and its subsidiary undertakings. Intra-group balances and any unrealised gains and losses or income and expenses arising from intra-group transactions are eliminated on consolidation except to the extent that unrealised losses provide evidence of impairment.

Non-controlling interests in subsidiaries are identified separately from the Group's equity therein. The non-controlling interests represent ownership interests entitling their holders to a proportionate share of net assets upon liquidation of the subsidiary, and may initially be measured at fair value or at the non-controlling interests' proportionate share of the fair value of the subsidiary's identifiable net assets. The choice of measurement is made on an acquisition-by-acquisition basis. Non-controlling interests are initially measured at fair value or at the non-controlling interests' proportionate share of the fair value of the subsidiary's identifiable net assets. Subsequent to acquisition, the carrying amount of non-controlling interests is the amount of those interests at initial recognition plus the non-controlling interests' share of subsequent changes in equity. "Total comprehensive income" is attributed to non-controlling interests even if this results in the non-controlling interests having a deficit balance.

Upon the loss of control of a subsidiary, the Group's profit or loss on disposal is calculated as the difference between (i) the fair value of the consideration received and of any investment retained in the former subsidiary and (ii) the previous carrying amount of the assets (including any goodwill) and liabilities of the subsidiary and any non-controlling interests.

Upon the Group's acquisition of further interest in a subsidiary, the non-controlling interest is reduced by the proportionate interest acquired, with the balance between the consideration paid and interest acquired being recognised in equity.

When a put option is held by a non-controlling interest in a subsidiary whereby that party can require the Group to acquire the non-controlling interest's shareholding in the subsidiary at a future date and the non-controlling interest retains present access to the results of the subsidiary, the Group applies the present access method of accounting to the arrangement, the existing shares held by the non-controlling interest are presented as a separate component of equity and the option is classified as a derivative and is recognised as a financial instrument on inception with fair value movements recognised through profit and loss.

When the Group has a call option over the shares held by a non-controlling interest in a subsidiary whereby the Group can require the non-controlling interest to sell its shareholding in the subsidiary at a future date, the option is classified as a derivative and is recognised as a financial instrument on inception with fair value movements recognised through profit and loss.

When the settlement of a put option in cash cannot be wholly avoided, a financial liability is recognised at the present value of the amounts payable upon exercise of the option. On initial recognition, the corresponding debit relating to the financial liability is booked to equity attributable to the Company within the category "Other reserves". Subsequent changes in the carrying amount of the financial liability that result from the remeasurement of the present value of the amount payable upon exercise of the non-controlling interest option are recognised in equity.

# Notes to the Consolidated Financial Statements continued

## 3. Basis of preparation and summary of significant accounting policies continued
### Revenue

The services provided by the Group comprise sports betting (sportsbook, the exchange sports betting product, daily fantasy sports products and pari-mutuel betting products), fixed odds games betting, online games and casino, peer-to-peer games including online poker, online bingo and online rummy and business-to-business services. Revenue is stated exclusive of value-added tax ("VAT").

Revenue from contracts with customers is recognised when control of the Group's services is transferred to the customer at an amount that reflects the consideration to which the Group expects to be entitled in exchange for those services. The Group has concluded that it is the principal in its revenue arrangements because it controls the services before transferring them to the customer.

Information about the nature and timing of the satisfaction of performance obligations pertaining to the Group's main sources of revenue are outlined below:

### Sportsbook revenue

The Group's sportsbook betting revenues are classified as derivative financial instruments, with the exception of:

a.   exchange sports betting product and pari-mutuel betting products on which commission income is earned;

b.   peer-to-peer games on which commission income and tournament fees are earned (including daily fantasy sports); and

c.   business-to-business services on which fees are earned.

Revenue from sportsbook betting activities represents the net gain or loss from betting activities in the year plus the gain or loss on the revaluation of open positions at year end and is stated net of the cost of customer promotions and bonuses incurred in the year. These derivatives are recognised initially at fair value and subsequently at fair value through profit or loss, within the revenue line as this represents the Group's principal activity. Customer promotions (including free bets) and bonuses are deducted from sportsbook betting revenue.

Revenue from the exchange sports betting product represents commission earned on betting activity and is recognised on the date the outcome for an event is settled.

Revenue from pari-mutuel betting products represents a percentage of stake and is recognised on settlement of the event, and is stated net of customer promotions and bonuses in the year.

Revenue from business-to-business services represents fees charged for the services provided in the year.

Revenue from conversion margins is the revenue earned on the processing of real-money deposits and cash outs in specified currencies. Revenue from customer cross-currency deposits and withdrawals is recognised when the transaction is complete at a point in time. Revenue is recognised with reference to the underlying arrangement and agreement with the players and represents a single performance obligation and is recorded within the applicable line of operations.

Revenue from daily fantasy sports products represents entry fees less prizes paid and player acquisition and retention incentives. Prizes are generally paid in cash or an entry fee into specific contests or tournaments.

The Group earns service fees from offering fantasy sports contests ("Contests") and fantasy sports tournaments ("Tournaments") to users. Contests are generally completed in a single day or up to one week. Tournaments are generally completed in one week or up to several months over two to three rounds. For Contests, revenue is recognised when the contest is settled. For Tournaments, revenue is recognised over the period of the tournament as each round is completed and there is no longer a service obligation to each user that participated in the tournament.

### Gaming revenue

Revenue from fixed odds games and the online casinos represents net winnings ("customer drop"), being amounts staked net of customer winnings, and is stated net of customer promotions and bonuses incurred in the year.

Revenue from peer-to-peer games represents commission income ("rake") and tournament fees earned from games completed by the year end, and is stated net of the cost of customer promotions and bonuses incurred in the year.

### Play-money gaming revenue

Customers can participate in online poker tournaments and social casino games using play-money, or virtual currency. Customers can purchase additional play-money chips online to participate in the poker tournaments and social casino games. The revenue is recognised at a point in time when the customer has purchased such chips as control has been transferred to the customer and no further performance obligations exist. Once a customer has purchased such chips, they are non-refundable and non-cancellable.

### Other

The Group sponsors certain live poker tours and events, uses its industry expertise to provide consultancy and support services to the casinos that operate the events, and has marketing arrangements for branded poker rooms at various locations around the world. The Group also provides customers with access to odds comparisons, tips and other information to assist with betting, and provides other media and advertising services, and limited content development services with revenue generated by way of affiliate commissions, revenue share arrangements and advertising income as applicable. Revenue is recognised upon satisfying the applicable performance obligations, at a point in time or over time as applicable.

Revenue from sponsorships represents advertising campaigns for customers who become a presenting sponsor at events. Customers are generally billed prior to the campaign launch and revenue is earned over the period of the event.

## 3. Basis of preparation and summary of significant accounting policies continued

### Cost of sales

Cost of sales includes direct costs incurred by the Group associated with revenue generation activities and principally comprises betting and gaming taxes, goods and services tax in Australia, software supplier costs, customer payment transaction fees, sporting levies and other data rights charges.

### Research and development

Expenditure on research activities is recognised in the income statement as an expense in the year in which it is incurred. Expenditure on development activities is recognised in profit or loss as an expense in the year in which it is incurred, except in cases where necessary criteria for capitalisation are met. Such criteria include demonstrating the technical feasibility of the product and having sufficient certainty over future revenue or cost savings that will be generated from the product. The qualifying expenditure capitalised represents costs directly attributable to the development of the asset. This expenditure is capitalised from the date when it first meets the recognition criteria and until the date at which the asset is available for use. Capitalised development expenditure assets are amortised on a straight-line basis from the date they are available for use over their useful economic life.

The amortisation method and the life of the commercial production are assessed annually, and the assets are tested for impairment whenever an indication exists that an asset might be impaired.

### Financial income

Interest income is recognised on an accruals basis by reference to the principal outstanding and the effective rate of interest. Financial income includes positive changes in the fair value of embedded derivatives, positive changes in the fair value of financial assets at fair value through profit or loss, foreign exchange gains on financing instruments associated with financing activities, ineffectiveness of cash flow hedges and positive changes in the fair value of deferred contingent consideration.

### Financial expense

Financial expense comprises interest expense on borrowings (except in respect of borrowing costs relating to qualifying assets), lease interest, interest on guarantee contracts entered into with third parties, the unwinding of the discount on provisions and other non-current liabilities, financing-related fees not eligible for capitalisation, foreign exchange losses on financing instruments associated with financing activities, negative changes in the fair value of embedded derivatives, negative changes in the fair value of financial assets at fair value through profit or loss, ineffectiveness of cash flow hedges and negative changes in the fair value of deferred contingent consideration.

### Bank and credit card charges

Bank and credit card charges and fees that are considered integral to the operations of the Group's business are recognised in 'cost of sales' in the consolidated income statement. Bank charges and fees that are related to the Group's financing activities are recognised in 'financial expense' in the consolidated income statement.

### Operating segment reporting

Operating segments are distinguishable components of the Group that have been established based on the internal reports regularly reviewed by the Group's Chief Operating Decision Maker ("CODM") in order to assess each segment's performance and to allocate resources to them. Following a review during the year, the Group determined that it is the Chief Executive Officer and Chief Financial Officer jointly rather than the Board of Directors who are performing the function of CODM. Following the change in the CODM, the Group re-assessed the identification of operating segments and determined that no change was necessary other than the change outlined below which had been determined prior to the change in CODM.

As a result of internal restructuring and integration initiatives, in 2021 the Group transitioned from the five segment operating model reported in 2020 to a four segment operating model. The Group has determined that its reportable segments are UK&I, Australia, International and US. The reportable segments reflect the way financial information is reviewed by the Group's CODM.

The previous reportable segments, as disclosed in the Group's 2020 Annual Report, of PPB, PokerStars and Sky Betting & Gaming have been realigned to follow the Group's integrated operational model and internal structure. The Group has restated the operating segment information for the year ended 31 December 2020 accordingly.

Geographical segments provide services within a particular economic environment that are subject to risks and rewards that are different from those components operating in alternative economic environments.

For further information on operating segments see Note 5.

### Functional and presentation currency

IFRS requires entities to consider primary and secondary indicators when determining functional currency. Primary indicators are closely linked to the primary economic environment in which the entity operates and are given more weight. Secondary indicators provide supporting evidence to determine an entity's functional currency. Once the functional currency of an entity is determined, it should be used consistently, unless significant changes in economic factors, events and conditions indicate that the functional currency has changed.

A change in functional currency is accounted for prospectively from the date of the change by translating all items into the new functional currency using the exchange rate at the date of the change.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 3. Basis of preparation and summary of significant accounting policies continued

Based on an analysis of the primary and secondary indicators, the Company has determined its and its subsidiaries' functional currencies. The Company's functional currency is pound sterling.

The pound sterling represents the primary currency for transactions and as such the Group has chosen to present its financial statements in pound sterling. Items included in the financial statements of each of the Group's entities are measured using their respective functional currencies, which are primarily the pound sterling ("GBP"), euro ("EUR"), Australian dollar ("AUD") and US dollar ("USD").

### Foreign currency transactions

Transactions in foreign currencies are translated at the relevant foreign exchange rate ruling at the date of the transaction. Non-monetary assets that are carried at historical cost are not subsequently retranslated. Monetary assets and liabilities denominated in foreign currencies at the reporting date are translated to functional currencies at the foreign exchange rates ruling at that date. Foreign exchange differences arising on translation are recognised in the income statement.

Gains and losses arising on the retranslation of cash and cash equivalent balances are included within 'operating costs excluding depreciation, amortisation and impairment' in the income statement rather than as financial income or expense, as the Directors consider that the gains or losses arising relate to operations, as the Group broadly matches its foreign currency denominated assets and liabilities to ensure that foreign exchange gains and losses are minimised. Gains and losses on retranslation of non-cash assets and liabilities with the exception of balances related to the Group's financing arrangements are also dealt with as operating items. Gains and losses on retranslation of balances relating to the Group financing activities are dealt with as financing items. Gains and losses on foreign currency retranslation are separately analysed into their components in the statement of cash flows.

For a review of the hedge accounting policies adopted by the Group, see Hedge accounting on page 187.

### Foreign currency translation of foreign operations

To the extent that the Group's foreign operations are considered to have functional currencies which are different from the Group's presentation currency, the assets and liabilities of foreign operations, including goodwill and fair value adjustments arising on consolidation and long-term intra-group loans that are part of the net investment because repayment is not planned or foreseen, are translated to GBP at the foreign exchange rates ruling at the reporting date.

The revenues and expenses of these foreign operations are translated to GBP at rates approximating the foreign exchange rates ruling at the dates of the transactions. Foreign exchange differences arising on translation are recognised directly in the consolidated statement of other comprehensive income and presented in the foreign currency translation reserve within equity.

### Income tax

Income tax in the income statement comprises current and deferred tax. Income tax expense is recognised in profit or loss except to the extent that it relates to items recognised in other comprehensive income or directly in equity, in which case it is recognised in other comprehensive income or directly in equity.

Current tax is the expected tax payable on the taxable income for the year, using tax rates enacted or substantively enacted at the reporting date and any adjustment to the tax payable in respect of the previous year.

Where uncertain tax treatments exist, the Group assesses whether it is probable that a tax authority will accept the uncertain tax treatment applied or proposed to be applied in its income tax filings. The Group assesses for each uncertain tax treatment whether it should be considered independently or whether some tax treatments should be considered together based on what the Group believes provides a better prediction of the resolution of the uncertainty. The Group considers whether it is probable that the relevant authority will accept each uncertain tax treatment, or group of uncertain tax treatments, assuming that the taxation authority with the right to examine any amounts reported to it will examine those amounts and will have full knowledge of all relevant information when doing so.

Deferred tax is provided on temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for taxation purposes. Deferred tax is measured at the tax rates that are expected to apply to temporary differences when they reverse, based on laws that have been enacted or substantively enacted at the reporting date. A deferred tax asset is recognised only to the extent that it is probable that future taxable profits will be available against which the asset can be utilised. Deferred tax assets are reviewed at each reporting period and are reduced to the extent that it is no longer probable that the related tax benefit will be realised. Deferred tax assets and liabilities are offset to the extent that they relate to income taxes levied by the same taxation authority.

## 3. Basis of preparation and summary of significant accounting policies continued
### Business combinations

Acquisitions of subsidiaries are accounted for using the acquisition method. The value of acquisition is measured at the date of purchase and represents the aggregate of the fair values of assets given, liabilities incurred or assumed and any equity instruments issued by the Group in exchange for control of the acquiree and fair value of previously held equity interests. The identifiable assets and liabilities of the acquiree are recognised at their fair values at the date of acquisition.

Goodwill recognised subsequent to 1 January 2004, representing the excess of purchase consideration over the fair value of net identifiable assets acquired defined in accordance with IFRS 3 Business Combinations, is capitalised. Goodwill is initially recognised as an asset at cost and is thereafter measured at cost less any accumulated impairment losses. Goodwill is not amortised but is tested for impairment annually. Any impairment in the value of goodwill is recognised in the income statement in the year in which it arises. Goodwill is recognised only when control of the acquiree is initially achieved. Following the acquisition of control, no goodwill is recognised on subsequent purchases of equity interests in the acquiree and instead the difference between the cost of such acquisitions is recognised through retained earnings. An adjustment is also made to non-controlling interests and the foreign exchange translation reserve through retained earnings to reflect the reduced non-controlling interest. Costs relating to the acquisition of businesses that occurred since 1 January 2010 are expensed to the income statement when incurred. Costs related to the acquisition of non-controlling interests are recognised directly in retained earnings.

The interest of non-controlling shareholders in the acquiree is initially measured at the non-controlling shareholders percentage interest in the net fair value of the assets, liabilities and contingent liabilities recognised under the proportionate interest method. Subsequently the non-controlling interests are allocated their share of results recognised in the income statement and the statement of comprehensive income.

Amounts payable in respect of deferred contingent consideration are recognised at fair value at the acquisition date. Subsequent changes to the fair value of the contingent consideration are recognised in the income statement within financial expense or income.

### Property, plant and equipment

Property, plant and equipment is stated at historical cost less accumulated depreciation and impairment losses. Cost includes expenditure that is directly attributable to the acquisition of the asset. The cost of self-constructed assets includes the cost of materials and direct labour, any other costs directly attributable to bringing the assets to a working condition for their intended use, and the costs of dismantling and removing items and restoring the sites on which they are located. Cost also may include transfers from equity of any gain or loss on qualifying cash flow hedges of foreign currency purchases of property, plant and equipment. Purchased software that is integral to the functionality of the related equipment is capitalised as part of that equipment.

Borrowing costs directly attributable to the acquisition, construction or production of a qualifying asset are capitalised as part of the cost of that asset.

Gains and losses on disposal of an item of property, plant and equipment are determined by comparing the proceeds from disposal with the carrying amount of property, plant and equipment and are recognised net in the income statement.

Depreciation is calculated to write-off the cost less estimated residual value of property, plant and equipment on a straight-line basis over their useful lives, as follows:

| | |
|---|---|
| Land | Not depreciated |
| Buildings: Freehold | 25 – 50 years |
| Buildings: Leasehold improvements | Unexpired term of the lease, except for leases with an initial term of 10 or less years, which are depreciated over the unexpired term of the lease plus the renewal length of the lease if there is an unconditional right of renewal |
| Fixtures and fittings | 3 – 10 years |
| Computer equipment | 2 – 5 years |
| Motor vehicles | 3 – 5 years |
| Right-of-use asset | Shorter of term of lease and useful life of the asset, as defined under IFRS 16 |

Assets in the process of construction are stated at cost less impairment losses. Depreciation of these assets begins when the assets are ready for their intended use.

The residual value of property, plant and equipment, if not insignificant, is reassessed annually.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 3. Basis of preparation and summary of significant accounting policies continued

### Intangible assets

Intangible assets, principally comprising brands, customer relations, computer software and technology, development expenditure, licences and broadcasting and wagering rights are capitalised and amortised over their estimated useful economic lives on a straight-line basis, with the exception of customer relations which is amortised on a reducing balance basis.

Brands represent the fair value of brands and trade-mark assets acquired in business combinations.

Customer relations represent the fair value of customer relations acquired in business combinations.

Computer software and technology includes the costs incurred in acquiring and bringing specific software programs into use and the fair value of software and technology acquired in business combinations.

Maintenance costs relating to computer software programs are expensed to the income statement when incurred.

Development expenditure represents internally generated costs incurred on development activities. These costs have been capitalised in accordance with the requirements of IAS 38 Intangible Assets.

Licences comprise the costs of acquiring retail bookmaking licences, the rents incurred in respect of the year prior to each shop opening for business (as the existence of a premises is a pre-requisite for obtaining such licences), licences for electronic point-of-sale ("EPOS") system software, and gambling licences including US market access payments across a number of jurisdictions globally.

Broadcasting and wagering rights represent assets acquired as part of the all-share merger with Betfair Group plc in 2016 and in particular relates to the US segment.

The estimated useful economic lives of intangible assets, according to which amortisation is calculated, are as follows:

| | |
|---|---|
| Brands | 8 – 20 years |
| Customer relations | 4 – 20 years in reducing balance, based on estimated customer lifecycle |
| Computer software and technology | 2 – 5 years |
| Development expenditure | 3 – 5 years |
| Licences | 2 – 20 years |
| Broadcasting and wagering rights | 6 years |

The licences intangible assets recognised on the acquisition of the D McGranaghan Limited business in 2008, the acquisition of an additional betting shop in Northern Ireland in 2011 and the brands intangible assets recognised on the acquisition of Sportsbet Pty Limited and International All Sports Limited ("IAS") in 2009, are considered indefinite life intangibles (see Note 13) and are therefore not amortised but rather are tested for impairment annually. For additional details regarding these assets and impairments, see Note 13.

### Financial instruments

#### Financial assets

*Recognition and measurement*

At initial recognition, the Group measures a financial asset at its fair value plus, in the case of a financial asset not measured at FVTPL (as defined below), transaction costs that are directly attributable to the acquisition of the financial asset. The Group classifies financial assets into one of the following measurement categories:

a.  Those to be measured subsequently at fair value through profit or loss ("FVTPL");

b.  Those to be measured subsequently through other comprehensive income ("FVOCI"); or

c.  Those to be measured at amortised cost.

The classification depends on the Group's business model for managing the financial assets and the contractual terms of the cash flows. Except in very limited circumstances, the classification may not be changed subsequent to initial recognition. The Group only reclassifies debt instruments when its business model for managing those assets changes.

*Debt instruments*

Subsequent measurement of debt instruments depends on the Group's business model for managing the asset and the cash flow characteristics of that asset. There are three measurement categories into which the Group classifies its debt instruments:

a.  Amortised cost: debt instruments are measured at amortised cost if they are held within a business model with the objective of collecting the contractual cash flows and those cash flows solely represent payments of principal and interest. A gain or loss on a debt instrument that is subsequently measured at amortised cost and is not part of a hedging relationship is recognised in profit or loss when the debt instrument is derecognised or impaired. Interest income from these debt instruments is recognised using the effective interest rate method. Cash, restricted cash and accounts receivable are classified as amortised cost.

b.  FVOCI: debt instruments are measured at FVOCI if they are held within a business model with the objective of either collecting the contractual cash flows or of selling the debt instrument, and those cash flows solely represent payments of principal and interest. Movements in the carrying amount are recorded in other comprehensive income, with impairment gains or losses, interest income and foreign exchange gains or losses recognised in profit or loss. When the debt instrument is derecognised, the cumulative gain or loss previously recognised in other comprehensive income is reclassified to profit or loss. Bonds recorded within current investments are classified as FVOCI.

### 3. Basis of preparation and summary of significant accounting policies continued

c.   FVTPL: debt instruments that are not solely payments of principal and interest are classified and measured at FVTPL, irrespective of the business model. Notwithstanding the criteria for debt instruments to be classified at amortised cost or at FVOCI, as described above, debt instruments may be designated at FVTPL on initial recognition if doing so eliminates, or significantly reduces, an accounting mismatch. A gain or loss on a debt instrument that is subsequently measured at FVTPL and is not part of a hedging relationship is recognised in profit or loss and presented in the consolidated income statement.

*Impairment of financial assets (including receivables)*
The Group recognises loss allowances for expected credit losses ("ECLs") on financial assets measured at amortised cost. The Group measures loss allowances at an amount equal to lifetime ECLs, except for bank balances for which credit risk (i.e. the risk of default occurring over the expected life of the financial instrument) has not increased significantly since initial recognition which are measured at 12-month ECLs.

Loss allowances for trade receivables and contract assets are always measured at an amount equal to lifetime ECLs.

When determining whether the credit risk of a financial asset has increased significantly since initial recognition and when estimating ECLs, the Group considers reasonable and supportable information that is relevant and available without undue cost or effort. This includes both quantitative and qualitative information and analysis, based on the Group's historical experience and informed credit assessment and including forward-looking information. The Group considers a financial asset to be in default when the borrower is unlikely to pay its credit obligations to the Group in full or the financial asset is significantly past due.

The maximum period considered when estimating ECLs is the maximum contractual period over which the Group is exposed to credit risk.

*Measurement of ECLs*
ECLs are a probability weighted estimate of credit losses. Credit losses are measured as the present value of all cash shortfalls (i.e. the difference between the cash flows due to the entity in accordance with the contract and the cash flows that the Group expects to receive). ECLs are discounted at the effective interest rate of the financial asset.

*Credit-impaired financial assets*
At each reporting date, the Group assesses whether financial assets carried at amortised cost are credit-impaired. A financial asset is 'credit-impaired' when one or more events that have a detrimental impact on the estimated future cash flows of the financial asset have occurred.

Evidence that a financial asset is credit-impaired includes the following observable data:

a.   significant financial difficulty of the third party;

b.   a breach of contract such as a default;

c.   the restructuring of a balance by the Group on terms that the Group would not consider otherwise; or

d.   it is probable that the third party will enter bankruptcy or other financial reorganisation.

*Presentation of allowance for ECL in the statement of financial position*
Loss allowances for financial assets measured at amortised cost are deducted from the gross carrying amount of the assets. See Note 27 for further detail.

*Write-off*
The gross carrying amount of a financial asset is written off when the Group has no reasonable expectations of recovering a financial asset in its entirety or a portion thereof. The Group individually makes an assessment with respect to the timing and amount of write-off based on whether there is a reasonable expectation of recovery. However, financial assets that are written off could still be subject to enforcement activities in order to comply with the Group's procedures for recovery of amounts due.

Financial liabilities
*Recognition and measurement*
Financial liabilities are classified, at initial recognition, as either financial liabilities at FVTPL or other financial liabilities.

• FVTPL: Financial liabilities are classified as FVTPL if they are held for trading or are designated as FVTPL upon initial recognition if such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise or the financial liability is managed and its performance is evaluated on a fair value basis. Any gains or losses arising on remeasurement are recognised in the consolidated income statement. Derivative instruments and certain other level 3 liabilities (see Note 29) are classified as FVTPL.

• Other financial liabilities: Financial liabilities, including borrowings, are initially measured at fair value, net of transaction costs. Other financial liabilities are subsequently measured at amortised cost using the effective interest method. The effective interest method calculates the amortised cost of a financial liability and allocates interest expense over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash payments through the expected life of the financial liability (or a shorter period where appropriate) to the net carrying amount on initial recognition. Long-term debt is classified within other financial liabilities and is measured at amortised cost.

# Notes to the Consolidated Financial Statements continued

## 3. Basis of preparation and summary of significant accounting policies continued

### Debt modifications

The Group may pursue amendments to its credit agreements based on, among other things, prevailing market conditions. Such amendments, when completed, are considered by the Group to be either debt modifications or re-estimation of cash flows.

The accounting treatment of debt modifications depends upon whether the modified terms are substantially different than the previous terms. The terms of an amended debt agreement are considered substantially different when either: (i) the discounted present value of the cash flows under the new terms, discounted using the original effective interest rate, are at least 10% different from the discounted present value of the remaining cash flows of the original debt; or (ii) management determines that other changes to the terms of the amended agreement, such as a change in the environment in which a floating interest rate is determined, are substantially different. If the modification is considered to be substantially different, the transaction is accounted for as an extinguishment of the original debt instrument, which is derecognised and replaced by the amended debt instrument, with any unamortised costs or fees incurred on the original debt instrument recognised as part of the gain or loss on extinguishment. If the modification is not considered to be substantially different, an adjustment to the carrying amount of the original debt instrument is recorded, which is calculated as the difference between the original contractual cash flows and the modified cash flows discounted at the original effective interest rate with the difference recognised in financial expense in the consolidated income statement.

### Re-estimation of cash flows

Where an original contract facilitates a repricing of a fixed component of an interest rate and where the terms enable an option to prepay without significant penalty the Group will apply the policy of revising the original effective interest rate of the financial contract based on the new term that aligns the interest rates to market rates, to reflect changes in cash flow for calculation of the modification gain or loss resulting in a re-estimation of cash flows.

### Transaction costs

Transaction costs that are directly attributable to the acquisition or issuance of financial assets and financial liabilities (other than financial assets and financial liabilities that are classified as FVTPL) are added to or deducted from, as applicable, the fair value of the financial instrument on initial recognition. These costs are expensed to financial expenses in the consolidated income statement over the term of the related interest-bearing financial asset or financial liability using the effective interest method. When a debt facility is retired by the Group, any remaining balance of related debt transaction costs is expensed to financial expenses in the period that the debt facility is retired. Transaction costs related to financial instruments at FVTPL are expensed when incurred.

Where new transaction fees are incurred as result of the re-estimation of cash flows under the existing contract (rather than a modification of contractual terms), then any transaction fees or lender costs incurred at time of revision are included in profit or loss immediately unless the lender costs incurred form part of the market interest rate in which case they alter the effective interest rate. Any existing unamortised original lender costs that do not need to be included in the measurement of the liability such that it reflects current market rates are also taken to profit or loss immediately on re-estimation of the cash flows.

### Non-derivative financial instruments

Other non-derivative financial instruments comprise cash and cash equivalents, restricted cash, deposits, investments, trade and other receivables and trade and other payables.

A financial instrument is recognised if the Group becomes a party to the contractual provisions of the instrument.

Non-derivative financial instruments are recognised initially at fair value plus, for instruments not at fair value through profit or loss, any directly attributable transaction costs. Subsequent to initial recognition, non-derivative financial instruments are measured as described below.

Cash and cash equivalents for the purpose of the statement of cash flows comprise cash and call deposits with an original maturity of three months or less, money market funds, and bank overdrafts, repayable on demand, that are integral to the Group cash management.

Restricted cash represents cash held by the Group but which is ring-fenced, or used as security for specific arrangements (such as cash held on the balance sheet in designated client fund accounts where certain jurisdictions require the Group to do so, or as collateral for a bank guarantee), and to which the Group has restricted access for a period of time. It includes funds held to cover monies owed to customers, as per the terms of our book making licences in various jurisdictions. Restricted cash is classified as amortised cost. Restricted cash balances are further classified as current or non-current depending on when the restriction first ends.

Neither cash and cash equivalents or restricted cash include certain customer funds deposited in a stakeholder account held by The Sporting Exchange (Clients) Limited, a wholly-owned subsidiary of the Group, on the basis that they are held on trust for customers and do not belong to and are not at the disposal of the Group.

Subsequent to initial recognition, cash and cash equivalents, financial assets – restricted cash, and trade and other payables are measured at amortised cost.

Trade and other receivables are stated at their nominal value as reduced by appropriate allowances for expected credit losses.

### 3. Basis of preparation and summary of significant accounting policies continued

Investments are measured at fair value and changes therein, are recognised in the consolidated income statement unless the irrevocable option at initial recognition to present changes in fair value in other comprehensive income is chosen. This designation is made on an instrument by instrument basis. Fair value is determined using a discounted cash flow which requires estimation of future net operating cash flows, the time period over which they will occur, an appropriate discount rate and discounts for lack of marketability and lack of control that pertains to the minority stake.

Financial assets are derecognised if the Group's contractual right to the cash flows from the financial assets expire or if the Group transfers the financial asset to another party without retaining control or substantially all the risks and rewards of the asset. Regular way purchases and sales of financial assets are accounted for at trade date, i.e. the date that the Group commits itself to purchase or sell the asset. Financial liabilities are derecognised if the Group's obligations specified in the contract expire or are discharged or cancelled.

#### Derivatives

As permitted by IFRS 9, the Group continues to apply the hedge accounting requirements of IAS 39 rather than the requirements of IFRS 9 and complies with the annual hedge accounting disclosures as required by IFRS 7.

The Group uses derivative instruments for risk management purposes and does not use derivative instruments for speculative trading purposes (except for derivatives with respect to the Group's sportsbook line of operations, which are transactions within the scope of IFRS 9 but reported as revenue as discussed above). All derivatives are recorded at fair value in the consolidated statements of financial position. The accounting for subsequent changes in fair value depends on whether the derivative is designated as a hedging instrument, and if so, the nature of the item being hedged. For derivatives not designated as hedging instruments, the re-measurement of those derivatives each year is recognised in the consolidated income statement.

Derivatives may be embedded in other financial liabilities and non-financial instruments (i.e. the host instrument). Embedded derivatives are treated as separate derivatives when their economic characteristics and risks are not closely related to those of the host instrument, the terms of the embedded derivative are the same as those of a stand-alone derivative and the combined instrument (i.e. the embedded derivative plus the host instrument) is not held for trading or designated at fair value. These embedded derivatives are measured at fair value with subsequent changes recognised in the consolidated income statement.

A derivative embedded within a hybrid contract containing a financial asset host is not accounted for separately under IFRS 9. The financial asset host together with the embedded derivative is required to be classified in its entirety as a financial asset at FVTPL.

#### Sports betting open positions

Amounts received from customers on sportsbook events that have not occurred by the year end are derivative financial instruments and have been designated by the Group on initial recognition as financial liabilities at fair value through profit or loss.

#### Hedge accounting

The Group designates certain derivatives as either:

- hedges of a particular risk associated with the cash flows of recognised assets and liabilities and highly probable forecast transactions (cash flow hedges); or
- hedges of a net investment in a foreign operation (net investment hedges).

At inception of the hedge relationship, the Group formally documents how the hedging relationship meets the hedge accounting criteria. It also records the economic relationship between the hedged item and the hedging instrument, including the nature of the risk, the risk management objective and strategy for undertaking the hedge and the method that will be used to assess the effectiveness of the hedging relationship at inception and on an ongoing basis.

#### Cash flow hedges

The Group uses derivatives for cash flow hedges. The effective portion of the change in fair value of the hedging instrument is recorded in other comprehensive income and accumulated in the cash flow hedging reserve, while the ineffective portion is recognised immediately in the consolidated income statement. Gains and losses on cash flow hedges accumulated in other comprehensive income/(loss) are reclassified to the consolidated income statement in the same year the hedged item affects the consolidated income statement. If the forecast transaction is no longer expected to occur, the hedge no longer meets the criteria for hedge accounting, the hedging instrument expires or is sold, terminated or exercised, or the designation is revoked, the hedge accounting is discontinued prospectively. If the forecast transaction is no longer expected to occur, then the amount accumulated in equity is reclassified to the consolidated income statement.

#### Net investment hedges

Hedges of net investments in foreign operations are accounted for similarly to cash flow hedges. Any gain or loss on the hedging item relating to the effective portion of the hedge is recognised in other comprehensive income and accumulated under the heading foreign exchange translation reserve. The gain or loss relating to the ineffective portion is recognised immediately in the consolidated income statement. Gains and losses accumulated in other comprehensive income are reclassified to the consolidated income statement when the foreign operation is partially disposed of or sold.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 3. Basis of preparation and summary of significant accounting policies continued

### Measurement of fair values

A number of the Group's accounting policies and disclosures require the measurement of fair values, for both financial and non-financial assets and liabilities.

The Group has an established control framework with respect to the measurement of fair values. Significant unobservable inputs and valuation adjustments are monitored on an on-going basis.

When measuring the fair value of an asset or liability, the Group uses market observable data as far as possible. Fair values are categorised into different levels in a fair value hierarchy based on the inputs used in the valuation techniques as follows:

a.   Level 1: quoted prices (unadjusted) in active markets for identical assets or liabilities;

b.   Level 2: inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly (i.e. as prices) or indirectly (i.e. derived from prices); and

c.   Level 3: inputs for the asset or liability that are not based on observable market data (unobservable inputs).

If the inputs used to measure the fair value of an asset or a liability might be categorised in the different levels of the fair value hierarchy, then the fair value measurement is categorised in its entirety in the same level of the fair value hierarchy as the lowest level input that is significant to the entire measurement.

The Group recognises transfers between levels of the fair value hierarchy at the end of the reporting period during which the change has occurred.

### Leases

At inception of a contract, the Group assesses whether a contract is, or contains, a lease. A contract is, or contains, a lease if the contract conveys the right to control the use of an identified asset for a period of time in exchange for consideration.

#### The Group as a lessee

The Group recognises a right-of-use asset and a lease liability at the lease commencement date.

The right-of-use assets comprise the initial measurement of the corresponding lease liability, lease payments made at or before the commencement of the lease, and any initial costs. They are then subsequently measured at cost less accumulated depreciation and impairment losses. Right-of-use assets are depreciated over the shorter of the lease term and the useful life of the underlying asset, and are tested for impairment in accordance with IAS 36, Impairment of Assets ("IAS 36").

The lease liability is initially measured at the present value of the future lease payments, discounted by using the interest rate implicit in the lease. If this rate cannot be readily determined, the Group uses its incremental borrowing rate at the lease commencement date. The Group subsequently measures the lease liability by increasing the carrying amount to reflect interest on the lease liability and by reducing the carrying amount to reflect the lease payments made.

Interest on the lease liability is recognised in financial expenses within the income statement. The total amount of cash payments in relation to lease payments is separated into a principal portion and interest, presented within financing activities in the consolidated statement of cash flows.

Lease payments included in the measurement of the lease liability include:

a.   fixed lease payments (including in-substance fixed payments), less any lease incentives;

b.   variable lease payments that depend on an index or rate initially measured using the index or rate at the commencement date;

c.   amount expected to be payable by the lessee under residual value guarantees;

d.   the exercise price of purchase options or the term of extension options if the lessee is reasonably certain to exercise the options; and

e.   Payments of penalties for terminating the lease if the lease includes an option to terminate the lease.

The Group remeasures the lease liability and makes a corresponding adjustment to the related right-of-use asset whenever:

a.   the lease term has changed or there is a change in the assessment of exercise of a purchase or an extension option, in which case the lease liability is remeasured by discounting the revised lease payments using a revised discount rate;

b.   the lease payments change due to changes in an index or rate or change in expected payment under a guaranteed residual value, in which case the lease liability is remeasured by discounting the revised lease payments using the initial discount rate (unless the lease payments change is due to a change in a floating interest rate, in which case a revised discount rate is used); or

c.   a lease contract is modified and the lease modification is not accounted for as a separate lease, in which case the lease liability is remeasured by discounting the revised lease payments using a revised discount rate.

Variable rents that do not depend on an index or rate are not included in the measurement of the lease liability or right-of-use asset. The related payments are recognised as an expense in the year in which the event or condition that triggers such payments occurs.

As a practical expedient, IFRS 16 permits a lessee to account for any lease and associated non-lease components as a single arrangement instead of separating the non-lease components. The Group has applied this practical expedient.

For short-term leases (lease term of 12 months or less) and leases of low-value assets, such as personal computers and office furniture, the Group has opted to recognise a lease expense on a straight-line basis as permitted by IFRS 16.

## 3. Basis of preparation and summary of significant accounting policies continued

**The Group as a lessor**

The Group has a small number of properties that are sublet.

At inception of a contract, the Group determines whether each lease is a finance lease or an operating lease, by reference to the transfer of all risks and rewards in connection to ownership of the underlying asset. In the case of a finance lease, the Group applies the derecognition and impairment requirements in IFRS 9 to the net investment in the lease.

When the Group is an intermediate lessor the sub leases are classified with reference to the right-of-use asset arising from the head lease, not with reference to the underlying asset.

Under operating leases, the Group recognises the income generated by the lease on an accrual basis over the life of the contract.

### Provisions

Provisions represent liabilities of the Group for which the amount or timing of payment is uncertain. A provision is recognised if, as a result of a past event, the Group has a present legal or constructive obligation that can be estimated reliably, and it is considered probable that an outflow of economic benefits will be required to settle the obligation. Provisions are determined by discounting the expected future cash flows at a pre-tax rate that reflects current market assessments of the time value of money and the risks specific to the liability. The increase in provisions due to the passage of time is recognised within financial expense on the consolidated income statement.

**Long service leave**

The provision for long service leave (that arises under the provisions of Australian state legislation) is measured per the requirements of IAS 19 Employee Benefits. Consideration is given to expected future wage and salary levels, experience of employee departures and periods of service. Expected future payments are discounted using market yields at the reporting date on Australian government bonds with terms to maturity that match, as closely as possible, the estimated future cash outflows.

**Onerous contracts**

A provision for onerous contracts is recognised when the expected benefits to be derived from a contract by the Group are less than the unavoidable costs of meeting its obligations under the terms of the contract. The provision is measured at the present value of the lower of the expected cost of terminating the contract and the expected net cost of continuing with the contract. Before a provision is established, the Group recognises any impairment loss on the assets associated with that contract.

**Gaming tax**

Gaming tax provisions relate to amounts provided for taxes in certain jurisdictions where the interpretation of tax legislation is uncertain. When the Group disagrees with the application of unclear tax legislation, for example when it is applied retrospectively and/or results in a one-off disproportionate tax equivalent to many times the profit derived by the Group from its historic activities in that jurisdiction, the Group continues to challenge these interpretations.

Whilst the maximum potential obligation for all ongoing cases could be greater than the recognised provision, and the outcomes may not be known for some time, a liability has been recorded for the Directors' best estimate of the cash outflows that will ultimately be required in respect of each claim. Management has not provided a sensitivity for this provision as the range is not considered to be material.

### Impairment of non-financial assets

The carrying amounts of the Group's non-financial assets, other than deferred tax assets, are reviewed at each reporting date to determine whether there is any indication of impairment. If any such indication exists, then the asset's recoverable amount is estimated. For goodwill, and intangible assets that have indefinite useful lives (such as certain licences and brands) or that are not yet available for use, the recoverable amount is estimated each year at the same time. The recoverable amount of an asset or cash generating unit ("CGU") is the higher of fair value less costs to sell or its value in use. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset. For the purpose of impairment testing, assets that cannot be tested individually are grouped together into the smallest group of assets that generates cash inflows from continuing use that are largely independent of the cash inflows of other assets or groups of assets (the "cash generating unit", or "CGU"). Subject to an operating segment ceiling test, for the purposes of goodwill impairment testing, CGUs to which goodwill has been allocated are aggregated so that the level at which impairment is tested reflects the lowest level at which goodwill is monitored for internal reporting purposes. Goodwill acquired in a business combination is allocated to groups of CGUs that are expected to benefit from the synergies of the combination. The Group's corporate assets do not generate separate cash inflows. If there is an indication that a corporate asset may be impaired, then the recoverable amount is determined for the CGU to which the corporate asset belongs.

An impairment loss is recognised if the carrying amount of an asset or its CGU exceeds its estimated recoverable amount. Impairment losses are recognised in profit or loss. Impairment losses recognised in respect of CGUs are allocated first to reduce the carrying amount of any goodwill allocated to the units, and then to reduce the carrying amounts of the other assets in the unit (group of units) on a pro rata basis. An impairment loss in respect of goodwill is not reversed. In respect of other assets, impairment losses recognised in prior years are assessed at each reporting date for any indications that the loss has decreased or no longer exists. An impairment loss is reversed if there has been a change in the estimates used to determine the recoverable amount. An impairment loss is reversed only to the extent that the asset's carrying amount does not exceed the carrying amount that would have been determined, net of depreciation or amortisation, if no impairment loss had been recognised.

# Notes to the Consolidated Financial Statements continued

## 3. Basis of preparation and summary of significant accounting policies continued

### Employee benefits

#### Pensions

The Group operates a number of defined contribution schemes under which the Group pays fixed contributions to a separate entity and has no legal or constructive obligation to pay further amounts. Obligations for contributions are recognised as an expense in the income statement as the service is received. Prepaid contributions are recognised as an asset to the extent that a cash refund or reduction in future payments is available.

#### Long-term incentive bonus plans

The Group accounts for obligations relating to long-term incentive bonus plans for employees at the present value of the benefit obligation at the reporting date. The service cost relating to such plans is allocated to the financial years over which service under the plan is rendered by the employee. The income statement expense represents the increase in the present value of the benefit obligation resulting from employee service in the current year, in addition to any associated finance costs where material.

#### Share-based payments

The Group operates equity-settled long-term and medium-term incentive plans for selected senior executives and other key management under which they are conditionally awarded shares or options over Company shares which vest upon the achievement of predetermined targets and/or future service periods. The fair value is measured at the award or option grant date and is spread over the period during which the employees become unconditionally entitled to the shares or options with a corresponding increase in the share-based payment reserve in equity. The fair value of the shares conditionally granted is measured using the market price of the shares at the time of grant or in the case of shares with a non-market condition measured using either a binomial or Monte Carlo valuation model.

The Group also currently operates a Deferred Share Incentive Plan ("DSIP") whereby one-third of any annual incentive payment (determined under the Annual Cash Incentive Plan) may be paid in deferred shares. Any such deferred element granted under the DSIP will vest 50% after 1 year and 50% after 2 years from the grant date and will be fair valued using the same methodology as other long and medium-term incentive plans. The two-thirds cash portion is measured on an undiscounted basis and expensed as the related service is provided. A liability is recognised for the amount expected to be paid under this cash portion if the Group has a present legal or constructive obligation to pay this amount as a result of past service provided by the employee and the obligation can be estimated reliably.

The Group operates an equity-settled Share Save scheme ("SAYE") for employees under which employees acquire options over Company shares at a discounted price subject to the completion of a savings contract. The fair value of share options granted is recognised as an employee cost with a corresponding increase in the share-based payment reserve in equity.

The fair value is measured at grant date and spread over the period during which the employees become unconditionally entitled to the options. The fair value of the options granted is measured using a Black-Scholes model, taking into account the terms and conditions, other than non-market performance conditions, upon which the options were granted. The amount recognised as an expense is adjusted to reflect the actual number of share options that vest for only non-market vesting and service conditions.

For the FOX equity option which is treated as a contingent cash-settled share-based payment, management has made certain judgements in the recognition and measurement of liabilities in relation to this commercial agreement and associated right of FOX Sports to acquire equity, including its judgement as to the probable method of settlement. The right has been valued using a discounted cash flow model and, as it represents a contingently cash-settled share-based payment, will be recorded at fair value at each reporting period.

### Share capital

#### Ordinary shares

Ordinary shares are classified as equity. Incremental costs directly attributable to the issue of ordinary shares and share options are recognised as a deduction from equity, net of any tax effects within retained earnings.

#### Shares held by Employee Benefit Trust

The costs of purchases of the Company's shares by the Employee Benefit Trust, which have been conditionally awarded to employees under the terms of the share award schemes, are shown separately as deductions from equity in the consolidated statement of financial position.

#### Repurchase of share capital (treasury shares)

When share capital recognised as equity is repurchased, the amount of the consideration paid, which includes directly attributable costs, is recognised as a deduction from equity. The repurchased shares are classified as treasury shares and are presented as a deduction from total equity. Transaction costs relating to the purchase by the Company of its own shares are recognised directly in retained earnings. When treasury shares are sold or reissued subsequently, the amount received is recognised as an increase in equity, and any resulting surplus on the transaction is recognised in share premium.

Where the Company purchases its own shares and subsequently cancels those shares, the cost of the shares cancelled is written off directly to retained earnings. The nominal value of the shares cancelled is transferred from share capital to undenominated capital.

#### Dividends

Dividends on ordinary shares are recognised in equity in the year in which they are approved by the Company's shareholders, or, in the case of the interim dividend, when it has been approved by the Board of Directors and paid.

## 3. Basis of preparation and summary of significant accounting policies continued

### Earnings per share

The Group presents basic and diluted earnings per share ("EPS") data for its ordinary shares. Basic EPS is calculated by dividing the profit or loss attributable to ordinary shareholders of the Company by the weighted average number of ordinary shares outstanding during the year. Diluted EPS is determined by adjusting the profit or loss attributable to ordinary shareholders and the weighted average number of ordinary shares outstanding for the effects of all dilutive potential ordinary shares, which include awards under share award schemes and share options granted to employees.

### Separately disclosed items

Separately disclosed items are those that in management's judgement need to be disclosed by virtue of their size, incidence or if not part of the Group's normal trading activities. The separate reporting of these items helps provide a better understanding of the Group's underlying performance.

Such items may include the amortisation of acquisition-related intangibles, significant restructuring and integration costs, material fees in respect of acquisitions, significant impairment of property, plant and equipment and intangible assets, disposal of subsidiaries and also significant movement in the fair value of contingent consideration. Following the acquisition of TSG, and the significant change in the Group's debt and derivatives portfolio, the Group considers items such as the gain/loss on embedded derivatives, the gain/loss on accelerated debt repayments, foreign exchange gain/losses on financial instruments associated with financing activities, and the write-off and expensing of one-off fees that do not meet the criteria for capitalisation as items that should be separately disclosed. The Group also considers significant transactions that have a material and distorting impact on the Group's effective tax rate in a given year as items that require separate disclosure.

In the majority of cases, it is the material impact that these items have on the financial statements that determines whether they should be separately disclosed. Materiality is determined by assessing whether disclosing such items separately would present a reader with a better understanding of the performance of the Group. If such items were deemed to be less than material, they would not be separately disclosed.

These items, usually due to their size and nature tend to be non-recurring items and would not arise on an annual basis. However, in other cases, items such as, for example, the amortisation of acquisition-related intangibles and the remeasurement of embedded derivatives, may occur over several years but are disclosed separately due to their finite life and the significantly changing amortisation profile of the assets in question in the related years. Other items such as the foreign exchange gains/losses associated with financing activities would also arise on a regular basis and can be separately disclosed due to their volatile nature.

The separate disclosure of such items helps the reader better understand underlying business performance.

The tax-related impact of such items is also disclosed separately.

## 4. Judgements and estimates

The preparation of consolidated financial statements in conformity with IFRS requires management to make judgements, estimates and assumptions that affect the application of accounting policies and the reported amounts of assets, liabilities, income and expenses. Actual results may differ from these estimates.

Estimates and underlying assumptions are reviewed on an on-going basis. Revisions to accounting estimates are recognised in the year in which the estimates are revised and in any future years affected.

### Judgements

In preparing these consolidated financial statements, the significant judgements in applying the Group's accounting policies and the key sources of estimation uncertainty were consistent with those that applied to the consolidated financial statements as at and for the year ended 31 December 2020 and are detailed below:

#### Kentucky proceedings

In 2010, prior to the combination with The Stars Group ("TSG"), the Commonwealth of Kentucky filed legal proceedings against various operators including certain companies that later became subsidiaries of TSG. The suit sought recovery of alleged losses incurred by Kentucky residents playing real-money poker on the PokerStars platform during a period between 2006 and 2011. The gross gaming revenues that TSG generated in Kentucky on the PokerStars platform during the relevant period were approximately US$18m. In 2015, a Kentucky trial court judge entered judgement against two TSG Isle of Man subsidiaries, Stars Interactive Holdings (IOM) Ltd ("SIHL") and Rational Entertainment Enterprises Ltd ("REEL") and awarded damages to the Commonwealth of Kentucky of approximately US$870m plus post-judgement interest.

In February 2016, in order to stay enforcement of the judgement while the matter was appealed, SIHL and REEL posted supersedeas bonds to the value of US$100m, on which the stay was conditioned. In 2018, the ruling against SIHL and REEL was vacated in its entirety by the Kentucky Court of Appeals.

Following an appeal by the Commonwealth of Kentucky, on 17 December 2020, the Kentucky Supreme Court reinstated the full 2015 award of damages, including post-judgement interest, which combined amounted to approximately US$1.3bn, against SIHL and REEL. The interest on the judgement continued to accrue at approximately US$250,000 per day due to the application of compound interest.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 4. Judgements and estimates continued

The two judgement debtors, SIHL and REEL, were Isle of Man incorporated companies, with no assets in the US. The Group took the view, based on the views of legal counsel and advisers that the judgement was unenforceable in the Isle of Man under both statute and public policy, being for multiple damages and penal in nature. The Group undertook a detailed review of what other steps Kentucky might seek to take to enforce the judgement, including against the assets of other Group companies in the US and formed the opinion that Kentucky had limited ability to enforce the full judgement. Based on the opinion of legal counsel and advisers as to the likely pay-out outcomes, the Group recognised a provision of $100m (£73.3m) as part of TSG combination fair value acquisition accounting in respect of this litigation, which reflects the value of the supersedes bond which was in place since February 2016. No liability was previously recognised by either TSG or Flutter prior to this judgement.

A rehearing petition was filed before the Kentucky Supreme Court on 6 January 2021 and was subsequently denied on 25 March 2021. In May 2021, following an April 2021 order by the Kentucky trial court, the $100m (£71.1m) bonds were paid to the Commonwealth of Kentucky, in line with the provision outstanding at 31 December 2020. The Group also considered the potential operational and reputational consequence of resisting enforcement of the judgement, e.g. any impact on the Group's ability to secure permits and licences in US states where its betting and gaming activities require State permissions.

On 21 September 2021, following mediation between the parties, the Group agreed to pay an additional $200m (£145.2m) to Kentucky. In return, Kentucky released SIHL, REEL and, inter alia, all Flutter entities from any claims relating to the matters in issue in the Kentucky proceedings, and the proceedings were consequently dismissed with prejudice. The Group strongly believes that this agreement and the certainty of outcome provided is in the best interests of the Group's shareholders.

### Valuation of tax assets and liabilities

Whilst we maintain good communication with key tax authorities, given the global nature of our business and the complex international tax landscape, there remain areas of tax uncertainty and therefore there is a level of uncertainty with regards to the measurement of our tax assets and liabilities. Uncertainties have been measured using the best estimate of the likely outcome. This assessment relies on estimates and assumptions and may involve a series of judgements about future events.

Where uncertain tax treatments exist, the Group assesses whether it is probable that a tax authority will accept the uncertain tax treatment applied or proposed to be applied in its tax filings. The Group assesses each uncertain tax treatment as to whether it should be considered independently or whether some tax treatments should be considered collectively based on what the Group believes provides a better estimate of the resolution of the uncertainty. The Group considers whether it is probable that the relevant authority will accept each uncertain tax treatment, or group of uncertain tax treatments, assuming that the taxation authority will have full knowledge of all relevant information when doing so. The key judgements are in relation to intercompany transactions including the internally generated intangible asset transfer referred to in Note 6 .

New information may become available that causes the Group to change its judgement regarding the adequacy of existing tax assets and liabilities; such changes to tax assets and liabilities will impact the income tax in the period in which such a determination is made. Management uses in-house tax experts, professional firms and previous experience when assessing tax risks and the Group believes that the position for all tax assets and liabilities at 31 December 2021 is adequate based on its assessment of the range of factors outlined above but given the inherent uncertainty, it is possible that resolution of tax uncertainties may differ from the amounts provided for.

### FOX Corporation

As announced on 2 October 2019, in order to achieve economic alignment of Flutter's and TSG's strategic third party relationships across their respective US businesses, concurrent with the Combination with TSG, the Group entered into an arrangement with FOX, pursuant to which FSG Services, a wholly-owned subsidiary of FOX, had an option to acquire an 18.6% equity interest in FanDuel Group at its market value in July 2021. Under the terms of the agreement an arbitration mechanism was put in place in the event of a disagreement between the two parties relating to the option.

In April 2021, FOX filed an arbitration claim against the Group with respect to its option to acquire an 18.6% equity interest in FanDuel for the same price that the Group paid for the acquisition of 37.2% of FanDuel from Fastball Holdings LLC in December 2020, representing an $11.2 billion valuation for FanDuel. In the Group's opinion this valuation would be materially favourable for FOX compared to the fair market valuation as of July 2021. An arbitrator has been appointed and the Group intends to vigorously defend its position. A ruling in the arbitration is not expected before Quarter 2, 2022.

The fair value of the call option as at 31 December 2021 is required to reflect the value that a market participant would have paid for such an option, with that strike price, reflecting the conditions that would have existed at 31 December 2021. Given the market assessment of comparable US assets, it is management's view that there has been no increase in the market value of FanDuel since July 2021, which represents the valuation date of the option, and therefore it is determined that the value of the option is out of the money for FOX and the derivative has close to nominal value at 31 December 2021.

## 4. Judgements and estimates continued
### Estimates

Determining the fair value of some assets and liabilities requires estimation of the effects of uncertain future events on those assets and liabilities at the end of the reporting year. The following discussion sets forth key sources of estimation uncertainty at the end of the reporting year that management believes have a significant risk of resulting in a material adjustment to the carrying amounts of assets and liabilities within the next financial year.

### Measurement of the recoverable amounts of cash generating units containing goodwill, indefinite life licences and intangible assets

The Group reviews the carrying value of goodwill for impairment annually (or more frequently if there are indications that the value of goodwill may be impaired) by comparing the carrying values of these cash generating units with their recoverable amounts (being the higher of value in use and fair value less costs to sell). The impairment review is performed on a "value-in-use" basis, which requires estimation of future net operating cash flows, the time period over which they will occur, an appropriate discount rate and an appropriate growth rate. Certain of these estimates and assumptions are subjective in nature.

The impact of Covid-19 on the performance of the Group and its individual business units for the year ended 31 December 2021 is set out in the business review section of the Annual Report.

The retail cash generating units ("CGUs") in the year were impacted by the temporary suspension of the activities of its shops, depending on local restrictions and social distancing rules during 2021. Based on the significant headroom that existed in the 31 December 2021 impairment test and customer activity levels since the shops have reopened as well as opportunities to make further market share gains as competitors reduce the size of their respective estates, the Group is satisfied that no impairment has arisen during the year ended 31 December 2021.

## 5. Operating segments
### Reportable business segment information

As a result of internal restructuring and integration initiatives, in 2021 the Group transitioned from the five segment operating model reported in 2020 to a four segment operating model. In 2021, the Group's four reportable segments are:

- UK & Ireland;
- Australia;
- International; and
- US.

During the year, the Group determined that it is the Chief Executive Officer and Chief Financial Officer jointly rather than the Board of Directors who are performing the function of CODM. The reportable segments reflect the Group's current operating model, following internal restructuring and integration initiatives undertaken by the Group following the Combination with TSG, and the way financial information is reviewed by the Group's Chief Operating Decision Maker (the Chief Executive Officer and Chief Financial Officer jointly). The Group has restated the operating segment information for the year ended 31 December 2020 to conform with the current year presentation.

### UK & Ireland

The UK & Ireland ("UK&I") segment is comprised of the operations of Sky Betting & Gaming, and Paddy Power and Betfair in the UK and Ireland. Revenues are earned from sports betting (sportsbook and the exchange sports betting product) and gaming services (games, casino, bingo and poker), as well as from Oddschecker (odds comparison website) until the disposal of Oddschecker in August 2021 (see Note 6 and Note 15). Services are provided primarily via the internet but also through licensed bookmaking shop estates.

### Australia

The Australia segment is comprised of the operations of the Sportsbet brand and in 2020 included the former BetEasy brand which was integrated into Sportsbet in the second half of 2020, and earns its revenues from sports betting services provided to Australian customers using primarily the internet.

### International

The International segment is comprised of PokerStars, Betfair International, Adjarabet and Junglee Games. The International segment earns most of its revenues from poker, casino, rummy and sports betting through various brands and mainly via the internet.

### US

The US segment is comprised of the FanDuel, TVG, FOX Bet, Stardust and PokerStars brands' operations in the U.S and earns its revenues from sports betting, daily fantasy sports and gaming services (casino and poker) provided to US customers, using primarily the internet, with a proportion of US sports betting services also provided through a small number of retail outlets.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 5. Operating segments continued

**Corporate**

Corporate administrative costs (Board, Finance, Legal, Internal Audit, HR, Property and other central functions) cannot be readily allocated to individual operating segments and are not used by the CODM for making operating and resource allocation decisions. These are shown in the reconciliation of reportable segments to Group totals.

The accounting policies in respect of operating segments reporting are the same as those described in the basis of preparation and summary of significant accounting policies set out in Note 3.

The Group does not allocate income tax expense or financing income and expenses to reportable segments. Treasury management is centralised for the UK&I, Australia, International and US segments.

Assets and liabilities information is reported internally in total and not by reportable segment and, accordingly, no information is provided in this note on assets and liabilities split by reportable segment.

### Seasonality

The Group's sportsbook revenue is driven by a combination of the timing of sporting and other events and the Group's results derived from those events. The Covid-19 pandemic which caused some postponement and cancellation of sporting events across the world has skewed results for the year and the comparative year. Gaming and other revenue is not as dependent on the sporting calendar.

Reportable business segment information for the year ended 31 December 2021:

|  | UK&I £m | Australia £m | International £m | US £m | Corporate £m | Total £m |
|---|---|---|---|---|---|---|
| Revenue from external customers | 2,062.9 | 1,293.5 | 1,288.4 | 1,391.4 | — | 6,036.2 |
| Cost of sales before separately disclosed items | (621.2) | (635.8) | (391.6) | (613.6) | — | (2,262.2) |
| Gross profit before separately disclosed items | 1,441.7 | 657.7 | 896.8 | 777.8 | — | 3,774.0 |
| Operating costs excluding depreciation and amortisation before separately disclosed items | (825.8) | (221.2) | (604.6) | (1,020.7) | (100.7) | (2,773.0) |
| Adjusted EBITDA[1] before separately disclosed items | 615.9 | 436.5 | 292.2 | (242.9) | (100.7) | 1,001.0 |
| Depreciation and amortisation before separately disclosed items | (125.7) | (25.6) | (51.8) | (46.5) | (4.8) | (254.4) |
| Loss on disposal before separately disclosed items | — | — | — | — | (0.3) | (0.3) |
| Reportable segment profit/(loss) before separately disclosed items | 490.2 | 410.9 | 240.4 | (289.4) | (105.8) | 746.3 |
| Germany and Greece tax expense | — | — | (47.3) | — | — | (47.3) |
| Kentucky settlement and associated legal costs | — | — | (163.1) | — | — | (163.1) |
| Gain on disposal | 12.2 | — | — | — | — | 12.2 |
| Amortisation of acquisition-related intangible assets | (225.9) | (20.9) | (276.4) | (20.1) | — | (543.3) |
| Reportable segment profit/(loss) after amortisation of acquisition-related intangibles | 276.5 | 390.0 | (246.4) | (309.5) | (105.8) | 4.8 |
| Transaction fees and associated costs[2] |  |  |  |  |  | (22.1) |
| Restructuring and integration costs[2] |  |  |  |  |  | (45.2) |
| Operating loss |  |  |  |  |  | (62.5) |

1. Adjusted EBITDA which is a non-GAAP measure in the above segment note is defined as profit for the year before separately disclosed items, depreciation, amortisation, impairment, gain on disposal, financial income, financial expense and tax expense/credit. It is considered by the Directors to be a key measure of the Group's financial performance.

2. The Group does not allocate transaction fees and restructuring and integration costs to reportable segments.

## 5. Operating segments continued

Reportable business segment information for the year ended 31 December 2020[3]:

| Restated[3] | UK&I £m | Australia £m | International £m | US £m | Corporate £m | Total £m |
|---|---|---|---|---|---|---|
| Revenue from external customers before VAT refund | 1,738.9 | 988.8 | 997.4 | 672.9 | — | 4,398.0 |
| Cost of sales before separately disclosed items | (499.1) | (468.7) | (269.0) | (302.2) | — | (1,539.0) |
| Gross profit before separately disclosed items | 1,239.8 | 520.1 | 728.4 | 370.7 | — | 2,859.0 |
| Operating costs excluding depreciation and amortisation before separately disclosed items | (727.3) | (213.2) | (418.7) | (519.0) | (91.6) | (1,969.8) |
| Adjusted EBITDA[1] | 512.5 | 306.9 | 309.7 | (148.3) | (91.6) | 889.2 |
| Depreciation and amortisation before separately disclosed items | (111.1) | (28.2) | (34.5) | (34.8) | (4.6) | (213.2) |
| Reportable segment profit/(loss) before separately disclosed items | 401.4 | 278.7 | 275.2 | (183.1) | (96.2) | 676.0 |
| Amortisation of acquisition-related intangible assets (Note 6) | (168.7) | (18.7) | (216.2) | (28.7) | — | (432.3) |
| Impairment | (12.1) | (2.0) | (4.4) | — | (4.1) | (22.6) |
| VAT refund (Note 6) | 11.2 | — | — | — | — | 11.2 |
| Reportable segment profit/(loss) after amortisation of acquisition-related intangibles and VAT refund | 231.8 | 258.0 | 54.6 | (211.8) | (100.3) | 232.3 |
| Transaction fees and associated costs[2] | | | | | | (32.7) |
| Restructuring and integration costs[2] | | | | | | (96.1) |
| Operating profit | | | | | | 103.5 |

1. Adjusted EBITDA which is a non-GAAP measure in the above segment note is defined as profit for the year before separately disclosed items, depreciation, amortisation, impairment, gain on disposal, financial income, financial expense and tax expense/credit. It is considered by the Directors to be a key measure of the Group's financial performance.

2. The Group does not allocate transaction fees and restructuring and integration costs to reportable segments.

3. Reportable segment split was restated to conform with current year presentation.

### Reconciliation of reportable segment information to Group totals

| | 2021 | | | 2020 | | |
|---|---|---|---|---|---|---|
| | Before separately disclosed items £m | Separately disclosed items £m | Total £m | Before separately disclosed items £m | Separately disclosed items £m | Total £m |
| Gross profit | 3,774.0 | (47.3) | 3,726.7 | 2,859.0 | 13.2 | 2,872.2 |
| Operating costs excluding depreciation, amortisation, impairment and gain on disposal | (2,773.0) | (230.4) | (3,003.4) | (1,969.8) | (130.8) | (2,100.6) |
| EBITDA[1] | 1,001.0 | (277.7) | 723.3 | 889.2 | (117.6) | 771.6 |
| Depreciation and amortisation | (254.4) | (543.3) | (797.7) | (213.2) | (432.3) | (645.5) |
| (Loss)/gain on disposal and impairment | (0.3) | 12.2 | 11.9 | — | (22.6) | (22.6) |
| Operating (loss)/profit | 746.3 | (808.8) | (62.5) | 676.0 | (572.5) | 103.5 |
| Net finance costs | (126.0) | (99.9) | (225.9) | (109.8) | 7.4 | (102.4) |
| (Loss)/profit before tax | 620.3 | (908.7) | (288.4) | 566.2 | (565.1) | 1.1 |
| Tax expense | (166.3) | 42.8 | (123.5) | (94.2) | 58.4 | (35.8) |
| (Loss)/profit for the year | 454.0 | (865.9) | (411.9) | 472.0 | (506.7) | (34.7) |

1. EBITDA is defined as profit for the year before depreciation, amortisation, impairment, gain on disposal, financial income, financial expense and tax expense/credit. It is considered by the Directors to be a key measure of the Group's financial performance.

See Note 6 for further detail on separately disclosed items.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 5. Operating segments continued
### Disaggregation of revenue under IFRS 15
Group revenue disaggregated by product line for the year ended 31 December 2021:

| | UK&I £m | Australia £m | International £m | US £m | Total £m |
|---|---|---|---|---|---|
| Sports revenue[1] | 1,281.8 | 1,293.5 | 220.2 | 978.3 | 3,773.8 |
| Gaming revenue[2] | 781.1 | — | 1,068.2 | 413.1 | 2,262.4 |
| Total Group revenue | 2,062.9 | 1,293.5 | 1,288.4 | 1,391.4 | 6,036.2 |

Group revenue disaggregated by product line for the year ended 31 December 2020[3]:

| | UK&I £m | Australia £m | International £m | US £m | Total £m |
|---|---|---|---|---|---|
| Sports revenue[1] | 1,117.6 | 988.8 | 162.1 | 457.0 | 2,725.5 |
| Gaming revenue[2] | 637.2 | — | 835.3 | 215.9 | 1,688.4 |
| Total Group revenue | 1,754.8 | 988.8 | 997.4 | 672.9 | 4,413.9 |

1.  Sports revenue comprises sportsbook, exchange sports betting, daily fantasy sports and pari-mutuel betting.

2.  Gaming revenue includes Games, Poker, Casino, Rummy and Bingo and in 2020 in UK&I includes the VAT refund (see Note 6).

3.  Reportable segment split was restated to conform with current year presentation.

### Geographical information
Group revenue disaggregated by geographical market for the year ended 31 December 2021:

| | UK&I £m | Australia £m | International £m | US £m | Total £m |
|---|---|---|---|---|---|
| UK | 1,860.1 | — | 73.7 | — | 1,933.8 |
| Ireland | 194.1 | — | 6.4 | — | 200.5 |
| EU (excl. Ireland)[1] | — | — | 656.4 | — | 656.4 |
| Australia | — | 1,293.5 | — | — | 1,293.5 |
| US | — | — | — | 1,391.4 | 1,391.4 |
| Rest of World[2] | 8.7 | — | 551.9 | — | 560.6 |
| Total Group revenue | 2,062.9 | 1,293.5 | 1,288.4 | 1,391.4 | 6,036.2 |

1.  The EU (excl. Ireland) category includes multiple countries, that individually represent less than 4% of total Group revenue.

2.  The Rest of World category includes multiple countries, that individually represent less than 2% of total Group revenue.

Group revenue disaggregated by geographical market for the year ended 31 December 2020[3]:

| Restated[2] | UK&I £m | Australia £m | International £m | US £m | Total £m |
|---|---|---|---|---|---|
| UK | 1,544.9 | — | 66.7 | — | 1,611.6 |
| Ireland | 209.9 | — | 7.4 | — | 217.3 |
| EU (excl. Ireland)[1] | — | — | 578.6 | — | 578.6 |
| Australia | — | 988.8 | — | — | 988.8 |
| US | — | — | — | 672.9 | 672.9 |
| Rest of World[2] | — | — | 344.7 | — | 344.7 |
| Total Group revenue | 1,754.8 | 988.8 | 997.4 | 672.9 | 4,413.9 |

1.  The EU (excl. Ireland) category includes multiple countries that individually represent less than 4% of total Group revenue.

2.  The Rest of World category includes multiple countries that individually represent less than 2% of total Group revenue.

3.  Reportable segment split was restated to conform with current year presentation.

Revenues are attributable to geographical location on the basis of the customers location.

### Non-current assets
Non-current assets (property, plant and equipment, intangible assets and goodwill) by geographical area are as follows:

| | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| UK | 8,492.3 | 8,882.6 |
| Ireland | 159.9 | 154.9 |
| Australia | 645.6 | 696.4 |
| US | 868.5 | 856.1 |
| Rest of World[1] | 4,507.5 | 4,816.4 |
| Total | 14,673.8 | 15,406.4 |

1.  Relates mainly to goodwill and fair value adjustments on acquisition intangibles such as brand and customer relationships pertaining to PokerStars worldwide operations (reported within the International segment) not otherwise allocated to any specific country or region.

## 6. Separately disclosed items

The separately disclosed items noted in Note 5 above are comprised as follows:

|  | 2021 £m | 2020 £m |
|---|---|---|
| Germany and Greece tax expense | (47.3) | — |
| Transaction fees and associated costs | (22.1) | (32.7) |
| Restructuring and integration costs | (45.2) | (96.1) |
| Kentucky settlement and associated legal costs | (163.1) | — |
| VAT refund | — | 11.2 |
| EBITDA | (277.7) | (117.6) |
| Amortisation of acquisition-related intangible assets | (543.3) | (432.3) |
| Disposal of Oddschecker Global Media | 12.2 | — |
| Impairment | — | (22.6) |
| Operating profit impact of separately disclosed items | (808.8) | (572.5) |
| Financial income | — | 78.5 |
| Financial expense | (99.9) | (71.1) |
| Profit before tax impact of separately disclosed items | (908.7) | (565.1) |
| Tax credit on separately disclosed items | 42.8 | 58.4 |
| Total separately disclosed items | (865.9) | (506.7) |
|  |  |  |
| Attributable to: |  |  |
| Equity holders of the Company | (860.0) | (483.8) |
| Non-controlling interest | (5.9) | (22.9) |
|  | (865.9) | (506.7) |

### Amortisation of acquisition–related intangible assets

Non-cash amortisation of £543.3m has been incurred in the period (year ended 31 December 2020: £432.3m) as a result of intangible assets separately identified under IFRS 3 as a result of the merger with Betfair in 2016, the acquisitions of FanDuel Limited in 2018 and Adjarabet in 2019, the Combination with TSG in 2020 and the acquisitions of Junglee and Singular in 2021.

### Kentucky settlement and associated legal costs

On 22 September 2021, the Group announced that the legal dispute between Flutter and the Commonwealth of Kentucky had been settled in full. The Group agreed to pay a further $200m (£145.2m) to Kentucky in addition to the $100m (£71.1m) previously forfeited to the Commonwealth as part of the supersedeas bond in the case in line with the provision outstanding at 31 December 2020. In return, Kentucky released Stars Interactive Holdings (IOM) Ltd, Rational Entertainment Enterprises Ltd and, inter alia, all Flutter entities from any claims relating to the matters in issue in the Kentucky proceedings, and the proceedings were consequently dismissed with prejudice. As a result of this settlement, costs of £163.1m (including associated legal costs of £17.9m) were incurred during the year ended 31 December 2021. See Note 4 for further details.

### Transaction fees and associated costs

During the year ended 31 December 2021, £22.1m of costs were incurred relating to various acquisitions, the FOX option (see Note 4) and also as announced in May 2021 the potential US listing of a small stake of FanDuel. During the year ended 31 December 2020, £32.7m of costs were incurred primarily relating to the Combination with TSG. The costs were included as separately disclosed items as they have not been incurred in the ordinary course of business.

### Restructuring and integration costs

During the year ended 31 December 2021 costs of £45.2m (year ended 31 December 2020: £96.1m) relating to incremental, one-off costs, were incurred by the Group as a result of significant restructuring and integration initiatives following the Combination with TSG.

### Germany and Greece tax expense
#### Germany

In 2012 Betfair was issued with a German tax assessment relating to the Betfair Exchange, which operated in Germany until November 2012. The assessment deemed that a tax liability of approximately €30.6m was payable. This represented a multiple of the revenues generated by the Exchange during the assessment period.

The Group paid the €30.6m German tax assessment in 2019, with the late payment interest of approximately €10m to be paid when assessed.

In September 2021 the German Federal Tax Court dismissed the Group's appeal of the tax assessment. Whilst the Group has lodged a formal complaint to the Federal Constitutional Court, it has decided to recognise the amount of the German tax assessment including the late payment interest. This has resulted in an expense of €40.6m (£34.5m) being recorded in the year in relation to the principal amount of tax and late payment interest.

# Notes to the Consolidated Financial Statements continued

## 6. Separately disclosed items continued

### Greece

In 2019, the Group was issued with a Greek tax assessment for financial years 2012, 2013 and 2014, relating to paddypower.com's Greek interim licence. This assessment concluded that the Group is liable to pay €15.0m in taxes including penalties and interest. This is substantially higher (by multiples) than the total cumulative revenues ever generated by paddypower.com in Greece. Pending the outcome of its appeal, in 2019 the Group paid the total Greek tax assessment (including the penalties and interest) of €15.0m.

In June 2021, the Athens Administrative Court of Appeal dismissed the Group's judicial recourses. While the Group has further appealed to the Greek Supreme Administrative Court, based on the nature of the decision received and the points of law which can be appealed, and in line with legal and tax advice it has received, it has decided to recognise the amount of the Greek assessment, of €15.0m (£12.8m) as an expense in profit or loss during the year ended 31 December 2021.

The Group considers these cost as one-off costs and not as part of ongoing operations in the current year.

### Disposal of Oddschecker Global Media

On 31 August 2021 the Group sold all of the shares of Oddschecker Global Media ("OGM"), a fully owned subsidiary of the Group, to Bruin Capital, in exchange for £127.1m in cash (proceeds of £141.3m net of £14.2m cash already on the balance sheet) and recorded a gain on the disposal of £12.2m (see also Note 15). There is potential for the Group to receive further consideration of up to £20m pending future events. However, it is currently not probable that further amounts will be received and therefore no contingent asset has been recorded. Prior to the disposal, the non-current assets were measured at the lower of their carrying amount and fair value less costs sell. No impairments were recognised. The assets and liabilities of OGM were included within the UK&I segment up to the date of sale.

### Impairment

During the year ended 31 December 2020, the Group recognised impairments of £22.6m. £12.1m of this relates to the impairment of Northern Ireland retail indefinite life licences described in more detail in Note 13. The remaining £10.5m is mainly as a result of various restructuring and integration decisions resulting from the TSG Combination with £4.4m relating to capitalised development expenditure and £6.1m relating to various property assets. No such impairments were recognised in the year ended 31 December 2021.

### VAT refund

In May 2020, HMRC confirmed it would not appeal the ruling of the Upper Tier Tribunal in the cases of Rank Group Plc and Done Brothers (Cash Betting) Ltd (trading as Betfred) that VAT was incorrectly applied to revenues earned from certain gaming machines prior to 2013. The Group submitted protective claims for the period and requested repayment from HMRC. In December 2020, the Group received the refund from the HMRC and recognised income net of the associated third-party costs expected to be incurred as a result of the refund. The refund of VAT due from HMRC of £15.9m has been booked as revenue with associated third-party costs of £2.7m and £2.0m recorded in the year ended 31 December 2020 in cost of sales and operating expenses respectively.

### Financial income

During the year ended 31 December 2020, a gain on remeasurement of embedded derivatives of £78.5m was recorded. These gains were included as separately disclosed items due to their volatile nature and/or non-recurring nature.

### Financial expense

During the year ended 31 December 2021, on repayment of the Senior Notes in 2021, the Group recorded a charge of £78.8m relating to the Senior Notes settlement. In conjunction with the repayment and refinancing, the Group incurred an additional £16.8m of fees that were not subject to capitalisation and £4.3m of fees relating to debt covenant amendments as a result of the Kentucky litigation. These charges were included as separately disclosed items due to their non-recurring nature. See also Note 8.

In the year ended 31 December 2020, a loss on remeasurement of the HRTV contingent consideration of £22.2m, an FX loss on financial instrument of £12.9m, a loss of £31.0m relating to accelerated debt repayments and £5.0m relating to the expensing of one-off financing related fees not eligible for capitalisation were incurred. These losses were included as separately disclosed items due to their volatility and/or non-recurring nature. See also Note 8.

### Presentation within the Consolidated Income Statement

The Germany and Greece tax expense is included in the Consolidated Income Statement within cost of sales. Transaction fees and associated costs, the Kentucky settlement and associated legal costs and restructuring and integration costs are included in the Consolidated Income Statement within operating costs excluding depreciation, amortisation, impairment and gain on disposal.

### Tax credit on separately disclosed items

The tax credit of £42.8m has arisen primarily in respect of a deferred tax credit of £67.7m in relation to deferred tax asset recognition on consolidation following an internal transfer of intangible assets, £59.2m in respect of the amortisation of acquisition-related intangibles and £20.0m in respect of the tax effect of other separately identifiable items.

The above is offset by an increase of £104.1m in the deferred tax liability on separately identifiable acquisition-related intangible assets as result of the increase in the UK's main corporation tax rate from 19% to 25% from 1 April 2023 as outlined in more detail in Note 10.

# Notes to the Consolidated Financial Statements continued

## 7. Employee expenses and related information

Employee expenses excluding separately disclosed items are:

|  | 2021 £m | 2020 £m |
|---|---|---|
| Wages and salaries | 807.5 | 710.5 |
| Social security costs | 76.8 | 43.3 |
| Defined contribution pension and life assurance costs | 49.2 | 30.9 |
| Share-based payment costs | 78.9 | 52.1 |
| Other staff costs | 36.7 | 19.8 |
|  | 1,049.1 | 856.6 |
| The average number of persons employed by the Group (including Executive Directors), all of whom were involved in the provision of sports betting and gaming services, during the year was: | 15,798 | 12,550 |

Details on the remuneration of Directors' as per the requirement of the Companies Act 2014 are set out below:

|  | 2021 £m | 2020 £m |
|---|---|---|
| Emoluments | 7.4 | 7.7 |
| Pension costs | 0.2 | 0.2 |
|  | 7.6 | 7.9 |

The gain on the exercise of share options in 2021 by individuals who were Directors at any time during 2021 was £2.2m (2020: £nil). Further details in respect of Directors' remuneration is set out in the Directors' Remuneration Report on pages 136 to 154 of the Annual Report.

## 8. Financial income and expense

|  | 2021 £m | 2020 £m |
|---|---|---|
| **Recognised in profit or loss** |  |  |
| Financial income: |  |  |
| Gain on remeasurement of embedded derivative (see Note 6 and Note 22) | — | 78.5 |
| Movement in fair value of investment | 1.7 | — |
| *On financial assets at amortised cost* |  |  |
| Interest income | 1.5 | 1.4 |
| Total | 3.2 | 79.9 |
| Financial expense: |  |  |
| Settlement of Senior Notes (see Note 6) | 78.8 | — |
| Change in fair value of contingent consideration (see Note 6) | 3.3 | 22.2 |
| Foreign exchange loss on financing instruments associated with financing activities (Note 6) | 1.2 | 12.9 |
| Financing related fees not eligible for capitalisation (see Note 6 and Note 22) | 21.1 | 5.0 |
| Accelerated accretion on debt repayments (see Note 6) | — | 31.0 |
| Movement in the fair value of investments | — | 1.5 |
| *On financial liabilities at amortised cost* |  |  |
| Interest on borrowings, bank guarantees and bank facilities | 106.0 | 95.6 |
| Interest on lease liabilities | 8.5 | 5.7 |
| Other interest | 10.2 | 8.4 |
| Total | 229.1 | 182.3 |

|  | 2021 £m | 2020 £m |
|---|---|---|
| **Recognised in other comprehensive income/(loss)** |  |  |
| Effective portion of changes in fair value of cash flow hedges | 61.4 | (280.4) |
| Fair value of cash flow hedges transferred to income statement | (28.4) | 267.8 |
| Net change in fair value of cash flow hedge reserve | 33.0 | (12.6) |
| Debt instruments at FVOCI | (1.3) | (0.4) |
| Foreign exchange gain on net investment hedges | 85.4 | 24.7 |
| Foreign exchange (loss)/gain on translation of the net assets of foreign currency denominated entities | (309.6) | 41.9 |
| Total | (192.5) | 53.6 |

A charge of £2.5m was recorded in the income statement in respect of ineffective cash flow hedges in the year ended 31 December 2021 (2020: gain of £0.2m).

Financial statements

# Notes to the Consolidated Financial Statements continued

## 9. Statutory and other information

| | 2021 £m | 2020 £m |
|---|---|---|
| Auditor's remuneration for audit and other assurance services | 5.5 | 4.8 |
| Depreciation of property, plant and equipment | 113.7 | 101.8 |
| Amortisation of intangible assets | 684.0 | 543.7 |
| Impairment of tangible and intangible assets | — | 22.6 |
| Gain on disposal | (11.9) | (0.2) |
| Foreign currency exchange loss/(gain) – monetary items | 15.7 | (31.6) |
| Operating lease rentals, principally premises | 0.1 | 0.1 |
| Research and development | 142.3 | 99.6 |
| Operating lease income (representing sub-lease income) | (0.8) | (0.9) |

### Remuneration to Group external auditor (KPMG Ireland)

In accordance with the requirements of Regulation 120 of Statutory Instrument 220/2010, "European Communities (Statutory Audits) (Directive 2006/43/EC) Regulations 2010", the auditor's remuneration figures presented below represent fees paid to KPMG Ireland only and are exclusive of value-added tax.

| | 2021 £m | 2020 £m |
|---|---|---|
| Audit | 1.5 | 1.6 |
| Other assurance services – audit of subsidiaries | 0.1 | 0.1 |
| Other assurance services – miscellaneous | 0.1 | 0.1 |
| Other non-audit services | 0.1 | 0.5 |
| Total | 1.8 | 2.3 |

Further analysis of the total fees paid to the Group external auditor, KPMG Ireland, worldwide for audit and non-audit services is presented below:

### Analysis of total auditor's remuneration for audit and other assurance services

| | 2021 £m | 2020 £m |
|---|---|---|
| Audit of Group (KPMG Ireland) | 1.5 | 1.6 |
| Audit of subsidiaries (KPMG Ireland) | 0.1 | 0.1 |
| Audit of subsidiaries (other KPMG offices) | 3.6 | 3.0 |
| Other assurance services – miscellaneous (KPMG Ireland and other KPMG offices) | 0.3 | 0.1 |
| Total | 5.5 | 4.8 |

### Analysis of amounts paid to the auditor in respect of non-audit services

| | 2021 £m | 2020 £m |
|---|---|---|
| Tax advisory services (other KPMG offices) | — | 0.1 |
| Other non-audit services (KPMG Ireland and other KPMG offices) | 0.1 | 2.0 |
| Total | 0.1 | 2.1 |

## 10. Tax expense

| | 2021 £m | 2020 £m |
|---|---|---|
| Recognised in profit or loss: | | |
| Current tax charge | 127.3 | 82.6 |
| Prior year under/(over) provision | 1.0 | (1.8) |
| Total current tax | 128.3 | 80.8 |
| Deferred tax credit | (6.2) | (45.8) |
| Prior year under provision | 1.4 | 0.8 |
| Decrease in net deferred tax liability (Note 18) | (4.8) | (45.0) |
| Total tax expense in income statement | 123.5 | 35.8 |

## 10. Tax expense continued

The difference between the total tax expense shown above and the amount calculated by applying the standard rate of corporation tax to the profit before tax is as follows:

| | 2021 £m | 2020 £m |
|---|---|---|
| (Loss)/profit before tax | (288.4) | 1.1 |
| Tax on Group profit before tax at the standard Irish corporation tax rate of 12.5% | (36.1) | 0.1 |
| Depreciation on non-qualifying property, plant and equipment | (5.4) | (4.7) |
| Effect of different statutory tax rates in overseas jurisdictions | 5.5 | 2.1 |
| Non-deductible expenses | 26.8 | 5.9 |
| Non-taxable income | (4.0) | (7.3) |
| Effect of changes in statutory tax rates | 104.4 | 1.2 |
| Movement on deferred tax balances not recognised | 29.9 | 39.5 |
| Under/(over) provision in prior year | 2.4 | (1.0) |
| Total tax expense | 123.5 | 35.8 |

The Group's adjusted effective tax rate before separately disclosed items for the period was 26.8% (year ended 31 December 2020: 16.6%), which compares to the standard Irish tax rate of 12.5%. A total tax credit on separately disclosed items of £42.8m was recorded during the year ended 31 December 2021 (year ended 31 December 2020: £58.4m) (see Note 6).

The Group's consolidated effective tax rate on profits including separately disclosed items for 2021 is (42.8)% (2020: 3,254.5%). The separately disclosed items impacting the consolidated tax rate include the unwind of deferred tax liabilities recognised in respect of acquisition-related intangibles. The UK rate change has led to a £104.4m charge primarily in respect to the deferred tax liability on separately identifiable acquisition-related intangible assets.

The Group's adjusted effective tax rate is also materially impacted by the movement on deferred tax balances which remain unrecognised due to the doubt over the future recoverability of those assets, as well as the effect of expenses which are not deductible for tax purposes.

The UK Budget 2021 announced on 3 March 2021 an increase in the UK's main corporation tax rate from 19% to 25% from 1 April 2023. This was enacted as part of the Finance Bill 2021 on 10 June 2021. As these changes were substantively enacted before the balance sheet date, they have been reflected in the deferred tax balances within these financial statements.

The future effective tax rate of the Group will be principally affected by the ongoing geographic mix of profits in accordance with the OECD guidelines in relation to Base Erosion and Profit Shifting. On 8 October 2021, 136 out of the 140 countries of the OECD Inclusive Framework on Base Erosion and Profit Shifting ("IF") have politically committed to potentially fundamental changes to the international corporate tax system. This includes a proposed introduction of a global minimum corporate tax rate set at 15% from 1 January 2023. Whilst consultation is ongoing, a template of these rules has been published by the OECD on 20 December 2021. We will continue to monitor developments closely and we expect this to lead to an increase in tax from 2023 onwards.

## 11. Earnings per share

The Group presents basic and diluted earnings per share ("EPS") data for its ordinary shares.

Basic EPS is calculated by dividing the profit or loss attributable to ordinary shareholders of the Company by the weighted average number of ordinary shares outstanding during the period. The weighted average number of shares has been adjusted for amounts held as treasury shares and amounts held by the Paddy Power Betfair plc Employee Benefit Trust ("EBT").

Diluted EPS is determined by adjusting the weighted average number of ordinary shares outstanding for the effects of all dilutive potential ordinary shares.

Adjusted EPS is determined by adjusting the profit attributable to ordinary shareholders for the impact of separately disclosed items.

# Notes to the Consolidated Financial Statements continued

## 11. Earnings per share continued

The calculation of basic, diluted and adjusted EPS is as follows:

|  | 2021 | 2020 |
|---|---|---|
| *Numerator in respect of basic and diluted earnings per share (£m)* |  |  |
| (Loss)/profit attributable to equity holders of the Company | (415.8) | 37.9 |
| *Numerator in respect of adjusted earnings per share (£m)* |  |  |
| (Loss)/profit attributable to equity holders of the Company | (415.8) | 37.9 |
| Separately disclosed items (Note 6) | 860.0 | 483.8 |
| Profit for adjusted earnings per share calculation | 444.2 | 521.7 |
| Weighted average number of ordinary shares in issue during the period (in '000s)[1] | 175,780 | 129,558 |
| Basic earnings per share | (£2.365) | £0.293 |
| Adjusted basic earnings per share | £2.527 | £4.027 |
| *Adjustments to derive denominator in respect of diluted earnings per share (in '000s)* |  |  |
| Weighted average number of ordinary shares in issue during the period | 175,780 | 129,558 |
| Dilutive effect of share options and awards on issue | — | 3,291 |
| Adjusted weighted average number of ordinary shares in issue during the period[1] | 175,780 | 132,849 |
| Diluted earnings per share | (£2.365) | £0.285 |

1. Where any potential ordinary shares would have the effect of decreasing a loss per share, they have not been treated as dilutive. The number of options excluded from the diluted weighted average number of ordinary shares calculation due to their effect being anti-dilutive is 2,289,170 (2020: 345,673).

The average market value of the Company's shares of £137.61 (31 December 2020: £108.80) was used to calculate the dilutive effect of share options based on the market value for the period that the options were outstanding.

## 12. Property, plant and equipment

|  | Land, buildings and leasehold improvements £m | Furniture and fixtures £m | Computer equipment £m | Right-of-use asset[1] £m | Total £m |
|---|---|---|---|---|---|
| **Cost** |  |  |  |  |  |
| Balance at 1 January 2020 | 99.5 | 202.1 | 154.0 | 202.4 | 658.0 |
| Additions | 3.2 | 20.6 | 30.6 | 19.6 | 74.0 |
| Remeasurement of lease term (Note 21) | — | — | — | 12.8 | 12.8 |
| Additions – business combinations | 14.0 | 19.9 | 31.6 | 40.0 | 105.5 |
| Disposals | (20.3) | (7.1) | (10.1) | (9.8) | (47.3) |
| Foreign currency translation adjustment | 3.9 | 1.0 | 1.3 | 0.5 | 6.7 |
| Balance at 31 December 2020 | 100.3 | 236.5 | 207.4 | 265.5 | 809.7 |
| Additions | 38.5 | 15.5 | 35.3 | 101.7 | 191.0 |
| Remeasurement of lease term (Note 21) | — | — | — | 13.3 | 13.3 |
| Additions – business combinations | — | — | 0.4 | — | 0.4 |
| Disposals | (2.4) | (0.1) | (0.1) | (5.6) | (8.2) |
| Foreign currency translation adjustment | 1.8 | 3.5 | 3.0 | (2.9) | 5.4 |
| Balance at 31 December 2021 | 138.2 | 255.4 | 246.0 | 372.0 | 1,011.6 |
|  |  |  |  |  |  |
| **Depreciation and impairment** |  |  |  |  |  |
| Balance at 1 January 2020 | 55.7 | 136.2 | 131.5 | 36.4 | 359.8 |
| Depreciation | 6.8 | 20.2 | 29.4 | 45.4 | 101.8 |
| Impairment charges | 3.6 | 2.5 | — | — | 6.1 |
| Disposals | (7.8) | (7.1) | (10.1) | (1.1) | (26.1) |
| Foreign currency translation adjustment | 3.8 | 0.8 | 1.2 | 0.4 | 6.2 |
| Balance at 31 December 2020 | 62.1 | 152.6 | 152.0 | 81.1 | 447.8 |
| Depreciation | 7.7 | 21.3 | 33.0 | 51.7 | 113.7 |
| Disposals | (1.6) | (0.1) | (0.1) | (3.1) | (4.9) |
| Foreign currency translation adjustment | 0.8 | 2.4 | 1.5 | (1.1) | 3.6 |
| Balance at 31 December 2021 | 69.0 | 176.2 | 186.4 | 128.6 | 560.2 |
|  |  |  |  |  |  |
| **Net book value** |  |  |  |  |  |
| At 31 December 2020 | 38.2 | 83.9 | 55.4 | 184.4 | 361.9 |
| At 31 December 2021 | 69.2 | 79.2 | 59.6 | 243.4 | 451.4 |

1. Materially all of this balance relates to buildings and leasehold improvements.

The net book value of land, buildings and leasehold improvements at 31 December 2021 includes £58.1m (2020: £33.6m) in respect of leasehold improvements.

The Directors do not consider the remaining useful lives of property, plant and equipment to be materially different from the period over which the assets are being depreciated.

## 13. Intangible assets

The movements during the prior year and current year in respect of intangible assets, which comprise computer software and technology, licences, development expenditure, brands, customer relations, and broadcasting and wagering rights, were as follows:

| | Computer software and technology £m | Licences £m | Development expenditure £m | Brands £m | Customer relations £m | Broadcasting and wagering rights £m | Total £m |
|---|---|---|---|---|---|---|---|
| **Cost** | | | | | | | |
| Balance at 1 January 2020 | 269.7 | 84.8 | 133.1 | 507.5 | 314.8 | 31.9 | 1,341.8 |
| Additions | 27.6 | 25.6 | — | — | — | — | 53.2 |
| Additions – internally developed | — | — | 99.6 | — | — | — | 99.6 |
| Additions – business combinations | 364.8 | 17.0 | 102.2 | 1,936.0 | 2,896.4 | — | 5,316.4 |
| Foreign currency translation adjustment | 4.2 | (2.6) | 6.8 | 23.3 | 46.7 | (0.9) | 77.5 |
| **Balance at 31 December 2020** | 666.3 | 124.8 | 341.7 | 2,466.8 | 3,257.9 | 31.0 | 6,888.5 |
| Additions | 31.4 | 31.0 | — | — | — | — | 62.4 |
| Additions – internally developed | — | — | 142.3 | — | — | — | 142.3 |
| Additions – business combinations | 10.4 | — | — | 16.7 | 20.1 | — | 47.2 |
| Disposals | (5.0) | — | (0.6) | (47.0) | — | — | (52.6) |
| Foreign currency translation adjustment | (13.0) | (2.0) | (4.5) | (80.5) | (112.7) | (0.3) | (213.0) |
| **Balance at 31 December 2021** | 690.1 | 153.8 | 478.9 | 2,356.0 | 3,165.3 | 30.7 | 6,874.8 |
| | | | | | | | |
| **Amortisation and impairment** | | | | | | | |
| Balance at 1 January 2020 | 200.8 | 14.2 | 75.6 | 189.1 | 282.7 | 20.9 | 783.3 |
| Amortisation | 77.7 | 5.5 | 86.4 | 122.5 | 246.2 | 5.4 | 543.7 |
| Impairment charges | — | 12.1 | 4.4 | — | 2.9 | — | 16.5 |
| Foreign currency translation adjustment | 3.3 | (1.9) | 6.2 | 7.3 | — | (0.6) | 17.2 |
| **Balance at 31 December 2020** | 281.8 | 29.9 | 172.6 | 318.9 | 531.8 | 25.7 | 1,360.7 |
| Amortisation | 94.6 | 10.0 | 120.8 | 152.7 | 301.4 | 4.5 | 684.0 |
| Disposals | (1.2) | — | (0.3) | (2.7) | — | — | (4.2) |
| Foreign currency translation adjustment | (4.2) | (1.0) | (2.3) | (12.9) | (20.7) | (0.2) | (41.3) |
| **Balance at 31 December 2021** | 371.0 | 38.9 | 290.8 | 456.0 | 812.5 | 30.0 | 1,999.2 |
| | | | | | | | |
| **Net book value** | | | | | | | |
| At 31 December 2020 | 384.5 | 94.9 | 169.1 | 2,147.9 | 2,726.1 | 5.3 | 5,527.8 |
| **At 31 December 2021** | 319.1 | 114.9 | 188.1 | 1,900.0 | 2,352.8 | 0.7 | 4,875.6 |

Computer software and technology-related intangible assets relate namely to innovations or technological advances including patented technology, trade secrets or databases and are amortised over their estimated useful life of 2–5 years.

Development expenditure relates to work performed for development of new products and technologies across the Group that have probable future economic benefits which can be clearly defined and measured. These are amortised over their estimated useful life of 3–5 years.

Brand-related intangible assets relate namely to trade names which arise from business combinations and are amortised over their estimated useful life of 8 to 20 years. Some brands are not being amortised due to indefinite useful lives and are instead tested for impairment as required.

Customer relationships-related intangible assets relate namely to customer bases that generate recurring revenues which arise from business combinations and are amortised over their estimated useful life of 4 to 20 years.

The original value of betting shop licences of £18.1m acquired as a result of the purchase of D McGranaghan Limited in 2008 and an additional betting shop in Northern Ireland in 2011 are not being amortised as the Directors consider these licences to have an indefinite life because:

- existing law in Northern Ireland restricts entry of new competitors;
- there exists a proven and future expected demand for bookmaking services and products; and
- the Group has a track record of renewing its betting permits and licences at minimal cost.

The value of brand intangible assets recognised on application of fair value accounting to the purchase of Sportsbet and International All Sports Limited ("IAS") in 2009 amounting to £12.7m at 31 December 2021 (2020: £13.4m) is not being amortised as the Directors consider that the relevant brands have indefinite lives because:

- the Directors intend to utilise the brands in the businesses for the foreseeable future (with the exception of the IAS brand – see below); and
- substantial sums are invested annually in the form of marketing expenditure expensed through profit or loss to maintain and to enhance the value of these brands.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 13. Intangible assets continued

The Group reviews the carrying value of licences and brands for impairment annually (or more frequently if there are indications that the value of the licences and brands may be impaired) by comparing the carrying values of these assets with their recoverable amounts (being the higher of value in use and fair value less costs to sell). The potential impact of Covid-19 was incorporated into the underlying assumptions used in the review.

In 2020, the Group reviewed the carrying value of the D McGranaghans licences of £18.1m (which form part of the UK&I operating segment) and determined on the basis of future cash flows, that an impairment charge of £12.1m was required against the value of the licences at 31 December 2020. A pre-tax discount rate of 10% and a terminal growth rate of 0% was used to determine the value in use. A similar review was performed at 31 December 2021 which indicated that there had been no change in the circumstances that gave rise to the impairment provision and that continued provision was appropriate.

In 2011, the Group reviewed the carrying value of the IAS brand of AUD6.9m and determined, on the basis of future plans, that an impairment provision was required against the value of that brand at 31 December 2011. A similar review was performed at 31 December 2020 and at 31 December 2021 (when the GBP equivalent value of the brand was £3.9m and £3.7m respectively) which indicated that there had been no changes in the circumstances that gave rise to the impairment provision and that continued provision was appropriate.

### Individually material intangible assets with definite useful lives

| | Carrying amount 2021 £m | Average remaining amortisation period 2021 Years | Carrying amount 2020 £m | Average remaining amortisation period 2020 Years |
|---|---|---|---|---|
| **Brands** | | | | |
| PokerStars | 939.8 | 18 | 991.0 | 19 |
| Sky Betting & Gaming | 781.5 | 18 | 824.1 | 19 |
| FanDuel | 75.4 | 7 | 87.0 | 8 |
| **Customer relationships** | | | | |
| PokerStars | 1,165.5 | 18 | 1,327.6 | 19 |
| Sky Betting & Gaming | 1,067.6 | 18 | 1,171.1 | 19 |
| BetEasy[1] | 96.6 | 9 | 117.2 | 10 |

1. BetEasy customers were migrated to the Sportsbet platform during 2020.

## 14. Goodwill

Following the Combination with the Stars Group in 2020, the Group reorganised its business into four divisions, reporting against these divisions from 2021. As part of this process the Group reviewed the historical assessment of cash generating units ("CGUs") and the allocation of goodwill. The legacy Sky Betting & Gaming CGU has been renamed 'UK&I Online', and has been allocated goodwill relating to the UK&I business under the relative value approach from the legacy PPB Online CGU. The legacy PokerStars CGU has been renamed to 'International', and has been allocated goodwill relating to the International business based on the relative values of the PPB Online CGU to the extent that the goodwill was not already separately identifiable. All other CGUs were unchanged.

The opening goodwill balance has been restated for comparable purposes. The following CGUs, being the lowest level of asset for which there are separately identifiable cash flows, have the following carrying amounts of goodwill:

| | UK&I Online £m | UK Retail £m | Irish Retail £m | International £m | Australia £m | US £m | Total £m |
|---|---|---|---|---|---|---|---|
| Balance at 1 January 2021 | 5,845.5 | 18.9 | 20.7 | 2,560.9 | 507.7 | 563.0 | 9,516.7 |
| Arising on acquisitions during the period (Note 15) | — | — | — | 58.5 | — | — | 58.5 |
| Disposals (Note 15) | (78.0) | — | — | — | — | — | (78.0) |
| Foreign currency translation adjustment | (0.6) | — | — | (129.1) | (25.3) | 4.6 | (150.4) |
| Balance at 31 December 2021 | 5,766.9 | 18.9 | 20.7 | 2,490.3 | 482.4 | 567.6 | 9,346.8 |

The Group reviews the carrying value of goodwill for impairment annually (or more frequently if there are indications that the value of goodwill may be impaired) by comparing the carrying values of these CGUs with their recoverable amounts (being the higher of value in use and fair value less costs to sell).

As a consequence of Covid-19, the retail CGUs were impacted by the temporary suspension of the activities of shops in 2021 for a period. Based on the significant headroom that existed in the 31 December 2021 impairment test, the performance of the shops and customer activity levels since the shops have reopened and further easing of social distancing requirements, as well as opportunities to make further market share gains as competitors reduce the size of their respective estates, the Group is satisfied that no impairment has arisen during the year ended 31 December 2021.

## 14. Goodwill continued

The UK&I Online segment goodwill amount arose from the acquisition of the Sky Betting and Gaming business as part of the TSG acquisition in 2020 (see Note 15), the acquisition of CT Networks Limited ("Cayetano"), a games developer based in the Isle of Man and Bulgaria, in 2011 and the acquisition of the Betfair online business (excluding operations outside of Ireland and the UK) as part of the all-share merger with Betfair Group plc in 2016.

Goodwill in UK Retail arose from the acquisition of two London bookmaking businesses in 2004, the acquisition of a retail bookmaking company in Northern Ireland in 2008 and the acquisition of a number of retail bookmaking shop properties since 2010.

Goodwill in Irish Retail arose from the amalgamation of three bookmaking businesses to form Paddy Power plc in 1988 and the acquisition of a number of retail bookmaking shop properties since 2007.

The International goodwill amount arose from the acquisition of the PokerStars business as part of the TSG acquisition in 2020, the acquisition of the Betfair online business (excluding the operations of Ireland, the UK, and the US) acquired as part of the all-share merger with Betfair Group plc in 2016, the acquisition of an initial 51% controlling stake in Adjarabet, the market leader in online betting and gaming in the regulated Georgian market, in February 2019 and the acquisitions in 2021 of a 57.3% controlling stake in Junglee Games, an Indian online rummy operator and Singular, a B2B operator which offers a flexible, modular sports betting and gaming technology platform (see Note 15).

The Australia segment goodwill amount arose from the acquisition of an initial 51% interest in Sportsbet Pty Limited ("Sportsbet"), the subsequent acquisition of International All Sports Limited ("IAS") by Sportsbet, both in 2009, and goodwill arising from BetEasy through the 2020 combination with TSG (see Note 15).

The US segment goodwill amount arose from the acquisition of the US business acquired as part of the all-share merger with Betfair Group plc in 2016, the acquisition of FanDuel Limited a market leading operator in the daily fantasy sports market in the United States, in 2018 and goodwill arising on Fox Bet through the combination with TSG in 2020 (see Note 15).

### Impairment tests for cash generating units containing goodwill and indefinite life intangible assets

In accordance with accounting requirements, the Group performs an annual impairment test of its CGUs. The most recent test was performed at 31 December 2021.

For the purpose of impairment testing, the Group's CGUs include amounts in respect of goodwill and indefinite life intangible assets, comprising licences acquired as part of the purchase of the D McGranaghan Limited business in 2008 and a shop acquisition in 2011 and brands acquired as part of the purchase of Sportsbet and IAS in 2009.

The impact of Covid-19 on the performance of the Group and its individual business units is set out in the Business Review section of the Annual Report. The impact of Covid-19 was also considered in the context of the goodwill impairment reviews especially in relation to its retail CGUs which were negatively impacted from the temporary suspension of the activities of shops for periods throughout the year to facilitate social distancing.

The details of the impairment reviews in respect of the CGUs as of 31 December 2021 are presented below:

### UK&I Online

The recoverable amount of the UK&I Online operating segment underlying CGU was estimated based on value in use calculations. These calculations use cash flow projections based on actual operating results and financial budgets and forecasts approved by the Board covering a three-year period and by management for a further two-year period. The terminal growth rate for the extrapolated period (following the initial five-year period) is projected to be approximately 2.6% (2020: 2.6%) per annum and is based on a weighted average income growth rate of 2.6% (2020: 2.6%), which is based on experience and is consistent with management's expectations for market development and growth in market share where applicable. The growth rate assumption is considered realistic by management in light of the recent performance of the segment and the Group's targeted performance over the next five years. A pre-tax discount rate of 9.8% (2020: 9.9%), which reflects the specific risks and currency of the cash flows relating to the underlying business segments, has been used in discounting the projected cash flows. Management believes that any reasonably possible change in the key assumptions on which the UK&I Online segment goodwill recoverable amount is based would not cause it's carrying amount to exceed its recoverable amount.

### UK Retail

The recoverable amount of the UK Retail underlying CGU was estimated based on value in use calculations. These calculations use cash flow projections based on actual operating results and financial budgets and forecasts approved by the Board covering a three-year period. The terminal growth rate for the extrapolated period (following the initial three-year period) is projected to be approximately 0% (2020: 0%) per annum and is based on a weighted average income growth rate of 0% (2020: 0%), which is based on experience and is consistent with management's expectations for market development and growth in market share where applicable. The growth rate assumption is considered realistic by management in light of the recent performance of the CGU and the Group's targeted performance over the next three years. A pre-tax discount rate of 11.2% (2020: 10.0%), which reflects the specific risks and currency of the cash flows relating to the underlying business segments, has been used in discounting the projected cash flows. Covid-19 remains a potential future risk to the carrying value of the CGU if restrictions on shops remained in place. Management believes that any reasonably possible change in the key assumptions on which the UK Retail CGU goodwill recoverable amounts are based would not cause their carrying amounts to exceed their recoverable amounts.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 14. Goodwill continued

### Irish Retail
The recoverable amount of the Irish Retail underlying CGU was estimated based on value in use calculations. These calculations use cash flow projections based on actual operating results and financial budgets and forecasts approved by the Board covering a three-year period. The terminal growth rate for the extrapolated period (following the initial three-year period) is projected to be approximately 0% (2020: 0%) per annum and is based on a weighted average income growth rate of 0% (2020: 0%), which is based on experience and is consistent with management's expectations for market development and growth in market share where applicable. The growth rate assumption is considered realistic by management in light of the recent performance (prior to Covid-19 impact) of the CGU and the Group's targeted performance over the next three years. However similar to the UK Retail CGU, Covid-19 continues to represent potential disruption to the near term cash flows. A pre-tax discount rate of 9.9% (2020: 9.9%), which reflects the specific risks and currency of the cash flows relating to the underlying business segments, has been used in discounting the projected cash flows. Management believes that any reasonably possible change in the key assumptions on which the Irish Retail CGU goodwill recoverable amount is based, would not cause its carrying amount to exceed its recoverable amount.

### International
The recoverable amount of the International operating segment underlying CGU was estimated based on value in use calculations. These calculations use cash flow projections based on actual operating results and financial budgets and forecasts approved by the Board for a three-year period and by management for a further two-year period. The terminal growth rate for the extrapolated period (following the initial five-year period) is projected to be approximately 2.6% (2020: 2.6%) per annum and is based on a weighted average income growth rate of 2.6% (2020: 2.6%) which is based on experience and is consistent with management's expectations for market development and growth in market share where applicable. The growth rate assumption is considered realistic by management in light of the recent performance of the segment and the Group's targeted performance over the next five years. A pre-tax discount rate of 9.4% (2020: 9.1%) which reflects the specific risks and currency of the cash flows relating to the underlying business segments, has been used in discounting the projected cash flows. Management believes that any likely change in the key assumptions on which the International segment goodwill recoverable amount is based would not cause its carrying amount to exceed its recoverable amount.

### Australia
The recoverable amount of the Australia operating segment underlying CGU was estimated based on value in use calculations. These calculations use cash flow projections based on actual operating results and financial budgets and forecasts approved by the Board for a three-year period and by management for a further two-year period. The terminal growth rate for the extrapolated period (following the initial five-year period) is projected to be approximately 2.5% (2020: 2.5%) per annum and is based on a weighted average income growth rate of 2.5% (2020: 2.5%), which is based on experience and is consistent with management's expectations for market development and growth in market share where applicable. The growth rate assumption is considered realistic by management in light of the recent performance of the segment and the Group's targeted performance over the next five years. A pre-tax discount rate of 13.1% (2020: 13.2%), which reflects the specific risks and currency of the cash flows relating to the underlying business segments, has been used in discounting the projected cash flows. Management believes that any reasonably possible change in the key assumptions on which the Australia operating segment goodwill and brands recoverable amount are based would not cause its carrying amount to exceed its recoverable amount.

### US
The recoverable amount of the US operating segment underlying CGU was estimated based on value in use calculations. These calculations use cash flow projections based on actual operating results and financial budgets and forecasts approved by the Board for a three-year period and by management for a further two-year period. The terminal growth rate for the extrapolated period (following the initial five-year period) is based on a revenue multiple similar to that of other comparable public companies. The growth rate assumption is considered realistic by management in light of the recent performance of the segment and the Group's targeted performance over the next five years. A pre-tax discount rate of 19.4%, which reflects the specific risks and currency of the cash flows relating to the underlying business segments, has been used in discounting the projected cash flows. Management believes that any reasonably possible change in the key assumptions on which the US operating segment goodwill recoverable amount are based would not cause its carrying amount to exceed its recoverable amount.

### Discount rates and terminal growth rates
The discount rates applied to each CGU's cash flows represent a post-tax rate that reflects the Group's weighted average cost of capital ("WACC") adjusted for any risks specific to that CGU. A 50bps change in the pre-tax discount rate and in the terminal growth rate which are considered to be the most sensitive inputs, would not cause the carrying amount to exceed the recoverable amount for any of the above CGUs.

## 15. Business combinations and disposals
### Year ended 31 December 2021
Acquisition of Singular

On 10 September 2021, the Group completed the acquisition of a 100% stake in Singular, a European sports betting and gaming technology platform which is already fully integrated with our Adjarabet business and will provide us with greater optionality as we enter new markets. The purchase comprised of an initial cash payment of €16.5m (£14.1m) with a further €20.1m (£17.2m) payable subject to the business meeting strategic milestones in the future, recorded as contingent consideration and €1.0m (£0.8m) included within deferred consideration.

Details of the fair value of identifiable assets and liabilities acquired, purchase consideration and goodwill are as follows:

|  | Provisional fair values as at 10 September 2021 £m |
|---|---:|
| **Assets** | |
| Property, plant and equipment | 0.2 |
| Intangible assets | 4.3 |
| **Total non-current assets** | 4.5 |
| Trade and other receivables | 0.9 |
| Cash and cash equivalents | 0.5 |
| **Total current assets** | 1.4 |
| **Total assets** | 5.9 |
| **Liabilities** | |
| Trade and other payables | 0.9 |
| **Total current liabilities** | 0.9 |
| Deferred tax liabilities | 0.2 |
| **Total non-current liabilities** | 0.2 |
| **Total liabilities** | 1.1 |
| **Net assets acquired** | 4.8 |
| Goodwill | 27.3 |
| **Consideration** | 32.1 |
| | |
| The consideration is analysed as: | |
| Consideration satisfied by cash | 14.1 |
| Contingent consideration | 17.2 |
| Deferred consideration | 0.8 |
| **Consideration** | 32.1 |

Included within the intangible assets were £4.3m of separately identifiable intangibles comprising technology and customer relations acquired as part of the acquisition, with the additional effect of a deferred tax liability of £0.2m thereon. These intangible assets are being amortised over their useful economic lives of up to five years. The book value equated to the fair value on the remaining assets as all amounts are expected to be received.

The main factors leading to the recognition of goodwill (none of which is deductible for tax purposes) is growth by combining the Group's significant operating experience in other markets with the local market knowledge and skills of the management team in Singular. The goodwill has been allocated to the existing International CGU and it has been deemed that a separate CGU is not appropriate.

If the acquisition had occurred on 1 January 2021, Singular's contribution to revenue and net profit after tax for the year ended 31 December 2021 would have been insignificant in terms of third party revenue and £0.1m respectively. Since the date of acquisition to 31 December 2021, Singular has contributed insignificant third party revenue and a £0.2m profit after tax to the results of the Group.

# Notes to the Consolidated Financial Statements continued

## 15. Business combinations and disposals continued

### Acquisition of Junglee Games

On 28 January 2021, the Group completed the acquisition of an initial 50.1% stake in Junglee Games ("Junglee"), an Indian online rummy operator, for US$67.3m (£49.3m), with US$63.5m (£46.5m) paid in cash and the remainder recorded as deferred consideration and paid subsequently in 2021. On the same date the Group entered into call and put options which would enable the Group to acquire an additional 7.2% stake in Junglee in exchange for cash consideration. In June 2021, these options were exercised and the Group acquired the additional 7.2% stake in Junglee in exchange for cash consideration of US$7.5m (£5.5m) with US$7.0m (£5.1m) paid in cash and the remainder recorded as deferred consideration and paid subsequently in 2021. This has been accounted under the anticipated acquisition method, with the combined 57.3% recognised as acquired from 28 January 2021.

Junglee is a top three player in the legal Indian online rummy market. Based on its December 2020 run-rate, Junglee would generate annualised gross revenue of c£50m in a full year. The Group sees good potential to further develop Junglee's product offering, including its recently launched daily fantasy sports product, leveraging the Group's capabilities in this area. The Group has put in place arrangements, consisting of call and put options that could see its ownership in the business increase to 100% in 2025. The call and put options consideration can be settled, at the Group's election, in cash or shares. As a consequence of both the call and put options being only exercisable at fair value being the future EBITDA and revenue multiple, which are considered to be two key inputs in valuing the option, it was determined that the fair value of the call and put options was not material and was close to nominal value.

Included within the intangible assets were £42.9m of separately identifiable intangibles comprising brand, technology and customer relations acquired as part of the acquisition, with the additional effect of a deferred tax liability of £10.8m thereon. These intangible assets are being amortised over their useful economic lives of up to 10 years. The book value equated to the fair value on the remaining assets and liabilities as all amounts are expected to be received.

The main factors leading to the recognition of goodwill (none of which is deductible for tax purposes) is growth by combining the Group's significant operating experience in other markets with the local market knowledge and skills of the management team in Junglee, driving revenue synergies over time. The goodwill has been allocated to the existing International CGU and it has been deemed that a separate CGU is not appropriate.

Since the date of acquisition to 31 December 2021, Junglee has contributed £50m of revenue and £7.4m of a net loss after tax to the results of the consolidated Group.

If the acquisition had occurred on 1 January 2021, Junglee's contribution to revenue and net loss after tax for the year ended 31 December 2021 would have been £53m and £6.6m respectively.

Details of the fair value of identifiable assets and liabilities acquired, purchase consideration and goodwill are as follows:

|  | Fair values as at 28 January 2021 £m |
|---|---|
| **Assets** |  |
| Property, plant and equipment | 0.2 |
| Intangible assets | 42.9 |
| **Total non-current assets** | 43.1 |
| Trade and other receivables | 3.8 |
| Cash and cash equivalents | 17.7 |
| **Total current assets** | 21.5 |
| **Total assets** | 64.6 |
| **Liabilities** |  |
| Trade and other payables | 13.1 |
| **Total current liabilities** | 13.1 |
| Deferred tax liabilities | 10.8 |
| **Total non-current liabilities** | 10.8 |
| **Total liabilities** | 23.9 |
| **Net assets acquired** | 40.7 |
| Goodwill | 31.2 |
| Non-controlling interest measured at the proportionate interest method | (17.1) |
| **Consideration** | 54.8 |
|  |  |
| **The consideration is analysed as:** |  |
| Consideration satisfied by cash | 46.5 |
| Put option satisfied by cash | 5.1 |
| Deferred consideration | 2.8 |
| Put option deferred consideration | 0.4 |
| **Consideration** | 54.8 |

## 15. Business combinations and disposals continued
### Year ended 31 December 2020
Acquisition of The Stars Group Inc.

On 5 May 2020, Flutter completed an all-share Combination with The Stars Group Inc. (the "Combination") resulting in existing Flutter shareholders owning 54.64% and The Stars Group Inc. shareholders owning 45.36% of Flutter (the "Company", together with its subsidiaries, the "Group"), on a fully diluted basis (excluding any out of the money options). Post-Combination, the Company is the ultimate parent of The Stars Group Inc. ("TSG").

Under the terms of the Combination, holders of TSG shares received 0.2253 ordinary shares with nominal value of €0.09 each in the Company ("ordinary shares") in exchange for each outstanding TSG share (the "Exchange Ratio"). Accordingly, the Company issued a total of 65,316,588 ordinary shares in exchange for 289,909,400 shares in TSG. The fair value of the ordinary shares issued was £94.84 per share at this date.

In addition: (i) each TSG Option outstanding at 5 May 2020, under the TSG Share Plans was exchanged for an option to purchase such number of New Flutter Shares calculated in accordance with the Exchange Ratio; and (ii) each TSG restricted share unit ("RSU"), TSG performance share unit ("PSU") and TSG deferred share unit ("DSU") outstanding at the Effective Time under the TSG Equity Plan was amended so as to substitute for the TSG Shares, subject to such equity awards, a number of Flutter Shares calculated in accordance with the Exchange Ratio but subject to any adjustment required to that award by the TSG Equity Plan or grant documentation as a result of the Plan of Arrangement.

TSG is a global leader in the online and mobile gaming and interactive entertainment industries, entertaining millions of customers across its online real- and play-money poker, gaming and betting product offerings. TSG offers these products directly or indirectly under several ultimately owned or licensed gaming and related consumer businesses and brands. TSG is one of the world's most licensed online gaming operators with its subsidiaries collectively holding licences or approvals in 22 jurisdictions throughout the world, including in Europe, Australia and the Americas.

The main drivers for the Combination were to accelerate delivery against each of the components of Flutter's four-pillar strategy; create a highly diversified business from a geographic, product and brand perspective with an enhanced global platform; deliver significant value for shareholders through the realisation of material cost synergies such as procurement synergies, removal of duplicate corporate and administrative costs and utilisation of scale to create efficiencies; reinforce a robust financial profile which will facilitate strategic flexibility as well as generate sustainable long-term shareholder returns; and maintain a leading role in the promotion of responsible gambling through an enlarged global footprint.

Included within the intangible assets were £5,316.4m of separately identifiable intangibles comprising brands, customer relations and technology acquired as part of the Combination, with the additional effect of a deferred tax liability of £527m thereon. These intangible assets are being amortised over their useful economic lives of up to 20 years. Receivables acquired amounted to £114.6m. The book value equated to the fair value as all amounts are expected to be received. The main factors leading to the recognition of goodwill (none of which is deductible for tax purposes) is growth by combining business activities, a strong workforce, leveraging existing products and synergy savings of the merged operations. The goodwill associated with the PokerStars and Sky Betting & Gaming businesses has been included in the International and UK&I CGUs, respectively. The goodwill associated with the Australia and US businesses has been allocated to the respective existing Australia and US CGUs and it has been deemed that separate CGUs are not appropriate.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 15. Business combinations and disposals continued

Details of the fair value of identifiable assets and liabilities acquired, purchase consideration and goodwill were finalised during the period and no change to the figures reported as at 31 December 2020 were identified. They are outlined as follows:

|  | Fair values as at 5 May 2020 £m |
|---|---|
| **Assets** | |
| Property, plant and equipment | 105.5 |
| Intangible assets | 5,316.4 |
| Deferred tax asset | 8.3 |
| Non-current tax receivable | 19.1 |
| Derivative financial assets | 79.2 |
| Investments | 4.0 |
| Other receivables | 26.2 |
| Financial assets – restricted cash | 8.9 |
| **Total non-current assets** | **5,567.6** |
| Trade and other receivables | 88.4 |
| Current tax receivable | 28.7 |
| Financial assets – restricted cash | 292.4 |
| Current investments – customer deposits | 89.7 |
| Cash and cash equivalents | 445.2 |
| **Total current assets** | **944.4** |
| **Total assets** | **6,512.0** |
| **Liabilities** | |
| Trade and other payables | 498.8 |
| Customer balances | 376.7 |
| Derivative financial liabilities | 10.0 |
| Provisions | 1.4 |
| Current tax payable | 15.1 |
| Lease liabilities | 16.4 |
| Borrowings | 59.7 |
| **Total current liabilities** | **978.1** |
| Trade and other payables | 3.1 |
| Derivative financial liabilities | 56.9 |
| Provisions | 149.1 |
| Non-current tax payable | 22.3 |
| Deferred tax liabilities | 487.5 |
| Lease liabilities | 26.1 |
| Borrowings | 3,873.9 |
| **Total non-current liabilities** | **4,618.9** |
| **Total liabilities** | **5,597.0** |
| **Net assets acquired** | **915.0** |
| Goodwill | 5,337.6 |
| **Consideration** | **6,252.6** |

| Consideration satisfied by: | |
|---|---|
| Issue of 65,316,588 Flutter Entertainment plc ordinary shares | 6,194.6 |
| Issue of replacement share options and awards | 58.0 |
| **Consideration** | **6,252.6** |

### Acquisition of additional shares of TSG Australia Pty Ltd

On 13 May 2020, the Group exercised its option to acquire the remaining 20% of the outstanding share capital of TSG Australia Pty Ltd ("TSG Australia"), bringing the Group's holding in TSG Australia to 100%, up from the previous 80%. The acquisition was satisfied by the issuance of 819,230 new ordinary shares of the Company, settling a liability of A$151.4m (£79.7m).

## 15. Business combinations and disposals continued

### Acquisition of additional shares of FanDuel

On 30 December 2020, the Group acquired an additional 37.2% of the outstanding shares of FanDuel in exchange for £3.340bn, satisfied by a cash payment of US$2.088bn (£1.546bn) and the issuance of 11,747,205 new ordinary shares of the Company (£1,794.4m). The acquisition brings the Group's holding in FanDuel to 95%, up from the previous controlling interest of 57.8%. As FanDuel's results and financial position had been previously consolidated into the Group, the excess of the purchase price over the carrying value of the non-controlling interest acquired was recognised directly within equity in retained earnings. The initial goodwill and non-controlling interest were recorded initially using the proportionate interest method and a transfer from non-controlling interest to retained earnings and foreign currency translation reserve has been made.

As outlined previously, as a result of the acquisition of FanDuel Limited in 2018, call and put options were put in place for the Group to acquire a further 37.2% of FanDuel at prevailing market valuations three and five years after the July 2018 acquisition. The Group had the discretion as to whether these options are settled by the issuance of Flutter Entertainment plc shares or via cash. These options terminated on the acquisition of 37.2% additional FanDuel shares on 30 December 2020.

The put and call agreement stated that the number of shares to be issued as consideration for the settlement of the put/call could not exceed 10% of the Flutter Entertainment plc shares in issue with any excess paid in cash. Due to the growth in value of FanDuel to 30 December 2020, this resulted in the Group recognising a liability of £846m which was derecognised on 30 December 2020 as part of the above acquisition.

### Disposal of Oddschecker Global Media

On 31 August 2021 the Group sold all of the shares of Oddschecker Global Media ("OGM"), a fully owned subsidiary of the Group, to Bruin Capital, in exchange for £127.1m in cash (proceeds of £141.3m net of £14.2m cash already on the balance sheet) and recorded a gain on the disposal of £12.2m (see also Note 6). There is potential for the Group to receive further consideration of up to £20m pending future events. However, it is currently not probable that further amounts will be received and therefore no contingent asset has been recorded. Prior to the sale, the non-current assets were measured at the lower of their carrying amount and fair value less costs sell. No impairments were recognised. The assets and liabilities of OGM were included within the UK&I segment up to the date of sale.

The net assets disposed and the gain on disposal recognised by the Group were as follows:

|  | 31 August 2021 £m |
|---|---|
| Property, plant and equipment | 0.8 |
| Intangible assets | 48.1 |
| Goodwill | 78.0 |
| Trade and other receivables | 2.1 |
| Cash and cash equivalents | 14.2 |
| Total assets | 143.2 |
| Accounts payable and other liabilities | (7.3) |
| Deferred taxes | (11.6) |
| Total liabilities | (18.9) |
| Net assets disposed | 124.3 |
| Disposal costs | (4.8) |
| Proceeds | 141.3 |
| Gain on disposal | 12.2 |

Cash (outflows)/inflows from business combinations:

|  | Year ended 31 December 2021 £m | Year ended 31 December 2020 £m |
|---|---|---|
| Cash consideration paid for acquisitions in the period | (63.4) | — |
| Cash consideration paid for put option exercised in the period | (5.5) | — |
| Cash acquired from acquisitions in the period | 18.2 | 445.2 |
| Cash consideration – acquisitions in previous periods | (21.6) | (7.2) |
| As presented in the statement of cash flows: |  |  |
| Purchase of businesses net of cash acquired | (50.7) | 445.2 |
| Payment of contingent deferred consideration | (21.6) | (7.2) |

During the year the Group settled in cash, deferred consideration liabilities of £21.6m in relation to Betfair's historical acquisition of HRTV, a horseracing television network based in the US.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 16. Investments and trade and other receivables
### Non-current assets

| | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| Investments – FVTPL | 5.5 | 3.0 |

Investments relate to a small number of individually immaterial equity investments in various companies.

| | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| **Other receivables** | | |
| Other receivables | 11.8 | 13.0 |
| Prepayments | 13.8 | 16.7 |
| Deferred financing costs on Revolving Credit Facility (see Note 22) | 3.7 | 4.6 |
| Amounts paid in respect of legacy German and Greek tax assessments | — | 40.9 |
| Total | 29.3 | 75.2 |

### Other receivables
Other receivables are comprised primarily of deposits for licences and property.

### Deferred financing costs on Revolving Credit Facility
In May 2020, the Group entered into a new Revolving Credit Facility agreement as part of its financing agreements. The Group incurred £5.3m of transaction costs and fees relating to the Revolving Credit Facility, which have been capitalised and included within non-current receivables, net of accretion of £3.7m (2020: £4.6m), on the Consolidated Statement of Financial Position and are recorded as financial expense over the term of the Revolving Credit Facility agreement using the effective interest rate method. As at 31 December 2021, no loan amount was drawn under the Revolving Credit Facility (31 December 2020: nil).

### Amounts paid in respect of legacy German and Greek tax assessments
#### Germany
In 2012 Betfair was issued with a German tax assessment relating to the Betfair Exchange, which operated in Germany until November 2012. The assessment deemed that a tax liability of approximately €30.6m is payable. This represents a multiple of the revenues generated by the Exchange during the assessment period.

The Group paid the €30.6m German tax assessment in 2019, with the late payment interest of approximately €10m to be paid when assessed.

In September 2021 the German Federal Tax Court dismissed the Group's appeal of the tax assessment. Whilst the Group has lodged a formal complaint to the Federal Constitutional Court, it has decided to recognise the amount of the German tax assessment. This has resulted in an expense of €40.6m (£34.5m) being recorded in the year in relation to the principal amount of tax and late payment interest.

#### Greece
In 2019, the Group was issued with a Greek tax assessment for financial years 2012, 2013 and 2014, relating to paddypower.com's Greek interim licence. This assessment concluded that the Group is liable to pay €15.0m in taxes including penalties and interest. This is substantially higher (by multiples) than the total cumulative revenues ever generated by paddypower.com in Greece. Pending the outcome of its appeal, in 2019 the Group paid the total Greek tax assessment (including the penalties and interest) of €15.0m.

In June 2021, the Athens Administrative Court of Appeal dismissed the Group's judicial recourses. While the Group has further appealed to the Greek Supreme Administrative Court, based on the nature of the decision received and the points of law which can be appealed, and in line with legal and tax advice it has received, it has decided to recognise the amount of the Greek assessment, of €15.0m (£12.8m) as an expense in the income statement during the year ended 31 December 2021. No notifications have as yet been received for later years and so no provision has been made for potential further assessments.

### Current assets

| | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| **Trade and other receivables** | | |
| Trade receivables | 39.5 | 11.9 |
| Other receivables | 34.4 | 28.5 |
| Value-added tax and goods and services tax | 5.1 | 2.2 |
| Prepayments | 124.9 | 96.9 |
| Total | 203.9 | 139.5 |

## 17. Current investments, financial assets – restricted cash and cash equivalents

| | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| **Non-current:** | | |
| Financial assets – restricted cash | **7.4** | 6.9 |
| **Current:** | | |
| Investments at FVOCI – customer deposits | **83.0** | 82.8 |
| Financial assets – restricted cash | **677.6** | 587.9 |
| Cash and cash equivalents | **951.7** | 603.4 |
| Total | **1,719.7** | 1,281.0 |

### Financial assets
Non-current financial assets – restricted cash include:

- amounts required to be held as to guarantee third party letter of credit facilities.

Current financial assets – restricted cash include:

- customer funds balances securing player funds held by the Group. These customer funds are matched by liabilities of equal value; and

- amounts required to be held as to guarantee third party letter of credit facilities.

The effective interest rate on bank deposits at 31 December 2021 was 0.3% (31 December 2020: 0.1%); these deposits have an average original maturity date of one day (2020: one day). The bank deposits also have an average maturity date of one day from 31 December 2021 (2020: one day). The Directors believe that all short-term bank deposits can be withdrawn without significant penalty.

### Investments – customer deposits
Investments relate to customer deposits, and are held in accounts segregated from investments held for operational purposes. Investments held in relation to customer deposits are liquid investments in short duration corporate and government bonds and are classified as current assets consistent with the current classification of customer deposits to which the investments relate. Management's investment strategy for the portfolio results in the majority of the bonds being held to maturity. Bonds are classified as FVOCI.

### Amounts held in trust
As at 31 December 2021, £355.6m (31 December 2020: £379.3m) was held in trust in The Sporting Exchange (Clients) Limited on behalf of the Group's customers and is equal to the amounts deposited into customer accounts. Neither cash and cash equivalents nor restricted cash include these balances on the basis that they are held on trust for customers and do not belong to and are not at the disposal of the Group.

### Currency details
Investments – customer deposits, financial assets – restricted cash and cash and cash equivalents are analysed by currency as follows:

| | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| GBP | **708.7** | 289.9 |
| EUR | **165.0** | 283.8 |
| AUD | **238.2** | 158.0 |
| USD | **570.8** | 506.5 |
| Other | **37.0** | 42.8 |
| Total | **1,719.7** | 1,281.0 |

## 18. Deferred tax assets and liabilities
Deferred tax assets and liabilities are attributable to the following:

| | 31 December 2021 | | | 31 December 2020 | | |
|---|---|---|---|---|---|---|
| | Assets £m | Liabilities £m | Total £m | Assets £m | Liabilities £m | Total £m |
| Property, plant and equipment | **11.5** | **(0.6)** | **10.9** | 13.2 | (3.5) | 9.7 |
| Intangible assets | **69.9** | **(601.9)** | **(532.0)** | — | (549.7) | (549.7) |
| Employee benefits | **13.3** | **—** | **13.3** | 17.6 | — | 17.6 |
| Other | **21.9** | **(3.9)** | **18.0** | 32.0 | (3.1) | 28.9 |
| Net assets/(liabilities) | **116.6** | **(606.4)** | **(489.8)** | 62.8 | (556.3) | (493.5) |

Deferred tax assets and liabilities have been offset at 31 December 2021 and 2020 where there is a legally enforceable right to such set-off in each jurisdiction. Included in the statement of financial position is a deferred tax asset of £8.2m (2020: £7.4m) and a deferred tax liability of £498.0m (2020: £500.9m).

Financial statements

# Notes to the Consolidated Financial Statements continued

## 18. Deferred tax assets and liabilities continued

The deferred tax liability in relation to intangible assets disclosed above primarily relates to the deferred tax liability arising in respect of acquisition accounting-related intangibles. This deferred tax liability continues to unwind as the intangible assets are amortised over their useful economic life.

The deferred tax asset arising on employee benefits primarily relates to future tax deductions the Group expects to receive in relation to share-based payment plans operated by the Group to reward its employees as well as other employee timing differences relating to Australia. The asset is recognised at the tax rate at which it is expected to unwind.

Movement in temporary differences during the year:

|  | Property, plant and equipment £m | Intangible assets £m | Employee benefits £m | Other £m | Total £m |
|---|---|---|---|---|---|
| Balance at 1 January 2020 | 6.8 | (70.4) | 13.1 | (2.6) | (53.1) |
| Arising on acquisition | 1.0 | (516.3) | 3.2 | 32.9 | (479.2) |
| Recognised in income | 3.1 | 44.3 | 2.3 | (4.7) | 45.0 |
| Recognised directly in equity | — | — | (1.0) | — | (1.0) |
| Foreign currency translation adjustment | (1.2) | (7.3) | — | 3.3 | (5.2) |
| Balance at 31 December 2020 | 9.7 | (549.7) | 17.6 | 28.9 | (493.5) |
| Arising on acquisition | (0.8) | (10.5) | — | 0.3 | (11.0) |
| Arising on disposal | 0.1 | 11.5 | — | — | 11.6 |
| Recognised in income | 1.9 | 18.1 | (4.1) | (11.1) | 4.8 |
| Recognised directly in equity | — | — | (0.2) | — | (0.2) |
| Foreign currency translation adjustment | — | (1.4) | — | (0.1) | (1.5) |
| Balance at 31 December 2021 | 10.9 | (532.0) | 13.3 | 18.0 | (489.8) |

### Unrecognised deferred tax assets

The Group has unrecognised deferred tax assets in respect of losses and other timing differences of £783.9m (2020: £454.9m). These have not been recognised on the basis that there is insufficient certainty of there being future taxable profits in the relevant jurisdictions and therefore the assets will not be realisable.

## 19. Trade and other payables
### Current liabilities

|  | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| **Trade and other payables** |  |  |
| Trade payables | 74.2 | 79.7 |
| PAYE and social security | 19.7 | 14.8 |
| Value-added tax and goods and services tax | 30.7 | 10.7 |
| Betting duty, data rights, and product and racefield fees | 190.0 | 208.0 |
| Employee benefits | 156.1 | 136.4 |
| Contingent deferred consideration – business combinations | 21.0 | 25.3 |
| Accruals and other liabilities | 604.7 | 558.1 |
| Total | 1,096.4 | 1,033.0 |

### Non-current liabilities

|  | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| **Trade and other payables** |  |  |
| Employee benefits | 2.1 | 1.1 |
| Contingent deferred consideration – business combinations | 16.9 | 12.8 |
| Accruals and other payables | 0.8 | 0.7 |
| Total | 19.8 | 14.6 |

### Contingent deferred consideration – business combinations

The Group's deferred consideration liabilities amounted to £37.9m at 31 December 2021 (31 December 2020: £38.1m) and relate to the following:

- £15.4m contingent and deferred consideration relating to Betfair's historical acquisition of HRTV, a horse racing television network based in the United States;

- £4.7m deferred consideration in respect of Diamond Game Enterprises, assumed as part of the Combination with TSG; and

- £17.8m relating to the acquisition of Singular in 2021 (see also Note 15).

## 20. Provisions

Provisions balances at 31 December 2021 and 31 December 2020 and movements during the year ended 31 December 2021 are outlined below:

|  | Employee benefits (long service leave) £m | Onerous contracts £m | Gaming tax £m | Kentucky £m | Other legal £m | Other £m | Total £m |
|---|---|---|---|---|---|---|---|
| Balance at 31 December 2020 | 3.0 | 16.0 | 10.5 | 73.3 | 56.0 | 0.5 | 159.3 |
| Additional provisions recognised | 0.8 | 4.8 | 12.3 | — | 17.3 | 7.0 | 42.2 |
| Amounts used during the year | (0.1) | (6.6) | (0.4) | (71.1) | (0.6) | — | (78.8) |
| Foreign currency translation | (0.2) | (0.5) | — | (2.2) | (0.7) | — | (3.6) |
| Balance at 31 December 2021 | 3.5 | 13.7 | 22.4 | — | 72.0 | 7.5 | 119.1 |
| Presented in: | | | | | | | |
| Balance at 31 December 2020: | | | | | | | |
| Current | 1.6 | 9.9 | 2.7 | — | — | 0.1 | 14.3 |
| Non-current | 1.4 | 6.1 | 7.8 | 73.3 | 56.0 | 0.4 | 145.0 |
| Total | 3.0 | 16.0 | 10.5 | 73.3 | 56.0 | 0.5 | 159.3 |
| Balance at 31 December 2021: | | | | | | | |
| Current | 2.2 | 6.6 | 22.4 | — | 34.5 | 5.6 | 71.3 |
| Non-current | 1.3 | 7.1 | — | — | 37.5 | 1.9 | 47.8 |
| Total | 3.5 | 13.7 | 22.4 | — | 72.0 | 7.5 | 119.1 |

### Employee benefits (long service leave)
The timing and amount of long service leave cash outflows are primarily dependent on when staff employed at the reporting date avail of their entitlement to leave and their expected salaries at that time. As of 31 December 2021 and 31 December 2020, it was expected that cash outflows would occur primarily within the following five years.

### Onerous contracts
The onerous contracts provision at 31 December 2021 relates to various marketing and minimum guarantee contracts where the cost of fulfilling these contracts exceeds the expected economic benefits to be received from them.

### Gaming tax
These are gaming tax provisions relating to amounts provided for taxes in certain jurisdictions where the interpretation of tax legislation is uncertain. When the Group disagrees with the application of unclear tax legislation, for example when it is applied retrospectively and/or results in a one-off disproportionate tax equivalent to many times the profit derived by the Group from its historic activities in that jurisdiction, the Group continues to challenge these interpretations.

Whilst the maximum potential obligation for all ongoing cases could be greater than the recognised provision, and the outcomes may not be known for some time, a liability has been recorded for the Directors' best estimate of the cash outflows that will ultimately be required in respect of each claim. Management has not provided a sensitivity for this provision as the range is not considered to be material. Management notes this is a key estimate; however, it is not a key judgement that will have a material impact in the coming year.

### Kentucky proceedings
On 22 September 2021, the Group announced that the legal dispute between Flutter and the Commonwealth of Kentucky had been settled in full. The Group agreed to pay an additional $200m (£145.2m) to Kentucky in addition to the $100m (£71.1m) previously forfeited to the Commonwealth as part of the supersedeas bond in the case in line with the provision outstanding at 31 December 2020. In return, Kentucky released Stars Interactive Holdings (IOM) Ltd, Rational Entertainment Enterprises Ltd and, inter alia, all Flutter entities from any claims relating to the matters in issue in the Kentucky proceedings, and the proceedings were consequently dismissed with prejudice. See Note 4 and Note 6 for further details.

### Other legal
Other legal provisions generally consist of payments for various future legal settlements where, based on all available information, management believes it is probable that there will be a future outflow.

These provisions comprise a number of different legal cases, the majority of which are immaterial. The most significant relates to the foreign payments contingent liabilities outlined in more detail in Note 30. Further disclosure in respect of these provisions has not been provided as such information would be expected to be prejudicial to the Group's position in such matters.

Whilst the maximum potential obligation for all ongoing cases could be greater than the recognised provision, and the outcomes may not be known for some time, a liability has been recorded for the Directors' best estimate of the cash outflows that will ultimately be required in respect of each claim. Management has not provided a sensitivity for this provision as the range is not considered to be material. Management notes this is a key estimate; however, it is not a key judgement that will have a material impact in the coming year.

### Other
Other provisions primarily comprise a number of different regulatory provisions.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 21. Leases

The Group leases various licensed betting and other offices under lease agreements. The leases have varying terms, escalation clauses and renewal rights. The leases have, on average, approximately seven years left to run (if the Group were to exercise available break options), with a right of renewal after that date. Lease rentals are typically reviewed every five years to reflect market rental rates or changes in general inflation rates. Leases for licensed betting and other offices are entered into as combined leases of land and buildings.

### Leases as lessee

Lease liabilities balances at 31 December 2021 and 31 December 2020 and movements during the year ended 31 December 2021 and 31 December 2020 are outlined below:

Lease liabilities

|  | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| Balance at 1 January | 194.0 | 170.5 |
| Additions – business combinations | — | 42.5 |
| Additions | 113.3 | 19.6 |
| Remeasurement of lease term | 13.1 | 12.8 |
| Lease liability derecognition | (2.5) | (8.9) |
| Lease interest expense | 8.5 | 5.7 |
| Principal and interest repayments | (56.3) | (51.4) |
| Foreign exchange translation | (5.7) | 3.2 |
| Balance at 31 December | 264.4 | 194.0 |

| Presented in: | | |
|---|---|---|
| Current portion of lease liabilities | 47.0 | 48.3 |
| Non-current portion of lease liabilities | 217.4 | 145.7 |
| Total | 264.4 | 194.0 |

Amounts recognised in profit or loss:

|  | 2021 £m | 2020 £m |
|---|---|---|
| Leases under IFRS 16: | | |
| Depreciation | 51.7 | 45.4 |
| Interest on lease liabilities | 8.5 | 5.7 |
| Income from sub-leasing right-of-use assets | (0.8) | (0.9) |
| Expense relating to short-term leases | 0.1 | 0.1 |

### Lease options

Some property leases particularly in our retail business contain extension and break options to provide operational flexibility. These options are held by the Group and not by the lessors. The Group assesses whether it is reasonably certain to exercise these options at lease commencement date. When assessing these options at the date of transition, the Group was mindful of the regulatory changes in 2019 particularly in UK Retail and the impact it would have on future shop profitability and whether it could state with reasonable certainty that these options would be exercised. The Group is of the view that other than the underlying trading of the shop, there is no economic incentive to extend a particular lease. For example, the rents are at market rates, there are no significant leasehold improvements and there are no significant costs relating to exiting or relocating.

When assessing the remeasurements of the lease term, the Group in particular considers those leases with option and break clauses that are due within the next 24 months.

The Group has estimated that the potential future lease payments should it exercise all options or not exercise any break clauses would result in an increase in the lease asset and liability of £37.9m (2020: £10.7m).

### Leases as lessor
### Finance lease

The Group has a small number of properties that are sublet. The following table sets out a maturity analysis of lease receivables showing the undiscounted lease payments to be received after the reporting date.

|  | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| Less than one year | 0.9 | 0.7 |
| Between two and five years | 0.6 | 1.0 |
| Total undiscounted lease receivable | 1.5 | 1.7 |
| Unearned finance income | (0.1) | (0.1) |
| Net investment in finance lease | 1.4 | 1.6 |

### Operating lease

The Group has a small number of properties that are sublet. Sublease payments of £0.9m (2020: £0.9m) are expected to be received during the year ended 31 December 2021.

## 21. Leases continued
### Reconciliation to Statement of Cash Flows
Reconciliation of movements in lease liabilities to the Statement of Cash Flows:

| | 2021 £m | 2020 £m |
|---|---|---|
| **Financing activities:** | | |
| Payment of lease liability | 47.9 | 45.7 |
| Interest paid | 8.4 | 5.7 |

## 22. Borrowings
The following is a summary of borrowings, including accrued interest, outstanding as at 31 December 2021 and 31 December 2020:

| | | 31 December 2021 | | 31 December 2020 | |
|---|---|---|---|---|---|
| | Contractual interest rate % | Principal outstanding balance in currency of borrowing Local currency (m) | Carrying amount (including accrued interest)[1] £m | Principal outstanding balance in currency of borrowing Local currency (m) | Carrying amount (including accrued interest) £m |
| GBP First Lien Term Loan A | 1.92 | £1,017.9 | 1,009.6 | £950.0 | 940.4 |
| USD First Lien Term Loan B | 2.38 | $2,931.0 | 2,142.6 | $1,456.3 | 1,042.9 |
| EUR First Lien Term Loan B | 2.50 | €507.2 | 419.6 | €507.2 | 449.1 |
| Senior Notes[2] | 7.00 | — | — | $1,000.0 | 706.5 |
| **Total borrowings** | | | **3,571.8** | | **3,138.9** |
| **Presented in:** | | | | | |
| Current portion | | | 22.1 | | 50.8 |
| Non-current portion | | | 3,549.7 | | 3,088.1 |
| **Total borrowings** | | | **3,571.8** | | **3,138.9** |

1. The carrying amounts at 31 December 2021 includes accrued interest of £0.4m (31 December 2020: £24.6m) presented within the current portion of borrowings above.

2. The carrying amounts at 31 December 2020 include an asset of £98.0m relating to the embedded derivatives on the Senior Notes which were subsequently settled on repayment in July 2021. See below in this note for further detail.

During the year ended 31 December 2021, the Group incurred the following interest on its then outstanding borrowings:

| | Effective interest rate[1] % | Interest[2] £m | Interest accretion[3] £m | Total interest £m |
|---|---|---|---|---|
| GBP First Lien Term Loan A | 2.21 | 17.4 | 2.3 | 19.7 |
| USD First Lien Term Loan B | 2.88 | 45.8 | 5.3 | 51.1 |
| EUR First Lien Term Loan B | 2.93 | 14.2 | 1.3 | 15.5 |
| Senior Notes | 5.70 | 28.1 | (46.8) | (18.7) |
| **Total** | | **105.5** | **(37.9)** | **67.6** |

1. The effective interest rate calculation excludes the impact of the Swap Agreements (as defined below).

2. In addition to the amount included above, the Group incurred £2.2m of interest expense relating to commitment, utilisation, and fronting fees associated with its Revolving Credit Facility and made payments of £4.4m to the lenders as a result of covenant amendments charged to the profit and loss.

3. Included within interest accretion is a gain of £42.9m following the settlement of the Senior Notes during the year.

The Group's change in borrowings during the year ended 31 December 2021 was as follows:

| | Balance at 1 Jan 2021 £m | New debt £m | Principal payments £m | Adjustments to amortised costs[1] £m | Interest accretion[2] £m | Embedded derivative settlement £m | FX translation £m | Balance at 31 Dec 2021 £m |
|---|---|---|---|---|---|---|---|---|
| GBP First Lien Term Loan A | 939.5 | 67.9 | — | (0.5) | 2.3 | | — | 1,009.2 |
| USD First Lien Term Loan B | 1,042.9 | 1,099.8 | (18.0) | (5.4) | 5.3 | | 18.0 | 2,142.6 |
| EUR First Lien Term Loan B | 449.1 | — | — | (2.2) | 1.3 | | (28.6) | 419.6 |
| Senior Notes | 682.8 | — | (733.2) | — | (46.8) | 96.1 | 1.1 | — |
| **Total** | 3,114.3 | 1,167.7 | (751.2) | (8.1) | (37.9) | 96.1 | (9.5) | 3,571.4 |
| Accrued interest | 24.6 | | | | | | | 0.4 |
| **Total borrowings** | **3,138.9** | | | | | | | **3,571.8** |

1. Adjustments to amortised costs include transaction costs and fees incurred in respect of the refinancing and additional debt drawdown noted below.

2. Interest accretion represents interest expense calculated at the effective interest rate less interest expense calculated at the contractual interest rate and is recorded in financial expenses in the consolidated income statement.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 22. Borrowings continued

As at 31 December 2021, the contractual principal repayments of the Group's outstanding borrowings, excluding accrued interest, amount to the following:

|  | < 1 year £m | 1-2 years £m | 2-3 years £m | 3-4 years £m | 4-5 years £m |
|---|---|---|---|---|---|
| GBP First Lien Term Loan A | — | — | — | 1,017.9 | — |
| USD First Lien Term Loan B | 21.7 | 21.7 | 21.7 | 21.7 | 2,080.7 |
| EUR First Lien Term Loan B | — | — | — | — | 425.9 |
|  | 21.7 | 21.7 | 21.7 | 1,039.6 | 2,506.6 |

### Revolving Credit Facility, First Lien Term Loans and Senior Notes

Each of the Group's facilities are discussed below.

### TLA Agreement – GBP First Lien Term Loan A

In May 2020, the Group, along with its subsidiaries PPB Financing Unlimited Company and PPB Treasury Unlimited Company as borrowers, entered into a Term Loan A and Revolving Credit Facility Agreement (the "TLA Agreement") comprising a term loan and revolving credit facility totalling £1.4bn. In November 2021, an additional lender was added to the facility increasing the overall TLA Agreement by £100m bringing the total to £1.5bn. Subsequently in November 2021, the Group completed an additional drawdown of £68m under the TLA Agreement and its existing terms. The TLA Agreement described above provides a term loan facility in an aggregate amount of £1,017.9m (2020: £950m) priced at GBP-LIBOR plus 1.75% (the "GBP First Lien Term Loan A"), with a maturity date of 5 May 2025 and a GBP-LIBOR floor of 0%. On 5 March 2021, the UK's Financial Conduct Authority ("FCA") formally announced the cessation of all GBP London Interbank Offered Rate ("LIBOR") benchmark settings currently published by ICE Benchmark Administration ("IBA") immediately after 31 December 2021. In response, the Company has entered into agreements with its lenders to amend the benchmark rate referenced in the Term Loan A agreement from GBP LIBOR to GBP SONIA for interest periods commencing on or after January 2022. There is no amortisation on the GBP First Lien Term Loan A and the principal is due at maturity. The Group incurred £11.9m of transaction costs and fees on the initial and subsequent drawdowns which have been capitalised against the principal of the debt and are recorded as financial expense over the term of the debt using the effective interest rate method.

### TLA Agreement – Revolving Credit Facility

The TLA Agreement described above provides a multi-currency revolving loan facility in an aggregate amount of £482.0m (2020: £450.0m) (the "Revolving Credit Facility"). Maturing on 5 May 2025, the Revolving Credit Facility includes a margin of 1.75% over GBP-LIBOR for borrowings with a 0% interest rate floor as well as a utilisation fee ranging from 0.1% to 0.4% based on the proportion of drawings to the total commitment. The commitment fee on the Revolving Credit Facility is 35% of the margin and is payable in respect of available but undrawn borrowings. The Revolving Credit Facility is available for general corporate purposes including the refinancing of existing borrowings. The Group incurred £5.3m of transaction costs and fees in 2020 which have been capitalised and are recorded as financial expense over the life of the facility using the straight-line method. These capitalised costs have been included within non-current receivables on the consolidated statement of financial position. As at 31 December 2021 no loan amounts were drawn under the Revolving Credit Facility. The Group has an undrawn capacity of £467m (2020: £377m) on the Revolving Credit Facility with £15m (2020: £73m) of capacity reserved for the issuance of Group guarantees as of 31 December 2021.

The terms of the TLA Agreement limit the Group's ability to, among other things: (i) incur additional debt (ii) grant additional liens on their assets and equity (iii) distribute equity interests and/or distribute any assets to third parties (iv) make certain loans or investments (including acquisitions) (v) consolidate, merge, sell or otherwise dispose of all or substantially all assets (vi) pay dividends on or make distributions in respect of capital stock or make restricted payments, and (vii) modify the terms of certain debt or organisational documents, in each case subject to certain permitted exceptions.

Borrowings under the TLA Agreement are subject to the satisfaction of customary conditions, including the absence of a default and compliance with certain representations and warranties. The TLA Agreement requires, subject to a testing threshold, that the Company comply on a bi-annual basis with a maximum net total leverage ratio of 5.1 to 1.0. On 29 June 2021, Lenders under the TLA consented to waive any Default or Event of Default that may have arisen by virtue of the Kentucky judgement, including any enforcement steps or actions taken by the Commonwealth of Kentucky prior to settlement. During the 12 months ended 31 December 2021, the Group is in compliance with all covenants related to its TLA Agreement.

### First Lien Term Loan B's

The Group holds a USD term loan with an outstanding principal balance of $2,931.0m (2020: $1,456.3m) priced at USD-LIBOR plus 2.25% (2020: 3.50%) (the "USD First Lien Term Loan B") and an EUR first lien term loan with an outstanding principal balance of €507.2m (2020: €507.2m) priced at EURIBOR plus 2.5% (2020: 3.75%) (the "EUR First Lien Term Loan B" and, together with the USD First Lien Term Loan, the "First Lien Term Loan B"), each with a maturity date of 21 July 2026 and a LIBOR and EURIBOR floor, as applicable, of 0%. The USD First Lien Term Loan requires scheduled quarterly principal payments in amounts equal to 0.25% of the initial aggregate principal amount of the USD First Lien Term Loan B of $2,938m (2020: $3,575m), with the balance due at maturity. There is no amortisation on the EUR First Lien Term Loan B and the principal is due at maturity.

In July 2021 the Group completed a debt re-financing transaction that reduced the effective cost of debt and provided it with additional liquidity, enhancing the financial flexibility of the Group. The key components of the transaction that occurred were as follows:

- a repricing and upsizing of the Group's existing First Lien Term Loan B facility by $1.5bn (£1.1bn);
- an extension to the maturity date of the First Lien Term Loan B facility by one year to July 2026;
- the USD First Lien Term Loan B component of the facility is repriced at LIBOR plus 2.25% and a 0% floor; and
- the EUR First Lien Term Loan B component of the facility is repriced at EURIBOR plus 2.50% and a 0% floor.

## 22. Borrowings continued

The resultant pricing equates to 1.25% below existing margins across both USD First Lien Term Loan B and EUR First Lien Term Loan B. The re-finance was accounted for as a re-estimation of cash flows. The Term Loan B arrangement facilitated a repricing of the fixed component of the interest rate spread along with existing terms that provide the opportunity of prepayment without significant penalty, and the Group applied the policy of revising the original effective interest rate of the financial contract based on the new terms, to reflect changes in cash flow for calculation of the gain or loss of nil. £7.5m of transaction costs and fees relating to the repricing incurred form part of the market interest rate and were capitalised as part of the transaction and are recorded as financial expense over the term of the debt using the effective interest rate method with a further £16.8m transaction costs charged to the profit and loss included within financial expense for fees not subject to capitalisation.

The First Lien Term Loan B are governed by the "Syndicated Facility Agreement". The Syndicated Facility Agreement limits Stars Group Holdings B.V. and Flutter Financing B.V, as borrowers, and its subsidiaries' ability to, among other things, (i) incur additional debt (ii) grant additional liens on their assets and equity (iii) distribute equity interests and/or distribute any assets to third parties (iv) make certain loans or investments (including acquisitions), (v) consolidate, merge, sell or otherwise dispose of all or substantially all assets (vi) pay dividends on or make distributions in respect of capital stock or make restricted payments (vii) enter into certain transactions with affiliates (viii) change lines of business and (ix) modify the terms of certain debt or organisational documents, in each case subject to certain permitted exceptions. The agreement also provides for customary mandatory prepayments, including a customary excess cash flow sweep if certain conditions are met.

On 20 April 2021, the Lenders of the First Lien Term Loan B consented to waive any Default or Event of Default that may have arisen by virtue of the Kentucky judgement, including any enforcement steps or actions taken by the Commonwealth of Kentucky. During the year ended 31 December 2021, the Group is in compliance with all covenants related to its First Lien Term Loan B.

### Senior Notes

As part of the drawdown of additional TLB USD above and the wider refinance the Group undertook the redemption of all of the 7% Senior Notes due in 2026 on 21 July 2021 as governed by the Indenture which were issued by Stars Group Holdings B.V. and Stars Group (US) Co-Borrower, LLC (the "Issuers"), on 10 July 2018 at par in an aggregate principal amount of US$1bn. The Group previously recognised an embedded derivative that required bifurcation from the carrying value of the Senior Notes with a fair value of £96.1m which was subsequently settled on the date of repayment and included within separately disclosed items. As part of the Indenture settlement, the Group made a premium payment of £35m (£25.7m) which has been included within settlement of Senior Notes (see Note 6).

Prior to the repayment, on 16 April 2021, the holders of the Senior Notes consented to waive certain events of potential default under the Indenture governing the Senior Notes that may have arisen as a result of the Kentucky litigation or the Kentucky litigation related events. Through the date of repayment the Group was in compliance with all covenants related to its Senior Notes.

### Reconciliation to Statement of Cash Flows

Reconciliation of movements in borrowings to the Statement of Cash Flows:

|  | 2021 £m | 2020 £m |
|---|---|---|
| Financing activities: |  |  |
| Proceeds from borrowings | 1,167.7 | 1,080.0 |
| Repayment of borrowings | (751.2) | (2,003.2) |
| Interest paid | (141.9) | (114.1) |

## 23. Derivatives

### Derivatives and hedge accounting

The Group uses derivative financial instruments for risk management and risk mitigation purposes. As such, any change in cash flows associated with derivative instruments are expected to be offset by changes in cash flows related to the hedged item. The Group's derivatives are discussed below.

### Swap agreements

The Group has executed cross-currency interest rate swaps which swap the profile of the USD First Lien Term Loan B in its entirety into EUR and GBP. In 2021 as part of the refinance, the Group amended the terms of the existing trades to reflect the repriced TLB USD and executed new cross-currency interest rate swaps on the additional drawn-down debt in line with the hedging policy to cover exposure to foreign currencies. From an accounting and risk management perspective, these hedging instruments consist of: (i) USD-EUR amortising cross-currency interest rate swap agreements (the "EUR Cross-Currency Interest Rate Swaps") with a remaining notional amount of €1.49bn (31 December 2020: €397m), which fix the USD to EUR exchange rate at 1.173 and fix the euro interest payments at an average interest rate of 1.7% (31 December 2020: 3.6%) and (ii) USD-GBP amortising cross-currency interest rate swap agreements (the "GBP Cross-Currency Interest Rate Swaps") with a remaining notional amount of £750m (31 December 2020: £756m), which fix the EUR to GBP exchange rate at 0.889 and fix the GBP interest payments at an average interest rate of 2.5% (31 December 2020: 5.4%). The EUR Cross-Currency Interest Rate Swaps and GBP Cross-Currency Interest Rate Swaps are in hedging relationships with and have a profile that amortises in line with the USD First Lien Term Loan B. The EUR Cross-Currency Interest Rate Swaps and GBP Cross-Currency Interest Rate Swaps have a maturity date of July 2023.

# Notes to the Consolidated Financial Statements continued

### 23. Derivatives continued

The Group previously held USD-EUR cross-currency interest rate swap agreements (the "Cross-Currency Swaps –Notes" and, collectively with the EUR Cross-Currency Interest Rate Swaps, the GBP Cross-Currency Interest Rate Swaps, and the Interest Rate Swap, the "Swap Agreements") with a total notional amount of €927.1m at 31 December 2020, which fixed the USD to EUR exchange rate at 1.079 and fixed the euro interest payments at an average interest rate of 6.16%. The cross-currency interest rate swaps were in a hedging relationship with and had an interest payment profile aligned with the Senior Notes. These swaps matured in July 2021 concurrent with the repayment of the Senior Notes as part of the debt refinancing. The Group paid £67.9m for the settlement and maturity of these cross-currency interest rate swaps.

#### Embedded derivatives

As a result of the repayment of the Senior Notes on 21 July 2021, the embedded derivative arising from the redemption option on the Senior Notes was settled (31 December 2020: asset of £98.0m).

#### Sports betting open positions

Amounts received from customers on sportsbook events that have not occurred by the balance sheet date are derivative financial instruments and have been designated by the Group on initial recognition as financial liabilities at fair value through profit or loss.

The fair value of open sports bets at 31 December 2021 and 31 December 2020 has been calculated using the latest available prices on relevant sporting events. The carrying amount of the liabilities is not significantly different from the amount that the Group is expected to pay out at maturity of the financial instruments. Sports bets are non-interest bearing. There is no interest rate or credit risk associated with open sports bets.

It is primarily based on expectations as to the results of sporting and other events on which bets are placed. Changes in those expectations and ultimately the actual results when the events occur will result in changes in fair value. There are no reasonably probable changes to assumptions and inputs that would lead to material changes in the fair value methodology, although final value will be determined by future sporting results.

The following table summarises the fair value of derivatives as at 31 December 2021 and 31 December 2020:

|  | 31 December 2021 | | 31 December 2020 | |
| --- | --- | --- | --- | --- |
|  | Assets £m | Liabilities £m | Assets £m | Liabilities £m |
| **Derivatives held for hedging** | | | | |
| *Derivatives designated as cash flow hedges:* | | | | |
| Cross-currency interest rate swaps – current | — | — | — | (86.6) |
| Cross-currency interest rate swaps – non-current | 31.7 | (54.6) | — | (101.8) |
| **Total derivatives designated as cash flow hedges** | **31.7** | **(54.6)** | **—** | **(188.4)** |
| *Derivatives designated as net investment hedges:* | | | | |
| Cross-currency interest rate swaps – current | — | — | — | (14.8) |
| Cross-currency interest rate swaps – non-current | 36.3 | — | 16.9 | — |
| **Total derivatives designated as net investment hedges** | **36.3** | **—** | **16.9** | **(14.8)** |
| **Total derivatives held for hedging** | **68.0** | **(54.6)** | **16.9** | **(203.2)** |
| | | | | |
| **Derivatives held for risk management and other purposes not designated as hedges** | | | | |
| Sports betting open positions – current | — | (74.0) | — | (49.5) |
| Sports betting open positions – non-current | — | (0.5) | — | (0.5) |
| **Total derivatives held for risk management and other purposes not designated as hedges** | **—** | **(74.5)** | **—** | **(50.0)** |
| | | | | |
| **Derivatives included within borrowings** | | | | |
| Embedded derivatives | — | — | 98.0 | — |

## 23. Derivatives continued
### Hedge accounting
### Cash flow hedge accounting

In accordance with the Group's risk management strategy and Group Treasury Policy, the Group executed the Swap Agreements to mitigate the risk of fluctuation of coupon and principal cash flows due to changes in foreign currency and interest rates related to the USD First Lien Term Loan B and foreign currency cash flow risk related to the Senior Notes.

The Group assesses hedge effectiveness by comparing the changes in fair value of a hypothetical derivative reflecting the terms of the debt instrument issued due to movements in the applicable foreign currency exchange rate and benchmark interest rate with the changes in fair value of the cross-currency interest rate swaps and cross-currency swaps used to hedge the exposure, as applicable. The Group uses the hypothetical derivative method to determine the changes in fair value of the hedged item. The Group has identified, and to the extent possible, mitigated, the following possible sources of ineffectiveness in its cash flow hedge relationships:

1. the use of derivatives as a protection against currency and interest rate risk creates an exposure to the derivative counterparty's credit risk which is not offset by the hedged item. This risk is minimised by entering into derivatives with counterparties with strong investment grade credit ratings;

2. differences in the timing of settlement of the hedging instrument and hedged item; and

3. the designation of off-market hedging instruments.

Certain of the EUR Cross-Currency Interest Rate Swaps in combination with the GBP Cross-Currency Interest Rate Swaps are designated in cash flow hedge relationships to hedge the foreign exchange risk and interest rate risk on the USD First Lien Term Loan B bearing a minimum floating interest rate of 2.25% (USD three-month LIBOR plus a 2.25% margin, with a LIBOR floor of 0%). The remaining EUR Cross-Currency Interest Rate Swaps have been bifurcated for hedge accounting purposes with the GBP portion of the exposure designated in a cash flow hedge relationship and the EUR exposure designated in a net investment hedge relationship.

As at 31 December 2021, £12.1m (2020: £5.7m) of accumulated other comprehensive income is included in the cash flow hedging reserve (see Note 24) related to de-designated cash flow hedges and is reclassified to the consolidated income statement as the hedged cash flows impact income/(loss).

### Net investment hedge accounting

In accordance with the Group's risk management strategy, as noted above the Group designates certain EUR cross-currency interest rate swap contracts in net investment hedging relationships to mitigate the risk of changes in foreign currency rates with respect to the translation of assets and liabilities of subsidiaries with foreign functional currencies.

The Group assesses hedge effectiveness by comparing the changes in fair value of the net assets designated, due to movements in the foreign currency rate with the changes in fair value of the hedging instruments used to hedge the exposure. The Group uses the hypothetical derivative method to determine the changes in fair value of the hedged item. The only source of ineffectiveness is the effect of the counterparty and the Group's own credit risk on the fair value of the derivative, which is not reflected in the fair value of the hypothetical derivative.

The Group has also designated the carrying amount of the EUR First Lien Term Loan as a hedge of the spot foreign exchange risk of its net investment in its EUR functional subsidiaries. The Group assesses hedge effectiveness using the forward rate method by comparing the currency and the carrying amount of the EUR First Lien Term Loan B with the currency and the net assets of its EUR functional subsidiaries.

As at 31 December 2021, £61.4m (2020: £11.5m loss) of accumulated other comprehensive income is included in the foreign exchange translation reserve (see Note 24) related to de-designated net investment hedges and is reclassified to the consolidated income statement upon disposal of the net investment in the applicable foreign subsidiaries.

# Notes to the Consolidated Financial Statements continued

## 23. Derivatives continued
### Effects of hedge accounting

The following tables presents the effects of cash flow hedges and net investment hedges on the Group's financial position and performance:

| | Change in value of hedged items for ineffectiveness measurement £m | Change in fair value of hedging instruments for ineffectiveness measurement £m | Hedge ineffectiveness gain/(loss)[1] £m | Hedging gains/ (losses) recognised in other comprehensive income/(loss) £m | Amount reclassified from accumulated other comprehensive loss to net earnings[2] £m | Net change in other comprehensive income/(loss) £m |
|---|---|---|---|---|---|---|
| **Cash flow hedges** | | | | | | |
| *Foreign exchange rate risk* | | | | | | |
| Lease liabilities | 2.1 | (2.1) | — | 2.1 | — | 2.1 |
| Fixed rate debt | (88.0) | 86.6 | (1.4) | 6.1 | 0.1 | 6.2 |
| *Interest rate risk and foreign exchange risk* | | | | | | |
| Floating rate, foreign currency debt | (81.9) | 79.1 | (2.8) | 53.2 | (28.5) | 24.7 |
| **Total cash flow hedges** | (167.8) | 163.6 | (4.2) | 61.4 | (28.4) | 33.0 |
| **Net investment hedges** | (83.7) | 85.4 | 1.7 | 85.4 | — | 85.4 |
| **Total** | (251.5) | 249.0 | (2.5) | 146.8 | (28.4) | 118.4 |

1. Hedge ineffectiveness is recorded within financial income/expense on the consolidated income statement.
2. For cash flow hedges that address interest rate risk and/or foreign currency exchange risk, the amount reclassified from accumulated other comprehensive earnings/(loss) to net earnings/(loss) is recorded within interest expense included in financial income or expense on the consolidated income statement.

Reconciliation of accumulated other comprehensive income/(loss):

| | Accumulated other comprehensive income/(loss), beginning of year £m | Net change in other comprehensive income/(loss) £m | Accumulated other comprehensive income, end of year £m | Accumulated other comprehensive income on designated hedges £m | Accumulated other comprehensive income/(loss) on de-designated hedges £m |
|---|---|---|---|---|---|
| **Cash flow hedges**[1] | | | | | |
| *Foreign exchange rate risk* | | | | | |
| Lease liabilities | (0.1) | 2.1 | 2.0 | 2.0 | — |
| Fixed rate debt | (6.2) | 6.2 | — | — | — |
| *Interest rate risk and foreign exchange risk* | | | | | |
| Floating rate, foreign currency debt | (4.0) | 24.7 | 20.7 | 8.6 | 12.1 |
| **Total cash flow hedges** | (10.3) | 33.0 | 22.7 | 10.6 | 12.1 |
| **Net investment hedges**[2] | 24.7 | 85.4 | 110.1 | 48.7 | 61.4 |
| **Total** | 14.4 | 118.4 | 132.8 | 59.3 | 73.5 |

1. Net changes in other comprehensive income/(loss) is recorded through the cash flow hedging reserve. See Note 24.
2. Net changes in other comprehensive income/(loss) is recorded through the foreign exchange translation reserve. See Note 24.

Details of the key terms of the hedging instruments are as follows:

| | Cross-currency interest rate swaps Cash flow hedges | | Cross-currency interest rate swaps Net investment hedges | |
|---|---|---|---|---|
| Term Loan B (USD): | **2021** | 2020 | **2021** | 2020 |
| **Foreign exchange and interest rate risk** | | | | |
| Carrying amount (asset/(liability)) | **(£22.9m)** | (£101.8m) | **£36.3m** | £16.9m |
| Notional amount | **$2,931.0m** | $1,456.3m | **€1,488.1m** | €396.9m |
| Maturity date | **July 2023** | July 2023 | **July 2023** | July 2023 |
| Hedge ratio | **100%** | 100% | **100%** | 100% |
| Change in intrinsic value of the outstanding hedging instruments during the year | **£78.9m** | (£101.8m) | **£19.4m** | £16.9m |

| | | | Net investment hedges | |
|---|---|---|---|---|
| Term Loan B (EUR): | | | **2021** | 2020 |
| **Foreign exchange and interest rate risk** | | | | |
| Carrying amount (asset/(liability)) | | | **£—m** | £—m |
| Notional amount | | | **€507.2m** | €507.2m |
| Maturity date | | | **July 2026** | July 2025 |
| Hedge ratio | | | **100%** | 100% |
| Change in intrinsic value of the outstanding hedging instruments during the year | | | **£22.9m** | £2.2m |

## 23. Derivatives continued

| Senior Notes: | Cross-currency interest rate swaps Cash flow hedges | | Cross-currency interest rate swaps Net investment hedges | |
|---|---|---|---|---|
| | **2021** | 2020 | **2021** | 2020 |
| **Foreign exchange and interest rate risk** | | | | |
| Carrying amount (asset/(liability)) | £—m | (£86.6m) | £—m | (£14.8m) |
| Notional amount | $—m | $1,000.0m | €—m | €927.1m |
| Maturity date | July 2021 | July 2021 | July 2021 | July 2021 |
| Hedge ratio | —% | 100% | —% | 100% |
| Change in intrinsic value of the outstanding hedging instruments since the start of the year | £86.6m | (£86.6m) | £14.8m | (£14.8m) |

Swaps relating to the Senior Notes matured in July 2021 concurrent with the debt refinancing and settlement of the Senior Notes.

| Lease liabilities: | Net investment hedges | |
|---|---|---|
| | **2021** | 2020 |
| **Foreign exchange rate risk** | | |
| Carrying amount (asset/(liability)) | £—m | £—m |
| Notional amount | £85.5m | £43.8m |
| Maturity date | February 2035 | January 2041 |
| Hedge ratio | 100% | 100% |
| Change in intrinsic value of the outstanding hedging instruments during the year | £2.0m | £0.1m |

## 24. Share capital and reserves

### Share capital

The total authorised share capital of the Company comprises 300,000,000 ordinary shares of €0.09 each (2020: 300,000,000 ordinary shares of €0.09 each). All issued share capital is fully paid. The holders of ordinary shares are entitled to vote at general meetings of the Company on a one vote per share held basis. Ordinary shareholders are also entitled to receive dividends as may be declared by the Company from time to time.

Transactions during the year ended 31 December 2021:

- a total of 558,275 ordinary shares were issued as a result of the exercise of employee share options, giving rise to share capital and share premium of £13.2m;

- on 25 August 2021, the Company announced it had cancelled 1,965,600 ordinary shares of €0.09 each previously held by it as treasury shares; and

- in accordance with the authority conferred by shareholders pursuant to resolution 10 at Flutter's Annual General Meeting ("AGM") held on Thursday, 29 April 2021, the Board on 10 September 2021 confirmed that it had completed the capitalisation of £7,982.9m, being the entirety of the amounts standing to the credit of Flutter's merger reserve account at 31 December 2020. In accordance with the provisions of sections 84 and 85 of the Companies Act 2014 and the authority conferred by resolution 11 as approved by shareholders at the AGM, the Board applied to the Irish High Court to reduce the Company's capital by the amount of £10,000m standing to the credit of Flutter's share premium account following completion of the capitalisation. On 3 November 2021, the Irish High Court approved the reorganisation of the Company's capital by the reduction of £10,000m standing to the credit of Flutter's share premium account, and the transfer of such sum to the Company's distributable reserves account. This resulted in the transfer of £10,000m from share premium to retained earnings.

Transactions during the year ended 31 December 2020:

- in May 2020, 1,312,260 new ordinary shares were issued as consideration for the 2019 final dividend;

- on 5 May 2020, the Company issued a total of 65,316,588 ordinary shares in exchange for 289,909,400 shares of TSG in respect of the all-share Combination with TSG resulting in Flutter Entertainment plc shareholders owning 54.64% and the TSG shareholders owning 45.36% of Flutter, on a fully diluted basis (excluding any out of the money options). Under the terms of the Combination, holders of TSG shares received 0.2253 ordinary shares with nominal value of €0.09 each in the Company ("ordinary shares") in exchange for each outstanding TSG share (the "Exchange Ratio"). Post Combination, the Company is the ultimate parent of The Stars Group Inc. This gave rise to a merger reserve under section 72 of the Companies Act 2014 of €6,189.5m (see also Note 15);

- on 13 May 2020, 819,230 new Flutter ordinary shares were issued as consideration for the acquisition of the remaining 20% interest of TSG Australia Pty Ltd by Flutter. The value of shares issued amounted to AUD$151.4m (£79.7m) (see also Note 15);

- on 29 May 2020, the Company issued 8,045,995 new ordinary shares at a price of 10,100 pence per share in respect of an equity placement announced on 28 May 2020, raising gross proceeds of £812.6m giving rise to share capital of £0.7m and a share premium of £811.9m. The proceeds raised net of issuance costs amounted to £806.3m with the issuance costs of £6.3m recognised in retained earnings. The Placing Shares represent approximately 5.5% of the Company's issued share capital immediately prior to the Placing (excluding treasury shares). The Placing Price represents a discount of approximately 4.7% to the closing price on 28 May 2020;

Financial statements

# Notes to the Consolidated Financial Statements continued

## 24. Share capital and reserves continued

- on 4 December 2020, the Company issued a total of 8,004,503 ordinary shares at a price of 14,000 pence per share in respect of an equity placement announced on 3 December 2020, raising proceeds of £1,120.6m giving rise to share capital of £0.7m and a share premium of £1,119.9m. The proceeds raised net of issuance costs amounted to £1,114.6m with the issuance costs of £6.1m recognised in retained earnings. The Placing Shares represent approximately 5.2% of the Company's issued share capital immediately prior to the Placing (excluding treasury shares). The Placing Price represents a discount of approximately 2.1% to the closing price on 3 December 2020;

- on 30 December 2020, 11,747,205 new Flutter ordinary shares were issued as partial consideration for the acquisition of an additional 37.2% of the outstanding share of FanDuel, bringing the Group's holding in FanDuel to 95%, up from the previous controlling interest of 57.8%. The value of shares issued amounted to £1.0m in share capital and gives rise to £1,793.4m of a merger reserve under section 72 of the Companies Act 2014 (see also Note 15); and

- a total of 1,492,430 ordinary shares were issued as a result of the exercise of employee share options, giving rise to share capital and share premium of £34.3m.

### Equity reserves
Equity reserves at 31 December 2021 and 31 December 2020 include the following classes of reserves:

### Merger reserve
At 31 December 2020, the Company held a merger reserve under section 72 of the Companies Act 2014 of £7,982.9m which represented the premium over the par value of shares issued as consideration for the Combination with TSG and as partial consideration for the acquisition of a further 37.2% of FanDuel Group. In accordance with the authority conferred by shareholders pursuant to resolution 10 at Flutter's Annual General Meeting held on Thursday, 29 April 2021, the Board on 10 September 2021 confirmed that it had completed the capitalisation of £7,982.9m, being the entirety of the amounts standing to the credit of Flutter's merger reserve account at 31 December 2020. This resulted in the transfer of £7,982.9m from merger reserve to share premium.

### Treasury shares
At 31 December 2020, a total of 1,965,600 ordinary shares were held in treasury. All rights (including voting rights and the right to receive dividends) in the shares held in treasury were suspended until such time as the shares were reissued. The Group's distributable reserves were restricted by the value of the treasury shares, which amounted to £40.7m at 31 December 2020. The cost of treasury shares held by the Company at 31 December 2020 was £4.2m, with a further £36.5m of shares being held by the Company's subsidiaries.

On 25 August 2021, the Company announced it cancelled all its 1,965,600 ordinary shares of €0.09 each previously held by it as treasury shares which resulted in the transfer of £40.7m from treasury shares to retained earnings, other reserves and share capital.

### Shares held by Employee Benefit Trust
At 31 December 2021, the Paddy Power Betfair plc Employee Benefit Trust ("EBT") held 33,158 (31 December 2020: 67,320) of the Company's own shares, which were acquired at a total cumulative cost of £4.0m (31 December 2020: £5.8m), in respect of potential future awards relating to the Group's employee share plans. The purchase of 1,337,894 shares at a cost of £180.7m during the year ended 31 December 2021 related to the settlement of share awards to FanDuel employees in 2021. The Company's distributable reserves at 31 December 2021 are restricted by this cost amount. During the year ended 31 December 2021, 1,372,056 shares with an original cost of £182.5m were transferred from the EBT to the beneficiaries of the EBT (year ended 31 December 2021: 3,077 shares with an original cost of £0.3m).

### Cash flow hedge reserve
The cash flow hedge reserve represents the effective portion of the cumulative net change in the fair value of cash flow hedging instruments related to hedged transactions that had not yet occurred at that date.

### Foreign exchange translation reserve
The foreign exchange translation reserve at 31 December 2021 amounted to a debit balance of £194.2m (31 December 2020: credit balance of £49.6m) and arose from the retranslation of the Group's net investment in primarily EUR, AUD and USD functional currency companies. The movement in the foreign exchange translation reserve for the year ended 31 December 2021, reflects mainly the weakening of EUR and AUD against GBP in the period.

### Other reserves
Other reserves comprise undenominated capital. Undenominated capital at 31 December 2021 of £2.5m (31 December 2020 of £2.3m) relates to the nominal value of shares in the Company acquired by the Company of £2.3m (31 December 2020: £2.1m) and subsequently cancelled, and an amount of £0.2m (31 December 2020: £0.2m) which arose on the redenomination of the ordinary share capital of the Company at the time of conversion from Irish pounds to euro.

### Share-based payment reserve
During the year ended 31 December 2021, an amount of £80.5m was expensed in the Consolidated Income Statement with respect to share based payments (year ended 31 December 2020: £70.2m), an amount of £49.6m (year ended 31 December 2020: £107.7m) in respect of share options exercised during the year was transferred from the share-based payment reserve to retained earnings.

An amount of £0.2m of deferred tax relating primarily to the Group's share-based payments was debited to retained earnings in the year ended 31 December 2021 (year ended 31 December 2020: charge of £1.0m). An amount of £0.9m of current tax relating to the Group's share-based payments was credited to retained earnings in the year ended 31 December 2021 (year ended 31 December 2020: credit of £6.4m).

## 24. Share capital and reserves continued

**Non-controlling interest**

During the year ended 31 December 2021, the Group paid dividends totalling £16.7m to the non-controlling interest in Adjarabet (year ended 31 December 2020: £15.2m). Also as a result of the acquisition of an initial 50.1% stake in Junglee Games during the year, £17.1m was recorded in respect of the non-controlling interest.

**Company profit and loss**

As permitted by section 304 of the Companies Act 2014, no separate profit and loss account is presented in respect of the Company. The Company recorded a profit for the year ended 31 December 2021 of £1,290.4m (year ended 31 December 2020: £905.9m).

## 25. Dividends paid on ordinary shares

Due to the impact of Covid-19, the Board paid the 2019 final dividend in May 2020 through the issuance of ordinary shares rather than by cash. This resulted in the Group issuing 1,312,260 Flutter ordinary shares of €0.09 each.

The Board's capital management policy for the Group remains to target a leverage ratio of 1.0x to 2.0x over the medium term. The Board will continue to monitor the financial performance of the Group, it's anticipated deleveraging and balance sheet position, and will decide when it is an appropriate time to reinstate a dividend.

As a result, the Board did not recommend an interim dividend for 2021 (2020: nil) or a final dividend for the year ended 31 December 2021 (2020: nil).

## 26. Share-based payments

### Summary of equity-settled share-based payments

The Group had the following share-based payment schemes during the year ended 31 December 2021:

a.   Betfair Long Term Incentive Plan and Deferred Share Incentive Plan;

b.   Flutter Entertainment plc Sharesave Scheme;

c.   Flutter Entertainment plc Long Term Incentive Plan, Medium Term Incentive Plan and Deferred Share Incentive Plan;

d.   Flutter Entertainment plc Restricted Share Plan;

e.   The Stars Group Equity Plans;

f.   FanDuel Value Creation Plan ("VCP"); and

g.   FanDuel Value Creation Option Plan ("VCOP").

The above schemes are settled via a mixture of the allotment of shares from the EBT and the issue of new shares, or in the case of the FanDuel VCP and some of the awards under the Flutter Entertainment plc Restricted Share Plan in either equity shares or cash at the Group's option. As a result, all schemes are accounted for as equity settled in the financial statements as it has been determined that Flutter shares represents the most likely means of settlement and is consistent with the Group's treatment historically in respect of the settlement of share-based payment schemes. No new awards will be granted under any of the legacy Betfair, TSG or FanDuel VCP schemes listed above.

The total share-based payments expense recognised in the income statement in respect of all schemes is as follows:

|  | 2021 £m | 2020 £m |
|---|---|---|
| **Before separately disclosed items:** |  |  |
| Flutter Entertainment plc Sharesave Scheme | 7.8 | 4.0 |
| Flutter Entertainment plc Long Term, Medium Term and Deferred Share Incentive Plans ("LTIP", "MTIP" & "DSIP") | 12.5 | 10.3 |
| Flutter Entertainment plc Restricted Share Plan | 44.6 | 25.6 |
| FanDuel Value Creation Plan ("VCP") | 2.6 | 8.2 |
| The Stars Group Equity Plans | 1.8 | 4.0 |
| Other plans | 9.5 | — |
| Total before separately disclosed items | 78.8 | 52.1 |
| Separately disclosed items (see Note 6)[1] | 1.7 | 18.1 |
| Total | 80.5 | 70.2 |

1.  These costs are included within restructuring and integration costs in Note 6.

For the FOX equity option which is treated as a contingent cash-settled share-based payment, management has made certain judgements in the recognition and measurement of liabilities in relation to this commercial agreement and associated right of FOX Sports to acquire equity, including its judgement as to the probable method of settlement. The right has been valued using a discounted cash flow model and as it represents a contingently cash-settled share-based payment, will be recorded at fair value at each reporting period. During the year ended 31 December 2021, the Group recorded £8.6m to sales and marketing expense in relation to the commercial agreement and at 31 December 2021, the fair value liability due was £3.3m. The Group has no other cash-settled share-based payments.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 26. Share-based payments continued

### General

The aggregate number of shares which may be utilised under the employee share schemes in any 10 year period may not exceed 10% of the Company's issued ordinary share capital. The percentage of share capital which can be utilised under these schemes complies with guidelines issued by the Investment Association in relation to such schemes.

### Summary of options outstanding

At 31 December 2021, 2,090,603 awards and options (31 December 2020: 1,842,762) in the capital of the Group remain outstanding and are exercisable up to 2030 as follows:

|  | 2021 # | 2020 # |
|---|---|---|
| Betfair Long Term Incentive Plan and Deferred Share Incentive Plan | 18,833 | 23,141 |
| The Stars Group Equity Plans | 79,835 | 281,282 |
| Flutter Entertainment plc Sharesave Scheme | 692,220 | 630,998 |
| Flutter Entertainment plc Long Term, Medium Term and Deferred Share Incentive Plans ("LTIP", "MTIP" & "DSIP") | 379,361 | 420,273 |
| Flutter Entertainment plc Restricted Share Plan | 920,354 | 487,068 |
| Total | 2,090,603 | 1,842,762 |

### The Betfair Long Term Incentive Plan and Deferred Share Incentive Plan

The following share plans were acquired on the Paddy Power Betfair merger in February 2016 and were originally introduced in the Betfair Group to incentivise and reward for the successful delivery of the short-term and long-term business strategy:

- Betfair Long Term Incentive Plan ("LTIP") which consists of restricted share awards; and
- Betfair Deferred Share Incentive Plan ("DSIP") which consists of cash and restricted share awards.

The schemes have awards in the form of cash and restricted shares. The level of award granted in each of the schemes was based on a mixture of the individual performance of the employee and Group-wide performance over the term of the award which was between one and three years.

Prior to this merger, Paddy Power and Betfair agreed that outstanding unvested awards granted under these schemes would not vest on completion but would be replaced by awards over an equivalent number of the Company's shares (calculated by reference to the exchange ratio) which would have the same normal vesting dates as the original awards but be subject to certain absolute vesting levels.

| Outstanding at 1 January 2021 | Lapsed/cancelled during year | Exercised during year | Outstanding at 31 December 2021 |
|---|---|---|---|
| 23,141 | (64) | (4,244) | 18,833 |

The outstanding shares on these schemes are exercisable up to 2025.

The weighted average exercise price for share options exercised during the year was a nominal price (2020: a nominal price) at a weighted average share price at the date of exercise of £157.09 (2020: £105.77). The total number of shares exercisable at 31 December 2021 is 18,833.

### The Stars Group Equity Plans

Following the Combination with TSG, the Group acquired a number of schemes under its Equity Incentive Plan dated 22 June 2015 (the "2015 Equity Incentive Plan") and the Amaya Gaming Group Stock Option Plan. These plans include restricted share units ("RSU"), deferred share units ("DSU"), performance share units ("PSU") and stock options ("options").

Summary of share awards outstanding:

| Outstanding at 1 January 2021 | Lapsed/cancelled during year | Exercised during year | Outstanding at 31 December 2021 |
|---|---|---|---|
| 281,282 | (15,139) | (186,308) | 79,835 |

The weighted average share price for exercises under these schemes during the year was £142.99 (2020: £118.81). The total number of shares exercisable at 31 December 2021 is 55,146.

## 26. Share-based payments continued

### Flutter Entertainment plc Sharesave Scheme

During the year, 230,091 options were granted under the Flutter Entertainment plc Sharesave Scheme. These SAYE options must ordinarily be exercised within six months of completing the relevant savings period. In line with market practice, the exercise of these options is not subject to any performance conditions.

All employees (including Executive Directors) may be invited to apply for options to acquire shares. The purchase price for each ordinary share in respect of which an option is granted shall not be less than 75% of the closing price of the shares on the Irish and London Stock Exchanges on the dealing day last preceding the date of grant of the option or its nominal value. The aggregate maximum monthly contribution payable by an employee in connection with all Sharesave related schemes is €500/£500 (or local equivalent).

| Year granted | Outstanding at 1 January 2021 | Granted during year | Lapsed/ cancelled during year | Exercised during year | Outstanding at 31 December 2021 | Exercise price £ | Exercisable before |
|---|---|---|---|---|---|---|---|
| 2017 | 53,830 | — | (2,598) | (50,921) | 311 | 57.87 | 2022 |
| 2018 | 96,982 | — | (3,045) | (36,861) | 57,076 | 54.68 | 2022 |
| 2019 | 134,513 | — | (8,702) | (8,119) | 117,692 | 59.56 | 2023 |
| 2020 | 345,673 | — | (42,353) | (9,202) | 294,118 | 98.75 | 2024 |
| 2021 | — | 230,091 | (7,068) | — | 223,023 | 115.96 | 2025 |
| Total | 630,998 | 230,091 | (63,766) | (105,103) | 692,220 | | |

The weighted average share price at the date of exercise was £128.99 (2020: £117.78). 66,863 shares were exercisable at 31 December 2021 (2020: 54,232 shares).

The fair value of the options is expensed over the period that the options vest.

The following assumptions were used in the Black-Scholes pricing model for the 2021 options:

| | 2021 |
|---|---|
| Share price at date of grant | £144.85 |
| Exercise price | £115.96 |
| Expected volatility | 33.36% |
| Expected term until exercised | 3.25 years |
| Expected dividend yield | 0.92% |
| Risk-free interest rate | 0.27%-0.49% |

### Flutter Entertainment plc Long Term Incentive Plan, Medium Term Incentive Plan and Deferred Share Incentive Plan

The following share plans have been put in place to incentivise and reward for the successful delivery of the short, medium and long-term business strategy:

- Long Term Incentive Plan ("LTIP") which consists of restricted share awards;

- Medium Term Incentive Plan ("MTIP") which consists of restricted share awards; and

- Deferred Share Incentive Plan ("DSIP") which consists of cash and restricted share awards.

The level of award granted in each of the schemes is based on a mixture of the individual performance of the employee and the Group wide performance over the term of the award which is between one and three years.

The DSIP has cash elements which are fixed in value and are paid and expensed in the first year that the awards are issued. The cash award represents between half and two-thirds of the total award. There is no option given to elect to have these issued in shares. The cash element issued is classified as a cash bonus in the income statement and not a "cash-settled share-based payment" on the basis that the employee does not have the option to choose whether they receive cash or shares, and the award value is fixed and not based on share price movements.

# Notes to the Consolidated Financial Statements continued

## 26. Share-based payments continued

The restricted share portion of the DSIP award will vest over the second and third year of the plan (fourth and fifth year in some cases).

| Year granted | Outstanding at 1 January 2021 | Granted during year | Lapsed/ cancelled during year | Exercised during year | Outstanding at 31 December 2021 | Exercise price £ | Exercisable before |
|---|---|---|---|---|---|---|---|
| 2016 | 10,051 | — | — | (3,525) | 6,526 | — | 2026 |
| 2017 | 26,674 | — | — | (4,327) | 22,347 | — | 2027 |
| 2018 | 132,733 | 6,174 | (834) | (48,967) | 89,106 | — | 2028 |
| 2019 | 201,071 | 633 | (9,425) | (13,484) | 178,795 | — | 2029 |
| 2020 | 49,744 | 202 | (1,051) | (10,332) | 38,563 | — | 2030 |
| 2021 | — | 45,283 | (1,259) | — | 44,024 | — | 2031 |
| Total | 420,273 | 52,292 | (12,569) | (80,635) | 379,361 | | |

The weighted average exercise price for share options exercised during the year was a nominal price and at a weighted average share price at the date of exercise of £136.17 (31 December 2020: £101.35). The value of each award was calculated at the grant date and expensed over a period of up to three years in which the awards vest. The total number of shares exercisable at 31 December 2021 is 123,592 (2020: 62,250). The awards granted from 2016 to 2020 during the year represent dividend roll-ups, in line with documented scheme rules. The share price at the date of the awards granted during the year was between £102.55 – £176.71 (2020: £82.93 – £110.50). For the 2020 and 2021 LTIP awards which are based solely on the Relative Total Shareholder Return ("TSR") performance measure, the Group has engaged third party valuation specialists to provide a fair value for the awards using a Monte Carlo simulation model. The key inputs in the model were the expected volatility and the share price of the Group at the date of grant of the award. The fair value of the TSR, i.e. the non-market value of the award was £76.67 and £64.51 for the 2021 and 2020 awards, respectively.

## Flutter Entertainment plc Restricted Share Plan

During the year, 698,452 (2020: 357,511) options were granted under the Flutter Entertainment plc Restricted Share plan.

The movements in this plan during the year ended 31 December 2021 were as follows:

| Year granted | Outstanding at 1 January 2021 | Granted during year | Lapsed/ cancelled during year | Exercised during year | Outstanding at 31 December 2021 |
|---|---|---|---|---|---|
| 2017 | 1,229 | — | — | (420) | 809 |
| 2018 | 14,171 | — | — | (11,591) | 2,580 |
| 2019 | 118,390 | 575 | (3,934) | (52,838) | 62,193 |
| 2020 | 353,278 | 11,124 | (36,114) | (101,451) | 226,837 |
| 2021 | — | 686,753 | (14,148) | (44,670) | 627,935 |
| Total | 487,068 | 698,452 | (54,196) | (210,970) | 920,354 |

Awards granted under the plan in some cases vest over three years and in other cases vest over one and two years. Restricted shares are valued with reference to the market value of the shares on the date of grant. The value of each award was calculated at the grant date and expensed over a period of up to three years in which the awards vest. The weighted average exercise price for share options exercised during the year was a nominal price and at a weighted average share price at the date of exercise of £133.08 (31 December 2020: £121.21). The fair value at the date of the awards granted during the year was between £102.55 – £176.61 (2020: £82.93 – £127.57). For 62,367 of the 2021 options awarded, there is an additional component to the core award that was valued at the share price at the date of grant that allows up to a 50% increase in the award based solely on the Relative TSR performance measure. The Group has engaged third party valuation specialists to provide a fair value for the awards using a Monte Carlo simulation model. The key inputs in the model were the expected volatility and the share price of the Group at the date of grant of the award. The fair value of the TSR, i.e. the non-market value of the potential award was £19.92. The awards granted in the 2019 and 2020 schemes during the year represent dividend roll-ups, in line with documented scheme rules.

## FanDuel Value Creation Plan ("VCP") and Value Creation Option Plan ("VCOP")

In 2019, the Group introduced a plan for FanDuel employees that allows them to share in the future value created within FanDuel. The expense recognised in respect of this plan in 2021 is £2.6m (2020: £8.2m). Employees were to be awarded an allocation of units which represent a share in value created. The value of these units was to be determined by the value of the business in July 2021 and July 2023 compared to benchmark.

Employees had the option to exercise 50% of these units at July 2021 at the prevailing value, or roll some or all of them to July 2023 at the prevailing value at that date. The Group has the option of settling this plan via the issuance of Flutter Entertainment plc shares or cash. It has accounted for this plan as equity-settled as it has been determined since the inception of the scheme that Flutter shares represented the most likely means of settlement and is consistent with the Group's treatment historically of the settlement of share based payment schemes.

## 26. Share-based payments continued

The transaction to acquire an additional 37.2% of FanDuel shares on 30 December 2020 implied a 100% value of $11.2bn. This is significantly in excess of the out-performance growth cap. Due to this, it was decided to fix the value of the plan in both July 2021 and July 2023 to provide certainty to employees.

As a result of the above, shares with a value of £173m were awarded to FanDuel employees during the year with shares with a value of approximately £148m due to be awarded to employees in 2023.

### Other plans

Separate to the above plans, the Group introduced a value creation award within the FanDuel business with the value of the award determined by the growth in the value of the FanDuel business from September 2021 to December 2026. The Group engaged third party valuation specialists to provide a fair value of the award using a Monte Carlo simulation model. The key inputs in the model were the expected volatility and the value of FanDuel at the date of grant of the award. The overall fair value of the award was determined to be £4.5m.

The expense recognised in respect of this plan in 2021 is £0.2m. The Group has the option of settling this plan via the issuance of Flutter Entertainment plc shares or cash. The Group has accounted for this plan as equity-settled as it has been determined that Flutter shares represents the most likely means of settlement and is consistent with the Group's treatment historically in respect of the settlement of share-based payment schemes. No future awards are expected in respect of this plan.

In addition to the above, the Group introduced an award plan in 2021 for management of the International division comprising of internal strategic milestones and a value creation element that allows employees share in the future value created in the International division vesting in two tranches in July 2023 and December 2025. The Group will have the option of settling this plan via the issuance of Flutter Entertainment plc shares or cash. The Group has accounted for this plan as equity-settled as it has been determined that Flutter shares represents the most likely means of settlement and is consistent with the Group's treatment historically in respect of the settlement of share based payment schemes.

The expense recognised in respect of this plan in 2021 is £4.7m. The plan is designed to reward strategic progress over the first three years and value growth over five years, with vest dates in July 2023 and December 2025 for the respective tranches. The Group engaged third party valuation specialists to provide a fair value of the value creation element of the award using a Monte Carlo simulation model. The key inputs in the model were the expected volatility and the value of the International division at the date of grant of the award. The overall fair value of the award was determined to be £13.5m.

Also in 2021, the Group introduced plans for other International employees that allow them to share in the future growth of their business. The expense recognised in respect of this plan in 2021 is £4.6m. The total fair value of the awards are estimated to be £10.9m with the fair value based on forecast revenue and EBITDA growth between 2021 and 2025. A portion of the awards will vest in 2023, with the remainder vesting through 2025.

### The Paddy Power Betfair plc Employee Benefit Trust

Various share awards are satisfied from the Paddy Power Betfair plc Employee Benefit Trust ("EBT"). Purchases of Flutter Entertainment plc ordinary shares from 1 January 2020 to 31 December 2021 and shares vested from the EBT during that period, are shown below:

|  | Number of Flutter Entertainment plc ordinary shares # | Cost of purchase £m |
|---|---|---|
| Shares held by the EBT at 1 January 2020 | 70,397 | 6.1 |
| Vested from the EBT in 2020 | (3,077) | (0.3) |
| Shares held by the EBT at 31 December 2020 | 67,320 | 5.8 |
| Purchases of shares in 2021 | 1,337,894 | 180.7 |
| Vested from the EBT in 2021 | (1,372,056) | (182.5) |
| Shares held by the EBT at 31 December 2021 | 33,158 | 4.0 |

The results of the EBT are included in the Flutter Entertainment plc Company financial statements. The shares held by the EBT at the reporting date are shown as a deduction from equity in the consolidated statement of financial position in accordance with the Group's accounting policy (see Note 3).

Financial statements

# Notes to the Consolidated Financial Statements continued

## 27. Financial risk management

The Group has the following risk exposures in relation to its use of financial instruments:

- market risk;
- credit risk;
- liquidity risk;
- foreign currency risk; and
- interest rate risk.

Set out below is information on the Group's exposure to each of the above risks, and what its objectives, policies and processes are for measuring and managing those risks. Information is also provided on how the Group manages its capital. Quantitative disclosures in respect of these risks are included throughout these consolidated financial statements.

### General

The Board of Directors has overall responsibility for the management of the Group's risks. This responsibility is delegated to a number of Committees over which the Board has oversight. The primary Board Committees set up to manage risks are the Risk and Sustainability Committee (previously the Risk Committee) and the Audit Committee. Both these Committees report regularly to the Board on their activities. The oversight of the Group's treasury operations is performed by a Treasury Committee, chaired by the Chief Financial Officer, which reports annually to the Audit Committee on its activities. Where all relevant criteria are met, hedge accounting is applied to remove the income statement volatility between the hedging instrument and the hedged item. This will effectively result in the exposure arising from fluctuations of currency exchange rates being mitigated by the retranslation effect of designated financial instruments.

### Market risk

Market risk relates to the risk that changes in prices, including sports betting prices/odds, foreign currency exchange rates and interest rates (see also 'Foreign exchange risk' and 'Interest rate risk' sections below), will impact the Group's income or the value of its financial instruments. Market risk management has the function of managing and controlling the Group's exposures to market risk to within acceptable limits, while at the same time ensuring that returns are optimised.

The management of market risk is performed by the Group under the supervision of the Risk and Sustainability Committee and the Treasury Committee and according to the guidelines approved by them. The Group will utilise hedges where there is an identified requirement to manage profit or loss volatility.

#### Sports betting prices/odds

Managing the risks associated with sportsbook bets is a fundamental part of the Group's business. The Group has a separate Risk department which has responsibility for the compilation of bookmaking odds and for sportsbook risk management. The Risk department is responsible for the creation and pricing of all betting markets and the trading of those markets through their lives. A mix of traditional bookmaking approaches married with risk management techniques from other industries is applied, and extensive use is made of mathematical models and information technology. The Group has set predefined limits for the acceptance of sportsbook bet risks. Stake and loss limits are set by reference to individual sports, events and bet types. These limits are subject to formal approval by the Risk and Sustainability Committee. Risk management policies also require sportsbook bets to be hedged with third parties in certain circumstances to limit potential losses. The profits and losses recorded on sportsbook hedging activities are recorded in 'revenue' in the income statement.

### Credit risk

The Group's counterparty credit risk represents the risk that a financial loss may result if a counterparty to a financial instrument, a trading partner or a customer fails to meet their contractual obligations.

#### Trade and other receivables

The Group applies the IFRS 9 simplified approach to measuring expected credit losses which uses a lifetime expected loss allowance for all trade receivables.

The Group's sports betting, gaming, and poker businesses are predominantly cash and card businesses where there is a requirement that the customer pays in advance when a transaction is entered into. Credit to customers is not a common feature in the business but in certain cases, credit is provided to customers. Individual credit limits are decided upon by the credit control function in the first instance after taking into account credit and background reference checks.

To measure the expected credit losses, trade receivables are monitored based on credit risk characteristics and the days past due. The absence of recurring patterns for specific categories of receivables and the relative immateriality of the amounts in the context of the broader balance sheet resulted in a portfolio approach not being adopted for the purpose of impairment recognition. The estimated credit loss on trade receivables is not considered to be material. There is no material concentration of sales with individual customers.

## 27. Financial risk management continued

### Cash, investments, derivative financial instruments and foreign exchange forward contracts

The Group's Treasury Policy sets conservative credit rating and tenor-based limits for exposures to financial counterparties. Any exceptions, breaches or potential breaches of such limits are referred to the Treasury Committee.

The Treasury Policy also specifies permitted instruments and the use of approved counterparties.

The Group monitors the financial strength of its counterparties through regular monitoring of credit ratings, credit default swaps and other public information, and takes action to adjust exposures to counterparties accordingly. The policy ensures that exposures to lower rated counterparties are kept to an acceptable level.

The Group has no expectation that any of its financial counterparties will fail to meet its obligations as of the reporting date and the date of this report.

### Exposure to credit risk

The carrying amount of financial assets represents the maximum credit exposure. The cash and cash equivalents are primarily held with bank and financial institution counterparties, which are rated investment grade, based on ratings assigned by S&P, Moody's and Fitch. The maximum exposure to credit risk at 31 December was:

| | Carrying amount | |
| --- | --- | --- |
| | 31 December 2021 £m | 31 December 2020 £m |
| Restricted cash | 685.0 | 594.8 |
| Investments – customer deposits | 83.0 | 82.8 |
| Trade receivables | 39.5 | 11.9 |
| Other receivables | 46.2 | 41.5 |
| Cash and cash equivalents | 951.7 | 603.4 |
| Total | 1,805.4 | 1,334.4 |

The maximum exposure to credit risk for trade and other receivables by geographic region at 31 December was:

| | Carrying amount | |
| --- | --- | --- |
| | 31 December 2021 £m | 31 December 2020 £m |
| United Kingdom | 34.6 | 20.8 |
| Ireland | 0.4 | 0.2 |
| Australia | 12.8 | 4.6 |
| US | 25.6 | 14.5 |
| Other | 12.3 | 13.3 |
| Total | 85.7 | 53.4 |

### Significant customers

There were no individual customers at 31 December 2021 or 31 December 2020 that represented over 10% of trade receivables.

### Expected credit loss

The ageing of trade receivables at 31 December 2021 and 2020 was as follows:

| | 31 December 2021 | | | 31 December 2020 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Gross £m | Impairment allowance £m | Net £m | Gross £m | Impairment allowance £m | Net £m |
| Not past due | 20.2 | — | 20.2 | 5.4 | — | 5.4 |
| Past due 0 days to 30 days | 13.2 | — | 13.2 | 2.9 | — | 2.9 |
| Past due 31 days to 120 days | 4.0 | (0.6) | 3.4 | 0.4 | (0.3) | 0.1 |
| Past due 121 days to 365 days | 4.5 | (2.0) | 2.5 | 4.8 | (1.3) | 3.5 |
| More than one year | 1.0 | (0.8) | 0.2 | 1.6 | (1.6) | — |
| Total | 42.9 | (3.4) | 39.5 | 15.1 | (3.2) | 11.9 |

The gross trade receivable balance is £42.9m (2020: £15.1m) with an allowance for impairment in respect of these receivables of £3.4m (2020: £3.2m). There were no material impairment losses during the year.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 27. Financial risk management continued
### Liquidity risk

This represents the risk that the Group will be unable to meet its financial obligations as they fall due. The Group's policy for liquidity risk management is to ensure that there is sufficient liquidity in place from available cash and borrowing facilities under normal and potentially adverse conditions.

The Group prepares regular cash projections to ensure that there is sufficient headroom available from cash and borrowing facilities to meet expected obligations over the forecasted period. The nature of the Group's business and the potential volatility in sporting results can result in significant differences between expected and actual short-term cash flows. Consequently, a highly conservative approach is applied to cash forecasting and flexibility is built into the forecast to cover potentially adverse sporting results and the policy on investment of surplus funds ensures that funds are readily available to meet the Group's financial obligations. The Group's Treasury Policy contains a maturity ladder, with a maximum maturity on deposits of up to 12 months. Information on the overall maturity of deposits at 31 December 2021 and 2020 is set out in Note 17. It is the Group's belief that the cash deposit balances can be withdrawn without significant penalty.

The Group has the following lines of credit:

- a committed Revolving Credit Facility ("RCF") of £482m (31 December 2020: £450m) obtained from a syndicate of banks which matures in May 2025. The RCF includes a margin of 1.75% for borrowings with a 0% interest rate floor and a utilisation fee ranging from 0.1% to 0.4% based on the proportion of drawings to the total commitment. The commitment fee on the RCF is 35% of the margin and is payable in respect of available but undrawn borrowings. The RCF is available for general corporate purposes including the refinancing of existing borrowings. As at 31 December 2021, no loan amounts were drawn under the RCF. The Group has £15m of capacity reserved for the issuance of Group guarantees against the RCF as of 31 December 2021 leaving undrawn designated capacity of £467m;

- unsecured uncommitted bank overdraft facilities for working capital purposes totalling £3.6m (€4.0m). Interest is payable thereon at the bank's prime overdraft rate plus 0.5%. Bank overdraft facilities for certain subsidiaries of the Company are guaranteed by way of a Letter of Guarantee issued by Flutter Entertainment plc in favour of Allied Irish Banks p.l.c; and

- unsecured uncommitted bank overdraft facilities for working capital purposes totalling £13m. Interest is payable thereon at the bank's sterling base rate plus 3.5%. Bank overdraft facilities for certain subsidiaries of the Company are guaranteed by way of a Letter of Guarantee issued by Flutter Entertainment plc in favour of AIB Group (UK) p.l.c.

At 31 December 2021, none of the bank overdraft facilities were being utilised (31 December 2020: £nil).

The following table provides information about the terms of the Group's financial instruments based on contractual maturities. The table is based on the undiscounted gross inflows and outflows on those derivatives that require gross settlement. For derivative cash flows based on a floating interest rate, the undiscounted amount is based on the floating interest rate in place at 31 December 2021.

| | 31 December 2021 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Carrying amount £m | Contractual cash flows £m | 6 months or less £m | 6 to 12 months £m | 1 to 2 years £m | 2 to 3 years £m | 3 years and over £m |
| **Non-derivative financial liabilities** | | | | | | | |
| Trade and other payables | 1,078.3 | 1,078.3 | 1,024.4 | 34.1 | 19.8 | — | — |
| Customer balances | 721.0 | 721.0 | 721.0 | — | — | — | — |
| Contingent deferred consideration | 37.9 | 42.0 | 21.0 | — | — | — | 21.0 |
| Borrowings | 3,571.8 | 3,969.1 | 53.0 | 51.9 | 105.9 | 106.3 | 3,652.0 |
| Lease liabilities | 264.4 | 301.9 | 27.1 | 25.5 | 50.3 | 43.5 | 155.5 |
| **Total non-derivative financial liabilities** | 5,673.4 | 6,112.3 | 1,846.5 | 111.5 | 176.0 | 149.8 | 3,828.5 |
| **Derivative financial liabilities** | | | | | | | |
| Sports betting open positions | 74.5 | 74.5 | 52.0 | 22.0 | 0.5 | — | — |
| Swap agreements – inflows | (68.0) | (2,250.9) | (37.8) | (38.0) | (2,175.1) | — | — |
| Swap agreements – outflows | 54.6 | 2,235.9 | 40.5 | 40.7 | 2,154.7 | — | — |
| **Total derivative financial liabilities** | 61.1 | 59.5 | 54.7 | 24.7 | (19.9) | — | — |
| **Total financial liabilities** | 5,734.5 | 6,171.8 | 1,901.2 | 136.2 | 156.1 | 149.8 | 3,828.5 |

## 27. Financial risk management continued

| | Carrying amount £m | Contractual cash flows £m | 6 months or less £m | 6 to 12 months £m | 1 to 2 years £m | 2 to 3 years £m | 3 years and over £m |
|---|---|---|---|---|---|---|---|
| | | | | 31 December 2020 | | | |
| **Non-derivative financial liabilities** | | | | | | | |
| Trade and other payables | 1,009.5 | 1,009.5 | 1,001.1 | 6.6 | 1.3 | 0.5 | — |
| Customer balances | 643.4 | 643.4 | 643.4 | — | — | — | — |
| Contingent deferred consideration | 38.1 | 39.5 | 19.2 | 7.5 | 12.8 | — | — |
| Borrowings | 3,138.9 | 3,841.0 | 76.1 | 76.4 | 150.6 | 149.3 | 3,388.6 |
| Lease liabilities | 194.0 | 214.8 | 24.9 | 23.4 | 39.6 | 35.4 | 91.5 |
| Total non-derivative financial liabilities | 5,023.9 | 5,748.2 | 1,764.7 | 113.9 | 204.3 | 185.2 | 3,480.1 |
| **Derivative financial liabilities** | | | | | | | |
| Sports betting open positions | 50.0 | 50.0 | 49.5 | — | 0.5 | — | — |
| Swap agreements – inflows | (16.9) | (1,952.1) | (58.9) | (792.2) | (65.4) | (1,035.6) | — |
| Swap agreements – outflows | 203.2 | 2,131.4 | 67.1 | 898.8 | 80.5 | 1,085.0 | — |
| Total derivative financial liabilities | 236.3 | 229.3 | 57.7 | 106.6 | 15.6 | 49.4 | — |
| Total financial liabilities | 5,260.2 | 5,977.5 | 1,822.4 | 220.5 | 219.9 | 234.6 | 3,480.1 |

The contingent deferred consideration payable represents management's best estimate of the fair value of the amounts that will be payable, and may vary depending on the future performance of the acquired businesses.

### Foreign currency risk

The Group is exposed to currency risk in respect of revenue, expenses, receivables, cash and cash equivalents, and other financial assets and financial liabilities (primarily borrowings, trade payables, accruals and customer balances) that are denominated in currencies that are not the functional currency of the entities in the Group. The currencies in which transactions are primarily denominated are pound sterling ("GBP"), euro ("EUR"), Australian dollar ("AUD") and US dollar ("USD").

It is Group policy to ensure that foreign currency denominated liabilities are broadly matched by foreign currency denominated assets. Surplus net foreign currency inflows are predominantly sold at spot rates. Foreign exchange impacts primarily arise on the retranslation of income and expense into the functional currency for Group reporting purposes. Subject to operating within limits stipulated in the Group's treasury policies, and above this, Treasury Committee approval, the Group may use forward contracts, and other instruments as permitted by the Group's treasury policies to reduce foreign currency exposure. The Group seeks to mitigate the impact of changes in currency rates by aligning to the extent possible, the currency of its borrowings (after derivatives) to the currency of EBITDA.

The Group uses derivative financial instruments for risk management and mitigation purposes. As such, any change in cash flows associated with derivative instruments is expected to be offset by changes in cash flows related to the hedged position. On 5 May 2020, the Group completed the TSG Combination and assumed the existing hedging instruments held by TSG. The Group's derivatives are discussed in more detail in Note 23.

While the Group strives to maintain a naturally hedged balance sheet, as described in the preceding paragraphs, it remains exposed to exchange rate risk in respect of its expected future foreign currency denominated income and expenses in its foreign operations.

### Exposure

As of 31 December 2021 and 2020, the Group's foreign currency risk exposure, based on the functional currencies of its operations, was as follows:

| | EUR £m | GBP £m | AUD £m | USD £m | Other £m |
|---|---|---|---|---|---|
| | | | 31 December 2021 | | |
| Financial assets | 31.1 | 16.3 | — | 148.4 | 36.8 |
| Non-derivative financial liabilities | (77.7) | (47.1) | (0.1) | (166.2) | (8.9) |
| Derivative financial liabilities | (73.0) | (0.1) | — | (1.3) | — |
| Gross statement of financial position exposure | (119.6) | (30.9) | (0.1) | (19.1) | 27.9 |

| | EUR £m | GBP £m | AUD £m | USD £m | Other £m |
|---|---|---|---|---|---|
| | | | 31 December 2020 | | |
| Financial assets | 82.5 | 10.6 | 1.4 | 147.7 | 14.8 |
| Non-derivative financial liabilities | (165.1) | (38.4) | (0.1) | (206.2) | (13.3) |
| Derivative financial liabilities | (5.3) | (0.1) | — | (0.1) | — |
| Gross statement of financial position exposure | (87.9) | (27.9) | 1.3 | (58.6) | 1.5 |

Financial statements

# Notes to the Consolidated Financial Statements continued

## 27. Financial risk management continued

The following are the significant exchange rates that applied during the year:

| | Average rate | | 31 December (mid-spot rate) | |
|---|---|---|---|---|
| To 1 GBP | **2021** | 2020 | **2021** | 2020 |
| EUR | **1.163** | 1.105 | **1.191** | 1.114 |
| AUD | **1.832** | 1.863 | **1.861** | 1.768 |
| USD | **1.376** | 1.283 | **1.352** | 1.364 |

### Sensitivity analysis

A 10% increase and decrease in the value of pound sterling against the following currencies at 31 December 2021 and 2020 would have increased/(decreased) profit and equity by the amounts below as a consequence of the retranslation of foreign currency denominated assets and liabilities at those dates. The equity movement at 31 December 2021 relates mainly to foreign currency denominated goodwill and intangible assets. It is assumed that all other variables, especially interest rates, remain constant in the analysis.

| | Profit | | Equity | |
|---|---|---|---|---|
| | 10% increase £m | 10% decrease £m | 10% increase £m | 10% decrease £m |
| **31 December 2021** | | | | |
| EUR | **5.0** | **(5.0)** | **(283.2)** | **283.2** |
| AUD | **—** | **—** | **(64.8)** | **64.8** |
| USD | **1.9** | **(1.9)** | **(46.7)** | **46.7** |
| 31 December 2020 | | | | |
| EUR | 8.8 | (8.8) | 4.0 | (4.0) |
| AUD | (0.1) | 0.1 | (0.1) | 0.1 |
| USD | 5.9 | (5.9) | (38.8) | 38.8 |

The table below details the effect on profit of a 10% strengthening or weakening of the GBP-EUR or the GBP-USD exchange rates on the valuations of the USD First Lien Term Loan B and EUR First Lien Term Loan B, net of hedging with the Swap Agreements that hedge the USD TLB and EUR TLB. 10% is the sensitivity rate which represents management's assessment of the reasonably possible change in foreign exchange rates.

| | -10% £m | +10% £m |
|---|---|---|
| GBP-EUR exchange rate | — | — |
| GBP-USD exchange rate | — | — |

### Interest rate risk

The Group's exposure to changes in interest rates includes fluctuations in the amounts of interest paid on the Group's long-term indebtedness, as well as the interest earned on its cash and investments. The Group manages its exposure to changes in interest rates through the offsetting of exposures and the use of hedging instruments.

### Profile

As of 31 December 2021 and 31 December 2020, the interest rate profile of the Group's interest-bearing financial instruments was as follows:

| | Carrying amount | |
|---|---|---|
| | 31 December 2021 £m | 31 December 2020 £m |
| Variable rate instruments | | |
| Financial assets – restricted cash | **685.0** | 594.8 |
| Investments – customer deposits | **83.0** | 82.8 |
| Financial assets – cash | **951.7** | 603.4 |
| Borrowings | **(3,571.8)** | (3,138.9) |
| Effect of interest rate swaps | **2,167.8** | 1,749.5 |
| | **315.7** | (108.4) |

## 27. Financial risk management continued

The table below details the effect on earnings before tax of a 100 basis points strengthening or weakening of the USD–LIBOR, GBP–LIBOR (SONIA effective for interest periods beginning on or after 1 January 2022) and EURIBOR interest rates on these loans after the effect of the Group's hedging activities. EURIBOR is currently negative and the analysis below presents the effect on earnings before tax if it were to turn positive by 100 basis points. 100 basis points sensitivity is the sensitivity rate used and represents management's assessment of a reasonably possible change in interest rates:

|  | Profit/(loss) £m | |
| --- | --- | --- |
|  | -100 bps | +100 bps |
| USD LIBOR | — | — |
| GBP LIBOR/SONIA | — | (10.4) |
| EURIBOR | — | (4.3) |

The USD First Lien Term Loan B and the GBP First Lien Term Loan A have a floor of 0% for their respective LIBORs and as such, the interest rate cannot decrease below the margins of 2.25% and 1.75% respectively. The EUR First Lien Term Loan B has a floor of 0% for EURIBOR and as such, the interest rate cannot decrease below 2.5%. Management monitors movements in interest rates by reviewing USD LIBOR and EURIBOR on a quarterly basis for the First Lien Term Loan B's and the GBP LIBOR monthly for the First Lien Term Loan A. During the years ended 31 December 2021 and 31 December 2020, EURIBOR was negative.

## 28. Capital management

The capital structure of the Group consists of cash and cash equivalents, debt finance, issued capital, reserves and retained earnings. The efficiency of the Group's capital structure is kept under regular review by the Board.

The Group continues to target a medium-term leverage range of between 1 and 2 times net debt to EBITDA. This target reflects the Group's strong cash flow generation, general capital market conditions and the need to retain strategic flexibility for continuing investment opportunities.

The Group has the authority to buy back up to 10% of the Company's issued share capital between the dates of its Annual General Meetings ("AGM"), subject to the annual approval of its shareholders at the Company's AGM. Shares bought back may either be cancelled or held in treasury. The Company's ordinary shares are also acquired on the market periodically by the Paddy Power Betfair plc Employee Benefit Trust ("EBT") to meet the EBT's obligations under share award schemes. These shares are held by the EBT and ownership is transferred to the EBT's beneficiaries if and when the related share awards vest.

At 31 December 2021 and 31 December 2020, neither the Company nor any of its subsidiaries were subject to externally imposed capital requirements.

## 29. Fair values
### Fair values versus carrying amounts

The Group has determined that the carrying values of its short-term financial assets and liabilities approximate their fair value due to the short periods to maturity of these instruments and their low credit risk.

The following are the fair values and carrying amounts of financial assets and liabilities carried at amortised cost in the statement of financial position:

|  | 31 December 2021 | | 31 December 2020 | |
| --- | --- | --- | --- | --- |
|  | Carrying amount £m | Fair value £m | Carrying amount £m | Fair value £m |
| **Assets** | | | | |
| Trade receivables | 39.5 | 39.5 | 11.9 | 11.9 |
| Other receivables | 46.2 | 46.2 | 41.5 | 41.5 |
| Restricted cash | 685.0 | 685.0 | 594.8 | 594.8 |
| Cash and cash equivalents | 951.7 | 951.7 | 603.4 | 603.4 |
| Total assets | 1,722.4 | 1,722.4 | 1,251.6 | 1,251.6 |
| **Liabilities** | | | | |
| Trade and other payables | (1,078.3) | (1,078.3) | (1,009.5) | (1,009.5) |
| Customer balances | (721.0) | (721.0) | (643.4) | (643.4) |
| Borrowings | (3,571.8) | (3,607.8) | (3,138.9) | (3,255.0) |
| Total liabilities | (5,371.1) | (5,407.1) | (4,791.8) | (4,907.9) |
| **Net** | (3,648.7) | (3,684.7) | (3,540.2) | (3,656.3) |

# Notes to the Consolidated Financial Statements continued

## 29. Fair values continued

Certain of the Group's financial assets and liabilities are measured at fair value, including at FVTPL or FVOCI, at the end of each reporting period. The following provides information about how the fair values of these financial assets and liabilities were determined as at 31 December 2021:

### Financial instruments carried at fair value

Fair value hierarchy

The table below analyses recurring fair value measurements for financial assets and financial liabilities. These fair value measurements are categorised into different levels in the fair value hierarchy based on the inputs to the valuation method used. The different levels are defined as follows:

- Level 1: quoted prices (unadjusted) in active markets for identical assets or liabilities that the Group can access at the measurement date;
- Level 2: inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly; and
- Level 3: unobservable inputs for the asset or liability.

|  | 31 December 2021 | | | |
|  | Level 1 £m | Level 2 £m | Level 3 £m | Total £m |
|---|---|---|---|---|
| Bonds – FVOCI | 58.2 | 24.8 | — | 83.0 |
| Investments – FVTPL | — | — | 5.5 | 5.5 |
| Derivatives | — | 68.0 | — | 68.0 |
| **Total financial assets** | **58.2** | **92.8** | **5.5** | **156.5** |
| Derivative financial liabilities | — | (54.6) | (74.5) | (129.1) |
| Non-derivative financial liabilities | — | — | (37.9) | (37.9) |
| **Total financial liabilities** | **—** | **(54.6)** | **(112.4)** | **(167.0)** |

|  | 31 December 2020 | | | |
|  | Level 1 £m | Level 2 £m | Level 3 £m | Total £m |
|---|---|---|---|---|
| Bonds – FVOCI | 26.3 | 56.5 | — | 82.8 |
| Investments – FVTPL | — | — | 3.0 | 3.0 |
| Derivatives | — | 16.9 | 98.0 | 114.9 |
| **Total financial assets** | **26.3** | **73.4** | **101.0** | **200.7** |
| Derivative financial liabilities | — | (203.2) | (50.0) | (253.2) |
| Non-derivative financial liabilities | — | — | (38.1) | (38.1) |
| **Total financial liabilities** | **—** | **(203.2)** | **(88.1)** | **(291.3)** |

The fair values of other financial assets and liabilities measured at amortised cost, other than those for which the Group has determined that their carrying values approximate their fair values on the consolidated statement of financial position as at 31 December 2021 and 31 December 2020 are as follows:

|  | 31 December 2021 | | | |
|  | Level 1 £m | Level 2 £m | Level 3 £m | Total £m |
|---|---|---|---|---|
| First Lien Term Loans B (as defined below) | — | (2,589.6) | — | (2,589.6) |
| **Total financial liabilities** | **—** | **(2,589.6)** | **—** | **(2,589.6)** |

|  | 31 December 2020 | | | |
|  | Level 1 £m | Level 2 £m | Level 3 £m | Total £m |
|---|---|---|---|---|
| First Lien Term Loans B (as defined below) | — | (1,530.5) | — | (1,530.5) |
| Senior Notes | — | (774.4) | — | (774.4) |
| **Total financial liabilities** | **—** | **(2,304.9)** | **—** | **(2,304.9)** |

As part of its periodic review of fair values, the Group recognises transfers, if any, between levels of the fair value hierarchy at the end of the reporting period during which the transfer occurred. There were no transfers between levels of the fair value hierarchy during the periods ended 31 December 2021 or 31 December 2020.

**29. Fair values** continued
**Valuation of Level 2 financial instruments**
Borrowings
The Group has determined that the principal value of the GBP First Lien Term Loan A (as defined above) approximates its fair value. The Group estimates the fair value of its First Lien Term Loan Bs by using a composite price derived from observable market data for a basket of similar instruments which approximates fair value.

Bonds – FVOCI
The Group has determined that the carrying value of the bonds approximates their fair value which is determined by using observable quoted prices or observable input parameters derived from comparable bonds/markets. Although the Group has determined that a number of the bonds fall within Level 1 of the fair value hierarchy, there are a class of bonds which have been classified as Level 2 due to the existence of relatively inactive trading markets for those bonds.

Derivative financial instruments
*Swap agreements*
The Group uses derivative financial instruments to manage its interest rate and foreign currency risk. The valuation of these instruments is determined using widely accepted valuation techniques including discounted cash flow analysis of the expected cash flows of each derivative. This analysis reflects the contractual terms of the derivatives, including the period to maturity, and uses observable market-based inputs, such as yield curves, spot and forward FX rates.

To comply with the provisions of IFRS 13, Fair Value Measurement, the Group incorporates credit valuation adjustments to appropriately reflect both its own non-performance risk and the applicable counterparty's non-performance risk in the fair value measurements. In adjusting the fair value of its derivative contracts for the effect of non-performance risk, the Group has considered the impact of netting and any applicable credit enhancements, such as collateral postings, thresholds, mutual puts and guarantees.

Although the Group has determined that the majority of the inputs used to value its derivatives fall within Level 2 of the fair value hierarchy, the credit valuation adjustments associated with its derivatives utilise Level 3 inputs, such as estimates of current credit spreads to evaluate the likelihood of default by itself and its counterparties. At both 31 December 2021 and 31 December 2020, the Group assessed the significance of the impact of the credit valuation adjustments on the overall valuation of its derivative positions, and with the exception of the embedded derivative in connection with the Senior Notes at 31 December 2020, which was classified as Level 3, determined that the credit valuation adjustments are not significant to the overall valuation of its derivatives. As a result, the Group determined that its valuations of its derivatives in their entirety are classified in Level 2 of the fair value hierarchy.

**Level 3 fair values**
Derivatives (Level 3)
Some of the Group's financial assets and liabilities are classified as Level 3 of the fair value hierarchy because the respective fair value determinations use inputs that are not based on observable market data. As at 31 December 2021, the valuation techniques and key inputs used by the Group for each Level 3 asset or liability were as follows:

*Sports betting open positions (Level 3)*
Derivative financial liabilities comprise sports betting open positions. The fair value of open sports bets at the period end has been calculated using the latest available prices on relevant sporting events. Changes in the fair value of the unsettled bets are recorded in revenue in the consolidated income statement.

It is primarily based on expectations as to the results of sporting and other events on which bets are placed. Changes in those expectations and ultimately the actual results when the events occur will result in changes in fair value.

There are no reasonably probable changes to assumptions and inputs that would lead to material changes in the fair value methodology although final value will be determined by future sporting results.

Non-derivative financial instruments (Level 3)
*Investments*
The Group valued its equity investments in private companies with reference to earnings measures from similar businesses in the same or similar industry and adjusts for any significant changes in the earnings multiple and the valuation. A reasonable change in assumptions would not have a material impact on fair value. Changes in the fair value of equity in private companies are recorded in financial income or financial expense in the consolidated income statement.

*Contingent deferred consideration (Level 3)*
Non-derivative financial liabilities include contingent consideration. The contingent consideration payable is primarily determined with reference to forecast performance for the acquired businesses during the relevant time periods and the amounts to be paid in such scenarios. The fair value was estimated by assigning probabilities to the potential payout scenarios. The significant unobservable inputs are forecast performance for the acquired businesses.

The fair value of contingent consideration is primarily dependent on forecast performance for the acquired businesses in excess of a predetermined base target. An increase and decrease of 10% in the excess over the predetermined base target during the relevant time periods would increase and decrease the value of contingent consideration at 31 December 2021 by £1.2m and £2.2m respectively (31 December 2020: £3.2m and £3.2m).

Financial statements

# Notes to the Consolidated Financial Statements continued

## 29. Fair values continued

*FOX Corporation*

As announced on 2 October 2019, in order to achieve economic alignment of Flutter's and TSG's strategic third party relationships across their respective US businesses, the Group entered into an arrangement with FOX, pursuant to which FSG Services, a wholly-owned subsidiary of FOX, had an option to acquire an 18.6% equity interest in FanDuel Group at its market value in July 2021. As a consequence of there being no increase in the market value of FanDuel since July 2021, it is determined that the value of the option is not material and is close to nominal value.

**Non-controlling interest agreements**

*Adjarabet*

As part of the acquisition of Adjarabet in 2019, a mechanism was agreed, consisting of call and put options, which enables the Group to acquire the remaining 49% after three years at a valuation equivalent to seven times the 2021 EBITDA. The call/put option consideration can be settled, at the Group's election, in cash or shares. As a consequence of both the put and call options being only exercisable at fair value being the future EBITDA and earnings multiple which are considered to be two key inputs into valuing the option, it was determined that the fair value was not material and was close to nominal value.

*Boyd*

A mechanism has been agreed with Boyd, a non-controlling interest in FanDuel Group, consisting of call and put options, which enables the Group to acquire the remaining 5% at prevailing market valuations in 2028. The call/put option consideration can be settled, at the Group's election, in cash or shares. As a consequence of both the put and call options being only exercisable at fair value based on the market value of FanDuel at the date of exercise of the options, it was determined that the fair value was not material and was close to nominal value.

As announced on 2 October 2019, in order to achieve economic alignment of Flutter's and TSG's strategic third-party relationships across their respective US businesses, the Group entered into arrangements conditional on completion of the Combination with Boyd pursuant to which Boyd would receive a total payment of the 12.5% of the increase in FOX Bet's market value between completion of the Combination and the exercise of Flutter's option to acquire Fastball's remaining equity interest in July 2023 (subject to a carrying value adjustment). Following the acquisition by the Group of Fastball's entire non-controlling interest on 30 December 2020, discussions are currently ongoing with the relevant parties in respect of the future operating model for the FOX Bet business and any payment due to Boyd in respect of this is not expected to be significant.

On 22 October 2021, FanDuel Group Parent LLC ("FanDuel") and Boyd Interactive Holdings LLC ("Boyd") entered into an arrangement where Boyd contributed 91,828 Investor Units equivalent to 0.5% of FanDuel's total Investor Units in exchange for 91,828 warrants to acquire Investor Units of FanDuel. The aggregate exercise price of the warrants is $1.00 and are exercisable at any time within the next 10 years. If the warrants remain outstanding after 10 years, they will be automatically converted into the number of Investor Units for which such warrants are exercisable. As this transaction involves the exchange of one form of fixed equity instrument for another fixed instrument with a non-controlling interest for no additional consideration, no further accounting is required.

*Junglee*

As part of the acquisition of Junglee, the Group has put in place arrangements, consisting of call and put options, that could see its ownership in the business increase to 100% in 2025. The call/put option consideration can be settled, at the Group's election, in cash or shares. As a consequence of both the put and call options being only exercisable at fair value being the future EBITDA and revenue multiple which are considered to be two key inputs into valuing the option, it was determined that the fair value was not material and was close to nominal value.

### Movements in the year in respect of Level 3 financial instruments carried at fair value

The movements in respect of the financial assets and liabilities carried at fair value in the year to 31 December 2021 are as follows:

|  | Sports betting open positions £m | Contingent deferred consideration £m | Embedded derivative £m | Investments £m | Total £m |
|---|---|---|---|---|---|
| Balance at 1 January 2020 | (21.1) | (18.4) | — | 0.1 | (39.4) |
| Arising on acquisitions (Note 15) | (10.0) | (5.3) | 25.8 | 4.0 | 14.5 |
| Recognised in the income statement | 2,256.1 | (23.7) | 78.5 | (1.5) | 2,309.4 |
| Settlements | (2,275.0) | 7.2 | — | — | (2,267.8) |
| Foreign currency translation adjustment | — | 2.1 | (6.3) | 0.4 | (3.8) |
| Balance at 31 December 2020 | (50.0) | (38.1) | 98.0 | 3.0 | 12.9 |
| Arising on acquisitions (Note 15) | — | (18.0) | — | 0.8 | (17.2) |
| Recognised in the income statement | 3,276.9 | (4.0) | (96.1) | 1.7 | 3,178.5 |
| Settlements | (3,301.4) | 21.6 | — | — | (3,279.8) |
| Foreign currency translation adjustment | — | 0.6 | (1.9) | — | (1.3) |
| Balance at 31 December 2021 | (74.5) | (37.9) | — | 5.5 | (106.9) |

## 30. Commitments and contingencies
### Guarantees
The Company enters into financial guarantee contracts to guarantee the indebtedness of other companies within the Group. The Company considers these to be insurance arrangements and accounts for them as such. The Company treats the guarantee contract as a contingent liability until such time as it becomes probable that the Company will be required to make a payment under the guarantee.

The Group has uncommitted working capital overdraft facilities of £16.2m (2020: £16.6m) with Allied Irish Banks p.l.c. These facilities are secured by a Letter of Guarantee from Flutter Entertainment plc.

The Group has bank guarantees: (i) in favour of certain gaming regulatory authorities to guarantee the payment of player funds, player prizes, and certain taxes and fees due by a number of Group companies; and (ii) in respect of certain third-party rental and other property commitments, merchant facilities and third party letter of credit facilities. The maximum amount of the guarantees at 31 December 2021 was £44.4m (2020: £74.8m). No claims had been made against the guarantees as of 31 December 2021 (2020: £Nil). The guarantees are secured by counter indemnities from Flutter Entertainment plc and certain of its subsidiary companies. The value of cash deposits over which the guaranteeing banks hold security was £17.5m at 31 December 2021 (2020: £12.9m).

As mentioned in Note 22, borrowings under the TLA Agreement and Syndicated Facility Agreement are guaranteed by the Company and certain of its operating subsidiaries.

### Contingent liabilities
The Group operates in an uncertain marketplace where many governments are either introducing or contemplating new regulatory or fiscal arrangements.

The Board monitors legal and regulatory developments and their potential impact on the business, however, given the lack of a harmonised regulatory environment, the value and timing of any obligations in this regard are subject to a high degree of uncertainty and cannot always be reliably predicted.

As outlined in more detail in Note 16, in June 2021, the Athens Administrative Court of Appeal dismissed the Group's judicial recourses. While the Group has appealed to the Greek Supreme Administrative Court, based on the nature of the decision received and the points of law which can be appealed, and in line with legal and tax advice it has received, it has decided to recognise the amount of the Greek assessment for the years 2012, 2013 and 2014 of €15.0m (£12.8m) as an expense in the income statement during the year ended 31 December 2021. No notifications have as yet been received for later years and so no provision has been made for potential further assessments.

Prior to the Combination, the Board of TSG became aware of the possibility of improper foreign payments by TSG or its subsidiaries in certain jurisdictions outside of Canada and the United States relating to its historical B2B business (which was never profitable and effectively ceased operations in 2014). When this matter arose, TSG contacted the relevant authorities in the United States and Canada with respect to these matters and, following the Combination, the Group continues to co-operate with the United States and Canada governmental authorities in respect of all inquiries relating to such payments. Based on its review of these matters to date, the Board of Flutter has not identified issues that it believes would have a significant adverse effect on the Group's financial position or business operations.

### Capital commitments
Capital expenditure contracted for at the statement of financial position date but not yet incurred was as follows:

| | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| Property, plant and equipment | 1.3 | 14.3 |
| Intangible assets | 1.6 | 1.0 |
| Total | 2.9 | 15.3 |

## 31. Related parties
There were no material transactions with related parties during the year ended 31 December 2021 or the year ended 31 December 2020.

Transactions between the Company and its subsidiaries, which are related parties, have been eliminated on consolidation and are not disclosed in this note.

The principal related party transactions requiring disclosure under IAS 24 Related Party Transactions relate to the existence of subsidiaries and transactions with these entities entered into by the Group, transactions with Directors and the identification and compensation of key management personnel.

### Subsidiaries
The consolidated financial statements include the financial statements of the Company and its subsidiaries. A listing of the material subsidiaries is provided in Note 32. Transactions and balances with subsidiaries have been eliminated in the preparation of the consolidated financial statements.

# Notes to the Consolidated Financial Statements continued

## 31. Related parties continued
### Transactions with Directors

There were no loans outstanding to any Director at any time during the year. Details of Directors' remuneration, interests in share awards and share options are set out on pages 136 to 154. Other related party transactions between the Group and the Directors, all of which were conducted on an arm's length basis and on normal commercial terms, are set out below.

During the year, the Group entered into separate consultancy agreements with one Director, Richard Flint, under which he received additional fees. See page 111.

### Transactions with key management personnel

This comprises of Executive Directors and Non-Executive Directors.

Key management personnel compensation is as follows:

| | 2021 £m | 2020 £m |
|---|---|---|
| Short-term employee benefits | 5.7 | 5.9 |
| Non-Executive Directors' fees | 1.7 | 1.8 |
| Post-employment benefits | 0.2 | 0.2 |
| Share-based payment costs | 3.6 | 3.0 |
| Total | 11.2 | 10.9 |

## 32. Group entities

The Company had the following subsidiary undertakings carrying on businesses which materially affect the profits and assets of the Group at 31 December 2021:

| Name | Equity interest as at 31 December 2021 | Country of incorporation | Activity | Registered office |
|---|---|---|---|---|
| Power Leisure Bookmakers Limited[1] | 100% | England and Wales | Bookmaker and provision of platform services | Waterfront, Hammersmith Embankment, Chancellors Road, London, W6 9HP |
| Betfair Group Limited[1] | 100% | England and Wales | Holding company | |
| Betfair Limited | 100% | England and Wales | Provision of support services | |
| TSE Holdings Limited | 100% | England and Wales | Holding company | |
| Stars Group Holdings (UK) Limited | 100% | England and Wales | Holding company | 4 Wellington Place, Leeds, LS1 4AP |
| Cyan Bidco Limited | 100% | England and Wales | Holding company | |
| Hestview Limited | 100% | England and Wales | Online sports betting | |
| Bonne Terre Limited | 100% | Alderney | Online gaming | Century House, 12 Victoria Street, Alderney GY9 3UF |
| FanDuel Limited | 95% | Scotland | Fantasy sports, R&D activities and support services | Shepherd and Wedderburn LLP, 1 Exchange Crescent, Conference Square, Edinburgh, EH3 8UL |
| TSE Data Processing Limited | 100% | Ireland | Provision of support services | Belfield Office Park, Beech Hill Road, Clonskeagh, Dublin 4, D04V972 |
| PPB Financing Unlimited Company[1] | 100% | Ireland | Group financing | |
| PPB Treasury Unlimited Company | 100% | Ireland | Treasury and Group financing | |
| PPB GE Limited | 100% | Ireland | Online gaming | |
| Global Sports Derivatives Limited | 100% | Ireland | Sporting events derivatives, risk management and other products | |
| TSG Platforms (Ireland) Limited | 100% | Ireland | Provision of platform services | |
| Paddy Power Holdings Limited[1] | 100% | Isle of Man | Holding company | Merchants House, 24 North Quay, Douglas, Isle of Man, IM1 4LE |
| Stars Interactive Holdings (IOM) Limited | 100% | Isle of Man | Holding company | Douglas Bay Complex, King Edward Road, Onchan, Isle of Man, IM3 1DZ |
| TSG Interactive Services Limited | 100% | Isle of Man | Service company | |
| Stars Interactive Limited | 100% | Isle of Man | Service company | |

## 32. Group entities continued

| Name | Equity interest as at 31 December 2021 | Country of incorporation | Activity | Registered office |
|------|------|------|------|------|
| Stars Interactive PS Holdings Limited | 100% | Isle of Man | Holding company | Douglas Bay Complex, King Edward Road, Onchan, Isle of Man, IM3 1DZ |
| Naris Limited | 100% | Isle of Man | Treasury | |
| Halfords Media (IOM) Limited | 100% | Isle of Man | Service company | |
| Rational Entertainment Enterprises Limited | 100% | Isle of Man | Service company | |
| Rational FT Services Limited | 100% | Isle of Man | Service company | |
| Worldwide Independent Trust Limited | 100% | Isle of Man | Treasury | |
| Rational Intellectual Holdings Limited | 100% | Isle of Man | IP holding company | |
| Sportsbet Pty Limited | 100% | Australia | Online sports betting | Level 17, 367 Collins Street, Melbourne, Victoria 3000 |
| Paddy Power Australia Pty Limited | 100% | Australia | Holding company | |
| TSED Unipessoal LDA | 100% | Portugal | R&D activities | Avenida de Camilo 72, 4300-095 Porto |
| Betfair Casino Limited | 100% | Malta | Online gaming | Triq il-Kappillan Mifsud, Santa Venera, SVR1851 |
| PPB Entertainment Limited | 100% | Malta | Online gaming | |
| PPB Counterparty Services Limited | 100% | Malta | Online sports betting | |
| Betfair International Plc | 100% | Malta | Online sports betting and gaming | |
| Betfair Holding (Malta) Limited | 100% | Malta | Holding company | |
| PPB Games Limited | 100% | Malta | Online gaming | |
| TSG Interactive Gaming Europe Ltd | 100% | Malta | Gaming company | Spinola Park – Level 2, Triq Mikiel Ang Borg, St Julian's, SPK 1000, Malta |
| TSG Interactive plc | 100% | Malta | Gaming company | |
| TSE Malta LP | 100% | Gibraltar | Online sports betting | 57/63 Line Wall Road, Gibraltar |
| Betfair Romania Development S.R.L | 100% | Romania | R&D activities | Cladirea The Office, B-dul 21 Decembrie 1989, Nr.77, Corp A, Etaj 4, Cluj-Napoca, 400604 |
| Atlas Holdings LLC | 100% | Georgia | Holding company | 4 Chovelidze Str., Mtatsminda District, Tbilisi |
| Atlas LLC | 51% | Georgia | Holding company | |
| Aviator LLC | 51% | Georgia | Online gaming and sports betting | 6 El. Akhvlediani Ascent, Chugureti District, Tbilisi |
| FanDuel Group Parent LLC | 95% | USA | Holding company | 251 Little Falls Drive, Wilmington, Delaware, 19808 |
| FanDuel Group, Inc. | 95% | USA | Holding company | |
| Stars Group (US) Holdings, LLC | 100% | USA | Holding company | |
| FanDuel Inc. | 95% | USA | Fantasy sports | |
| Betfair Interactive US LLC | 95% | USA | Sports betting and online gaming | |
| ODS Technologies LP | 95% | USA | Horse racing broadcaster, betting network, advanced deposit wagering | |
| HRTV LLC | 95% | USA | Horse racing broadcaster | |
| Flutter Financing B.V.[1] | 100% | Netherlands | Financing company | Prinses Margrietplantsoen 88, WTC, Toren E, 23e verdieping, 2595BR 's-Gravenhage |
| Flutter Holdings B.V. | 100% | Netherlands | Holding company | |
| Stars Group Holdings B.V. | 100% | Netherlands | Holding company and financing company | |
| The Stars Group Inc. | 100% | Canada | Holding company | 200 Bay Street, South Tower, Suite 3205, Toronto, Ontario, Canada, M5J 2J3 |
| Junglee Games India Private Limited | 57% | India | Online skill games company | 55, 2nd Floor, Lane-2, Westend Marg, Saidullajab, Near Saket Metro New Delhi South Delhi DL 110030 INDIA |

1. These companies are held directly by Flutter Entertainment plc.

All subsidiary undertakings have been included in the Group Consolidated Financial Statements.

In addition to the above subsidiary undertakings, the Group utilises an employee trust, The Paddy Power Betfair plc Employee Benefit Trust, with a registered address at 12 Castle Street, St Helier, Jersey, JE2 3RT, and which holds shares under the share award schemes.

Financial statements

# Notes to the Consolidated Financial Statements continued

## 33. Events after the reporting date

### Acquisition of Tombola

On 18 November 2021, the Group announced that it had reached agreement to acquire 100% of Tombola, one of the UK market's leading online bingo operators, for an enterprise value of £402m subject to merger control clearance by the UK Competition and Markets Authority. The transaction completed on 10 January 2022.

Tombola is a successful bingo-led gaming company with an emphasis on providing a low staking bingo proposition to a highly engaged customer base. In its financial year ended April 2021, Tombola generated pro forma revenue of £164m and EBITDA of £38.5m. The acquisition-date fair value accounting had not been completed as at 14 March 2022.

### Acquisition of Sisal

On 23 December 2021, the Group announced the acquisition of Sisal, Italy's leading online gaming operator, from CVC Capital Partners Fund VI for a consideration of €1.913bn/£1.62bn. This acquisition fully aligns with the Group's strategy of investing to build leadership positions in regulated markets globally. Sisal expects to report revenue (after deduction of gaming duties) in 2021 of £590m (€694m). It expects to report consolidated EBITDA of £211m (€248m), 90% of which will come from its Italian operations (online 59%, retail 31%).

The total consideration for Sisal is payable in cash and in full on completion of the transaction. This amount includes full repayment of all Sisal's debt upon completion. The transaction will be financed by way of additional Flutter debt facilities, agreed with Barclays Bank PLC. The transaction is conditional on merger control clearance and customary gaming and foreign investment consents. Subject to these approvals, it is expected that the transaction will complete in Quarter 2 2022.

# Company Statement of Financial Position

As at 31 December 2021

| | Note | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|---|
| **Assets** | | | |
| Property, plant and equipment | 5 | 104.7 | 73.4 |
| Intangible assets | 6 | 0.4 | 0.3 |
| Goodwill | 7 | 18.0 | 18.0 |
| Financial assets | 8 | 16,681.7 | 16,610.0 |
| Other receivables | 9 | — | 13.5 |
| Deferred tax assets | 11 | 0.2 | 0.1 |
| **Total non-current assets** | | **16,805.0** | 16,715.3 |
| Trade and other receivables | 9 | 881.1 | 190.9 |
| Corporation tax receivable | | 5.7 | 3.7 |
| Cash and cash equivalents | 10 | 7.5 | 8.3 |
| **Total current assets** | | **894.3** | 202.9 |
| **Total assets** | | **17,699.3** | 16,918.2 |
| **Equity** | | | |
| Issued share capital and share premium | | 477.6 | 2,481.7 |
| Merger reserve | | — | 7,982.9 |
| Treasury shares | | — | (4.2) |
| Shares held by Employee Benefit Trust | | (4.0) | (5.8) |
| Other reserves | | 255.7 | 227.6 |
| Retained earnings | | 15,784.2 | 4,631.2 |
| **Total equity** | | **16,513.5** | 15,313.4 |
| **Liabilities** | | | |
| Trade and other payables | 14 | 1,114.4 | 1,566.7 |
| Derivative financial liabilities | 14 | 2.6 | 3.7 |
| Lease liability | 15 | 5.8 | 8.8 |
| **Total current liabilities** | | **1,122.8** | 1,579.2 |
| Lease liability | 15 | 63.0 | 25.6 |
| **Total non-current liabilities** | | **63.0** | 25.6 |
| **Total liabilities** | | **1,185.8** | 1,604.8 |
| **Total equity and liabilities** | | **17,699.3** | 16,918.2 |

Notes 1 to 21 on pages 246 to 259 form an integral part of these financial statements.

On behalf of the Board

**Peter Jackson**
Chief Executive Officer
14 March 2022

**Jonathan Hill**
Chief Financial Officer

Financial statements

# Company Statement of Changes in Equity

For the year ended 31 December 2021

| Attributable to shareholders of the Company | Number of ordinary shares in issue millions # | Issued share capital and share premium £m | Undenominated capital £m | Merger reserve £m | Foreign currency translation reserve £m | Treasury shares £m | Shares held by Employee Benefit Trust £m | Share-based payments reserve £m | Retained earnings £m | Total equity £m |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at 1 January 2021 | 177.0 | 2,481.7 | 2.4 | 7,982.9 | 130.0 | (4.2) | (5.8) | 95.2 | 4,631.2 | 15,313.4 |
| Profit for the period | — | — | — | — | — | — | — | — | 1,290.4 | 1,290.4 |
| Shares issued on exercise of employee share options | 0.6 | 13.2 | — | — | — | — | — | — | — | 13.2 |
| Cancellation of treasury shares | (2.0) | (0.2) | — | — | — | 4.2 | — | — | (4.0) | — |
| Merger reserve capitalisation | — | 7,982.9 | — | (7,982.9) | — | — | — | — | — | — |
| Reduction of capital | — | (10,000.0) | — | — | — | — | — | — | 10,000.0 | — |
| Ordinary shares of the Company acquired by the Employee Benefit Trust | — | — | — | — | — | — | (180.7) | — | — | (180.7) |
| Equity-settled transactions – expense recorded in income statement | — | — | — | — | — | — | — | 77.2 | — | 77.2 |
| Equity-settled transactions – vesting | — | — | — | — | — | — | 182.5 | — | (182.5) | — |
| Transfer to retained earnings on exercise of share options | — | — | — | — | — | — | — | (49.1) | 49.1 | — |
| Total contributions by and distributions to owners of the Company | (1.4) | (2,004.1) | — | (7,982.9) | — | 4.2 | 1.8 | 28.1 | 9,862.6 | (90.3) |
| Balance at 31 December 2021 | 175.6 | 477.6 | 2.4 | — | 130.0 | — | (4.0) | 123.3 | 15,784.2 | 16,513.5 |

Notes 1 to 21 on pages 246 to 259 form an integral part of these financial statements.

# Company Statement of Changes in Equity
For the year ended 31 December 2020

| Attributable to equity holders of the Company | Number of ordinary shares in issue millions # | Issued share capital and share premium £m | Undenominated capital £m | Merger reserve £m | Foreign currency translation reserve £m | Treasury shares £m | Shares held by Employee Benefit Trust £m | Share-based payment reserve £m | Retained earnings £m | Total equity £m |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at 1 January 2020 | 80.3 | 428.3 | 2.4 | — | 130.0 | (4.2) | (6.1) | 44.5 | 3,669.9 | 4,264.8 |
| Profit for the period | — | — | — | — | — | — | — | — | 905.9 | 905.9 |
| Shares issued on exercise of share options | 1.5 | 34.3 | — | — | — | — | — | — | — | 34.3 |
| Shares issued on equity placement (net of issuance costs) (Note 12) | 16.1 | 1,933.2 | — | — | — | — | — | — | (12.4) | 1,920.8 |
| Shares issued as consideration for the combination with TSG (Note 12) | 65.3 | 5.1 | — | 6,189.5 | — | — | — | — | — | 6,194.6 |
| Shares issued in connection with acquisition of non-controlling interest in TSG Australia (Note 12) | 0.8 | 79.7 | — | — | — | — | — | — | — | 79.7 |
| Shares issued in connection with acquisition of non-controlling interest in FanDuel Group (Note 12) | 11.7 | 1.0 | — | 1,793.4 | — | — | — | — | — | 1,794.4 |
| Deal fees on acquisition of FanDuel | — | — | — | — | — | — | — | — | (9.3) | (9.3) |
| Equity-settled transactions – expense recognised | — | — | — | — | — | — | — | 70.2 | — | 70.2 |
| Equity-settled transactions – vesting | — | — | — | — | — | — | 0.3 | (0.3) | — | — |
| Exercise of share options (Note 12) | — | — | — | — | — | — | — | (77.2) | 77.2 | — |
| Dividends to shareholders (Note 13) | 1.3 | 0.1 | — | — | — | — | — | — | (0.1) | — |
| Issue of replacement options | — | — | — | — | — | — | — | 58.0 | — | 58.0 |
| Total contributions by and distributions to owners of the Company | 96.7 | 2,053.4 | — | 7,982.9 | — | — | 0.3 | 50.7 | 55.4 | 10,142.7 |
| Balance at 31 December 2020 | 177.0 | 2,481.7 | 2.4 | 7,982.9 | 130.0 | (4.2) | (5.8) | 95.2 | 4,631.2 | 15,313.4 |

Notes 1 to 21 on pages 246 to 259 form an integral part of these financial statements.

Financial statements

# Notes to the Company Financial Statements

## 1. Basis of preparation and summary of significant accounting policies

These financial statements were prepared in accordance with Financial Reporting Standard 101 Reduced Disclosure Framework ("FRS 101"). There have been no material departures from the Standard. The functional and presentation currency of these financial statements is GBP. All amounts in the financial statements have been rounded to the nearest 0.1 million. In preparing these financial statements, the Company applies the recognition, measurement and presentation requirements of International Financial Reporting Standards as adopted by the EU ("Adopted IFRSs"), but makes amendments where necessary in order to comply with the Companies Act 2014 and has set out below where advantage of the FRS 101 disclosure exemptions has been taken.

The Company is the ultimate parent company of the Flutter Group which includes the Company in its consolidated financial statements. In these financial statements, the Company has applied the exemptions available under FRS 101 in respect of the following disclosures:

- cash flow statement and related notes;
- comparative period reconciliations for property, plant and equipment and intangible assets;
- disclosures in respect of transactions with wholly owned subsidiaries;
- disclosures in respect of capital management;
- the effects of new but not yet effective IFRSs;
- disclosures in respect of the compensation of Key Management Personnel;
- disclosures of transactions with a management entity that provides Key Management Personnel services to the Company; and
- certain disclosures regarding revenue.

As the consolidated financial statements of the Flutter Group include the equivalent disclosures, the Company has also taken the exemptions under FRS 101 available in respect of the following disclosures:

- IFRS 2 Share-Based Payments in respect of group settled share-based payments;
- certain disclosures required by IAS 36 Impairment of assets in respect of the impairment of goodwill and indefinite life intangible assets;
- certain disclosures required by IFRS 3 Business Combinations in respect of business combinations undertaken by the Company; and
- certain disclosures required by IFRS 13 Fair Value Measurement and the disclosures required by IFRS 7 Financial Instrument Disclosures.

As permitted by section 304 of the Companies Act 2014, no separate profit and loss account is presented in respect of the Company. The Company recorded a profit for the year of £1,290.4m (2020: £905.9m).

### Recent accounting pronouncements

The IASB has issued the following standards, policies, interpretations and amendments which were effective for the Company for the first time in the year ended 31 December 2021:

- Amendments to IFRS 9, IAS 39, IFRS 7 and IFRS 16: Interest Rate Benchmark Reform Phase 2; and
- Amendment to IFRS 16: Covid-19 Related Rent Concessions.

The adoption of the above new standards and interpretations did not have a significant impact on the Company's financial statements.

### Going concern

The Company is in a net current liability position of £228.5m at 31 December 2021 primarily as a result of net amounts owed to fellow Group companies of £206.3m. The Directors have considered the available financial resources for the Company and have obtained confirmations from fellow Group companies that amounts due will not be called upon within 12 months.

The Company's forecasts for 2022 and beyond indicate that it will continue to have significant financial resources for at least a period of 12 months from the date of these financial statements.

Having given regard to the above, the Directors are satisfied that there are no material uncertainties with regard to the going concern of the Company and as a result have a reasonable expectation that the Company has adequate resources to continue in operational existence for a period of at least 12 months from the date of approval of these financial statements, and therefore it continues to adopt the going concern basis of accounting in preparation of its financial statements.

### Revenue

The services provided by the Company comprise sports betting and business-to-business services as well as services provided to other Group companies. Revenue is stated exclusive of value-added tax ("VAT"). The costs of customer promotions (including free bets) and bonuses are deducted from revenue. Revenue is stated exclusive of VAT.

The Company's activities, with the exception of business-to-business services and services to other Group companies on which fees are earned, are classified as derivative financial instruments.

Revenue from betting activities represents the net gain or loss from betting activities in the period plus the gain or loss on the revaluation of open positions at period end, and is stated net of the cost of customer promotions and bonuses incurred in the period.

## 1. Basis of preparation and summary of significant accounting policies continued

These derivatives are recognised initially at fair value and subsequently at fair value through profit or loss, within the income line as this represents the Company's principal activity. Commission and other fee income earned is also recorded within revenue.

Revenue from business-to-business services and services to other Group companies represents fees charged for the services provided in the period.

### Financial assets

Interests in subsidiary undertakings are stated in the Company statement of financial position as financial assets, at cost less, where necessary, provisions for impairment.

Included within financial assets are capital contributions representing share-based payment awards made to employees of certain of the Company's subsidiaries.

### Property, plant and equipment

Property, plant and equipment is stated at historical cost less accumulated depreciation and impairment losses. Cost includes expenditure that is directly attributable to the acquisition of the asset. The cost of self-constructed assets includes the cost of materials and direct labour, any other costs directly attributable to bringing the assets to a working condition for their intended use, and the costs of dismantling and removing items and restoring the sites on which they are located. Cost also may include transfers from equity of any gain or loss on qualifying cash flow hedges of foreign currency purchases of property, plant and equipment. Purchased software that is integral to the functionality of the related equipment is capitalised as part of that equipment.

Gains and losses on disposal of an item of property, plant and equipment are determined by comparing the proceeds from disposal with the carrying amount of property, plant and equipment and are recognised net within the income statement. Depreciation is calculated to write-off the cost less estimated residual value of property, plant and equipment on a straight-line basis over their useful lives, as follows:

| Land | Not depreciated |
|---|---|
| Buildings: Freehold | 25 – 50 years |
| Buildings: Leasehold improvements | Unexpired term of the lease, except for leases with an initial term of 10 or less years, which are depreciated over the unexpired term of the lease plus the renewal length of the lease if there is an unconditional right of renewal |
| Fixtures and fittings | 3 – 10 years |
| Computer equipment | 2 – 5 years |
| Right-of-use asset | Shorter of term of lease and useful life of asset, as defined under IFRS 16 |

Assets in the process of construction are stated at cost less impairment losses. Depreciation of these assets begins when the assets are ready for their intended use. The residual value of property, plant and equipment, if significant, is reassessed annually.

### Intangible assets

Intangible assets, principally comprising licences and computer software, are capitalised at cost and amortised over their estimated useful economic lives on a straight-line basis.

Licences comprise the costs of acquiring retail bookmaking licences, the rents incurred in respect of the period prior to each shop opening for business (as the existence of a premises is a pre-requisite for obtaining such licences) and licences for electronic point of sale ("EPOS") system software.

Computer software and technology includes the costs incurred in acquiring and bringing specific software programs into use. Maintenance costs relating to computer software programs are expensed to the income statement when incurred.

The estimated useful economic lives of intangible assets, according to which amortisation is calculated, are as follows:

| Licences | 2 – 20 years |
|---|---|
| Computer software and technology | 2 – 5 years |

### Business combinations

Acquisitions of businesses are accounted for using the acquisition method. The value of acquisition is measured at the date of purchase and represents the aggregate of the fair values of assets given, liabilities incurred or assumed and any equity instruments issued by the Group in exchange for control of the acquiree and fair value of previously held equity interests. The identifiable assets and liabilities of the acquiree are recognised at their fair values at the date of acquisition.

Financial statements

# Notes to the Company Financial Statements continued

## 1. Basis of preparation and summary of significant accounting policies continued

Goodwill recognised under Irish Generally Accepted Accounting Practice ("GAAP") prior to the date of transition to IFRS is stated at net book value as at the transition date. Goodwill recognised subsequent to 1 January 2014, representing the excess of purchase consideration over the fair value of net identifiable assets acquired defined in accordance with IFRS 3 Business Combinations, is capitalised. Goodwill is initially recognised as an asset at cost and is thereafter measured at cost less any accumulated impairment losses. Goodwill is not amortised but is tested for impairment annually. Any impairment in the value of goodwill is recognised in the income statement in the period in which it arises. Goodwill is recognised only when control of the acquiree is initially achieved. Following the acquisition of control, no goodwill is recognised on subsequent purchases of equity interests in the acquiree and instead the difference between the cost of such acquisitions and the fair values of the relevant net assets acquired is dealt with through retained earnings.

Costs relating to the acquisition of businesses that occurred since 1 January 2014 are expensed to the income statement when incurred. Costs relating to the acquisition of non-controlling interests are recognised directly in retained earnings.

Amounts payable in respect of deferred contingent consideration are recognised at fair value at the acquisition date. Subsequent changes to the fair value of the contingent consideration are recognised in the income statement.

### Impairment
#### Financial assets (including receivables) – excluding investments in subsidiaries
The Company recognises loss allowances for expected credit losses ("ECLs") on financial assets measured at amortised cost. The Company measures loss allowances at an amount equal to lifetime ECLs, except for bank balances for which credit risk (i.e. the risk of default occurring over the expected life of the financial instrument) has not increased significantly since initial recognition which are measured at 12 month ECLs.

Loss allowances for trade receivables and contract assets are always measured at an amount equal to lifetime ECLs.

When determining whether the credit risk of a financial asset has increased significantly since initial recognition and when estimating ECLs, the Company considers reasonable and supportable information that is relevant and available without undue cost or effort. This includes both quantitative and qualitative information and analysis, based on the Company's historical experience and informed credit assessment and including forward-looking information. The Company considers a financial asset to be in default when the borrower is unlikely to pay its credit obligations to the Company in full or the financial asset is significantly past due.

The maximum period considered when estimating ECLs is the maximum contractual period over which the Company is exposed to credit risk.

#### Measurement of ECLs
ECLs are a probability weighted estimate of credit losses. Credit losses are measured as the present value of all cash shortfalls (i.e. the difference between the cash flows due to the entity in accordance with the contract and the cash flows that the Company expects to receive). ECLs are discounted at the effective interest rate of the financial asset.

#### Credit-impaired financial assets
At each reporting date, the Company assesses whether financial assets carried at amortised cost are credit impaired. A financial asset is "credit impaired" when one or more events that have a detrimental impact on the estimated future cash flows of the financial asset have occurred.

Evidence that a financial asset is credit impaired includes the following observable data:

- significant financial difficulty of the third party;
- a breach of contract such as a default;
- the restructuring of a balance by the Company on terms that the Company would not consider otherwise; or
- it is probable that the third party will enter bankruptcy or another financial reorganisation.

#### Presentation of allowance for ECL in the statement of financial position
Loss allowances for financial assets measured at amortised cost are deducted from the gross carrying amount of the assets.

#### Write-off
The gross carrying amount of a financial asset is written off when the Company has no reasonable expectations of recovering a financial asset in its entirety or a portion thereof. The Company individually makes an assessment with respect to the timing and amount of write off based on whether there is a reasonable expectation of recovery. However, financial assets that are written off could still be subject to enforcement activities in order to comply with the Company's procedures for recovery of amounts due.

## 1. Basis of preparation and summary of significant accounting policies continued

### Non-financial assets
The carrying amounts of the Company's non-financial assets, other than deferred tax assets, are reviewed at each reporting date to determine whether there is any indication of impairment. If any such indication exists, then the asset's recoverable amount is estimated. For goodwill, and intangible assets that have indefinite useful lives (such as certain licences and brands) or that are not yet available for use, the recoverable amount is estimated each year at the same time. The recoverable amount of an asset or cash generating unit is the higher of fair value less costs to sell or its value-in-use. In assessing value-in-use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset. For the purpose of impairment testing, assets that cannot be tested individually are grouped together into the smallest group of assets that generates cash inflows from continuing use that are largely independent of the cash inflows of other assets or groups of assets (the "cash generating unit", or "CGU"). Subject to an operating segment ceiling test, for the purposes of goodwill impairment testing, CGUs to which goodwill has been allocated are aggregated so that the level at which impairment is tested reflects the lowest level at which goodwill is monitored for internal reporting purposes. Goodwill acquired in a business combination is allocated to groups of CGUs that are expected to benefit from the synergies of the combination. The Company's corporate assets do not generate separate cash inflows. If there is an indication that a corporate asset may be impaired, then the recoverable amount is determined for the CGU to which the corporate asset belongs.

An impairment loss is recognised if the carrying amount of an asset or its CGU exceeds its estimated recoverable amount. Impairment losses are recognised in the profit or loss. Impairment losses recognised in respect of CGUs are allocated first to reduce the carrying amount of any goodwill allocated to the units, and then to reduce the carrying amounts of the other assets in the unit (group of units) on a pro-rata basis. An impairment loss in respect of goodwill is not reversed. In respect of other assets, impairment losses recognised in prior periods are assessed at each reporting date for any indications that the loss has decreased or no longer exists. An impairment loss is reversed if there has been a change in the estimates used to determine the recoverable amount. An impairment loss is reversed only to the extent that the asset's carrying amount does not exceed the carrying amount that would have been determined, net of depreciation or amortisation, if no impairment loss had been recognised.

### Other non-derivative financial instruments
Other non-derivative financial instruments comprise cash and cash equivalents, trade and other receivables and trade and other payables.

A financial instrument is recognised if the Company becomes a party to the contractual provisions of the instrument. Non-derivative financial instruments are recognised initially at fair value plus, for instruments not at fair value through profit or loss, any directly attributable transaction costs. Subsequent to initial recognition, non-derivative financial instruments are measured as described below.

Financial assets are derecognised if the Company's contractual right to the cash flows from the financial assets expires or if the Company transfers the financial asset to another party without retaining control or substantially all the risks and rewards of the asset. Regular way purchases and sales of financial assets are accounted for at trade date, i.e. the date that the Company commits itself to purchase or sell the asset. Financial liabilities are derecognised if the Company's obligations specified in the contract expire or are discharged or cancelled.

Cash and cash equivalents are comprised of cash and deposits with an original maturity of three months or less.

Subsequent to initial recognition, cash and cash equivalents and trade and other payables are measured at amortised cost.

Trade and other receivables are stated at their nominal value as reduced by appropriate allowances for expected credit losses.

### Derivative financial instruments
The Company holds certain derivative financial instruments which are initially recognised at fair value.

### Sports betting open positions
Amounts received from customers on sportsbook events that have not occurred by the year end are derivative financial instruments and have been designated by the Company on initial recognition as financial liabilities at fair value through profit or loss.

### Borrowings
Borrowings are recorded at the fair value of the proceeds received, net of any directly attributable transaction costs. Subsequent to initial recognition, borrowings are stated at amortised cost using the effective interest method.

### Employee benefits
#### Pensions
The Company operates a number of defined contribution schemes under which the Company pays fixed contributions to a separate entity and has no legal or constructive obligation to pay further amounts. Obligations for contributions are recognised as an expense in the income statement as the service is received. Prepaid contributions are recognised as an asset to the extent that a cash refund or reduction in future payments is available.

# Notes to the Company Financial Statements continued

## 1. Basis of preparation and summary of significant accounting policies continued

### Share-based payments

The Company operates equity-settled long-term and medium-term incentive plans for selected senior executives and other key management under which they are conditionally awarded shares or options over Company shares which vest upon the achievement of predetermined targets and/or future service periods. The fair value is measured at the award or option grant date and is spread over the period during which the employees become unconditionally entitled to the shares or options with a corresponding increase in the share-based payment reserve in equity. The fair value of the shares conditionally granted is measured using the market price of the shares at the time of grant or in the case of shares with a non-market condition measured using either a binomial or Monte Carlo valuation model.

The Company operates an equity-settled share save scheme ("SAYE") for employees under which employees acquire options over Company shares at a discounted price subject to the completion of a savings contract. The fair value of share options granted is recognised as an employee benefit cost with a corresponding increase in the share-based payment reserve in equity. The fair value is measured at grant date and spread over the period during which the employees become unconditionally entitled to the options. The fair value of the options granted is measured using a Black-Scholes model, taking into account the terms and conditions, other than non-market performance conditions, upon which the options were granted. The amount recognised as an expense is adjusted to reflect the actual number of share options that vest for only non-market vesting and service conditions.

Where the Company grants options over its own shares to the employees of its subsidiaries, it recognises in its individual financial statements an increase in the cost of investment in its subsidiaries (unless reimbursed) equivalent to the equity-settled share-based payment charge recognised in its consolidated financial statements with the corresponding credit being recognised directly in equity. Amounts subsequently recharged to the subsidiary or reimbursed by the subsidiary are recognised as a reduction in the cost of investment in subsidiary. When the cost of investment in subsidiary has been reduced to nil, the excess is recognised as a dividend/creditor.

### Leases

At inception of a contract, the Company assesses whether a contract is, or contains, a lease. A contract is, or contains, a lease if the contract conveys the right to control the use of an identified asset for a period of time in exchange for consideration.

#### The Company as a lessee

The Company recognises a right-of-use asset and a lease liability at the lease commencement date.

The right-of-use assets comprise the initial measurement of the corresponding lease liability, lease payments made at or before the commencement of the lease, and any initial costs. They are then subsequently measured at cost less accumulated depreciation and impairment losses. Right-of-use assets are depreciated over the shorter of the lease term and the useful life of the underlying asset, and are tested for impairment in accordance with IAS 36, Impairment of Assets ("IAS 36").

The lease liability is initially measured at the present value of the future lease payments, discounted by using the interest rate implicit in the lease. If this rate cannot be readily determined, the Company uses its incremental borrowing rate at the lease commencement date. The Company subsequently measures the lease liability by increasing the carrying amount to reflect interest on the lease liability and by reducing the carrying amount to reflect the lease payments made.

Interest on the lease liability is recognised in financial expenses within the income statement.

Lease payments included in the measurement of the lease liability include:

- fixed lease payments (including in-substance fixed payments), less any lease incentives;
- variable lease payments that depend on an index or rate initially measured using the index or rate at the commencement date;
- amount expected to be payable by the lessee under residual value guarantees;
- the exercise price of purchase options or the term of extension options if the lessee is reasonably certain to exercise the options; and
- payments of penalties for terminating the lease if the lease includes an option to terminate the lease.

The Company remeasures the lease liability and makes a corresponding adjustment to the related right-of-use asset whenever:

- the lease term has changed or there is a change in the assessment of exercise of a purchase or extension option, in which case the lease liability is remeasured by discounting the revised lease payments using a revised discount rate;
- the lease payments change due to changes in an index or rate or change in expected payment under a guaranteed residual value, in which case the lease liability is remeasured by discounting the revised lease payments using the initial discount rate (unless the lease payments change is due to a change in a floating interest rate, in which case a revised discount rate is used); or
- a lease contract is modified and the lease modification is not accounted for as a separate lease, in which case the lease liability is remeasured by discounting the revised lease payments using a revised discount rate.

Variable rents that do not depend on an index or rate are not included in the measurement of the lease liability or right-of-use asset. The related payments are recognised as an expense in the period in which the event or condition that triggers such payments occurs.

As a practical expedient, IFRS 16 permits a lessee to account for any lease and associated non-lease components as a single arrangement instead of separating the non-lease components. The Company has applied this practical expedient.

For short-term leases (lease term of 12 months or less) and leases of low-value assets, such as personal computers and office furniture, the Company has opted to recognise a lease expense on a straight-line basis as permitted by IFRS 16.

## 1. Basis of preparation and summary of significant accounting policies continued

**The Company as a lessor**

The Company has a small number of properties that are sublet.

At inception of a contract, the Company determines whether each lease is a finance lease or an operating lease, by reference to the transfer of all risks and rewards in connection to ownership of the underlying asset. In the case of a finance lease, the Company applies the derecognition and impairment requirements in IFRS 9 to the net investment in the lease.

When the Company is an intermediate lessor the sub leases are classified with reference to the right-of-use asset arising from the head lease, not with reference to the underlying asset.

Under operating leases, the Company recognises the income generated by the lease on an accrual basis over the life of the contract.

### Income tax

Income tax in the income statement comprises current and deferred tax. Income tax expense is recognised in profit or loss except to the extent that it relates to items recognised in other comprehensive income or directly in equity, in which case it is recognised in other comprehensive income or directly in equity.

Current tax is the expected tax payable on the taxable income for the year, using tax rates enacted or substantively enacted at the reporting date, and any adjustment to tax payable in respect of the previous year.

Deferred tax is provided on temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for taxation purposes. Deferred tax is measured at the tax rates that are expected to apply to temporary differences when they reverse, based on laws that have been enacted or substantively enacted at the reporting date.

A deferred tax asset is recognised only to the extent that it is probable that future taxable profits will be available against which the asset can be utilised. Deferred tax assets are reviewed at each reporting period and are reduced to the extent that it is no longer probable that the related tax benefit will be realised.

Deferred tax assets and liabilities are offset to the extent that they relate to income taxes levied by the same taxation authority.

### Foreign currency transactions

Transactions in foreign currencies are translated at the relevant foreign exchange rate ruling at the date of the transaction. Non-monetary assets that are carried at historical cost are not subsequently retranslated. Monetary assets and liabilities denominated in foreign currencies at the reporting date are translated into GBP at the foreign exchange rates ruling at that date. Foreign exchange differences arising on translation are recognised in the income statement.

### Repurchase of share capital (treasury shares)

When share capital recognised as equity is repurchased, the amount of the consideration paid, which includes directly attributable costs, is recognised as a deduction from equity. The repurchased shares are classified as treasury shares and are presented as a deduction from total equity. Transaction costs relating to the purchase by the Company of its own shares are recognised directly in retained earnings. When treasury shares are sold or reissued subsequently, the amount received is recognised as an increase in equity, and any resulting surplus on the transaction is recognised in share premium.

Where the Company purchases its own shares and subsequently cancels those shares, the cost of the shares cancelled is written off directly to retained earnings.

### Dividends

Dividends on ordinary shares are recognised in equity in the period in which they are approved by the Company's shareholders, or, in the case of the interim dividend, when it has been approved by the Board of Directors and paid.

### Critical accounting estimates and judgements

The preparation of annual financial statements in conformity with IFRS requires management to make judgements, estimates and assumptions that affect the application of accounting policies and the reported amounts of assets, liabilities, income and expenses. Actual results may differ from these estimates.

Estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognised in the period in which the estimates are revised and in any future periods affected.

In the course of preparing the financial statements, no judgements have been made in the process of applying the Company's accounting policies, other than those involving estimation (as described below), that have a significant effect on the amounts recognised in the financial statements.

Information about assumptions and estimation uncertainties that have a significant risk of resulting in material adjustment to the carrying amount of assets and liabilities within the next financial year is set out below.

**Measurement of the recoverable amount of investments in subsidiaries**

The Group reviews the carrying value of investments in subsidiaries for impairment annually (or more frequently if there are indications that the value of investments may be impaired) by comparing the carrying values with their recoverable amounts (being the higher of value-in-use and fair value less costs to sell). The impairment review is performed on a "value-in-use" basis, which requires estimation of future net operating cash flows, the time period over which they will occur, an appropriate discount rate and an appropriate growth rate. Certain of these estimates and assumptions are subjective in nature.

The Company also considers the overall market capitalisation of the Group and whether it is in excess of the carrying value of investments for this review.

Financial statements

# Notes to the Company Financial Statements continued

## 2. Employee expenses and numbers

|  | 2021<br>£m | 2020<br>£m |
|---|---|---|
| Wages and salaries | 30.0 | 31.9 |
| Social security costs | 3.3 | 4.1 |
| Defined contribution pension and life assurance costs | 0.3 | 0.2 |
| Share-based payment expense (see below) | 0.2 | 4.7 |
| Other staff costs | 1.2 | 1.0 |
| Total employee costs | 35.0 | 41.9 |
| The average number of persons employed by the Company (including Executive Directors), all of whom were involved in the provision of sports betting and gaming services, during the year was: | 1,311 | 1,398 |

Details of the remuneration of Directors are set out in the Directors' Remuneration Report on pages 136 to 154.

### Summary of share-based payments expense

The share-based payments expense in the profit and loss account in respect of the Company's share schemes is comprised as follows:

|  | 2021<br>£m | 2020<br>£m |
|---|---|---|
| Flutter Entertainment plc Long Term Incentive Plan ("LTIP") and Restricted Share Plan | — | 4.4 |
| The Flutter Entertainment plc Sharesave Scheme | 0.2 | 0.3 |
| Total | 0.2 | 4.7 |

## 3. Financial income and expense

|  | 2021<br>£m | 2020<br>£m |
|---|---|---|
| Recognised in profit or loss: |  |  |
| Financial expense |  |  |
| *On financial liabilities at amortised cost:* |  |  |
| Lease interest | 1.4 | 1.0 |
| Interest on third party borrowings, bank guarantees and bank facilities | — | 2.5 |
| Total | 1.4 | 3.5 |

## 4. Statutory information

|  | 2021<br>£m | 2020<br>£m |
|---|---|---|
| Auditor's remuneration for audit and other assurance services | 1.8 | 2.3 |
| Depreciation of property, plant and equipment | 17.7 | 17.6 |
| Amortisation of intangible assets | 0.1 | 0.3 |
| Foreign currency exchange loss – monetary items | 6.1 | 8.1 |
| Operating lease income (representing sub-lease income) | — | (0.1) |

The auditor's remuneration of £1.8m (2020: £2.3m) relates to the audit of Group and subsidiary financial statements and other non-audit services. Further details on auditor's remuneration is disclosed in Note 9 to the consolidated financial statements.

### Auditor remuneration to Company external auditor (KPMG Ireland)

In accordance with the requirements of Companies Act 2014, reference s322, the auditor's remuneration figures presented below represent fees paid to KPMG Ireland only and are exclusive of value-added tax. Audit relates to the audit of the Company financial statements only. Audit fees borne by the Company in relation to the audit by KPMG Ireland of the Group and subsidiary companies are classified as other assurance services.

|  | 2021<br>£m | 2020<br>£m |
|---|---|---|
| Audit | 0.1 | 0.1 |
| Other assurance services | 1.6 | 1.7 |
| Other non-audit services | 0.1 | 0.5 |
| Total | 1.8 | 2.3 |

Other assurance services includes £1.5m (2020: £1.6m) in respect of fees incurred by the Company for the audit of the Group financial statements and £0.1m (2020: £0.1m) in respect of fees relating to the audit of subsidiary companies which have been borne by the Company.

## 5. Property, plant and equipment

| | Land, buildings and leasehold improvements £m | Fixtures and fittings £m | Computer equipment £m | Right-of-use assets [1] £m | Total £m |
|---|---|---|---|---|---|
| **Cost** | | | | | |
| Balance at 1 January 2021 | 38.5 | 96.5 | 15.5 | 52.0 | 202.5 |
| Additions | — | 7.3 | 3.0 | 38.9 | 49.2 |
| Disposals | (0.2) | (0.6) | (0.1) | — | (0.9) |
| **Balance at 31 December 2021** | **38.3** | **103.2** | **18.4** | **90.9** | **250.8** |
| | | | | | |
| **Depreciation** | | | | | |
| Balance at 1 January 2021 | 27.2 | 72.2 | 13.0 | 16.7 | 129.1 |
| Depreciation charges | 1.3 | 6.1 | 1.3 | 9.0 | 17.7 |
| Disposals | (0.1) | (0.5) | (0.1) | — | (0.7) |
| **Balance at 31 December 2021** | **28.4** | **77.8** | **14.2** | **25.7** | **146.1** |
| | | | | | |
| **Net book value** | | | | | |
| At 31 December 2020 | 11.3 | 24.3 | 2.5 | 35.3 | 73.4 |
| **At 31 December 2021** | **9.9** | **25.4** | **4.2** | **65.2** | **104.7** |

1. Note that materially all of this balance relates to buildings and leasehold improvements.

The net book value of land, buildings and leasehold improvements at 31 December 2021 includes £6.6m (2020: £7.8m) in respect of leasehold improvements.

The Directors do not consider the remaining useful lives of property, plant and equipment to be materially different from the period over which the assets are being depreciated.

## 6. Intangible assets

The movements during the prior year and current year in respect of intangible assets, which comprise licences and computer software, were as follows:

| | Licences £m | Computer software £m | Total £m |
|---|---|---|---|
| **Cost** | | | |
| Balance at 1 January 2021 | 1.4 | 4.8 | 6.2 |
| Additions | — | 0.2 | 0.2 |
| **Balance at 31 December 2021** | **1.4** | **5.0** | **6.4** |
| | | | |
| **Amortisation** | | | |
| Balance at 1 January 2021 | 1.4 | 4.5 | 5.9 |
| Amortisation charge | — | 0.1 | 0.1 |
| **Balance at 31 December 2021** | **1.4** | **4.6** | **6.0** |
| | | | |
| **Net book value** | | | |
| Balance at 31 December 2020 | — | 0.3 | 0.3 |
| **Balance at 31 December 2021** | **—** | **0.4** | **0.4** |

## 7. Goodwill

| | Goodwill £m |
|---|---|
| Balance at 31 December 2020 | 18.0 |
| **Balance at 31 December 2021** | **18.0** |

The goodwill balance as at 31 December 2021 arose from the assets acquired as part of the amalgamation of three bookmaking businesses to form Paddy Power plc in 1988 and subsequent acquisitions of licensed book making shops in Ireland. The goodwill balance as at 31 December 2021 is attributable to the Irish Retail cash generating unit, being the lowest level of asset for which there are separately identifiable cash flows (see Note 14 to the consolidated financial statements).

The accumulated amortisation balance at 31 December 2021 is £4.1m (2020: £4.1m). Under IFRS, goodwill is not amortised but is instead tested for impairment annually. The most recent test for impairment was performed at 31 December 2021 and is detailed in Note 14 to the consolidated financial statements within the Irish Retail cash generating unit.

Financial statements

# Notes to the Company Financial Statements continued

## 8. Financial assets

| | Unlisted investments in subsidiary companies £m | Capital contributions £m | Total £m |
|---|---|---|---|
| Balance at 1 January 2020 | 4,889.5 | 140.1 | 5,029.6 |
| Additional investments in subsidiaries | 11,519.6 | — | 11,519.6 |
| Share-based payments | — | 60.8 | 60.8 |
| **Balance at 31 December 2020** | **16,409.1** | **200.9** | **16,610.0** |
| Additional investments in subsidiaries | 1,922.0 | — | 1,922.0 |
| Impairment | (1,750.0) | — | (1,750.0) |
| Share-based payments | — | 72.6 | 72.6 |
| Amounts received in respect of share-based payments | — | (172.9) | (172.9) |
| **Balance at 31 December 2021** | **16,581.1** | **100.6** | **16,681.7** |

In the opinion of the Directors, the value to the Company of the unlisted investments in and capital contributions to subsidiary companies at 31 December 2021 is not less than the carrying amount of £16,681.7m (2020: £16,610.0m).

The Company's principal subsidiaries are listed in Note 32 to the consolidated financial statements.

The increase in investments in subsidiary companies in 2021 is due to various internal restructuring of subsidiaries.

The increase in investments in subsidiary companies in 2020 is due to the following:

- £6.3bn as a result of the Combination with TSG on 5 May 2020 described in more detail in Note 15 of the consolidated financial statements;
- £2.9bn due to the acquisition of a further 37.2% of FanDuel on 30 December 2020 described in more detail in Note 15 of the consolidated financial statements; and
- £2.3bn due to various internal restructuring of subsidiaries following the TSG Combination.

An impairment charge has arisen as a result of various subsidiary restructuring activities. The recoverable amount of the impaired subsidiary was estimated based on value in use calculations using approved cash flow projections for a five-year period. A pre-tax discount rate of 9% and a terminal growth rate of 2.8% have been applied to the projected cash flows.

Capital contributions represent amounts included in the Company's share-based payment reserve relating to share-based payment awards made to employees of certain of the Company's subsidiary undertakings.

Amounts received in respect of share-based payments relates to amounts from subsidiaries due in respect of share payments.

## 9. Trade and other receivables
### Non-current assets

| | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| **Trade and other receivables** | | |
| Amounts paid in respect of legacy Greek tax assessments | — | 13.5 |

### Amounts paid in respect of legacy Greek tax assessments
In 2019, the Group was issued with a Greek tax assessment for financial years 2012, 2013 and 2014, relating to paddypower.com's Greek interim licence. This assessment concluded that the Group is liable to pay €15.0m in taxes including penalties and interest. This is substantially higher (by multiples) than the total cumulative revenues ever generated by paddypower.com in Greece. Pending the outcome of its appeal, in 2019 the Group paid the total Greek tax assessment (including the penalties and interest) of €15.0m.

In June 2021, the Athens Administrative Court of Appeal dismissed the Group's judicial recourses. While the Group has further appealed to the Greek Supreme Administrative Court, based on the nature of the decision received and the points of law which can be appealed, and in line with legal and tax advice it has received, it has decided to recognise the amount of the Greek assessment, of €15.0m (£12.8m) as an expense in the income statement during the year ended 31 December 2021. No notifications have as yet been received for later years and so no provision has been made for potential further assessments.

### Current assets

| | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| **Trade and other receivables** | | |
| Prepayments | 8.9 | 6.4 |
| Amounts owed by fellow Group companies | 872.2 | 184.5 |
| **Total** | **881.1** | **190.9** |

## 10. Cash and cash equivalents

Cash and cash equivalents are analysed by currency as follows:

|  | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| GBP | 3.4 | 0.1 |
| EUR | 1.8 | 8.1 |
| USD | 1.6 | 0.1 |
| Other | 0.7 | — |
| Total | 7.5 | 8.3 |

There was no cash on deposit at 31 December 2021 and 31 December 2020.

## 11. Deferred tax assets and liabilities

Deferred tax is attributable to the following:

|  | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| Property, plant and equipment | 0.2 | 0.1 |

### Movement in temporary differences during the year:

|  | 2021 £m | 2020 £m |
|---|---|---|
| Balance at 1 January | 0.1 | 0.2 |
| Recognised in income | 0.1 | (0.1) |
| Balance at 31 December | 0.2 | 0.1 |

All the above deferred tax balances are in respect of Irish corporation tax.

## 12. Share capital and reserves

The total authorised share capital of the Company comprises 300,000,000 ordinary shares of €0.09 each (2020: 300,000,000 ordinary shares of €0.09 each). All issued share capital is fully paid. The holders of ordinary shares are entitled to vote at general meetings of the Company on a one vote per share held basis. Ordinary shareholders are also entitled to receive dividends as may be declared by the Company from time to time.

Transactions during the year ended 31 December 2021:

- a total of 558,275 ordinary shares were issued as a result of the exercise of employee share options, giving rise to share capital and share premium of £13.2m;
- on 25 August 2021, the Company announced it had cancelled 1,965,600 ordinary shares of €0.09 each previously held by it and its subsidiaries as treasury shares; and
- in accordance with the authority conferred by shareholders pursuant to resolution 10 at Flutter's Annual General Meeting held on Thursday, 29 April 2021, the Board on 10 September 2021 confirmed that it had completed the capitalisation of £7,982.9m, being the entirety of the amounts standing to the credit of Flutter's merger reserve account at 31 December 2020. In accordance with the provisions of sections 84 and 85 of the Companies Act 2014 and the authority conferred by resolution 11 as approved by shareholders at the AGM, the Board applied to the Irish High Court to reduce the Company's capital by the amount of £10,000m standing to the credit of Flutter's share premium account following completion of the capitalisation. On 3 November 2021, the Irish High Court approved the reorganisation of the Company's capital by the reduction of £10,000m standing to the credit of Flutter's share premium account, and the transfer of such sum to the Company's distributable reserves account. This resulted in the transfer of £10,000m from share premium to retained earnings.

Transactions during the year ended 31 December 2020:

- in May 2020, 1,312,260 new ordinary shares were issued as consideration for the 2019 final dividend;
- on 5 May 2020, the Company issued a total of 65,316,588 ordinary shares in exchange for 289,909,400 shares of TSG in respect of the all-share Combination with TSG resulting in Flutter Entertainment plc shareholders owning 54.64% and the TSG shareholders owning 45.36% of Flutter, on a fully diluted basis (excluding any out of the money options). Under the terms of the Combination, holders of TSG shares received 0.2253 ordinary shares with nominal value of €0.09 each in the Company ("ordinary shares") in exchange for each outstanding TSG share (the "Exchange Ratio"). Post Combination, the Company is the ultimate parent of The Stars Group Inc. This gave rise to a merger reserve under section 72 of the Companies Act 2014 of €6,189.5m (see also Note 15 to the Consolidated Financial Statements);
- on 13 May 2020, 819,230 new Flutter ordinary shares were issued as consideration for the acquisition of the remaining 20% interest of TSG Australia Pty Ltd by Flutter. The value of shares issued amounted to AUD$151.4m (£79.7m) (see also Note 15 to the Consolidated Financial Statements);

Financial statements

# Notes to the Company Financial Statements continued

## 12. Share capital and reserves continued

- on 29 May 2020, the Company issued 8,045,995 new ordinary shares at a price of 10,100 pence per share in respect of an equity placement announced on 28 May 2020, raising gross proceeds of £812.6m giving rise to share capital of £0.7m and a share premium of £811.9m. The proceeds raised net of issuance costs amounted to £806.3m with the issuance costs of £6.3m recognised in retained earnings. The Placing Shares represent approximately 5.5% of the Company's issued share capital immediately prior to the Placing (excluding treasury shares). The Placing Price represents a discount of approximately 4.7% to the closing price on 28 May 2020;

- on 4 December 2020, the Company issued a total of 8,004,503 ordinary shares at a price of 14,000 pence per share in respect of an equity placement announced on 3 December 2020, raising proceeds of £1,120.6m giving rise to share capital of £0.7m and a share premium of £1,119.9m. The proceeds raised net of issuance costs amounted to £1,114.6m with the issuance costs of £6.1m recognised in retained earnings. The Placing Shares represent approximately 5.2% of the Company's issued share capital immediately prior to the Placing (excluding treasury shares). The Placing Price represents a discount of approximately 2.1% to the closing price on 3 December 2020;

- on 30 December 2020, 11,747,205 new Flutter ordinary shares were issued as partial consideration for the acquisition of an additional 37.2% of the outstanding share of FanDuel, bringing the Company's indirect holding in FanDuel to 95%, up from the previous 57.8%. The value of shares issue amounted to £1.0m in share capital and gives rise to £1,793.4m of a merger reserve under section 72 of the Companies Act 2014 (see also Note 15 to the Consolidated Financial Statements); and

- a total of 1,492,430 ordinary shares were issued as a result of the exercise of employee share options, giving rise to share capital and share premium of £34.3m.

### Equity reserves

Equity reserves at 31 December 2021 and 31 December 2020 include the following classes of reserves:

#### Undenominated capital

Undenominated capital of £2.2m (2020: £2.2m) which relates to the nominal value of shares in the Company acquired by the Company and subsequently cancelled, and the nominal value of shares in the Company cancelled as part of the return of capital to shareholders, and an amount of £0.2m (2020: £0.2m) which arose on the redenomination of the ordinary share capital of the Company at the time of conversion from Irish pounds to euro.

#### Merger reserve

At 31 December 2020, the Company held a merger reserve under section 72 of the Companies Act 2014 of £7,982.9m which represented the premium over the par value of shares issued as consideration for the Combination with TSG and as partial consideration for the acquisition of a further 37.2% of FanDuel Group.

In accordance with the authority conferred by shareholders pursuant to resolution 10 at Flutter's Annual General Meeting held on Thursday, 29 April 2021, the Board on 10 September 2021 confirmed that it had completed the capitalisation of £7,982.9m, being the entirety of the amounts standing to the credit of Flutter's merger reserve account at 31 December 2020. This resulted in the transfer of £7,982.9m from merger reserve to share premium.

#### Foreign exchange translation reserve

The foreign exchange translation reserve of £130.0m arose as a result of the Company changing its functional currency and presentation currency from euro to pound sterling with effect from 1 January 2018.

#### Treasury shares

At 31 December 2020, the Company held a total of 225,000 ordinary shares in treasury with a further 1,740,600 shares held by the Company's subsidiaries. All rights (including voting rights and the right to receive dividends) in the shares held in treasury were suspended until such time as they were reissued. The cost of treasury shares held by the Company at 31 December 2020 was £4.2m.

On 25 August 2021, the Company announced it cancelled all its 225,000 ordinary shares of €0.09 each previously held by it as treasury shares which resulted in the transfer of £4.2m from treasury shares to retained earnings and share capital.

#### Share-based payments reserve

In 2021, an amount of £49.1m (2020: £77.2m) in respect of share options exercised during the year was transferred from the share-based payment reserve to retained earnings.

## 13. Dividends paid on ordinary shares

Due to the impact of Covid-19, the Board paid the 2019 final dividend in May 2020 through the issuance of ordinary shares rather than by cash. This resulted in the Company issuing 1,312,260 Flutter ordinary shares of €0.09 each.

The Board's capital management policy for the Group remains to target a leverage ratio of 1.0x to 2.0x over the medium term. The Board will continue to monitor the financial performance of the Group, it's anticipated deleveraging and balance sheet position, and will decide when it is an appropriate time to reinstate a dividend.

As a result, the Board did not recommend an interim dividend for 2021 (2020: nil) or a final dividend for the year ended 31 December 2021 (2020: nil).

## 14. Trade and other payables and derivative financial liabilities
### Current liabilities

| | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| **Trade and other payables** | | |
| Trade payables | **2.5** | 0.6 |
| PAYE and social security | **1.1** | 0.9 |
| Value-added tax | **4.4** | 1.1 |
| Betting duty | **3.5** | 2.2 |
| Amounts owed to fellow Group companies | **1,078.5** | 1,533.3 |
| Accruals and other liabilities | **24.4** | 28.6 |
| Total | **1,114.4** | 1,566.7 |
| **Derivative financial liabilities** | | |
| Sports betting open positions (Note 18) | **2.6** | 3.7 |

## 15. Leases
### Lease liabilities

| | 31 December 2021 £m | 31 December 2020 £m |
|---|---|---|
| Current portion of lease liabilities | **5.8** | 8.8 |
| Non-current portion of lease liabilities | **63.0** | 25.6 |

See Note 21 to the Consolidated Financial Statements for further information on lease liabilities.

## 16. Financial risk management
The Company's risk exposures, and what its objectives, policies and processes are for managing those risks, are set out in Note 27 to the Group consolidated financial statements.

## 17. Credit risk
### Exposure to credit risk
The carrying amount of financial assets represents the maximum credit exposure. The maximum exposure to credit risk at 31 December was:

| | Carrying amount | |
|---|---|---|
| | 31 December 2021 £m | 31 December 2020 £m |
| Cash and cash equivalents | **7.5** | 8.3 |
| Amounts owed by fellow Group companies | **872.2** | 184.5 |
| Total | **879.7** | 192.8 |

## 18. Fair values
### Fair values versus carrying amounts
The following are the fair values and carrying amounts of financial assets and liabilities carried at amortised cost in the statement of financial position:

| | 31 December 2021 | | 31 December 2020 | |
|---|---|---|---|---|
| | Carrying amount £m | Fair value £m | Carrying amount £m | Fair value £m |
| **Assets** | | | | |
| Amounts owed by fellow Group companies | **872.2** | **872.2** | 184.5 | 184.5 |
| Cash and cash equivalents | **7.5** | **7.5** | 8.3 | 8.3 |
| Total | **879.7** | **879.7** | 192.8 | 192.8 |
| **Liabilities** | | | | |
| Trade and other payables | **(1,114.4)** | **(1,114.4)** | (1,566.7) | (1,566.7) |
| Net | **(234.7)** | **(234.7)** | (1,373.9) | (1,373.9) |

Financial statements

# Notes to the Company Financial Statements continued

## 18. Fair values continued
### Fair value hierarchy
Financial instruments at 31 December which are carried at fair value are analysed by the valuation method below. The different levels have been defined as follows:

- Level 1: quoted prices (unadjusted) in active markets for identical assets or liabilities;
- Level 2: inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly (i.e. as prices) or indirectly (i.e. derived from prices); and
- Level 3: inputs for the asset or liability that are not based on observable market data (unobservable inputs).

| | 31 December 2021 | | | |
| | Level 1 £m | Level 2 £m | Level 3 £m | Total £m |
|---|---|---|---|---|
| Derivative financial liabilities | — | — | (2.6) | (2.6) |
| Total | — | — | (2.6) | (2.6) |

| | 31 December 2020 | | | |
| | Level 1 £m | Level 2 £m | Level 3 £m | Total £m |
|---|---|---|---|---|
| Derivative financial liabilities | — | — | (3.7) | (3.7) |
| Total | — | — | (3.7) | (3.7) |

### Basis for determining fair values
The following are the significant methods and assumptions used to estimate the fair values of the financial instruments above:

#### Financial instruments carried at amortised cost
*Cash and cash equivalents (Level 2)*
The fair value of cash and cash equivalents is based on the nominal value of the relevant cash and bank deposit balances, as all are held at variable interest rates.

*Trade and other payables (Level 2)*
The fair value of trade and other payables is estimated using the present value of future cash flows discounted at the market rate of interest at the reporting date. Amounts due within three months are not discounted.

#### Financial instruments carried at fair value
*Derivative financial instruments (Level 3)*
Derivative financial instruments comprise sports betting open positions. The fair value of open sports bets at the year end has been calculated using the latest available prices on relevant sporting events.

#### Sensitivity analysis in respect of Level 3 financial instruments carried at fair value
The following sensitivity analysis has been performed for the Level 3 financial liabilities carried at fair value at 31 December 2021 and 2020:

*Sports betting open positions*
The fair value of sports betting open positions is primarily based on expectations as to the results of sporting and other events on which bets are placed. Changes in those expectations and ultimately the actual results when the events occur will result in changes in fair value. There are no reasonably probable changes to assumptions and inputs that would lead to material changes in the fair value methodology although final value will be determined by future sporting results.

#### Movements in the year in respect of Level 3 financial instruments carried at fair value
The movements in respect of the financial assets and liabilities carried at fair value in the year to 31 December are as follows:

| | Sports betting open positions £m |
|---|---|
| Balance at 1 January 2020 | (4.6) |
| Recognised in the income statement | 75.1 |
| Settlements | (74.2) |
| Balance at 31 December 2020 | (3.7) |
| Recognised in the income statement | 56.8 |
| Settlements | (55.7) |
| Balance at 31 December 2021 | (2.6) |

## 19. Pension arrangements

The Company operates defined contribution pension schemes for certain employees. The assets of the schemes are held separately from those of the Company in independently administered funds. Pension costs for the year were £0.2m (2020: £0.2m) and the amount due to the schemes at 31 December 2021 amounted to £0.1m (2020: £0.1m).

## 20. Contingent liabilities

### Guarantees

The Company has uncommitted working capital overdraft facilities of £3.5m (2020: £3.5m) with Allied Irish Banks p.l.c. These facilities are secured by cross-guarantees within the Group.

The Company enters into financial guarantee contracts to guarantee the indebtedness of other companies within the Group. The Company considers these to be insurance arrangements and accounts for them as such. The Company treats the guarantee contract as a contingent liability until such time as it becomes probable that the Company will be required to make a payment under the guarantee.

Borrowings under the TLA Agreement and Syndicated Facility Agreement are guaranteed by the Company and certain of its operating subsidiaries. See Note 22 to the Consolidated Financial Statements for further detail.

### Capital commitments

There was no capital expenditure contracted for at 31 December 2021 but not yet incurred (31 December 2020: £nil).

### Section 357 guarantees

Pursuant to the provisions of section 357 of the Companies Act 2014, the Company has guaranteed the liabilities and commitments of its wholly owned subsidiary undertakings in the Republic of Ireland for the financial year ended 31 December 2021 and, as a result, each subsidiary undertakings is exempted from the filing provisions of the Companies Act 2014.

## 21. Approval of financial statements

The financial statements of the Company for the year ended 31 December 2021 were approved by the Board of Directors on 14 March 2022.

Financial statements

# Five year financial summary (unaudited)

Financial information for the Group for the five years ended 31 December is set out below:

| | Statutory 2021 £m | Statutory 2020 £m | Statutory 2019 £m | Statutory 2018 £m | Statutory 2017 £m |
|---|---|---|---|---|---|
| Revenue | 6,036.2 | 4,413.9 | 2,140.0 | 1,873.4 | 1,745.4 |
| EBITDA | 723.3 | 771.6 | 407.8 | 423.0 | 465.8 |
| Operating (loss)/profit | (62.5) | 103.5 | 149.9 | 204.6 | 250.0 |
| (Loss)/profit before tax | (288.4) | 1.1 | 135.7 | 218.7 | 246.6 |
| (Loss)/profit for the year | (411.9) | (34.7) | 111.9 | 180.7 | 217.7 |

# ESG supplementary information

## Global Reporting Initiative (GRI)

As part of formalising our ESG reporting, in FY2021 we have begun to align our internal reporting to the GRI standards. GRI provides a comprehensive reporting framework and our alignment to it is a focus area for us. We will report under this standard in FY2022.

We have begun by carrying out a materiality assessment allowing us to identify our key material issues which will serve as the foundation for our GRI reporting. Moreover, our new central Sustainability team is leading our first global sustainability strategy, Our Positive Impact Plan, which will guide us in ensuring that we make a positive impact on our customers, colleagues, and the communities in which we operate.

For additional information regarding our sustainability reporting, please see the contact details on our website www.flutter.com/contact-us

## Methodologies and boundary

Our carbon and energy reporting approach is prepared in accordance with the following standards and guidelines:

- Greenhouse Gas Protocol ("GHG Protocol") for Corporate Accounting and Reporting Standard;
- UK Government Streamlined Energy and Reporting (SECR) Guidelines

Flutter has an operational control boundary covering 100% of our business activities with a materiality reporting threshold of 95%.

The term "carbon emissions" or "emissions" in this report refers to GHG emissions as required for a GHG inventory. This includes carbon dioxide alongside six other GHGs calculated in mass of carbon equivalent ($CO_2$e).

Our GHG inventory is reported in four categories referred to as "scopes", listing our direct and indirect carbon emissions in accordance with the GHG Protocol:

- **Scope 1:** Direct emissions from heating fuel
- **Scope 2:** Indirect emissions from the generation of electricity purchased for buildings
- **Scope 3:** Other indirect emissions inclusive of electricity transmission and distribution (T&D), business travel and stay

We no longer include Well-To-Tank (WTT) emission calculation within our reporting as this is not material for our company, nor is it commonly reported against within our peer group thus not allowing like-for-like emission calculations and comparison.

Our carbon emissions and energy equivalents for this reporting period are calculated using government issued emission factors. We use the most appropriate emission factors from consistent sources applied across our reporting year (2021). Our two emission factor sources are:

### Emission factor selection

| Source | Emission factors |
|---|---|
| IEA Emission factors, 2021 | Electricity (excluding UK) |
| UK Government GHG conversion factors for company reporting: BEIS, 2021 | Stationary and mobile fuels |
| | UK electricity |
| | Natural gas |
| | Hotel stays |
| | Business travel |

We report GHG data as location-based that uses a geographical emission factor. We have limited examples of applied 'bespoke' emission factors that have been developed and provided by the supplier. These bespoke emissions are limited to travel data.

### Emission sources by scope

| Scope | Source |
|---|---|
| Scope 1 | Heating fuels: natural gas |
| Scope 2 | Electricity: for use in buildings |
| Scope 3 | Staff travel and stay: air, rail and hotel stays Electricity transmission and distribution |

Financial statements

# ESG supplementary information continued

## Exclusions and estimations (carbon and energy)

Our activities and emission sources that comprise our total carbon and energy footprints are materially correct. Those sections of our business which have been excluded from the analysis are listed below:

### Emission source exclusions and estimations

| Division | Data Source | Further information |
|---|---|---|
| All | Fuel – Diesel | Fuel is used for back-up generators within our buildings. Our back-up generators have been reported to have not been used within the reporting year and therefore not required to have needed refueling. Diesel fuel used within business travel represents less than 0.5% of our footprint (FY2020), we have not been able to gather this data in FY21 and will be reported against in FY2022 in line with our Restatement Policy. |
| All | Fuel – Petrol | Petrol fuel used within business travel represents less than 0.5% of our footprint (FY2020), we have not been able to gather this data in FY2021 and will be reported against in FY2022 in line with our Restatement Policy. |
| All | Fugitive emissions (refrigerants) | Our buildings are predominantly leased and have also been largely closed due to COVID restrictions. Fugitive emissions represent less than 0.5% of our total footprint in FY2020. We have not been able to gather this data in FY2021 and will be reported against in FY2022 in line with our Restatement Policy. |
| All | All sources | 14 offices have been excluded from reporting (2 of which are under construction) with the remaining 12 sites totalling 2.3% of total office floor space. |
| All | All sources | We have not been able to complete the data gathering process to validate cloud data in FY2021, this process will be completed and reported against in FY2022 in line with our Restatement Policy. |
| All | Taxi | Taxi data has been estimated this year and represented less than 0.5% of our total footprint in FY2020. We have not been able to gather this data in FY2021 and will be reported against in FY2022 in line with our Restatement Policy. |
| All | Waste | We have not been able to complete the data gathering process to validate waste data in FY2021, this process will be completed and reported against in FY2022 in line with our Restatement Policy. |
| All | Water | We have not been able to complete the data gathering process to validate waste data in FY2021, this process will be completed and reported against in FY2022 in line with our Restatement Policy. |
| International, United States | All | We have not been able to complete the data gathering process to validate International or United States retail data in FY2021, this process will be completed and reported against in FY2022 in line with our Restatement Policy. |

## Restatements

Flutter currently uses a rolling base year for when we report our carbon footprint. If significant changes occur which can materiality reduce or increase our emissions by 5%, we will adjust our emissions inventory, including the base year in order to accurately track progress in reducing our emissions. Material changes include:

- Changes of base period (baseline) or length of the reporting period
- Changes in the measurement methodologies or in the definitions used
- Structural changes which include the nature of our business, disposals, mergers, or acquisitions
- Errors made in previous reporting periods

## How we have addressed the TCFD Recommendations

The following table summarises the elements of the TCFD framework, the work we have completed to date in relation each recommendation, and future actions we are committed to.

| TCFD Recommendation | Relevant section of Annual Report | Page | Status |
|---|---|---|---|
| **Governance** | | | |
| Describe the Board's oversight of climate-related risks and opportunities ☑ | Sustainability – Environment – Climate change | 60–61 | **Actions undertaken:**<br>Board received an update in December 2021 on the TCFD framework and an outline of the relevance of climate-related risks and opportunities to the business. |
| | Sustainability – Governing our approach to sustainability | 66–67 | |
| | Governance – Chair's introduction | 102–103 | Board's Risk Committee became the Risk and Sustainability Committee, with Terms of Reference revised in February 2022 to include amongst its primary roles the overseeing of climate-related issues. |
| | Governance – Statement of Corporate Governance | 104–115 | |
| | Risk and Sustainability Committee report | 132–135 | |
| Describe management's role in assessing and managing climate related risks and opportunities ☑ | Sustainability – Environment – Climate change | 60–61 | Formation of an Executive Sustainability Steering Committee, comprising members of the Executive management team and chaired by the Chief Legal Officer and Group Commercial Director. |
| | Sustainability – Governing our approach to sustainability | 66–67 | |
| | | | Creation of the Sustainability working group, which is represented by Group functional and divisional management. The Sustainability working group meets monthly and reports into the Committee. |
| | | | **Next steps:**<br>Specific climate related updates/training for the Board and the Board Committees. |
| | | | The Risk and Sustainability Committee will receive regular updates from the Executive Sustainability Steering Committee of sustainability matters including environment and climate change. |
| **Strategy** | | | |
| Describe the climate-related risks and opportunities the organization has identified over the short, medium and long term ☒ | Sustainability – Environment – Climate change | 61–62 | **Actions undertaken:**<br>Identified climate change as a material topic as part of our sustainability strategy development. |
| Describe the impact of climate risks and opportunities on the organization's business, strategy and planning ☒ | Sustainability – Our Approach to Sustainability – Developing our materiality matrix | 47 | Identified climate change, with the potential to have an impact on Flutter's physical footprint, as a top level longer-term emerging risk within the horizon scanning process completed as part of the group standard risk management process. |
| Describe the resilience of the organisation's strategy taking into consideration different climate related scenarios, including a 2°C or lower scenario ☒ | Understanding and managing our principal risks | 84–91 | **Next steps:**<br>During 2022 complete a top down and granular bottom-up review focusing specifically on climate change risks and opportunities.<br><br>Complete scenario analysis on the most material climate change risk and opportunities identified and integrate the results into our strategic considerations where relevant. |

Financial statements

☑ While further work in this area is ongoing, we have disclosed in line with the TCFD recommendations.

☒ Not disclosed in line with the TCFD recommendations. Flutter has developed an action plan in relation to this area in order to improve the maturity of this reporting in future periods.

# ESG supplementary information continued

| TCFD Recommendation | Relevant section of Annual Report | Page | Status |
|---|---|---|---|
| **Risk management** | | | |
| Describe the organisation's processes for identifying and assessing climate-related risks ☑ | Sustainability – Environment – Climate change | 62 | **Actions undertaken:** Identified climate change as a top level longer-term emerging risk within the horizon scanning process completed as part of the group standard risk management process. |
| Describe the organisation's processes for managing climate-related risks ☒ | Understanding and managing our principal risks | 84–91 | |
| Describe how processes for identifying, assessing and managing climate-related risks are integrated into the organisation's overall risk management ☑ | | | Climate change is also a component within other categories identified as part of the horizon scanning processes such as Regulatory and Tax & Legal. |
| | | | **Next steps:** Provide division heads with training on climate related issues. |
| | | | During 2022 complete a top down and granular bottom-up review focusing specifically on climate change risks and opportunities. |
| **Metrics and targets** | | | |
| Disclose the metrics used by the organisation to assess climate-related risk and opportunities in line with its strategy and risk management process ☒ | Sustainability – Environment – Climate change | 62–63 | **Actions undertaken:** In September 2021, committed to align our climate mitigation targets to the Science Based Targets initiative (SBTi). |
| Disclose scope 1, scope 2 and, if appropriate, scope 3 greenhouse gas emissions and the related risks ☑ | | | Completed significant work in closing data gaps within our current Scope 1 and 2 emission metrics, in addition to expanding our Scope 3 emission reporting. |
| Describe the targets used by the organisation to manage climate related risks and opportunities and performance against targets ☒ | | | **Next steps:** During 2022 complete a top down and granular bottom-up review focusing specifically on climate change risks and opportunities. |
| | | | Develop key metrics to measure and manage them. |
| | | | Build a homogeneous, comprehensive and granular data gathering processes across all sites and all geographies to ensure that we are collecting accurate and comprehensive data. |

☑ While further work in this area is ongoing, we have disclosed in line with the TCFD recommendations.

☒ Not disclosed in line with the TCFD recommendations. Flutter has developed an action plan in relation to this area in order to improve the maturity of this reporting in future periods.

## EU Taxonomy

The Taxonomy Regulation (Art. 8 Taxonomy Regulation (Regulation (EU) 2020/852) is a key component of the European Commission's action plan to redirect capital flows towards a more sustainable economy, representing an important step towards achieving carbon neutrality by 2050 in line with EU goals. In particular, the Taxonomy Regulation contains a classification system for assessing whether activities are environmentally sustainable and imposes certain reporting requirements relating to such activities.

The EU has published a catalogue of sustainable activities in the Climate Delegated Act[1] which supplements the Taxonomy Regulation. The Climate Delegated Act sets out the technical screening criteria for the first two environmental objectives of: a) climate change mitigation; and b) climate change adaptation prescribed under the Taxonomy Regulation. The Climate Delegated Act determines which economic activities can be considered Taxonomy Regulation-eligible in respect of these two environmental objectives.

Below, we present the share of our Group turnover, capital expenditure ("CapEx") and operating expenditure ("OpEx") for the reporting period ending 31 December 2021, which are associated with Taxonomy Regulation-eligible and Taxonomy Regulation non-eligible economic activities related to the first two environmental objectives (climate change mitigation and climate change adaptation) in accordance with Article 8 of the Taxonomy Regulation and Article 10 (2) of the Climate Delegated Act.

The Taxonomy Regulation is complex with guidance still being developed and interpreted. We have completed an analysis of Taxonomy Regulation-eligible activities with regard to our 2021 reporting period activities based on the information and existing market guidance available to us at this time. This information is subject to change as the Taxonomy Regulation and related market guidance develops further and as we go through our planned alignment process in 2022.

### Application of the Taxonomy Regulation to Flutter

As an Irish-incorporated company listed on the London Stock Exchange and Euronext Dublin, Flutter Entertainment plc (the "Group") is required to apply the requirements of the EU Taxonomy Regulation. The consolidated financial statements of Flutter Entertainment plc have been prepared for the financial year ended 31 December 2021 in accordance with IFRS. The amounts used for the calculation of the turnover, CapEx and OpEx ratios set out below are accordingly based on the reported data in those consolidated financial statements.

If activities of Flutter Entertainment plc meet the descriptions of economic activities of being environmentally sustainable for the purposes of the Taxonomy Regulation, as listed in the Climate Delegate Act, these activities will be considered to the be Taxonomy Regulation-eligible. Our initial assessment at Group level identified that our core economic activities are not covered by the Climate Delegated Act and are consequently Taxonomy Regulation non-eligible.

We used the EU Taxonomy Regulation Compass to assist us in identifying Taxonomy Regulation-eligible activities for our sector, gambling and gaming which is not listed within the climate mitigation and climate adaptation environmental objectives. We then undertook a further assessment at an economic activity level, as set out in the Climate Delegated Act. Through this approach we identified the following activities which the Group carries out within the following two sectors: 1) construction and real estate (7.2 – Renovation of existing buildings, 7.3 – Installation, maintenance and repair of energy efficiency equipment, 7.7 – Acquisition and ownership of buildings); and 2) information and communication (8.1 – Data processing, hosting and related activities) and sought opinion from a wider group of stakeholders to further understand whether any of our activities are Taxonomy Regulation-eligible.

Based on an analysis of economic activities, we are required to report the proportion of Taxonomy-eligible and Taxonomy non-eligible economic activities in our turnover, CapEx, and operating expenditure (OpEx) for the reporting period that ended on 31 December 2021, in respect of annual reports published after 1 January 2022.

### Proportion of Taxonomy Regulation-eligible and Taxonomy Regulation-non-eligible economic activities in total turnover, CapEx and OpEx

| | Total (£m) | Proportion of Taxonomy Regulation-eligible economic activities (in %) | Proportion of Taxonomy Regulation non-eligible economic activities (in %) |
|---|---|---|---|
| Turnover | 6,036 | 0% | 100% |
| Capital expenditure (CapEx) | 443 | <1% | 99% |
| Operating expenditure (OpEx) | 62 | <1% | 99% |

1 Commission Delegated Regulation (EU) 2021/2139 of 4 June 2021 supplementing Regulation (EU) 2020/852 of the European Parliament and of the Council by establishing the technical screening criteria for determining the conditions under which an economic activity qualifies as contributing substantially to climate change mitigation or climate change adaptation and for determining whether that economic activity causes no significant harm to any of the other environmental objectives (Climate Delegated Act).

# ESG supplementary information continued

## EU Taxonomy continued
### Key Performance Indicators ("KPIs")
#### Turnover KPI
The denominator of the turnover KPI is based on our consolidated net turnover in accordance with IAS 1.82(a). For further details on our accounting policies regarding our consolidated net turnover on page 180 of our Annual Report 2021.

$$\text{Turnover-KPI} = \frac{\text{Taxonomy Regulation-eligible net turnover}}{\text{Net turnover}}$$

The total turnover of £6,036 million for the financial year ended 31 December 2021 as presented in the Consolidated Income Statement on page 171 is the basis of the denominator for the turnover KPI.

Due to the fact that the economic activities of Flutter Entertainment plc cannot be identified in the Climate Delegated Act, no products or services are considered Taxonomy Regulation-eligible.

#### CapEx-KPI
The CapEx-KPI is calculated as the proportion of the capital expenditure (CapEx) of an activity that is either already Taxonomy Regulation-eligible or is part of a credible plan to extend or reach environmental sustainability divided by total CapEx.

$$\text{CapEx-KPI} = \frac{\text{Taxonomy Regulation-eligible investment}}{\text{Additions to tangible and intangible assets}}$$

Capital expenditures for the year ended on 31 December 2021 amounted to £443 million. Total Capex consists of additions to tangible and intangible fixed assets during the financial year, before depreciation, amortisation and any re-measurements, including those resulting from revaluations and impairments, as well as excluding changes in fair value. It includes additions to fixed assets (IAS 16), intangible assets (IAS 38) and right-of-use assets (IFRS 16). Additions resulting from business combinations are also included (see Notes 12 and 13 in the Notes to the Consolidated Financial Statements). Additions to acquired goodwill are not included in the analysis.

Based on the project description of the additions, an analysis was carried out with regard to Taxonomy Regulation-eligibility, including comparison of the relevant additions with Annex I (substantial contribution to climate mitigation) and Annex II

(substantial contribution to climate change adaptation) of the Climate Delegated Act. The sum of expenditure on additions that relate to a Taxonomy Regulation-eligible investments forms the numerator of the CapEx-KPI.

#### OpEx-KPI
The OpEx-KPI is calculated as the proportion of the operating expenditure associated with Taxonomy Regulation-eligible activities.

$$\text{OpEx-KPI} = \frac{\text{Taxonomy Regulation-eligible operating expenses}}{\text{Total OpEx as defined in the EU-Taxonomy}}$$

The amounts consist of directing non-capitalised costs that relate to building renovation measures, short-term leasing, maintenance and repair expenses and any other direct expenditures relating to the day-to-day servicing of tangible and intangible fixed assets by the undertaking or third parties to whom the activities are outsourced that are necessary to ensure the continued and effective functioning of such assets incurred during the year ended 31 December 2021 have been applied as the denominator for this calculation.

The numerator derives from an analysis of the extent which the activities of the assets related to the expenses recorded on the above are considered Taxonomy Regulation-eligible by reference to Annex I (substantial contribution to climate change mitigation) and Annex II (substantial contribution to climate change adaptation) of the Climate Delegated Act.

## Future reporting
For 2022 reporting periods onwards, an even more extensive analyses will be carried out concerning the fulfilment of certain criteria in relation to the identified activities. In addition to the requirement to expand on the assessment to evaluate the "alignment" criteria, there will also be a requirement to assess whether the Taxonomy Regulation-eligible activities make a significant contribution to an environmental objective defined by the Taxonomy Regulation and whether no other environmental objective is significantly harmed. In addition, compliance with minimum social safeguards in accordance with the OECD Guidelines for Multinational Enterprises, UN Guiding Principles on Business and Human Rights, ILO Core Labour Standards and the International Bill of Human Rights must be ensured. The disclosure requirements will also be more extensive for 2022 reporting periods onwards.

# Shareholder information

Flutter Entertainment plc is a public limited company incorporated and domiciled in the Republic of Ireland. It has a primary listing on the London Stock Exchange and a secondary listing on Euronext Dublin.

## Corporate website
The Company's corporate website provides shareholders with a broad range of information including investor information such as the Annual Report and Accounts, current and historic share prices, AGM materials, events and governance information:

≡ www.flutter.com

## Dividends
### Dividend payments
Details of the Company's dividends policy for the financial year ended 31 December 2021 can be found on page 159 and at:

≡ www.flutter.com/investors

### Dividend withholding tax ("DWT")
As an Irish resident company, all dividends paid by the Company are subject to DWT, currently at the rate of 25% unless a shareholder is entitled to an exemption. Shareholders entitled to the exemption must have submitted a properly completed exemption form to the Company's Registrar by the relevant record date for the dividend. Non-Irish resident shareholders and certain Irish companies, trusts, pension schemes, investment undertakings, companies' resident in any member state of the European Union and charities may be entitled to claim exemption from DWT. If you require any further assistance or information on the relevant form to be completed, please contact the Registrar.

Forms are available on the Irish Tax & Customs Revenue website:

≡ www.revenue.ie

Shareholders should note that DWT will be deducted from dividends where a properly completed form has not been received by the relevant record date for a dividend.

### Dividend mandates
We encourage shareholders to have their dividends paid directly into their bank account to ensure efficiency of payment on the payment date and reduce the instances of lost or out-of-date unclaimed cheques. Please contact the Registrar to avail of this.

### Out-of-date/unclaimed dividends
If you have out-of-date dividend cheques or unclaimed dividends, please contact the Registrar.

## Financial calendar

| | 2022 |
|---|---|
| Preliminary Results | 1 March |
| 2021 Annual General Meeting | 28 April |
| Financial year end | 31 December |

Further updates to the calendar can be found at:

≡ www.flutter.com

## Electronic shareholder communications
We encourage you to be notified by email or letter when shareholder communications such as the Annual Report or Notice of Annual General Meeting are available to be viewed online on our website at:

≡ www.flutter.com

This allows the Company to have a positive effect on the environment by significantly reducing the volume of paper used in the production of shareholder mailings, save substantial printing and postal costs in addition to speeding up the provision of information to you as a shareholder. You can elect to receive email notifications by contacting the Registrar.

## Amalgamation of accounts
Shareholders who receive duplicate sets of Company mailings owing to multiple accounts in their name should contact the Registrar to request their accounts are amalgamated.

## Shareportal
Shareholders may access their accounts online at:

≡ www.signalshares.com

This facility allows shareholders to check their shareholdings and dividend payments, change address, change dividend instructions, register email addresses, appoint proxies electronically and also download standard forms and documents to initiate other changes in details held by the Registrar.

## Shareholder security
Please be aware that organisations, typically from overseas, sometimes make unsolicited contact with shareholders offering to buy their shares or to sell shares on their behalf at prices which can be significantly higher than the market price of the shares.

If you are in receipt of an unsolicited call from someone offering to buy your shares, you should remain vigilant; take a note of the name of the person and organisation that has contacted you; not respond to high pressure tactics to provide bank details or arrange to transfer money if you are unsure of the bona fide nature of the caller; check if the company or individual is appropriately authorised to operate as an investment firm with your local regulatory authority (Central Bank of Ireland for shareholders resident in Ireland and the Financial Conduct Authority for shareholders resident in the UK); and obtain independent advice from a qualified advisor or stockbroker.

## Share dealing
If you wish to buy or sell shares in the Company you can do this by using the services of a stockbroker or high street bank.

You can also use Link Share Dealing Services:

≡ www.linksharedeal.com

Please note the price of shares can go down as well as up, and you are not guaranteed to get back the amount you originally invested. If you are in any doubt you should contact an independent financial adviser.

Financial statements

# **Shareholder information** continued

## Contacts

### Registered office
Belfield Office Park,
Beech Hill Road, Clonskeagh,
Dublin 4, Ireland
Tel: +353 1 905 1000
www.flutter.com

### General
To contact the Investor Relations team email:

📧 **investor.relations@flutter.com**

To contact the Company Secretariat team email:

📧 **cosec@flutter.com**

### Our brands
More information on each of our brands is available at:

📧 Paddy Power: **www.paddypower.com**

📧 Betfair: **www.betfair.com**

📧 Sportsbet: **www.sportsbet.com.au**

📧 TVG: **www.tvg.com and us.betfair.com**

📧 FanDuel: **www.fanduel.com**

📧 Adjarabet: **www.adjarabet.com**

📧 Pokerstars: **www.pokerstars.com**

📧 Sky Betting & Gaming: **www.Skybet.com**

📧 Tombola: **www.tombola.com**

### Registrar
Shareholders with queries concerning their holdings, dividend information or administrative matters should contact the Company's Registrar:

Link Registrars Limited,
Block C, Maynooth Business Campus,
Maynooth, Co. Kildare,
W23 F854, Ireland
Tel: +353 1 553 0050
Fax: +353 1 224 0700
Email: enquiries@linkgroup.ie

## Other information

### Directors and Company Secretary
Biographies of our current Directors can be found on pages 96 to 99. The Company Secretary is Edward Traynor.

### Company Number
16956

### Brokers
Goldman Sachs International
J & E Davy

### Legal advisers
Arthur Cox, Earlsfort Centre,
Earlsfort Terrace, Dublin 2, Ireland
Freshfields Bruckhaus Deringer LLP,
65 Fleet Street, London EC4Y 1HS, UK

### External Auditor
KPMG IE, 1 Stokes Place,
St. Stephen's Green, Dublin 2, Ireland

### Principal bankers
Allied Irish Banks, p.l.c.
Bank of Ireland Group plc
Barclays Bank Ireland PLC
Lloyds Bank PLC
National Australia Bank Limited
Santander UK plc
The Royal Bank of Scotland Group plc
Ulster Bank Ireland Limited

## Designated Foreign Issuer Status

In connection with its acquisition of The Stars Group Inc. on May 5, 2020, the Company became a "reporting issuer" under applicable securities laws in each of the provinces and territories of Canada. The Company also qualifies as a "designated foreign issuer", as such term is defined in National Instrument 71-102 – Continuous Disclosure and Other Exemptions Relating to Foreign Issuers of the Canadian Securities Administrators. As such, the Company is not subject to the same ongoing reporting requirements as most other reporting issuers in Canada. Generally, the Company will be in compliance with Canadian ongoing reporting and disclosure requirements if it complies with the requirements of the UK Financial Conduct Authority in its capacity as the competent authority for the purposes of Part VI of the Financial Services and Markets Act 2000 (United Kingdom), as amended from time to time, and the applicable laws of England and Wales (the "UK Rules") and files any documents required to be filed or furnished pursuant to the UK Rules on its profile on the System for Electronic Document Analysis and Retrieval (SEDAR) at www.sedar.com maintained by the Canadian Securities Administrators.

## Forward-looking statements

This document (including information incorporated by reference in this document), contains statements which are, or may be deemed to be, "forward-looking statements". Forward-looking statements are prospective in nature and are not based on historical facts, but rather on current expectations and projections about future events, and are therefore subject to risks and uncertainties which could cause actual results to differ materially from the future results expressed or implied by the forward-looking statements. The forward-looking statements contained in this document include statements relating to the financial condition, results of operations, business, viability and future performance of Flutter and certain of the plans and objectives of Flutter and other statements other than historical facts. Often, but not always, forward-looking statements can be identified by the use of forward-looking words such as "plans", "expects" or "does not expect", "is expected", "is subject to", "budget", "scheduled", "estimates", "forecasts", "intends", "anticipates" or "does not anticipate", or "believes", or variations of such words and phrases or statements that certain actions, events or results "may", "could", "should", "would", "might" or "will" be taken, occur or be achieved.

Although Flutter believes that the expectations reflected in such forward-looking statements are reasonable, it can give no assurance that such expectations will prove to be correct. There are a number of factors that could cause actual results and developments to differ materially from those expressed or implied by such forward-looking statements. These factors include factors such as economic and financial conditions generally in various countries and regions where we operate, the ongoing impact of the Covid pandemic on the global economy and on the holding of sports events, currency fluctuations, the behaviour of other market participants, the actions of regulators, changes in the political, social and regulatory framework in which Flutter will operate or in economic or technological trends or conditions, failure to complete or successfully integrate acquisitions and the specific factors identified in the discussions accompanying such forward-looking statements and in the Understanding and Managing our Principal Risks section included on pages 84 to 91 of this Annual Report. Other unknown or unpredictable factors could cause actual results to differ materially from those in the forward-looking statements. Such forward-looking statements should therefore be construed in light of such factors.

None of Flutter or any of its associates or Directors, officers or advisers provides any representation, assurance or guarantee that the occurrence of the events expressed or implied in any forward-looking statements in this document will actually occur. You are cautioned not to place undue reliance on these forward-looking statements. Other than in accordance with its legal or regulatory obligations, Flutter is under no obligation, and Flutter expressly disclaims any intention or obligation, to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

Produced by

**design**portfolio



**Belfield Office Park,**
**Beech Hill Road,**
**Clonskeagh,**
**Dublin 4,**
**Ireland**
**www.flutter.com**

**Massachusetts Gaming Commission**
**Betfair Interactive US, LLC**
**Application for Sports Wagering Operator License**
**Attachment G3-e-01 Audited Financial Statements**

**Withheld in its Entirety**

**CONFIDENTIAL AND NOT SUBJECT TO DISCLOSURE**
**PURSUANT TO MASSACHUSETTS'S PUBLIC RECORDS LAW**

**Massachusetts Gaming Commission**
**Betfair Interactive US, LLC**
**Application for Sports Wagering Operator License**
**Attachment G3-j-01 Example of Internal Controls**

**Withheld in its Entirety**

**CONFIDENTIAL AND NOT SUBJECT TO DISCLOSURE**
**PURSUANT TO MASSACHUSETTS'S PUBLIC RECORDS LAW**

CONFIDENTIAL - NOT FOR PUBLIC DISCLOSURE

| Entity Name | Type of Licence | Regulatory/Licensing Body | Disposition of Application | Licence Number |
|---|---|---|---|---|
| Betfair Interactive US LLC | Event Wagering Designee | Arizona Department of Gaming | Approved | PCA# EW237 |
| Betfair Interactive US LLC | Temporary Management Services Provider | Illinois Gaming Board | Approved | N/a |
| Betfair Interactive US LLC | Temporary Vendor License | Indiana Gaming Commission | Approved | BC-VEN-001-FDS |
| Betfair Interactive US LLC | Advance Deposit Sports Wagering Operator License | Iowa Racing and Gaming Commission | Approved | N/A |
| Betfair Interactive US LLC | Vendor License | Iowa Racing and Gaming Commission | Approved | N/A |
| Betfair Interactive US LLC | Sports Wagering Platform Provider - Temporary Certificate of Approval | Louisiana Gaming Control Board | Approved | B016503481 |
| Betfair Interactive US LLC | Sports Wagering Facility Operator License; Online Sports Wagering Operator | Maryland Lottery & Gaming Control Commission | Qualification Approved | 2021-SW-08 |
| Betfair Interactive US LLC | Temporary Supplier License - Gaming | Michigan Gaming Control Board | Approved | 7399 |
| Betfair Interactive US LLC | Mississippi Gaming License - Manufacturer | Mississippi Gaming Commission | Approved | License No. 1127 |
| Betfair Interactive US LLC | Casino Vendor Temporary License | New York State Gaming Commission | Approved | G2286 |
| Betfair Interactive US LLC | Conditional Sports Wagering Operator | Pennsylvania Gaming Control Board | Approved | 111487-3 |
| Betfair Interactive US LLC | Management Services Provider; Mobile Management Services Provider | Ohio Casino Control Commission | Approved | N/A |
| Betfair Interactive US LLC | Conditional Interactive Gaming Operator | Pennsylvania Gaming Control Board | Approved | 111487-2 |
| Betfair Interactive US LLC | Temporary Internet Sports Betting Operator License | State of Colorado Department of Revenue - Gaming Division | Approved | 30472197 |
| Betfair Interactive US LLC | Online Gaming Operator | State of Connecticut - Department of Consumer Protection | Approved | OGO.000002 |
| Betfair Interactive US LLC | Casino Service Industry Enterprise License | State of New Jersey Casino Control Commission | Approved | 368-50 |
| Betfair Interactive US LLC | Distributor; Manufacturer; Information Service Operator | Nevada Gaming Commission | Approved | N/A |
| Betfair Interactive US LLC | Sports Gaming Operator | Tennessee Education Lottery | Approved | N/A |
| Betfair Interactive US LLC | Sports Betting Permit | Virginia Lottery | Approved | P-004 |
| Betfair Interactive US LLC | Major Sports Wagering Vendor | Washington State Gambling Commission | Approved | 10-00075 |
| Betfair Interactive US LLC | Sports Wagering Managment Services Provider | West Virginia Lottery | Approved | SWP-002 |
| Betfair Interactive US LLC | Professional Sports Wagering Operator License | District of Columbia Office of Lottery and Gaming | Approved | PSW21CLA0004 |
| Betfair Interactive US LLC | Sports Wagering Service Provider | Kansas Racing and Gaming Commission | Temp. Approved | 5000556 |
| Betfair Interactive US LLC | Online Sports Wagering Operator | Wyoming Pari-Mutuel Commission | Approved | 21-003 |

# ARIZONA DEPARTMENT OF GAMING

ISSUES State Certification PCA# EW237

TO

### *Betfair Interactive US, LLC*

**Event Wagering Designee**

And authorizes this vendor to provide service in accordance with the
Arizona Revised Statutes for Event Wagering and Fantasy Sports

Date of Issue: <u>Aug 27, 2021</u>          Date of Expiration: <u>Aug 31, 2026</u>



*Clifford Holden*

Clifford Holden, Interim Manager

Vendor Certification Unit





**COLORADO**
**Department of Revenue**
Specialized Business Group—Gaming

1707 Cole Blvd, Suite 300
Lakewood, CO 80401

3/18/2022


BETFAIR INTERACTIVE US LLC
d/b/a FANDUEL SPORTSBOOK
6701 CENTER DRIVE WEST
SUITE 800
LOS ANGELES, CA  90045


Dear License Holder:

The Colorado Limited Gaming Control Commission at its meeting approved your temporary Internet Sports Betting Operator sports betting license, which is enclosed. Please examine the license to ensure all the information is correct.


The primary contact person we presently have on record for you is:

       CHRISTIAN GENETSKI
       300 PARK AVENUE SOUTH, 14TH FLOOR
       NEW YORK, NY 10010
       646-930-0950

If you have any questions, please contact me at (303) 205-1337 or john.madruga@state.co.us.


Sincerely,

John Madruga
Agent in Charge

enclosures

DR 4044 (06/12/14)

DR 9526 (Rev. 02/99)

# STATE OF COLORADO
# DEPARTMENT OF REVENUE

## DIVISION OF GAMING
1707 Cole Blvd. Suite 300
Lakewood, Colorado 80401

BETFAIR INTERACTIVE US LLC
d/b/a FANDUEL SPORTSBOOK
6701 CENTER DRIVE WEST
SUITE 800
LOS ANGELES, CA 90045

# SPORTS BETTING LICENSE

| | |
|---|---|
| Account Number | 30472197 |
| License Type | Internet Sports Betting Operator |
| License Expires at Midnight | March 19, 2024 |

This license is issued subject to the laws of the State of Colorado and especially under the provisions of Title 44, Article 30, C.R.S. 2019, as amended. This license is nontransferable and shall be conspicuously posted in the place above described. This license is only valid through the expiration date shown above. Any questions concerning this license should be addressed to: Colorado Division of Gaming, 1707 Cole Blvd., Suite 300, Lakewood, CO 80401.

In testimony whereof, I have hereunto set my hand.

Division Director

Executive Director

CPL-03 Rev 06/13

# STATE OF CONNECTICUT
# DEPARTMENT OF CONSUMER PROTECTION

This is your registration certificate.  This certificate shall be shown to any properly interested person on request.   Do not attempt to make any changes or alter this certificate in any way.  This registration is not transferable.

In an effort to be more efficient and Go Green, the department asks that you keep your email information with our office current to receive correspondence.  Questions can be emailed to dcp.gaming@ct.gov.

Mailing address:

**BETFAIR INTERACTIVE  US LLC**
**290 PARK AVE S**
**NEW YORK, NY  10010-5313**

Email on file to be used for receiving all notices from this office:

**fdglicensing@fanduel.com**

---

## STATE OF CONNECTICUT ✦ DEPARTMENT OF CONSUMER PROTECTION

Be it known that
Pursuant to Public Act 21-23 of the Connecticut General Statutes

### BETFAIR INTERACTIVE  US LLC
### 290 PARK AVE S
### NEW YORK, NY  10010-5313

has been certified by the Department of Consumer Protection as a holder of a

# ONLINE GAMING OPERATOR

APPROVED GAMES: ONLINE CASINO GAMES,ONLINE SPORTS WAGERING

FYﾘ]ﾃﾙﾘﾑﾂﾂﾄ #:   OGO.000002

**Effective Date:**  09/28/2022

**Expiration Date:** 09/27/2023

*Michelle Seagull*

**Michelle Seagull, Commissioner**

verify online at www.elicense.ct.gov



# GOVERNMENT OF THE DISTRICT OF COLUMBIA
# OFFICE OF LOTTERY AND GAMING
# PROVISIONAL SPORTS WAGERING OPERATOR LICENSE



### License No. PSW21CLA0004          Expires: December 21, 2022

THIS IS TO CERTIFY that a **Provisional Class A Sports Wagering Operator License** is granted to BetFair Interactive US dba FanDuel at Audi Field, 100 Potomac Avenue, SW, Washington, DC and described as Lot 0027, Square 0665; Retail ONLY.

THIS LICENSE is granted subject to the applicable provisions of D.C. Official Code §§ 22-1716–22-1718, 36.601.01–36-621.17, and Title 30 of the District of Columbia Municipal Regulations.



**OFFICE OF LOTTERY AND GAMING**

By:  *Frank Suarez*

Frank Suarez, Executive Director

Issued:  June 21, 2022

TO REPORT WASTE, FRAUD, OR ABUSE BY ANY
DC GOVERNMENT OFFICE OR OFFICIAL CONTACT
THE DC INSPECTOR GENERAL AT (202) 724-8477
OR (800) 521-1639 OR hotline.oig@dc.gov

# ILLINOIS GAMING BOARD

JB Pritzker • *Governor*    Charles Schmadeke • *Chairman*    Marcus D. Fruchter • *Administrator*

160 North LaSalle ♠ Suite 300 ♣ Chicago, Illinois 60601 ♥ Tel: 312/814-4700 ♦ Fax: 312/814-4602

July 17, 2020

**<u>Via Email</u>**

Mr. John Hindman
BetFair Interactive US LLC
d/b/a FanDuel Sportsbook
6701 Center Drive West, Suite 800
Los Angeles, California 90045

RE:    Management Services Provider Temporary Operating Permit

Dear Mr. Hindman:

The Illinois Gaming Board has received BetFair Interactive US LLC's ("FanDuel") application for a management services provider license and request for a Temporary Operating Permit pursuant to Board Rule 1900.790.

After reviewing the information FanDuel submitted, I have determined that issuing a Temporary Operating Permit to FanDuel is in the best interests of the Illinois sports wagering industry and would not pose a threat to public confidence and trust in Illinois gaming.

Accordingly, I am pleased to inform you that I am granting FanDuel's request for a Temporary Operating Permit.

Please be aware that a Temporary Operating Permit issued pursuant to Board Rule 790 is subject to rescission for just cause.  All applicants and Temporary Operating Permit holders are required to comply with all Board Rules and statutory provisions.

**The request by BetFair Interactive US LLC d/b/a FanDuel Sportsbook for a Temporary Operating Permit pursuant to 11 Ill. Admin. Code 1900.790 is hereby GRANTED.**

Kind regards,

Marcus D. Fruchter
Administrator

East Tower, Suite 1600

101 W. Washington Street

Indianapolis, Indiana 46204



**INDIANA GAMING COMMISSION**

(317) 233.0046 phone

(317) 233.0047 fax

www.in.gov/igc

**Greg Small**
*Executive Director*

October 1, 2021

Alex Smith
BetFair Interactive US
300 Park Avenue South, 14ᵗʰ Floor
New York, NY 10010

VIA E-MAIL:  Alex.Smith@FanDuel.com

### RE: *Betfair Interactive US, LLC - Indiana Permanent Vendor License*

Mr. Smith,

Please see the enclosed Permanent Vendor License for Betfair Interactive US for its agreement with Blue Chip Casino and Order 2021-132, which is valid from September 5, 2021 through September 4, 2022.

If Betfair would like the Commission to review its decision on the Renewal Request, it must proceed pursuant to Ind. Code § 4-21.5-3-7 by filing a petition for review within fifteen (15) days after receiving this notice and enclosed Order.  A petition must be submitted to:

> Greg Small, Executive Director
> Indiana Gaming Commission
> East Tower, Suite 1600
> 101 West Washington Street
> Indianapolis, Indiana  46204

The enclosed Order will become a final order of the Commission fifteen (15) days from the date of service.  Ind. Code § 4-21.5-3-5(f).  If Betfair wishes to seek a stay of the effectiveness of the Order, it must do so in accordance with Ind. Code § 4-21.5-5.  If Betfair has any questions or needs any additional information, please contact me at your convenience

Sincerely,

Bob Opat
Staff Attorney
ROpat1@igc.in.gov

Enclosures: Order 2021-132 and License

ORDER 2021-132
AN ORDER OF THE INDIANA GAMING COMMISSION
CONCERNING RENEWAL OF VENDOR'S LICENSES

In accordance with Ind. Code art. 4-38 and Title 68 of the Ind. Admin. Code, the Indiana Gaming Commission ("Commission") previously issued vendor's licenses to: (1) Betfair Interactive US (Blue Chip vendor); (2) Betfair Interactive US (Belterra vendor); (3) American Wagering, Inc. d/b/a William Hill Sports Book (Tropicana vendor); (4) Crown IN Gaming LLC d/b/a DraftKings; (5) Rush Street Interactive IN, LLC. The Commission previously issued temporary vendor's licenses to: (1) Unibet Indiana LLC; (2) Score Digital Sports Ventures, Inc.

A vendor's license is valid for a period of one year, beginning on the anniversary of the date that the vendor licensee begins performing services with a certificate holder in the conduct of sports wagering. Further, in accordance with Ind. Code § 4-38-6-6, a vendor's license must be renewed annually along with the payment of Fifty Thousand Dollars ($50,000.00) as an annual administrative fee. Each of these licensees has requested renewal and paid the required administrative fee. The Commission has determined that the above-named vendor licensees remain in substantial compliance with Ind. Code art. 4-33, Ind. Code art. 4-38, and Title 68 of the Indiana Administrative Code and are suitable to hold a vendor's license.

The Commission hereby **GRANTS** the renewal of the licenses of each of the following for a period of one year as specified below:

1) Betfair Interactive US (Blue Chip vendor): valid September 5, 2021 through September 4, 2022;
2) Betfair Interactive US (Belterra vendor): valid September 9, 2021 through September 8, 2022;
3) American Wagering, Inc. d/b/a William Hill Sports Book (Tropicana vendor): valid September 12, 2021 through September 11, 2022;
4) Crown IN Gaming LLC d/b/a DraftKings: valid October 3, 2021 through October 2, 2022;
5) Rush Street Interactive IN, LLC: valid October 3, 2021 through October 2. 2022.

The Commission hereby **GRANTS** the renewal of the temporary license of each of the following for a period of one year as specified below:

(1) Unibet Indiana LLC: valid July 30, 2021 through July 29, 2022;
(2) Score Digital Sports Ventures, Inc.: valid September 17, 2021 through September 16, 2022;

Each licensee must notify the Commission of its desire to be considered for subsequent license renewal at least thirty days before the expiration of the license.

**IT IS SO ORDERED THIS 29th DAY OF SEPTEMBER, 2021.**

**THE INDIANA GAMING COMMISSION:**    ATTEST:

_____        _____
Michael B. McMains, Chair                Jason Dudich, Secretary

# VENDOR'S LICENSE

## STATE OF INDIANA

## The Indiana Gaming Commission

in accordance with and subject to IC 4-38 and 68 IAC issues to

## Betfair Interactive US d/b/a FanDuel (Blue Chip)

a vendor's license to operate as a sports wagering vendor on behalf of a certificate of authority holder licensed by the Indiana Gaming Commission from September 5, 2021 through September 4, 2022.

_____
Chair

_____
Executive Director

BC-VEN-001-FDS

East Tower, Suite 1600

101 W. Washington Street

Indianapolis, Indiana 46204



**INDIANA GAMING COMMISSION**

(317) 233.0046 phone

(317) 233.0047 fax

www.in.gov/igc

**Greg Small**
*Executive Director*

October 1, 2021

Alex Smith
BetFair Interactive US
300 Park Avenue South, 14th Floor
New York, NY 10010

VIA E-MAIL: Alex.Smith@FanDuel.com

### *RE: Betfair Interactive US, LLC - Indiana Permanent Vendor License*

Mr. Smith,

Please see the enclosed Permanent Vendor License for Betfair Interactive US for its agreement with Belterra Casino and Order 2021-132, which is valid from September 9, 2021 through September 8, 2022.

If Betfair would like the Commission to review its decision on the Renewal Request, it must proceed pursuant to Ind. Code § 4-21.5-3-7 by filing a petition for review within fifteen (15) days after receiving this notice and enclosed Order. A petition must be submitted to:

> Greg Small, Executive Director
> Indiana Gaming Commission
> East Tower, Suite 1600
> 101 West Washington Street
> Indianapolis, Indiana 46204

The enclosed Order will become a final order of the Commission fifteen (15) days from the date of service. Ind. Code § 4-21.5-3-5(f). If Betfair wishes to seek a stay of the effectiveness of the Order, it must do so in accordance with Ind. Code § 4-21.5-5. If Betfair has any questions or needs any additional information, please contact me at your convenience

Sincerely,

Bob Opat
Staff Attorney
ROpat1@igc.in.gov

Enclosures: Order 2021-132 and License

ORDER 2021-132
AN ORDER OF THE INDIANA GAMING COMMISSION
CONCERNING RENEWAL OF VENDOR'S LICENSES

In accordance with Ind. Code art. 4-38 and Title 68 of the Ind. Admin. Code, the Indiana Gaming Commission ("Commission") previously issued vendor's licenses to: (1) Betfair Interactive US (Blue Chip vendor); (2) Betfair Interactive US (Belterra vendor); (3) American Wagering, Inc. d/b/a William Hill Sports Book (Tropicana vendor); (4) Crown IN Gaming LLC d/b/a DraftKings; (5) Rush Street Interactive IN, LLC. The Commission previously issued temporary vendor's licenses to: (1) Unibet Indiana LLC; (2) Score Digital Sports Ventures, Inc.

A vendor's license is valid for a period of one year, beginning on the anniversary of the date that the vendor licensee begins performing services with a certificate holder in the conduct of sports wagering. Further, in accordance with Ind. Code § 4-38-6-6, a vendor's license must be renewed annually along with the payment of Fifty Thousand Dollars ($50,000.00) as an annual administrative fee. Each of these licensees has requested renewal and paid the required administrative fee. The Commission has determined that the above-named vendor licensees remain in substantial compliance with Ind. Code art. 4-33, Ind. Code art. 4-38, and Title 68 of the Indiana Administrative Code and are suitable to hold a vendor's license.

The Commission hereby **GRANTS** the renewal of the licenses of each of the following for a period of one year as specified below:

1) Betfair Interactive US (Blue Chip vendor): valid September 5, 2021 through September 4, 2022;
2) Betfair Interactive US (Belterra vendor): valid September 9, 2021 through September 8, 2022;
3) American Wagering, Inc. d/b/a William Hill Sports Book (Tropicana vendor): valid September 12, 2021 through September 11, 2022;
4) Crown IN Gaming LLC d/b/a DraftKings: valid October 3, 2021 through October 2, 2022;
5) Rush Street Interactive IN, LLC: valid October 3, 2021 through October 2. 2022.

The Commission hereby **GRANTS** the renewal of the temporary license of each of the following for a period of one year as specified below:

(1) Unibet Indiana LLC: valid July 30, 2021 through July 29, 2022;
(2) Score Digital Sports Ventures, Inc.: valid September 17, 2021 through September 16, 2022;

Each licensee must notify the Commission of its desire to be considered for subsequent license renewal at least thirty days before the expiration of the license.

**IT IS SO ORDERED THIS 29th DAY OF SEPTEMBER, 2021.**

**THE INDIANA GAMING COMMISSION:**    ATTEST:


Michael B. McMains, Chair                Jason Dudich, Secretary



# VENDOR'S LICENSE

## STATE OF INDIANA

## The Indiana Gaming Commission

in accordance with and subject to IC 4-38 and 68 IAC issues to

## Betfair Interactive US d/b/a FanDuel (Belterra)

a vendor's license to operate as a sports wagering vendor on behalf of a certificate of authority holder licensed by the Indiana Gaming Commission from September 9, 2021 through September 8, 2022.

_____
Chair

_____
Executive Director

BT-VEN-001-FDS

# State of Iowa

This is To Acknowledge That

## BETFAIR INTERACTIVE US LLC d/b/a FANDUEL

has been licensed by the

## IOWA RACING AND GAMING COMMISSION

to conduct *Advanced Deposit Sports Wagering pursuant to Iowa Code §99F.9(4)(b) at Diamond Jo, LLC from January 01, 2022 to expire on December 31, 2022.*



*Brian Ohorilko*

Brian J. Ohorilko, Administrator



© 1989 GOES P
All Rights Reserved

LITHO. IN U.S.A.



**Kansas**
Racing and Gaming Commission

Eisenhower State Office Building
700 SW Harrison, Suite 500
Topeka, KS 66603

Phone: (785) 296-5800
Fax: (785) 296-0900
krgc@krgc.ks.gov
krgc.ks.gov

Don Brownlee, Executive Director

Laura Kelly, Governor

October 4, 2022

Greetings,

Please accept this correspondence notifying you that **Betfair Interactive US, LLC d/b/a FanDuel Sportsbook** has been granted a Sports Wagering Provisional Certification (#5000556). This Provisional Certification allows for Betfair Interactive US, LLC d/b/a FanDuel Sportsbook to offer sports wagering in the State of Kansas, September 1, 2022.

The provisional certification is valid for one (1) year from the date granted (8/24/2022) or until presented to the Kansas Racing and Gaming Commission for approval. Once the commission has granted final approval of the certification, it will be valid for a period of two (2) years from the date of commission approval.

If you should have any questions regarding provisional certification/licensing, please direct them to me.

Thank you

D.J. Lopez
Regional Security Manager-*Security/Licensing Division*
Kansas Racing and Gaming Commission
700 SW Harrison Suite 500
Topeka, Kansas 66603
Office: (785) 296-4365
Cell: (785) 438-0107
Fax: (785) 291-3196
Email: dj.lopez@ks.gov



JOHN BEL EDWARDS
*GOVERNOR*

RONNIE S. JOHNS
*CHAIRMAN*

### Approval of the Sports Wagering Platform Provider Permit for
### Betfair Interactive US, LLC d/b/a FanDuel Sportsbook
### No. B016503481

## RESOLUTION

**On the 16th day of May 2022**, the Louisiana Gaming Control Board ("Board") did, in a duly noticed public meeting, consider the sports wagering platform provider permit application and the comprehensive compulsive and problem gambling program of Betfair Interactive US, LLC d/b/a FanDuel Sportsbook, and upon motion duly made and seconded, the Board adopted this Resolution:

**BE IT RESOLVED** that Betfair Interactive US, LLC d/b/a FanDuel Sportsbook be approved for a sports wagering platform provider permit for a term of five (5) years commencing December 3, 2021.

**BE IT RESOLVED** that the comprehensive compulsive and problem gambling program submitted by Betfair Interactive US, LLC d/b/a FanDuel Sportsbook is hereby approved.

**THUS DONE AND SIGNED IN BATON ROUGE, LOUISIANA THIS 16th DAY OF MAY, 2022.**

**RONNIE S. JOHNS, CHAIRMAN**
**LOUISIANA GAMING CONTROL BOARD**

LGCB-6439-22

7901 Independence Boulevard, Building A, Baton Rouge, LA 70806
Phone: (225) 925-1846  Email: LGCB@la.gov



# State of Maryland

## State Lottery and Gaming Control Commission

### Online Sports Wagering Operator License

Issued to

**Betfair Interactive US LLC
d/b/a FanDuel Sportsbook**

Effective on the <u>27th</u> day of October, 2022

License Expires: <u>October 26, 2027</u>

_____
**John Martin, Director**

<u>10/31/22</u>
**Date**

DocuSign Envelope ID: 8C1414FE-958A-445C-938C-ADCEF61A8058

**DECISION OF THE MARYLAND LOTTERY AND
GAMING CONTROL COMMISSION**

**Application for Sports Wagering Facility Operator License
Betfair Interactive US LLC d/b/a FanDuel Sportsbook**

**License Applicant No. 2021-SW-08**

**Qualification Hearing before
the Maryland Lottery and Gaming Control Commission
November 4, 2021**

On November 4, 2021, the Maryland Lottery and Gaming Control Commission ("Commission") held a virtual public meeting during which it conducted a hearing to determine whether Betfair Interactive US LLC d/b/a FanDuel Sportsbook ("Applicant" or "FanDuel") is qualified for a sports wagering facility operator license under Maryland's Sports Wagering Law.

**FINDINGS OF FACT**

**Background Process**

1. Sports wagering in Maryland is governed by the Sports Wagering Law, found in State Government Article ("SG"), Title 9, Subtitle 1E, Annotated Code of Maryland, and the regulations of the Maryland Lottery and Gaming Control Commission ("Commission"), found in the Code of Maryland Regulations ("COMAR") 36.10. The Sports Wagering Law also incorporates the Gaming Law, which governs casino operations in Maryland, found in SG, Title 9, Subtitle 1A, and COMAR 36.03.

2. The Commission is authorized to issue licenses necessary for sports wagering in the State, one of which is a sports wagering facility operator license. Unless a person holds a valid sports wagering facility operator license issued by the Commission, the person may not conduct, offer, or operate sports wagering at a sports wagering facility

1

DocuSign Envelope ID: 8C-1447E-958A-445C-938C-ADCEE61A8058

License Applicant No. 2021-SW-08
Betfair Interactive US LLC d/b/a FanDuel Sportsbook
Maryland Lottery and Gaming Control Commission
Decision Statement

on behalf of a sports wagering facility licensee.

3.       An applicant for a license related to sports wagering must submit a Sports Wagering Facility Operator License Application to the Commission. Before it can be issued a license, an applicant must meet all applicable qualification requirements in the Sports Wagering Law, and prove to the Commission, by clear and convincing evidence, that it is qualified under COMAR 36.10.03.02. The Commission is required to deny the license application of an applicant that does not meet qualification requirements.

4.       An applicant must submit to the Commission all information that is necessary for the Commission to determine its qualifications, and those of its principals, its principal entities, and any other necessary qualifiers.

5.       The Commission may establish an abbreviated process for qualifying and licensing an applicant that holds a valid license in another state, if the Commission determines that the licensing standards of the issuing agency in the other state are comprehensive and thorough, and provide similar safeguards to those in the Sports Wagering Law.  COMAR 36.10.02.12.

6.       The Commission has approved 16 states with acceptable licensing standards: Arkansas, Colorado, Illinois, Kansas, Louisiana, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Pennsylvania, Rhode Island, Virginia and Wisconsin. Because Maryland's licensing standards for casino-related licenses are identical to, and specifically incorporated into the Sports Wagering Law, those standards are sufficient for qualifying an applicant for a sports wagering license.

7.       In accordance with the alternative licensing process, an applicant may be qualified for a license before the Agency conducts a full background investigation.

DocuSign Envelope ID: 8C1414E7E-958A-415C-938C-ADCEF61A8058

License Applicant No. 2021-SW-08
Betfair Interactive US LLC d/b/a FanDuel Sportsbook
Maryland Lottery and Gaming Control Commission
Decision Statement

8.      The Commission's decision to abbreviate an applicant's licensing process on the basis of alternative licensing standards is discretionary. The Commission may deny an applicant's request, or grant a request to apply alternative licensing standards. If the Commission grants a request, it may place conditions on a license, or take any other necessary action to protect the State's interests.

9.      The Commission has delegated to Staff of the Maryland Lottery and Gaming Control Agency ("Agency") the authority to decide whether to grant an applicant's request to apply alternative licensing standards.

10.     Staff applies alternative licensing standards if the applicant holds a current, valid Maryland issued casino-related license issued by the Commission because Maryland's qualification standards for casino-related licenses are identical to, and specifically incorporated in, the Sports Wagering Law and are clearly sufficient for qualifying an applicant for a sports wagering license on that basis.

11.     If an applicant does not hold a current, valid Maryland casino-related license, staff applies alternative licensing standards if the applicant has a current, valid sports wagering-related license in at least 3 of the 16 Commission-approved states that have licensing standards which are comprehensive and thorough, and provide similar and adequate safeguards to those in the Sports Wagering Law.

**Application of Alternative Licensing Standards**

12.     The Applicant submitted a written request for the Commission to find it qualified for a sports wagering facility operator license under the alternative licensing process. Along with the request, the Applicant submitted an Affidavit in Support of Applicant's Request to Apply Alternative Licensing Standards, in which the Applicant

DocuSign Envelope ID: 8C141475-958A-415C-938C-ADCEF61A8058

acknowledged that Staff will conduct a full background investigation, and that Staff may take enforcement action against the license if it determines that the Applicant (or licensee, if licensed), does not meet a Commission requirement. Enforcement action may include license suspension or revocation.

13.    Staff granted the Applicant's request to apply alternative licensing standards to determine the Applicant's qualifications.

**Qualification Hearing – November 4, 2021**

14.    Staff of the Agency's Licensing Division provided the Applicant with written notice of the hearing. Jason Weintraub, Licensing Manager for FanDuel, was present in the virtual hearing on behalf of the Applicant. In advance of the hearing, John J. Mooney, MLGCA's Managing Director of Regulatory Oversight, provided the Commission the confidential full background investigation summary. At the hearing, Mr. Mooney made publicly available Staff's executive summary of the background investigation, and Staff's recommendations.

**Applicant's Regulatory History and Ownership**

15.    Betfair Interactive US LLC, d/b/a FanDuel Sportsbook is currently the largest sports betting operator in the United States by volume. FanDuel Group Inc., which is the parent company of Betfair Interactive US LLC, operates a number of leading gaming products in the U.S., to include retail and mobile sports wagering products.

16.    FanDuel is licensed to offer retail and mobile sports wagering products in 16 U.S. states. FanDuel launched in New Jersey in the summer of 2018. FanDuel Group Inc. is headquartered in New York, NY.

DocuSign Envelope ID: 8C1414FE-958A-445C-9386-ADCEF61A8068

License Applicant No. 2021-SW-08
Betfair Interactive US LLC d/b/a FanDuel Sportsbook
Maryland Lottery and Gaming Control Commission
Decision Statement

17.     FanDuel Group Inc. is a subsidiary of Flutter Entertainment PLC ("Flutter"). Flutter is the largest online gaming company in the world, offering a range of sports wagering and online casino gaming products in the U.K. and Ireland, Europe, Australia, and a number of other jurisdictions. Flutter is based in Dublin, Ireland and is publicly traded on the London Stock Exchange.

18.     Seven individuals have been identified as Principals: Jonathan Hill, Carolyn Renzin, David F. Nathanson, Amy Howe, John R. Hindman, Paul Rushton, and Jeremy P. Jackson. Each has submitted the required Principal Employee License Application.

19.     Any additional Principals and Principal Entities who become involved in the Applicant's sports wagering operations must submit the appropriate applications for qualification and licensure.

**Licensing Inquiry**

20.     The Applicant's Request for Application of Alternative Licensing Standards identified its current licenses in these Commission-approved states, with which Staff inquired. Those states' licensing agencies reported:

- Michigan Gaming Control Board
    - Type of License: Commercial and Internet Gaming and Sports Betting License (Issued: 06/08/2021)
    - Expiration Date: 06/07/2022
    - Status: Active and In Good Standing

- Mississippi Gaming Commission
    - Type of License: Manufacturer and Distributor License (Issued: 08/22/2021)
    - Expiration Date: 08/21/2024
    - Status: Active and In Good Standing

- New York State Gaming Commission
    - Type of License(s): Temporary License
    - Expiration Date: Pending

5

License Applicant No. 2021-SW-08
Betfair Interactive US LLC d/b/a FanDuel Sportsbook
Maryland Lottery and Gaming Control Commission
Decision Statement

- o Status: Active and In Good Standing

- Pennsylvania Gaming Control Board
  - o Type of Licenses: Sports Wagering Operator License; iGaming Operator License (Issued: 09/12/2018)
  - o Expiration Date: 02/09/2026
  - o Status: Active and In Good Standing

- Virginia Lottery
  - o Type of License: Permit Holder License (Issued: 01/21/2021)
  - o Expiration Date: 01/20/2024
  - o Status: Active and In Good Standing

**Sports Wagering Facility Operator License Application**

21.    In addition to the Request for Application of Alternative Licensing Standards and Affidavit, the Applicant submitted: a completed Sports Wagering Facility Operator License Application; all required fees; and documentation that it is covered under the sports wagering facility license applicant's performance bond for which the sports wagering facility operator applicant intends to conduct sports wagering.

22.    Staff is not aware of information that would indicate FanDuel fails to meet the Commission's qualification requirements.

23.    Staff recommends that the Commission determine the Applicant has established that it is qualified, by clear and convincing evidence, for a sports wagering facility operator license.

## CONCLUSIONS OF LAW

1.    The Applicant has established by clear and convincing evidence that it is qualified for, and is not disqualified from, a sports wagering facility operator license.

2.    The Applicant remains under an ongoing obligation to comply with all qualification requirements and to notify the Commission if any of the information

DocuSign Envelope ID: 8C1447E-958A-445C-9386-ADCEF61A8058

submitted to the Commission or Agency changes.

3.      The Applicant will undergo a full background investigation by the Agency, and if Staff determines that the Applicant or licensee, if licensed, does not meet a Commission standard, the Commission may take enforcement action, up to and including revocation of the license.

## REVIEW RIGHTS

A party aggrieved by this final administrative Decision may file a petition for judicial review with the circuit court for the county where any party resides or has a principal place of business within thirty days of the date of this Decision. SG § 10-222; Maryland Rules 7-201 – 7-211.

_E Randolph Marriner_                                       11/4/2021

_____                    _____
E. Randolph Marriner, Chair                              Date

7

# Michigan Gaming Control Board

This is to Certify that

## Betfair Interactive US LLC

Los Angeles, California 90045

is Hereby Issued a

## Sports Betting Supplier License

This license authorizes Betfair Interactive US LLC to conduct business with an Internet sports betting supplier when done in accordance with the provisions of the Lawful Sports Betting Act.

**Issued June 08, 2021**
**Valid Until June 07, 2026**

LINDA D. FORTE
Board Chair

HENRY L. WILLIAMS, JR.
Executive Director

**Major General (R) Al Hopkins**
*Chairman*

**Tom Gresham**
*Commissioner*

**Francis C. Lee**
*Commissioner*



**Jay McDaniel**
*Executive Director*

**MISSISSIPPI GAMING COMMISSION**
Post Office Box 23577
Jackson, Mississippi 39225-3577
(601) 576-3800

July 21, 2022

Betfair Interactive US LLC
6701 Center Drive West, Suite 1000
Los Angeles, CA 90045

RE:    Manufacturer/Distributors License # 1258

ATTN:  Legal Department

On July 21, 2022, at its regular monthly meeting, the Mississippi Gaming Commission voted to grant Betfair Interactive US LLC a manufacturer and distributor's license to conduct business in the State of Mississippi subject to the following conditions:

(1)    The license will be issued for a three-year period, effective August 22, 2022, through August 21, 2025;

(2)    Licensee will comply with all federal, state and local laws, including the laws of the State of Mississippi and particularly the Mississippi Gaming Control Act;

(3)    Licensee will comply with all the policies, rules and regulations adopted by the Mississippi Gaming Commission;

(4)    Licensee will comply with and does hereby agree to be bound by all laws, including the Gaming Control Act, of the State of Mississippi; further, licensee agrees to adjudicate all legal proceedings (both state and federal) relative to said license in the courts located in the State of Mississippi; and

(5)    The license is based on the licensee's ability to maintain satisfactory results for all investigations and agency checks.

No individual shall be associated with or hold an interest in this license without prior investigation and approval of the Mississippi Gaming Commission.

If there are any questions regarding this license, please feel free to contact the Mississippi Gaming Commission.

Sincerely,

Jay McDaniel
Executive Director

Attachment: License # 1258

cc:    Central File
       Corporate Securities



License No. №  1258

### State of Mississippi
# MISSISSIPPI GAMING COMMISSION
### Gaming License

This Gaming License entitles ___Betfair Interactive US LLC___, located at

6701 Center Dr. W, Suite 1000
Los Angeles, CA 90045 ___ to engage in gaming as a(n) ___Manufacturer/Distributor___.
This license is subject to Mississippi Gaming Control Act and the Rules and Regulations adopted thereunder.  This authorizes the holder of the license to conduct gaming pursuant to the type of license issued by the Mississippi Gaming Commission.  This license is non-transferable or assignable and must be conspicuously displayed in an area visible to the public.

___
CHAIRMAN
Mississippi Gaming Commission

___
EXECUTIVE DIRECTOR
Mississippi Gaming Commission

___
August 22, 2022
DATE ISSUED

___
August 21, 2025
EXPIRATION DATE



# NEVADA GAMING COMMISSION

1919 College Parkway, P.O. Box 8003
Carson City, Nevada 89702
(775) 684-7750

STEVE SISOLAK
*Governor*

NICOLE RUPERT
*Executive Secretary*

HON. JENNIFER TOGLIATTI (RET), *Chair*
ROSA SOLIS-RAINEY, *Member*
STEVEN COHEN, *Member*
OGONNA M. BROWN, *Member*
BEN KIECKHEFER, *Member*

August 25, 2022

Carson City
(775) 684-7770
Fax: (775) 684-7787

35546-01
BETFAIR INTERACTIVE US LLC
DBAS FANDUEL SPORTSBOOK
ATTN: JOHN HINDMAN
6701 CENTER DR W STE 800
LOS ANGELES CA 90045-1558

Re: Nevada Gaming Commission Approval - Distributor License

Dear Licensee:

The Nevada Gaming Commission ("NGC"), meeting on August 25, 2022, approved your application for a license as reflected on the enclosed document. In accordance with NGC Regulation 4.080(1), this approval is void if it has not been effected within six months of the NGC's vote on this matter.

The below referenced form must be submitted using our online filing system, please see enclosure for instructions. The form along with payment must be submitted **prior** to commencement of operations.

| Form | Description |
|------|-------------|
| NGC-09 | License Verification |
| NGC-21 | Annual License Fee Report |

Failure to submit the required fees/taxes **prior** to commencement of operations will result in the assessment of a late filing penalty.

Please direct any questions you may have to the Tax and License Division in Carson City at (775) 684-7770.

Sincerely,

Nicole Rupert
Executive Secretary

NR:hp

cc: Tax and License Division
    Records & Research

Enclosures



# NEVADA GAMING COMMISSION

1919 College Parkway, P.O. Box 8003
Carson City, Nevada 89702
(775) 684-7750

STEVE SISOLAK
*Governor*

NICOLE RUPERT
*Executive Secretary*

HON. JENNIFER TOGLIATTI (RET), *Chair*
ROSA SOLIS-RAINEY, *Member*
STEVEN COHEN, *Member*
OGONNA M. BROWN, *Member*
BEN KIECKHEFER, *Member*

August 25, 2022

Carson City
(775) 684-7770
Fax: (775) 684-7787

35545-01
BETFAIR INTERACTIVE US LLC
DBAS FANDUEL SPORTSBOOK
ATTN: JOHN HINDMAN
6701 CENTER DR W STE 800
LOS ANGELES CA 90045-1558

Re: Nevada Gaming Commission Approval - Manufacturer License

Dear Licensee:

The Nevada Gaming Commission ("NGC"), meeting on August 25, 2022, approved your application for a license as reflected on the enclosed document. In accordance with NGC Regulation 4.080(1), this approval is void if it has not been effected within six months of the NGC's vote on this matter.

The below referenced form must be submitted using our online filing system, please see enclosure for instructions. The form along with payment must be submitted **prior** to commencement of operations.

| Form | Description |
| --- | --- |
| NGC-09 | License Verification |
| NGC-21 | Annual License Fee Report |

Failure to submit the required fees/taxes **prior** to commencement of operations will result in the assessment of a late filing penalty.

Please direct any questions you may have to the Tax and License Division in Carson City at (775) 684-7770.

Sincerely,

Nicole Rupert
Executive Secretary

NR:hp

cc: Tax and License Division
    Records & Research

Enclosures



**NEVADA GAMING COMMISSION**

1919 College Parkway, P.O. Box 8003
Carson City, Nevada 89702
(775) 684-7750

STEVE SISOLAK
*Governor*

NICOLE RUPERT
*Executive Secretary*

HON. JENNIFER TOGLIATTI (RET), *Chair*
ROSA SOLIS-RAINEY, *Member*
STEVEN COHEN, *Member*
OGONNA M. BROWN, *Member*
BEN KIECKHEFER, *Member*

August 25, 2022

Carson City
(775) 684-7770
Fax: (775) 684-7787

35547-01
BETFAIR INTERACTIVE US LLC
DBAS FANDUEL SPORTSBOOK
ATTN: JOHN HINDMAN
6701 CENTER DR W STE 800
LOS ANGELES CA 90045-1558

Re: Nevada Gaming Commission Approval - Operator of an Information Service License

Dear Licensee:

The Nevada Gaming Commission ("NGC"), meeting on August 25, 2022, approved your application for a license as reflected on the enclosed document. In accordance with NGC Regulation 4.080(1), this approval is void if it has not been effected within six months of the NGC's vote on this matter.

The below referenced form must be submitted using our online filing system, please see enclosure for instructions. The form along with payment must be submitted **prior** to commencement of operations.

| Form | Description |
|------|-------------|
| NGC-09 | License Verification |
| NGC-27 | Annual License Fee Report |

Failure to submit the required fees/taxes **prior** to commencement of operations will result in the assessment of a late filing penalty.

Please direct any questions you may have to the Tax and License Division in Carson City at (775) 684-7770.

Sincerely,

Nicole Rupert
Executive Secretary

NR:hp

cc: Tax and License Division
    Records & Research

Enclosures

State of New Jersey
Division of Gaming Enforcement
License No. 368-50
Vendor No. 86464
Order No. 1677
PRN 1721701

---

In the Matter of Betfair Interactive US,:
LLC, an Applicant for Initial Licensure as:          **ORDER**
a Casino Service Industry Enterprise:

Betfair Interactive US, LLC, having filed an application on July 15, 2013 for initial licensure as a casino service industry enterprise, pursuant to *N.J.S.A.* 5:12-92a(1); and the Division of Gaming Enforcement ("Division") having filed a letter report recommending that said application be granted; and the Director of the Division having considered this matter;

**IT IS ORDERED** that the application for a casino service industry enterprise license of Betfair Interactive US, LLC is **GRANTED**;

**IT IS FURTHER ORDERED** that the following entities meet the criteria for qualification set forth at *N.J.S.A.* 5:12-92b:

| NAME | POSITION |
|---|---|
| Paddy Power Betfair, PLC (#368-50-000-003) | Ultimate Parent Company and Owner |
| Betfair Group, Limited (#368-50-000-004) | Intermediary Holding Company Owner of The Sporting Exchange, Limited |
| The Sporting Exchange, Limited (#368-50-000-002) | Intermediary Holding Company Owner of TSE Holdings, Limited |
| TSE Holdings, Limited (#368-50-000-001) | Intermediary Holding Company Owner of Applicant |

**IT IS FURTHER ORDERED** that the following individuals meet the criteria for qualification set forth at *N.J.S.A.* 5:12-92b:

| NAME | POSITION |
|------|----------|
| Alexander Gersh (#368-50-002) | Chief Financial Officer, Paddy Power Betfair, PLC |
| Ian Dyson (#368-50-003) | Director (Audit Committee), Paddy Power Betfair, PLC |
| Breon Corcoran (#368-50-006) | Chief Executive Officer, Paddy Power Betfair, PLC |
| Zillah Byng-Thorne (#368-50-011) | Director (Audit Committee), Paddy Power Betfair, PLC |
| John R. Hindman (#368-50-012) | Senior Vice President and General Counsel |
| Samuel "Kip" Levin (#368-50-015) | Chief Executive Officer |
| Niall T. Connell (#368-50-019) | Senior Vice President of Commercial |
| Tanya Horgan (#368-50-022) | Director of Internal Audit, Compliance, and Risk Management |
| Elina Portman (#368-50-023) | Compliance Analyst |
| Wendy Fletcher (#368-50-024) | Senior Vice President of Finance |
| Lorcan Kelly (#368-50-025) | Director of Betfair Casino |
| Michael E. Cawley (#368-50-026) | Director (Audit Committee Chairman), Paddy Power Betfair, PLC |
| Gerrard W. "Gary" McGann (#368-50-027) | Chairman of the Board, Paddy Power Betfair, PLC |
| Edward Traynor (#368-50-028) | General Counsel and Corporate Secretary, Paddy Power Betfair, PLC |

**IT IS FURTHER ORDERED**, pursuant to *N.J.S.A.* 5:12-94h(1) and *N.J.A.C.* 13:69J-1.3B, that not later than five years from the date of this Order, Betfair Interactive US, LLC and all of its qualifiers, shall have the affirmative obligation to submit such information and

documentation to the Division, as required, to demonstrate that they continue to meet the requirements for licensure;

**IT IS FURTHER ORDERED,** pursuant to *N.J.A.C.* 13:69A-8.6(a), that the application of Paddy Power North America, Inc. (CSI #338-50/VID #83379) for casino service industry enterprise licensure is **WITHDRAWN** and that the casino service industry enterprise license application fees paid by Paddy Power North America, Inc. shall not be refundable, pursuant to *N.J.A.C.* 13:69A-9.19(b).

State of New Jersey
Division of Gaming Enforcement

Date: January 2, 2018

David L. Rebuck
Director

-3-

Distribution List:

Louis S. Rogacki, Deputy Director, Division of Gaming Enforcement
Chuck Kimmel, Deputy Attorney General, Division of Gaming Enforcement
Marianne Liwacz, Deputy Chief of Investigations, Division of Gaming Enforcement
Dan Bennett, Administrator of Investigations, Division of Gaming Enforcement
Maria Ivanic, Administrative Analyst, Division of Gaming Enforcement
DGE Records Section – File: Vendor No. 86464

Eric G. Fikry, Esq.
Blank Rome, LLP
301 Carnegie Center, 3rd Floor
Princeton, New Jersey 08540

**GURBIR GREWAL**
Attorney General of New Jersey
State of New Jersey
Department of Law and Public Safety
Division of Gaming Enforcement
1300 Atlantic Avenue
Atlantic City, New Jersey 08401

STATE OF NEW JERSEY
DIVISION OF GAMING ENFORCEMENT
ORDER NO.: TSB-FI-018-005

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF<br>"SOFT PLAY" OPERATIONS AND THE FULL<br>IMPLEMENTATION OF THE FANDUEL<br>INTERNET SPORTS WAGERING<br>PLATFORM IN CONJUNCTION WITH NEW<br>MEADOWLANDS RACETRACK | )<br>)<br>)      **ORDER**<br>)<br>)<br>) |

      New Meadowlands Racetrack, which holds a license as a race track issued by the New Jersey Racing Commission and also holds a license as a sports wagering operator issued by the New Jersey Racing Commission , has partnered with FanDuel to operate an Internet sports wagering platform. The Platform operates an online sports pool as the FanDuel sports wagering website. FanDuel entered "soft play" operations on or about September 1, 2018. FanDuel has demonstrated to the satisfaction of the Division of Gaming Enforcement (Division) that the Internet sports wagering website it has operated in "soft play" through its partnership with New Meadowlands Racetrack meets the requirements of the Casino Control Act, *N.J.S.A.* 5:12-1 *et seq.,* and attendant rules of the Division.

      I hereby **AUTHORIZE** "soft play" operations to terminate and full operations to proceed, subject to the terms and conditions imposed by the Division's Technical

Services Bureau and Regulatory Enforcement Bureau and the regulations of the Division, at anytime after 12:00 noon on September 6, 2018.

Dated: September 6, 2018

David Rebuck
Director

**Mary Stone**

| | |
|---|---|
| **From:** | Michael Golub <Michael.Golub@njdge.org> |
| **Sent:** | Monday, July 19, 2021 9:45 AM |
| **To:** | Mary Stone; Bridget Gable |
| **Subject:** | RE: FanDuel - Sports Wagering License Certificate |

To Whom It May Concern:

Please be advised that Fanduel is permitted to engage in sports wagering activity in the State of New Jersey. It currently operates two retail establishments, both at Bally's Atlantic City and Meadowlands Racetrack. IT operates an online sports wagering platform through a partnership with Meadowlands and an internet casino operation through a partnership with Golden Nugget.

The Division does not issue specific licenses to operators to engage in this operation. They are permitted to do so either under an existing license previously granted to Betfair Interactive. Please contact me if you have any further questions.

Sincerely,

Michael J. Golub
Deputy Attorney General
Division of Gaming Enforcement
Atlantic City: 609-441-7534
Trenton: 609-376-9529



**Gaming Commission**

One Broadway Center, P.O. Box 7500, Schenectady, NY 12301-7500
www.gaming.ny.gov

January 6, 2022

<span style="color:red">SENT VIA ELECTRONIC MAIL TO christian.genetski@fanduel.com</span>

Christian Genetski
Chief Legal Officer/Strategic Partnerships
FanDuel
300 Park Avenue South, 14th Floor
New York, NY 10010

Dear Christian Genetski,

On November 8, 2021, the New York State Gaming Commission (Commission), accepted the recommendation by the Evaluation Committee for licensure of Betfair Interactive US LLC dba FanDuel Sportsbook (FanDuel Sportsbook) to administer Mobile Sports Wagering as a Platform Provider and an Operator and further conditionally licensed such entity. As a result of FanDuel Sportsbook having met all statutory and regulatory thresholds to be able to conduct Mobile Sports Wagering as a Platform Provider and Operator, the Commission hereby removes the conditional status of the license.

With the granting of full licensure, FanDuel Sportsbook may launch Mobile Sports Wagering on its platform as set forth herein. Based on the consensus of operators that 24 to 48 hours' notice allows for final configuration of software, integration of third-party systems onto the platform and deploying staff essential to launch, FanDuel Sportsbook is permitted to launch Mobile Sports Wagering no sooner than January 8, 2022 at 9:00AM Eastern Time, with only wager types that the Commission has approved. The ability for FanDuel Sportsbook to launch after January 8, 2022 at 9:00AM Eastern Time is solely dependent on business capacity to do so and is not dependent on further Commission action. Please provide the Commission's Division of Gaming at least six hours' notice of launch timing by sending an email to jim.googas@gaming.ny.gov.

Sincerely,

Kristen M. Buckley
Acting Secretary to the Commission

cc:    Robert Williams
       Thomas Anapolis
       Ed Burns
       Jim Googas



**Gaming Commission**

One Broadway Center, P.O. Box 7500, Schenectady, NY 12301-7500
www.gaming.ny.gov

January 6, 2022

SENT VIA ELECTRONIC MAIL TO christian.genetski@fanduel.com

Christian Genetski
Chief Legal Officer/Strategic Partnerships
FanDuel
300 Park Avenue South, 14th Floor
New York, NY 10010

Dear Christian Genetski,

On November 8, 2021, the New York State Gaming Commission (Commission), accepted the recommendation by the Evaluation Committee for licensure of Betfair Interactive US LLC dba FanDuel Sportsbook (FanDuel Sportsbook) to administer Mobile Sports Wagering as a Platform Provider and an Operator and further conditionally licensed such entity. As a result of FanDuel Sportsbook having met all statutory and regulatory thresholds to be able to conduct Mobile Sports Wagering as a Platform Provider and Operator, the Commission hereby removes the conditional status of the license.

With the granting of full licensure, FanDuel Sportsbook may launch Mobile Sports Wagering on its platform as set forth herein. Based on the consensus of operators that 24 to 48 hours' notice allows for final configuration of software, integration of third-party systems onto the platform and deploying staff essential to launch, FanDuel Sportsbook is permitted to launch Mobile Sports Wagering no sooner than January 8, 2022 at 9:00AM Eastern Time, with only wager types that the Commission has approved. The ability for FanDuel Sportsbook to launch after January 8, 2022 at 9:00AM Eastern Time is solely dependent on business capacity to do so and is not dependent on further Commission action. Please provide the Commission's Division of Gaming at least six hours' notice of launch timing by sending an email to jim.googas@gaming.ny.gov.

Sincerely,

Kristen M. Buckley
Acting Secretary to the Commission

cc:    Robert Williams
       Thomas Anapolis
       Ed Burns
       Jim Googas



One Broadway Center, P.O. Box 7500, Schenectady, New York 12301-7500
www.gaming.ny.gov

Sent via Electronic Mail to: christian.genetski@fanduel.com

November 8, 2021

Christian Genetski
Chief Legal Officer/Strategic Partnerships
FanDuel
300 Park Avenue South, 14th Floor
New York, NY 10010

Dear Mr. Genetski,

The N.Y.S. Gaming Commission has accepted the recommendation of the Evaluation Committee established to review submissions of bidders in response to a Request For Applications for Mobile Sports Wagering Platform Providers, which advanced Sports Information Services Limited dba Kambi, and colloquially referenced as Kambi #2, and Betfair Interactive US LLC dba FanDuel Sportsbook. Accordingly, Betfair Interactive US LLC dba FanDuel Sportsbook, as part of Betfair Interactive US LLC dba FanDuel Sportsbook, has been selected to administer Mobile Sports Wagering as a Platform Provider and an Operator.

This correspondence shall be considered as the Commission-license and is conditioned upon satisfaction of all further unsatisfied requirements, and submission and approval of all regulatory requirements.

Commission staff stands ready to cooperatively work with FanDuel Sportsbook to ensure a prompt commencement of Mobile Sports Wagering operations in New York. Moving forward, please address questions and concerns regarding Mobile Sports Wagering implementation to Division of Gaming Manager of Sports Wagering Operations Jim Googas at jim.googas@gaming.ny.gov or 518-388-1266.

Sincerely,

Kristen M. Buckley

Kristen Buckley
Secretary

cc.    Robert Williams
       Thomas Anapolis
       Edmund C. Burns
       Jim Googas



One Broadway Center, P.O. Box 7500, Schenectady, New York 12301-7500
www.gaming.ny.gov

Sent via Electronic Mail to: christian.genetski@fanduel.com

November 8, 2021

Christian Genetski
Chief Legal Officer/Strategic Partnerships
FanDuel
300 Park Avenue South, 14th Floor
New York, NY 10010

Dear Mr. Genetski,

The N.Y.S. Gaming Commission has accepted the recommendation of the Evaluation Committee established to review submissions of bidders in response to a Request For Applications for Mobile Sports Wagering Platform Providers, which advanced Sports Information Services Limited dba Kambi, and colloquially referenced as Kambi #2, and Betfair Interactive US LLC dba FanDuel Sportsbook. Accordingly, Betfair Interactive US LLC dba FanDuel Sportsbook, as part of Betfair Interactive US LLC dba FanDuel Sportsbook, has been selected to administer Mobile Sports Wagering as a Platform Provider and an Operator.

This correspondence shall be considered as the Commission-license and is conditioned upon satisfaction of all further unsatisfied requirements, and submission and approval of all regulatory requirements.

Commission staff stands ready to cooperatively work with FanDuel Sportsbook to ensure a prompt commencement of Mobile Sports Wagering operations in New York. Moving forward, please address questions and concerns regarding Mobile Sports Wagering implementation to Division of Gaming Manager of Sports Wagering Operations Jim Googas at jim.googas@gaming.ny.gov or 518-388-1266.

Sincerely,

Kristen M. Buckley

Kristen Buckley
Secretary

cc.     Robert Williams
        Thomas Anapolis
        Edmund C. Burns
        Jim Googas

OHIO CASINO CONTROL COMMISSION

RESOLUTION 2022-72

**CONSIDERATION OF TWO MOBILE MANEGEMENT SERVICES PROVIDERS AND FIVE MANAGEMENT SERVICES PROVIDERS LICENSE APPLICATIONS**

**WHEREAS**, Article XV, Section 6(C) of the Ohio Constitution created the Ohio Casino Control Commission ("Commission");

**WHEREAS**, R.C. 3775.02 grants the Commission jurisdiction over all persons conducting or participating in the conduct of sports gaming authorized by R.C. Chapters 3770, 3772, and 3775;

**WHEREAS**, R.C. 3775.03 prohibits any person from operating, conducting or assisting in operating or conducting sports gaming without first being licensed by the Commission;

**WHEREAS**, R.C. 3775.02, 3775.03, 3775.041, 3775.05, 3775.051, and 3775.09, as well as Ohio Adm.Code 3775-4-01, 3775-4-05, and 3775-4-06 describe the requirements for persons seeking a mobile management services provider or management services provider license, as applicable, and the criteria the Commission uses when evaluating those applicants for licensure;

**WHEREAS**, R.C. 3775.03 and Ohio Adm.Code 3775-4-01 only permits the Commission to grant a mobile management services provider or management services provider license to an applicant once it has determined that each person in control of the applicant has met the qualifications of licensure;

**WHEREAS**, those entities listed in Exhibit A submitted a Mobile Management Services Provider or Management Services Provider License Application ("Application"), as applicable, and paid the nonrefundable application fee in compliance with the requirements under R.C. Chapter 3775 and the rules adopted thereunder;

**WHEREAS,** those entities listed in Exhibit A and their Persons in Control, submitted the information and documentation required of such individuals or entities;

**WHEREAS**, the Commission's Division of Licensing and Investigations ("Division") reviewed the Applications and other materials and information and conducted a thorough investigation of those entities listed in Exhibit A;

**WHEREAS**, the Division has filed investigative reports for those entities listed in Exhibit A ("Reports");

**WHEREAS**, the Reports conclude that the Division's investigations did not uncover any material derogatory information that would render the entities or their Persons in Control not suitable or not qualified and that those entities are eligible for licensure;

**WHEREAS**, based on the above, the Division recommends that the Commission grant

mobile management services provider or management services provider licenses, as applicable, and as described in Exhibit A, to those entities;

**WHEREAS**, the Commission has reviewed the Reports and considered this matter at its public meeting held on October 19, 2022.

**NOW, THEREFORE, BE IT FURTHER RESOLVED** that the entities listed in Exhibit A are **SUITABLE** and **ELIGIBLE** for licensure.

**BE IT FURTHER RESOLVED** that the Applications are **APPROVED** and that the licenses listed in Exhibit A are **GRANTED** for a period of 5 years, effective upon the designated Universal Start Date of January 1, 2023, subject to continued compliance with R.C. Chapter 3775 and the rules adopted thereunder and the following conditions:

(A)     These entities must ensure the payment of all fees required by the Commission, including the first installment of the nonrefundable license fees outlined in R.C. 3775.05 or 3775.051 and required by Ohio Adm.Code 3775-4-05 or 3775-4-06, as applicable, by December 1, 2022, with each subsequent installment fee paid by the anniversary date of the effective date of the license;

(B)     These entities must ensure a surety bond is posted as required by and in the amount required by Ohio Adm.Code 3775-4-05 or 3775-4-06, as applicable, by December 1, 2022;

(C)     These entities must provide a complete and executed contract with their application-specified sports gaming proprietor partner that meets the requirements in R.C. 3775.05 or 3775.051 and Ohio Adm.Code 3775-4-05 or 3775-4-06, as applicable, by December 1, 2022;

(D)     These entities must provide to the Commission final and approved versions of the regulatory compliance documents referenced in Question 5 of the Application at least sixty calendar days before launching any applicable type of sports gaming and prepare all equipment or systems for Commission verification, as described in that Question, at least thirty calendar days before launching the applicable type of sports gaming;

(E)     These entities' current Persons in Control must obtain provisional or plenary key sports gaming licenses prior to January 1, 2023; and

(F)     The failure to comply with conditions (A), (B), (C), (D), or (E) of this paragraph within the specified time periods, unless extended by the Commission's Executive Director, will render these application approvals null and void.

**BE IT FURTHER RESOLVED** that Resolution 2022-72 does not in any way affect, negate, or otherwise absolve any entity or its Persons in Control from their duties to update information in accordance with R.C. 3775.03 and Ohio Adm.Code 3772-4-

2

01.

**BE IT FURTHER RESOLVED** that Resolution 2022-72 does not restrict or limit the Commission's future exercise of authority and discretion with respect to imposing additional conditions or taking further action upon any entity or its Persons in Control under R.C. Chapter 3775 and the rules adopted thereunder.

Adopted: October 19, 2022

3

**Exhibit A**

1. Penn Sports Interactive, LLC (Barstool) – One Mobile Management Services Provider License; Four Management Services Provider Licenses

2. Betfair Interactive US, LLC (FanDuel) – One Mobile Management Services Provider License; One Management Services Provider License

**Statement of Conditions for Sports Wagering Operator**
**Betfair Interactive US, LLC, License #111487-3**

Christian Genetski, Chief Legal Officer, FanDuel Group, Inc., having been duly authorized to legally bind Betfair Interactive US, LLC, hereby expressly accepts, agrees and stipulates to the following conditions for the Sports Wagering Operator License approved for Betfair Interactive US, LLC by the Pennsylvania Gaming Control Board ("Board") on February 10, 2021, pursuant to the Act of October 30, 2017 (P.L. 419, No. 42), amending and expanding the Act of July 5, 2004 (P.L. 572, No.71), known collectively as the Pennsylvania Race Horse Development and Gaming Act (the "Act").

**Note:  The licensee is responsible for reporting compliance with any of the following conditions if/when it occurs to the Bureau of Licensing unless another Bureau is otherwise noted in this document.**

## <u>Standard Conditions</u>:

1.  To at all times comply with any and all provisions of the Act, as amended, and any rules, regulations, technical standards, orders, Statement of Conditions and, if required by the Board, an amended Statement of Conditions to reflect any amendments to the Act or the passage of any gaming-related legislation, commitments made to the Board in writing and/or under oath and to immediately inform the Board of any actions which they know or suspect constitute a violation of the Act or any rules, regulations, technical standards or orders in effect as of this date or later amended or promulgated by the Board.

2.  To at all times comply with all applicable Federal laws governing the conduct of sports wagering and interstate commerce.

3.  To not enter into any sale, lease, contract or other type of agreement associated with sports wagering in the Commonwealth of Pennsylvania with any person other than a person licensed, if required, in the Commonwealth of Pennsylvania

4.  To acknowledge and agree that any license, permit or other authorization issued by the Board to Betfair Interactive US, LLC, its principal affiliates, subsidiaries, principals, key employees, permittees, and registrants is a non-transferable, revocable privilege to engage in activities regulated by the Board.

5.  To exercise due diligence to ensure that at all times, Betfair Interactive US, LLC, its principal affiliates, subsidiaries, principals, and key employees meet and maintain the suitability requirements of the Act, including but not limited to, those relating to good character, honesty, integrity and financial fitness.

6.  To promptly reimburse the Board for all costs associated with any background or other investigation conducted in connection with any application filed by or associated with Betfair Interactive US, LLC, its principal affiliates, subsidiaries, principals, key employees, permittees, and registrants and to promptly pay any other fine, fee, sanction or assessment imposed by the Board or the Department of Revenue.

7.   To discontinue as expeditiously as possible the use of a particular advertisement, promotion or program upon receipt of written notice that the Board or Board staff has determined that the use of the particular advertisement, promotion or program in or with respect to Pennsylvania could adversely impact the public or the integrity of sports wagering.

8.   To ensure at all times that the information provided to the Board by Betfair Interactive US, LLC, its principal affiliates, subsidiaries, key employees, principals, permittees and registrants, is true and correct, and to immediately notify the Board upon knowing or suspecting that any false or misleading information may have been provided to the Board by any such entity or individual.

9.   To immediately notify the Board, except as expressly prohibited by law, upon learning of:
   a.   the charging, indictment or conviction of Betfair Interactive US, LLC, or any of its principal affiliates, subsidiaries, principals, key employees or permittees, for any felony or gambling offense, and upon conviction to request the withdrawal of any pending application filed on behalf of any such person, and, if applicable, to cause the divestiture of any such person.
   b.   any formal written inquiry, review or investigation by any law enforcement authority, regulatory agency or self-regulatory organization or of any action filed by any governmental authority against Betfair Interactive US, LLC or any of its affiliates or against any of its principals or key employees.
   c.   any arrests or citations issued for any violations or offenses enumerated under 18 Pa.C.S. (relating to crimes and offenses) or any similar offense under the laws of another jurisdiction.

10.   To ensure that Betfair Interactive US, LLC, its principal affiliates, subsidiaries, principals, key employees, permittees, and registrants provide any requested assistance or information required by the Board, the Pennsylvania Department of Revenue, or the Pennsylvania State Police and cooperate in any inquiry, investigation or hearing.

11.   To immediately notify the Board if any person identified in the verification submitted pursuant to *Quarterly Condition Q1*, who was required to be found suitable, fails to be or remain suitable to hold a license, permit, or other authorization issued by the Board, and, if applicable, to cause the divestiture of any such person and to request the withdrawal of any pending application filed on behalf of any such person.

12.   To cause any person identified in the verification submitted pursuant to *Quarterly Condition Q1* who has not filed the appropriate application with the Board, to file the appropriate application along with all other information and fees required by the Board, or, if applicable, to cause the divestiture of any such person or to request the withdrawal of any pending application filed on behalf of any such person.

13.   To submit to the Board, within 15 days of the execution of this Statement of Conditions, details of what policies and procedures Betfair Interactive US, LLC has established for investigating the background of all employees, including individuals who are not required to obtain a license, permit or registration from the Board.

14. To register and comply with the requirements of the Pennsylvania Department of Revenue, the Pennsylvania Department of Labor and Industry and the Pennsylvania Department of State, as required by state law.

15. To notify the Board, on a confidential basis, prior to or immediately upon becoming aware of any impending change of control.

    For purposes of this condition, a change of control of a sports wagering licensee will be deemed to have occurred when a person or group of persons acquires: (1) more than 20% of a sports wagering licensee's securities, assets or other ownership interests; (2) more than 20% of the securities or other ownership interests of a corporation or other form of business entity that owns directly or indirectly at least 20% of the voting or other securities or other ownership interests of the sports wagering licensee; or (3) any other interest in a sports wagering licensee which allows the acquirer to control the sports wagering licensee.

16. To provide written information about sports wagering rules, payouts or winning wagers as well as a clear explanation of all types of wagers permitted by the Board and events on which those wagers are permitted and other information as the Board may require and to make this information available to the public and patrons as determined by the Board.

17. To comply with 4 Pa.C.S. § 13C02(8)(ii) and provide specifications approved by the board under 4 Pa.C.S. § 1207(11) of the Act (relating to regulatory authority of board) to integrate and update the licensed facility's surveillance system to cover all areas in the licensed facility where sports wagering is conducted. The specifications shall include provisions providing the board and other persons authorized by the board with onsite access to the surveillance system or its signal.

18. To ensure that visibility of each sports wagering area in the licensed facility of the sports wagering certificate holder is not obstructed in any way that could interfere with the ability of the sports wagering certificate holder, the board and other persons authorized under the Act or by the board to oversee the surveillance of the conduct of sports wagering.

19. To only conduct sports wagering at a licensed facility, a temporary facility authorized under 4 Pa.C.S. § 13C21(b), an area authorized under 4 Pa.C.S. § 13C21(c) or through an Internet-based system as approved by the Board.

20. To ensure that sports wagering platforms and systems adhere to the requirements of 58 Pa Code § 809 (relating to interactive gaming platform requirements—temporary regulations) and that sports wagering interactive systems must adhere, where applicable, to the requirements of 58 Pa Code § 810 (relating to interactive gaming testing and controls—temporary regulations), pursuant to 58 Pa Code § 1407.8.

21. To ensure that protections are in place to guard against persons under 21 years of age from participating in sports wagering.

22. To ensure the use of an integrity monitor to assist in protecting against and identifying suspicious or illegal sports wagering activities.

23. To ensure the use of a risk manager to assist in managing the risk and liabilities associated with operating a sportsbook.

24. To maintain copies of Betfair Interactive US, LLC's Operator License, Statement of Conditions, and approval of the designated sports wagering area as required by 58 Pa. Code § 809.3, readily accessible for examination and inspection by any agent, employee or representative of the Board, the Department of Revenue or the Pennsylvania State Police.

25. To at all times comply with the interactive gaming system requirements approved by the Board pursuant to 58 Pa. Code §§ 1407.8(a) & 809.6 and any Board requirements with regard to changes or amendments. Betfair Interactive US, LLC expressly agrees to create and implement a methodology (for example, cryptographic controls) approved by the Board to ensure secure communications between a player's device and the interactive gaming system.

26. To ensure that protections are in place to comply with the geolocation requirements approved by the Board pursuant to 58 Pa. Code §§ 1407.8(a) & 809.7 and any Board requirements with regard to changes or amendments. In addition, to ensure that mechanisms are in place to detect the physical location of a player as frequently as specified in the Board's technical standards and the interactive gaming certificate holder's or interactive gaming operator licensee's approved internal controls submission to ensure players placing sports wagering bets are located in this Commonwealth.

27. To at all times comply with the security policy requirements approved by the Board pursuant to 58 Pa. Code §§ 1407.8(a) & 809.8 and any Board requirements with regard to changes or amendments. Betfair Interactive US, LLC expressly agrees to adopt and maintain a Board-approved information security policy which describes the certificate holder's or licensee's approach to managing information security and its implementation. This policy is required in addition to any similar requirements that may be imposed as part of the certificate holder's or licensee's internal controls.

28. If applicable, to intelligently, knowingly and voluntarily execute an indemnification agreement in a form prescribed by the Board. If required, the indemnification agreement shall be executed no later than 30 days following the execution of this Statement of Conditions.

29. To adopt standards to protect the privacy and security of registered players engaged in sports wagering.

30. To maintain all books, records and documents pertaining to sports wagering in a manner and location as required by the Board.

***All correspondence regarding Conditions 31-34 should be sent directly to the Bureau of Gaming Laboratory Operations.***

31. To ensure that sports wagering devices utilized by Betfair Interactive US, LLC have been submitted to and tested by the Bureau of Gaming Laboratory Operations and approved by the Board.

32. To ensure that all sports wagering devices utilized by Betfair Interactive US, LLC, and any modification thereto, are configured and operate in compliance with the Act, and any rules, regulations, technical standards or orders in effect as of this date or later amended or promulgated by the Board.

33. To immediately notify the Board with regard to sports wagering devices, in such manner and in such form as the Board shall prescribe, of the following:
    a. Any known or suspected defects or malfunctions.
    b. Any known lawsuit or regulatory investigation that involves an allegation or suspicion of a utilized defect or malfunction.
    c. Any known or suspected noncompliance with the Act or the rules, regulations, technical standards or orders in effect as of this date or later amended or promulgated by the Board.
    d. Any known or suspected failure to comply with any provision of this Statement of Conditions.

34. Betfair Interactive US, LLC acknowledges that sports wagering devices are tested and approved in a laboratory environment. Betfair Interactive US, LLC expressly agrees to immediately comply with any Board request to discontinue the use of any sports wagering devices. Betfair Interactive US, LLC further expressly agrees to: (1) implement any system upgrade approved by the Board in accordance with a timeline specified by the Board; (2) immediately implement procedural revisions in its system of controls, should Board review of the sports wagering devices in a live environment, or subsequent compliance audit or financial audit results, support the need to discontinue the use of a sports wagering device; and (3) install a system upgrade or modify a procedure as a means of insuring the integrity of sports wagering and/or its compliance with the Act, the regulations and technical standards in effect as of this date or as later amended.

***All correspondence regarding Condition 35 should be sent directly to the Bureau of Gaming Operations.***

35. To at all times comply with the system of internal controls and audit protocols approved by the Board pursuant to 58 Pa. Code § 1408.3 and any Board requirements with regard to changes or amendments in this system of internal controls. Betfair Interactive US, LLC acknowledges that the initial system of internal controls required under 58 Pa. Code § 1408.3 will be reviewed and approved in concept form prior to the commencement of sports wagering operations. Betfair Interactive US, LLC agrees to immediately implement any revisions to its system of internal controls requested by the Board should review of the system as implemented, or subsequent compliance audit or financial audit results support the conclusion that the controls are not in compliance with the Act, the regulations or technical standards in effect as of this date or as later amended.

*All correspondence regarding Conditions 36-37 should be sent directly to the Office of Compulsive and Problem Gambling ("OCPG").*

36.  To ensure that prior to the commencement of interactive sports wagering operations in Pennsylvania, the Certificate Holder's Interactive Gaming Compulsive and Problem Gambling Plan was submitted to and received approval from the Director of the Office of Compulsive and Problem Gambling and to agree to compliance with the policies and procedures provided therein.

37.  To ensure that prior to the commencement of land-based sports wagering operations in Pennsylvania, the Certificate Holder's current Compulsive and Problem Gambling Plan was amended and received amendment approval from the Director of the Office of Compulsive and Problem Gambling and to agree to compliance with the policies and procedures provided therein.

*All correspondence regarding Conditions 38-41 should be sent directly to the Financial Investigations Unit ("FIU") and the Bureau of Licensing ("BOL"). The following submissions can be made exclusively in electronic format.*

38.  Betfair Interactive US, LLC shall execute, as requested and in a timely manner, authorization for members of the Board or their duly authorized representatives to have access to and review any and all work papers and documents associated with any work completed in connection with an audit or other engagement performed by an independent certified public accountant or an independent registered public accounting firm for Betfair Interactive US, LLC.

39.  Betfair Interactive US, LLC shall submit a copy of the federal and Pennsylvania tax returns that includes the information for reporting the operations of Betfair Interactive US, LLC. The copy of each return shall be submitted within 5 days of the date on which the returns was filed with the federal government or the Commonwealth of Pennsylvania. The copy of each return shall include all forms, statements and attachments to the return as filed. If at any time subsequent to the initial filing, an amended return is filed, full copies of the amended returns shall be submitted to FIU and BOL within 5 days of the amended filing.

40.  Betfair Interactive US, LLC shall provide, in a timely manner, to the Board or their duly authorized representatives any and all reports associated with any work completed in connection with an audit, review, test, or other engagement performed on the internal controls and/or system tests by a contracted 3rd party for Betfair Interactive US, LLC.

41.  Betfair Interactive US, LLC shall execute, as requested and in a timely manner, authorization for members of the Board or their duly authorized representatives to have access to and review any and all work papers and documents associated with any work completed in connection with an audit, review, test, or other engagement performed on the internal controls and/or system tests by a contracted 3rd party for Betfair Interactive US, LLC.

*All correspondence regarding Condition 42 should be sent directly to the Office of Diversity.*

42.  To develop, implement, and provide a Diversity Plan to the Board, in accordance with the Act and its regulations, which demonstrates that Betfair Interactive US, LLC has made a good faith effort to ensure that all persons are accorded equality of opportunity in employment and contracting by the licensee, its contractors, subcontractors, assignees, lessees, agents, gaming service providers and suppliers.

## <u>Quarterly Conditions</u>:

Q1.  To submit to the Board, in such manner and in such form as the Board shall prescribe, on the twentieth day of the month following the end of each calendar quarter, a verification executed by Betfair Interactive US, LLC's chief compliance officer, identifying all principals and key employees, including name and title, and all persons who hold an ownership or other beneficial interest in Betfair Interactive US, LLC and any such interest in any of its principal affiliates, and subsidiaries required to be licensed or permitted in Pennsylvania; provided however, if any of the principal affiliated entities are publicly traded, only interests equal to or exceeding five percent must be disclosed pursuant to this condition.  Ownership interest should be provided in a manner consistent with the Ownership Interest Report found on the Board's website.

Q2.  Except as otherwise required by Condition 33 regarding defects or malfunctions in any sports wagering devices, Betfair Interactive US, LLC shall provide to the Board, in such manner and in such form as the Board shall prescribe, on the twentieth day of the month following the end of each calendar quarter, a list of any and all pending litigation where the amount in controversy exceeds $100,000 wherein Betfair Interactive US, LLC, or any of its affiliates is named as a party.

Q3.  To submit to the Board, in such manner and in such form as the Board shall prescribe, on the twentieth day of the month following the end of each calendar quarter, a list identifying all of the licensed entity representatives that represented or otherwise acted on the Betfair Interactive US, LLC's behalf in the preceding quarter in Pennsylvania.

## <u>Annual Conditions</u>:

A1.  To submit to the Board, in accordance with 4 Pa.C.S. § 1207(4) of the Act, one copy of its audited annual financial statements, together with any management letter, written report, or other written communications prepared thereon, not later than 90 days after the end of its fiscal year.

I certify and affirm, subject to the penalties of 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities) that I am authorized to act on behalf of the licensee.  I also certify and affirm that I have read and fully understand the foregoing Statement of Conditions and acknowledge that my signature below shall legally bind Betfair Interactive US, LLC and Christian Genetski, Chief Legal Officer, FanDuel Group, Inc.

Betfair Interactive US, LLC

By:

Christian Genetski, Chief Legal Officer,
FanDuel Group, Inc.

Dated:  2/10/21

***These conditions will remain in effect until or unless amended by the Board.***

| | |
|---|---|
| **From:** | Midgley, Jennifer (PGCB) |
| **To:** | Mary Stone |
| **Subject:** | RE: [External] FanDuel - Entity License Renewals |
| **Date:** | Monday, March 1, 2021 1:38:14 PM |
| **Attachments:** | image001.png |

Mary,

Betfair was fully approved on 2/10/2021, which means they no longer have a conditional license. The new expiration dates are 2/9/2026.

---

**From:** Mary Stone <mary.stone@fanduel.com>
**Sent:** Monday, March 1, 2021 11:35 AM
**To:** Midgley, Jennifer (PGCB) <jmidgley@pa.gov>
**Subject:** [External] FanDuel - Entity License Renewals

***ATTENTION:*** *This email message is from an external sender. Do not open links or attachments from unknown sources. To report suspicious email, forward the message as an attachment to* *CWOPA_SPAM@pa.gov*.

Morning Jenn,

I am reviewing our entity licensing documents and found that it looks like our PA licenses are up for renewal 03/05/2021(sports wagering) and 04/16/2021 (iGaming). I know we recently issued our Statement of Conditions for our full license, so I wanted to see if that reset our renewal dates for the entity licenses. If not, then could you please point me in the right direction to how best to renew these licenses?

Thank you,
**Mary Stone**
Regulatory Compliance Manager, Licensing
Cell: 843.819.3346
Email: mary.stone@fanduel.com







# Licensing Verification

## Search Licensing

**First Name**

First Name

**Last Name**

Last Name

**Date Of Birth**

[            ] 📅 (mm/dd/yyyy)

**Entity Name**

Betfair

[ 🔍 Search ]

| Full Name | License Status | License Status Date | License Type | Expiration Date |
|---|---|---|---|---|
| Betfair Interactive US LLC | Approved for Licensure | 5/15/2019 | Affiliate | 5/14/2024 |
| Betfair Interactive US LLC, DBA: FanDuel | Approved for Licensure | 2/10/2021 | iGaming Operator | 2/9/2026 |
| Betfair Interactive US LLC, DBA: FanDuel | Approved for Licensure | 2/10/2021 | Sports Wagering Operator | 2/9/2026 |
| Betfair Group Limited | Approved for Licensure | 2/10/2021 | Affiliate | 2/9/2026 |

### COMMONWEALTH OF PENNSYLVANIA
### Pennsylvania Gaming Control Board



# TENNESSEE SPORTS
# GAMING OPERATOR
## L I C E N S E

**Betfair Interactive US, LLC**
**LICENSEE OFFICIAL NAME**

**FanDuel**
**LICENSEE DBA**

**10/24/2022**
**EFFECTIVE DATE**

**10/23/2023**
**EXPIRATION DATE**

**20-10002**
**LICENSE NUMBER**

This License is granted by the Tennessee Sports Wagering Advisory Council pursuant to the Tennessee Sports Gaming Act, §§ 4-49-101 et seq., and is granted subject to Licensee's continued compliance with the Act and Rules of the Sports Wagering Advisory Council. This License shall not be assignable or transferable except as set forth in SWAC Rule 1350-01-.14 and is only valid through the expiration period as provided above.

**Mary Beth Thomas**
Executive Director

**10/24/2022**
DATE

# THE VIRGINIA LOTTERY

This certifies that

*Betfair US Interactive, LLC. in conjunction with the Washington Football Team*

has been issued sports betting permit P-#004.

Date of Issuance: January 20, 2021          Date of Expiration: January 20, 2024





Kevin Hall, Executive Director



**WASHINGTON STATE**

**GAMBLING COMMISSION**



**ISSUED TO:**

**FANDUEL SPORTSBOOK**
**BETFAIR INTERACTIVE US LLC**
**6701 CENTER DR W STE 1000**
**LOS ANGELES  90045**
**US**

**LICENSE FOR:     10-00075**

| LICENSE NUMBER | TYPE | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|---|
| 80-00018 | Sports Wagering Pre-Licensing Investigation | 01/14/2022 | 12/31/2022 |
| 81-00009 | Major Sports Wagering Vendor | 01/14/2022 | 12/31/2022 |

**DISPLAY AT:**

**FANDUEL SPORTSBOOK**
**6701 CENTER DR W STE 1000**
**LOS ANGELES  90045**
**US**

Interim Director

GC5-150A (Rev. 2/13)

* * * * **ATTENTION** * * * *
See important notices on reverse side.

*Our Mission*

*Protect the Public by Ensuring that Gambling is Legal and Honest.*

**WAC 230-06-065  DISPLAY COPIES OF ALL LICENSES OR HAVE THEM PRESENT ON BUSINESS PREMISES.** (1) Licensees must prominently display all gambling activity licenses or permits we have issued in the gambling area of their business premises.

(2) Licensees must have these licenses and permits ready for inspection by us, other law enforcement, and the public at all times.

**WAC 230-05-124 Quarterly License Fees and License Reports.** All licensed organizations must submit quarterly license fees and license reports to us for each licensed gambling activity beginning with the first quarter of their license year. The quarterly license fee is due with the quarterly license report. The quarterly license reports must be in the format we require and must:

(1)

| Cover the period: | Be received by us no later than: |
|---|---|
| January 1 through March 31 | April 30 |
| April 1 through June 30 | July 30 |
| July 1 through September 30 | October 30 |
| October 1 through December 31 | January 30 |

(2) Be received online at our administrative office or postmarked no later than the dates indicated in the table in subsection (1) of this section; and

(3) Be submitted even if there is no quarterly license fee payable to us; and

(4) Be accurate; and

(5) Be completed by the highest ranking executive officer or a designee. If someone other than the licensee or an employee prepares the report, the preparer must include his or her name and business telephone number on the report; and

(6) Be submitted for any period of time the license was valid, even if there was no gambling activity or the gambling license was not renewed.



# Sports Wagering Management Services Provider License

## Betfair Interactive US, LLC
## dba: FanDuel Sportsbook

is fully licensed under the provisions of West Virginia Code §29-22D-1 et seq. is therefore permitted to provide services thereunder.

Valid from **August 10, 2022** to **August 10, 2023**

John A Myers, Director

License No. **SWP 002**

# State of Wyoming

## Wyoming Pari-Mutuel Commission



**Governor**

**Mark Gordon**

**Executive Director**

**Charles E. Moore**

## BetFair Interactive US LLC, dba Fanduel Sportsbook

### Permit No. 21-003

This is to certify that BetFair Interactive US LLC, dba Fanduel Sportsbook, of Los Angeles, CA, is hereby granted an Online Sports Wagering Operator permit, specifically authorized by the Commission, in accordance with Wyoming Laws and Wyoming Pari-Mutuel Commission Rules governing Online Sports Wagering, made effective November 19, 2021.

*Charles E. Moore*

—————————————————————————

Charles E. Moore – Executive Director

Expiration Date:    November 18, 2026